**UNITED STATES DISTRICT COURT**
**Northern District of California**
**450 Golden Gate Avenue**
**San Francisco, California 94102**
────────────────
www.cand.uscourts.gov

Richard W. Wieking                                                    General Court Number
Clerk                                                                          415.522.2000

July 18, 2008

RE:  CV 08-3429 MMC          Michael Tyrone Johnson v. John Marshall

MANUAL FILING NOTIFICATION

This filing is in paper or physical form only, and is being maintained in the case file in the
Clerk's office.  For information on retrieving this filing directly from the court, please see the
court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions
(FAQ).

 This filing was not e-filed for the following reason(s):

[✔ ] Voluminous Document (PDF file size larger than the e-filing system allows)

[ ] Unable to Scan Documents

[ ] Physical Object (description): _____

[ ] Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media

[ ] Item Under Seal

[ ] Conformance with the Judicial Conference Privacy Policy (General Order 53).

[ ] Other (description): _____

RICHARD W. WIEKING, Clerk

by_____
Deputy Clerk

# ORIGINAL PART 1

# Table of Contents

Proof of Service                                               1.

Petition For Writ Of Habeas Corpus                            2.

   Claim One - Denied 6th Amendment Right           6, 7.
     To Impartial Jury

   Claim Two - Actual Innocence                    6-14.

   Claim Three - Cumulative Errors Denied         6-47.
    A Fair Trial

   Direct Appeal Issues                           48, 49.

   In Forma Pauperis                              52-57.

   Supreme Court of California - Denial            58.

   Supreme Court of California - Petition         59-89.
    For Writ Of Habeas Corpus

   Trial Transcripts - Confabulation              90-95.
    Proofs; Recovered Memory will
    Be Perfectly Accurate, Or Not
    At All.

   Exhibit H - Emergency Protective              96-106.
    Order; proof "I don't remember"

   E.P.O. - proof; "contradictory state-         108-116
    ments by prosecutrix" NO violence
    in relationship

   Trial Transcript - "nothing thrown at          117
    prosecutrix"

Table of Contents (con't)

Trial Transcript - missing witness,    118-123.
Jasmine Kanaser; more evi-
dence prosecutrix doesn't re-
member, "was she dragged or pick-
ed-up?"

Trial Transcript - more evidence    124-129.
prosecutrix "doesn't remember",
even, "she wasn't blind"; more
prevarication

Trial Transcript - prosecutrix con-    130-134.
tradicts, she met defendant
"at the door" at Friday's

Trial Transcript - prosecutrix con-    135-137.
tradicts time she spoke with
witness, "5:00-6:00 or 8:00?"

Trial Transcript - prosecutrix does    138
not remember; she testifies, she
got the information from pictures;
more confabulation

Trial Transcript - comparison(s)    139-159
demonstrate, prosecutrix doesn't
remember even anything about
what happened

Trial Transcript - "who is Joe    160.
Bevvans?"

# Table of Contents

Trial Transcript - foundation for          161.
  "audio tapes"

Trial Transcript - first respondent         162
  Doctor, Graig Hoffman

Trial Transcript - foundation for
  text messages not admitted;             163-164
  why not?

Trial Transcript - foundation of           165
  abuse by Father; why excised?

Attachments - All State Appeals, Direct    166-
  and Habeas Corpus                        End.

ORIGINAL

Name *Michael Johnson*

Address *P.O. Box 8103*

*San Luis Obispo CA*

*93403-8103*

CDC or ID Number *F06081*

RECEIVED

NOV 19 2007

CLERK SUPREME COURT

MC-275

SUPREME COURT

FILED

DEC 6 2007

Frederick K. Ohlrich Clerk

_____
Deputy

*Supreme Court of*

*California*

(Court)

---

*Michael Tyrone Johnson*

Petitioner

vs.

*John Marshall - Warden*

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

# S158827

(To be supplied by the Clerk of the Court)

No. _____

*(Lower Court Case No.'s*
*A116950, SC58720(2))*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 (Rev. July 1, 2005)

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60[a]

American LegalNet, Inc.
www.USCourtForms.com

*61*

VERIFICATION – 446, 2015.5 C.C.P.)

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

am the party of the above entitled actions, a citizen of the United States, over the age of eighteen years  and a resident
of San Luis Obispo County. My current address is:

*Michael Johnson* CDC No. *F06081*
California Men's Colony-West
P.O. Box 8103    Unit *1*  Dorm *4*  Bed *37LL*
San Luis Obispo, California  93403-8103

CERTIFY (OR DECLARE), UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND
CORRECT. EXECUTED ON *NOV 16*  , 20 *07* AT SAN LUIS OBISPO, CALIFORNIA, 93403-8103

PETITIONER.
*Michael Johnson*

..........................................................................

PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

AM A RESIDENT OF SAID COUNTY, OVER THE AGE OF EIGHTEEN YEARS, AND NOT A PARTY TO THE ABOVE
ENTITLED ACTION. MY STATE PRISON ADDRESS IS:

*Reva Johnson Hall*  )     ~~Michael Johnson~~ CDC No. ~~F06081~~
*368 Imperial Way*   )     ~~California Men's Colony-West~~
*#105 Daly City Ca*  )     ~~P.O. Box 8103    Unit 1  Dorm 4  Bed 37LL~~
*94015*              )     ~~San Luis Obispo, California  93403-8103~~

ON *11/16*  , 20 *07* , I SERVED THE WITHIN *Petition for Writ of Habeas*
*Corpus / Exhibits*

ON THE PARTY: *Supreme Court of California*

IN SAID ACTION, BY PLACING A TRUE COPY THEREOF IN A SEALED ENVELOPE WITH POSTAGE THEREON
PREPAID, IN THE UNITED STATES MAIL, AT CALIFORNIA MEN'S COLONY, SAN LUIS OBISPO, CA, 93403-8103,
ADDRESS AS FOLLOWS:

*350 McAllister Street*
*San Francisco CA*
*94102-7303*

I DECLARE, UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED
ON *11/16*  , 20 *07* , AT SAN LUIS OBISPO, CALIFORNIA

SIGNATURE OF DECLARANT
*Reva Johnson Hall*

(REV. 9/02)

# TABLE of CONTENTS

Proof of Service                                                    i
Petition for Writ of Habeas Corpus                                 1 - 53
Attachment A _
    Petition for Review, Denial, Sept. 12, 2007
    Petition for Writ of Habeas Corpus, Denial,
        May 30, 2007
    Direct Appeal, Denial, May 30, 2007,
        with Opinion, pp. 1-48
    Petition for Rehearing, Brief, A112322,
        pp. 1-6
    Petition for Review, Brief, S154179,
        pp. 1-41
Attachment B _
    Attorney Letter to Probation Dept.
    Judicial Counsel Form MC-002, with
        Associate Rules, Questionair
Attachment C _
    Original Petition for Writ of Habeas
        Corpus, A116950, pp. 1-264

RECEIVED

NOV 1 9 2007

CLERK SUPREME COURT

62

**This petition concerns:**

- ☒ A conviction
- ☐ A sentence
- ☐ Jail or prison conditions
- ☐ Other (specify): _____
- ☐ Parole
- ☐ Credits
- ☐ Prison discipline

1. Your name: _Michael Tyrone Johnson_

2. Where are you incarcerated? _California Men's Colony-West_

3. Why are you in custody? ☒ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   _Assault with force, with great bodily injury_

   b. Penal or other code sections: _§ 245(a), § 12022.7_

   c. Name and location of sentencing or committing court: _Superior Court of San Mateo_
   _400 County Center, Redwood City, CA 94063-1655_

   d. Case number: _SC58720(a)_

   e. Date convicted or committed: _6 November, 2005_

   f. Date sentenced: _7 December, 2005_

   g. Length of sentence: _7 years_

   h. When do you expect to be released? _11 October, 2011_

   i. Were you represented by counsel in the trial court? ☒ Yes.  ☐ No. If yes, state the attorney's name and address:

   _Steven Chase, 421 Grand Ave. Suite A 3. San Francisco_
   _CA 94080-3635_

4. What was the LAST plea you entered? (check one)

   ☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

MC-275 [Rev. July 1, 2005]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page two of six

## Statement About Case

Petitioner is convicted of a crime he did NOT do; petitioner did not accept a no prison term deal by prosecutor because he is innocent! The injury to petitioner's girlfriend which occurred was a result of an accidental fall, cause being a medical condition unknown to petitioner at the time. Petitioner's girlfriend suffered "complete" memory loss from the accident. There were family issues in Paolina's life, one of which was her father's dislike of petitioner. This driving force, along with police involvement, other's in Paolina's life; then, relationship failure with petitioner, resulted in prosecution; a "recovered memory" case. Paolina's memory was NOT her's, but a "confabulation" of those around her, who believed it wasn't an accident. Petitioner gave his defense attorney all the facts he knew about what happened and to the police, same; he [d]idn't cause Paolina's injuries, but came to her aid, immediately, did what a boyfriend and any respectable citizen would, took her to the Hospital. After indictment, defense attorney Chase took-over, petitioner now an adversary, a defendant.

Petitioner's defense was lacking because evidence (in the form of inconsistent statements made by Paolina) and, credible witnesses that

63

Statement About Case (con't.)

refute things Paolina said, all NEVER made it to the evidence table. In Exhibit, petitioner's Petition for Writ of Habeas Corpus, are [s]ome of which defense attorney Chase did NOT introduce at Trial *Petitioner has "highlighted" IMPORTANT issues/conversations. Credible witnesses, as Jose Villa (who would have demonstrated Paolina's memory not so good) and, Ron Haysbert (who would have placed Paolina at petitioner's work instead of taking a nap, then waking-up to her memory recollection) were NOT subpoenaed. * Ron Haysbert gave his Statement to Brian Wright and Detective Neary of South San Francisco, Police Department. Attorney Chase did NOT discredit Paolina's testimony when he very well could have. Was Paolina under sedation when her supposed statements were made? How come the police photo's don't match her testimony of her bruised face, swollen, black and blue eye? And, where is the object that she said was thrown at her? If Paolina was dragged by her feet as she said, where is the blood trail? There were NO photo's of bruises to Paolina's midsection, where she said she was kicked. There was NO medical evidence that petitioner stepped on Paolina's head, petitioner did NOT. There was credible evidence of Paolina being abused by her father; reason, how and why she could be subjucated by him, and Police. Abuse victims

63A

## Statement About Case (con't.)

are easily persuaded and this occurred; petitioner has included such evidence in his habeas Exhibits. Noteable and striking in contrast, NOT how domestic abusers act/talk, is petitioner's "patience with Paolina" which, demonstrates petitioner is NOT abusive. Reader of Exhibits will observe Paolina's opposite demeanor, she is agressive, accusatory, and volatile. Defense attorney Chase did NOT develope all the aforementioned exculpatory facts; so many inconsistancies in Paolina's statements made over the months before petitioner's Trial. ALL credible evidence which discredit henessay statements allowed into trial. Was it infusion? Paolina over the months before indictment, said, Officer McHale wanted "to take me down". Petitioner's Mother's testimony was NOT allowed as heresay, yet other heresay testimony was; why? Prosecutor was allowed to say, "There is no evidence of a seizure" yet, Dr Forte was NOT allowed to testify about Seizure. Trial court just allowed prosecutor her opinion un sup-ported by her credential in Medicine. Paolina's "stiff legs" was crucial evidence NOT allowed, evidence of a seizure!

   Petitioner cared, loved, his girl friend, Paolina, but now post mortem see's her personality disorder, and the Evidence (in Exhibit

64

*Statement About Case (con't.)*

this Petition) is poignantly so, a woman scorned.
Had we married, the accident which occurred,
would have remained an accident. Paolina re-
membered what "people" wanted her to remember
Had we gone-on to-be married, she would
NOT have been persuaded. Paolina was abused
by her father, a long time! In Exhibit, find
her statement to her father, "the truth hurts".
Paolina prevaricated; a cause and effect,
built-in character trait, to fight-back as
it were; transference from her abuse. Petition
er is serving-time, convicted of a crime that
NEVER happened. It was an Accident.

64A

6. **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

denied Sixth Amendment trial as of right (1) Jury selection procedure deficient (2) ineffective assistance of counsel without Batson-Wheeler Motion (3) equal protection under the law

a. **Supporting facts:**
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time (when) or place (where). *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

the Sixth Amendment requires that the Jury venire from which the petit jury is selected represent A fair cross-section of the community. Taylor vs Louisiana, 419 U.S. 522, 528-29 (1975). There were 55 men and women selected venire, including Hispanics, but NO African-Americans. Defendant is African-American, alleged victim is Hispanic. Ultimately, the petit Jury and Alternate venire-person was comprised of Hispanic-American's and Other's. At issue during trial was the fact of Defendant's size (6'1" and 210 lb's) and Victim's petitness (4'11" and 95 lbs). This was a peculiarly credibility case; highly emotional and prejudicially charged.

b. **Supporting cases, rules, or other authority (optional):**
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

Petitioner has NO way of producing statistical data of systematic exclusion other than the fact California's Jury Questionaire Form, MC-002, does NOT ask for ethnicity; what race are you? (See, Attachment "B")

MC-275 [Rev. July 1, 2005]  **PETITION FOR WRIT OF HABEAS CORPUS**  Page three of six

65

Ground 1. (con't.)

In light of that Fact, when NO African-American's were in Jury Venire, Defendant's Attorney should have pointed-out African-American's were a "distinctive" group in San Mateo County, because they are (sic)(See, Exhibit "A") and they were NOT fairly represented because of California's Jury selection procedure. See, Castaneda vs. Partida, 430 U.S. 482, 494 (1977), the Supreme Court held that a defendant establishes a prima facie case of discrimination against a particular group by demonstrating that (1) the group is a recognizable class (Rose vs. Mitchell, 443 U.S. 545, 565 (1979) (plurality opinion) African-Americans a recognizable class) and (2) the selection procedure resulted in substantial underrepresentation of the group over a significant period of time, and (3) the selection procedure is susceptible to abuse or is not racially neutral. Under "statistical decision theory" (Castaneda, supra, 430 U.S. at 494) California's ME-002 Form would in San Mateo County (with populace of 688,847 and "distinctive group" of 25,023) produce results such as in Alston vs Manson, 791 F.2d 255, 258 (2nd. Cir. 1986) which, HELD "substantial underrepresentation" because of "odds against random selection"; in fact, under ME-002, throughout California such emperical theory is Constitutionally deficient. Petitioner-Defendant was denied effective assistance of counsel (1) be-

Ground 1. (con't.)

cause of nature of case, and (2) California Law makes clear that a Constitutional violation may arise even when only one of several members of a "cognizable group" is improperly excluded. See, People vs. Montiel (1993) 5 Cal. 4th. 877, 909, cert. den. (1994) 512 U.S. 1253 [114S.Ct. 2782, 129 L. Ed. 2d. 894]. It is a Batson error with Racial discrimination in selection of trial jury (Batson vs. Kentucky (1986) 476 U.S. 79, 90 L.Ed 2d. 69, 106 S.Ct. 1712), and, when a serious trial error has been arguably waived, combining an argument on the merits with an argument that if trial counsel waived the issue, the defendant was denied effective assistance of counsel. People vs. Marshall (1996) 13 C4th. 799, 825 n.1, 55 CR2d 347. Defense Counsel, instant case, failure to object to "irregularities in jury selection" effectively waived petitioner's Direct Appeal right on this issue (People vs. Holt (1997) 15 C4th. 619, 656, 63 CR2d 782; People vs. Gallego (1990) 52 C3d 115, 276 CR 679) but, petitioner, comes, now, as movant, moving this Court to grant Writ on the basis of "ineffective assistance of counsel" and "structural error" that, his Jury was NOT impaneled pursuant to Constitutional Law. "Sixth Amendment right to counsel is right to effective assistance of counsel." McMann vs. Richardson, 397 U.S. 759, 771 n.14 (1970). "Sixth Amendment right to impartial Jury requires Jury to be drawn from a fair cross section of the

66

Ground 1. (con't.)

Community. Witkins e Epstein, Calif. Crim. Law 3rd Ed #5 pp. 631 [§442, §446]—; People rs. Harris (1984) 36 C3d 36, 48, 20L CR 782, 679 P. 2d 433 (right that jury be selected from representative cross section is guaranteed by California Constitution, Art. I, § 16). See, also, Arizona rs. Fulminante (1991) 499 US 279, 309, 113 L ED 2d 302, 111 S Ct 1246 (an error that results in a complete or constructive denial of the right to jury trial may be considered a "structural defect in the constitution of the trial mechanism" which, requires reversal without a finding of prejudice.) Instant case, there was "total exclusion" of African-American vicinage, yet San Mateo County is muti cultural. U.S. rs. Greer, 223 F3d 41 (2nd Cir 2000)(Motion for new trial must be granted if the trial court was not fair to the moving party) Petitioner request a NEW TRIAL, with a fair and impartial JURY VENIRE. Petitioner suggests Judicial Counsel Form MC-002 be changed to include Question of "what ethnicity or race are you?" lest it continue to be "susceptable to abuse or not racially neutral" et al.

7. **Ground 2 or Ground** _2_ *(if applicable):*

trial court imposed an illegal enhancement

_____

_____

_____

a. Supporting facts:

petitioner is sentenced concurrently to his con-
victions; trial court imposed sentence, using Pen.
Code § 273.5, sub.(a), as base term, with Pen. Code §
12022.7, subd. (e), consecutive as enhancement. Pursuant
to California Rules of Court "criteria" on "a fact that is an
element of the crime shall not be used to impose conse-
cutive sentences" (Rule 4.425 (b)(iii)) [and] Blockburger
"element test" (U.S. vs. Blockburger, 284 U.S. 299) which bars
punishment under different statutory provisions on the
"same set of operative facts;" petitioner's sentence is pro-
hibited. (sic) The "operative facts" which trial court used
were the "wounds, both external and internal, serious
in nature" to victim. Penal Code § 273.5 requires as an
element "corporal injury" (which means bodily injury)
and "traumatic condition" (which means minor or serious
bodily injury) which, are elements of Pen. Code § 12022.7.
California Rules of Court, Rule 4.441, is "prohibition against
dual use of any fact"; consequently, Pen. Code § 12022.7

b. Supporting cases, rules, or other authority:

should be illegal enhancement to Pen. Code § 273.5.
See, People vs Hawkins (1993) 15 C.A. 4th. 1373, 1375, 1376, 19 C.R 2d
434 (Since serious bodily injury in P.C. 243(d) and great bodily
injury in P.C. 12022.7 have substantial the same meaning, great
bodily injury is element of battery with serious bodily injury;

Ground 2. (con't.)

hence, enhancement under P.C. 12022.7 is improper).
In like manner Pen. Code § 273.5, and as trial court
Judge chose to use "cohabitant" Statute to punish
because of it's specificity, it is Specific Statute
that controls. See, Code Civ. Proc., §1859; People vs.
Price, LCal 4th at p. 385 (If general and specific sta-
tutes dealing with the same subject are inconsist-
ent, the specific will prevail over the general.) By
all accounts (of elements) of Pen. Code §273.5 (and
evidence adduced) CalJic No. 9.35 Spouse or cohabi-
tant beating occurred. The focus of Pen. Code §
273.5 is exactly that which Defendant was con-
victed "actual injury on cohabitant" as opposed
to Pen. Code §12022.7 which focus is <u>additional</u>
punishment for actual injury on cohabitant "in the
commission of another felony"; e.g. one of the many
sexual offenses, kidnapping, etc., but "another
felony." Where Pen. Code § 12022.7 (d) requires com-
mission of another felony, Pen. Code § 273.5 (a) does
NOT, with each Statute containing element of
serious (or great) bodily injury a result of the
Evidence. Hence, a distinction is made between
the Statutes; Penal Code § 273.5 (a) can stand alone,
Penal Code §12022.7 et seg. cannot. (sic) The "actual,
serious, bodily injury" was "a fact essential
to the definition" of Pen. Code §273.5: "In order
to prove this crime, each of the following elements
must be proved: 1) A person willfully inflicted

Ground 2. (con't.)

bodily injury upon a former cohabitant; and 2.) The bodily injury resulted in a traumatic condition." Even Pen. Code § 245 (a) is contained/subsumed in Pen. Code § 273.5: "The word inflicts as used in this instruction means that the corporal injury results from a direct application of force by the perpetrator upon the victim." See, Blockburger vs. United States, supra, 284 U.S. 299, 76 L Ed 306, 52 S. Ct. 180 — "consecutive punishments should not be imposed for violations of separate statutes when only one offense has been committed;" Deal vs. United States, 113 S. Ct. 1993, 1997, fn. 2 — "Court's interpretation of conviction and it's reading of 18 U.S.C. § 924 (c)(1) limit prosecutor's ability to determine punishment by manipulating manner of charging." California law is No different, "A sentencing factor is an element of the offense if the crime as defined by statute cannot be accomplished without performance of the acts which constitute such a factor" People vs. Clark (1993) 12 Cal. App. 4th 663, 15 Cal. Rptr. 2d 709; "A sentencing factor is an element of offense, so as to be unavailable for sentence enhancement purposes, if crime as defined by statute cannot be accomplished without performance of acts which constitute such factor." Sentence & Punishment § 138. (55 Cal D. 2d. 168); "Single fact may not be used to both to constitute

68

Ground 2. (con't.)

an element of the offense, whether the underlying conduct would have been criminal without that fact, and to increase the punishment for the offense." People vs. Tillman, 86 Cal. Rptr 2d 715, 73 Cal. App. 4th 771, Sentence e Punishment § 138. (38 B Cal. D. 2d _ 165); See, also, Flores- Chevez vs. Ashcroft, 362 F. 3d 1150, 1158 (9th Cir. 2004), Frances vs. Franklin, 471 U.S. 307, 85 L. Ed. 2d. 344, 105 s. Ct. 1965 (1985)( well settled rule of construction that specific controls the general). Clearly, the aforementioned Statutes fall under both State and Federal Law. The Rule of Expressio Unius Est Exclusio Alterius should apply. (sic) Petitioner's Sentence should be corrected, to be 3-years (midterm, pursuant to Pen. Code § 273.5.) See, People vs. DuVall (1998) 9 Cal. 4th 464, 475, 478 _ "petitioner's entitlement to relief hinges on the resolution of factual disputes."

7. **Ground 2 or Ground** _3_ *(if applicable):*                                    MC–275

trial court denied Defense Theory that was supported by the Evidence

a. Supporting facts:

petitioner's case was peculiarly a credibility case; one of questionable recovered memory. There were Expert Witness's testimony given/prevented (by prejudicial judicial rulings that, violated existing Due Process.) Expert Witnesses were called to testify, by both prosecution and Defense, for "trier of fact" (the Jury) to "weigh the opinion of one expert against the other" (CalJic No. 2.83) "the qualifications and believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion" (Cal. Jic No. 2.80); Cal. Jic No. 2.82 "Hypothetical Questions" was [b]oth Prosecution and Defense "corpus delicti" to prove "believability of Victim" (was her memory recovered or not, possible or impossible, a confabulation or prevarication, her injuries really a crime or accident?) CalJic No. 2.82 clearly allowed what trial court Judge denied: "hypothetical questions" on "cause and effect" of the proffered Evidence, injuries to alleged victim: " in ex-

b. Supporting cases, rules, or other authority:

amining an expert witness counsel may ask hypothetical questions. This is a question in which the witness is asked to assume the truth in a set of facts and give an opinion based on that assumption. In permitting this type of questioning the Court does not

69

Ground 3. (con't)

rule and does not necessarily find that all the assumed facts have been proved. It only determines that those assumed facts are within the possible range of the evidence. It is for you to decide from all the evidence whether or not the facts assumed in a hypothetical question have been proved..." (CalJic. No. 2.82, exerpt, pertenent part); the EVIDENCE WAS of severe or traumatic head injury and other bodily injury, a result of accident or criminal assault. The Expert Witnesses were called NOT to prove any fact, just to proffer their OPINION about the "range of facts", AND, with only ONE except they did. They ALL laid down a Foundation of Possibilities of "cause and effect" such as being related to the evidenced injuries, except the "one" Judge prevented by his ruling. Ironically, at Expert Witness, Doctor James Missett's "Foundational" hearing (Trial Transcript, Volume I of I, pp 14-72) at p. 27 — The Court :

> "Hang on a second. I am just going to overrule the objection. This is just a foundational hearing. Let's have the doctor say what he has to say and I can sort it out."

The objection was to the relevance of coma testimony with respect to this case; defense was proffering different types of coma and ability to recover

Ground 3. (con't.)

memory. The testimony continued on levels of unconsciousness, from being under anesthetics to "people who have organic problems of one sort or another." (Id., at p. 35, line 25, 26). The Court: "He can testify about anything within that scope which memory would fall within". (Id., p. 21, 22, line 26, 1) And, Dr. Missett, being qualified, testified about Alzheimer effects, Benzodiazapin effects, physiological and psychological effects on suppression of memory, confabulation, Korsokof's psychosis, dementia, cranial nerves, effects of torture and rape, brain edema, the Glascow scale, encephalomalacia; in general, a gamut of Possibilities. The Court: "Dr. Missett laid more than enough information for the testimony to be presented to the jury..." (Id., at p. 73, line 24, 25). Peculiarly, was the Foundation laid of "organic problems of one sort or another" of which a Zeisure Disorder is ONE and with a sudden attack and resulting fall could cause such head injury as evidenced. It is common for Zeisure Disorder patients to wear protective head gear. It is also common for Zeisure Disorder occurrance to be infrequent or one grand mal, a type of epilepsy in which there are convulsions and loss of consciousness. The question of "Loss of consciousness" is throughout ALL the EVIDENCE and Testimonies. * Given ALL the EVIDENCE and

70

Ground 3. (con't.)

NOT in a criminal context, a Seisure Disorder
would be in forefront of causation because it
is plausible. (sic) Dr. Missett testified (Id., at p.
35)—

    Q. Doctor, when we left I asked you
    about a concept called confabulation.
    A. Yes.
    Q. Can you describe what confabulation
    is in psychological terms?
    A. It is a term that refers to an indi-
    vidual creating a memory, it's usually
    unconscious, they are not aware that
    they are creating a memory when they
    don't have a memory for something, and
    then presenting it as if it was a memory.
    It's most commonly encountered in people
    who have organic problems of one sort or
    another.

Dr. Messett testified (Id., at p. 33, 34) about an
"old right 'parietal' skull fracture" (was
found in an X-ray taken after an auto accident)
*The Evidence of instant case, was of "right 'occipital'
non-depression skull fracture." The parietal
region and occipital region is two different
sections in the skull. Point Reserved is the
reasonable doubt incurred by "two" head trauma,
accidents. Was the causation a repetitive sei-
sure? Was the auto accident caused by alleged

Ground 3. (con't.)

victim's Seizure Disorder, too? Was the "old"
right parietal skull fracture a result of abuse
by alleged victim's Father? Clearly, the "range
of evidence" included the Father's physical
abuse of Victim. A Expert Witness's testimony
was crucial to this case (sic) Prosecution's Expert,
Jose Maldonado, testified he was Credentialed in
forensic psychistry, forensic medicine, neuropsy-
chistry, general psychistry and hypnosis, and listed
sub topics related to his work in "neuropsy-
chistry" (Trial Transcript, pp. 432, Line 2-21):
        A. Sure. The mental changes surround-
        ing Parkinson's desease and dementia,
        the mental behavioral changes associated
        with trauma brain injury, the BIT effect
        of seizures on seizure activity, the effect
        of stroke on other types of brain injuries.
        Q. With respect to your work as a neuropsy-
        chistrist have you done much research
        in the area of how trauma affects memory?
        A. Yes. I started that even before I be-
        came a neuropsychistrist ... So early on
        I was doing studies on why people remem-
        ber, why they don't remember, why they
        develop amnesia after trauma experiences,
        the development of altered state of minds
        such as multiple personality disorder.
        All those things led to the study of mem-

11

Ground 3. (con't.)

ory even before neuropsychiatry. I have read extensively along with another colleagues at Stanford, Dr. David Feegle multiple chapters on that.

Prosecution's Expert Witness testified: "the B.I.T. (Brain Injury Trauma) effect of [seizures on seizure activity] [emphasis supplied] has/is relative to "MEMORY" (sic). Dr. Maldonado went-on to testify about memory is a result of brain injury trauma (B.I.T.) using as reference Vandeclof's Studies (Id., at 443) and William's Studies (Id., at 456); he referenced his own writings in the American Psychiatric Association: "I talk about hypnosis, there's an entire section on memory" (Id., at 446, Line 8, 9, 10.)

*Point Reserved is Trial Court Judge allowed GREAT Latitude of OPINION in Dr. Missett's and Dr. Maldonado's Testimony, and as well should have because the Law Commands such OPINION testimony on hypothetical questions of facts. But, when Dr. Forte offers his OPINION on hypothetical question of fact, Judge disallows Expert OPINION. Point Reserved is "whether or not Seizure Disorder (a Defense Theory) was purposely prevented, because in depth testimony by Expert Witnesses on coma, Alzheimer's. disease, dementia, alcoholism, anesthetics, torture, rape, multiple personality disorders, other causes; for memory and amnesia Loss, were allowed[.]

*To reiterate: (Judge allocution) "He can testify

Count 3. (con't.)

about anything within that scope which memory would fall within" (supra). Prosecution's Expert testified Seizure Disorder was one of many scientific causes ..."the B.I.T. effect of seizures on seizure activity".; Defense Expert testified one of the many scientific causes ..."people who have organic problems of one sort or another"..; the Foundation laid by the range of evidence, in the hypothetical questions and OPINION(s) allowed, surely proffered such a Defense Theory. CalJic No. 2.82 supports petitioner's pleadings (supra)... "In permitting this type of questioning the court does not rule and does not necessarily find that all the assumed facts have been proved. It only determines that those assumed facts are within the possible range of the evidence".[B]oth Expert Witnesses were neutral., Dr. Missett even stated, he didn't even know what theory of defense was (Id. at 695); [b]oth Dr. Missett and Dr. Maldonado testified a myriad of cause and affect Brain Injury Trauma on MEMORY, one of which Dr. Maldonado stated "Seizures on seizure activity" was "within possible range of the evidence"; Dr. Forte's OPINION on hypothetical question –

> Q. And is there, is a common sequelae a result of a head trauma that would result in a fracture to the skull the possibility of a seizure?

72

Ground 3. (con't.)

A. A seizure is a possibility, I would put it less than 50 percent of the time, but it certainly is a possibility.

With Dr. Maldonado's Expert OPINION... "the B.I.T. effect of seizures on seizure activity?".. is dead on-point (sic) to Defense Counsel's line of questioning; and, quoting Prosecution's Expert Witness, Dr. Maldonado (again)... "the mental behavioral changes associated with trauma brain injury, the B.I.T. effect of seizures on seizure activity..". (supra, Answer, at p. 432); Defense Counsel's theory of a Seizure the cause of the Brain Injury Trauma a reasonable probability [and] well within the range of evidence, NOT based on Dr. Forte's OPINION but on Prosecution's Expert OPINION.* The foundation laid because of "people who have organic problems of one sort of another" was allowed, and certainly Seizures are organic problems and being "unconscious" is a result of a fall and subsequent B.I.T. one's memory would not be encoded. To reiterate Judge: He can testify about anything within that scope which memory would fall within" (supra) Point Reserved is Dr. Missett and Dr. Maldonado could testify "liberally," but Dr. Forte could NOT ? See, People vs. Jones, 37 Cal. Rptr. 454, 225 Cal. App. 2d 598 (A medical expert is entitled to express his opinion on med-

Ground 3. (con't.)

ical questions presented in issue, and expert
may then support that opinion by giving the
reasons assigned in support of opinion); Los An-
geles vs. Howard, 244 Cal. App. 2d 538, 53 Cal. Rptr.
274 (The presence of expert testimony does not pre-
clude the trier of fact from considering other mat-
ters pertinent to the issue involved).

　　　　Defendant's ultimate Defense Theory was
he was NOT the cause of his girlfriend's injuries;
they were a result of an accident. He had NO
knowledge of, or even if she had suffered a
previous skull fracture, or possible cause of it,
even if she suffered from a malady such as a
Siezure Disorder. He DID know, his girlfriend
on the night of April 10th, 2004, suddenly grabbed
him, missing, and fell backward, seriously being
injured. Those FACTS shown by the EVIDENCE
in the subsequent Criminal Prosecution, absent
any recovered memory issue or any Expert Testi-
mony given, were enough for Defendant to pre-
sent a Defense Theory on "how" his version of
the "accident" occurred. See, Giles vs. Maryland
(1967) 386 U.S. 66, 96, 17 LEd. 2d 737, 87 S. Ct. 793 –
the right to develope "all possible defenses"; Gray
vs. Klauser, 282 F3d 633 (9th. Cir. 2002)(A state may not
arbitrarily prevent defendant from presenting evidence
that is material, trustworthy, and important to his

13

Ground 3. (con't.)

defense.) Instant case, Defendant had NO idea what caused his girlfriend to fall backward, suddenly; just that she DID. Those FACTS alone, withstand trial court Judge's erroneous ruling, preventing Dr. Forte from expounding the "brain injury trauma effect of seizures on seizure activity." Clearly, something caused Defendant's girlfriend to fall suddenly if NOT a criminal assault. Certainly, a seizure would explain a lot (sic) assist[ed] trier of fact with "presumption of innocence." Cool vs. United States, 409 U.S. 100, 104, 34 L.Ed.2d 335, 93 S.Ct. 354 (1972). Clearly, all the Expert Witnesses were knowledgeable and had extensive experience in brain injury trauma, causes and affect; all their OPINIONS would assist a Jury in making Proper assessment. See, Evidence Code § 801. Undeniably, if a Grand Mall Seizure occurred, such Credible Expert Opinion on "the B.I.T. effect of seizures on seizure activity" would have created a reasonable doubt in the minds of the Jury because "a Seizure is a plausible reason for the accident." To say there was no foundation, is to say the only evidence in this case was the resulting injury and trauma occurring which, every crime has for it's element, the actus reus, causation, the mens rea; Model Penal Code § 1.13 (9). The hypothetical question on a Seizure is founded in the [element of causation.]

Ground 3. (con't.)

Trial court Judge unduly restricted "theory
of defense" which, Expert Testimony "can"
conclude in the hypothetical (Harrison vs. De Young
(1935) 3 Cal. App. 2d 662, 664)("Frequently it happens
when expert witnesses are testifying that conclu-
sions to be drawn from the facts stated depend
upon professional or scientific knowledge or skill
not within the range of ordinary training or intel-
ligence. In such cases not only the facts but the
conclusions to which they lead may be testified to
by qualified experts.") Instant case, there was
evidence of a crime or accident, the injury which
occurred as a result of mens rea of Defendant
or unknown malady of alleged victim, which
in such circumstance as existed: a memory loss;
would in the "bounds of reason" (People vs Catlin,
(2001) 26 C4th 81, 131, 109 CR 2d 31) be an abuse
of discretion NOT to allow BOTH sides to present
their theories, in full. A Seizure certainly
was a possibility, even to a Juror, if to a Doctor.

74

'. **Ground 2 or Ground** _4_   (if applicable):

Defendant was denied Sixth and Fourteenth Amendment trial as of right; hence, did NOT receive a fair trial.

a. Supporting facts:

In Ground 1, petitioner has shown a partial jury was impanelled; in Ground 2, the enhancement was an element of the substantive offense and illegally imposed; in Ground 3, the trial court judge unduly restricted "theory of defense" by suppression of Expert Testimony that, petitioner proves "foundational" (evidentiary foundation is identification of evidence by proponent or authentication of evidence, usually the testimony of witness; no rule of evidence requires a foundation; foundation is simply a loose term for preliminary question designed to establish that evidence is admissable. AL Credit Corp. vs Legion Ins. Co., 265 F.3d 630) in that "causation" must be deemed "foundational" to every actus reus, without which there can be NO connection with mens rea or resulting injury to a victim; there must be an act or omission, to every element(s) of crime (or accident.) Ground 4, petitioner amalgamates his legal

b. Supporting cases, rules, or other authority:

issues of merit because of their Kafkaesque effect; hence, Petitioner-Defendant did NOT receive a fair trial. See, Ceja vs Stewart, 97 F3d 1246 (9th Cir 1996) ¶ trial court-Judge denied Defense the SAME res gestae and spontaneous testimony allowed to Prosecution.

Ground 4. (con't.)

An element of a Fair Trial is the Judge's freedom from bias (Arizona vs. Fulminante (1991) 499 U.S. 279) an impartial Judge (Tumey vs. Ohio (1927) 273 U.S. 510). What the Judge instant case allowed for Prosecution was "hearsay evidence" (the testimony of alleged victim's Stepmother, Yadira Lara) and, other's, but NOT the hearsay testimony of defendant's Mother, Reva Johnson Hall. The Stepmother testified 9-times "she said _____" without any objection by Defense Counselor (failure to object to prejudicial hearsay evidence should constitute ineffective assistance of counsel; U.S. vs Tucker, 716 F. 2d 576 (9th. Cir. 1983)(holding counsel ineffective for failing, inter-alia, to object to admission of documentary evidence, failure to make any motions and failure to seek suppression of statements.) It is reasonable to say that a fair trial would include equitable rulings by trial court Judge on the issue of admission and exclusion of hearsay testimony. E.g. [b]oth Mother's in __, or both Mother's out _[.] NO Appellat Court can say what reasonable Jury would have concluded with "stiff legs" Evidence "in" [and] Dr Forte's Expert Opinion "included" on "the B.I.T. effect of seizures on seizure activity" ifet, the Court of Appeals ruled Jury would NOT have decided more favorably for Defendant. Justice Scalia in United States vs. Gaudin, 515 U.S. at 511 wrote "right to have jury decide materiality"— Id. — " the

75

Ground 4. (con't.)

most an appellate court can conclude is that a jury would surely have found petitioner guilty ... [T]hat is not enough." A fair trial would have excluded the very prejudicial testimony of Cristen Marcos. Due Process required it's exclussion. Propensity evidence tends to "over persuade" the Jury. Old Chief vs. United States, 519 U.S. at 181. [O]nce prior convictions are introduced, the trial is, for all practical purposes, completed and the guilty outcome follows as a mere formality. United States vs. Burkhart, 458 F.2d at 204. This authority contradicts [state] finding that propensity evidence, or criminal disposition, had nothing to do with outcome. [Propensity] evidence is [deemed] objectionable, not because it has no appreciable probative value, but because it has too much! People vs. Alcala (1984) 36 Cal. 3d 604, 631. See, U.S. vs. Burkhart (10th. Cir. 1972) 458 F.2d 201, 204. Also, a jury's tendency to condemn in one case because the defendant escaped punishment elsewhere is one reason propensity evidence was banned for centuries. People vs. Smallwood (1986) 42 Cal. 3d 415, 428. Particular errors call out for reversal in light of their nature, ie. their power to influence the Jury. United States vs. Harrison (9th. Cir. 1994) 34 F.3d 886, 892; Such is with criminal propensity. (sic) Based on the above Federal Law, the prejudicial effect of propensity evidence clearly outweigh[s]

Ground 4. (con't.)

probative value. See, Auto Equity Sales, Inc. vs. Superior Court (1962) 57 C2d 450, 455, 20 CR 321 (Appellate Court is bound by the doctrine of stare decisis to "accept the law declared by courts of superior jurisdiction"); see, also, U.S. Constitution, Article VI, clause 2, Del Monte vs. Wilson (1992) 1 Cal. 4th. 1009, 1023, Cooper vs Larson (1958) 358 U.S. 1, 18 (The Supremacy Clause requires that [ ] prevail over a state court's contrary opinion). Besides, the "Interest of Justice" involves the Constitutional Rights of the Defendant, peculiarly where as in this case, Prosecutor "admits" the charged offense was problematic and that the Statutorily Prohibitive 1994 incident was needed because the alleged victim's memory of the relevant events in the charged offense was "altered" (1 CT 151; 5 RT 855). [W]ithout Cristen Marcos testimony "reasonable probability a different outcome[.]" (People vs. Watson (1956) 46 Cal. 2d 818, 836.) A fair trial includes Proper Jury Instruct- ions. (sic) A "Guiton error" occurs when the Jury is instructed both on a legally correct and legally incorrect theory. People vs. Guiton (1993) 4 C 4th 1116, 17 CR 2d 365 (Due Process was prevented, without a showing of prejudice.) Because Cristen Marcos testimony of prior uncharged bad acts was admitted, the trial court instructed Jury

16

Ground 4. (con't.)

pursuant to CALJIC No.'s 2.50.02 and 2.50.1,
and several other instructions on the require-
ments of proof, and Jury's Duty. Petitioner
calls to particular attention other Instruction,
CALJIC No. 2.01 which states in part..."before
any inference essential to establish guilt may
be found to have been proved beyond a reason-
able doubt, each fact or circumstance on
which the inference necessarily rests must be
proved beyond a reasonable doubt." Persuasive
Authority that Due Process was violated on
these "conflicting/confusing" Instructions,
is found in Gibson vs. Ortiz, 2004 U.S. LEXIS
20685 (9th Cir. No. 03-56518) which HELD the
language of the Instruction(s) CALJIC No's 2.50.02,
2.50.1, 2.01, "conflict with each other" and are
Constitutionally infirmed when given/used to-
gether. A reviewing court has no way of knowing
which of the irreconcilable instructions the
jurors applied in reaching their verdict. Adding
CALJIC No. 2.00 to the mix, too, only adds to
the dichotomy. Petitioner's Jury was asked
to prove beyond a reasonable doubt that which
they were instructed they could prove by a
preponderance (sic). Clearly, this was a "Sullivan
error" and Reversible Error. Petitioner contends
his trial was unfair because admitted pursuant
to Evidence Code 352 (hearing) was the testimony

Ground 4. (con't)

of Cristen Marcos which, pursuant to Section 1109 was NOT admissible because Legislature Intent under subsection (a) and (b) was peculiarly focused to domestic violence that was "on-going" course of conduct where the abuse in a case before the bar of "one battering episode is part of a larger scheme of dominance and control, A scheme that usually escalates in frequency and severity" (citing Assembly Committee Representatives on Public Safety, June 25, 1996, pp. 3-4.) This was NOT the circumstances, instant case. If anything, the Evidence demonstrated just the "opposite" between Defendant and alleged Victim. A 3½ year relationship such as was the Evidence, would NOT fall under pervading Intent and Purpose of Legislature's Section 1109. No Court has power to redefine Legislature's Law. Separation of Powers Doctrine. Cf. Ogden vs. Blackledge, 2 Cranch 272, 277. (1804). The deferential abuse of discretion standard California Court's apply is "contrary to" Federal Law, and should NOT be used. (sic) See, United States vs. Moone, 115 F.3d 1348 (7th. Cir. 1997) (other crimes evidence may not be used to demonstrate individual's propensity to commit crime); United States vs. Miles, 207 F.3d 988 (7th. Cir. 2000); See, also, United States vs. Aldrich, 169 F.3d 526 (8th. Cir. 1999) (evidence of a prior crime is always prejudicial to a defend-

77

Ground 4. (con't.)

ant because it diverts the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character); United States vs Lattner, 385 F3d 947 (6th Cir 2004)(evidence of past criminal activity is inadmissible to show criminal propensity). Here, instant case, Defendant NEVER was charged, much less convicted of "any" other crime; following Federal Law, an evidentiary hearing pursuant to Evidence Code § 352, [A]ny findings would [a]lways be "prejudicial" creating quasi estoppel to their use (because admission would creat a serious danger of undue prejudice, of confusing the issues, or of misleading the jury. This legal issue properly discerned would eliminate need of CalJic No.'s 2.50.01 and 2.50.02. See, Cool vs. United States, 409 U.S. 100, 104, 34 L. Ed. 2d 335, 93 S. Ct. 354 (1972)(any jury instruction that "reduce[s] the level of proof necessary for the Government to carry it's burden ... is plainly inconsistent with the constitutionally rooted presumption of innocence.") Point petitioner makes that NO ONE has considered, yet, is the propensity evidence proffered actually contained element of assault [b]y Cristen Mareos toward Defendant. (sic) The resulting injury was a result of mutual combat(ing)(if the account was correctly remembered.) Any criminal act requires motive and intent. There wasn't any proffered.

Ground 4. (con't)

The Court of Appeals as Other's, wants to find petitioner-Defendant guilty of having No remorse. which, how can there be remorse for a crime NOT committed? If Defendant died of a severed artery when Chisten Marcos pushed him through the window, would she been guilty? Propensity evidence, preponderance jury instructions are NOT due process; any convictions with them MUST be set aside. Boyde vs. California (1990) 494 U.S. 370, 384-85, 108 L.Ed 2d 316, 110 S.Ct. 1190 (when a court gives the jury instruction that allows it to convict a defendant on an impermissible legal theory, as well as a theory that meets constitutional requirements, "the unconstitutionality of any of the legal theories require that the conviction be set aside". The premise is: with Judge giving the instruction Jury would naturally believe it's okay. When alternate theories are involved, it is "equally likely that ... the verdict rested on an unconstitutional ground." (Id., at 380.) See, James vs. Vandekamp (9th Cir. 1991) 976 F 2d 918 "[t]he issue for us, always, is whether state proceedings satisfies due process, the presense or absense of a statelaw violation is largely beside the point." Point Reserved is whether or not Defendant-Petitioner received a Fair Trial? was there Due Process? See, Moore vs. Johnson, 194 F 3d 586 (5th Cir. 1999) (Criminal Law does not

Ground 4. (con't.)

preclude alternative, or even inconsistent, defense theories); United States vs. White, 222 F3d 363 (7th Cir 2000) (The Government has a special responsibility to ensure the integrity of the criminal judicial process by living up to the code of professional ethics and fair play at all times). City of Auburn vs. Quest Corp., 260 F3d 1160 (9th Cir. 2001) (Under the Supremacy Clause, the state courts are obligated to apply and adjudicate federal claims fairly presented to them). Moore vs. Dempsey, 261 U.S. 86-88, 69 L Ed 543, 43 S.Ct. 265 (1923) (What we have to deal with [on habeas review] is not the petitioner's innocence or guilt, but solely the question whether constitutional rights have been preserved). People vs. Lyons (1956) 47 C2 311, 303 P2d 329 (Denial of a fair trial to a Defendant amounts to a denial of Due Process of Law).

7. Ground 2 or Ground ___5___ *(if applicable):*                                    MC–275

*petitioner is "actually innocent" [and] was in-*
*effective assistance of counsel not to present*
*all the Evidence available to prove-it, more[.]*

---

a. Supporting facts:

*petitioner is convicted of a crime he did NOT do;*
*petitioner did NOT accept a NO PRISON term deal*
*by prosecutor because he is innocent! (sic) The injury*
*to petitioner's girlfriend which occurred was a result*
*of an accidental fall, cause being a medical condition*
*unknown to petitioner at the time, a Seizure Disorder,*
*or she just fell, losing her balance. Petitioner's girlfriend*
*suffered a "complete" memory loss from the accident.*
*(sic) There were Family Issues in his girlfriend's life, a*
*controlling and physically abusing Father, with certain*
*Prejudice against Defendant - petitioner; and Other's that*
*caused his girlfriend to testify falsely; her testimony*
*ONLY could be a "confabulation" because as the Expert*
*Witness's all Testified : an "unconscious" person cannot*
*remember. (sic) The "accident" (sic) rendered petitioner's*
*girlfriend unconscious. Her Testimony was "contradictory*
*and inconsistent" on really "all-points". A legal issue*
*of merit NEVER addressed, to date, is "can any statements*

b. Supporting cases, rules, or other authority:

*made by an alleged victim under the influence of in-*
*duced Medicines, be credible" in a criminal prosecu-*
*tion ? The facts are, petitioner's girlfriend was treated*
*and sedated, immediately by Emergency Personal and*
*continued while she was in the Hospital. There were*

---

MC-275 [Rev. January 1, 2007]               **PETITION FOR WRIT OF HABEAS CORPUS**                    Page 4 of 6

Ground 5. (con't.)

"text messages" NOT allowed, that a foundation was laid for them to be introduced and received into Evidence, are "proof" of reasons why girlfriend would prevaricate. (sic) Text messages were a form of communication between petitioner and his girl friend. See, Trial Transcript, p. 262, Line 24, 25 — (prosecutor on Direct) Laid the Foundation:

> Q. Had you spoken with him that summer by phone?
> A. Yes, only by phone and text messages, that's it.

(prosecutor on Direct, pp. 270, 271

> Q. Was that a common way that you and the defendant would communicate with each other?
> A. Yes.

It was highly Prejudicial for Trial Court Judge to disallow ALL Text Messaging between Defendant and Girlfriend in a peculiarly credibility case, especially when Under Evidence Code 771, any "writings" tending to contradict Testimony is admissible. (sic) The Text Messages are in Exhibit "H" for this Court "to read and see the 'extreme value' of them" to prove girlfriend's "mental intent", but the Due Process Violation was Judge's improper ruling in "excluding" there, with a "foundation laid for them by the Prosecutor, herself." (sic) The "theory of Defense" argued in Limine

Ground 5. (con't.)

was "an angry, jealous girlfriend", making
all kinds of accusations recorded <u>via text</u>
<u>messages</u>. Perhaps as Judge stated (Trial
Transcripts, p. 92) "It doesn't exclude you from
doing it down the road." (Id., line 20, 21) is where
petitioner's Defense Counsel was ineffective by
NOT introducing such contemning and impeach-
able Evidence "after Prosecutor laid down the
Foundation. (sic)" Defendant would NOT have
to testify with such "foundation laid" [and]
Defense Counselor did NOT present the Evidence
of the confession, by girlfriend of her Father
"beating her" which, was on the text messages
allowed by the Judge (see, Exhibit "  " )_

    "Me (2/9 10:25 a.m.): My witness,
    <u>audio tapes</u>, your story in your
    writing, should be interesting case
[audio tape 2, pp. 6,7]_ Phone call:
    Mike: What are you scared of?
    Paolina: I don't know.
    Mike: Scared of tomorrow, for what?
    Paolina: Huh?
    Mike: You're scared about the court
    hearing tomorrow, why?
    Paolina: I don't know. I just have
    this bad feeling about me I mean.
    I think I don't know, Mike.
    Mike: A bad feeling about what?

Ground 5. (con't.)

> Paolina: Because my dad is going
> to go. I mean I don't know [in-
> audible] with him going because
> firstly I feel bad because he's
> not going to go to my sister's grad-
> uation and she was really sad and
> I was just like, "I mean, if you
> want to go you could go. It's fine."
> He's like, "No, I'm going with you."
> And I was just like, I mean we kind
> of talked about it and he's going
> to go after the end of it. I'm scared.
> Mike: What are you scared of?
> Paolina: I mean if they find out
> that we are talking, we'll get in
> trouble and I'll get in trouble with
> my dad. <u>He'll beat me up even more</u>
> [inaudible] (Paolina mentions again
> on p. 8, 11, her Father beats on her)
> (In tape 1, also is history of Father's
> physical abuse, perhaps more when she
> was a little girl)

Petitioner's girlfriend was for good reason afraid
of her Father and <u>would</u> under such duress "con-
fabulate/prevaricate" testimony being estranged
from Defendant. Defense Counselor was ineffective
by NOT introducing such condemning Evidence
with it already on the Evidence Table [and] the

Ground 5. (con't.)

Record is clear on this Legal Point Reserved, found in the Discovery Materials, the transcript record known as "drama queen and me" Text Messages

"Me (2/9 10:25 a.m.): My witness, <u>audio tapes</u>, your story in writing, should be interesting case"

"Me (2/9 10:26 a.m.): Not to mention <u>all the text messages</u>"

The Prosecutor argued, "The foundational issue is a big one..." and, petitioner argues, now, the SAME; BIG (sic) because Girlfriend's testimony was a confabulation, a prevarication. (sic) The "audio tapes" and "text messages" DO demonstrate alleged victim's "state of mind and motive to fab- ricate on her behalf" contrary to Prosecutor's opinion. The testimony of Paolina Lara Gutierrez, herself, laid down a Foundation for "anything contained in the Text Messages between Defendant and her to be received into Evidence" (see, p. 262, Trial Transcripts)

Q. When you returned from L.A. after the summer of 2003, did you begin to speak with the defendant again?

A. Yes.

Q. Had you spoken with him that summer by phone?

A. Yes, only by <u>phone</u> and <u>text messages</u>, that's it.

It was Ineffective Assistance by Defense Counsel NOT to argue-in "All possible Evidence", and offer

81

Ground 5. (con't.)

the "affirmative defense" that girlfriend was coarced by her abusive father and other's to testify falsely, that her coercion was easily provoked by her co-dependency, and, histrionic personality. (sic) The Evidence of such is clearly supported throughout her conversations with Dependent.

It was Ineffective Assistance of Counsel when at in limine (see, Trial Transcript, pp. 99-106) Defense Counsel did not lay down the foundation of the possibility of a Seizure Disorder as a result of the "old parietal skull fracture" (Id., Line 13-17) The cause of this other/unrelated skull fracture was not the issue, but was medical nexus to form a basis for such an "affirmative defense, that the accident and resulting brain trauma/physical injuries were caused by a seizure" even, that the "old saull fracture was a result of Seizure activity."(sic) Did not have to be a direct result of her father's abuse. Why didn't Prosecutor file charges against the Father? Clearly, it is Duty of Defense to investigate all facts/Law and present [e]very possible Defense Theory for his/or her client. The medical nexus was there for Defendant's Defense Counselor, and All Expert Witnesses testified, affirmatively.

Ground 5. (con't.)

It was Ineffective Assistance of Counsel for Defense Counselor NOT to have introduced / have received into Evidence the "statement of Ron Haysbert" (see, Trial Transcript, pp. 2-3) which, proves alleged victim DID commit perjury: at the time Paolina says she is home taking a nap, she really is seen by Ron Haysbert at J.C. Penny's not only once, but twice to talk with Defendant about their relationship. This statement is crucial because it demonstrates, again, girlfriend's mental intent toward Defendant; a prelude to her sudden memory recovery, (the same evening.) She showed Defendant a police accident report FORM saying she was going to the police and change her story, that they'll believe me because I'm the victim. The legal issue always is the credibility of a witness testifying, inconsistantly[.] Paolina's prevarication continued throughout trial (see, Trial Transcript, p. 304) she testifies she got a restraining order because she respected her father's concern for her safety (Line 9, 10) yet, in the audio tapes, she says her father will beat her if she didn't get a restraining order; clearly, this is a witness manipulated by her own fear! (sic) and, NOT being forthright, a confabulation/or prevarication? for sure, "NOT the truth." (sic) A "neurosurgeon" has NO reason to lie, and how any Attorney or Justice of any Court could think otherwise hedges on absurdity, yet at Trial Dr Jun's Expert Testimony is questioned in-

82

Ground 5 (con't.)

stead of the testimony of an angry and jealous girlfriend, whom throughout Trial continually "contradicted herself." (sic) On April 27, 2004, Dr. Jun says Paolina told him she remembers what happened, but tells everyone else she doesn't remember, then testifies at Trial she NEVER told Dr. Jun she had regained her memory. Dr. Jun should be considered the credible witness, without any motive or intent, he testified in such cases as Paolina Lam "patients never get back their memory" Only obvious is the People around Paolina and Investigator's had "their own agenda's "(sic). It was Ineffective Assistance of Counsel for Defense Counsel NOT to have introduced /have received into Evidence the " Emergency Protective Orders" for their obvious exculpatory value; [m]ore evidence of girlfriend's "contradictory statement's" made. [B]ig is the statement of "defendant throwing something at her" which there was NO evidence of anything being thrown except that Paolina's Father threw things at her which proffer's confabulation[.] Officer Mchale wrote and signed EPO, on April 10, 2004, that Paolina lost conscienciousness, as opposed to his testimony at Trial that, she was slipping in and out of consciousness (Trial Transcrip, pp. 531, Line 2, 3) which is "Big" because all Expert Witnesses testified an unconscious person cannot recall any memory. This was emphacized

Ground 5. (con't.)

throughout Trial by Prosecutor that alleged victim did not fully lose her consciousness that, she could recover her memory. This and other crucial defense evidence such as Poulins in the Restraining Orders stating:

"I asked them what happened."

"My father told me that the respondent physically assaulted me."

"I spoke to a police officer about what happened to me."

"The officer reported that I made statements to the nurse that respondent threw something at me."

"I had an accident in front of my house, I lost my memory and all that I could remember was going out with my girlfriends and getting home at 11:30 p.m. next thing I notice I was in the hospital. At that time I didn't remember what happened and I was asking my father what had happened. At that time my father didn't like my boyfriend Michael, he wanted me to break up with him, so he told me in the hospital that Michael Johnson hit me and almost killed me. I didn't believe

83

Ground 5. (con't.)

him so he made me file a restraining order against him. Know that I remember what happened and knowing that he didn't put his hands on me at any time. I would like to take the restraining order out. I am not scared of him or I don't feel threat by him in any way."

The "restraining orders" were evidence, again, of a witness that clearly was being coerced and "influenced by Other's" and quoting Chief Justice Byrd—"given to the seriousness of the charged offense defense counsel had no satisfactory rational for not initiating an intense investigation as to every aspect of defendant's case ... it is difficult to understand why deputy public defender took none of these steps ... such a fundamental requirement of the basic duties of an attorney." In re Ibarra, 60 Cal at pp. 465-66, 34 Cal. Rptr 863, 386 P. 2d 489, Referencing ABA Project on Standard for Criminal Justice Relating to the Defense Function. On Restrainer Order dated April 22, 2004, Paolina states she has "bruises all over my body"... "The insides of my eyes were dark red, and my right eye was black and blue. My face was swollen and bruised." Yet, Officer Mchale photographed Paolina for about an hour (Trial Transcript, pp. 540, Line 2-4, 19-21), with NO photographic evidence of "bruises" (on her face or torso.) Paolina testified she was kicked twice in the stomach. Officer Mchale testified (Trial Transcript,

Ground 5. (con't.)

p.553, Line 18-20) Q. And you didn't see any bruises on Miss Lara's stomach, did you? A. I don't recall any, no. People's Exhibit 1-A, a photograph of Paolina's face shows NO bruises. What Paolina says and what the forensic photographic evidence shows is clearly a contradiction and is perjury. Defense Counselor had a "duty" to present this evidence, he did NOT. More, and is prima facie PROOF that Paolina's testimony was a confabulation/or coerced prevarication is found on Page 289, 290 (Prosecutor Ms. Ford has been illiciting Paolina's testimony which has been vague and sketchy, not exacting; she really doesn't remember, but what she has been led to believe did happen)

Q. At that point, what were you focused on when you woke up?

A. On the pain and what was going on.

Q. Could you see and hear the hospital staff that were surrounding you?

A. Yes.

Q. Could you see if they were male or female?

A. No.

Q. Why not?

A. I couldn't see.

Q. When I asked you if you can see there were hospital staff around you, and you said yes, what did you mean?

A. The way they were talking.

Q. You could hear them speaking?

84

Ground 5. (con't.)

> A. Yes.
>
> Q. You said you could feel hands holding you?
>
> A. Yeah.
>
> Q. Did you know if they were conducting tests or hooking you up to machines, could you feel anything specific?
>
> A. They were taking staples out of my head.
>
> Q. You remember that being done to your head with respect to your head wounds?
>
> A. Yes.

(Prosecutor Ford abruptly stops her questioning, knowing exactly what just happened; her witness answering spontaneously "jumping from the rehearsed testimony to what she DID remember: They were taking staples out of my head. (emphasis supplied in red) Staples would NOT be taken out until after the fact; Paolina even while testifying still didn't remember, just like Dr Jun testified, patients with her type of brain trauma NEVER remember. Prosecutor Ford quickly says: Your Honor, I have a couple of exhibits to mark. A recess is taken, then Prosecutor Ford resumes her questioning, in a "totally different direction":

> Q. I am going to go back for a moment

Ground 5, (con't)

and try to clear up a question
that I had. I asked you about
going to T.G.I. Friday's with Yes-
senia on the evening of April 9th
and I assume that it was the
T.G.I. Friday's in San Mateo across
from the Hillsdale Mall?

(Prosecutor's maneuver/diversion went-by Defense
Counselor like a passing jet, but not the Judge;
was why the recess, he saw the witness stumble!
What were the Exhibits to mark? 15-Minutes
later Prosecutor Ford is back to the rehearsed
testimony. Ms. Ford is leading her witness!)
this Court or Anyone can read Paolina's testimony;
she does NOT remember any thing but what she has
been told.

p. 286. Q. Do you have a recollection
of arriving at the hospital? A. No.
p. 287. A. I don't know.
          A. No
          A. No
          A. No
          A. No
          A. No
          A. No.
p. 288 Q. Do you have any memory about
an injury or the assault occurring
around your feet? A. No.

85

Ground 5. (con't.)

p. 292 Q. Do you have any recollection of these photographs being taken?
A. No.

Defense Counselor allowed without objection Prosecutor to cross examine Dr. Forte on the "bilateral redness" (Trial Transcript, pp. 723-727), "it's a toothpaste tube effect ... petechiae rush ... consistent with increased pressure in the brain ..."; Prosecutor hammers home her theory, but Dr. Forte's (and Defense Theory) explanation of "seizure activity" is disallowed. Why? It was Ineffective Assistance of Counsel when Defense Counselor did NOT move to strike "taped interview" (by Officer Tom Neary) and any testimony of it; the evidence was "tainted" NOT a complete production. See, Trial Transcript, pp. 547-551 —

Q. Have you had the opportunity to review the video tape of the interview conducted by Detective Neary on February 11th at which you were present?
A. Yes, I have.
Q. And the video tape when you reviewed it, can you tell us what the quality of the tape is?
A. It's poor, the audio cuts in and out.
Q. Are there portions of her statement that you can hear?
A. Yes, there are.
Q. And about how long is the tape recorded interview?
A. About 30 minutes I would think.

Ground 5. (con't.)

Q. How much of it is distorted?
A. At least 40 percent.

Crucial was: and NO one can know with 40% of PAOLINA's taped interview "missing" what is her real truth? was she picked-up or dragged by the ankles to the car? [M]ore confabulation, or she "doesn't really know". (sic) The Police Department equipment was either just NOT working well, or conveniently just NOT working well because Officer Neary's interview with Defendant didn't go so well, either! (Trial Transcript, pp. 561, 562)_

Q. With respect to the quality of the tape recording, were there any problems with it?
A. Yes.
Q. Can you describe that for the Jury, please?
A. We had some technical difficulties, some of the audio is difficult to hear.
Q. In places where the audio is difficult to hear, does the transcript simply contain the word unintelligible?
A. Yes.

Of course, Defendant's "denial" that he assaulted his girlfriend and the part about her "abusive Father" and that her "limbs were stiff" were on the part

86

## Conclusion

For the aforementioned reasons (Grounds 1-5) petitioner was Denied a Fair Trial. A right to a fair trial is fundamental, and extends to all criminal trials, regardless of the charged crime, and the same as if tried in a Federal Court. Gordon vs. Justice Court for Yuba District (1974) 12 C3d 323, 115 Cal Rptr 632; People vs. Lyons (1956) 47 c 2d 311, 303 P. 2d 329; Duncan vs. Louisiana (1968) 391 U.S. 145. Writ of Habeas Corpus should Issue, with Case Reversed.

88

Did you appeal from the conviction, sentence, or commitment?    [X] Yes.    [ ] No.    If yes, give the following information:

a.    Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

*First Appellate District, Division Four*

b.    Result    *denied*    c.    Date of decision: *May 30, 2007*

d.    Case number or citation of opinion, if known:    *A112322*

e.    Issues raised:    (1)    *see attached (very many)*

(2) _____

(3) _____

f.    Were you represented by counsel on appeal?    [X] Yes.    [ ] No. If yes, state the attorney's name and address, if known:

*Richard Newhoff 11 Franklin Sq. New Britain, Conn. 06051*

Did you seek review in the California Supreme Court?    [X] Yes    [ ] No.    If yes, give the following information:

a.    Result    *denied*    b.    Date of decision: *Sept 12, 2007*

c.    Case number or citation of opinion, if known:    *S154170*

d.    Issues raised:    (1)    *See attached*

(2) _____

(3) _____

If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

*new legal issues not able to present on Direct Appeal*

_____

Administrative Review:

a.    If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

*n.a.*

_____

_____

_____

_____

_____

_____

b.    Did you seek the highest level of administrative review available?    [ ] Yes.    [X] No.

*Attach documents that show you have exhausted your administrative remedies.*

MC-275 (Rev. July 1, 2005)    **PETITION FOR WRIT OF HABEAS CORPUS**    Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?  ☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _Superior Court / Court of Appeals_

    (2) Nature of proceeding (for example, "habeas corpus petition"): _habeas corpus petition_

    (3) Issues raised: (a) _See Petition ⟨Att 6950⟩_

       (b) _____

    (4) Result (Attach order or explain why unavailable): _denied_

    (5) Date of decision: _May 30, 2007_

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

       (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
_none held_

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
_waited for Petition for Review results, then now in due course (relying on inmate paralegal assistance)_

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
_in due course._

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: _20 October, 2007_   ▶ _(signature)_

                                         (SIGNATURE OF PETITIONER)

MC-275 [Rev. July 1, 2005]    **PETITION FOR WRIT OF HABEAS CORPUS**    Page six of six

89

1    memories will be filed in one way versus things that are not

2    so happy or very sad and we tend to give priority to highly

3    charged emotional memories, which is why we tend to remember

4    more easily.   Forgetting a phone number is not as important

5    as you know remembering an anniversary, for example.

6         Some of us don't do well with those things, we file

7    things in different ways.   Therefore, when there's trauma in

8    the brain we might remember it a different way, we might

9    remember some things in patchy ways, some things very clear.

10   If you look at Vandeclof, he was in power for a long time,

11   he has done studies with people who have been traumatized.

12        And his theory is that people have traumatic memories

13   compared to other memories.   Your memory of me being here

14   today will show that.   Traumatic memories are, once they are

15   recovered, they are /exceedingly accurate/ compared to

16   memories of not so important events.

17        You guys might go home and think that I was more bald

18   or had more hair or more handsome than I am, but that's not

19   as important.   If I pull a gun and start shooting people

20   here you will remember that one.   That is really important

21   for you to keep in mind.   The other ones you can embellish

22   and change because it's not really that important.

23        Q    So you would expect more accuracy in the recall?

24        A    According to Vandeclof's studies, he had numerous

25   studies, many of them are backed up brain imaging, that is

26   true.

⊤  F-mal

1    they are confabulaating a memory.  On the other hand,

2    there's also a possibility that they had lost consciousness

3    because they were not fully cognizant, and they had a

4    depressed consciousness which happens often in trauma

5    events.

6        Q    There is a third one and that is that they are

7    lying?

8        A    Correct.  Confabulation has two aspects.  There's

9    the purpose for lying and then there's the non purpose for

10   lying.  People confabulate all the time.  Think about a

11   demented person who has fulty memories then they fill in the

12   blanks.  It's a very unconscious purpose, they are not

13   consciously lying, they are saying what is.

14       Q    For instance, if they had certain facts presented

15   to them, they can look at those facts, and then confabulate

16   a story to fit the facts?

17       A    That's possible.

18       Q    With regard to the charts that you have up there

19   on the wall, that time line and the recovery is not

20   speaking about memory per se, but a brain function.

21       A    Correct.

22       Q    Memory will be a function of your brain.  And if

23   somebody in the hypothetical that was given you by the

24   prosecutor were brought to an emergency room and was

25   combative and confused, that would comply, and they had a

26   non depressed skull fracture to the right occipital area,

SONIA KOLOKOURIS RISTING, CSR 6678

*91*

T   C - mel

1     that would comply with that little squigly section there,

2     the delusional stage?

3          A     Sure.  Now, since you are referring to the

4     hypothetical, if we are talking about this is when the

5     traumatic event begins, so the D.A. was saying if somebody

6     beat her, the beating begins here (indicating) at some

7     point.  The person loses consciousness, everything that

8     happened in this episode before the person loses

9     consciousness would be perfectly captured in memory.

10     So if the person, let's say, you say the person was

11     unconscious for half-an-hour, right, and she in this case,

12     the female patient says this is what happened during this

13     half hour, then your theory is possible.

14     But if the person later recovered what happens here,

15     that is consistent with the theory of post traumatic

16     amnesia, therefore later recovered.

17          Q     But just to make it clear, during the period

18     that the person is unconscious for whatever reason they

19     would not have a memory if they were truly unconscious

20     during that period?

21          A     If you are unable to encode memory, you cannot

22     retrieve memory.

23          Q     And so again with that chart and the intervening

24     months up to one year, that's a recovery of brain function,

25     that might be the ability to recover past events from memory

26     that might be in terms of their behavior, there might be

c-mal

1    they have nothing to do with the photographs.

2            MS. FORD:  I would ask for an offer of proof.

3            MR. CHASE:  He interviewed Ms. Lara when she

4    claimed her recovered her memory and I want to examine

5    him about certain statements she made during that

6    examination which contradict her testimony here in court

7    today.

8            Also, the officer, in his investigation, after

9    speaking with Mr. Johnson, found blood in a location on

10   the street where Mr. Johnson said Ms. Lara had fallen --

11   and when I say "Lara," Ms. Gutierrez is a new addition to

12   her name, I didn't know that name before.  But that was

13   consistent with where he was.  And also there was blood

14   inside the house from the dog that had been run over.

15           MS. FORD:  I am not sure how the placement of

16   the blood would rise to the level of an affirmative

17   defense which would be the standard to allow the

18   testimony of Detective McHale.

19           MR. CHASE:  If one assumes that the alleged

20   recovered memory is not a recovered memory at all but

21   merely a fabrication made by the witness to have her

22   injuries conform to some story of what happened, the

23   witness claimed that she fell -- she was pushed down

24   inside the house and struck her head, yet there was no

25   blood from her inside the house.  The blood that would

26   have been consistent with a wound that was on the back of

*93*

1    and what we do is we fill it in, but we fill it in with

2    things we believe were what happened.  And it can be a lie,

3    or some combination of that.

4        Q    And did you find evidence within the records

5    that you reviewed of Miss Lara giving different statements

6    at different times regarding her condition or what

7    happened to her?

8        A    Yes.

9        Q    And would that be useful in assessing whether or

10   not she was confabulating or lying?

11       A    It depends on what statement it is that you are

12   talking about. You almost have to go by each individual

13   statement and whether there are indications as to why it

14   is that there might have been something that prompted that

15   particular statement or that particular statement at that

16   time.

17       Because you have statements sometimes that it was an

18   accident, statements at other times that she does not

19   remember, statements at other times that she just recovered

20   her memory, but then four to five months earlier you find

21   another statement wherein she claims that she had a memory

22   for what occurred.  They are not all consistent with one

23   another, they are inconsistent with one another.  They are

24   all produced apparently voluntarily by Miss Lara.

25       That creates a problem for knowing which is the one

26   that you are going to listen to and only one is the accurate

T C-missett

94

1    one, and which is the inaccurate, and if it's inaccurate

2    whether it's consciously inaccurate which would mean lie or

3    it is not accurate, but it's a mistake which is along the

4    lines of confabulation where somebody is filling in things.

5          Q    If a person were to to tell a police officer when

6    she first recovered her memory that she was dragged by the

7    ankles to Mr. Johnson's car before she was put in the car,

8    and on another occasion or more than one occasion testify

9    that she was not dragged by the ankles, would that be an

10   inconsistency that is important?

11         MS. FORD:  Your Honor, I am going to object at

12   this point.  Counsel is asking the expert to characterize

13   Miss Lara's testimony.

14         THE COURT:  Well, it's asking to have the witness

15   give an opinion as to one of the ultimate questions.

16   Sustained.  You can rephrase it in a different fashion here

17   if you want.  We are going to be a minute away from the

18   evening recess.

19         All right, folks, we are going to take our

20   evening recess.  Please keep in mind the admonition that I

21   have been give giving to you.

22          It is your duty not to converse amongst

23   yourselves or with anyone else on any subject connected with

24   this trial nor to form or express any opinion thereon until

25   the cause is finally submitted to you by this Court.  Please

26   leave the juror badges, the notebooks, pens and the

T  c - misset     95

EXHIBIT "H"

FL-300

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*
Paolina Lara
150 Ramona Ave
South San Francisco CA 94080

TELEPHONE NO. *(Optional):*    FAX NO. *(Optional):*
EMAIL ADDRESS *(Optional):*
ATTORNEY FOR *(Name):*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
Superior & Municipal Courts
STREET ADDRESS: 1050 MISSION ROAD
MAILING ADDRESS:
CITY AND ZIP CODE: So. San Francisco, CA 94080
BRANCH NAME: www.sanmateocourt.org

PETITIONER: Paolina Lara

RESPONDENT: Michael Johnson

**FOR COURT USE ONLY**

**ENDORSED FILED**
SAN MATEO COUNTY

NOV 2 4 2004

Clerk of the Superior Court
By CEDRIC A. CARTER
DEPUTY CLERK

| ORDER TO SHOW CAUSE FOR | ☐ MODIFICATION | CASE NUMBER: |
|---|---|---|
| ☐ Child Custody  ☐ Visitation  ☐ Injunctive Order | | 079377 |
| ☐ Child Support  ☐ Spousal Support  ☑ Other *(specify):* | | |
| ☐ Attorney Fees and Costs | Terminate Restraining Order | |

1. TO *(name):* Michael Johnson

2. YOU ARE ORDERED TO APPEAR IN THIS COURT AS FOLLOWS TO GIVE ANY LEGAL REASON WHY THE RELIEF SOUGHT IN THE ATTACHED APPLICATION SHOULD NOT BE GRANTED. If child custody or visitation is an issue in this proceeding, Family Code section 3170 requires mediation before or concurrently with the hearing listed below.

   a. Date: JAN 0 7 2005    Time: 9AM    ☐ Dept.: DV 19    ☐ Room: SSF

   b. The address of the court is ☑ same as noted above ☐ other *(specify):*

   c. ☐ The parties are ordered to attend custody mediation services as follows: ~~Parties are referred to Family Court Services to schedule a Mediation Hearing prior to the hearing date. (650) 363-4561~~

3. THE COURT FURTHER ORDERS that a completed *Application for Order and Supporting Declaration* (form FL-310), a blank *Responsive Declaration* (form FL-320), and the following documents be served with this order:

   a. (1) ☐ Completed *Income and Expense Declaration* (form FL-150) and a blank *Income and Expense Declaration*
      (2) ☐ Completed *Financial Statement (Simplified)* (form FL-155) and a blank *Financial Statement (Simplified)*
      (3) ☐ Completed *Property Declaration* (form FL-160) and a blank *Property Declaration*
      (4) ☐ Points and authorities
      (5) ☐ Other *(specify):*

   b. ☐ Time for ☐ service ☐ hearing is shortened. Service must be on or before *(date):*
      Any responsive declaration must be served on or before *(date):*

   c. ☐ You are ordered to comply with the temporary orders attached.

   d. ☐ Other *(specify):*

Date: NOV 2 4 2004

KATHLEEN McKENNA
JUDICIAL OFFICER

NOTICE: If you have children from this relationship, the court is required to order payment of child support based on the incomes of both parents. The amount of child support can be large. It normally continues until the child is 18. You should supply the court with information about your finances. Otherwise, the child support order will be based on the information supplied by the other parent.
You do not have to pay any fee to file declarations in response to this order to show cause (including a completed *Income and Expense Declaration* (form FL-150) or *Financial Statement (Simplified)* (form FL-155) that will show your finances). In the absence of an order shortening time, the original of the responsive declaration must be filed with the court and a copy served on the other party at least ten calendar days before the hearing date.

Form Adopted for Mandatory Use
Judicial Council of California
FL-300 [Rev. January 1, 2003]

**ORDER TO SHOW CAUSE**

Family Code, §§ 215, 270 et seq., 3000 et seq., 3500 et seq., 4300
www.courtinfo.ca.gov

Page 1 of 1

96

| PETITIONER/PLAINTIFF: Paolina Lara | CASE NUMBER: |
|---|---|
| RESPONDENT/DEFENDANT: Michael Tyrone Johnson | 079377 |

7. ☐ PROPERTY CONTROL    ☐ To be ordered pending the hearing
   a. ☐ Petitioner ☐ Respondent  are given the exclusive temporary use, possession, and control of the following property we own or are buying *(specify)*:

   b. ☐ Petitioner ☐ Respondent  are ordered to make the following payments on liens and encumbrances coming due while the order is in effect:
   Debt                    Amount of payment              Pay to

8. ☐ I request that time for service of the Order to Show Cause and accompanying papers be shortened so that they may be served no less than *(specify number)*:                    days before the time set for the hearing. I need to have the order shortening time because of the facts specified in the attached declaration.

9. ☑ OTHER RELIEF *(specify)*:

   Terminate restraining Order

10. ☑ FACTS IN SUPPORT of relief requested and change of circumstances for any modification are *(specify)*:
    ☑ contained in the attached declaration.

    On April 10, 2009 around 2:00 am, I had an accident in front of my house, I lost my memory and all that I could remember was going out with my girlfriends and getting home at 11:30 pm next thing I notice I was in the hospital. At that time I didn't remember what happened and I was asking my father what had happened. At that time my father didn't like my boyfriend Michael, he wanted

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Nov 17, 2009

X  Paolina Lara
        (TYPE OR PRINT NAME)

▶ X  [signature]
              (SIGNATURE OF APPLICANT)

98

1. me to break up with him, so he told me in the hospital
2. that Michael Johnson hit me and almost killed me. I
3. didn't believe him so he made me file a restraining
4. Order against him. Now that I remember what happened
5. and knowing that he didn't put his hands on me at any
6. time I would like to take the restraining Order out, I
7. am not scare of him or I don't feel threat by him
8. in any way.
9.
10.
11.
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.
26. *(Required for verified pleading)* The items on this page stated on information and belief are *(specify item numbers, not line numbers)*:
27. This page may be used with any Judicial Council form or any other paper filed with the court

Page_____

Form Approved by the
Judicial Council of California
MC-020 [New January 1, 1987]
Martin Dean's Essential Forms™

**ADDITIONAL PAGE**
**Attach to Judicial Council Form or Other Court Paper**

CRC 201, 501
[E116]


99

Dept. 24                    DEFENSE                    Case #: SC058720A

# EXHIBIT RECORD

Judge: STEPHEN M. HALL                    Clerk: Leslie WIse

Plaintiff: People   DDA Christine Ford                    Defendant: Michael T. Johnson

Def Counsel Steven Chase

Jury trial start date: 10/17/5

| Number or Letter | Description of Exhibits | Id | Admit | Withdrawn by (signature) | Date of W/drawl |
|---|---|---|---|---|---|
| A | 2 pg individual charges of Sprint Cell Phone Bill | 10/27/5 | Not Admit | | |
| B | 3 pg declaration of events form filled out by victim | 10/27/5 | Not Admit | | |
| C | 8x10 paper w/4 color photo copies showing dog w/blood | 10/31/5 | 11/1/5 | | |
| D | 8x10 paper  w/4 color photo copies showing dog w/blood | 10/31/5 | 11/1/5 | | |
| E | 8x10 paper w/2 color photo copies of street  views w/houses/vehicles | 10/31/5 | 11/1/5 | | |
| F | Patient progress record of Paolina Lara | 10/31/5 | Not Admit | | |
| G | 2 pg notarized statement by Joseph Gerrans | 11/1/5 | Not Admit | | |
| H | 4 pg Restraining Order document | 11/1/5 | Not Admit | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

*100*

**Date:** 11-3-2005            **Time:** 13:03

**Foreperson:** ███████████

**Request:**

We seem to be missing some evidence items.
We have:

Prosecution #1-15

Defense C, D, E

Can we have whatever is not listed above?
WE KNOW FROM OUR NOTES THERE IS DEFENSE A, B,
F, G, H. WE WOULD LIKE TO SEE THIS EVIDENCE.

**Response:**

PEOPLE'S EXHIBITS 1-15 WERE RECEIVED INTO
EVIDENCE.

DEFENSE EXHIBITS "C", "D", and "E" WERE RECEIVED INTO
EVIDENCE.

THE REMAINING EXHIBITS WERE MARKED DURING TRIAL,
HOWEVER THEY WERE NOT RECEIVED INTO EVIDENCE.

Judge Stephen Hall

101

| | |
|---|---|
| 1 | November 3, 2005                    Redwood City, CA |
| 2 | P R O C E E D I N G S |
| 3 | AFTERNOON SESSION |
| 4 | THE COURT:  We are here on the record outside the |
| 5 | presence of the jury with Ms. Ford present and Mr. Chase. |
| 6 | Are you waiving your client's appearance at this point so we |
| 7 | may deal with two questions submitted by the jury? |
| 8 | MR. CHASE:  I am. |
| 9 | THE COURT:  The first question is, copies of which |
| 10 | have been handed to counsel along with what the Court had |
| 11 | determined to be the appropriate response here.  The first |
| 12 | one was:  "We seem to be missing some evidence, items.  We |
| 13 | have:  Prosecution 1 through 15, Defense C, D and E.  Can we |
| 14 | have whatever is not listed above?  We know from our notes |
| 15 | this evidence.  There's Defense A, B, F, G, H.  We would |
| 16 | like to see this evidence." |
| 17 | The Court's response was that, "People's Exhibits |
| 18 | 1 through 15 were received into evidence.  Defense Exhibits |
| 19 | C, D and E were received into evidence.  The remaining |
| 20 | exhibits were marked during trial, however, they were not |
| 21 | received into evidence," which I signed. |
| 22 | The second question is:  "We do not see any |
| 23 | specific instructions on Count I special allegation.  While |
| 24 | this looks like a similar charge to Count II with the |
| 25 | addition of great to bodily injury, we want to make sure |
| 26 | that we are not missing something.  Can you provide any |

SONIA KOLOKOURIS RISTING, CSR 6678

*102*

1    Court.  I will submit that.

2              THE COURT:  I think transcripts were pretty clear.

3    They can have the underlying exhibits, but not the

4    transcript.

5              MS. FORD:  With respect to the Court's statement,

6    that's right, that's what I am offering.

7              THE COURT:  Mr. Chase, then anything further on

8    the People's exhibits?

9              MR. CHASE:  No, Your Honor.  I submit the

10   matter.

11             THE COURT:  I am going to go ahead and admit

12   Exhibits 1 through 8 of the People which would include the

13   other diagrams used by Dr. Maldonado's demonstrative device

14   screen during the course of his testimony.  8-A is received

15   but will not be submitted to the jury.  That is, it is to be

16   retained as part of the Court record of the proceedings of

17   the content of the DVD interview, but not to go into the

18   jury room.  9 through 15 will be received into evidence, 16

19   is duplicative of one of the defense exhibits, so rather

20   than have the same photograph going in twice, 16 will not be

21   received.

22                         (Whereupon, People's

23                         Exhibits No. 1 through 8 and

24                         Exhibits No. 9 through 15

25                         were admitted into Evidence.)

26             THE COURT:  As to the defense exhibits at this

*103*

1    point, Mr. Chase, in terms of offering for the purposes of

2    introduction of other exhibits constituting hearsay, you are

3    only seeking to have admitted for trial C, D and E, is that

4    correct?

5         MR. CHASE:  Yes, Your Honor.  I'd like A, B, F and

6    H to remain marked for identification.

7         THE COURT:  They will be marked for Identification

8    only.  Any comment, Ms. Ford?

9         MS. FORD:  Submitted.

10                        (Whereupon, Defendant's

11                        Exhibits No. C, D and E were

12                        admitted into Evidence.)

13        THE COURT:  Mr. Chase, as it relates to any prior

14   exhibits used in the motions, I just note that any of the

15   People's exhibits that might have been used for motion

16   proceedings we had simply taped over.  For example, the

17   photograph of Miss Marcos which was used both during the

18   foundational hearing and at trial, the taped over of

19   exhibits, so the Court will have a record, but the jury will

20   not see that as it relates to any of the defense exhibits

21   for the motion.

22        MR. CHASE:  I would like those to be in evidence

23   as part of the motion record and as part of the record of

24   the case.

25        THE COURT:  Any such exhibits certainly would be

26   retained as part of the Court record, but they are not going

*104*

1    Q    So why did you see Mr. Johnson that day?

2    A    Every time that I would go by, he is always out

3    from his office, he was the one talking to me.

4    Q    You talked to him at that time about lifting the

5    restraining order?

6    A    He talked to me about that.

7    Q    Did you see him on his birthday in 2004?

8    A    Yes.

9    Q    What day is his birthday?

10        MS. FORD:  This is beyond the scope.  Objection.

11        THE COURT:   It is as it relates to the

12   restraining order.  What's the relevance here?

13        MR. CHASE:  His birthday is in November.  I want

14   to find out if this was one of the occasions that they

15   discussed this.

16        THE COURT:  Give me a second here.  All right.

17   November.  Is it May or November?

18        MR. CHASE:  Sorry, I withdraw the question.

19        BY MR. CHASE:

20   Q    When you went with the papers and he didn't want

21   to sign the papers, what did he have to sign on these

22   papers?

23   A    The date he has to go to Court.

24   Q    To sign acknowledging the date?

25   A    Yes, to know that he got, that he received the

26   papers for him to go to Court.

*105*    *Exhibit H*

1     Q    So you thought in order to serve him with the

2    papers he had to sign something?

3     A    They said he had to sign.

4     Q    Who said that he had to sign?

5     A    In the paper.

6     Q    The paper said that he had to sign?

7     A    Yes, it was kind of like a subpoena.

8          MR. CHASE:  Okay.  Just one minute, Your Honor.

9    I'd like to have a four-page document entitled, Order to

10   Show Cause as Exhibit H.

11         THE COURT:  It may be so marked.

12                              (Whereupon, Defendant's

13                              Exhibit No. H was marked

14                              for Identification.)

15         BY MR. CHASE:

16    Q    I'd like you to look at this and noting that the

17   name is blocked out here, do you see anywhere -- first of

18   all, is this the restraining order that you filed on

19   November 24th or the request to have the restraining order

20   lifted?

21    A    Yes.

22    Q    And is there anywhere on that document that it

23   calls for the signature of the person against whom you are

24   trying to get the restraining order lifted?

25    A    It was a different paper, it was the other person

26   who was going to give it to him had to sign as well, date

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN MATEO

**FILED**
SAN MATEO COUNTY
APR 22 2004
Clerk of the Superior Court
By _____
DEPUTY CLERK

Petitioner: _Paolina Lara_____

And

Respondent: _Michael Johnson_____

Case No. __**079377**__

DECLARATION RE: NOTICE OF
EX PARTE APPLICATION
FOR ORDERS

I, _Paolina Lara_____, declare:

1. That I am ☐ counsel for petitioner/respondent
   ☒ petitioner in propria persona
   ☐ respondent in propria persona
   ☐ other:_____
   in the within action.

2. That, pursuant to Local Rules of Court, I have given notice of the present ex-parte application for orders to:

   ☐ counsel for petitioner/respondent,
   _____(name)
   ☐ petitioner in propria persona
   ☐ respondent in propria persona
   ☐ other:_____

   in the following manner:

   ☐ by telephone call at _____(AM) (PM) on _____, 20___
   ☐ by personally advising at _____(AM) (PM) on _____, 20___
   ☐ by letter (personally delivered) (mailed) at _____(AM) (PM)
   on _____, 20_____
   ☐ other: (describe)_____
   _____

   to appear in Department No. _____at _____(AM) (PM) on _____, 20___

3. I have received the following response to said notice:

_108_

Your name: PAOLINA LARA

Case Number:

**079377**

## What orders do you want? Check the boxes that apply to your case ☑

**18**  [X] **More Time for Notice**
I need extra time to notify the person in ❷ about these papers. Because of the facts explained on this form, I want the papers served up to _5_ days before the date of the hearing. *For help, read DV-210.*
*If necessary, add additional facts:* _____

_____

**19**  [ ] **Other Orders**
What other orders are you asking for? _____

[ ] *Check here if you need more space. Attach MC-020 and write "DV-100, Item 19—Other Orders" by your statement.*

**20**  Turn In Guns or Other Firearms
I ask the judge to order the person in ❷ to sell or turn in any guns or firearms that he or she has or controls. If the judge approves the orders at a noticed hearing, the restrained person will be required to sell to a gun dealer or turn in to police any guns or firearms that he or she has or controls. *Describe any use or threatened use of firearms in* ㉑ .

**21**  **Describe the most recent abuse.**
 a. Date of most recent abuse: _4/10/04_
 b. Who was there? SEE ATTACHMENT
 c. What did the person in ❷ do or say that made you afraid?  SEE ATTACHMENT

_____
_____
_____
_____

 d. Describe any use or threatened use of guns or other weapons:  SEE ATTACHMENT
_____

 e. Describe any injuries: SEE ATTACHMENT
_____

 f. Did the police come? [ ] No  [X] Yes
 If yes, did they give you an Emergency Protective Order? [X] Yes  [ ] No  [ ] I don't know
 *Attach a copy if you have one.*
 [X] *Check here if you need more space. Use Form MC-020 and write "DV-100, Item 21—Recent Abuse" by your statement.*
 [X] *Check here if the person in* ❷ *has abused you (or your children) other times. Use Form DV-101 or Form MC-020 to describe any previous abuse.*

**22**  I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: APRIL 20, 2004

PAOLINA LARA
*Type or print your name*

▶ *Sign your name*  _Polo Lara_

**This is not a Court Order.**

*109)*

**DV-100**    **Request for Order**

Clerk stamps below when form is filed.

**1** Your name (person asking for protection):

PAOLINA LARA

Your address *(skip this if you have a lawyer)*: *(If you want your address to be private, give a mailing address instead)*:

150 RAMONA AVE.

City: SOUTH SAN FRANCISCO    State: CA.    Zip: 94080

Your phone # *(optional)*: ( 650 ) 873-2769

Your lawyer *(if you have one)*: *(Name, address, phone #, and State Bar #)*:

_____

_____

_____

**FILED**
**SAN MATEO COUNTY**

APR 2 2 2004

Clerk of the Superior Court

By _____
     DEPUTY CLERK

Court name and street address:

Superior Court of California, County of
SAN MATEO
SAN MATEO COUNTY SUPERIOR COURT
401 MARSHALL STREET
400 COUNTY CENTER
REDWOOD CITY, CA    94063

**2** Name of person you want protection from (restrained person):

MICHAEL JOHNSON

Describe that person: Sex: [X] M [ ] F  Ht.: 6'1"   Wt.: 215

Race: BLACK _____    Hair Color: BLACK

Eye Color: BROWN _____  Age: 37    Date of Birth: 5/28/66

Case Number 0 7 9 3 7 7

**3** Besides you, who needs protection? *(Family or household members)*

| Full Name | Age | Lives with you? | How are they related to you? |
|---|---|---|---|
| _____ | ____ | [ ] Yes [ ] No | _____ |
| _____ | ____ | [ ] Yes [ ] No | _____ |
| _____ | ____ | [ ] Yes [ ] No | _____ |
| _____ | ____ | [ ] Yes [ ] No | _____ |

[ ] Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 3—Protected People" by your statement.  NOTE: In any item that asks for Form MC-020, you can use an 8 1/2 x 11 inch sheet of paper instead.

**4** What is your relationship to the person in **2**? *(Check all that apply)*

a. [ ] We are now married.

b. [ ] We used to be married.

c. [ ] We live together.

d. [X] We used to live together.

e. [ ] We are relatives, in-laws, or related by adoption *(specify relationship)*: _____

f. [X] We are dating or used to date.

g. [ ] We are engaged to be married or were engaged to be married.

h. [ ] We are the parents together of a child or children under 18:

    Child's Name: _____    Date of Birth: _____

    Child's Name: _____    Date of Birth: _____

    Child's Name: _____    Date of Birth: _____

[ ] Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 4h" by your statement.

i. [ ] We have signed a Voluntary Declaration of Paternity for our child or children. *Attach a copy if you have one.*

**This is not a Court Order.**

Judicial Council of California

*110*

SHORT TITLE: LARA V. JOHNSON     CASE NUMBER: 0 7 9 3 7 7

1 | The Respondent and I were in an on and off dating relationship for almost three and a half

2 | years. We lived together for a period of six months. We have no minor children. I am

3 | nineteen years old and the Respondent is thirty seven years old. I did not know his true age

4 | until recently because when I met him he lied to me and told me that he was twenty-three

5 | years old.

6 |

7 | The most recent incident of violence occurred on April 10, 2004. I came home from work. I

8 | went to bed early. I live in the same house as my father and step-mother. I do not remember

9 | anything that happened next. My next memory is waking up in the hospital. I was surrounded

10 | by my family. I had no idea what happened to me. I was in excruciating pain. I asked them

11 | what happened. My father told me that the Respondent physically assaulted me. He told me

12 | that my step-mom received a phone call from the Respondent at 6:00 a.m. on the morning of

13 | April 11, 2004. He said that the Respondent told her that I was hurt and that he took me to

14 | the emergency room. The doctor told me that I had severe injuries. I had a fractured skull

15 | and my scalp had to be stapled. The insides of my eyes were dark red, and my right eye was

16 | black and blue. My face was swollen and bruised. I have trouble hearing and seeing. It is

17 | difficult for me to walk without assistance because it is hard for me to maintain my balance.

18 | My elbow was badly cut and bruised. My head is still bleeding and sore.

19 |

20 | I spoke to a police officer about what happened to me. It is difficult for me to talk about

21 | the incident because due to my severe head injuries I am having a hard time remembering the

22 | details. The police took photographs of me while I was at the hospital. The officer

23 | reported that I made statements to the nurse that the Respondent threw something at me. An

24 | officer came to my home a few days ago. The officer told me the Respondent's true age. He

25 | also told me that the Respondent made statements indicating that he was responsible for

26 | *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers)*:

27 | This page may be used with any Judicial Council form or any other paper filed with this court.    Page 1

///

SHORT TITLE: LARA V. JOHNSON                    CASE NUMBER: **079377**

1 | hurting me. ⸢I told the police officer about the history of violence in our relationship.⸣

2 | The officer issued an Emergency Protective Order protecting me from the Respondent. (Please

3 | see attached EPO Case #: 04-04-10-014). The order expired on April 19, 2004. The Respondent

4 | was arrested and is out on bail. The victim advocate at the District Attorney's Office

5 | informed me that his arraignment is set for May 18, 2004.

6 |

7 | A recent threat of violence occurred approximately four months ago. The Respondent and I had

8 | an argument. He called me and told me that he wanted to talk to me. I told him that I did

9 | not want to talk to him. He called me again. I did not pick up the phone. He left a

10 | message threatening that he was on his way to my house and if I didn't open the door he would

11 | break the door down. He told me that he didn't care if I called the police or made a big

12 | deal about it. The Respondent showed up about ten minutes later at around 11 p.m. He called

13 | again and told me that he was in front of the house. He demanded that I open the door. I

14 | opened the door because I didn't want him to wake up anyone else in the house.

15 |

16 | Another incident of violence occurred in May 2003 while the Respondent and I were living

17 | together. The Respondent and I had an argument. I was trying to pack up my belongings and

18 | leave. The Respondent got made at me and pushed me.

19 |

20 | My Emergency Protective Order expired on April 19, 2004 and I am afraid that the Respondent

21 | will try to hurt me again. I am respectfully requesting that this Court grant my request for

22 | a three year domestic violence restraining order.

23 |

24 |

25 |

26 | *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers):*

27 | This page may be used with any Judicial Council form or any other paper filed with this court.    Page 2

*112*                                                                                          *q*

345

1      Q    Now, when you first talked to Officer McHale you

2   told him there had been no previous incidents of violence

3   between you and Mr. Johnson, remember that?

4      A    Yes.

5      Q    But in this declaration, didn't you tell the

6   person that was typing it up that you told the police

7   officer about the history of violence in your relationship?

8      A    I just told him about the time he put me down, and

9   that's it.

10     Q    What I am asking, on April 18th, two days before

11  you signed this declaration, didn't you tell Officer McHale

12  that there was never any violence in the relationship?

13     A    That it will come to the point for me to go to the

14  hospital, yes, I told him that.

15     Q    Did you tell him -- listen very carefully.  Did

16  you ever say there was no previous evidence of violence in

17  our relationship?

18     A    Yes.

19     Q    So when you said in your declaration two days

20  later on the 20th of April, that you told him about the

21  violence, the history of violence in your relationship, what

22  were you talking about?

23     A    The time he just put me down.

24     Q    Are you saying you told Officer McHale that on

25  April 18th?

26     A    I believe I told him, but I don't know what date.

SONIA KOLOKOURIS RISTING, CSR 6678

113

Ground 5. (con't.)

unintelligible. It was Ineffective Assistance of Counsel when Defense Counselor did NOT demonstrate to Jury the "impossibility" of Paolina's testimony on how Defendant supposedly assaulted her (Trial Transcript, pp. 277-284). *If a person grabs anyone by the <u>left</u> arm and <u>pushes</u> someone with a leg in <u>front</u> and that person trips and falls down with a hand on the <u>right</u> side of the head, any injury would be on <u>the front</u> NOT back of the head. However, if someone grabs the front of a shirt and slips, accidently falling backward, injury would be on the back of the head, especially so, with sudden attack of a seizure.* Read girlfriend's testimony over and over again, and ONLY one conclusion can be derived: She was making-up her testimony; <u>she didn't remember.</u> If a 200 lb man kicks a 95 lb female in the stomach, there would be bruises, as well, there were NOT any bruises on the front or back of abdomen area. The street was too narrow for Defendant's car to make a U-turn. Paolina Lara Guiterrez was not telling the truth; she did NOT remember. "Defense Counselor was ineffective by NOT pointing these facts out to the Jury." (sic) Petitioner is innocent! It was Ineffective Assistance of Counsel for Defense Counselor NOT to have petitioned the Court for a 2nd chair to assist him in Defense of Defendant. Perhaps, that

Ground 5. (con't.)

2nd chair would have brought to light "the effects 'anxiolytic and amnestic medications' had on Paolina." Upon entering the Hospital, the Emergency Trauma Technicians certainly did administer Medication (i.e. painkillers). Defense Counselor did NOT ask about the impact of blood lost on memory, nor did he ask about the medications that were given to Paolina, what affects the medications would have on a victim's "statements." It was Ineffective Assistance of Counsel for Defense Counselor when he did NOT consult a Medical Expert regarding the effects of blood loss and painkillers on Paolina's memory. In an analogus "memory" case, just on this Issue alone, Ineffective Assistance of Counsel was Proven. See, Bell vs. Miller, Docket No. 05-5235-pr, 2nd Cir. 2007. citing People vs. Taylor, 75 N.Y. 2d 277, 288 "Beyond the ken of the typical juror" to know the effects of trauma, blood loss, and anxiolytic and amnestic medications on the human brain. The Court reasoned "True, counsel cross examined Moriah and Dr. Brewer in an effort to cast doubt on Moriah's identification. But counsel's failure even to investigate the scientific implications of Moriah's trauma, blood loss and sedation handicapped his cross-examination of those key prosecution witnesses. See, Eze vs. Senkowski, 321 F.3d 110, 129 (2nd Cir. 2003) (explaining

87

Ground 5. (con't.)

that by not investigating the scientific accuracy of prosecution witness's conclusions, counsel "missed out on the chance to impeach him on contrary medical literature")... And counsel failed to ascertain from Dr. Brewer what drugs he administered to Moriah, let alone how those medication might have impacted Moriah's memory. Likewise, counsel failed to elicit any testimony from Moriah about those medications, even though Moriah had testified to the grand jury (on videotape) that, over a month after the crime, he continued to take painkillers and suffer memory lapses and dizziness." Court reasoned (defense theory) "would have been promoted, without any appreciable downside, by expert medical testimony on the impact that blood loss and painkillers had on Moriah's memory. See, e.g., Pavel vs. Hollins, 261 F.3d 210, 219 (2nd Cir. 2001)(finding ineffectiveness for failure to call witness whose testimony could have bolstered defense theory)." Instant case, above mentioned "In context of criminal trial, accumulation of errors can be grounds for new trial" Latzo Lais vs. Whitley, 93 F3d 205 (5th Cir. 1996). "It was reversible error to admit into evidence, plaintiffs conviction that was over 10 years old." Shows vs. M/v Red Eagle, 695 F2d 114 (5th Cir 1983). "Other crimes evidence may not be used to demonstrate individual's propensity to commit crime" U.S. vs Moore, 115 F3d 1348.

1    Q    When you wrote this declaration you had only

2    talked to him one time, hadn't you?

3    A    Yes, and then after that we talked a couple of

4    times.

5    Q    When you wrote this on April 20th, you had only

6    seen him one time, that was on the 18th of April?

7    A    Yes.

8    Q    And are you saying you told him at that time about

9    the incident or are you saying that Mr. Johnson pushed you

10   down when you were grabbing him for your clothes?

11   A    I don't think I mentioned that to him.

12   Q    When you had this person type on here that you

13   told the police about the history of violence in our

14   relationship, what were you talking about?

15   A    Probably the time that we used to argue, the time

16   he used to text me, come outside out or I will break the

17   door, I don't care if you talk to me or if your dad wakes

18   up.  They probably took that as violence.

19   Q    In this declaration you write about an incident

20   that happened sometime earlier, some four months earlier or

21   so when Mr. Johnson was text messaging the same thing, you

22   remember text messaging you the night this happened.

23   A    What do you mean?

24   Q    Come out of the house or I will break the door

25   down.

26   A    Yes, he had texted me that a couple of times.

SONIA KOLOKOURIS RISTING, CSR 6678

*114*

1      under penalty of perjury under the laws of the State of

2      California that the foregoing is true and correct.

3           A    That's correct, I didn't.

4           Q    Did you sign this typewritten declaration?

5           A    Yes.

6           Q    Did the person that typed it up read it to you or

7      had you read it before you signed it?

8           A    No, they didn't read it to me.

9           Q    Did you read it?

10          A    I couldn't.

11          Q    Did they ask you to read it?

12          A    No, because they knew I couldn't really see.

13          Q    Did you put down anything in this declaration that

14     you couldn't see other than saying I have trouble hearing

15     and seeing?

16          A    No.

17          Q    You didn't say you were blind, did you?

18          A    No.

19          Q    You are saying that the person who helped you fill

20     this out and had you sign it never read it to you after they

21     typed it up?

22          A    Yes, I believe so, I don't remember them reading

23     it to me.

24          Q    They just told you to sign it?

25          A    Yeah.

26          Q    Did you know you were signing it?

1      A    They told me what I was saying, they were typing,

2   and then they just told me to sign right here.  They put my

3   hand on the line and I signed.

4      Q    Now this document that you filed to release the

5   restraining order, that was filed in November of 2004,

6   that's a hand written document, right?

7      A    Yes.

8      Q    You wrote everything on there?

9      A    Yes.

10     Q    And in this you said that your father didn't like

11  Mr. Johnson, that's why you got the restraining order in the

12  first place?

13     A    Yes.

14     Q    And you say that you remember now that it was an

15  accident?

16     A    That was based on what he was telling me.

17     Q    You said, I remember it was an accident.

18     A    Because I didn't know what else to put in, in

19  order for them to take the restraining order out.

20     Q    I had an accident in front of my house.  Do you

21  remember that, and now you remember what happened and

22  knowing that he didn't hurt you, you want the restraining

23  order lifted, right?

24     A    Yeah.

25     Q    Yet no other explanation for how you got those

26  injuries that are depicted in these pictures, did you?

SONIA KOLOKOURIS RISTING, CSR 6678

*116*

1        Q      Do you know how long after this assault occurred

2    you woke up at the hospital, do you know if it was hours,

3    days?

4        A      I don't know.

5        Q      Do you recall speaking to hospital staff when you

6    arrived at the hospital?

7        A      No.

8        Q      Do you recall telling a nurse that the defendant

9    had thrown something at you?

10       A      No.

11       Q      Do you have any memory of him having thrown

12   something at you?

13       A      No.

14       Q      Do you recall giving any information to hospital

15   staff about your name, where you lived, how old you were?

16       A      No.

17       Q      Do you recall the defendant being present with

18   you in the emergency room of the hospital shortly after

19   this assault that you have described?

20       A      No.

21       Q      Do you remember saying to the defendant, baby I

22   forgive you, I'll be a good girl?

23       A      No.

24       Q      You said that after being seated in the car and

25   the defendant holding your head, the next thing you remember

26   is waking up in the hospital.  When you woke up in the

SONIA KOLOKOURIS RISTING, CSR 6678

*117*

1                        RECROSS EXAMINATION

2              BY MR. CHASE:

3         Q    Did you tell Officer McHale or Detective Neary

4    here, when you talked to him on February 9th, 2005, that Mr.

5    Johnson had grabbed you by your ankles and dragged you to

6    the car?

7         A    No.

8         Q    You didn't tell them that?

9         A    I believe not.

10        Q    He didn't do that, did he?

11        A    I don't remember him doing that.

12        Q    And did you tell them that he continued to assault

13   you in the car by grabbing your arms?

14        A    My head.

15        Q    You told them, your head?

16        A    He was holding me on my head.

17        Q    You didn't tell either of those officers on

18   February 9th that he grabbed, he kept grabbing your arms.

19        A    My arms, no.

20             MR. CHASE:  Those are all the questions I have.

21             THE COURT:  Thank you.  May this witness be

22   excused?

23             MR. CHASE:  Subject to recall, please.

24             THE COURT:  Ma'am, you are excused today subject

25   to recall.  What that means is you are not to discuss your

26   testimony with any other witness in this case.  You are

1      A    No.

2      Q    Now, you told us what you can recall about

3    Michael grabbing onto your head pushing you down to the

4    ground, kicking you and stepping on your head.

5          Do you remember anything after that point where

6    he stepped on your head?

7      A    Yes.  I know I noticed that the light was on

8    and a person was there.  He was walking away.  And when

9    he saw that, he walked back to where I was at and he

10   picked me up and put me in the car.

11     Q    Where is it that you saw a light on in the

12   window?

13     A    It was one of my neighbors that was across the

14   street.

15     Q    Okay.  So you saw there was a light on and you

16   are assuming that Michael saw that too?

17     A    Yes.

18     Q    Okay.  But you don't know for sure that he

19   saw --

20     A    No, I don't know for sure.

21     Q    When the defendant came back towards you how

22   did he -- how did he take hold of you?

23     A    He just grabbed me real fast and he put me

24   inside the car in a rush.

25     Q    Did he pick you up or did he drag you?

26     A    He picked me up.

*119*

)

0055

1    know it was his car because it was a big shadow and I

2    knew it was him.

3        Q    You had already lost your eyesight at this

4    point?

5        A    Yes.

6        Q    Now, did he ever drag you by your heels?

7        A    No.  No, I don't remember that.

8        Q    Did you ever tell the police the heels of your

9    feet?  Did he ever grab your ankles and pull you?

10        A    No.  I wasn't wearing heels.

11        Q    Did you ever tell the police that he did that?

12        A    No, not that I can remember.

13        Q    Just before your memory came back, were you

14    having arguments with Mr. Johnson?

15        A    What kind of arguments?

16        Q    Arguments about him seeing other people.

17        A    We also talked about it.  It was more or less

18    conversation than argument.

19        Q    Well, do you remember test messaging him within

20    a couple of days before recovering your memory?

21        A    Yes.

22        Q    And talking with him about coming back from

23    Florida?

24        A    Yes.

25        Q    And you were angry with him that the trip to

26    Florida took longer than you thought it should.

*120*

```
 1        A    No.

 2        Q    Did your father show you pictures that he had

 3   taken of you in the hospital?

 4        A    Later on, yes.

 5        Q    When you saw those pictures, do you remember

 6   when that was?

 7        A    No.

 8        Q    And you didn't just put two and two together as

 9   to what must have happened based on your injuries?

10        A    No.  Because I don't know what happened.  When

11   my feet were bruised, I don't know what happened with

12   that part.

13        Q    You never told the police officer that he

14   dragged you by your heels?

15        A    I don't remember.

16        Q    You don't remember telling them that, or you

17   don't remember that happening?

18        A    Both.  I don't remember him doing anything to

19   my feet.

20        Q    Everything you are remembering here today, what

21   you are saying happened here, is that all of what you

22   recovered in your memory on February the 8th?

23        A    Yes.  And so far right now.

24        Q    Has any more memory come back to you since that

25   day?

26        A    No.  I am trying to not think about it too
```

/2/

1    her head and demonstrated in the photographs was on the

2    street.

3        She made statements that she was dragged by the

4    heels to Mr. Johnson's car and today she said he picked

5    her up.

6        I believe that this is showing that her --

7        THE COURT:  I would allow questions regarding

8    the statements that she gave regarding the incident when

9    she recovered her memory and also questions regarding the

10   blood on the street.

11       Ms. Ford, any objection to doing that now?

12       MS. FORD:  No.

13       THE COURT:  Go ahead.

14                   CROSS-EXAMINATION

15       MR. CHASE:  Q  Officer McHale, you did speak

16   with Mr. Johnson, the gentleman seated here to my right?

17       A    Yes, I did.

18       Q    And you spoke with him shortly after this

19   incident had been reported?

20       A    That is correct.

21       Q    And Mr. Johnson told you where the complaining

22   witness had fallen in the street?

23       A    Yes, he did.

24       Q    And did you go to that location in the street?

25       A    I personally did not, no.

26       Q    Had you written a report where you indicated

/22

P c-m

0070

1        A     Yes, I do.

2        Q     And did she happen to tell you how she knew the

3    neighbor was watching Mr. Johnson?

4        A     I believe she said she saw a light on inside

5    the house.

6        Q     And that it was Jasmine Kanaser?

7    K-A-N-A-S-E-R.

8        A     Correct.

9        Q     Did you ever talk to Ms. Kanaser?

10       A     I did not.

11       Q     And then after that happened, Mr. Johnson was

12   walking away, he came back and he dragged the complaining

13   witness to his car by her ankles?

14       A     That is correct.

15       Q     So did she tell you that her head was being

16   dragged across the pavement while he was doing that?

17       A     I don't recall other than she said she was

18   dragged by her ankles.

19       Q     And she also told you that during the ride to

20   the hospital that he kept grabbing and squeezing her arm?

21       A     That is correct.

22       Q     Did she tell you that he was holding her up or

23   trying to hold her head in any way during this trip?

24       A     No, she did not.

25       Q     And she also told you that she suffered from

26   blurred vision for several weeks, didn't she?

*123*

*P. c-m*

1     outside or how he took me outside, but I remember it was

2     outside he stepped on me.

3            And there was a window and the blinds were

4     drawn and somebody was watching, but I don't recall who

5     exactly it was.

6        Q     All right.  Ms. Gutierrez, as you testify

7     today, you seem to be testifying in pieces.  Can you

8     describe for us how clear your memory is of this

9     incident, of the assault?

10       A     I can't see exactly what happened step by step,

11    but I recall -- I recall him hitting me and kicking me

12    several times.  I can't put it together, I can just see

13    parts of it.

14       Q     Okay.  Immediately after this incident

15    occurred, do you have any memory of being in the

16    hospital?

17       A     Yes.  Just two memories I have of the hospital.

18       Q     What are your memories of the hospital?

19       A     That when I woke up, I was in a sitting

20    position and they were shaving the back of my head.  And

21    I was asking the doctor why they were doing this.  And

22    the doctor said they were going to put staples in my head

23    because two of them had to have staples.

24       Q     What the other memory do you have from the

25    hospital?

26       A     The other memory is when another patient who

P F-P                    124

1    was a couple of beds next to me, he was yelling for water

2    and I couldn't stand the yelling part.  My head was

3    really in pain.  So I yelled back at him, like, Give him

4    some water, he needs some water, give him some water.

5    And my dad told me, It is okay, he doesn't need any

6    water.  He is sleeping.

7         Q     Now, when you were in the hospital, do you

8    recall being visited by police?

9         A     No.

10        Q     Okay.  When you were in the hospital, did you

11   have a memory of the incident that you have just been

12   describing?

13        A     No.

14        Q     After you were released from the hospital, do

15   you recall detectives visiting you at your home to talk

16   about the incident?

17        A     Yes.  I remember hearing them, but I couldn't

18   see them because I was blind for a month and a half.

19        Q     When the detectives visited you, at that time

20   did you have a memory of what had occurred?

21        A     No.

22        Q     When did you first have a memory about this

23   incident that occurred on April the 9th?

24        A     As I was sitting there February 8th, I believe

25   so.

26        Q     What happened just prior to you getting

P F.p            125

1    Q    Following your hospitalization, did you suffer

2    from the loss of any of your bodily functions or senses?

3    A    Yes.

4    Q    Can you describe how you were injured?

5    A    I couldn't see.  I was blind for a month and a

6    half.  I couldn't hear for four weeks.  My balance was

7    bad, I couldn't walk by myself.  I needed help walking

8    and eating.  My stepmom and my sisters were the ones

9    bathing me because I couldn't take a shower by myself, I

10   couldn't stand up.  They had to feed me.  Since I

11   couldn't hear with my right ear, I had to turn the volume

12   for everything up.

13   Q    Has your hearing in the right ear returned?

14   A    Yes.

15   Q    So you suffered the loss of hearing for about a

16   month?

17   A    Yes.

18   Q    And with respect to your blindness for a month

19   and a half, were you completely blind or were things

20   blurred?  How would you describe that?

21   A    At the beginning, it was everything was black.

22   Little by little, I started seeing shadows, blurriness.

23   And it just started a little bit and a little bit I could

24   see shapes of things and then the actual thing and then

25   the color.

26   Q    And how is your vision today?

*126*          P F.P

1   the hospital which would mean that you sort of wait until

2   the vision is cleared or you have documented evidence in

3   the records that the person is receiving follow-up for

4   this.  Inasmuch as our optic nerve is part of our brain,

5   it's an extension of the brain, but it's brain tissue and

6   if you have trouble with your vision, that's usually

7   regarded as an indication of an extraordinarily severe

8   injury.

9          BY MR. CHASE:

10     Q    Did you find anything in the medical records

11   from the admission on April 10, 2004 that indicated that

12   the cranial nerves were intact with regard to Miss Lara?

13     A    That's what the records indicated.  The way it's

14   referred to is basically cranial nerves 2 through 12 it was

15   within normal limits.

16     Q    And is the optic nerve one of those nerves?

17     A    Yes.

18     Q    And you found a notation of that in the record?

19     A    Yes.

20     Q    And the record that you didn't have, I'd like to

21   have marked as Defense Exhibit F.

22              (Whereupon, Defense

23              Exhibit No. F was marked

24              for Identification.)

25          BY MR. CHASE:

26     Q    Showing you a record from the patient's progress

127

T c-missett

658

1    record from April 27th, 2004, read that over.  Exhibit F.

2        A    Yes.

3        Q    That record of April 27th, 2004, said that she was

4    able to read with either eye, doesn't it, down towards the

5    bottom?

6        A    Yes.

7        Q    And that would be contrary to being blind,

8    wouldn't it?

9        A    Yes.

10       Q    And that was a record that you had not

11   previously seen?

12       A    I have not seen this.

13       Q    And there was a mention in the record, was there

14   not, about a claim that she was blind from four to six weeks

15   when she was in the hospital in October of 2004?

16       A    Yes.

17       Q    That was the first mention of blindness you saw on

18   record?

19       A    Yes.

20       Q    You also saw that she testified under oath in

21   May of 2005 that she had been blind from four to six

22   weeks?

23       A    She didn't say that.

24       Q    Now with regard to the claim that she had no

25   memory in the medical records, did you find the notation

26   that maybe she had recovered some memory or at least

SONIA KOLOKOURIS RISTING, CSR 6678

*T c-misset*

*128*

1    Q    And you never heard the phrase under "penalty

2    of perjury" before?

3    A    No.  I heard of it, but I don't remember

4    exactly what it means.

5    Q    When you were sworn to tell the truth here

6    today, do you know what that meant?

7    A    Yes.

8    Q    And you told the doctors that you lost your

9    vision.

10   A    They knew.  I didn't have to tell them, they

11   knew.

12   Q    How did they know if you didn't tell them?

13   A    My eyes were covered with blood and they were

14   asking me, How many fingers do you see I am holding?  And

15   I couldn't see anything.

16        When I went back and I told them I could see a

17   little bit of shadows, they told me they were surprised.

18   They told me they thought I would be blind for the rest

19   of my life.

20   Q    And that blindness lasted how long?

21   A    A month and a half.

22   Q    And then did your vision come back all of a

23   sudden?

24   A    A little by little.  Not all at once.

25   Q    When you were in the hospital you couldn't see

26   the bruises on your body?

*129*

1        A        He normally would say, but he would not say the

2    love that he had.

3        Q        He told you that he loved you?

4        A        Yes.

5        Q        Had you spoken with him about being faithful to

6    you?

7        A        We were always talking about him being with other

8    girls, but being faithful, no.

9        Q        I don't understand what you mean by we were

10   always talking about it.  Was it something you were always

11   questioning him about?

12       A        Yes.

13       Q        Were you suspicious about it regularly?

14       A        Yes.

15       Q        Is it fair to say that you didn't necessarily

16   trust him?

17       A        That's right, I didn't trust him.

18       Q        And when you saw him with this other woman, you

19   were suspicious?

20       A        Yes.

21       Q        What did you do?

22       A        I just walked out.

23       Q        You walked out of the restaurant?

24       A        Yes.

25       Q        Did you speak with the defendant before leaving?

26       A        No.

T F-P                    130

1      A      I remember him mentioning something, it was
2  Friday night so he was going to go out.
3      Q      Was Friday's a place he usually went to on Friday
4  nights?
5      A      Yes.
6      Q      Is that because you went to Friday's, because you
7  wanted to check up on him?
8      A      Yes.
9      Q      So when you got there you looked around and you
10  saw him, right?
11      A      Yes.
12      Q      And he was standing, he had his arm around a
13  woman?
14      A      Yes.
15      Q      And you didn't go up to talk to him, did you?
16      A      No.
17      Q      Was he up in the bar area?
18      A      Yes.
19      Q      You weren't allowed in the bar area I take it
20  because of your age?
21      A      Yeah, that's correct.
22      Q      And you never had any conversation with him there
23  at Friday's?
24      A      No.
25      Q      Did you ever tell a police officer that you had a
26  conversation with Michael at the front door and that you

SONIA KOLOKOURIS RISTING, CSR 6678

T C-P                    131

1     told him, have fun with your girls?

2          A     No, I sent him a text message saying that.

3          Q     Did you ever tell an officer that you actually

4     had a face-to-face conversation with Michael there at the

5     door?

6          A     No.

7          Q     You didn't?

8          A     I didn't.

9          Q     You didn't have any, right?

10         A     No.

11         Q     But you did send him a text message that said,

12    have fun with your girls.

13         A     Yes.

14         Q     Now, have you ever testified before that text

15    messages that you sent him was to be a good boy?

16         A     Yes.

17         Q     Did you send him both those text messages?

18         A     I don't know, but I sent him the one, have fun

19    with your girls, I don't know about the other one.

20         Q     Now, did you send text messaging back and forth

21    with him that night?

22         A     Yes.

23         Q     Do you know what time it was when you arrived at

24    Friday's?

25         A     Around 9:30, 10:00, I believe.

26         Q     And did you ever tell anyone, a police officer or

SONIA KOLOKOURIS RISTING, CSR 6678

T C - P            132

1    anyone else, that you arrived around 8:00 o'clock?

2        A    No.

3        Q    Are you sure about that?

4        A    Yes, because I remember saying I was working that

5    day at J.C. Penny and my friend she gets off at 9:00, so it

6    was after 9:00.

7        Q    Do you remember talking to Officer McHale on

8    April 19th, that is eight days after your head was injured,

9    you were talking to Officer McHale at that time?

10       A    I remember talking to him, but I don't remember

11   what date.

12       Q    Do you remember a week after this happened?

13       A    Probably, I don't know.

14       Q    Did you ever tell Officer McHale that you saw Mr.

15   Johnson at Friday's around 8:00 p.m. that night?

16       A    No.

17       Q    And do you remember talking to Officer McHale,

18   Detective Neary on February 9th of 2005?

19       A    Yes.

20       Q    Do you remember at that time telling them that

21   you tried to leave Friday's without talking to Mr. Johnson,

22   but that he stopped you at the door and that's when you

23   said, have fun with your girls?

24       A    No.

25       Q    You didn't tell him that?

26       A    Because I had no communication with Michael.

SONIA KOLOKOURIS RISTING, CSR 6678

T - C - P              133

1    A    Yes.

2    Q    She didn't say anything about her left side?

3    A    I don't recall.

4    Q    And when you talked to Miss Lara on April 18th

5  she told you that she and Mr. Johnson had verbal

6  arguments, but never had a physical altercation?

7    A    That's correct.

8    Q    She was clear about that?

9    A    Yes, she was.

10   Q    Miss Lara also told you on, I believe it was on

11  the 18th, I am sorry -- let's go now to the February 11th

12  interview.  She told you that when she saw Mr. Johnson at

13  Friday's she tried to leave without talking to him, but he

14  stopped her at the door and she told him, "have fun with

15  your other girl", remember her saying that?

16   A    I remember her telling me she texed him that

17  message.

18   Q    Let me find this in the report.  Can you look at

19  your report dated February 11th, 2005, page number BM2,

20  and look at lines 18 through 24.  Read those to yourself,

21  see if that refreshes your recollection.  Does it?

22   A    Yes, it does.

23   Q    So she said he stopped her at the door, she had

24  contact with him at Friday's.

25   A    Yes, it does.

26   Q    With regard to the picture of the hat there, you

SONIA KOLOKOURIS RISTING, CSR 6678

*134*

T C-mchale

1    A    Yes.

2    Q    Do you recall a date in February of this year

3  when you received a phone call from Paolina?

4    A    Yes.

5    Q    Does the date February 8th of 2005 sound

6  familiar?

7    A    Yes.

8    Q    Do you recall about what time on February 8th,

9  2005 you received that phone call from her?

10    A    It was about 5:00 to 6:00 p.m.

11    Q    Were you at home or on your cell phone when she

12  called?

13    A    At home.

14    Q    When Paolina called you that evening of February

15  8th can you describe for us her emotional state?

16    A    She was crying, she was upset, very upset.

17    Q    Did she tell you why she was upset?

18    A    Yes.

19    Q    What did she say?

20    A    She said that she had remembered what happened

21  that night.

22    Q    Did you and she have an extended conversation

23  about her memory while you were on the phone?

24    A    No.

25    Q    What happened?

26    A    I asked her to come over right away to my house

SONIA KOLOKOURIS RISTING, CSR 6678

*135*

T F-yes

Text messages poor Timeline

Paolina claims nothing to Vessana around 9am

1    memories back about the assault that you have been

2    describing?

3        A    My dad evicted me out of the house because I

4    believed that Michael was not the one who hit me, that it

5    was probably an accident, like the way Michael was

6    telling me over the phone.  He told me that I went back;

7    he told me that I was grabbing his shirt and I slipped

8    back and hit my head.  So I believed him.

9            MR. CHASE:  Your Honor, I am going to object to

10    this narrative, it is not responsive to the question.

11    She said, What happened next, and she is talking about

12    why she was kicked out.

13            THE COURT:  Well, the court will sustain the

14    objection.

15            MS. FORD:  Okay.

16        Q    Ms. Gutierrez, what I would like you to tell me

17    about, on the day you began to remember the incident, on

18    that particular day, what happened just prior to you

19    getting some of your memories back?

20        A    That day?

21        Q    Yes.

22        A    I went to my girlfriend's house, Mable, with

23    her baby.  And she had a pair of black pants for work, I

24    got them.  And Mable was asking me questions, a lot of

25    questions, like, How was your day?  Or, Do you remember

26    now something of what happened that night?  You should be

*136*

1    able to remember something, at least seeing him or

2    talking to him. Do you remember what you were wearing,

3    what he was wearing, during the time?

4         And so those were questions I couldn't answer.

5    And every time somebody asked me those type of questions,

6    I would try to remember them and I would get migraines in

7    my head because I can't figure it out. And she kept on

8    asking me those type of questions, what happened and I

9    couldn't remember.

10        And I dropped her off at her house and I stayed

11   with her baby for a couple of minutes and I went at my

12   house. When I was home, I fell asleep, I took a

13   45-minute, an hour nap. And when I woke up, that is when

14   I could remember seeing little pieces of him hitting me

15   and kicking me.

16        And after that, I called my best friend on the

17   cell phone, it was around 8 p.m., I believe. So I called

18   her up and I told her that I remember parts of what

19   happened that night. I was shaking. I was crying.

20        She told me, Let me take you to the hospital

21   because you don't sound too good. And I said, No. She

22   gave me some water because I was at her house. She gave

23   me some water and she told me to go to the police station

24   and tell them exactly what I can remember.

25        Q    Okay. Did you go to the police shortly after

26   you regained these memories?

*137*

1    right?

2         A    No.

3         Q    You don't remember walking outside?

4         A    No.

5         Q    And the memory outside was you were across the

6    street outside, right?

7         A    Yes.

8         Q    And you were laying on the ground?

9         A    Um-hum.  Yes.

10        Q    And you don't how you got there, right?

11        A    No.

12        Q    And when he stepped on your head, what part of

13   his foot came in contact with what part of your head?

14        A    I was holding my face because I didn't want him

15   to kick my face, so he stepped on me.  I don't know which

16   leg, but he stepped on me.

17        Q    Didn't you tell my investigator that the reason

18   why you know he stepped on your head is because he had

19   blood on his shoes?

20        A    Yes.  I looked at the pictures.  After I was

21   telling them the story, what I remembered, they showed me

22   the pictures of him.  I think it was like the right arm

23   had blood, his shoes were blood.  His car was full of

24   blood, too.

25        Q    But you don't know how the blood got on his

26   shoes, do you?

*138*                    *PFP*

1    image.

2        A    Do you?

3        A    Yes.

4        Q    Did you see a face?

5        A    No.

6        Q    Now, we were speaking about you having woken up

7    in the hospital.  I want to show you a couple of exhibits.

8    The first is an exhibit that has been marked as People's 1

9    for Identification.

10              THE COURT:  This is a poster board that appears

11   to have seven photographic prints on it marked A through E.

12              BY MS. FORD:

13       Q    If you can take a look at this exhibit that's

14   been marked as People's 1, tell me if you recognize the

15   person depicted in these photographs?

16       A    That's me.

17       Q    Now, in this top photograph labeled A, your eyes

18   were closed, is that accurate?

19       A    Yes.

20       Q    Do you have any recollection of these photographs

21   being taken?

22       A    No.

23       Q    If you can please look closely at each of the

24   photographs A through E on People's 1, and tell me whether

25   or not any of the marks on your body that are photographed

26   were present on your body before the assault that you have

T F-P                    139

61

0068

1    there was blood on the street at this location?

2          A    Officer Lawle and Corporal Toscano responded to

3    that location, it was not myself.

4          Q    Okay.  All right.  Well, we won't talk about

5    that.

6               So you didn't view the scene that night outside

7    the residence of the complaining witness?

8          A    No, I did not.

9          Q    Now, you did speak with Ms. Lara-Gutierrez on

10   February the 9th of 2005, did you not?

11         A    I did, by telephone.

12         Q    She didn't come in?

13         A    She came in on 2/11.

14         Q    Okay.  All right.  I am sorry.  Okay.

15              So on 2/11 of 2005 you had a conversation with

16   her about her now recovered memory?

17         A    Yes, I did.

18         Q    And in that discussion with her, she told you

19   that when Mr. Johnson came to the house that she walked

20   outside and confronted him, correct?

21         A    That is correct.

22         Q    And that she told him, Look, I don't want to be

23   with you anymore?

24         A    That is correct.

25         Q    And it is your understanding, during the

26   conversation on February the 11th, she was outside of her

*140*

P C-m

1    house at the time this took place, correct?

2         A    I am sorry, repeat the question.

3         Q    Yes.  Your recollection of what she said in

4    your conversation with her on February the 11th, 2005,

5    was that she was outside the house when this took place?

6         A    That is correct.

7         Q    And then Ms. Lara-Gutierrez told you that

8    Mr. Johnson became angry and grabbed her left arm,

9    twisted her body while tripping her with his left leg,

10   correct?

11        A    I believe she didn't specify which leg was

12   tripped, but the rest is correct.

13        Q    If you would look at your report on page BM-3,

14   it's at the first of that interview, the fifth line.

15        A    Yes.  I stand corrected.  She said with his

16   left leg.

17        Q    And then she said he then threw her to the

18   ground and the back of her head struck the ground,

19   correct?

20        A    Correct.

21        Q    She didn't say that he pushed her head or he

22   put his hand on her head and pushed her down, did she?

23        A    I don't recall.

24        Q    And she said that Mr. Johnson started to move

25   away but noticed that a neighbor was watching.

26             Do you remember her saying that?

*141*

P c-m

1              MS. FORD:  For the record, the witness is

2      indicating with her palm pressed up against the right side

3      of her head with her fingers spread out.

4              THE COURT:  Fingers pointing toward the top.  Go

5      ahead.

6              BY MS. FORD:

7          Q      When the defendant grabbed onto your head in the

8      way that you have just demonstrated, did he do something

9      with his hands, did he direct your head in a particular way?

10         A      Yes, he just put it down.

11         Q      He pushed your head down?

12         A      Yes.

13         Q      Where?

14         A      To the ground.

15         Q      Can you describe the force with which he pushed

16     your head down to the ground in the manner that you are

17     demonstrating?

18         A      With anger and frustration.

19         Q      What part of your body hit the ground?

20         A      My head.

21         Q      And when your head hit the ground, did it feel as

22     though your head hit the ground in a hard fashion, soft?

23         A      Hard, I remember it was more like that was it.

24         Q      Do you know where precisely you were with respect

25     to your home or your front step or your front yard when this

26     occurred, when the defendant put his hand on your head and

SONIA KOLOKOURIS RISTING, CSR 6678

T F -P 142

1    pushed you down to the ground?

2        A    I don't.

3        Q    Do you recall what surface it was that your head

4    hit?

5        A    I don't, I know it was hard.

6        Q    After your head hit the ground, what do you

7    recall next?

8        A    I have an image of him kicking me a couple of

9    times on my stomach, I was trying to cover my face.

10            MS. FORD:  For the record, Your Honor, the

11   witness held both her hands with her fingers pointing upward

12   in the front of her chest and neck area.

13            THE COURT:  Yes.

14            BY MS. FORD:

15       Q    You have an image of him kicking you a couple of

16   times?

17       A    Yes.

18       Q    On what part of your body?

19       A    My stomach.

20       Q    And did you put your hands up in the way that you

21   just demonstrated to protect yourself?

22       A    To protect my face, he was going to kick my face.

23       Q    Do you have any other memories of what occurred?

24       A    He stepped on me.

25       Q    Where on your body did he step?

26       A    I was trying to cover my face and that's when he

SONIA KOLOKOURIS RISTING, CSR 6678

T F.P 143

0019

1     Q     On that date, how much do you think the

2     defendant weighed?

3     A     215 pounds.

4     Q     When you arrived home at 11 p.m., did you go

5     into the house?

6     A     Yes.

7     Q     And what did you once you got inside?

8     A     I went upstairs to let my dad know that I was

9     back home and I changed and I just went to bed.

10     Q     Okay.  When you arrived home and went to bed,

11     did you receive any further contact from the defendant?

12     A     Yes, he kept on texting me.

13     Q     And do you recall the nature of the messages

14     that you were receiving from him once you arrived home?

15     A     He was saying:  I am on my way.  When he was

16     there, he said to me:  If you don't come outside, I will

17     knock the door out; I will call the cops if your dad gets

18     involved; come outside and talk to me.

19     Q     So when you received those messages from the

20     defendant, how did that make you feel?

21     A     I was scared because of my dad.  I didn't want

22     him to find out, or I didn't want him to get involved in

23     anything, so I went outside.

24     Q     You didn't want him to find out what?

25     A     That Michael was by the house late at night

26     because he didn't approve of anything like that.

*144*

P F-P

1       Q    Your father didn't approve of Michael coming

2   over late at night?

3       A    Yes.  Especially at that time.

4       Q    Your curfew was 11 p.m.

5       A    Yes.

6       Q    What time were you receiving these messages

7   from the defendant indicating that he was outside and you

8   should come out and talk?

9       A    Around midnight.

10      Q    Did you go outside?

11      A    Yes.

12      Q    And when you went outside, were you alone?

13      A    Yes.

14      Q    When you went outside, was the defendant

15  there?

16      A    Yes.

17      Q    Where was he when you first saw him?

18      A    First he was coming from the side across the

19  street and he came to the door in the front of my house.

20      Q    You saw his car parked across the street?

21      A    Yes.

22      Q    What kind of car was that?

23      A    A black Mustang.

24      Q    And you saw him approaching your house on foot?

25      A    Yes.

26      Q    And did he come right up to the front door?

*145*

P F P

1       A    Yes.

2       Q    And what did you do when you saw him coming

3    towards the front door?

4       A    I don't remember at that point.

5       Q    Did you go completely outside of the house?

6       A    No.

7       Q    No?

8       A    .No.

9       Q    Okay.  What happened next?

10      A    I recall we weren't arguing, we are talking.  I

11   couldn't remember exactly what we were talking about.

12   Originally about that girl, about that night.

13           Then we started arguing and that is when I told

14   him I didn't want to be with him anymore, that I can go

15   my way and he can go his way.  And he acted extremely

16   mad; he got mad about it.

17           And that is when he grabbed me by my left arm

18   and turned me, grabbed me with his right hand, put it on

19   my head and he smashed me down in the ground.

20           MS. FORD:  For the record, Your Honor, the

21   witness has held her right hand out near her shoulder

22   with her palm and her fingers spread open.

23      Q    You said the defendant grabbed you by your left

24   arm.

25      A    Yeah.  He grabbed me by the back of it to turn

26   me around, I was going to go back into the house.  And as

P F·P        146

1    I was leaving, he must of just put my head down.

2        Q    You said you were going to go back to the

3    house.  How close to the front door were you when the

4    defendant grabbed you by your left arm and turned you

5    around?

6        A    I don't remember.

7        Q    Okay.  And then you showed your right hand with

8    an open palm.  Is that the way he placed his hand on your

9    head, was his hand open?

10       A    Yes.

11       Q    What part of your head -- if you remember, what

12   part of your head did he grab on to?

13       A    The right side (indicating), this whole right

14   side.

15       Q    For the record, the witness is indicating

16   around her right ear and above her ear.

17       A    Yes.

18       Q    When he grabbed onto your head with his palm

19   stretched out the way you demonstrated, what did he do

20   with your head next?

21       A    He smashed -- he did like a smashing type of

22   movement and my head went to the ground first.

23       Q    Did he push you down to the ground with his

24   hand on your head that way?

25       A    Yes.

26       Q    Can you describe the force with which he

P F-P                    147

1    grabbed your head and pushed you down to the ground?

2        A    It was hard enough to bring my head to the

3    ground.

4        Q    Aside from telling us what injuries you

5    suffered as a result of the force, what I am asking is,

6    was his force very strong?  Very powerful?  Was it just a

7    tap?  If you can describe the feeling of his hand pushing

8    you down.

9        A    I know that it was a force.  It was hard.

10       Q    And when he pushed your head down, do you

11   recall what your head hit?

12       A    The ground first.

13       Q    And is the ground where your head hit, was that

14   cement or lawn?

15       A    I believe it was inside my house because I

16   could see it was inside the house, this part of what

17   happened.

18       Q    Inside the house or the front doorstep?

19       A    Inside the house.

20       Q    Once you felt the defendant grab your head and

21   push you down to the ground, what do you remember

22   happening next?

23       A    He kicked me.  I was trying to cover my head

24   because I didn't want him to kick my face and that is

25   when he stepped on my -- on my right side.  And I could

26   see that was outside the house.  I don't know how I went

P F~P                    148

1     Q    And did he ask to see you at that point in his

2     text message?

3     A    Yes.  He asked me to go back to Fridays.

4     Q    But you didn't go, right?

5     A    Yes, I didn't go.

6     Q    You went home?

7     A    Yes.

8     Q    When you got home, did you see your dog in the

9     house?

10    A    Yes.

11    Q    Do you remember when you went outside to see

12    Mr. Johnson if your dog was in the house?

13    A    No, I don't remember seeing my dog.

14    Q    And where did your dog usually sleep in the

15    house?

16    A    Upstairs.

17    Q    Now, when Mr. Johnson came to the house, you

18    came outside?

19    A    No, I was in the door.  I was inside, but I was

20    in the door.

21    Q    So you opened the door and you stood in the

22    doorway?

23    A    Yes.  And he was coming my way.

24    Q    And your father didn't approve of him being

25    there at that time of night.

26    A    No, he did not.

*149*

P r P

1    Q    He did not?

2    A    No, he did not.

3    Q    So did you come outside of the house and close

4    the door?

5    A    No, I didn't close the door.  It was open.

6    Q    Did you come outside of the house?

7    A    I don't remember that part, to be honest.

8    Q    Okay.  Well, do you remember anything happening

9    between you and Mr. Johnson when you were in the house?

10    A    Yes.

11    Q    What do you remember happening?

12    A    That is when he grabbed my arm and I just was

13    going to turn around and walk away because I didn't want

14    to be with him anymore.  And that is when he grabbed me

15    by my head and he just smashed me on the ground.

16    Q    Okay.  When you say he smashed you on the

17    ground, did he smash you on the ground inside your house?

18    A    Yes.

19    Q    And you have a clear memory of that now?

20    A    Yes.  I can recall him smashing it.

21    Q    Okay.  And this is something that you

22    remembered starting with February the 8th of this year,

23    2005, correct?

24    A    Yes.  That is right, during that time.

25    Q    Up until that day, you had no memory of this,

26    correct?

150

P F.P

1        A    Correct.

2        Q    Okay.  And so in your memory when you woke up

3    after your nap, what is the first thing that you

4    remembered about the incident on April 10th?

5        A    The first thing was him kicking me in my

6    stomach.

7        Q    Okay.  And when you remembered that, do you

8    remember where you were when he kicked you in the

9    stomach?

10        A    Yes.  Outside the house.

11        Q    When did the memory of him pushing you down

12    inside the house come back to you?

13        A    The same day.  It all came in pieces.

14        Q    Okay.  So the first piece was him kicking you

15    in the stomach and you were outside the house?

16        A    Yes, it was outside.

17        Q    And were you outside of the house on the lawn?

18    On the sidewalk?  On the street?

19        A    On the concrete, outside my house.

20        Q    Across the street from your house?

21        A    Yes.

22        Q    And you don't know how you got from the house?

23        A    To the outside, no.

24        Q    And you don't know what happened in the moments

25    that went -- that passed between the time that you were

26    pushed down inside the house and the time you got to the

/5/

P  F · P

1    spot on the concrete outside, correct?

2        A    Correct.

3        Q    And when Mr. -- you remember, were you talking

4    to Mr. Johnson inside the house?

5        A    Yes.

6        Q    And you weren't afraid that was going to wake

7    up your father?

8        A    No, because we weren't yelling.  We weren't

9    talking loud, we were just talking normal.

10       Q    But you knew your father didn't like him being

11   there at that time of night; is that right?

12       A    Yes.

13       Q    Yet you talked to him inside the house?

14       A    Yes, inside and outside.

15       Q    Was he standing outside the house or was he

16   inside?

17       A    When he pushed me down to the ground, he was

18   inside the house.

19       Q    Do you know how he got inside?

20       A    No, because I opened the door and he walked

21   in.

22       Q    Okay.  And was any part of the conversation

23   with him standing outside the house?

24       A    I don't remember.

25       Q    Did you tell him not to come in the house when

26   he came?

/52

P · c-p

1      Q     I just want to make sure that you don't

2    actually remember the conversation.

3      A     Yes.  I don't specifically, no.

4      Q     Now, at some point in time he grabbed you on

5    your arm.  Is that on your right arm or left arm?

6      A     My left arm.

7      Q     And he twisted you around?

8      A     Yes -- yeah.  Because I was on my way and that

9    is when he grabbed my arm and he smashed me.

10     Q     Did he grab you from behind or did he grab you

11   facing you?

12     A     From behind.

13     Q     Okay.  So when he grabbed your left arm, he

14   grabbed you with his left hand?

15     A     Yes.  I believe so, yes.  I don't -- I wasn't

16   completely facing him, but I could feel the force in my

17   arm.

18     Q     When he put his hand on your head and pushed

19   you down, was your back to him or were you facing him?

20     A     I was halfway.  He was turning me to face him,

21   so my back was facing him when that happened.

22     Q     Okay.  So when he put his hand on your head and

23   pushed down, did he push you forward or did he push

24   you --

25     A     Downward.

26     Q     Downward?

*153*

P FP

1    A    I believe so, I was trying to turn and walk

2    inside the house.

3    Q    When he grabbed you by your left arm, what did he

4    do?

5    A    That's when he grabbed me by my head and he just

6    pulled me down.

7    Q    You said that he grabbed you by your left arm,

8    did he do anything to change the position of the body after

9    grabbing you by your left arm?

10    A    For some reason, I don't know how, but he just, I

11    remember I couldn't put my hands on the ground.

12    Q    The question was though, when he grabbed onto

13    your left arm, did he do anything to change your body's

14    position, did he pull or push you?

15    A    He had pushed me and his leg was in front, so I

16    got tripped.

17    Q    What did he do with his other hand?

18    A    He put it on my head.

19    Q    So with one hand he had ahold of your arm, is

20    that correct?

21    A    Yes.

22    Q    And with the other hand he put it on your head?

23    A    Yes.

24    Q    Can you describe for us how he placed his hand on

25    your head?

26    A    Just on this side.

SONIA KOLOKOURIS RISTING, CSR 6678

- p 154

```
 1        A    Yes.

 2        Q    And he grabbed you from behind?

 3        A    Yes, yes.

 4        Q    Do you know if he grabbed you with his left hand

 5    or right hand?

 6        A    I don't know, I wasn't looking at him.

 7        Q    Did he spin you around so you were facing him?

 8        A    It wasn't that type of motion, but he didn't

 9    really spin me, it was more side than back.

10        Q    Did he trip you?

11        A    In a way you can say that because his leg was kind

12    of in my way.

13        Q    His leg was in your way?

14        A    In a way to me, and in my way.

15        Q    Do you remember, do you remember falling over his

16    leg?

17        A    I remember feeling it.

18        Q    Where did you feel it?

19        A    By my thigh and my leg.

20        Q    In front of your thigh?

21        A    Yes, right next to it.

22        Q    And were you coming forward towards him at that

23    point?

24        A    No, it was more sideways.

25        Q    And when, if ever, did he let go of your arm, when

26    you were going down?
```

SONIA KOLOKOURIS RISTING, CSR 6678

T C-p          155

```
 1        A    No.

 2        Q    You don't know?

 3        A    I don't think so.

 4        Q    Do you remember which hand he had on your head?

 5        A    I don't remember.

 6        Q    You couldn't feel where his thumb was?

 7        A    No, everything, it happened really really fast.

 8        Q    Was it on the right hand side of your head?

 9        A    I don't know.  He was holding me and everything

10   happened so fast, it was a matter of seconds.

11        Q    Well, you don't know which hand he was holding you

12   with, right?

13        A    Yes.

14        Q    When he put his hand on your head, could you see

15   his face?

16        A    No.

17        Q    Was he behind you?

18        A    Yes.

19        Q    And how, when you went down you went down kind of

20   sideways?

21        A    Yes.

22        Q    Was your head the first thing that hit?

23        A    Yes.

24        Q    That was the back of your head?

25        A    Yes.

26        Q    Where the injury is there?
```

T C-Ø          156

1    much.

2         Q    Okay.  Well, do you have any dreams about it?

3         A    Yes.

4         Q    And in the dreams, do you dream about the

5    events just as you have testified here today?

6         A    No, I dream differently.

7         Q    And are you aware that your dog was injured the

8    night that this happened?

9         A    Yes.

10        Q    Did you ever find out what happened to your

11   dog?

12        A    He got ran over.

13        Q    And you don't know when that happened, do you?

14        A    No.

15        Q    And you don't know how he got out of the house?

16        A    I am pretty sure he got out of house when I

17   opened the door because that is how he is.

18        Q    Okay.  You didn't see him?

19        A    No.

20        Q    Now, you thought that a neighbor of yours saw

21   this happen, didn't you?

                                    *Jasmine Kanaser*

22        A    Yes.

23        Q    And you told the police that when Mr. Johnson

24   saw that the neighbor was watching, that is when he came

25   back and got you?

26        A    Yes.  When he moved the car around, yes.


*157*

*P  C·P*

1      Q    Do you talk to this neighbor?

2      A    Not anymore.  We don't communicate.  Before we

3   had a close relationship, but not anymore.

4      Q    Well, when you say "not anymore," did you ever

5   ask your neighbor if she observed what happened that

6   night?

7      A    No, I didn't.

8      Q    Are you aware of anybody else asking your

9   neighbor --

10           MS. FORD:  Objection; relevance; beyond the

11   scope; calls for hearsay.

12           MR. CHASE:  Well, this is somebody who is

13   claiming to have recovered a memory, Your Honor, and I am

14   testing the accuracy of that recovered memory.

15           MS. FORD:  But this is as to --

16           THE COURT:  I will sustain the objection.  I

17   think this is beyond the scope.

18           MR. CHASE:  Those are all the questions I have.

19           THE COURT:  Ms. Ford, any redirect?

20           MS. FORD:  No further questions.

21           THE COURT:  Do you want the witness to remain

22   outside or is she --

23           MR. CHASE:  Subject to recall, Your Honor.

24           THE COURT:  Please wait outside the courtroom

25   until asked to come back into the courtroom or told you

26   can leave.  And while you are outside, you are not

*158*

P C-P

*Also, Preliminary Transcript, p 0060, 61
Jasmine Kanaser

291

1    Q    Which one was it?

2    A    Near the Tanforan.

3    Q    I also want to ask you a couple more questions

4    about your memory of the assault at your house.  When it was

5    occurring, did you see anything with respect to your

6    neighbors that caught your attention?

7    A    Yes.  I believe there was a light on in one of

8    the windows.

9    Q    Do you recall which house you believe there was a

10   light on in?

11   A    The one in front of my house on the right hand

12   side.

13   Q    Across the street from your house?

14   A    Yes.

15   Q    And when you say you believe there was a light on

16   in one of the windows, do you know with specificity which

17   window it was?

18   A    Yes, the lower one.

19   Q    Do you recall seeing anything else beside the

20   light on?

21   A    I believe there was a shadow like they were

22   looking.

23   Q    You thought someone might be looking?

24   A    Yes.

25   Q    Can you be sure of that?

26   A    I can't be sure, but I remember seeing that

T  F - P            159

1    Q    And Mr. Johnson's reason for not wanting to sign

2    whatever it was you wanted him to sign, was that he wanted

3    somebody else to give him the papers?

4    A    Yes, a police officer.

5    Q    But he was the one who wanted to have this

6    filed, is that right?

7    A    Yes.

8    Q    And did he give you any reason as to why he

9    wanted a police officer to give him the papers?

10    A    Because he wanted him to be more with the law

11    because he wanted to be a cop, to be present to witness.

12    Q    And you never had a conversation with him at J.C.

13    Penney's where you said, I know this was an accident, words

14    to that effect?

15    A    We never talked about that in his job, he never

16    was like that.

17    Q    And you know who Joe Gerrans is?

18    A    Yes.

19    Q    Was he ever there when you were visiting Michael

20    at his job?

21    A    No, because Michael didn't want me to go inside

22    when people were around.

23    Q    So Mr. Gerrans was never there?

24    A    Not that I know of, no.

25    Q    You didn't go inside to see?

26    A    I went inside, most of the times he wasn't there,

SONIA KOLOKOURIS RISTING, CSR 6678

*160*

1    A:    I get what [unintelligible]

2    Q:    Yeah, go ahead.

3    A:    Do these look like kicks? I mean I have a size nine shoe.

4    Q:    She didn't say, she didn't say she was kicked.

5    A:    She said she was kicked.

6    Q:    No.

7    A:    Po...she sent me a text message saying I kicked the shit

8    Q:    She said that, during her statement today, she said that you placed your foot on the back of her

9          head and that you, you placed pressure on the back of her head.

10   A:    Okay. There were no scratches on her face like that. I mean how, could, could you put your

11         head, your foot, put it on the back of my head and show me how?

12   Q:    I'm not gonna put my foot on the back of your head.

'3   A:    Just, just stand then

14   Q:    But I have seen, I have seen people who have been

15   A:    [unintelligible]

16   Q:    who've had shoes [unintelligible]

17   A:    That's why I've got a witness. I'm tired of this crap. I'm not going to get upset because

18   Q:    Did you mention the witness to Officer McHale?

19   A:    I don't, I don't, I did not trust him. After I told him [unintelligible] Mike Johnson would you

20         come down and make a voluntary statement. Not a problem.

21   Q:    Okay.

22   A:    Then he tells me that my story doesn't match hers when she didn't even give a story, which I

23         also have on tape, audio tape. *foundation for tapes*

'4   Q:    But you know that I mean I'm sure you know that cops, I don't [unintelligible] sometimes

25         legally, we can lie to people.

1      Q    Right, but not after trip.

2      A    After fall, that's how we term it.

3      Q    And this next part, 19 year-old female brought in

4 by boyfriend after falling and striking the back of her

5 head?

6      A    That's Dr. Craig Hoffman.

7      Q    Do you know where he got that information?

8      A    Sorry.

9      MS. FORD:  Objection.  Asks for speculation, it's

10 also hearsay, this witness has no knowledge of it.

11      THE COURT:  It is.  I don't know if this witness

12 has any knowledge of it, so in terms of knowledge, do you

13 have any idea where the doctor got this information?

14      THE WITNESS:  No idea.  I don't know who she was

15 questioned by or who she spoke to.

16      Q    In terms of the room times here, Kaiser records,

17 does that show when the person was brought into the

18 emergency room?

19      A    That's the time the patients would be roomed,

20 that's their time, whoever wrote that.

21      Q    That's 3:45 in the morning?

22      A    That's what it says.

23      Q    And you said that your recollection is this

24 happened sometime after 2:00 o'clock?

25      A    Later in the shift, yes.

26      Q    Sometime later in the shift.  You have no

T C - norse san.        162

1    the blonde female.  It looked like they had something

2    going on.  And so I -- he saw me and that is when I

3    turned around and --

4        Q    When you say, "He saw me," are you referring to

5    the defendant?

6        A    Yes.

7        Q    Did you actually approach the defendant and

8    speak with him at TGI Friday's?

9        A    No.

10       Q    So once you saw him with the blonde female, you

11   left?

12       A    Yes.

13       Q    But it was your opinion that he had seen you --

14   he, the defendant, had seen you before you left?

15       A    Yes, I am pretty sure he did.

16       Q    When you left TGI Friday's, where did you and

17   your girlfriend go?

18       A    We went to Chili's.

19       Q    After you left TGI Friday's did you have any

20   contact with the defendant?

21       A    He was text messaging me.

22       Q    He was sending you text messages?

23       A    Yes.

24       Q    And was that something that he did frequently

25   during your relationship?

26       A    Yes, but not as often as that night.

163

P FP

1        Q     Do you recall the nature of the text messages

2    that you received from the defendant after leaving TGI

3    Friday's?

4        A     Yes.  He said if I would come back, there is no

5    girl; come and show me who she is; we need to talk, come

6    back.  And that is when I was in Chili's.

7        Q     Now, when he was sending you text messages,

8    were you returning messages to him?

9        A     Yes.

10       Q     Did you -- did you tell him in your messages

11   what bothered you?

12       A     Not exactly, but, yes, I did.  I told him that

13   he looked happy with the other girl that was next to him,

14   so I was going to mind my own business.

15       Q     How long did you stay at Chili's that night if

16   you remember?

17       A     An hour and a half.

18       Q     Did you have dinner there?

19       A     Yes.

20       Q     And after having dinner at Chili's, where did

21   you go next?

22       A     I went home.

23       Q     Now, where were you living at that time?

24       A     South City -- do you want me to tell the

25   address?

26       Q     Yes.

*164*

P FP

1          (Whereupon, the jury exited the courtroom.)

2          THE COURT:  We are outside the presence of the

3     jury.  Mr. Chase.

4          MR. CHASE:  Since there's going to be a transcript

5     as is required when somebody is presenting audio visual

6     equipment, I'd like the jury to be instructed as to the use

7     of the transcript.  The prosecutor will pass them out to the

8     jury while the DVD is being shown, and you can give the

9     transcript admonition at that time.

10         THE COURT:  I don't know that there is an official

11    transcript admonition, but I'll be happy to explain the best

12    efforts made to see that it's an accurate recording, the DVD

13    itself is the evidence.

14         MR. CHASE:  Just for the record, I have not viewed

15    the final edition of the expurgated DVD and Ms. Ford assured

16    me that she has taken out those areas that we had talked

17    about and I am assuming that is an accurate representation.

18         MS. FORD:  That's correct, Your Honor.  There

19    were two areas consisting of about six lines worth of

20    transcript, six lines a page of each transcript in the

21    area pertaining to first the victim's tires being slashed

22    and second, abuse by the father and he or someone else

23    being the source of her injury.  Those two areas were

24    excised.  I have watched it repeatedly to make sure

25    there's no sound.  In fact it's a weird cut, it has been

26    excised in compliance with the Court's orders.

SONIA KOLOKOURIS RISTING, CSR 6678

*165*                    *T*

**ORIGINAL PART 2**

# ATTACHMENT "A"

Court of Appeal, First Appellate District, Div. 4 - No. A112322
**S154170**

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

MICHAEL TYRONE JOHNSON, Defendant and Appellant.

The petition for review is denied.

SUPREME COURT
# FILED

SEP 1 2 2007

Frederick K. Ohlrich Clerk

_____
Deputy

_____
GEORGE
Chief Justice

*167*

COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

**FILED**

MAY 3 0 2007

Court of Appeal - First App. Dist.
DIANA HERBERT

by _____
                    DEPUTY

In re MICHAEL TYRONE JOHNSON,
on Habeas Corpus.

A116950

(San Mateo County
Super. Ct. No. SC58720(a))

BY THE COURT:

The motion to augment the petition for writ of habeas corpus is granted. The petition for writ of habeas corpus is denied.

(Reardon, P.J., Sepulveda, J., and Rivera, J., joined in the decision.)

Date: ___MAY 3 0 2007_____    **REARDON, ACTING P.J** P.J.

*168*

COPY

Filed 05/30/07

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

**FILED**

MAY 3 0 2007

Court of Appeal - First App. Dist.
DIANA HERBERT

By_____
DEPUTY

THE PEOPLE,

    Plaintiff and Respondent,

v.

MICHAEL TYRONE JOHNSON,

    Defendant and Appellant.

A112322

(San Mateo County
Super. Ct. No. SC045779)

     A jury found defendant, Michael Tyrone Johnson, guilty of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)) and corporal injury to a former cohabitant, resulting in a traumatic condition (Pen. Code, § 273.5, subd. (a)). As to both counts, the jury also found true the special allegations that defendant committed serious felonies and personally inflicted great bodily injury under circumstances involving domestic violence (Pen. Code, §§ 1192.7, subd. (c)(8), 12022.7, subd. (e)). The trial court sentenced defendant to seven years in prison. On appeal, defendant alleges a multitude of errors, including evidentiary errors, instructional error, ineffective assistance of counsel, and cumulative error. We affirm.

## FACTS

I.   PROSECUTION EVIDENCE

    *A.   Events Prior to the Assault*

     The victim, P.G., met defendant in 2002, while both were employed at J.C. Penney's department store; defendant worked in loss prevention, and P.G. was a sales

*169*

associate. P.G. was 17 years old, 4 feet 9 inches tall, and weighed 95 pounds. Defendant, who was considerably older than P.G., was 6 feet 1 inches tall, and weighed 220 pounds. P.G. and defendant began dating in late 2002 or early 2003. The relationship became serious after two months, at which time P.G. believed that she was in love with defendant. P.G. began living with defendant and his mother in early 2003. She lived with defendant and his mother for approximately six months.

Sometime in early 2003, defendant became violent with P.G. during an argument. P.G. testified that defendant "was going to take me out of his house." Defendant held P.G.'s clothes high in the air so that she could not reach them. When P.G. jumped up to reach her clothes, defendant grabbed her by the back of the neck and pushed her face down onto the floor. P.G. was not injured, but she was "a little bit" frightened. Defendant then threw P.G.'s clothes out of the door. As P.G. was picking up her clothes, defendant shut the door. P.G. began crying, and was about to leave when defendant came back outside and apologized. P.G. accepted his apology, and she decided to keep living with defendant. P.G. did not report this act of violence to the police. She also did not tell her family about this incident because she knew that they would be upset about it.

P.G. eventually moved out of defendant's home in the summer of 2003, after discovering that she had contracted herpes, a sexually transmitted disease (STD). P.G. believed that defendant had given her the STD because he was the only person she had been intimate with during that time period. When P.G. confronted defendant, he denied giving her the STD; P.G. believed that defendant was being unfaithful.

After moving out of defendant's home, P.G. went to live with her mother in Los Angeles. P.G. lived in Los Angeles for a couple of months, during which time she kept in contact with defendant by text messages. In November 2003, P.G. moved back to her family's house in South San Francisco, where she lived with her father, stepmother, and sisters. P.G. and defendant reconciled near the end of 2003. P.G. and defendant no longer worked together, but they saw each other almost every day and had resumed their sexual relationship. P.G. believed that she had an exclusive dating relationship with defendant. Although P.G.'s father gave his approval to the relationship, he refused to let

P.G. spend the night at defendant's home; P.G.'s father also imposed an 11:00 p.m. curfew on her.

> B.    *The Assault*

On April 9, 2004, defendant told P.G. that he was going out with his friends for a "guys' night out." P.G. suspected that defendant was going out to meet other women. P.G. and a female friend, Y.P., went to TGI Friday's restaurant in San Bruno. At the restaurant, P.G. saw defendant with a couple of men and one woman. P.G. did not recognize the men or the woman. P.G. said that she was "bothered" by the way defendant had been holding the woman because it "looked like they ha[d] been dating." P.G. testified that she and Y.P. left the restaurant without speaking to defendant.

As P.G. left the restaurant, defendant sent her a text message, asking her why she left without saying hello. P.G. sent defendant a return text message, stating that she had seen him with another girl and that he looked happy with that girl. Defendant sent a reply text message, asking P.G. to return to the restaurant and to show him the girl that she said he was with. P.G. did not go back into the restaurant. She and Y.P. then went to dinner at Chili's restaurant in San Bruno. While P.G. and Y.P. ate dinner, defendant repeatedly sent P.G. text messages, claiming that he was not with a girl and asking her to return to TGI Friday's. P.G. did not return to TGI Friday's, but instead went home around 11:00 p.m.

Sometime after midnight, defendant began calling P.G. on her cellular telephone; she would not speak with him. When defendant sent P.G. a text message saying that he wanted to talk to her, she replied that she had nothing to say to him. P.G. then received a message from defendant stating that he was outside her house, that he wanted her to come out, and that he did not care if she called the police, or if her family woke up, and saying something to the effect that he would knock the door down if she did not come out and talk to him. P.G. testified that she was not frightened by the message because defendant had made similar threats in the past.

*170*

P.G. went outside because she did not want defendant to awaken her family. P.G. could not remember the exact words of her conversation with defendant, but she remembered having a "heated" argument with defendant about the woman she had seen him with at the restaurant. When P.G. turned her back to go inside, defendant grabbed her left arm, put his other hand around her head, and pushed her over his leg, causing her to trip. She was unable to put her hands on the ground. Defendant pushed P.G.'s head down to the ground, causing the back of her the head to hit the hard ground. Once her head hit the ground, P.G. had an image of defendant kicking her a couple of times in the stomach as she tried to cover her face. P.G. recalled that defendant stepped on her hand as he was trying to step on her head. She also remembered defendant stepping on the right side of her face and head. P.G. was frightened during the assault; she could not recall what appellant was saying or whether she said anything to him.

As P.G. lay immobilized on the ground in a fetal position, defendant picked her up and threw her in his car. P.G. did not remember whether defendant dragged her by the ankles during the assault. However, she did recall that defendant did not appear to have any difficulty in carrying her to the car. P.G. remembered defendant holding her head as he drove her to the hospital.

### C.    *P.G.'s Hospitalization*

P.G.'s next memory was of waking up at the hospital, with doctors and nurses holding her head, feet, and hands. She was in "a lot of pain," especially in her feet and head. P.G. could hear the hospital staff around her but could not see them. She remembered her head being shaved and the wound in her head being closed with staples. P.G. had no memory of telling the hospital staff that defendant had thrown something at her, or of saying, "baby, I forgive you, I'll be a good girl."

Bessie Sandoval, an emergency medical technician at Kaiser Hospital in South San Francisco, first saw P.G. when defendant brought her to the emergency room sometime after 2:00 a.m. on April 10, 2004. P.G.'s face and head were covered in blood.

P.G.'s hair was drenched in dripping blood. P.G. seemed confused and was combative when hospital staff moved her onto a gurney and applied a surgical collar.

Sandoval called the police due to the suspiciousness of the nature and extent of P.G.'s injuries. Defendant told Sandoval that P.G. had tripped forward, which Sandoval thought was inconsistent with the injury to the back of P.G.'s head. Sandoval also thought there was a "certain awkwardness" because defendant did not stay very long at the hospital. Sandoval had been concerned regarding the extent of P.G.'s bruises. Finally, Sandoval's concerns were prompted by hearing P.G. say something to the effect of, "I forgive you."

South San Francisco Police Officer Bart MacHale reported to the emergency room at 6:30 a.m. on April 10, 2004. He spoke to Sandoval and wrote down her statements in his police report, using direct quotes where appropriate. Specifically, Officer MacHale, reading from his report, testified, "Sandoval told me [P.G.] was 'slipping in and out of consciousness' unquote. Sandoval said that [P.G.] had a serious injury to the back of the head along with scrapes, scratches, and bruises to several parts of her body. Sandoval said that [P.G.] told her [defendant] threw something at her head causing her injury. Sandoval also heard [P.G.] tell [defendant], 'baby I forgive you, I'll be a good girl' end quote." Although Sandoval remembered speaking with Officer MacHale, she did not specifically remember giving this statement to Officer MacHale, but Sandoval added that if she were so quoted, she was "a pretty honorable person." Sandoval further testified that she had given accurate statements to Officer MacHale about what she had seen and heard regarding P.G. After reading Officer MacHale's report, Sandoval stated that she remembered that something P.G. said had given her cause for concern.

Defendant called P.G.'s stepmother, Y.L., around 6:00 on the morning of April 10, 2004, and told her that P.G. had been in an accident and that she was at Kaiser Hospital in South San Francisco. At that time, defendant did not mention anything about P.G.'s injuries. When Y.L. called defendant back to ask about P.G.'s condition, defendant said P.G. was "okay." Y.L. left immediately and arrived at the hospital about five minutes later. Y.L. did not see defendant at the emergency room. Y.L. was unable to see P.G.

*/ 7 /*

because she was being transferred to another hospital in Redwood City; Y.L. eventually saw P.G. a few hours later. Y.L. said that when she first saw P.G., P.G was in "very bad shape," and that she had "bruises all over" and "black eyes."

### D.    Defendant's Initial Police Interview

Officer MacHale first saw defendant in the waiting room of Kaiser Hospital in South San Francisco on the morning of April 10, 2004. Officer MacHale noticed that defendant had dried blood on his sleeve, right hand, and shoe. Later that morning, Officer MacHale spoke with defendant at the South San Francisco Police Department regarding the circumstances of P.G.'s injuries. During an hour-long conversation, defendant never mentioned he had an eyewitness or the name Patricia Rico.

### E.    P.G.'s Recuperation and Initial Memory Loss

P.G. remained at the hospital for a week, during which time she was immobilized and unable to care for herself; P.G.'s family came to the hospital to feed and bathe her. Initially, P.G. experienced significant vision loss, with everything appearing black, and then gradually she was able to see shadows and then color. She regained her full eyesight after about a month. P.G. did not recall mentioning her vision problems to her doctors while she was in the hospital; she was more concerned with the pain she was experiencing. P.G. also experienced hearing loss in her right ear that lasted for approximately a month. P.G. also lost her sense of taste and smell, the loss of which persisted at the time of trial.

In April 2004, P.G. had no memory of the events that caused her injuries. She only recalled being at T.G.I. Friday's and going home. When her parents expressed suspicions that defendant was responsible for her injuries, P.G. did not believe them. While she was recovering, defendant called P.G. and told her that she had been injured when she slipped backwards and hit her head on the concrete. Defendant "always" maintained that he had a witness to the incident that caused P.G.'s injuries. However, defendant never named the witness, even after P.G. asked defendant to identify the person. P.G. did not recall a third person being present in defendant's Mustang as they

drove to the hospital; she further stated that there would not have been enough room in the car for another person.

On April 18, 2004, Officer MacHale interviewed P.G. at her home. P.G. was unable to say how she was injured. She reported having blurred vision and difficulty hearing in her right ear.

On April 22, 2004, P.G., at the insistence of her father, obtained a restraining order against defendant. P.G. did not want to get the restraining order, but her father was worried for her safety and she wanted to respect his wishes.

On April 24, 2004, Officer MacHale again interviewed P.G. at her home. She still complained of vision and hearing problems, and she still had no memory of how she was injured. The police continued to contact P.G. However, she did not want to cooperate with the investigation because she believed defendant's explanation for her injuries.

In the weeks following her release from the hospital, P.G.'s stepmother, Y.L., tried to talk to P.G. about her injuries. Y.L. testified that on one occasion, P.G. said that "he hit me, but she didn't say much." Y.L. also stated that when she inquired about P.G.'s injuries at the hospital, the staff said that P.G. said that "he hit her."

Despite her father's suspicion that defendant had assaulted her, P.G. continued to have contact with defendant. P.G. and defendant continued to talk every day on the telephone. She saw defendant once at work, and then another time at the end of May for his birthday. In November 2004, P.G., at defendant's request, withdrew the restraining order. Defendant told P.G. that he wanted to become a police officer and that the restraining order would interfere with this goal. At the time she withdrew the restraining order, P.G. still had no memory of the cause of her injuries, but she believed defendant's explanation. P.G. wanted to remember what happened. She even asked one of her doctors if medication or hypnosis would help her to recovery her memory.

By February 2005, P.G. and defendant had reunited, but they argued almost every day about "what happened that night, about him lying, over little things, [and] girls pretty much." When defendant traveled to the Super Bowl, P.G. became upset because she suspected that he went on the trip with another woman.

*172*

F.    *P.G.'s Recovered Memory*

On February 8, 2005, P.G. spent time with her friend, M.V. During their visit, M.V. asked P.G. many detailed questions about her injuries that P.G. was unable to answer. Feeling useless and suffering from a headache, P.G. went home and took a nap. After sleeping for about 45 minutes, P.G. woke up and started to see "little images" of what happened on the night of her injuries. What she saw was an assault by defendant. P.G. felt like a "fool" for believing defendant; she also experienced feelings of sadness, anger, and confusion. Upon recovering her memory, P.G. called Y.P. P.G. then went over to Y.P.'s house and described how she awoke from her nap and had images of defendant assaulting her.

G.    *Subsequent Police Investigation and Videotaped Interview*

On February 8, 2005, P.G. went to the police station to talk to Officer MacHale, but he was off duty that day. She returned to the police station on February 11, 2005, and was interviewed by Officer MacHale and Detective Tom Neary. During the interview, P.G. described defendant dragging her to the car by her ankles and putting her in the car. P.G. testified that what she told the officers about her attack was based on her recovered memory; she was not motivated by her suspicion that defendant had been cheating on her.

On February 11, 2005, Detective Neary conducted a videotaped interview of defendant at the police department.[1] Regarding the night in question, defendant said that he had been at TGI Friday's for a guys' night out, when he saw P.G. and Y.P come into the restaurant and sit down at a table. Defendant was at the bar with his friends when he noticed that P.G. and Y.P. were leaving. As P.G. left, she sent defendant a text message

---

[1] A transcript of the interview was provided to the jury while the recorded interview was shown in court; the transcript was not introduced into evidence and was not used during the jury's deliberations. The transcript is part of the record on appeal; we have read the transcript in conjunction with viewing the recorded interview of defendant.

saying, " 'have fun with those girls.' " Defendant looked at the message and said, "What girls, I am surrounded by five guys."

Defendant said that he went home and changed his clothes. He then picked up a coworker, Patricia Rico, and drove over to P.G.'s house. While outside of P.G.'s house, defendant sent a text message to P.G. telling her that he wanted her to come outside so that they could talk, and that if she did not come out he would kick the door in. P.G. came outside, and defendant told her that he loved her, but that she had to stop being upset about nothing. P.G. and defendant walked down the street and then sat down on the curb. When P.G. accused defendant of being with "those girls," she grabbed his sweatshirt and started jerking back and forth. As P.G. was pulling on defendant's sweatshirt, she lost her grip and fell backward. Defendant put his hand under P.G.'s head and felt blood.

Defendant stated that, at this point, his "witness hops out of the car." Defendant was barely able to carry P.G. because of her baggy clothes. Defendant explained that he had to drag P.G. to his car, and that in this process her toes were dragging on the ground. When Detective Neary commented that P.G. had bruises on her head that were consistent with being kicked, defendant denied causing the bruises and explained that the injuries were caused when P.G.'s head initially hit the ground. Defendant put P.G. in his car and drove her to the hospital. Defendant gave the police Patricia Rico's name and telephone number.

### H.    Patricia Rico's Testimony

Patricia Rico testified that she was not with defendant in the late evening/early morning hours of April 9-10, 2004. Rico had never been to P.G.'s residence, and had heard about P.G.'s injuries from defendant. Defendant did not tell Rico that he was going to name her as an eye witness; he simply said he would use her as a character witness.

I.     *Expert Testimony*

1.     Neurosurgeon

Cecil Jun, M.D., a neurosurgeon at Kaiser Hospital in Redwood City, first saw P.G. on the morning of April 10, 2004. She was in bed and had blood-stained bandages around her head. At the time of the initial examination, P.G. was not alert, and seemed somewhat tired, sleepy, and lethargic. Upon removing the bandages, Dr. Jun saw a laceration on P.G.'s scalp. A CT scan revealed that P.G. had suffered a skull fracture on the right side of her head, specifically referred to as a "linear fracture in the occipital area." This type of fracture does not require surgery, but it can take several months to heal.

Dr. Jun opined that P.G. had sustained an "unusually severe injury" that seemed inconsistent with a mere slip and fall at home. Additionally, numerous other bruises on P.G.'s back, left shoulder, right wrist and fingers, left elbow and fingers, and feet were more extensive than one would expect from a mere fall.[2] Dr. Jun further testified that the bruising on P.G.'s eyelids was not the result of the skull fracture, but was consistent with direct trauma to the eye.

On cross-examination, Dr. Jun admitted that the unusual severity of P.G.'s skull fracture could be consistent with a person falling without breaking the fall and striking concrete. However, he was unable to express an opinion as to the cause of P.G.'s numerous other bruises.

Dr. Jun next saw P.G. on April 15, 2004, when he removed her staples and cleaned the wound. Dr. Jun saw P.G. again on April 27, 2004, at which time he observed that her laceration had not been healing as expected. At this visit, P.G. complained of decreased hearing in her right ear. Dr. Jun stated that P.G.'s hearing loss could have been the result of blood draining behind her right eardrum. P.G. indicated that she was experiencing vision problems and had lost her sense of smell.

---

[2] We have reviewed the prosecution's exhibits 1, 2, and 3, which depict numerous color photographs of P.G.'s injuries.

On cross-examination, Dr. Jun stated that he seemed to recall P.G. telling him at the April 27, 2004 visit that she had regained her memory. However, his file did not include a notation that P.G. had regained her memory. Dr. Jun testified that he would not have expected P.G. to remember the events immediately preceding the injury, or to be able to recover these memories if she had been totally unconscious. According to Dr. Jun, head trauma patients never regain such memories. On redirect, Dr. Jun testified that the neurological community believes it is impossible for someone who has retrograde amnesia to recover his or her memory. He further testified that if P.G. had told him that she had remembered the incident, he probably would have told her that he did not think she would ever regain her memory.

        2.        Psychiatrist

Jose Maldonado, M.D., an associate professor of psychiatry at Stanford University, testified as an expert in neuropsychiatry. Dr. Maldonado specializes in changes in brain function following surgery or physical trauma. As a neuropsychiatrist, he examines "how brain function leads to mental changes, like behavior changes or mental changes like memory disturbances, post traumatic stress syndrome . . . ."

Dr. Maldonado did not examine P.G., but he reviewed her medical records, as well as the police reports and photographs. He offered two explanations for P.G.'s delayed recollection of how she was injured. The first theory was purely psychological. According to this theory, a person who undergoes significant traumatic events may repress those memories for a certain period of time. These memories can be recovered later when the patient feels safe and something jogs the memory. Any number of things could trigger the memory, including watching another event that is reminiscent of the repressed event, talking with a friend, or walking by the place where the incident occurred.

Dr. Maldonado also discussed a second, more physiological explanation for P.G.'s recovered memory. In this scenario, a patient suffers a traumatic injury with accompanying stages of recovery. In the first or emergent stage, the patient emerges

*174*

from the trauma itself. This stage is associated with acute confusion and delirium, as well as variable posttraumatic amnesia. The second or recovery stage can last anywhere between six and twelve months. In this stage, memories can come back all at once or in pieces.

Based on the medical evidence he reviewed and the hypothetical facts regarding the injury, Dr. Maldonado opined that P.G. had suffered "significant brain injury," which weighed in favor of a physiological explanation for her memory loss. He described her skull fracture as being large enough to allow air to flow into the brain. He further stated that there was absolutely no doubt that P.G.'s brain was bruised. Looking beyond the interpersonal drama surrounding the injury, Dr. Maldonado stated that P.G. had "significant memory, significant cognitive and brain function deficit[s]," which he opined were more likely than not the cause of P.G.'s amnesia and subsequent recovered memory. He disagreed with the suggestion that a patient who initially had no memory of a traumatic event could never regain that memory.

On cross-examination, Dr. Maldonado conceded that if a person "truly lost consciousness" and then claimed to recall what happened during the time he or she was unconscious, that person could be lying or confabulating the incident. He further explained that confabulation has two aspects. There is confabulation for the purpose of lying, and there is confabulation based on a faulty memory of an event. In the latter, the person is not consciously lying, but is trying to fill in the gaps in his or her memory.

On redirect, Dr. Maldonado explained that he would question the veracity of person's recovered memory claim only in the event of a complete loss of consciousness.

J.    *Prior Incident of Domestic Violence*

Defendant met C.M. in 1992, while they were in the Army stationed in Texas. Defendant and C.M. dated for approximately two years. During an argument at a Super Bowl party in 1994, defendant accused C.M. of flirting with another man and pushed her. She pushed defendant back and he fell into a window and broke it. Both C.M. and defendant had been drinking alcohol at the party. C.M. did not recall how much alcohol

defendant had consumed, but remembered that she had not been intoxicated to the point where she did not know what she was doing. Defendant and C.M. left the party and went back to defendant's barracks to continue their conversation.

When the pair arrived at defendant's room, defendant no longer wanted to talk about the argument, he wanted to watch the rest of the Super Bowl. C.M. stood in front of the television and insisted that they talk about what had happened at the party. Defendant asked C.M. to move out of the way; she refused to move. C.M. told defendant that she was going to leave if they did not talk. Defendant did not want C.M. to leave, but he did not want to talk about the argument. When C.M. turned off the television, defendant grabbed both of her legs below her knees and pulled her legs out from under her. C.M. fell and hit the back of her head on the cement floor. C.M. testified that defendant was standing above her, "with his hand on [her] neck pushing on [her] Adam's apple." She recalled that she was unable to breathe as defendant was forcefully pressing on her neck, and that he was saying, "say good-bye, Chris, say good-bye."

C.M. testified that the next thing she remembered was being on the bed or some soft surface, face down, with defendant's hands still on her neck. C.M. did not know how long she remained in that position or whether she lost consciousness. She recalled waking up on the bed, with defendant lying next to her. C.M. experienced soreness in her "whole body." When she got out of bed and looked at herself in the mirror, she could barely see herself. She had two black eyes that were very swollen; it was very difficult for C.M. to open her eyes. The whites of C.M.'s eyes were red from broken blood vessels, and she had blurred vision. After looking at herself in the mirror, C.M. turned around and said to defendant, "look what you have done to me." Defendant denied injuring C.M., and told her that she had gotten beaten up in a fight in Juarez, Mexico. When C.M. told him that she remembered what had happened and that she knew his version of the incident was untrue, defendant admitted that he was responsible for her injuries.

Although C.M. wanted to seek medical attention, defendant persuaded her to stay at his room and allow him to take care of her injuries. C.M. stayed at defendant's room

*/ 75*

for approximately one day. When her pain and blurred vision persisted, defendant agreed to take C.M. to the hospital. Before going to the hospital, defendant and C.M. agreed that they would say that she had been injured in a fight in Juarez, Mexico. C.M. agreed to go along with the story because she believed that defendant was sorry, and that this was an isolated incident for which defendant would seek counseling. C.M. was also in love with defendant and wanted to maintain her relationship with him.

Initially, C.M. told military personnel the false story about being injured in Juarez, Mexico. She later told a chaplain and the military police the truth about her injuries. As a result, C.M. was restricted from going to defendant's barracks and she could not use military telephones to contact him.

C.M. testified that there was no violence between them after the January 1994 incident. However, a few times before the incident, defendant had grabbed her neck and pushed her against a wall during arguments. C.M. never reported these incidents to law enforcement.

C.M. completed her term of enlistment approximately six months after the January 1994 incident. Following her discharge from the Army, C.M. and defendant remained in contact for approximately six months. During this time, the two exchanged letters, and they visited each other at or near the Army base; defendant also visited C.M. at her family's home in Wyoming.

In 1995, defendant paid a surprise visit to C.M. in Wyoming. At that time, C.M. had a new boyfriend and was pregnant. Defendant told C.M. that he wanted to reconcile and be a couple again; C.M. declined.

Following the 1995 visit, C.M. had no further contact with defendant until September 2005. At that time, she received a call from Detective Neary regarding the January 1994 incident. Defendant called her about one week later. During the conversation, defendant indicated that he was aware that she had spoken with Detective Neary. Defendant told C.M. that he was sorry about the 1994 incident and said that he had a different recollection of what had happened. Defendant told C.M. that he was in trouble and needed her help. During this conversation, defendant did not ask C.M to lie

and did not specify how she could help him; he also did not threaten her. C.M. explained that there was nothing she could do for defendant, and that her only involvement with the instant case was to tell the truth about what had happened between them.

## II.  DEFENSE EVIDENCE

### A.  *Expert Testimony*

#### 1.    Psychiatrist

James Missett, M.D., a board certified psychiatrist and deputy chief of psychiatric services at Stanford University, testified as an expert in psychiatry. Dr. Missett reviewed P.G.'s medical records, as well as the police reports and her testimony at the preliminary hearing. Dr. Missett explained that there are three components to memory: (1) perception, meaning the experience of seeing, hearing, or thinking something; (2) the ability to encode or retain the experience; and (3) the ability to recall the retained experience. He further explained that memory has temporal components of immediacy and remoteness.

Dr. Missett opined that a person suffering P.G.'s skull fracture would likely lose consciousness and would have no memory of the event while unconscious. He did not know of any patient who had sustained a serious brain injury who was able to remember the injury-causing event itself. However, an emotionally traumatic event, where there is no physical damage to the brain, may "cut both ways," in terms of a person's ability to recall the event. Specifically, one person may be able to recall the event with exquisite detail, while another may have no memory at all, or traumatic amnesia, because the event is too painful to think about. A person suffering from traumatic amnesia is usually able to recover his or her memory of the traumatic event.

Based on the severity of P.G.'s injuries, Dr. Missett opined that her recovered memory could be result of confabulation, lying, or both. He noted that P.G. had made inconsistent statements regarding whether the injury was an accident and whether she had a memory of the event. These inconsistencies created a problem for determining the veracity of P.G.'s recovered memory claim.

*176*

Dr. Missett could not explain with any degree of certainty whether P.G.'s claim of recovered memory was presented consciously and accurately, or whether it was consciously false, or if she were malingering, or in some way mistaken. Based on the hypothetical questions, Dr. Missett could not determine whether P.G. lost consciousness, and if so, when or whether she was confabulating. However, he did opine that if P.G. were at all conscious during the event, she could have experienced it, encoded it, and later retrieved the memory.

2.      Emergency Medicine Physician

Terry Fotre, M.D., testified as an expert in the field of emergency medicine. Dr. Fotre estimated that about 20 percent of the patients he had treated for skull fractures had no memory of how they were injured. Of this group of patients, none had ever recovered a memory of the injury-causing event after arriving at the hospital with no such memory.

Dr. Fotre testified that a common sequel to a skull fracture is the possibility of a seizure, though it happens in less than 50 percent of the time. He explained that a seizure can cause spasm, shaking, odd posturing, grunting, straining, and a massive discharge of the muscles in the body.

Dr. Fotre opined that the redness in P.G.'s eyes was consistent with increased pressure in the brain, and could also have been caused by her straining against the cervical collar after she was brought to the hospital, or from being kicked. He further explained that if blows to the eyes were the cause of redness in P.G.'s eyes, he would have expected to see swelling, which was not present in the medical records or photographs. Additionally, the "raccoon sign" or discoloration of P.G.'s lower eyelids was an indication of a skull fracture.

According to Dr. Fotre, the bruise behind P.G.'s ear was the result of blood pooling in that area, which had been caused by the skull fracture. He explained that if the bruise had been caused by a direct blow, there would have been bruising and swelling to

the outer portion of the ear as well, which was not depicted in the photographs. Dr. Fotre did not find any indication of blunt trauma to P.G.'s eyes or the front of her head.

On cross-examination, Dr. Fotre testified that the abrasions on P.G.'s elbow and hand were consistent with someone falling backwards on the ground. However, the marks on P.G.'s arm, which were in a fingerprint pattern, were consistent with someone grabbing or hitting the arm.

On further direct examination, Dr. Fotre testified that lifting an unconscious person was like lifting "dead weight" or a bag of wet cement.

    *B.*    *Testimony from Defendant's Family and Coworkers*

    1.    Reva Hall

Defendant's mother, Reva Johnson Hall, testified that P.G. moved into her home in February of 2003. P.G. lived at Hall's home until the end of April 2003, when P.G. moved out for two days and then returned. P.G. stayed at Hall's home until after P.G.'s final exams that May. Hall said that P.G.'s departure in April 2003 was sudden. Hall saw defendant carry P.G.'s clothes to her car. According to Hall, defendant and P.G. had not been arguing, but Hall thought P.G had been unhappy that defendant had purchased a Mustang. Hall never saw defendant push P.G., but had seen P.G. push defendant a couple times in the past.

    2.    Patricia Rico

Patricia Rico, recalled as a defense witness, testified that she heard P.G. tell defendant on a speakerphone at work that "it was an accident and that she remembered everything that happened." On cross-examination, Rico admitted that even though she knew that this was important information, she never disclosed this information to the defense investigator, Detective Neary, or the prosecutor, when she was interviewed by them.

3.    Joseph Gerrans

Joseph Gerrans, a loss prevention manager at J.C. Penny's, recalled P.G. arriving at the store in November 2004. He heard P.G. say that she had had a restraining order lifted and that she remembered that it was not defendant's fault. Gerrans did not know what P.G. was talking about when she referred to "it" not being defendant's fault. On cross-examination, Gerrans admitted that he did not mention what he had overheard to the defense investigator, even though he considered it to be important information. After his interview with the defense investigator, Gerrans typed a statement dated June 2, 2005, in which he sets forth what he heard in November 2004; Gerrans had the statement notarized.

## III.    PROSECUTION REBUTTAL

P.G. testified that when she visited Dr. Jun on April 27, 2004, she did not tell him that she had regained her memory of the attack. Rather, she asked him whether she would ever get her memory back, and if she could take some medicine, or be hypnotized, to regain it.

On December 2, 2004, P.G. saw Dr. Andrew Oh because she was experiencing dizziness. At that time, P.G. did not tell Dr. Oh that she remembered the assault that had occurred. She mentioned that her visit was regarding a "domestic case" because that is what she had been told by her family, friends, and neighbors, and that "kind of made sense[]" to her.

P.G. did not recall any conversation with defendant at his place of work in April 2004, or talking to him on a speakerphone. Defendant was the one who had brought up the subject of withdrawing the restraining order because he wanted to be a police officer. During their conversations, defendant told P.G. that her injuries were an accident and that he would never do something like that to her because he loved her. P.G. talked to defendant up until the time she had obtained the restraining order because he continued to call her. P.G. denied telling defendant that her injuries were an accident and not his fault because at that time she did not know what had happened to her.

# DISCUSSION

I.   ADMITTING EVIDENCE PURSUANT TO EVIDENCE CODE SECTION 1109
     AND INSTRUCTING THE JURY WITH CALJIC NO. 2.50.02 DID NOT
     DEPRIVE DEFENDANT OF DUE PROCESS

### A.   Background

The prosecution moved in limine for an order allowing the introduction of

defendant's prior acts of domestic violence against C.M. in 1994 and against P.G. in

2003. With respect to the 1994 incident, defendant argued that it was too remote in time

to be admissible under Evidence Code section 1109 (all further section references are to

this code unless otherwise indicated).[3] He also argued that the evidence should be

excluded pursuant to section 352. As to the 2003 incident, defendant argued that it did

not constitute an act of domestic violence within the meaning of section 1109. Following

a lengthy section 402 hearing, at which C.M. testified, the trial court allowed the

prosecution to present the testimony of C.M. at trial pursuant to sections 1109 and 1101,

subdivision (b). In a detailed ruling, the trial court took pains to discuss the limits on

admitting propensity evidence under sections 1108 (prior sexual offenses) and 1109,

noting that courts faced with such an issue are required "to consider the nature and type

of evidence, the relevance and possible remoteness of that proposed evidence, the degree

---

[3] Section 1109 provides, in pertinent part, as follows: "(a)(1) Except as provided in
subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense
involving domestic violence, evidence of the defendant's commission of other domestic
violence is not made inadmissible by Section 1101 if the evidence is not inadmissible
pursuant to Section 352. [¶] . . . [¶] (c) This section shall not be construed to limit or
preclude the admission or consideration of evidence under any other statute or case law.
[¶] (d) As used in this section: [¶] . . . [¶] (3) 'Domestic violence' has the meaning set
forth in Section 13700 of the Penal Code. Subject to a hearing conducted pursuant to
Section 352, which shall include consideration of any corroboration and remoteness in
time, 'domestic violence' has the further meaning as set forth in Section 6211 of the
Family Code, if the act occurred no more than five years before the charged offense.
[¶] (e) Evidence of acts occurring more than 10 years before the charged offense is
inadmissible under this section, unless the court determines that the admission of this
evidence is in the interest of justice."

*178*

of certainty as to its commission and the likelihood of confusing, misleading or distracting jurors from their main inquiry whether or not that other evidence is to be prejudicial." The court explained that "[i]n this particular case in weighing all of these factors the Court's biggest focus is on frankly, the question of remoteness," and noted that "Subdivision E of 1109 contains a . . . statutory provision on the question of remoteness which is not contained within 1108." The court found that, given the unique facts and circumstances of this case, C.M.'s testimony was admissible under section 1109. In so ruling, the court explained: "Despite the issue raised as it relates to remoteness, I believe that in the interest of justice this jury should in fact hear this evidence much of which is due to the fact, one, there is describance [*sic*] here which may also be admitted under 1109 which would fit within the ten year period, that is, the events that took place between [P.G. and defendant] sometime on and between April and May of 2003 which would be admissible under 1109."

At the close of evidence, the court modified its ruling so as to admit the testimony to show only propensity evidence under section 1109, and not for purposes of section 1101. The court instructed the jury with CALJIC No. 2.50.02, regarding the permissible use of evidence of prior domestic violence. The court also instructed the jury with CALJIC No. 2.50.1, regarding the requirement of proof by a preponderance of evidence for crimes other than the charged offenses. The court gave several other instructions on the requirement of proof beyond a reasonable doubt; the elements of the charged offenses; the sufficiency of the testimony of a single credible witness as proof of any fact, and the duty to consider all the evidence upon which proof of a fact depends; the requirement of proof of each element independent of any confession by the defendant; and the requirement that the jury consider the instructions as a whole and each in light of all the others.

Defendant's principal contention on appeal is that admission of the 1994 and 2003 incidents pursuant to section 1109 was improper and violative of his right to due process and a fair trial. He further contends that the giving of CALJIC No. 2.50.02, which advised the jury about the permissible use of evidence of prior domestic violence, likely

confused the jury about its obligations, and impermissibly lowered the prosecution's burden of proof. We will discuss each of these issues in turn.

B.    *Section 1109 Issues*

Section 1109 supplants the general rule that prior acts are inadmissible to prove a defendant's conduct on a specific occasion. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026; see also § 1101, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) This section reflects the Legislature's determination that evidence of prior acts of domestic violence is highly relevant, despite its potential prejudicial impact, and is admissible in new prosecutions for domestic violence. (*People v. Garcia* (2001) 89 Cal.App.4th 1321, 1335; *People v. Johnson* (2000) 77 Cal.App.4th 410, 419 (*Johnson*).)

The statute's legislative history offers insight as to why the Legislature singled out domestic violence offenses for disparate evidentiary treatment: ". . . 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' " (*Johnson, supra,* 77 Cal.App.4th at p. 419, citing Assem. Com. Rep. on Public Safety (June 25, 1996) pp. 3-4.)

Additionally, the nature of these crimes often produces uncooperative witnesses and victims because they fear retaliation from the abuser. (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1333 (*Brown*).) Therefore, "the California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic

*179*

violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*Johnson, supra,* 77 Cal.App.4th at p. 420.)

Section 1109 authorizes the admission of other acts of domestic violence in a prosecution for domestic violence, subject to exclusion under section 352. (§ 1109, subd. (a).) The admission of such evidence is also limited by section 1109, subdivision (e), which states that "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."

Defendant contends that the admission of prior acts of domestic violence under section 1109 violated his right to due process. We have previously considered and rejected this claim, as have other appellate courts. (*People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095-1096 (*Escobar*); *People v. James* (2000) 81 Cal.App.4th 1343, 1353 (*James*); *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310 (*Jennings*); *Brown, supra,* 77 Cal.App.4th at p. 1335; *People v. Hoover, supra,* 77 Cal.App.4th at pp. 1027-1028; *Johnson, supra,* 77 Cal.App.4th at p. 417.) We need not revisit this question. Because the trial court's discretion to exclude propensity evidence under section 352 provides an adequate safeguard, admission of prior acts of domestic violence does not facially violate the due process clause. (See *Falsetta, supra,* 21 Cal.4th at p. 916-918 [construing section 1108, which provides for an identical exception for the admission of prior sexual offenses in current prosecution for sexual offense]; *People v. Hoover, supra,* 77 Cal.App.4th at p. 1028.)

Defendant concedes that courts have rejected due process challenges to section 1109, but contends that this section is unconstitutional as applied in his case. He argues the trial court erred in its application of the remoteness limitation set forth in section 1109, subdivision (e), and failed to properly evaluate the evidence as required by section 352.

1.    Remoteness

Section 1109 establishes a 10-year presumption of remoteness and requires that prior acts that occurred more than 10 years before the charged offense are inadmissible unless the trial court finds the evidence is admissible in the "interest of justice." (§ 1109, subd. (e).) Here, the prior act, occurring in late January 1994, fell just outside the 10-year period, by approximately two months. Defendant contends the trial court improperly interpreted the term "interest of justice" as merely calling for an inquiry as to whether the prior act was too " 'remote' " to be admitted.

Section 1109 does not define the meaning of the phrase the "interest of justice." Defendant argues that the " 'interest of justice' " exception requires a "heightened burden of justification" that implicates some of the Legislature's concerns when it enacted section 1109. Thus, according to defendant, "when a prior act of domestic violence occurs more than ten years before the charged offense, the question of whether admission of that prior act serves 'the interest of justice' should include a close assessment of whether the case involves 'on-going violence and abuse' or an 'escalating pattern of domestic violence' and whether the charged offense presents 'acute difficulties of proof' associated with uncooperative victims, fear of retaliation, or reluctant third party witnesses." However, as defendant concedes, there is no authority supporting this, or any other, interpretation of the meaning of " 'interest of justice' " in the context of section 1109.

*180*

While we need not determine the exact criteria that define this requirement,[4] we find that it requires more than a mere finding that the evidence is not remote. If that were the sole criterion, it would have been easy enough for the Legislature to have so stated. That said, defendant offers no compelling evidence that the trial court interpreted the "interest of justice" exception as merely requiring a determination as to whether the prior act was too "remote" to be admitted. The record reflects that the trial court gave "greater scrutiny" to the 1994 incident by evaluating more carefully the foundational hearing testimony of C.M. to determine the veracity of the witness when balancing the probative value of the evidence against its prejudicial effect.

Defendant further contends that the trial court erred in considering and admitting evidence of the 2003 incident between defendant and P.G., which thereby caused the 1994 incident to fall within the 10-year period of admissibility. He asserts that the 2003 incident did not constitute an act of domestic violence within the meaning of section 1109 because P.G. testified that she had not been injured and had been only "a little bit" scared. Essentially, defendant is challenging the sufficiency of the evidence to support a finding that he engaged in a violent act.

"Domestic violence," for the purposes of section 1109, is broadly defined as "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (Pen. Code, § 13700, subd. (b); § 1109, subd. (d).) " 'Abuse' is defined as 'intentionally or recklessly causing or attempting to cause

---

[4] As one court has noted, "Some lawyers and judges get squeamish over the unqualified term 'justice.' Perhaps it smacks too much of merely asking 'Is it fair?' rather than what the law is. [Citation]. But it is interesting to note that if you type in the word in a computer database of unannotated California statutes and exclude such usages as 'administration of justice,' 'criminal justice' and 'chief justice,' there are easily more than a thousand times the word appears in the positive law of California. (There are over 200 times when the phrases 'miscarriage of justice,' 'right and justice' and 'interests of justice' are used.) Obviously the Legislature on occasion entertains the notion that judges can divine what 'justice' is." (*In re Marriage of Cordero* (2002) 95 Cal.App.4th 653, 663, fn. 12.)

bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.' " (Pen. Code, § 13700, subd. (a); § 1109, subd. (d); *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114 (*Rucker*).)

For example, in *Rucker, supra,* 126 Cal.App.4th 1107, the court rejected a defendant's contention that she had not engaged in domestic violence because her former boyfriend was not scared when she pointed a gun at him. (*Id.* at p. 1118.) There, the former boyfriend had testified that he was scared when the defendant pointed the gun at him, and became more frightened after she left. (*Ibid.*) Additionally, there was evidence indicating that defendant had wanted to kill her former boyfriend. (*Ibid.*)

Defendant argues that here, unlike in *Rucker, supra,* 126 Cal.App.4th 1120, there is no substantial evidence to support a determination that his conduct constituted domestic violence. We disagree. Defendant's act of grabbing P.G., who was 4 feet 9 inches tall and weighed only 95 pounds, by the neck and pushing her, face first, to the ground reasonably supports a finding that defendant intentionally or recklessly caused *or* attempted to cause bodily injury to P.G. (Pen. Code, § 13700, subd. (a); § 1109, subd. (d).) Additionally, P.G. testified that she had been frightened by defendant's act.

We conclude that there was substantial evidence to support the predicate finding that defendant had engaged in a prior act of domestic violence against P.G.

2.     Section 352

"Section 1109 conditions the introduction of prior domestic violence evidence on an evaluation under section 352 of whether the evidence is more probative than prejudicial. A careful weighing of prejudice against probative value under that section is essential to protect a defendant's due process right to a fundamentally fair trial. [Citations.]" (*Jennings, supra,* 81 Cal.App.4th at pp. 1313-1314.)

"Under section 352, a trial court may in its discretion exclude material evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. The weighing process under section 352

*181*

depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules. [Citations.] We will not overturn or disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd. [Citations.] 'The [trial] court's exercise of discretion under [] section 352 will not be disturbed on appeal unless the court clearly abused its discretion, e.g., when the prejudicial effect of the evidence clearly outweighed its probative value.' [Citation.]" (*Jennings, supra,* 81 Cal.App.4th at pp. 1314-1315.)

Here, defendant complains that the evidence of the 1994 incident was prejudicial under section 352 because it was significantly dissimilar from the charged offenses; the evidence regarding the 1994 incident was stronger than the evidence of the charged offenses because C.M.'s testimony was relatively unchallenged, whereas the charged offenses were based on P.G.'s compromised memory and inconsistent statements; he was never punished for the 1994 incident; and the 1994 incident was remote and he had led a law abiding life in the interim.

Applying the above rules, we conclude that the trial court did not err in its application of section 352. As noted, the record reflects that the trial court articulated its reasons for admitting the evidence under section 352 in a detailed and thorough manner. Although defendant argues at length about the dissimilarities between the 1994 incident and the charged offenses, we are not persuaded by his attempt to subject the admission of this evidence to the exacting standards governing admission of evidence under section 1101, because the evidence was independently admissible under section 1109. (See *Brown, supra,* 77 Cal.App.4th at p.1338; *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138; see also *People v. Frazier* (2001) 89 Cal.App.4th 30, 40-41 [discussing section 1108].) The charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under section 1101, otherwise section 1109 would serve no purpose. (See *Frazier, supra,* 89 Cal.App.4th at pp. 40-41.) In other words, it is enough that the charged and uncharged offenses are domestic violence offenses as defined in section 1109. (See *id.* at p. 41.)

Even considering the remoteness of the 1994 incident, together with the defendant's purported blameless life in the interim, the similarities between the prior act and the current offense balance out the remoteness. (See *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395.) Specifically, in both instances defendant tried to mislead the victims into believing that he was not the cause of the injuries.

To the extent defendant argues that the 1994 incident was based on "stronger evidence" than the charged offenses, the prior incident of domestic violence was no more egregious than the charged offenses, and posed no danger of confusing the jury. These circumstances decreased the potential for prejudice because it was unlikely that the jury's passions were inflamed by the evidence of the 1994 incident. Nor do we believe that any inclination to punish defendant for the 1994 incident was a significant factor in this case. (See *Jennings, supra,* 81 Cal.App.4th at p. 1315.)

Finally, defendant contends that even if the January 1994 incident was admissible, the trial court erred in admitting evidence regarding purported incidents of abuse that occurred prior to this date. Defendant claims that the trial court failed to engage in any section 352 weighing with respect to this evidence. He further contends that the trial court erred in admitting evidence regarding defendant's 1995 visit to C.M.'s home in Wyoming because it was irrelevant to the 1994 incident, and that C.M.'s description of the visit as being " 'unexpected' " was highly prejudicial as it portrayed defendant as being a "disturbed stalker." Defendant failed to object to this evidence at trial and the issue is therefore waived on appeal. (*People v. Thomas* (1992) 2 Cal.4th 489, 520.) However, even overlooking the absence of a trial objection, defendant's claims fail on the merits. Even assuming for the sake of argument that the trial court failed to weigh the prejudicial effect of this evidence, " ' "[t]he prejudice referred to in [] section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." [Citation.]' " (*People v. Smith* (2005) 35 Cal.4th 334, 357, italics omitted.) C.M.'s testimony regarding the other incidents was brief and was unlikely to evoke an emotional bias against defendant as an individual.

*182*

In sum, the record reflects that the trial court properly performed its duty to weigh the probative value of the prior domestic violence evidence against its prejudicial effect.

3.    CALJIC No. 2.50.02

Defendant contends that the trial court violated his right to due process, and related constitutional rights, by instructing the jury with CALJIC No. 2.50.02. According to defendant, CALJIC No. 2.50.02 impermissibly invited the jury to convict him based solely on evidence of prior, uncharged incidents of domestic violence and the inference that he had a propensity to commit such crimes.

The 2005 revision to CALJIC No. 2.50.02, which was given in the instant case, instructs in pertinent part: "Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence on one or more occasions than that charged in the case. [¶] . . . [¶] If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a disposition to commit other offenses involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused. [¶] However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime. [¶] Unless you are otherwise instructed, you must not consider this evidence for any other purpose."[5]

---

[5] Defendant concedes that he requested CALJIC No. 2.50.02. Ordinarily, a party is estopped from complaining on appeal of an instruction he requested. (See *People v. Lucero* (2000) 23 Cal.4th 692, 723-724.) However, because defendant's substantial rights are affected by the challenged instruction, we consider the merits of his argument. (Pen. Code, § 1259.)

Relying on *James, supra,* 81 Cal.App.4th 1343, defendant argues that CALJIC No. 2.50.02 "did not adequately restrain the use of propensity evidence so as to ensure that the jury knew of its obligation to find that there was proof beyond a reasonable doubt of each element of the charged offenses and that a conviction could not solely rest upon proof of propensity arising out of prior crimes." Specifically, he argues that the instruction failed to indicate "that if the jury determined by a preponderance of evidence that the defendant committed other offenses involving domestic violence and if it inferred from those prior offenses that the defendant has a disposition to commit other domestic-violence offenses, neither the prior offenses *nor the inference of disposition arising from such offenses* would be sufficient by themselves 'to prove beyond a reasonable doubt that the defendant committed the charge[d] offenses.' " (Italics original.)

Contrary to defendant's contention, the instruction does not expressly permit a conviction to be based on propensity evidence, and he waived the issue of whether the instruction should have been modified to expressly prohibit such a finding since he failed to request amplification of the otherwise correct instruction. (See *People v. Palmer* (2005) 133 Cal.App.4th 1141,1156.) We, nonetheless, consider this issue and conclude that it fails on the merits.

*James,* the case upon which defendant relies, held that a *former* version of CALJIC No. 2.50.02 violated due process because it improperly permitted the jury to base a conviction solely on propensity evidence. (*James, supra,* 81 Cal.App.4th at p. 1346-1347.) There, the court observed, "The jury must be reminded that propensity evidence alone cannot meet the prosecution's burden of proving the elements of the charged offense. Otherwise, the jury is prompted to use evidence of prior offenses in precisely the wrong way, as a substitute for proof of the current offense. [Citation.]" (*Id.* at p. 1353.) Here, unlike in *James,* the jury was instructed with the 2005 revised instruction, which contained language expressly stating that a finding that defendant had committed the uncharged prior offenses "is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses." This is precisely the sort of

*183*

admonition that the *James* court found lacking in the pre-1999 version of CALJIC No. 2.50.02. (See *Escobar, supra,* 82 Cal.App.4th at pp. 1100-1101.)

In *James,* the court specifically noted that the 1999 revisions of CALJIC No. 2.50.01[6] (parallel instruction regarding prior sexual offenses) had been implicitly approved by the Supreme Court in *Falsetta, supra,* 21 Cal.4th at pages 923-924, and by another division of this court in *Brown, supra,* 77 Cal.App.4th at page 1336 [approving 1999 revision of CALJIC No. 2.50.02]. (*James, supra,* 81 Cal.App.4th at p. 1357, fn. 8.) Similarly, in *Escobar,* we noted that *Falsetta,* although voicing concerns similar to those raised in *James,* "expressed confidence that the 1999 amendments to those instructions have eliminated that flaw and will 'assure that the defendant will be tried and convicted for his present, not his past, offenses.' (*Falsetta, supra,* 21 Cal.4th at p. 923.)" (*Escobar, supra,* 82 Cal.App.4th 1101.)

Nevertheless, defendant argues that the 2005 revision of CALJIC No. 2.50.02 does not cure the constitutional deficiencies identified in *James, supra,* 81 Cal.App.4th 1343. Defendant contends that the cautionary language was defective in implying that if the jury was convinced, not merely by a preponderance of the evidence but beyond a reasonable doubt, that he committed a prior act of domestic violence, then it could use that finding as the basis for convicting him of the charged offenses.

In *People v. Reliford* (2003) 29 Cal.4th 1007, 1009, 1015 (*Reliford*), our Supreme Court rejected this precise argument and confirmed the constitutionality of the 1999

---

[6] "For the purposes of evaluating the constitutional validity of the instructions, there is no material difference between CALJIC No. 2.50.01 and CALJIC No. 2.50.02." (*People v. Pescador* (2004) 119 Cal.App.4th 252, 261.) Accordingly, cases decided with respect to these instructions, at least within this context, are interchangeable. (*Escobar, supra,* 82 Cal.App.4th at p. 1097, fn. 7.)

revision of CALJIC No. 2.50.01.[7] As in this case, the defendant argued that the instruction " 'implies by way of a negative pregnant that prior sex offenses proved beyond a reasonable doubt are indeed sufficient to prove the present offense beyond a reasonable doubt.' " (*Id.* at p. 1015.) The Supreme Court held that "no juror could reasonably interpret the instructions [as a whole] to authorize conviction of a charged offense based solely on proof of an uncharged sexual offense." (*Ibid.*)

Here, the jury was instructed not to single out any particular sentence or point in the instructions but to consider all instructions as a whole and in light of the others (CALJIC No. 1.01). Other instructions reminded the jury that it had to find proof beyond a reasonable doubt that defendant committed the charged offense (CALJIC No. 2.90), and that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt" (CALJIC No. 2.01).

Defendant contends that CALJIC No. 2.01 only "added to the confusion" because it is "in direct conflict with the preponderance of evidence standard of CALJIC [No.] 2.50.02." Rejecting a claim that CALJIC No. 2.50.01 was too complicated for jurors to apply, the Supreme Court in *Reliford* explained, "This is not the first time jurors have been asked to apply a different standard of proof to a predicate fact or finding in a criminal trial. [Citations.] As we do in each of those circumstances, we will presume

---

[7] The instruction given in *Reliford* was as follows: " 'Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense other than that charged in the case. [¶] . . . [¶] If you find that the defendant committed a prior sexual offense in 1991 involving S[.]B[.], you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused. [¶] However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense in 1991 involving S[.]B[.], that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime. The weight and significance of the evidence, if any, are for you to decide. [¶] You must not consider this evidence for any other purpose.' " (*Reliford, supra,* 29 Cal.4th at pp. 1011-1012.)

*184*

here that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to a preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (*Reliford, supra,* 29 Cal.4th at p. 1016.)

So too here, we presume that the jury was able to differentiate between CALJIC Nos. 2.01 and 2.50.02, and to apply the different standards of proof articulated therein. Viewing CALJIC No. 2.50.02 in the context of the entire body of instructions delivered to the jury, we do not believe that any reasonable juror would have interpreted the instructions as permitting a conviction based on the evidence of the uncharged acts of domestic violence alone.

Finally, in light of the strength of the evidence against defendant, we are convinced beyond any reasonable doubt that the jury did not draw an improper inference of guilt solely from the propensity evidence. (*Escobar, supra,* 82 Cal.App.4th at p. 1102.)

## II. THE TRIAL COURT DID NOT ERR IN EXCLUDING CERTAIN DEFENSE EVIDENCE

Defendant contends that the trial court erred in precluding certain testimony from his expert witnesses and his mother . Defendant claims that by precluding testimony regarding a possible discrepancy in the date of P.G.'s recovered memory and whether she had suffered a seizure, the trial court not only erred under state evidence law, but also violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. We address each of defendant's claims in turn.

### A. *Exclusion of Evidence Regarding Earlier Date of P.G.'s Recovered Memory*

Defendant contends that the trial court erred in preventing Dr. Missett from testifying that P.G. may have regained her memory two months before she claimed to have recovered it. The basis for Dr. Missett's proposed testimony was an entry in P.G.'s

medical records, dated December 2, 2004, in which Dr. Oh noted that P.G. was "evidently attacked by an ex-boyfriend."[8]

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness ([] § 720) and to give testimony in the form of an opinion (*id.*, § 801). Under . . . section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*Id.*, subd. (a).)" (*People v. Gardeley* (1996) 14 Cal.4th 605, 617; *People v. Cole* (1956) 47 Cal.2d 99, 104 [decisive consideration in admitting expert opinion is whether subject of inquiry is beyond common experience and would assist trier of fact].) In other words, expert opinion is not admissible if it consists of inferences and conclusions that can be drawn as easily and intelligently by the trier of fact as by the expert witness. (See *Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 291 (*Kotla*) [expert testimony that employer discharged employee for retaliatory reasons improper]; *Everett v. Superior Court* (2002) 104 Cal.App.4th 388, 393-394 [expert testimony not required for simple comparison of percentages].)

"[T]he courts have the obligation to contain expert testimony within the area of the professed expertise, and to require adequate foundation for the opinion." (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523.) For example, in *People v. Torres* (1995) 33 Cal.App.4th 37, 47-48, the court held that it was improper for a police officer to testify as to the statutory meaning of the terms robbery and extortion and to express the opinion the crimes committed were robberies.

Here, Dr. Missett's proposed testimony was not within his professed expertise of psychiatry and was not meant to assist the jury in understanding medical evidence regarding the nature of recovered memories. Rather, defendant sought to elicit this testimony to cast doubt on P.G.'s credibility. This proposed testimony would have

---

[8] Defendant presented no offer of proof to establish that this comment came directly from P.G., as opposed to being an independent conclusion drawn by Dr. Oh.

*185*

improperly invaded the province of the jury to determine the credibility of witnesses. (See *Kotla, supra,* 115 Cal.App.4th at p. 291; see also *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Moreover, the veracity of witnesses is not a matter sufficiently beyond common experience to permit the testimony of an expert. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)

The trial court did not abuse its discretion in excluding this testimony.

B.    *Exclusion of "Seizure" Evidence*

During the trial, defense counsel asked Dr. Fotre whether "during a seizure is it possible to get redness in the eyes" like that demonstrated in one of the photographs of P.G. The prosecutor objected to any questions being asked about seizures, and argued that there had been no testimony by the treating physicians to substantiate a seizure. The trial court sustained the objection on the ground that there had been no foundational questioning regarding seizures.

Later, defense counsel asked Dr. Fotre whether a person having a seizure "would . . . be more difficult to lift up and carry than a person who is not having a seizure." The trial court again sustained the prosecutor's objection, stating that there had been no foundational evidence in the record regarding seizures. When defense counsel asked to approach the bench, the trial court responded, "No, lay a foundation, . . . if there is anything in the medical record to relate to that." Despite these admonitions, defense counsel failed to elicit any foundational evidence regarding seizures, and attempted to assert during closing argument that the redness on P.G.'s eyelids was consistent with someone having a seizure. Whereupon, the prosecutor objected, and the trial court told the jury that there had been no evidence of a seizure.

Defendant contends that the trial court improperly prevented Dr. Fotre from expressing an opinion that a seizure was a possible cause of P.G.'s injuries and defendant's difficulty in carrying her to his car.

"Generally, an expert may render opinion testimony on the basis of facts given 'in a hypothetical question that asks the expert to assume their truth.' [Citation.] Such a

hypothetical question must be rooted in facts shown by the evidence, however. [Citations.]" (*People v. Gardeley, supra,* 14 Cal.4th at p. 618 ; see also *People v. Hayes* (1985) 172 Cal.App.3d 517, 522.) "[A]n expert's opinion based on . . . speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence. [Citations.]" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) Whether the foundational requirements for an expert opinion have been met "rests in the sound discretion of the trial court. [Citation.] That discretion is necessarily broad . . . . Absent a manifest abuse, the court's determination will not be disturbed on appeal. [Citations.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.)

The trial court did not abuse its discretion. Defendant's proposed questioning of Dr. Fotre called for speculation. Dr. Fotre was not a treating physician; he had only reviewed P.G.'s medical records, which did not mention a seizure. Notably, defendant never asked Dr. Jun, P.G.'s treating neurosurgeon, whether she had suffered a seizure. Rather, defendant sought to elicit an opinion from Dr. Fotre based on an assumed fact that was utterly lacking any evidentiary support in the record. Because his opinion was nothing more than speculation, the trial court correctly excluded Dr. Fotre's testimony regarding the possibility of a seizure.

The cases cited by defendant do not compel a contrary conclusion. For example, in *People v. Obie* (1974) 41 Cal.App.3d 744, 756 (*Obie*) (overruled on another ground in *People v. Rollo* (1977) 20 Cal.3d 109, 120, fn. 4), a physician and forensic pathologist who had performed an autopsy of the victim testified as to the results of his investigation of the victim's death. "He detailed his findings as to the abrasions, contusions and lacerations of portions of the body, sublexation of the fourth thoracic vertebrae, multiple rib fractures with lung contusions, transverse basilar skull fracture and other conditions of the body. Based on a hypothetical question asked by the prosecution, using the doctor's findings, a photograph of the embankment over which the truck ran, the truck itself, a certain speed and a certain position of the body, the doctor opined that the victim's injuries were not caused by the accident, but by repeated blows from a short blunt

*186*

instrument." (*Obie, supra,* 41 Cal.App.3d at p.756.) The court held that it was permissible to elicit the doctor's opinion through the use of a hypothetical and that he was entitled to use a photograph of the embankment as a part of the basis for his opinion. (*Id.* at p. 757.) In so holding, the court reasoned, " 'An expert can express an opinion from a photograph just as he can from a hypothetical question stating the facts which appear in a photograph. [Citations.]' [Citation.]" (*Ibid.*)

 *Obie, supra,* 41 Cal.App.3d 744 is clearly distinguishable from the instant case. There, the expert did not merely speculate as to the cause of the victim's death based on a photograph, but used the photograph in conjunction with his detailed findings from the autopsy he performed, as well as various other facts to determine the cause of the victim's injuries.

 Similarly, defendant's reliance on *Harrison v. De Young* (1935) 3 Cal.App.2d 662 is equally misplaced. There, a physician was allowed to testify as to microscopic changes that may take place in the brain following a concussion. (*Id.* at p. 664.) After defense counsel objected that there was no evidence regarding changes in the brain, plaintiff's counsel stated, "I submit that there is testimony that this man had a concussion." (*Ibid.*) In affirming the trial court's ruling allowing the expert testimony, the appellate court explained, "Frequently it happens when expert witnesses are testifying that conclusions to be drawn *from the facts stated* depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. In such cases not only the facts but the conclusions to which they lead may be testified to by qualified experts." (*Ibid.,* italics added.)

 In *Harrison v. De Young, supra,* 3 Cal.App.2d 662, there was evidence in the record that the plaintiff had suffered a concussion, which formed the factual predicate for the expert's testimony regarding the microscopic changes in the brain following such an injury. (*Id.* at p. 664.) Here, unlike in *Harrison,* there was no evidence in the record that P.G. had suffered a seizure. Rather, Dr. Fotre merely stated that when someone sustains a skull fracture, a seizure might occur "less than 50 percent of the time, but is certainly a possibility." Lacking the factual predicate that P.G. suffered a seizure, Dr. Fotre's

testimony that a seizure could have been the possible cause of P.G.'s injuries and defendant's difficulty in carrying her to his car would have been mere speculation. The trial court did not abuse its discretion in excluding this testimony.

C.    *Exclusion of "Stiff Legs" Evidence*

In a related argument, defendant contends that the trial court erroneously excluded evidence that he had told his mother that P.G. had "stiff legs" when he was attempting to lift her and take her to the hospital.

Defense counsel first brought this statement to the prosecution's attention by sending a facsimile of a motion to permit hearsay evidence on Saturday, October 29, 2005, just two days before Dr. Fotre testified at trial. The proposed testimony consisted of defendant's mother stating that, after his release from police custody on April 10, 2004, defendant told her that when he lifted P.G. into his car, her legs were "stiff like tree limbs." At trial, the prosecution argued that this evidence appeared to be a way around defendant testifying and noted that more than 12 hours had elapsed since the incident causing P.G.'s injuries had occurred. In denying the motion, the trial court ruled as follows: "This [statement] would not meet the criteria under the definition of spontaneous statements under 1240 of the Evidence Code. It is not a statement made to attempt to narrate, to try to explain the act, condition or event perceived by the declarant, being [defendant], spontaneously under the stress and excitement of the events. [¶] Given the passage of time between the time of the events and the time that that statement is purportedly made, let alone the other foundational questions as it relates to the relationship between the parties and the fact that there's been nothing presented to me this was ever memorialized until discussing this with [defense counsel] on Friday, it will not meet the foundational requirements and as such will not be permitted to be presented to the jury." In response to defense counsel's question inquiring whether one of the defense experts could rely on this statement, the trial court explained: "They can't unless there's been some admissible evidence [on] which they can rely. They can't rely upon a hearsay statement made by your client. It's not otherwise admissible to the jury. They

*187*

can certainly rely on hearsay that is foundational in terms of it's in some other context, but not something that is now coming from your client on the eve of trial."

Defendant contends that his statement to his mother about P.G.'s "stiff legs" should have been admitted as a spontaneous declaration. Alternately, he contends that even if this statement constituted inadmissible hearsay, his medical experts should have been permitted to rely on it when rendering their opinions that P.G. may have suffered a seizure. Neither contention is meritorious.

The hearsay rule, codified at section 1200, presumes hearsay statements are inadmissible because they are not made under oath, are not subject to cross-examination, and the jury does not have the opportunity to view the declarant's demeanor as the statement is made. (*People v. Duarte* (2000) 24 Cal.4th 603, 610.) Section 1240 is one exception to the general rule of exclusion. Section 1240 allows for admission of a hearsay statement if the statement: "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) was made spontaneously while the declarant was under the stress of excitement caused by such perception." (§ 1240.) " 'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318.)

"[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer* (1989) 47 Cal.3d 888, 903, overruled on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.) "The crucial element in determining whether a declaration is sufficiently reliable to be admissible

under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker." (*People v. Farmer, supra,* 47 Cal.3d at p. 903.)

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is largely a question of fact. The determination of this question is vested in the trial court. The trial court necessarily exercises discretion in deciding it. The discretion of the trial court is at its broadest when it determines whether the nervous excitement still dominated and the reflective powers were still in abeyance. [Citations.]" (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 590-591.)

Here, the fact that defendant's "stiff legs" statement was made 12 hours after the incident, does not automatically deprive the utterance of spontaneity. (*People v. Poggi, supra,* 45 Cal.3d at p. 319.) Rather, to be admissible as a spontaneous declaration, "the statement must be the product of a reaction to a stimulus (an exciting event such as a robbery) and not the product of processing information in a deliberative manner." (*People v. Gutierrez* (2000) 78 Cal.App.4th 170, 181 (*Gutierrez*).) However, the circumstances surrounding the defendant's statement to his mother, including its mid-trial disclosure, rather than providing a basis for its trustworthiness, suggest defendant had the opportunity to reflect between the time of the incident and the time he purportedly made the statement. In other words, there is ample support for the conclusion that defendant's statement was part of deliberative process to provide an excuse, and not a mere product of the startling occurrence. (See e.g., *People v. Williams* (2006) 40 Cal.4th 287, 318-319 ["trial court did not abuse its discretion in concluding that defendant's somewhat self-serving statements made several hours after the murder did not qualify as a spontaneous utterance"]. There is substantial evidence to support the trial court's conclusion that section 1240 did not apply to defendant's "stiff legs" comment, and we conclude the exclusion of the statement was not an abuse of discretion.

Finally, contrary to defendant's contention, his "stiff legs" comment was not a proper basis for defense experts to render an opinion as to whether P.G. had suffered a seizure. " 'When expert opinion is offered, much must be left to the trial court's discretion.' (*People v. Carpenter* (1997) 15 Cal.4th 312, 403.) Although an expert may

188

base an opinion on hearsay, the trial court may exclude from the expert's testimony 'any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value.' (*People v. Montiel* (1993) 5 Cal.4th 877, 919.)" (*People v. Pollock* (2004) 32 Cal.4th 1153, 1172.)

Dr. Fotre's proffered opinion that P.G. had suffered a seizure would necessarily be based entirely on defendant's hearsay statements to his mother that P.G. had "stiff legs." "To avoid putting this potentially self-serving and unreliable hearsay before the jury, without defendant ever having testified and submitted to cross-examination, the trial court could properly require the defense to proceed by the use of hypothetical questions. [Citations.]" (*People v. Pollock, supra,* 32 Cal.4th at p. 1172.) Here, the trial court allowed defendant to lay a foundation with respect to the proposed hypothetical question to Dr. Missett regarding the possibility of a seizure. However, as discussed, there was absolutely no evidentiary support in the record to support a conclusion that P.G. may have suffered a seizure. Accordingly, the trial court did not abuse its discretion in precluding defendant's experts from relying on hearsay evidence to speculate that P.G. had suffered a seizure.

D.    *Constitutional Violations*

"The challenged trial court rulings did not violate state evidence law, nor did they deny defendant his constitutional rights under the federal Constitution. 'Application of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1035; accord, *People v. Snow* (2003) 30 Cal.4th 43, 90; *People v. Boyette* (2002) 29 Cal.4th 381, 427-428; *People v. Gurule* (2002) 28 Cal.4th 557, 620.) The rulings did not deprive defendant of a meaningful opportunity to present a defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 690.)" (*People v. Pollock, supra,* 32 Cal.4th at p. 1173.) Defendant was given ample opportunity to lay the appropriate foundation regarding the hypothetical questions posed to his experts, and otherwise present a defense.

E.    *Defendant Was Not Denied Effective Assistance of Counsel*

Defendant raises several issues involving the claim that he received ineffective assistance of counsel at trial.  When making such a claim, the burden of proof is on defendant.  (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)  "Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result. [Citations.]  A 'reasonable probability' is one that is enough to undermine confidence in the outcome.  [Citations.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)

"  'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." '  [Citations.]  '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation].  'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.'  [Citation.]" (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)  "If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'  [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.)  Defendant's burden is difficult to carry on direct appeal, as the competency of trial counsel "is presumed unless the record affirmatively excludes a rational basis" for counsel's act or omission.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, italics omitted; *People v. Lucas* (1995) 12 Cal.4th 415, 437.)

*189*

With these rules in mind, we examine defendant's claims of ineffective assistance.

1.    Alleged Failure to Object to Hearsay Statements

Defendant claims that his counsel was ineffective because he failed to object to "three sets of hearsay testimony" regarding statements made by P.G. at the hospital.

Hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200.) Hearsay statements are inadmissible "when they are offered to prove the truth of the matter asserted." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 387.) When a defendant claims counsel was ineffective for failing to object to evidence, the defendant must show that there was a sound legal basis for such an objection. (*People v. Majors* (1998) 18 Cal.4th 385, 403.)

a.    Officer MacHale's Police Report

Defendant contends that his counsel failed to object to Officer MacHale's testimony, in which he read from his police report that repeated Sandoval's statements about what she had heard P.G. say at the hospital. Defendant asserts that this testimony constituted "triple hearsay," for which no applicable exceptions existed.

Reading from his police report, Officer MacHale testified that Sandoval had told him that she heard P.G. say, " 'baby, I forgive you, I'll be a good girl.' " Officer MacHale's report also indicated that Sandoval told him that P.G. had said that defendant had thrown something at her head, which had caused her injury. Defendant contends defense counsel could have no tactical reason for failing to object to this multilevel, inculpatory hearsay. We disagree.

As an initial matter, the record reflects that defense counsel may have had a tactical reason for failing to object to this evidence. Specifically, on direct examination of Dr. Missett, defense counsel used P.G.'s statements in a hypothetical question, stating the following, "She says two things while at the hospital. One is that somebody may have possibly thrown something at her, and the other is she says the words to her boyfriend who brought her to the hospital, 'I forgive you baby, I'll be a good girl.'

During the ensuing course in the hospital she does not report any memory and has a lack of memory of the events that brought her to the hospital." Thus, one plausible explanation for defense counsel's failure to object to this evidence was the desire to subsequently use it to discredit P.G.'s claims of recovered memory.

In any event, contrary to defendant's contention, applicable hearsay exceptions existed at each level of this "triple hearsay." First, P.G.'s statements upon arriving at the hospital constituted spontaneous declarations, as they described an event perceived by P.G. (her injuries), and were made spontaneously while P.G. was under the stress of excitement caused by such perception. (§ 1240.) Defendant unpersuasively argues that P.G.'s statements were untrustworthy because she was in and out of consciousness and was "in all probability delusional." As discussed, "the basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." (*People v. Farmer, supra,* 47 Cal.3d at p. 903.) Here, P.G.'s "altered" state of consciousness actually supports the conclusion that her statements were instinctive and uninhibited and not the product of processing information in a deliberative manner. (*Gutierrez, supra,* 78 Cal.App.4th at p. 181.)

Second, Sandoval's statement was admissible as a past recollection recorded (§ 1237). Section 1237 provides, in pertinent part: "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he

*190*

made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement."

Relying on *People v. Simmons* (1981) 123 Cal.App.3d 677, defendant argues that Sandoval's recorded statement was inadmissible because she could not verify the accuracy of her statements in MacHale's report. Defendant's reliance on *Simmons* is misplaced. There, a witness provided a signed statement to the police describing how the defendant discussed his plans to burn a home and boasted of the arson afterwards. (*Id.* at p. 679.) The witness subsequently suffered a severe head injury, developed amnesia and, on the stand, could not recall giving his statement to the police, nor could he independently recall discussing the arson with the defendant. (*Id.* at p. 680.) *Simmons* held the witness's written statement was inadmissible, concluding the past recollection recorded doctrine applied only "where the trustworthiness of the contents of those statements is attested to by the maker, subject to the test of cross-examination, a procedure not meaningfully available" in that case due to the witness's amnesia. (*Id.* at p. 682.)

Unlike the amnesiac witness in *Simmons, supra*, 123 Cal.App.3d 677, Sandoval recalled providing her earlier police statement and she testified she was "a pretty honorable person." The present situation is more akin to *People v. Gentry* (1969) 270 Cal.App.2d 462, 468-470, where a declarant could not remember at trial what had happened, but testified that she did remember speaking with the officer at the time of the incident and had told the truth. (See also *People v. Cummings* (1993) 4 Cal.4th 1233, 1292-1293 [declarant had no recollection of conversation with detective because he was undergoing detoxification, but he testified he told detective truth and spoke with him while incident fresh in his mind].)

Defendant further complains that MacHale's report did not "refresh" Sandoval's recollection. By this argument, he confuses a past recollection recorded with the separate evidentiary rule pertaining to the use of writings to refresh a witness's present recollection. (See § 771.) "Present recollection refreshed . . . involves the use of a writing for no reason other than to refresh the memory of the witness. The writing has no

independent evidentiary value. By contrast, in past recollection recorded, a review of the writing fails to refresh recollection. Assuming the writing meets the foundational requirements of [§ 1237], it has evidentiary value and may be read into evidence as [a] past recollection recorded." (Simons, California Evidence Manual (2007) Hearsay Evidence, § 2:44, p. 118.)

Here, the foundational requirements of section 1237 have been met. Although Sandoval could not recall the exact statements made by P.G., she remembered speaking to Officer MacHale about something P.G. had said that had given her (Sandoval) cause for concern. Sandoval further testified that she had given Officer MacHale accurate statements about what she had seen and heard with respect to P.G. Thus, despite the failure of MacHale's report to "refresh" Sandoval's recollection, it was properly read into evidence as a past recollection recorded. Finally, MacHale's police report, the last layer of hearsay, constituted an official record. (§ 1280.)

Defendant has not met his burden of establishing ineffective assistance of counsel. Defense counsel may not be faulted for failing to make a pointless objection. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1081.)

      b.     Testimony of P.G.'s Stepmother

Defendant next contends that his counsel was ineffective for failing to object to two statements made by Y.L., P.G.'s stepmother, regarding the cause of P.G.'s injuries. Specifically, Y.L. testified that she had asked P.G. about what had caused her injuries, and "one time [P.G.] said, he hit me . . . ." Y.L. further testified that hospital staff "said that [P.G.] said that he hit her." We agree that these statements were hearsay not within any applicable exceptions. That said, defendant has not met his burden of establishing prejudice flowing from counsel's performance or lack thereof. As discussed, to prove prejudice, defendant has to establish that, but for counsel's errors, "there is a reasonable probability that . . . the result would have been different." (*People v. Cleveland* (2004) 32 Cal.4th 704, 747; see *People v. Maury* (2003) 30 Cal.4th 342, 389.) In light of P.G.'s testimony that defendant had caused her injuries, plus the quantity and extent of P.G.'s injuries, together with defendant's false eyewitness claim, it is not reasonably probable

*191*

that the jury would have reached a more favorable verdict had it not heard Y.L.'s testimony that P.G. had said defendant had hit her.

2.     Alleged Failure to Adequately Cross-Examine P.G.

Defendant's next claim of ineffective assistance of counsel relates to his counsel's failure to cross-examine P.G. about whether her father had abused her and/or forced her to leave his home just prior to " 'recovering' " her memory. Defendant contends that had his counsel elicited this information from P.G., "it would have provided highly significant evidence that [P.G.] had been pressured into having a memory" that defendant had assaulted her, which would have supported his theory that P.G.'s recovered memory was either knowingly false or a confabulation.

The circumstances surrounding P.G.'s recovered memory, including the possibility that her recovered memory had been the product of lying or confabulation, or some combination thereof, were explored at length by trial counsel. We cannot find ineffective assistance of counsel based on this claim.

The cases cited by defendant are inapposite, as they pertain to instances where counsel failed to investigate possible corroborative witnesses. (See *Riley v. Payne* (9th Cir. 2003) 352 F.3d 1313, 1318-1321 [counsel ineffective for failing to interview eyewitness to events leading up to shooting upon which defendant's assault conviction was based]; *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, 870-873 [defendant prejudiced by counsel's failure to call alibi witness or submit records supporting defendant's alibi]; *Mitchell v. Ayers* (N.D. 2004) 309 F.Supp.2d 1146, 1151, 1155-1156 [counsel ineffective for failing to investigate eyewitness who purportedly could have corroborated defendant's explanation for entering victims' home].)

We recognize that the inexcusable failure to conduct a reasonable investigation of available defenses constitutes a denial of effective assistance of counsel. (See *Wiggins v. Smith* (2000) 539 U.S. 510, 521-523; *In re Branch* (1969) 70 Cal.2d 200, 210.) However, the manner of cross-examination is within counsel's discretion and rarely implicates ineffective assistance of counsel. (See *People v. Frye* (1998) 18 Cal.4th 894, 985; *People*

*v. Williams* (1997) 16 Cal.4th 153, 217; *People v. Cox* (1991) 53 Cal.3d 618. 662.)  The cross-examination of P.G. did not qualify as ineffective assistance of counsel.

    *F.*    *Cumulative Error*

    Finally, defendant contends that even if harmless individually, the cumulative effect of the trial errors mandates reversal.  Because we have rejected all of his claims, we perforce reject this contention as well.  (*People v. Bolin* (1998) 18 Cal.4th 297, 335.)

## DISPOSTION

    The judgment is affirmed.[9]

---

[9] Defendant has also filed a habeas corpus petition (A116950), which we address by separate order filed on the date of this opinion.

*192*

_____
Sepulveda, J.

We concur:

_____
Reardon, Acting P.J.

_____
Rivera, J.

*People v. Johnson* (A112322)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FOUR

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) | |
| Plaintiff and Respondent, | ) ) | <u>A112322</u> |
| v. | ) ) ) | San Mateo County Superior Court No. SC056779 |
| MICHAEL T. JOHNSON, | ) ) | |
| Defendant and Appellant. | ) ) ) | |

## APPELLANT'S PETITION FOR REHEARING

(On appeal from a judgment of the Superior Court of California, in and for the County of San Mateo, the Honorable Stephen M. Hall, Judge.)

* Richard C. Neuhoff, No. 54215
Barbara A. Zuras, No. 100522
Attorneys at Law
11 Franklin Square
New Britain, CT  06051
tel.:    (860) 229-0433
fax:    (860) 348-1942

Attorney for Appellant
Michael T. Johnson

* By appointment of the Court of Appeal under the First District Appellate Project's independent case system

*193*

## TABLE OF CONTENTS

II.   THIS PETITION IS NECESSARY TO CORRECT
      STATEMENTS OF FACTS  .............................. 1

II.   REHEARING IS NECESSARY BECAUSE THIS COURT
      FAILED TO CONSIDER APPELLANT'S
      CONSTITUTIONAL CLAIM OF INEFFECTIVE
      ASSISTANCE OF COUNSEL BASED ON TRIAL
      COUNSEL'S FAILURE TO ELICIT TESTIMONY FROM
      THE COMPLAINANT THAT WOULD HAVE
      CORROBORATED APPELLANT'S STATEMENT TO
      POLICE  ............................................. 4

CONCLUSION  ........................................... 6

CERTIFICATE OF WORD COUNT ...................... end page

## TABLE OF AUTHORITIES

### MISCELLANEOUS

Rule 8.268, Cal. Rules of Court  ................................ 1

*194*

TO THE HONORABLE TIMOTHY A. REARDON,
ACTING PRESIDING JUSTICE, THE HONORABLE
PATRICIA K. SEPULVEDA AND THE HONORABLE
MARIA P. RIVERA, ASSOCIATES JUSTICES OF THE
CALIFORNIA COURT OF APPEAL, FIRST
APPELLATE DISTRICT, DIVISION FOUR:

Appellant Michael Tyrone Johnson hereby respectfully petitions this
Court to grant a rehearing of his appeal, pursuant to Rule 8.268 of the
California Rules of Court.[1]

## I.    THIS PETITION IS NECESSARY TO CORRECT MISSTATEMENTS OF FACT

A number of facts were not accurately stated in the decision filed by
the Court:

- EMT Sandoval testified that appellant told her that P.G. had
  tripped forward. (Slip Opn. at p. 5.) Ms. Sandoval testified
  that appellant told her that P.G. had "tripped." She then
  testified that she found it "rather interesting to trip forward or
  trip back." (2 RT 382.)

- Appellant "did not stay very long at the hospital" after
  bringing P.G. in to the emergency room. (Slip Opn. at p. 5.)
  Appellant was in the waiting room of the hospital when
  Officer MacHale responded to Sandoval's call at 6:30 a.m.
  and was wearing the clothes he had worn when he brought
  P.G. in. (3 RT 534.)

- Ms. Sandoval remembered speaking with Officer MacHale.
  (Slip Opn. at p. 5.) Sandoval stated that she did not have a

---

[1]    As with appellant's prior briefing, all references in this
petition to sections are to the Penal Code unless indicated otherwise and all
references to the Constitution or to constitutional provisions are to the
federal Constitution.

*195*

specific recollection of having a conversation with MacHale. (2 RT 383.)

- "Defense psychiatrist Missett could not explain with any degree of certainty whether P.G.'s claim of recovered memory was presented consciously and accurately, or whether it was consciously false or if she were malingering or in some way mistaken. Based on the hypothetical questions, Dr. Missett could not determine whether P.G. lost consciousness, and if so, when or whether she was confabulating." (Slip Opn. at p. 16.) Dr. Missett was prohibited by the trial court from testifying whether P.G. was lying because the trial court ruled that the question of whether P.G. was lying was an ultimate question for the jury to decide. (3 RT 664-665.) Dr. Missett testified on direct examination that he would be surprised if a person such as P.G. whose head sustained an impact with a surface hard enough to cause a non-depressed fracture of the skull did not lose consciousness. (3 RT 650.) Dr. Missett also testified that if P.G. had been conscious and was able to retrieve memory of the assault, her descriptions of the assault should have been consistent but her descriptions weren't. (4 RT 705.) He noted that P.G. had made contradictory statements regarding whether she had a memory and whether the injury was an accident, and these contradictions created problems for determining which version was accurate and, if inaccurate, whether the inaccuracy was due to lying or to confabulation. (3 RT 662-663.)

- "Dr. Fotre opined that the redness in P.G.'s eyes was consistent with . . . being kicked." (Slip Opn. at p. 16.) Dr.

*196*

Fotre did not testify that the redness in P.G.'s eyes could be attributed to "being kicked." (4 RT 712 - 730.)

- "Defendant failed to object to this evidence at trial and the issue is therefore waived on appeal" (referring to the testimony regarding appellant's 1995 visit to Wyoming). (Slip Opn. at p. 27.) However, appellant's filed a written objection to the anticipated testimony, and that objection was overruled by the trial court. (1 CT 171, item 4.)

- "Dr. Fotre's proffered opinion that P.G. had suffered a seizure would necessarily be based entirely on defendant's hearsay statements to his mother that P.G. had "stiff legs." (Slip Opn. at p. 40.) The testimony of Dr. Fotre established that there were several conditions noted in P.G.'s medical records and photos that suggested a seizure: (1) the redness in eyes, (2) her fractured skull, and (3) her confused and combative state while in the emergency room. (4 RT 712, 717-722.)

- "Dr. Missett's proposed testimony was not within his professed expertise of psychiatry and was not meant to assist the jury in understanding medical evidence regarding the nature of recovered memories." (Slip Opn. at p. 39.) Dr. Missett's testimony was proposed to assist the jury in understanding of medical evidence regarding when P.G. may have recovered her memory and was meant to assist the jury in interpreting a medical record notation in which a treating physician describes the cause of P.G.'s injuries. (ARB 37-39.)

/ 97

II.    **REHEARING IS NECESSARY BECAUSE THIS COURT FAILED TO CONSIDER APPELLANT'S CONSTITUTIONAL CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON TRIAL COUNSEL'S FAILURE TO ELICIT TESTIMONY FROM THE COMPLAINANT THAT WOULD HAVE CORROBORATED APPELLANT'S STATEMENT TO POLICE**

This Court did not consider or decide appellant's claim that defense counsel's failure to cross-examine the complainant (hereafter referred to as "P.G.") about her father's physical abuse of her and his eviction of her from the family home deprived appellant of corroborating evidence that would have supported significant portions of his recorded statement to police. (Slip Opn. at pp.46-47; see esp. AOB 72-73; ARB 48-49.) In his statement to police, which was heard by the jury, appellant told police that P.G. made up the story regarding her assault by him because P.G. blamed him for her troubles with her father, including her eviction from her father's home. (AOB 17-18; RB 48-49.) P.G.'s testimony about her father's abuse would have corroborated appellant's statement since it would have established (1) that her recovered memory and her complaint to the police closely followed her eviction from her family home and (2) that the reason for her father's abuse and her eviction was her father's anger at her for not remembering that appellant had assaulted her.

Further, the cross-examination of P.G. on the subject of her father's abuse would have provided support for appellant's description of how P.G. sustained her injuries. Appellant in his statement to police described that P.G. sustained her head injury when she fell backwards while tugging back and forth on appellant's sweatshirt and accusing him of being "just like my father." (*Ibid.*) P.G's disclosure of her difficulties with her father immediately proceeding her injuries would have given credibility to appellant's version of the night in question. Without support, appellant's

*198*

statement sound not only sounded implausible but also malicious, given that it appeared to be an unsubstantiated accusation against P.G.'s father.[2]

Appellant cited federal cases that support his claim based on trial counsel's failure to elicit known corroborative evidence. (AOB 72-73; RB 48-49.) This Court's opinion referred to the federal cases cited by appellant but found them "inapposite." The Court stated that the cases were "inapposite" because they concerned "instances where counsel failed to investigate **possible** corroborative witnesses" or failed to "interview eyewitness to events leading up" to the defendant's conviction, or because they involved "counsel's failure to call alibi witness or submit records supporting defendant's alibi" or counsel's "failing to investigate eyewitness who **purportedly** could have corroborated defendant's explanation." (Slip Opn. at p. 46, emphasis added.) This Court's descriptions of the cases not only substantiate their support for appellant's claim but also suggests that appellant's claim is stronger than the circumstances of the cited cases because the corroborative evidence in them was only "possible" or "purported" whereas here the corroborative evidence ignored by trial counsel was indisputably available.[3]

---

[2]    Appellant explained in his briefing that the evidence of P.G.'s abuse by her father and her eviction were plainly available to trial counsel. The facts of the abuse and eviction were not disputed by the prosecutor because P.G. had told her about the incidents. (AOB 71.) It was also undisputed that the reason why P.G.'s father had assaulted her and evicted her from the family home was because P.G. would not tell the police that appellant had assaulted her. (*Ibid.*) P.G. testified at the preliminary hearing not only about why her father had abused her but that the abuse had occurred shortly before she regained her memory and went to the police to blame appellant for her injuries. (*Ibid.*)

[3]    The Court rejected the ineffective-assistance claim on the ground that "[t]he circumstances surrounding P.G.'s recovered memory,
(continued...)

*199*

## CONCLUSION

Wherefore, appellant respectfully requests that this Court grant rehearing in his case to correct the aforementioned matters and reverse the judgment. Failure to do so would deny appellant his right to due process of law under the Fifth and Fourteenth Amendments.

DATED:    June 12, 2007

Richard C. Neuhoff
Barbara A. Zuras
Attorneys for Appellant
Michael T. Johnson

---

[3](...continued)
**including the possibility that her recovered memory had been the product of lying or confabulation or some combination thereof, were explored at length by trial counsel,"** but this reasoning is incorrect as to why she would have lied or confabulated. The only possible motive that defense counsel tried to establish was that P.G. lied or confabulated out of jealousy regarding appellant's other purported girlfriends, but P.G. simply denied that jealously was in any way involved. (See AOB 73.) By contrast, the evidence regarding (1) P.G.'s abuse and eviction by her father, (2) the reason for the abuse and eviction (namely, that she would not tell the police that appellant assaulted her), and (3) the fact that those events occurred shortly before she went to police and accused appellant was undisputed but *never reached the jury*.

200

## CERTIFICATE OF WORD COUNT

I, Richard C. Neuhoff, appellate counsel for appellant Michael T. Johnson in the above-entitled cases, hereby certify that the Appellant's Petition for Rehearing was produced on a computer and that the brief contains 1,533 words, according to the word count of the computer program used to prepare the petition.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this certificate was executed on June 11, 2007, at New Britain, CT.

RICHARD C. NEUHOFF

2 01

202

COPY

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

**FILED**

JUN 2 1 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____
DEPUTY

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL TYRONE JOHNSON,<br><br>Defendant and Appellant. | A112322<br><br>(San Mateo County<br>Super. Ct. No. SC045779) |

BY THE COURT:

Plaintiff's petition for rehearing is denied. The opinion filed on May 30, 2007, is modified as follows:

1.      Delete the first sentence from the third paragraph of FACTS II.A.2. and replace it with "Dr. Fotre opined that the redness in P. G.'s eyes was consistent with increased pressure in the brain, and could have also been caused by her straining against the cervical collar after she was brought to the hospital, or from a significant physical blow."

2.      Delete the fourth sentence in the seventh paragraph under DISCUSSION I.B.2. and replace it with "Defendant failed to object to the pre-1994 evidence at trial and the issue is therefore waived on appeal."

3.      Delete the fifth sentence from the seventh paragraph of DISCUSSION I.B.2 and replace it with "In any event, defendant's claims fail on the merits."

The above modification does not effect any change in the judgment. (Cal. Rules of Court, rule 8.264(c).)

Dated:     JUN 2 1 2007

REARDON, ACTING P.J.

_203_

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) | |
| Plaintiff and Respondent, | ) ) | ——————— |
| | ) | (Court of Appeal No. A112322) |
| v. | ) ) | (San Mateo County Superior |
| MICHAEL T. JOHNSON, | ) | Court No.  SC045779) |
| | ) | |
| Defendant and Appellant. | ) ) | |

## **APPELLANT'S PETITION FOR REVIEW**

\* Richard C. Neuhoff, No. 54215
Barbara A. Zuras, No. 10522
Attorney at Law
11 Franklin Square
New Britain, CT  06051
tel.:    (860) 229-0433
fax:    (860) 348-1942

Attorney for Appellant
Michael T. Johnson

\* By appointment of the Court of
Appeal under the First District
Appellate Project's independent
ᵢse system

204

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . 1

QUALIFICATION OF ISSUES UNDER RULE 8.500(b) . . . . . . . . . . . 4

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    REVIEW SHOULD BE GRANTED BECAUSE THE
      COURT OF APPEAL INCORRECTLY INTERPRETED
      THE PHRASE "IN THE INTEREST OF JUSTICE," AN
      OPERATIVE TERM THAT PROVIDES AN EXCEPTION
      TO THE 10 YEAR LIMIT FOUND IN SUBDIVISION (E)
      OF EVIDENCE CODE SECTION 1109 . . . . . . . . . . . . . . . . . . .

II.   REVIEW IS NECESSARY BECAUSE, BY AUTHORIZING
      THE ADMISSION OF PROPENSITY EVIDENCE IN
      DOMESTIC VIOLENCE PROSECUTIONS, SECTION 1109
      PLAINLY VIOLATES THE UNITED STATES
      CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.  REVIEW SHOULD BE GRANTED BECAUSE PRIOR
      ACTS OF DOMESTIC VIOLENCE MUST BE SIMILAR
      TO THE CHARGED OFFENSE IN ORDER TO COMPLY
      WITH THE REQUIREMENTS OF EVIDENCE CODE
      SECTION 1109, SUBDIVISION (A) AND THE UNITED
      STATES CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.   REVIEW SHOULD BE GRANTED ON THE ISSUE OF
      WHETHER APPELLANT'S DUE PROCESS AND FAIR
      TRIAL RIGHTS WERE VIOLATED WHEN THE TRIAL
      COURT PERMITTED THE JURY TO HEAR TESTIMONY
      REGARDING EVENTS OCCURRING BEFORE THE 1994
      MARCOS INCIDENT WITHOUT SCREENING THAT
      EVIDENCE UNDER SUBDIVISIONS (a) AND (e) OF
      SECTION 1109 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

205

TABLE OF CONTENTS (continued)

V.    REVIEW SHOULD BE GRANTED BECAUSE
      APPELLANT'S TRIAL COUNSEL FAILED TO PROVIDE
      EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE
      FAILED TO MOVE TO EXCLUDE HARMFUL AND
      UNRELIABLE HEARSAY REGARDING P.G.'S
      PURPORTED STATEMENTS IN THE EMERGENCY
      ROOM THAT ACCUSED APPELLANT OF ASSAULT  . . . . . . 22

VI.   REVIEW SHOULD BE GRANTED BECAUSE THE TRIAL
      COURT VIOLATED APPELLANT'S RIGHTS TO DUE
      PROCESS AND A FAIR TRIAL BY BLOCKING
      APPELLANT FROM OFFERING A CREDIBLE DEFENSE
      THAT SOME OF P.G.'S INJURIES WERE NOT THE
      RESULT OF AN ASSAULT BUT WERE THE RESULT OF
      A SEIZURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VII.  REVIEW SHOULD BE GRANTED BECAUSE
      APPELLANT'S TRIAL COUNSEL VIOLATED
      APPELLANT'S CONSTITUTIONAL RIGHT TO
      EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE
      FAILED TO ELICIT FROM P.G. THE UNDISPUTED
      FACTS THAT SHORTLY BEFORE SHE REPORTED TO
      POLICE THAT APPELLANT HAD ASSAULTED HER,
      HER FATHER HAD PHYSICALLY ABUSED HER AND
      EVICTED HER FROM HIS HOME BECAUSE SHE HAD
      NOT REPORTED TO THE POLICE THAT APPELLANT
      HAD ASSAULTED HER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VIII. REVIEW SHOULD BE GRANTED BECAUSE JURY
      INSTRUCTIONS GIVEN ON HOW THE JURY SHOULD
      USE EVIDENCE OF OTHER ACTS OF DOMESTIC
      VIOLENCE VIOLATED APPELLANT'S RIGHTS TO DUE
      PROCESS AND A FAIR TRIAL . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF WORD COUNT  . . . . . . . . . . . . . . . . . . . . . end page

# TABLE OF AUTHORITIES

## CASES

Chapman v. California (1967)
  386 U.S. 18 ............................................................................ 19

Crane v. Kentucky (1986)
  476 U.S. 683 .......................................................................... 28

Michelson v. United States (1948)
  335 U.S. 469 .......................................................................... 11

People v. Brown (2000)
  77 Cal.App.4th 1324 .............................................................. 8

People v. Cox (1991)
  53 Cal.3d 618 ........................................................................ 32

People v. Dept. of Transp. v. Clauser/Wells Partnership (2002)
  95 Cal.App.4th 1066 ............................................................. 28

People v. Ewoldt (1994)
  7 Cal.4th 380 ......................................................................... 14

People v. Falsetta (1999)
  21 Cal.4th 903 .............................................................. 9, 14, 17

People v. Flood (1998)
  18 Cal.4th 470 ....................................................................... 40

People v. Frye (1998)
  18 Cal.4th 894 ....................................................................... 32

People v. Gardeley (1996)
  14 Cal.4th 605 ....................................................................... 28

People v. James (2000)
  81 Cal.App. 4th 1343 .................................... 11, 34-38, 40-41

People v. Jennings (2000)
  81 Cal.App.4th 1301 ..................................... 7, 9, 17, 21

*206*

TABLE OF AUTHORITIES (continued)

People v. Johnson (2000)
    77 Cal.App.4th 410 ........................................................................ 8

People v. Montiel (1993)
    5 Cal.4th 877 ............................................................................... 28

People v. Peterson (1972)
    23 Cal.App.3d 883 ....................................................................... 21

People v. Reliford (2003)
    29 Cal. 4th 1007 ..................................................................... 21, 34

People v. Rucker (2005)
    126 Cal.App.4th 1107 ........................................................... 7, 9, 17

People v. Shattuck (1895)
    109 Cal. 673 ............................................................................... 28

People v. Williams (1997)
    16 Cal.4th 153 ............................................................................ 32

Yates v. Evatt (1991)
    500 U.S. 391 .............................................................................. 40

## STATUTES AND RULES

Evid. Code, § 352 ......................................... 2, 9-11, 13-14, 17, 19, 20-21

Evid. Code, § 801 ................................................................................ 27

Evid. Code, § 1108 .............................................................................. 14

Evid. Code, § 1109 ............................................... 1-2, 4, 6-11, 13, 18-20

Evid. Code, § 801 ................................................................................ 27

Rule 8.500, Cal. Rules of Court ............................................................ 4

TABLE OF AUTHORITIES (continued)

## MISCELLANEOUS

CALJIC No. 2.50.02 ............................................................. 35, 38, 39, 40

CALJIC No. 2.50.1 .................................................................... 39

CALJIC No. 2.01 ..................................................................... 39

207

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    This petition is necessary to settle an important question of law, namely, the meaning of the term "in the interest of justice" in Evidence Code section 1109, subdivision (e), which provides that prior acts of domestic violence committed more than ten years before the charged offense are inadmissible unless the court determines that the admission of the evidence is "in the interest of justice." The term should have been but was not interpreted by the Court of Appeal to address the Legislature's concerns that led to the enactment of section 1109.[1]

2.    Whether Evidence Code section 1109 violates the United States Constitution by allowing prior acts of domestic violence to be admitted into evidence as propensity evidence to prove that a defendant committed the charged offenses of domestic violence in a criminal prosecution.

3.    Whether state law and the United States Constitution are violated when prior acts of domestic violence are not similar to the

_____

[1]    Unless otherwise noted, references to statutory sections are to the Evidence Code.

*208*

charged offense but are admitted into evidence as propensity
evidence to prove the defendant committed the charged offenses
of domestic violence in a criminal prosecution.

4.      Whether state law and the United States Constitution are violated
when a trial court admits prior acts of domestic violence
committed more than ten years before the charged offense as
propensity evidence without screening the evidence under
Evidence Code section 352 as required by Evidence Code section
1109, subdivision (a) and without determining if the "in the
interest of justice" is served by the admission as required under
subdivision (e) of section 1109.

5.      Whether trial counsel for petitioner failed to provide effective
assistance of counsel under state law and the United States
Constitution by not moving to exclude highly inculpatory hearsay
statements purportedly made by the complainant.

6.      Whether state law and the U.S. Constitution were violated when
the trial court prevented petitioner from offering a credible
defense that a seizure may have been a cause of some of the

complainant's injuries, injuries the prosecution contended were
the result of an assault by petitioner.

7.  Whether state law and the U.S. Constitution were violated when
petitioner's trial counsel failed to cross-examine the complainant
regarding the indisputable facts that shortly before she went to the
police and claimed that petitioner had assaulted her, she had been
abused by her father and evicted from her home precisely because
she would not report to the police that petitioner assaulted her.

8.  Whether state law and the U.S. Constitution were violated by
instructions the jury was given concerning the permissible uses of
other domestic violence evidence.

## QUALIFICATION OF ISSUES UNDER RULE 8.500(b)

Issue 1 above qualifies for review under Rule 8.500(b)(1) because the interpretation of the term "in the interest of justice" in subdivision (e) of Evidence Code section 1109 is an important and recurring question of law of statewide importance that has not been decided by this Court or in any published decision of the Court of Appeal. When a defendant is charged with an offense involving domestic violence, subdivision (a) of section 1109 generally permits the prosecution to admit "evidence of the defendant's commission of other domestic violence." However, subdivision (e) precludes the admission of evidence of such acts "occurring more than 10 years before the charged offense" unless the admission of such evidence is "in the interest of justice." This case squarely presents the question of what the Legislature meant by "in the interest of justice" in subdivision (e)'s exception to the rule precluding acts more than ten years old.

Review of Issues 2 through 8 is necessary to secure uniformity of decision because the Court of Appeal's decision was out of line with controlling state and federal precedent and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

## STATEMENT OF THE CASE

For purposes of this petition for review only, petitioner does not quarrel with the Court of Appeal's statement of the case. A copy of the Court of Appeal's unpublished, written decision, filed on May 30, 2007, is appended to the original and to this Court's copies of the instant petition. Petitioner filed a petition for rehearing, which was denied on June 25, 2007. A copy of the denial order is also appended to the original of this petition and to this Court's copies thereof.

## STATEMENT OF FACTS

For purposes of this petition for review only, and except for the matters raised in the petition for rehearing and the factual conclusions inherent in the Court of Appeal's conclusions that any errors were not prejudicial or did not contribute to the verdict, the Court may resort to the Court of Appeal's statement of the facts.

210

**I.**

**REVIEW SHOULD BE GRANTED BECAUSE THE COURT OF APPEAL INCORRECTLY INTERPRETED THE PHRASE "IN THE INTEREST OF JUSTICE," AN OPERATIVE TERM THAT PROVIDES AN EXCEPTION TO THE 10 YEAR LIMIT FOUND IN SUBDIVISION (E) OF EVIDENCE CODE SECTION 1109**

Appellant argued below that the testimony of a previous girlfriend (Ms. Marcus, referred to as "C.M." in the slip opinion) regarding an assault purportedly committed by appellant should have been excluded pursuant to subsection (e) of section 1109 because the incident happened more than ten years before the charged offense and its admission was not "in the interest of justice." (AOB 41-42.) Appellant urged that the "interest of justice" standard should be defined by reference to the concerns that motivated the Legislature to enact section 1109, namely, to stop "on-going violence and abuse," to prevent "escalating pattern of domestic violence," and to aid in prosecutions where there were "acute difficulties of proof" associated with uncooperative victims, fear of retaliation, or reluctant third party witnesses. (AOB 32-36.) Appellant argued that these concerns did not present themselves in his and therefore the admission of the C.M. incident was not "in the interest of justice."

In its decision, the Court of Appeal acknowledged that there is no authority interpreting the phrase's meaning. (Slip Opn. at p. 23.) However, while not offering any criteria to implement the phrase, the Court concluded the trial court had correctly interpreted the term because it gave "greater scrutiny" to the prior incident "by evaluating more carefully the foundational hearing testimony of C.M. to determine the veracity of the witness when balancing the probative value of the evidence against its prejudicial effect." (Slip Opn. at pp. 23-24.) For the reasoning outlined below, the Court of Appeal's approach cannot be correct.

Section 1109 authorizes the admission of other acts of domestic violence in a prosecution for domestic violence if the evidence is screened under section 352 and is determined to be more probative than prejudicial. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1114; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314-1315.) Subdivision (e) of section 1109 also limits the admission of propensity evidence by directing that "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible under this section unless the court determines that the admission of this evidence is in the interest of justice."

211

In *People v. Johnson* (2000) 77 Cal.App.4th 410, 419, the court examined the legislative history of section 1109 and concluded that Legislature felt that the "propensity inference" of section 1109 was necessary because "on-going violence and abuse is the norm in domestic violence cases" and criminal prosecution is one of the few factors which may interrupt "the escalating pattern of domestic violence."

In *People v. Brown* (2000) 77 Cal.App.4th 1324, the court found that in enacting section 1109, the Legislature sought to create special evidentiary rules for domestic violence cases because of the typically repetitive nature of domestic violence crimes, which made past acts of domestic violence probative of whether the defendant committed the charged act of domestic violence. (*Id.* at pp. at 1333-1334.) The court also explained that allowing other acts of domestic violence to prove a defendant's propensity for domestic violence would address "the acute difficulties of proof associated with frequently uncooperative victims and third-party witnesses who are often children or neighbors who may fear retaliation from the abuser and do not wish to become involved." (*Id.* at p. 1333.)

Therefore, when a prior act of domestic violence occurs more than ten years before the charged offense, the question of whether admission of that prior act serves "the interest of justice" should involve

an assessment of whether the case involves "on-going violence and abuse" or an "escalating pattern of domestic violence" and whether the charged offense presents "acute difficulties of proof" associated with uncooperative victims, fear of retaliation, or reluctant third party witnesses.

In rejecting appellant's interpretation of the phrase, the Court of Appeal found that the "interest of justice" test was satisfied because the trial court stated it gave "greater scrutiny" to the prior act "by evaluating more carefully the foundation hearing testimony" of C.M. "to determine *the veracity* of the witness when balancing the probative value of the evidence against its prejudicial effect." (Slip Opn. at p. 24, emphasis added.) In short, the Court found that the trial court met the "interest of justice" test by evaluating more carefully whether the victim of the prior act was telling the truth. Yet, evaluating the veracity of the witness involved in a prior act or determining the "certainty of its commission" is already an important part of determining how probative the prior act is under section 352. (*People v. Falsetta* (1999) 21 Cal.4th 903, 916-917 [certainty of commission a factor in careful weighing in the section 1108 cases].) Subdivision (a) of section 1109 requires that all prior acts be given a "careful" screening in the section 352 process. (*People v. Jennings, supra*, 81 Cal.App. 4th at pp. 1314-1315; *People v. Rucker,*

212

*supra*, Cal.App.4th at p. 1114.)  And, since "certainty of its commission" is already a factor weighed in the 352 process, the phrase "in the interest of justice" must refer to some other concern.  "In the interest of justice" in subdivision (e) of section 1109 must mean something more than what is already guaranteed by the section 352 evaluation required by subdivision (a) of section 1109.  The Court of Appeal's decision on this term cannot be correct.  But, in the court's defense, there is no case law defining what "in the interest of justice" means.  Review should be granted to resolve this important issue and provide guidance to the trial and appellate courts of this State.

## II.

**REVIEW IS NECESSARY BECAUSE, BY AUTHORIZING THE ADMISSION OF PROPENSITY EVIDENCE IN DOMESTIC VIOLENCE PROSECUTIONS, SECTION 1109 PLAINLY VIOLATES THE UNITED STATES CONSTITUTION**

By authorizing the admission of prior acts of domestic violence as propensity evidence in domestic violence prosecutions, section 1109 violates the due process and fair trial rights guaranteed by the U.S. Constitution. Even when a trial court has properly screened the evidence under section 352, there is still a danger that the presumption of innocence will dissolve under the heat of emotions aroused by the defendant's prior offenses. (*Ibid.*) The Court of Appeal rejected this constitutional challenge on the basis that it and other courts have previously upheld the constitutionality of the statute. (Slip Opn. at p. 22.)

Propensity evidence is likely to improperly sway a jury to overlook its obligation to find that each element of the charged offense is proven beyond a reasonable doubt. (*Michelson v. United States* (1948) 335 U.S. 469, 475-476.) Even when properly screened via section 352, there is still "a danger that the presumption of innocence will melt under the heat of emotions aroused by the defendant's prior offenses." (*People v. James* (2000) 81 Cal.App. 4th 1343, 1353.) For this reason, appellant

*213*

request that review be granted and the conviction overturned based on the statute's clear violation of his due process and fair trial rights guaranteed by the United States Constitution.

## III.

## REVIEW SHOULD BE GRANTED BECAUSE PRIOR ACTS OF DOMESTIC VIOLENCE MUST BE SIMILAR TO THE CHARGED OFFENSE IN ORDER TO COMPLY WITH THE REQUIREMENTS OF EVIDENCE CODE SECTION 1109, SUBDIVISION (A) AND THE UNITED STATES CONSTITUTION

The 1994 incident involving C.M. should not have been admitted into evidence because under the section 352 process required by Evidence Code section 1109, subdivision (a), the incident was not sufficiently similar to the charged offense so that its probative effect was outweighed by the likely prejudicial effects. The trial court's inadequate weighing of the evidence violated his constitutional due process and fair trial rights. In its decision, the Court of Appeal rejected that either section 1109 or section 352 required that the prior act be similar to the charged offense. (Slip Opn. at p. 26.) The Court of Appeal held that "it is enough that the charged and uncharged offenses are domestic violence offenses as defined in section 1109." (*Ibid.*)

The holding by the Court of Appeal that there need not be similarity between the charged and prior acts in a section 1109 case violates the Constitution. As decisions of this Court have held, a proper section 352 screening that protects a defendant's due process and fair trial rights involves a determination of how similar the prior act is to the

*214*

charged offense. (*See People v. Falsetta, supra,* 21 Cal.4th at p. 917

[similarity as a factor in 352 process in section 1108 cases]; *People v.*

*Ewoldt* (1994) 7 Cal.4th 380, 404- 405.)

      After holding that similarity was not a necessary factor in a

section 1109 case, the Court of Appeal concluded that the trial court's

decision to admit the 1994 evidence under section 1109 and section 352

was appropriate because appellant on both occasions "mislead the

victims into believing that he was not the cause of the injuries" and that

this "fact" outweighed the fact that appellant had led a purported

blameless life in between the two incidents. (Slip Opn. at p. 27.) In

reaching that conclusion, the Court ignored the dissimilarities between

the 1994 incident and the charged offense, which were many. Ignored

were the facts that:

-     C.M. admitted that prior to sustaining the injuries she
  accused appellant of inflicting, she herself had assaulted
  appellant by pushing him into a window, causing it to
  break. (3 RT 474-476.) By contrast, the complainant in
  the charged offense (whom the Court of Appeal referred to
  as P.G.) did not describe any assaultive behavior on her
  part; she said that she was walking a way from appellant
  when the assault began. (2 RT 361.)

- C.M. admitted to having consumed a number of alcoholic beverages prior to her argument with appellant, so that alcohol may have played a role in what transpired thereafter. (3 RT 477.) Alcohol was not involved in the incident described by P.G.

- The dispute between C.M. and appellant involved appellant accusing her of flirting with other men at a party they both attended and then appellant refusing to talk about it. (3 RT 474-477.) By contrast, P.G. testified that prior to her assault, she and appellant had been arguing about *his* supposed infidelity, that *she* refused to talk about it further, that appellant *did* want to talk, and that she tried to walk away. (2 RT 276.)

- The ways in which the two women were purportedly assaulted were dissimilar. P.G. testified that appellant first grabbed her arm and pushed her head down to the ground and that she was tripped by his leg (2 RT 277-278), while C.M. testified that after she turned off the television that appellant had been watching, he grabbed her legs below the knees and pulled them from under her (3 RT 480-481.) P.G. testified to appellant kicking her stomach and stepping

*215*

on her head (2 RT 278-280), whereas C.M. described
appellant as putting his hands around her neck pushing up
her Adam's apple (3 RT 481).

- Also, there is a significant dissimilarity in appellant's
  purported reaction to the women's injuries.  Although
  appellant initially denied having caused C.M.'s injuries,
  she described that he soon confessed to the assault and was
  apologetic.  (3 RT 490-492.)  By contrast, P.G.'s account
  was that appellant never admitted having caused her harm
  and consistently told her that her injuries were an accident.
  (2 RT 307, 313.)

In addition to ignoring those dissimilarities, the Court of Appeal
compounded its error by casting aside the factors that demonstrated that
prejudicial effect of the evidence  outweighed probative factors.  Without
citing any factual support, the Court of Appeal found that there was
nothing to suggest the jury would have an "inclination to punish
defendant for the 1994 incident." (Slip Opn. at p. 27.)  Yet, it is
indisputable that appellant had never been charged, convicted or in any
way punished for the 1994 incident.  (3 RT 496.)  The Court of Appeal
ignored that this Court has held that lack of punishment increases the
"prejudicial impact" of prior act evidence in that the jury might be

tempted to punish a defendant for the prior offense by convicting him on the charged offense even if that case is weak. (*People v. Falsetta, supra,* at 21 Cal.4th at p. 917.) Further, without factual support, the Court of Appeal asserted that the evidence of the prior act was no stronger or more egregious than the charged offense. (Slip Opn. at p. 27.) Yet, the prosecutor in this case admitted that the case for the charged offense was problematic and that the prosecution needed the 1994 incident because the complainant's memory of the relevant events in the charged offense was "altered." (1 CT 151; 5 RT 855.) The potential for prejudice increases if the evidence for the prior act is stronger than the evidence on the charged act because the jury may be swayed to convict on the charged offense to punish the defendant for the prior or the jury may become confused on the issues to be decided. (*See People v. Rucker, supra,* 126 Cal.App.4th at pp. 1118-1119; *People v. Jennings, supra,* 81 Cal.App.4th at p. 1314.)

Without consideration of the dissimilarities between the prior and the charged offense and the factors that demonstrated the potential volatile effect of the 1991 evidence, the section 352 screening performed in this case fell short of safeguarding appellant's due process and fair trial rights. Review should be granted to reverse the conviction.

216

## IV.

**REVIEW SHOULD BE GRANTED ON THE ISSUE OF WHETHER APPELLANT'S DUE PROCESS AND FAIR TRIAL RIGHTS WERE VIOLATED WHEN THE TRIAL COURT PERMITTED THE JURY TO HEAR TESTIMONY REGARDING EVENTS OCCURRING BEFORE THE 1994 MARCOS INCIDENT WITHOUT SCREENING THAT EVIDENCE UNDER SUBDIVISIONS (a) AND (e) OF SECTION 1109**

The trial court violated Evidence Code section 1109 and appellant's due process and fair trial rights by allowing C.M. to testify about purported acts of abuse that occurred prior to the 1994 incident without having screened the testimony pursuant to section 1109, subdivisions (a) and (e). The testimony was admitted without the trial court finding that the probative value outweighed the prejudicial impact and without a finding that its admission was "in the interest of justice" since it occurred more than ten years before the charged offense. The Court of Appeal ruled that the issue had been waived by the failure of appellant's trial counsel to object to it, but the Court also reached the merits and found that despite the trial court's failure to screen the testimony, there was no harm to appellant because the testimony was brief and was "unlikely to evoke an emotional bias against defendant as an individual." (Slip Opn. at p. 27.)

The Court of Appeal's dismissal of this claim should not stand.
The indisputable fact that the trial court failed to screen the testimony
prior to or after it had been elicited by the prosecution without notice to
the defense violated the requirements of section 1109 and therefore,
violated appellant's due process and fair trial rights as explained
hereinbefore in Issue III. Moreover, although the admission violated
appellant's due process and fair trial rights, the Court of Appeal
evaluated the impact of the testimony under section 352 instead of the
*Chapman* test. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)
Under *Chapman*, it is obvious that it cannot be established beyond a
reasonable doubt that the testimony did not contribute to the verdict.
The impact of the unscreened testimony on the verdict is clear. Prior to
the admission of this evidence, the jury had not heard of any pattern of
abuse on the part of appellant. There was only the one incident in 1994
involving C.M., and the 2003 incident when appellant held P.G.'s
clothes above her head and then pushed her down to prevent her from
jumping up and down. (2 RT 256-258.) However, C.M.'s
unsubstantiated accusation that "a few times" prior to 1994 appellant had
grabbed her by her neck and pushed her against a wall when they had
argued ( 3 RT 520) gave the jury a basis for finding that there was a
pattern on appellant's part in relationships to end an argument with

217

physical force. Therefore, contrary to the Court of Appeal's conclusion, the testimony had a harmful impact that contributed to the verdict despite its brevity. Review should be granted to bring the handling of appellant's case within the mainstream of the law.

As for the Court of Appeal's claim of waiver, it is invalid. For one thing, there is the conduct of the prosecution. The government represented to the defense and the trial court that it would only seek the admission of evidence concerning the January 1994 C.M. assault. (1 CT 155.) It did not give notice of any intention to question C.M. about acts occurring before January 1994. (§ 1109, subd. (b).) Consequently, the trial court never gave that evidence even a section 352 review. And, because those pre-January acts were more than ten years old, evidence of them were inadmissible unless the trial court found that admission was "in the interest of justice." (§ 1109, subd. (e).) The failure of the government to comply with the provisions of section 1109 precludes any finding that appellant forfeited the issue. The prosecution cannot be allowed to benefit from its failure to abide by the notice requirement of subsection (b) of section 1109.[2]

---

[2]     Further, when the prosecutor asked C.M. whether there had been violence before the January 1994 assault, appellant's trial counsel was placed in the untenable position of objecting to the prosecution's question and appearing to the jury to be trying to hide adverse evidence. The prosecutor was in a win/win situation. Even an admonishment to
(continued...)

In addition, the waiver doctrine is inapplicable here because the admission of the testimony without a section 352 weighing was a violation of appellant's due process rights. (See *People v. Reliford, supra,* 29 Cal.4th at pp. 1012-1013; *People v. Jennings, supra,* 81 Cal.App.4th at pp. 1313-1314.) Where the admission of unchallenged evidence violates the defendant's due process rights, the waiver rule does not apply. (See *People v. Peterson* (1972) 23 Cal.App.3d 883, 893.)

In any event, if the current issue was forfeited by counsel's failure to object, then that failure amounted to the ineffective assistance of counsel. No reasonably competent attorney acting as a diligent advocate would have failed to object to the eliciting of this prejudicial evidence.

---

[2](...continued)
the jury by the trial court to disregard the question or C.M.'s answer would not have disinfected the case.

218

## V.

**REVIEW SHOULD BE GRANTED BECAUSE
APPELLANT'S TRIAL COUNSEL FAILED TO
PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL
WHEN HE FAILED TO MOVE TO EXCLUDE
HARMFUL AND UNRELIABLE HEARSAY
REGARDING P.G.'S PURPORTED STATEMENTS
IN THE EMERGENCY ROOM THAT ACCUSED
APPELLANT OF ASSAULT**

Trial counsel failed to provide effective assistance of counsel, in

violation of the Sixth Amendment, by failing to move to exclude hearsay

statements in which P.G. was reported to have accused appellant of

assault. (AOB 51-54; ARB 24-32.) P.G., at the time of her admission to

the hospital was quoted by EMT Sandoval who was quoted by a police

officer, Officer MacHale, in the officer's report as saying, "Baby, I

forgive you, I'll be a good girl." (3 RT 528-533.) The Court of Appeal

rejected appellant's claim of ineffective assistance of counsel,

hypothesizing that trial counsel may have had a strategic purpose for

allowing the statements in and that even if there was no strategic purpose

for the admission, the hearsay statements were admissible under the

exceptions of spontaneous utterance and past recollection recorded.

(Slip Opn. at p. 42-46.)

The Court of Appeal's reasoning fails. First of all, there could be

no strategic purpose for the defense to allow the admission of the

statements. P.G. professed to have no memory of how she was injured

for approximately ten months after her injuries were sustained. (Slip

Opn. at pp. 3, 8.) Her purported statements in the hospital were the only

statements she made suggesting that appellant had anything to do with

her assault in close proximity to the injury causing event. They were

highly damning statements. And, the prosecutor made frequent use of

the statements when questioning witnesses and experts and in her closing

arguments. (5 RT 894.)

Nor can the admission be justified on exceptions to the rule

excluding hearsay. The Court of Appeal ruled that P.G.'s purported

statement was trustworthy and qualified as a spontaneous utterance.

(Slip Opn. at p. 43.) In reaching that conclusion, the Court had to reject

the uncontradicted medical testimony by Sandoval and the prosecution's

medical expert, Dr. Maldonado. Both Sandoval and Maldonado testified

that at the time the statements were made, P.G. was, due to her head

injury, in an "altered state" and was in all likelihood suffering from

delirium in which patients say **"weird things"** and do not understand

what is being addressed or attempted for their care. (3 RT 427, 440; 2

RT 379-380, 384-385, emphasis added.) The Court of Appeal, despite

the medical testimony, ruled that Ms. Lara's "altered state of

consciousness actually supports the conclusion that her statements were

instinctive and uninhibited and not the product of processing information

219

in a deliberative manner." (Slip Opn. at p. 43.)  There is no precedent to

support  "delusional" equates with "uninhibited" and "trustworthy" and

there cannot reasonably be any.

       Nor is the admission of the next layer of hearsay justified.

Sandoval could not remember what P.G. had said. (2 RT 372 -393.)  The

jury heard P.G.'s statement when Officer MacHale read from his report

to quote what Sandoval had told him.  The Court of Appeal held that

MacHale's report could be read to the jury because it qualified as a past

recollection recorded.  (Slip Opn. at pp. 43-45.)  However, in order to

come to that conclusion, due to the requirements of that hearsay

exception, the Court of Appeal had to find that Sandoval remembered

talking to Officer MacHale about P.G.  (Slip Opn. at p.44.)  However,

Sandoval testified that she did not remember speaking to Officer

MacHale about the statements, and his report did not refresh her

recollection.  (2 RT 384-386, 390.)  Therefore, neither the "spontaneous

utterance" or the "past recollection recorded" exceptions could justify

the admission of the highly damaging statements.   Had defense counsel

made an objection, these highly damaging statements would have been

excluded.  The claim of ineffective assistance of counsel clearly has

merit.

**VI.**

**REVIEW SHOULD BE GRANTED BECAUSE THE
TRIAL COURT VIOLATED APPELLANT'S
RIGHTS TO DUE PROCESS AND A FAIR TRIAL
BY BLOCKING APPELLANT FROM OFFERING A
CREDIBLE DEFENSE THAT SOME OF P.G.'S
INJURIES WERE NOT THE RESULT OF AN
ASSAULT BUT WERE THE RESULT OF A
SEIZURE**

The trial court violated appellant's due process and fair trial rights

by blocking a potentially meritorious defense supported by appellant's

medical experts that some of P.G.'s physical injuries could have been

caused by a seizure. (AOB 63-70; ARB 33-36, 44-45.) The trial ruled

that appellant's proposed questioning of his medical expert Dr. Fotre

called for speculation since the medical records did not mention a seizure

and that Dr. Fotre could not rely on appellant's hearsay statement to his

mother that P.G. had "stiff legs" immediately following her head injury

because Fotre's proffered opinion regarding the possibility of a seizure

would have been based "entirely on defendant's hearsay statements to

his mother the P.G. had 'stiff legs'." (Slip Opn. at p.40.) The Court of

Appeal adopted this reasoning, but it was simply wrong.

Dr. Fotre, a certified emergency room physician and a diplomate

of the American Board of Forensic Medicine, testified on appellant's

behalf. (4 RT 714-715.) He reviewed P.G.'s medical records and

photographs of her injuries. (4 RT 716-717.) He testified that P.G.'s

*220*

"confused state" as described in the medical records was consistent with

a significant injury to the head with or without loss of consciousness.

(4 RT 718.) Dr. Fotre was then asked whether a seizure was a possible

side effect of a fractured skull, given P.G.'s confused and combative

state in the emergency room which led to her being restrained and

strapped to the examining table. (*Ibid.*) Fotre testified that a seizure was

a possible explanation for her behavior and injuries, though occurring in

fewer than 50 percent of the patients who suffer a skull fracture. (*Ibid.*)

Fotre went on to describe some of the side effects of a seizure, which

included spasms, shaking, odd posturing, grunting, straining, and

massive discharge of the muscles in the body. (*Ibid.*)  Defense counsel

then asked Dr. Fotre whether, during a seizure, it was possible to get the

redness in the eyes that was shown in one of the prosecution's photos of

P.G. in the hospital. (4 RT 718.)  The prosecutor objected to any

questions being asked about seizures; she argued that the jury had not

"heard any testimony to substantiate the reasons of a seizure by treating

physicians." (4 RT 719.)  The trial court sustained the objection on the

ground that "there hasn't been any foundational questioning in this case

that would establish that." (*Ibid.*)

Further into Dr. Fotre's testimony, defense counsel asked whether

a person having a seizure would be more difficult to lift up and carry

than a person not having a seizure. (4 RT 722.) Again, the trial court sustained the prosecution's objection, stating there was no foundation regarding seizures. (*Ibid.*)

The defense also made a motion for permission to allow Dr. Fotre to use, in formulating an opinion regarding a possible seizure, the hearsay statement appellant made to his mother regarding how stiff P.G.'s legs were when he attempted to carry her to the car following her head injury. (1 CT 199-201, 3 RT 567-573.) The trial court denied the motion and ruled that the information regarding purported stiff legs could not be used by the experts. (3 RT 572-573.)

Thereafter, the trial court not only precluded defense counsel from arguing to the jury that the redness on P.G.'s eyelids may have been the result of a seizure, but it affirmatively told the jury that there was no evidence of seizure. (5 RT 860.)

Based on section 801, subdivisions (a) and (b), Dr. Fotre should have been allowed to express his opinion. (Evid. Code, § 801, subds. (a) and (b).) Further, he should have been permitted to use appellant's hearsay statement to his mother that Ms. Lara had stiff legs and was difficult to carry following her head injuries.[3] Hearsay information of a

---

[3]    Dr. Fotre's proffered opinion that P.G. had suffered a seizure would not have been based "entirely" on appellant's hearsay statement regarding her stiff legs, as the Court of Appeals asserted. (Slip
(continued...)

*221*

type reasonably relied upon by professionals in a field in forming an opinion on a subject may be used to support an expert opinion, even though not admissible in court. (*People v. Montiel* (1993) 5 Cal.4th 877, 918; *People v. Dept. of Transp. v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1085.) Such hearsay includes out-of-court statements of lay persons. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) Statements regarding patients' symptoms have long been recognized as hearsay that medical experts may reasonably rely upon. (*People v. Shattuck* (1895) 109 Cal. 673, 678.)

The trial court's rulings deprived appellant of his constitutional right to a meaningful opportunity to present a defense. (*See Crane v. Kentucky* (1986) 476 U.S. 683, 690.) The trial court took that medical issue as to the possible causes of P.G.'s injuries away from the medical experts.[4] The Court of Appeal affirmed that error.

---

[3](...continued)
Opn. at p. 40.) Dr. Fotre's opinion would also have been based on his review of the medical records and his examination of the photos of the injuries.

[4]     Depriving appellant of the opportunity to offer a reasonable medical alternative explanation for some of P.G.'s injuries caused prejudicial harm to appellant's case. Without the seizure testimony, the jury was left with only the prosecution's contention, not backed by medical testimony, that the red in P.G.'s eyes were due to physical trauma associated with an assault. The trial court's rulings also prevented appellant from corroborating his statement to police that he had difficulty picking P.G. up after she sustained her head injury and that

(continued...)

## VII.

**REVIEW SHOULD BE GRANTED BECAUSE APPELLANT'S TRIAL COUNSEL VIOLATED APPELLANT'S CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN HE FAILED TO ELICIT FROM P.G. THE UNDISPUTED FACTS THAT SHORTLY BEFORE SHE REPORTED TO POLICE THAT APPELLANT HAD ASSAULTED HER, HER FATHER HAD PHYSICALLY ABUSED HER AND EVICTED HER FROM HIS HOME BECAUSE SHE HAD NOT REPORTED TO THE POLICE THAT APPELLANT HAD ASSAULTED HER**

Trial counsel provided constitutionally ineffective assistance by failing to question P.G. about the undisputed facts that shortly before she reported appellant to the police, her father physically abused her and evicted her from the family home because she would not tell the police that appellant had assaulted her. (AOB 71-74; 46-50.) The Court of Appeal ruled that those facts could not serve as a basis for an ineffective assistance of counsel claim in that "the manner of cross-examination is within counsel's discretion and rarely implicates ineffective assistance of

---

[4](...continued)

some of her injuries may have resulted from his inability to hold her and carry her to his car. (1 CT 215, 225.) The prosecutor ridiculed appellant's explanation. (5 RT 855.) Moreover, the trial court compounded the prejudicial effect of the error when in closing arguments, it told the jury that there was no evidence of seizure. That act not only discredited the defense theory that seizure had produced some of her injuries, but the trial court's dismissal cast doubt on the portions of Dr. Fotre's testimony that did not concern seizures, in which he opined that P.G.'s injuries were secondary to the skull fracture.

*222*

counsel." (Slip Opn. at pp 46-47.)  Review should be granted because the facts concerning trial counsel's omission clearly establish that appellant was deprived of his Sixth Amendment right to effective assistance of counsel.

Appellant's trial counsel failed to make use of powerful evidence that would have severely undermined the credibility of P.G.'s claim of recovered memory.  Specifically, counsel failed to elicit evidence that P.G. "recovered" her memory shortly after her father had forced her out of his home because of her failure to "remember" that appellant had assaulted her.  The trial court specifically ruled that the defense could question P.G. on the issue of her father's abuse and pressure on her to regain her memory; it also ruled that the impact of such abuse or pressure could be addressed by the defense experts.  (1 RT 202-204.) Outside the jury's presence, the prosecutor conceded that P.G. had described to her (the prosecutor) the abusive behavior on the part of P.G. father; the prosecutor further conceded that there were other witnesses who had heard P.G. say that her father was abusive and had kicked her out of the house because she failed to remember what happened on the night her injuries occurred.  (1 RT 99-102.)

P.G. herself had testified at the preliminary hearing that right before she regained her memory, her father had kicked her out of her

home. (1 CT 25-26). She plainly stated that the reason she was "evicted" by her father was "because I believed that Michael was not the one who hit me." (1 CT 26.) And at trial, P.G. testified on direct examination that her father had "prompted" her to obtain a restraining order against appellant even though she did not want it. (2 RT 302-304.)

Had the information concerning P.G.'s father been presented to the jury, it would have provided highly significant evidence that P.G. had been pressured into having a memory and that only a memory accusing appellant of having caused her injuries would have satisfied her father and allowed her to return to his house. The information also corroborated appellant's statement to police that P.G. was accusing him of assault because she was blaming him for the trouble she was having with her father. (1 CT 213, 220.) And, the information would have lent support to appellant's version of how P.G.'s injuries were sustained because she purportedly was yelling, "You're just like my father, just like my father!" while tugging appellant's shirt when she lost her balance and fell backwards hitting her head. (*Ibid.*)

Yet, the Court of Appeal dismissed these facts as an insufficient basis for an ineffective assistance of counsel claim. (Slip Opn. at pp. 46-47.) The Court cited three decisions by this Court as precedent supporting its decision. However, those cases are easily distinguished.

223

In *People v. Frye* (1998) 18 Cal.4th 894, 985, this Court found that an ineffective assistance of counsel claim did not exist where the defendant had failed "to disclose what evidence, if any, counsel might have elicited had he subjected prosecution witnesses to more rigorous cross-examination." Here, one does not need to guess what could have been elicited for the facts known and available.

Similarly, *People v. Cox* (1991) 53 Cal.3d 618, 622 does not provide support for the Court of Appeal's decision. In *Cox*, the defendant identified no exculpatory or impeachment evidence that trial counsel might have revealed by further questioning of prosecution witnesses. (*Id.* at p. 622.) In the present case, by contrast, the existence of the exculpatory and corroborating testimony was undisputed.

Nor does the decision in *People v. Williams* (1997) 16 Cal.4th 153, 217, support the opinion below. In *Williams*, the defendant complained about defense counsel's cross-examining of prosecution witnesses that the defendant contended elicited damaging testimony. (*Id.* at p.217.) This Court rejected the claim of ineffective assistance of counsel because the questions asked had "plausible tactical possibilities" to impeach witnesses' statements even though the questions did not elicit the hoped for testimony. (*Id.* at pp. 217- 218.)

Here, appellant is not complaining about questions asked that backfired; he is complaining about information available and known both to the prosecutor and defense counsel that would have provided a far stronger defense than the one defense counsel relied on, which involved accusing P.G. of exacting revenge for appellant's purported infidelities. Review should be granted and the conviction reversed.

224

## VIII.

**REVIEW SHOULD BE GRANTED BECAUSE JURY INSTRUCTIONS GIVEN ON HOW THE JURY SHOULD USE EVIDENCE OF OTHER ACTS OF DOMESTIC VIOLENCE VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL**

The instructions given the jury on the purposes for which the other-domestic-violence evidence could be used violated constitutional principles of due process and a fair trial embodied in the Fifth, Sixth, and Fourteenth Amendments because they impermissibly lowered the prosecution's burden of proof and, in all probability, led the jury to incorrectly interpret what its obligations were. (AOB 74-81; ARB 51-53.) The Court of Appeal rejected this claim by pointing to the fact that this Court has rejected similar claims regarding section 1108 (*People v. Reliford* (2003) 29 Cal. 4th 1007, 1009) and that the instructional error identified in *People v. James, supra,* 81 Cal.App.4th at pages 1349-1354, on which appellant relied, was cured in the CALJIC instructions used in this case. (Slip Opn. at pp 28-32.) The Court also thought that the prosecution's evidence against appellant was strong, and therefore it was convinced beyond a reasonable doubt that the jury did not draw an improper inference of guilt solely from the propensity evidence. (Slip Opn. at p. 32.)

In this case, the court gave the jury the 2005 version of CALJIC

No. 2.50.02.  That instruction permitted the jury to find that appellant

possessed a propensity to commit the charged offenses if the jury found

*by a preponderance of evidence* that appellant had committed any prior

act of domestic violence.  (2 CT 277-278, 5 RT 830-831.)  The

instruction also informed the jurors that "[i]f you find that the defendant

had *this disposition* [i.e., to commit other offenses of domestic violence],

*you may*, but are not required to, *infer that he* was likely to commit and

*did commit the crime or crimes of which he is accused.*"  (2 CT 277-278,

5 RT 830-831(emphasis added.)

The instruction then declared that "if you find by a preponderance

of the evidence that the defendant committed a prior crime or crimes

involving domestic violence, that is not sufficient by itself to prove

beyond a reasonable doubt that he committed the charged offenses."

(*Ibid.*)  It further stated that "[i]f you determine *an inference* properly

can be drawn from this evidence, *this inference* is simply one item for

you to consider, along with all other evidence, in determining whether

the defendant has been proved guilty beyond a reasonable doubt of the

charge crime."  (*Ibid.*, emphasis added.)

The 1997 version of CALJIC No. 2.50.02 had been found to be

unconstitutional in *People v. James*, *supra*, 81 Cal.App. 4th, and the

*225*

relevant portion of the 1997 version was identical to language in the version that was given at appellant's trial. That is, the instruction in *James*, like the instruction at appellant's trial, (1) permitted the jury to find that appellant possessed a propensity to commit the charged offenses if the jury found *by a preponderance of evidence* that appellant had committed any prior act of domestic violence and (2) informed the jurors that "[i]f you find that the defendant had *this disposition, you may,* but are not required to, *infer that he* was likely to commit and *did commit the crime or crimes of which he is accused."* (See 81 Cal.App.4th at pp. 1349-1350.

James held that italicized language did not properly rein in the jury's use of propensity evidence and improperly permitted a conviction to be based upon a defendant's propensities, in violation of due process. (81 Cal.App. 4th at pp. 1353-1354.) Since the identical language condemned in *James* also appears in the instruction given to appellant's jury (5 RT 830), the same holding should have resulted.

However, the instruction given to appellant's jury added two sentences that *attempted* to preclude the limit the jury's ability to return a conviction based upon propensity evidence. These two sentences provided:

> "However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic

violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses.  If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime."

(5 RT 830-831.)

These two additional sentences did not cure the due process defect found in *James*.  At the very least, there is at least a reasonable likelihood that the jury applied the instruction in an unconstitutional manner.  There are at least two reasons why this is so.

One:  Insofar as the first of the additional sentences stated that a determination that the defendant "committed a prior crime or crimes involving domestic violence" is "not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses," this statement is plainly *not* a warning or advisement that "the inference of a disposition" arising from the prior act cannot by itself convict the defendant of the charged offense.  All that this language forbids is the jury using a finding (by preponderance of evidence) that the defendant committed prior domestic violence to directly prove guilt of the current offenses.  But it does not forbid the jury from using its conclusion that the defendant had "a disposition" as the sole basis for a conviction on the charged offenses.

226

The second additional sentence builds upon this foundation. For it provides that if the jury does draw the inference that the defendant has a disposition to commit crimes of domestic violence, this inference is "one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime." This language is wordy, but it does not prohibit the jury from using the inference of disposition as the sole basis for a conviction. To the contrary, it is reasonably likely that a jury would read this instruction as allowing a conviction based solely on the inference of disposition.

What these instructions failed to indicate was that if the jury determined by a preponderance of evidence that the defendant committed other offenses involving domestic violence and if it inferred from those prior offenses that the defendant has a disposition to commit other domestic-violence offenses, neither the prior offenses *nor the inference of disposition arising from such offenses* would be sufficient by themselves "to prove beyond a reasonable doubt that the defendant committed the charge offenses."

Two: There is a second reason why the two additional sentences in CALJIC No. 2.50.02 did not cure the constitutional deficiencies found in *James*. The new language warned that a determination by

preponderance of evidence that the defendant committed a prior act of domestic violence is not sufficient by itself to prove beyond a reasonable doubt that he committed the charge offenses, but it is reasonably likely that this language would be interpreted by the jury as permitting it to convict the defendant solely on the basis of the prior offense as long as the evidence of that prior offense exceeds a preponderance of evidence. In other words, if the jury found that the prosecution had proven beyond a reasonable doubt that the uncharged acts of domestic violence occurred, those acts could serve as the basis for convicting the defendant on the charged offenses.

Nothing in the other instructions given corrected these constitutional defects. CALJIC No. 2.50.1 only referred to proof "that a defendant committed the other crimes." Furthermore, CALJIC No. 2.01 added to the confusion, because it required — in direct conflict with the preponderance of evidence standard of CALJIC No. 2.50.02 — that "before any inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt."

227

And, here there is no doubt that these errors contributed to the verdict.[5] Here, it cannot be said that the evidence of appellant's guilt was so strong that the effect of the inference from propensity alone was insignificant. P.G.'s testimony was riddled with inconsistencies as to whether she had a true and accurate memory of the events leading to her injuries or whether the injuring producing event was an accident or assault. Medical testimony questioned whether she could have any memory at all. But unlike P.G.'s testimony, the testimony of C.M. regarding the prior act of domestic violence went virtually unchallenged. Exacerbating the instructional error was the fact that appellant had never been charged or punished for his role in C.M.'s injuries, making this case one in which the jury had great emotional motivation to convict solely on C.M.'s testimony, as CALJIC No. 2.50.02 permitted. The jury had a tremendous incentive to substitute appellant's apparent guilt in the Marcos incident with the problematic proof of the charged offenses.

---

[5]     Where a jury is given burden of proof instructions that violate the demands of due process, the standard of review is "whether it appears beyond a reasonable doubt that the error did not contribute to [the] jury's verdict." (*People v. Flood* (1998) 18 Cal.4th 470, 504; *People v. James, supra,* 81 Cal.App.4th at pp. 1360-1361.) The error did not contribute to the verdict if it is unimportant in relation to everything else the jury considered on the question of the defendant's guilt as revealed in the record. (*Yates v. Evatt* (1991) 500 U.S. 391, 403.) It is only when the effect of the inference is comparatively minimal that it can be said the error did not contribute to the verdict. (*Id.* at pp. 404-405.)

(See *People v. James*, *supra*, 81 Cal.App.4th at p. 1365.)  Reversal of the

conviction was and is mandated.

## CONCLUSION

For the foregoing reasons, appellant respectfully requests that

review be granted in this case.

DATED: June 29, 2006

Richard C. Neuhoff
Barbara A. Zuras
Attorneys for Appellant
Michael T. Johnson

228

## CERTIFICATE OF WORD COUNT

I, Richard C. Neuhoff, appellate counsel for appellant Michael T. Johnson in the above-entitled cases, hereby certify that the Appellant's Petition for Review was produced on a computer and that the brief contains 8,057 words, according to the word count of the computer program used to prepare the petition.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this certificate was executed on June 29, 2007, at New Britain, CT.

_____
RICHARD C. NEUHOFF

ATTACHMENT "B"

# LAW OFFICE
### OF
## STEVEN A. CHASE
### *421 Grand Avenue, Suite A*
### *South San Francisco, California 94080-3635*

Steven A. Chase                                          Telephone: 650 589-6990
State Bar Number 50274                                   Fax:       650 589-3980

17 November 2005

Cheryl Batiste
Probation Department
400 County Center, 5th Floor
Redwood City, CA 94063

Re: Michael Tyrone Johnson, SC58720

Dear Ms. Batiste:

As I told you on the phone today, I'm the attorney for Michael Tyrone Johnson.  I worked closely with Michael since he was first arraigned in the case after being appointed by the Office of the Private Defender to handle the case.

I have been practicing law since January 1972 and in all my years, this was the most factually interesting case I have ever had.  When I saw the photographs of the condition of Paulina Lara when she was in the hospital, I was at a loss to explain how such injuries could have been caused if my client's version of what happened was correct.  At the conclusion of the trial, I was convinced that the conditions demonstrated in these photographs were the natural consequence of what happened to her as a result of the brain trauma sustained when she struck her head (the redness on her eyelids, the hemorrhage in the whites of her eyes, and the bruise behind her ear), and that the bruising on her wrists was caused by having to be restrained when she was admitted to the emergency room at Kaiser hospital.  The bruise on her foot was caused when Michael accidentally stepped on her foot.  I also came away from the trial with the belief that Paulina Lara has no memory of the events that took place after she fell and struck her head.  I am sincerely questioning whether an innocent man was convicted of these charges.

The initial offer to settle the case from the prosecution would have required Michael to plead guilty to a strike and be sentenced to three years in prison.  He turned this down without consideration.  After the prosecutor learned new information while preparing for trial, she made an offer of "no state prison" and a plea to a 245(a)(1) PC count with no strike allegation attached to it.  I told Michael that it was in his best interest to accept this plea because I believed that I would not prevail at trial, and that he would be sent to prison for seven years with two strikes against him.  I pleaded with him to accept the offer.  He said "I'm not going to go to jail for

229

something I didn't do. I never harmed Paolina." I couldn't dissuade him from his decision.

I had two expert witnesses for the defense. One was Dr. James Missett, a psychiatrist, and the other was Terry Fotre, an emergency room doctor. I was also armed with information that I couldn't get before the jury without putting Michael on the stand, and I wouldn't put him on because of the fact that the judge allowed Cristen Marcos, his girlfriend when he was in the Army, to testify against him for a prior claimed act of domestic violence. What I knew from both Michael, and his mother (to whom he had told this just after being released from jail on the day of the claimed offense), that Paolina was having a seizure after she fell. Michael tried to pick her up and she was "dead weight." Then, as he was trying to put her in the car, she was stiffening up and her body was rigid. This was a sign of a seizure. Dr. Fotre was unable to testify about seizures and symptoms to demonstrate one because of what I believe was an erroneous ruling of the judge. It is because I know she was having a seizure, that I can say with authority that she has no memory of the event. Both Dr. Missett and the prosecution expert Dr. Maldonado testified that if a person is unconscious, they don't form memory of events occurring during the period of unconsciousness. Paolina Lara's version of what happened was caused by a phenomenon called "confabulation." This is a process By which a person can take known facts, and create a story of what happened which the person then actually believes. In this case, Paolina took what she believed were injuries shown on the photographs and made up a story. This is not a lie. She believes it to be true.

Losing this trial has been very hard for me as I truly believed that I had created reasonable doubt. I'm sure that it didn't help that none of the jurors was an African American. There were no African American jurors in either of the panels used to pick the jury. Prejudice is a subtle monster that hides within the best of intentions. I believe that this hidden, but real issue contributed to the jury's verdicts.

Michael is not going to show remorse for her actions. He will defend his honor and tell you just what he told me—that this was an accident and that he was not the cause of Paolina's injuries. His co-workers Patti Rico, and Joseph Gerrans both testified at his trial, and I'm expecting to have recommendation letters from each of them  In talking with them, it is obvious that they think the world of Michael.

I want to address the issue of Cristen Marcos and her testimony against Michael. No court martial was implemented as a result of this incident. Ms. Marcos was required to attend alcohol counseling and was to have no contact with Michael at his barracks or through the use of Army phones. She disobeyed this order and continued to see him. She invite him to her family's home in Montana for Christmas after she left the service, and lied to police officers who questioned her about this extension of her relationship after the claimed incident where she claims Michael assaulted her. Obviously the Army didn't think it was as serious as portrayed by Ms. Marcos. It is very important to note that there have been no other complaints against Michael between that

Page 3

event (January 1994) until the event with Paulina in April 2004.  If Michael had any violent propensities toward women, one would expect to have seen more complaints against him.

I can't say what happened on 10 April 2004, as I wasn't there.  What I can say is that the evidence of wrongdoing on the part of Michael Johnson was thin at best, and that he makes a very convincing argument for his innocence.  He stands convicted of a very serious event. Paulina Lara could have died as a result of the skull fracture she sustained that night.  If Michael actively caused that injury, he certainly deserves to be punished.  However, because of the doubt surrounding the claimed facts (now found to be true by a jury), I am requesting that he receive a lenient sentence—one that would include probation—so that he can prove to the Court and to all others that he can be a productive member of society and never come before the Court again on criminal charges.

If you wish to discuss the evidence from the trial in more depth, please feel free to call me. Thank you for the attention that you give to Mr. Johnson.

Very truly yours,

STEVEN A. CHASE
encs.
cc: Michael Tyrone Johnson

231

**(VERIFICATION – 446, 2015.5 C.C.P.)**

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

I am the party of the above entitled actions, a citizen of the United States, over the age of eighteen years and a resident of San Luis Obispo County. My current address is:

*Michael Johnson* CDC No. *F06081*
California Men's Colony-West
P.O. Box 8103    Unit *1* Dorm *4* Bed *37LL*
San Luis Obispo, California 93403-8103

I CERTIFY (OR DECLARE), UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON *22 March*, 20*07*, AT SAN LUIS OBISPO, CALIFORNIA, 93403-8103

PETITIONER

**PROOF OF SERVICE BY MAIL**

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

I AM A RESIDENT OF SAID COUNTY, OVER THE AGE OF EIGHTEEN YEARS, AND NOT A PARTY TO THE ABOVE ENTITLED ACTION. MY STATE PRISON ADDRESS IS:

*Michael Johnson* CDC No. *F06081*
California Men's Colony-West
P.O. Box 8103    Unit *1* Dorm *4* Bed *37LL*
San Luis Obispo, California 93403-8103

ON *22 March*, 20*07* I SERVED THE WITHIN *Motion To Augment Petition For Writ Of Habeas Corpus*

ON THE PARTY: *First Appellate District Court of California*

IN SAID ACTION, BY PLACING A TRUE COPY THEREOF IN A SEALED ENVELOPE WITH POSTAGE THEREON PREPAID, IN THE UNITED STATES MAIL, AT CALIFORNIA MEN"S COLONY, SAN LUIS OBISPO, CA. 93403-8103, ADDRESS AS FOLLOWS:

*350 McAllister St.*
*San Francisco*
*CA  94102*

I DECLARE, UNDER THE PENALTY OF PERJURY, THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON *22 March*, 20 *07*, AT SAN LUIS OBISPO, CALIFORNIA

*232*

SIGNATURE OF DECLARANT

Michael Johnson  F06081  UL437U
P.O. Box 8103  California Men's Colony-West
San Luis Obispo CA 93403-8103


State of California.
First Appellate District Court

| | | |
|---|---|---|
| Michael Johnson, | ) | Case No. A112322 |
| Petitioner, | ) | Motion To Augment |
| vs. | ) | Petition For Writ Of |
| John Marshall, | ) | Habeas Corpus |
| Respondent. | ) | |

TO: This Honorable Court of Appeals, for the First
Appellate District of California; All Justices,
Attorneys, and Representatives:

   Comes, now, Petitioner, Michael Johnson,
with additional facts and Exhibit, to augment
his Petition for Writ of Habeas Corpus already
filed with this Court at the same time as
his Direct Appeal (Case No. A112322, Sup. Ct.
No. SC056779, San Mateo County.) Petitioner's
habeas corpus No. is not known (please, send
filed copy; petitioner is indigent.)

   An argument (on habeas corpus) is there
were NO African Americans on Defendant's
petite Jury; infact, none were interviewed

233

Voir dire. Petitioner argued this was highly prejudicial and unConstitutional, per se. Petitioner argues the County's Jury Summons process is discrimatory when it excludes ethnicity on it's Questionsire, since a member of one's race is A Constitutional guarantee, any Jury. The Sixth Amendment guarantee of an "impartial Jury" cannot be denied; yet, San Mateo County did NOT provide Defendant such protection. No one can say the prejudicial impact, peculiarly when the Case at bar was inter-racial, it-self. There were Hispanic Jurors voir dine(a with several sitting on petite Jury (the al-ledged victim Hispanic and small in stature, the Defendant African American (and tall, muscular build); as defense attorney wrote after-the-fact, "Prejudice is a subtle monster that hides within the best of intentions", a priori truth! However impartial the jurors interviewed might have answered their questions, Defendant deserved African American(s to be selected for Voir dire. ONLY an African American, or Vietnamese, or Columbian, or any Minority, even Hispanic, knows the dragon from within (prejudice.) Please, find enclosed Exhibit (sample Juror Questionnaire) that has NO WAY of including "fair cross section of vis-cinage." Petitioner deserves a trial with

234

at least as many African Americans to Voir dire as Hispanics. The JUROR QUESTIONNAIRE FOR CRIMINAL CASES (FORM MC-002) needs to include "Of what Ethnicity are you?" (as in 1.4.) Such a simple fix to be Constitutional the questionnaire seems to skirt around the issue of race, yet race is a very real ISSUE in our present World.

Respectfully submitted,

Michael Johnson, in pro per

235

Juror ID number _____

Case number _____

# JUROR QUESTIONNAIRE
# FOR CRIMINAL CASES
## General Questions

### PLEASE PRINT ALL ANSWERS LEGIBLY

**1.1**  **AGE:** _____

**1.2**  **THIS (THESE) CRIME(S) ALLEGEDLY TOOK PLACE** _____

*INSERT LOCATION OF CRIME(S)*

**DO YOU RESIDE IN THE VICINITY OF THIS LOCATION OR DO YOU FREQUENT THIS LOCATION?**

**YES**           **NO**

**IF YES, PLEASE EXPLAIN:**

_____

_____

_____

**1.3**  **DESCRIBE ANY DIFFICULTIES (VISION, HEARING, OR MEDICAL PROBLEMS) THAT MAY AFFECT YOUR JURY SERVICE:**

_____

_____

_____

_____

**1.4**  **IF YOU HAVE ANY ETHICAL, RELIGIOUS, POLITICAL, OR OTHER BELIEFS THAT MAY PREVENT YOU FROM SERVING AS A JUROR, EXPLAIN:**

_____

_____

_____

_____

*236*

Juror ID number _____

Case number _____

**1.5  WHAT IS THE HIGHEST LEVEL OF EDUCATION YOU COMPLETED?**

GRADE SCHOOL OR LESS · SOME COLLEGE

(MAJOR): _____

SOME HIGH SCHOOL COLLEGE GRADUATE

(MAJOR): _____

HIGH SCHOOL GRADUATE POSTGRADUATE STUDY

(MAJOR): _____

OTHER *(PLEASE EXPLAIN):* TECHNICAL, VOCATIONAL, OR BUSINESS SCHOOL

_____ (MAJOR): _____

_____

_____

**1.6  IF YOU PLAN TO ATTEND OR ARE CURRENTLY ATTENDING SCHOOL, DESCRIBE:**

_____

_____

_____

**1.7  IF YOU, YOUR SPOUSE, ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP, OR A RELATIVE HAVE TAKEN ANY COURSES OR HAD ANY TRAINING IN LAW OR A RELATED SUBJECT, DESCRIBE:**

_____

_____

_____

**1.8  EDUCATIONAL BACKGROUND OF ANY OTHER ADULT WHO LIVES IN YOUR HOME, INCLUDING ANY DEGREES OR CERTIFICATES EARNED:**

_____

_____

_____

**1.9  YOUR PRESENT EMPLOYMENT STATUS (CHECK ALL THAT APPLY):**

EMPLOYED FULL-TIME RETIRED UNEMPLOYED, LOOKING FOR WORK

EMPLOYED PART-TIME STUDENT UNEMPLOYED, NOT LOOKING FOR WORK

HOMEMAKER

**1.10  YOUR CURRENT OR MOST RECENT OCCUPATION (AND FOR HOW LONG):**

_____

_____

237

Juror ID number _____

Case number _____

**1.11  NAME OF YOUR CURRENT OR MOST RECENT EMPLOYER OR, IF A STUDENT, YOUR SCHOOL:**

_____

_____

**1.12  WHAT ARE YOUR SPECIFIC JOB DUTIES AND RESPONSIBILITIES?**

_____

_____

_____

_____

**1.13  DOES YOUR JOB INVOLVE SUPERVISING OTHER PEOPLE?      YES          NO**

IF YES, APPROXIMATELY HOW MANY? _____

**1.14  ARE YOU INVOLVED IN THE HIRING AND FIRING OF OTHER EMPLOYEES?**

YES             NO

**1.15  ARE YOU INVOLVED IN EVALUATING THE JOB PERFORMANCE OF OTHER EMPLOYEES?**

YES             NO

**1.16  ALL OTHER EMPLOYMENT YOU HAVE HAD IN THE PAST 10 YEARS (AND FOR HOW LONG):**

_____

_____

_____

_____

**1.17  THE PRESENT EMPLOYMENT STATUS OF YOUR SPOUSE OR ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP (CHECK ALL THAT APPLY):**

EMPLOYED FULL-TIME          RETIRED            UNEMPLOYED, LOOKING FOR WORK

EMPLOYED PART-TIME          STUDENT            UNEMPLOYED, NOT LOOKING FOR WORK

HOMEMAKER

**1.18  THE CURRENT OR MOST RECENT OCCUPATION OF YOUR SPOUSE OR ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP (AND FOR HOW LONG):**

_____

_____

**1.19  THE NAME OF THE CURRENT OR MOST RECENT EMPLOYER OF YOUR SPOUSE OR ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP OR, IF A STUDENT, HIS OR HER SCHOOL:**

_____

_____

*238*

Juror ID number _____

Case number _____

**1.20  WHAT ARE THE SPECIFIC JOB DUTIES AND RESPONSIBILITIES OF YOUR SPOUSE OR ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP?**

_____

_____

_____

_____

**1.21  IF YOU, YOUR SPOUSE, A PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP, OR A RELATIVE ARE CURRENTLY WORKING OR HAVE EVER WORKED IN LAW ENFORCEMENT, PLEASE LIST THE AGENCY, POSITION, AND THE PERSON'S RELATIONSHIP TO YOU:**

_____

_____

_____

_____

**1.22  IF YOU HAVE CHILDREN, PLEASE LIST (INCLUDING ANY CHILDREN WHO DO NOT CURRENTLY LIVE WITH YOU):**

| SEX | AGE | DOES CHILD LIVE WITH YOU? | EDUCATION | OCCUPATION |
|-----|-----|---------------------------|-----------|------------|
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |
| ____ | ____ | _____ | _____ | _____ |

**1.23  IF YOU, YOUR SPOUSE, OR A PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP HAS EVER SERVED IN THE MILITARY, PLEASE LIST FOR EACH THE BRANCH OF SERVICE AND DATES OF SERVICE:**

_____

_____

_____

**1.24  IF YOU, YOUR SPOUSE, OR A PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP EVER HAD INVOLVEMENT WITH THE MILITARY POLICE OR THE MILITARY JUSTICE SYSTEM, PLEASE DESCRIBE:**

_____

_____

_____

**1.25  SOCIAL, CIVIC, PROFESSIONAL, TRADE, OR OTHER ORGANIZATIONS WITH WHICH YOU ARE AFFILIATED:**

_____

_____

Form Approved by the
Judicial Council of California
MC-002 [Effective January 1, 2006]
Optional Form

JUROR QUESTIONNAIRE FOR CRIMINAL CASES/General Questions ▪ 4

*239*

**1.26  DESCRIBE ANY OFFICES YOU HAVE HELD IN ORGANIZATIONS LISTED ABOVE:**

_____

_____

**1.27    DO YOU KNOW ANYONE ON THIS JURY PANEL?    YES          NO**

**1.28  IF YOU PERSONALLY KNOW ANY JUDGES OR ATTORNEYS OR COURT PERSONNEL, WHAT ARE THEIR NAMES AND RELATIONSHIPS TO YOU?**

_____

_____

_____

**1.29    HAVE YOU PREVIOUSLY SERVED ON A CRIMINAL OR CIVIL TRIAL JURY?**

YES          NO

ON HOW MANY CASES DID YOU SERVE? _____

APPROXIMATE YEAR(S)? _____

WHERE DID YOU SERVE ON A JURY? _____

WERE YOU A JUROR OR AN ALTERNATE? _____

WHAT KINDS OF CASES DID YOU HEAR WHILE SERVING ON A JURY?

_____

_____

WAS THERE ANYTHING ABOUT YOUR JURY SERVICE THAT WOULD MAKE YOU QUESTION YOUR ABILITY TO BE FAIR AND IMPARTIAL IN THIS CASE? IF SO, PLEASE EXPLAIN:

_____

_____

_____

_____

**1.30  HAVE YOU EVER SERVED ON A GRAND JURY PANEL?      YES          NO**

CRIMINAL OR CIVIL GRAND JURY? _____

APPROXIMATE YEAR(S)? _____

WHERE DID YOU SERVE ON A GRAND JURY? _____

HOW LONG DID YOU SERVE ON A GRAND JURY? _____

WHAT KIND OF MATTERS DID YOU HEAR WHILE SERVING ON A GRAND JURY?

_____

_____

WAS THERE ANYTHING ABOUT YOUR GRAND JURY SERVICE THAT WOULD MAKE YOU QUESTION YOUR ABILITY TO BE FAIR AND IMPARTIAL IN THIS CASE? IF SO, PLEASE EXPLAIN:

_____

_____

_____

Form Approved by the
Judicial Council of California
MC-002 [Effective January 1, 2008]
Optional Form

JUROR QUESTIONNAIRE FOR CRIMINAL CASES/General Questions ■ 5

_240_

Juror ID number _____

Case number _____

**1.31  HAVE YOU, YOUR SPOUSE, ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP, OR A RELATIVE EVER BEEN A VICTIM OF A CRIME?**

    YES         NO

IF YES, WHO? _____

WHAT CRIME(S)?_____

WHEN? _____

WHAT HAPPENED? _____

_____

_____

WAS ANYONE ARRESTED?     YES        NO

WAS THERE A TRIAL?          YES        NO

IF YES, DID YOU ATTEND THE TRIAL?    YES        NO

DID THE PERSON WHO IS THE SUBJECT OF THIS QUESTION TESTIFY?    YES        NO

DID THE POLICE INTERVIEW THE PERSON WHO IS THE SUBJECT OF THIS QUESTION?
    YES        NO

DID ANYONE WORKING FOR THE DEFENDANT INTERVIEW THE PERSON WHO IS THE SUBJECT OF THIS QUESTION?
    YES        NO

AS A RESULT OF THAT EXPERIENCE IS THERE ANYTHING THAT WOULD MAKE YOU QUESTION YOUR ABILITY TO BE FAIR AND IMPARTIAL IN THIS CASE? IF SO, PLEASE EXPLAIN:

_____

_____

_____

_____

**1.32  HAVE YOU, YOUR SPOUSE, ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP, OR A RELATIVE EVER BEEN A WITNESS TO A CRIME?**

    YES         NO

IF YES, WHO? _____

WHAT CRIME(S)?_____

WHEN? _____

WHAT HAPPENED? _____

_____

_____

WAS ANYONE ARRESTED?     YES        NO

WAS THERE A TRIAL?          YES        NO

IF YES, DID YOU ATTEND THE TRIAL?    YES        NO

DID THE PERSON WHO IS THE SUBJECT OF THIS QUESTION TESTIFY?    YES        NO

Form Approved by the
Judicial Council of California
MC-002 [Effective January 1, 2006]
Optional Form

JUROR QUESTIONNAIRE FOR CRIMINAL CASES/General Questions ■ 6

241

Juror ID number _____

Case number _____

DID THE POLICE INTERVIEW THE PERSON WHO IS THE SUBJECT OF THIS QUESTION?
YES          NO

DID ANYONE WORKING FOR THE DEFENDANT INTERVIEW THE PERSON WHO IS THE SUBJECT OF THIS QUESTION?
YES          NO

AS A RESULT OF THAT EXPERIENCE IS THERE ANYTHING THAT WOULD MAKE YOU QUESTION YOUR ABILITY TO BE FAIR AND IMPARTIAL IN THIS CASE? IF SO, PLEASE EXPLAIN:

_____
_____
_____
_____
_____

1.33  HAVE YOU, YOUR SPOUSE, ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP, OR A RELATIVE EVER HAD ANY CONTACT WITH LAW ENFORCEMENT, INCLUDING, BUT NOT LIMITED TO, BEING: (A) STOPPED BY THE POLICE? (B) ACCUSED OF MISCONDUCT, WHETHER OR NOT IT WAS A CRIME? (C) INVESTIGATED AS A SUSPECT IN A CRIMINAL CASE? (D) CHARGED WITH A CRIME? (E) A CRIMINAL DEFENDANT?
YES          NO

IF YES, WHO? _____

WHAT CRIME(S)?_____

WHEN? _____

WHAT HAPPENED? _____

_____
_____

WAS ANYONE ARRESTED?          YES          NO

WAS THERE A TRIAL?              YES          NO

IF YES, DID YOU ATTEND THE TRIAL?     YES          NO

DID THE PERSON WHO IS THE SUBJECT OF THIS QUESTION TESTIFY?     YES          NO

DID THE POLICE INTERVIEW THE PERSON WHO IS THE SUBJECT OF THIS QUESTION?
YES          NO

DID ANYONE WORKING FOR THE DEFENDANT INTERVIEW THE PERSON WHO IS THE SUBJECT OF THIS QUESTION?
YES          NO

AS A RESULT OF THAT EXPERIENCE IS THERE ANYTHING THAT WOULD MAKE YOU QUESTION YOUR ABILITY TO BE FAIR AND IMPARTIAL IN THIS CASE? IF SO, PLEASE EXPLAIN:

_____
_____
_____
_____

*242*

**1.34  HAVE YOU EVER BEEN TO COURT FOR ANY OTHER REASON? EXPLAIN:**

_____

_____

_____

**1.35  THE FOLLOWING IS A PRINCIPLE OF LAW THAT APPLIES TO ALL CRIMINAL CASES:**

A defendant in a criminal action is presumed to be innocent. This presumption requires that the People prove each element of a crime [and special allegation] beyond a reasonable doubt. Whenever the judge tells you the People must prove something, the judge means they must prove it beyond a reasonable doubt [unless the judge specifically tells you otherwise].

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant[s] guilty beyond a reasonable doubt, (he/she/they) (is/are) entitled to an acquittal and you must find (him/her/they) not guilty. (CALCRIM No. 130)

**DO YOU UNDERSTAND THIS PRINCIPLE OF LAW?**

YES            NO

**DO YOU AGREE WITH THIS PRINCIPLE OF LAW?**

YES            NO

**WILL YOU FOLLOW THIS PRINCIPLE OF LAW?**

YES            NO

IF YOU ANSWERED NO TO ANY QUESTION, PLEASE EXPLAIN:

_____

_____

_____

**1.36  IN GENERAL, WHAT ARE YOUR OPINIONS, IF ANY, ABOUT LAW ENFORCEMENT OFFICERS?**

_____

_____

**1.37  HAVE YOU, YOUR SPOUSE, ANY PERSON WITH WHOM YOU HAVE A SIGNIFICANT PERSONAL RELATIONSHIP, OR A RELATIVE EVER HAD A PARTICULARLY PLEASANT OR UNPLEASANT EXPERIENCE WITH LAW ENFORCEMENT OR THE DISTRICT ATTORNEY'S OFFICE?**

YES            NO

IF YES, PLEASE EXPLAIN:

_____

_____

_____

*243*

Juror ID number _____

Case number _____

**1.38 WOULD THE FACT THAT A WITNESS IS A MEMBER OF LAW ENFORCEMENT CAUSE YOU TO AUTOMATICALLY BELIEVE OR DISBELIEVE HIS OR HER TESTIMONY?**

YES                 NO

IF YES, PLEASE EXPLAIN:

_____

_____

_____

244

Juror ID number _____

Case number _____

# JUROR QUESTIONNAIRE
# FOR CRIMINAL CASES

## Verification

I, _____, DECLARE UNDER PENALTY OF PERJURY UNDER
*(PRINT NAME)*

THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING RESPONSES I HAVE GIVEN

ON THIS JUROR QUESTIONNAIRE, AND ON ANY ATTACHED SHEETS, ARE TRUE AND CORRECT

TO THE BEST OF MY KNOWLEDGE AND BELIEF.

**(DATE and PLACE)**                                    **(SIGNATURE)**

Form Approved by the
Judicial Council of California
MC-002 [Effective January 1, 2006]
Optional Form

JUROR QUESTIONNAIRE FOR CRIMINAL CASES/Verification

*245*

*no one is African American on this list.*

*NON African American list.*

COUNTY OF SAN MATEO
JURY MANAGEMENT SYSTEM
LIST OF JURORS

PAGE:    1

COURT: SMC
VENIRE: 00000510
DATE: 10/25/2005
LOCATION: RCAM
PANEL: SILVER
CASE-ID:
JUDGE:

| JUROR NAME | CITY | OCCUPATION | EMPLOYER | SPOUSE OCCUPATION |
| --- | --- | --- | --- | --- |
| ALAGAO,GLORIA BESONA | SO SAN FRANCISCO | | | |
| ARAP,MIRSAD | REDWOOD CITY | | | |
| BALDISSERI,DAVID JAMES | SAN MATEO | | | |
| BAUTISTA,CINDY CAFUIR | SAN BRUNO | | | |
| BENSON,PAMELA L | MENLO PARK | | | |
| BERNARDO,EMILY FE PACHECO | PACIFICA | | | |
| BURKOWSKI,ROGER R | PACIFICA | | | |
| CARLOS,RODOLFO C | PACIFICA | | | |
| CHEW,SCOTT WILLIAM | REDWOOD CITY | | | |
| DAROZA,DANIEL A | SAN MATEO | | | |
| DIAZ,JORGE ARTURO | SAN MATEO | | | |
| DOIDGE,ERICA ANN | REDWOOD CITY | | | |
| EBADY,SOUDABEH | HILLSBOROUGH | | | |
| EDWARDS,ELIZABETH S | MENLO PARK | | | |
| FENNIE,ELIZABETH H | HALF MOON BAY | | | |
| GAZOLI,CANDIDA M | BRISBANE | | | |
| HARRISON,HEIDI BUMAGAT | DALY CITY | | | |
| INESI,MARGARET ENA | MENLO PARK | | | |
| JENKINS,JOSHUA DAVID | BELMONT | | | |
| JOE,PETER JR | PACIFICA | | | |

246

C O U N T Y   O F   S A N   M A T E O

DATE: 10/25/05                    JURY MANAGEMENT SYSTEM                              PAGE:    2

COURT: SMC
VENIRE: 00000510

PANEL: SILVER
CASE-ID:
JUDGE:

| JUROR NAME | CITY | OCCUPATION | EMPLOYER | SPOUSE OCCUPATION |
|---|---|---|---|---|
| KENNEDY,KIM ILENE | HALF MOON BAY | | | |
| KINNE,BONNIE JEAN | REDWOOD CITY | | | |
| LA,DANIEL D | SO SAN FRANCISCO | | | |
| LEE,CARA K | DALY CITY | | | |
| LEE,MIRA KIM | SAN BRUNO | | | |
| LIE,ANDREW HWAN-WEI | PACIFICA | | | |
| LORIN,LIANE M | SAN MATEO | | | |
| LUBIN,DONALD LEWIS | WOODSIDE | | | |
| MACIAS,RAMIRO | EAST PALO ALTO | | | |
| MALIK,FADY | BURLINGAME | | | |
| MARGARONI,JOHN | SAN MATEO | | | |
| MCNALLY,BRANDON PATRICK | BURLINGAME | | | |
| MEYER,INGRID CLAIRE | SAN MATEO | | | |
| NEIPP,ELISA TERESA | REDWOOD CITY | | | |
| NICHOLAS,FRANK | SO SAN FRANCISCO | | | |
| OTERO,ERNST CHRISTIAN | BELMONT | | | |
| OUYE,ALAN HIROSHI | SAN MATEO | | | |
| REINSTRA,SUSAN PASQUINELL | MENLO PARK | | | |
| ROSILLO,ELOY | DALY CITY | | | |
| SANDROFF,CLAUDE JOSH | HALF MOON BAY | | | |

247

DATE: 10/25/05

C O U N T Y   O F   S A N   M A T E O
JURY MANAGEMENT SYSTEM
LIST OF JURORS

PAGE:    3

COURT: SMC
VENIRE: 00000510
DATE: 10/25/2005
LOCATION: RCAM
PANEL: SILVER
CASE-ID:
JUDGE:

| JUROR NAME | CITY | OCCUPATION | EMPLOYER | SPOUSE OCCUPATION |
| --- | --- | --- | --- | --- |
| SCHACKNE, JESSICA MARIE | FOSTER CITY | | | |
| SIMERSON, LAURIE SUSAN | LA HONDA | | | |
| SONSTROM, LAUREN ELAINE | BURLINGAME | | | |
| TABLADA, ISMAEL FRANCISCO | S SAN FRAN | | | |
| TAN, KUIFONG ECHO | FOSTER CITY | | | |
| THOMPSON, PHILIP STEPHEN | SAN MATEO | | | |
| TING, GRACE | DALY CITY | | | |
| TSIPTSIS, ARLENE A | MILLBRAE | | | |
| URIBE, SUSAN JOSEPHINE | SAN MATEO | | | |
| WALTER, JENNIFER | HALF MOON BAY | | | |
| WILLIS, STIRLING QUINN | BURLINGAME | | | |
| YABUT, NORMA M | DALY CITY | | | |
| YAM, SHIRLEY Y N | MILLBRAE | | | |
| ZARAZUA, MOISES C | REDWOOD CITY | | | |
| ZHENG, CHENG | SAN CARLOS | | | |

******  END OF REPORT  ******



248

# JUROR QUESTIONNAIRE
# FOR CRIMINAL CASES
## Form MC-002 (Optional Form)
### Code of Civil Procedure Section 205(c)–(d)

## Sec. 1. Statutory Authority

This Juror Questionnaire has been drafted under the authority of Code of Civil Procedure section 205(c)–(d) and is intended to expedite jury selection. It is not intended to alter statutes or rules governing the authority of the court or the role of counsel during voir dire.

## Sec. 2. Use Notes for Courts

### A. General

This Juror Questionnaire is an **optional form** and is **NOT** intended to constitute the complete examination of prospective jurors. **The utility and appropriateness of this questionnaire to a particular case is at the discretion of the judge.** Particular kinds of cases may require that this questionnaire be altered or augmented with the participation of counsel.

### B. Pre–Voir Dire Conference

Rule of Court 4.200 requires that the court confer with counsel about voir dire before a jury panel is called. At this conference, the court may establish (1) guidelines for the use of the Juror Questionnaire, (2) any supplemental questions to be propounded to the panel by questionnaire, (3) the extent of the court's oral inquiry of the panel, and (4) the extent of oral questioning by counsel. Arrangements for duplication of completed questionnaires should be confirmed.

### C. Introduction of Questionnaire to Prospective Jurors

It is suggested that the Juror Questionnaire be used after the court has given its customary introductory remarks and any additional instructions that the court deems appropriate. The court also may wish to tell the panel members that a questionnaire will be used, to encourage complete answers, and to remind them that their answers will be given under penalty of perjury. In introducing the questionnaire, the court should instruct prospective jurors how to proceed if they have difficulty reading or filling out the form.

It is not recommended that the court direct the jury commissioner to give the Juror Questionnaire to prospective jurors in the jury assembly room. This procedure ordinarily will mean that jurors are not given complete instructions about the type of case they will hear or the identity of participants and witnesses. In addition, jurors who fill out the form before appearing in the trial court may not clearly understand that their answers are given under penalty of perjury. For these reasons, and to avoid the need to have jurors fill out supplemental questionnaires once they have been sent to the trial court, it is strongly recommended that the Juror Questionnaire be used in the trial court setting.

Form Approved by the
Judicial Council of California
MC-002 [Effective January 1, 2006]
Optional Form

JUROR QUESTIONNAIRE FOR CRIMINAL CASES/Code of Civil Procedure section 205(c)-(d)

# JUROR QUESTIONNAIRE
# FOR CRIMINAL CASES
## Introduction and Instructions

Thank you for coming to court as a potential juror. Before the case can start, a jury must be selected. The judge and the parties need to know information about you and people you know in order to select jurors who can be fair to both sides.

Everyone has attitudes and opinions that are shaped by their life experiences. Sometimes these experiences can make it difficult to look at a certain issue in an unbiased and unemotional way. As a juror, you must return a verdict based on the law and on the facts proved in court. The judge will give you instructions on the law and on how you should go about deciding the case. You must listen to and follow the judge's instructions.

The questions on this form are designed to help the court and the lawyers learn something about your background and your views on issues that may be related to this case. The questions are asked not to invade your privacy, but to make sure that you can be a fair and impartial juror.

In portions of this form, you will see the term "person with whom you share a significant personal relationship." That term means a former spouse, domestic partner, life partner, or anyone with whom you have an influential or intimate relationship that you would characterize as important.

As you answer the questions that follow, please keep in mind that there are no "right" or "wrong" answers. The only right answer is one that reflects how you honestly feel. Please make sure your answers are as complete as possible. Complete answers are far more helpful and may help shorten the time it takes to select a jury. If you have trouble reading, understanding, or filling out this form, please let the court staff know. If a question does not apply to you please write in "N/A" for "not applicable" rather than leave the question blank.

**The information you provide will become part of the court record in this case and will be a public document that is accessible to anyone.** Some of the questions may require information that is personal and sensitive to you, and you may be reluctant to talk about this information with the other prospective jurors and the public present. If this is so, write "private" next to the question and the court **may** then give you an opportunity to share your information on the record with only the judge, counsel, the defendant, and the court reporter present. The answers you provide will, under most circumstances, be included as part of the public record but you may not have to share the information in open court.

PLEASE PUT THE LAST FOUR DIGITS OF YOUR JUROR IDENTIFICATION NUMBER FOUND ON YOUR JUROR BADGE ON THE TOP OF EACH PAGE.

Form Approved by the
Judicial Council of California
MC-002 [Effective January 1, 2006]
**Optional Form**

JUROR QUESTIONNAIRE FOR CRIMINAL CASES/Code of Civil Procedure section 205(c)-(d)

*249*

REMEMBER THAT YOU ARE ANSWERING THESE QUESTIONS UNDER PENALTY OF PERJURY. YOUR ANSWERS MUST BE TRUE AND COMPLETE. THANK YOU FOR YOUR HELP IN SELECTING A FAIR JURY.

*250*

Rule 4.201 of the California Rules of Court is amended, effective January 1, 2006, to read:

1    **Rule 4.201.  ~~Supplemental v~~Voir dire in criminal cases**
2
3    ~~In criminal jury trials,~~ To select a fair and impartial jury, the judge must conduct an initial
4    examination of the prospective jurors orally, or by written questionnaire, or by both
5    methods. The *Juror Questionnaire for Criminal Cases* (form MC-002) may be used.
6    After completion of the initial examination, the court ~~shall~~ must permit counsel to
7    conduct supplemental questioning as provided in Code of Civil Procedure section 223.

*251*

Section 8.5 of the Standards of Judicial Administration is amended, effective January 1, 2006, to read:

1    **Sec. 8.5. Examination of prospective jurors in criminal cases**

3    (a)    **[In general]**

5        (1)    This standard applies in all criminal cases.

7        (2)    The examination of prospective jurors in a criminal case should include
8            all questions necessary to insure the selection of a fair and impartial jury.

10        ~~The trial judge may, upon a showing of good cause, permit supplemental~~
11        ~~examination calculated to discover possible bias or prejudice with regard to the~~
12        ~~circumstances of the particular case, relevant to a challenge for cause.~~

14        (3)    The court may consider conducting sequestered voir dire on issues that
15            are sensitive to the prospective jurors, on questions concerning media
16            reports of the case, and on any other issue the court deems advisable.

18    *(Subd (a) amended effective* January 1, 2006*June 6, 1990; previously amended*
19    *effective January 1, 1988, January 1, 1990*, and June 6, 1990*.)*

21    (b)    [**Examination of jurors**] The trial judge's examination of prospective jurors in
22            criminal cases should include the ~~following~~ areas of inquiry listed below and
23            any other matters affecting their qualifications to serve as jurors in the case~~.~~:
24            The trial judge may want to use the *Juror Questionnaire for Criminal Cases*
25            (form MC-002) to assist in the examination of prospective jurors. Form MC-
26            002 is an optional form and is *not* intended to constitute the complete
27            examination of prospective jurors. Form MC-002 is a tool for trial judges to
28            use to make the initial examination of prospective jurors more efficient. If the
29            court chooses to use form MC-002, its use and any supplemental questions
30            submitted by counsel must be discussed at the pre–voir dire conference
31            required by rule 4.200. Excusing jurors based on questionnaire answers alone
32            is generally not advisable.

34        (1)    *(Address to entire jury panel):* Do any of you have any vision, hearing, or
35            medical difficulties that may affect your jury service? *(Response.)*

37        (2)(3) *(In particular, for lengthy trials. Address to entire jury panel):* This trial
38            will likely take _____ days to complete, but it may take longer. *(State*
39            *the days and times during the day when the trial will be in session.)* Will
40            any of you find it difficult or impossible to participate for this period of

*252*

1   time? *(After the entire panel has been screened for time hardships, direct*
2   *the excused jurors to return to the jury assembly room for possible*
3   *reassignment to other courtrooms for voir dire.)*

4

5   (3)(1) *(At this point the court may wish to submit any juror questionnaire that*
6   *has been developed to assist in voir dire. The court should remind panel*
7   *members that their answers on the questionnaire are given under penalty*
8   *of perjury. In addition, if a questionnaire is used, the court and counsel*
9   *may wish to question individual prospective jurors further based on their*
10  *responses to particular questions, and a procedure for doing so should be*
11  *established at the pre–voir dire conference. Therefore, it may not be*
12  *necessary to ask all of the prospective jurors questions 5 through 25 that*
13  *follow, although the text may assist the court with following up with*
14  *individual jurors about answers given on the questionnaire.)*

15

16  *(To the entire jury panel ~~after it has been sworn and seated~~):* I am now
17  going to question the prospective jurors who are seated in the jury box
18  concerning their qualifications to serve as jurors in this case. All the
19  remaining members of this jury panel, however, should pay close
20  attention to my questions, making note of the answers you would give if
21  these questions were put to you personally. If and when any other
22  member of this panel is called to the jury box, he or she will be asked to
23  answer these questions.

24

25  (4)(2) *(To the prospective jurors seated in the jury box):* In the trial of this
26  case each side is entitled to have a fair, unbiased, and unprejudiced jury.
27  If there is any fact or any reason why any of you might be biased or
28  prejudiced in any way, you must disclose such reasons when you are
29  asked to do so. It is your duty to make this disclosure.

30

31  (5)  *(To the prospective jurors seated in the jury box):* Do any of you know
32  anyone else on this jury panel? *(Response.)*

33

34  (6)(4) Ladies and gentlemen of the jury: This is a criminal case entitled The
35  People of the State of California v. _____. The (defendant is)
36  (defendants are) seated _____.

37

38     a.   (Mr.) (Ms.) (defendant), please stand and face the prospective
39          jurors in the jury box and in the audience seats. *(Defendant*
40          *complies.)* Is there any member of the jury panel who is
41          acquainted with the defendant or who may have heard (his)
42          (her) name prior to today? If your answer is yes, please raise
43          your hand.

*253*

b.  The defendant, _____, is represented by (his) (her) attorney, _____, who is seated _____. (Mr.) (Ms.) (defense attorney), would you please stand? Is there any member of the jury panel who knows or who has seen (Mr.) (Ms.) _____ prior to today?

c.  (If there is more than one defendant, repeat (a) and (b) for each codefendant.)

(7)(5) The People are represented by _____, Deputy District Attorney, who is seated _____. (Mr.) (Ms.) (district attorney), would you please stand? Is there any member of the jury panel who knows or who has seen (Mr.) (Ms.) _____ prior to today?

(8)(6) The defendant is charged by an (information) (indictment) filed by the district attorney with having committed the crime of _____, in violation of section _____ of the _____ Code, it being alleged that on or about _____ in the County of _____, the defendant did (describe the offense). To (this charge) (these charges) the defendant has pleaded not guilty, and ~~it will be the question of~~ the jury will have to decide whether the defendant's guilt has been proved beyond a reasonable doubt. ~~that you will be asked to decide if you are selected as a trial juror in this case.~~ Having heard the charge(s) that (has)(have) been filed against the defendant, is there any member of the jury panel who feels that he or she cannot give this defendant a fair trial because of the nature of the charge(s) against (him)(her)?

(9)(7) Have any of you heard of, or have you any prior knowledge of, the facts, or events in this case?

(10) Do any of you have any ethical, religious, political, or other beliefs that would prevent you from serving as a juror in this case?

(11)(8) During the trial of this case, the following persons may be called as witnesses to testify on behalf of the parties or their names may be mentioned in evidence: _____ ~~(The defendant may be excused from disclosing the name of any witness.~~ (Do not identify the side on whose behalf the witness might be called.) Have any of you heard of or otherwise been acquainted with any of the witnesses just named? You should note that the parties are not required and might not wish to call all of these witnesses, and they may later find it necessary to call other witnesses.

254

(12)~~(9)~~ ~~Do any of you have any belief or feeling toward any of the parties,~~ ~~attorneys or witnesses that would make it impossible, or difficult, for you~~ ~~to act fairly and impartially, both as to the defendant and the People?~~ Do any of you have any <u>financial or personal</u> interest in the outcome of this case?

(13)~~(10)~~ How many of you have served previously as jurors in a criminal case?

      *(To each person whose hand is raised):*

    a.   (Mr.) (Ms.) _____ (or Juror ID number), you indicated you have been a juror in a criminal case. What <u>were the charges</u> ~~was the nature of the charge~~ in that case? *(Response.)*

    b.   Do you feel you can put aside whatever you heard in that case and decide this case on the evidence to be presented and the law as I ~~shall~~ <u>will</u> state it to you? *(Response.)*

(14)~~(11)~~ May I see the hands of those jurors who have served on civil cases, but who have never served on a criminal case? *(Response.)* You must understand that there are substantial differences in the rules applicable to the trial of criminal cases from those applicable to the trial of civil cases. This is particularly true respecting the burden of proof ~~which~~ <u>that</u> is placed ~~upon~~ the People. In a civil case we say that the plaintiff must prove his case by a preponderance of the evidence. In a criminal case, the defendant is presumed to be innocent, and before ~~(he)~~ <u>(she)</u> may be found guilty, the People must prove ~~(his)~~ <u>(her)</u> guilt beyond a reasonable doubt. If the jury has a reasonable doubt, the defendant must be acquitted. Will each of you be able to set aside the instructions ~~which~~ <u>that</u> you received in your previous cases and try this case on the instructions given by me in this case?

(15)~~(12)~~ The fact that the defendant is in court for trial, or that charges have been made against ~~(him)~~ (her), is no evidence whatever of (his) (her) guilt. The jurors are to consider only evidence properly received in the courtroom in determining whether the defendant's guilt has been proved beyond a reasonable doubt. The defendant has ~~been arraigned and has~~ entered a plea of "not guilty," which is a complete denial, making it necessary for the People, acting through the district attorney, to prove beyond a reasonable doubt the case against the defendant. ~~Until and~~ ~~unless this is done, the presumption of innocence prevails~~ <u>If the evidence</u>

255

1    does not convince you of the truth of the charges beyond a reasonable
2    doubt, the defendant is entitled to a verdict of not guilty.
3
4        In the following questions I will be using the terms "family," "relative," "close
5    friend," and "anyone with whom you have a significant personal relationship."
6    The term, "anyone with whom you have a significant personal relationship"
7    means a domestic partner, life partner, former spouse, or anyone with whom
8    you have an influential or intimate relationship that you would characterize as
9    important.
10
11        (16)(14) Have you, or to your knowledge, any member of your family, relative,
12    close friend, or anyone with whom you have a significant personal
13    relationship, ever been the victim of any crime? a complaining witness or
14    a victim in a case of this kind? (Response.)
15
16        (17)(13) Have you, or to your knowledge, any member of your family, relative,
17    close friend, or anyone with whom you have a significant personal
18    relationship, ever been arrested for or charged with an offense similar to
19    that in this case? had any contact with law enforcement, including, but not
20    limited to, being: (a) stopped by the police? (b) accused of misconduct,
21    whether or not it was a crime? (c) investigated as a suspect in a criminal
22    case? (d) charged with a crime? or (e) a criminal defendant? (Response.)
23
24        (18)(15) Have you, or to your knowledge, any member of your family, relative,
25    close friend, or anyone with whom you have a significant personal
26    relationship, had any law enforcement training or experience or been a
27    member of or been employed by any law enforcement agency? By law
28    enforcement agency, I include any police department, sheriff's office,
29    highway patrol, district attorney's office, city attorney's office, attorney
30    general's office, United States attorney's office, FBI, etc.and others. (If
31    so, elicit the details of the experience or connection.)
32
33        (19)(16) Would you be able to listen to the testimony of a police or other peace
34    officer and measure it by the same way you would standards that you use
35    to test the credibility of any other witness?
36
37        (17) Would you have any difficulty or embarrassment in returning a verdict for
38    or against the side which had a police or other peace officer as a witness?
39
40        (20)(18) (When appropriate) It may appear that one or more of the parties,
41    attorneys, or witnesses come from a particular national, racial, or religious
42    group (or may have a life style different from your own). Would this in

256

1      any way affect your judgment or the weight and credibility you would
2      give to their testimony?

(21)(19) It is important that I have your assurance that you will, without reservation, follow my instructions and rulings on the law and will apply that law to this case. To put it somewhat differently, whether you approve or disapprove of the court's rulings or instructions, it is your solemn duty to accept as correct these statements of the law. You must accept and follow my instructions even if you disagree with the law. You may not substitute your own idea of what you think the law ought to be. Will all of you follow the law as given to you by me in this case?

(22)(20) Each of you should now state your:

     (i)   (Name) (or juror ID number);

     (ii)  Children's ages and the number of children, if any;

     (iii) Occupation;

     (iv) Occupational history; and

     (v)  Present employer.

And for your spouse or anyone with whom you have a significant personal relationship, their:

     (vi)  Names;

     (vi)(vii) Occupations;

     (vii)(viii) Occupational histories; and

     (viii)(ix) Present employers.

And for your adult children, their:

     (ix)  Occupations;

     (x)   Occupational histories; and

     (xi)  Present employers.

257

*(Please begin with juror number one.)*

(23)(21) Do you know of any other reason, or has anything occurred during this question period, that might make you doubtful you would be a completely fair and impartial juror in this case or why you should not be on this jury? If there is, it is your duty to disclose the reason at this time?.

(24)(22) *(At this point After the court conducts the initial examination, Code of Civil Procedure section 223 allows counsel to ask supplemental questions for the purposes of uncovering possible bias or prejudice relevant to challenges for cause. The court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel. The court may specify the maximum amount of time that counsel for each party may question an individual juror, or may specify an aggregate amount of time for each party, which can then be allocated among the prospective jurors by counsel.)*

*(After the conclusion of counsel questioning, the court asks each side to exercise any challenges for cause.)*

*(At this point After ruling on challenges for cause, if any, the court calls on each side, alternately, to exercise any peremptory challenges.)*

(25)(23) *(When it a new prospective juror is seated, the court should ask (him/her him or her):*

   (i)   Have you heard my questions to the other prospective jurors?

   (ii)  Have any of the questions I have asked raised any doubt in your mind as to whether you could be a fair and impartial juror in this case?

   (iii) Can you think of any other reason why you might not be able to try this case fairly and impartially to both the prosecution and defendant, or why you should not be on this jury?

   (iv) Give us the personal information requested concerning your occupation, that of your spouse or anyone with whom you have a significant personal relationship, that of your adult children, and your prior jury experience.

258

*(Thereupon, as to each new juror seated, the court ~~must~~ permit counsel~~,~~* *~~upon a showing of good cause,~~ to ask supplemental questions, and* *proceed with challenges as above.)*

*(Subd (b) amended effective <u>January 1, 2006</u> ~~January 1, 2004~~; adopted effective* *July 1, 1974, as subd (c); amended and relettered effective June 6, 1990; previously* *amended effective January 1, 1997<u>, and January 1, 2004</u>.)*

(c)    **[Improper questions]** When any counsel examines the prospective jurors, the trial judge should not permit counsel to attempt to precondition the prospective jurors to a particular result or allow counsel to comment on the personal lives and families of the parties or their attorneys. ~~Nor should (he) (she) allow counsel to question the jurors concerning the pleadings, the applicable law, the meaning of particular words and phrases, or the comfort of the jurors, except in unusual circumstances, where, in the trial judge's sound discretion, such questions become necessary to ensure the selection of a fair and impartial jury.~~

*<u>(Subd (c) amended effective January 1, 2006</u> ~~Subd (c) as relettered effective January 1,~~ ~~1997~~; adopted effective July 1, 1974, as subd (e); ~~previously~~ amended and relettered to be subd (d) effective June 6, 1990<u>; previously relettered effective January 1, 1997</u>.)*

*Sec. 8.5 amended effective <u>January 1, 2006</u> ~~January 1, 2004~~; adopted effective July 1,* *1974; previously amended effective January 1, 1988, January 1, 1990, June 6, 1990,* *January 1, 1997<u>, and January 1, 2004</u>.*

**Drafter's Notes**

**1990**—Gender-neutral language is added in section 8.5 of the Standards of Judicial Administration.

Section 8.5(a)(1) of the Standards of Judicial Administration is amended concerning the examination of prospective jurors in criminal cases, to delete the reference to Code of Civil Procedure section 223.5, which has been repealed by the initiative.

Section 8.5(a)(2) is amended concerning the examination of prospective jurors in criminal cases, to reflect the limitations on the participation of counsel in voir dire found in new Penal Code section 223.

New rules 228.2 and 516.2 are added to provide for supplemental examinations in criminal cases, and section 8.5(a)(3) of the Standards of Judicial Administration is repealed concerning the same subject.

1  **1997**—Standard 8.5 was amended to recommend that the judge explain to potential jurors
2  in a criminal case that they are to determine whether the defendant's guilt has been
3  proven beyond a reasonable doubt.

**JUDICIAL COUNCIL OF CALIFORNIA**
**ADMINISTRATIVE OFFICE OF THE COURTS**
455 Golden Gate Avenue
San Francisco, California 94102-3688

**Report**

TO:        Members of the Judicial Council

FROM:      Criminal Law Advisory Committee
           John A. Larson, Senior Court Services Analyst, 415-865-7589

DATE:      August 15, 2005

SUBJECT:   Juror Questionnaire for Criminal Cases (approve form MC-002, adopt
           amendments to Cal. Rules of Court, rule 4.200 and 4.201, and adopt
           amendments to Cal. Stds. Jud. Admin., § 8.5) (Action Required)

Issue Statement
In 1993 the Judicial Council approved form MC-001, *Juror Questionnaire for Civil
Cases* and amended Rule 228 of the California Rules of Court to authorize its use in civil
jury trials. There is, however, no similar model questionnaire in criminal cases. Indeed, in
*People v. Fuentes* (1991) 54 Cal.3d 707, 720, footnote 8 states that the Judicial Council is
studying "the feasibility of uniform or standard juror questionnaire forms" and form MC-
001 was subsequently developed for this purpose.

Recommendation
The Criminal Law Advisory Committee recommends that the Judicial Council, effective
January 1, 2006, approve form MC-002, *Jury Questionnaire for Criminal Cases*, amend
California Rules of Court, rule 4.200 and 4.201, and amend Standard of Judicial
Administration section 8.5, to provide a model questionnaire for optional use in criminal
cases. The text of the proposed form and amendments to the rules and standard is
attached at page 17.

Rationale for Recommendation
This proposal discusses a new form and amendments to rules of court and a
standard of judicial administration as detailed below.

*Form MC-002*
The Task Force on Jury System Improvements, in its 2003 Final Report, delegated
the development of the statewide criminal case questionnaire's content (based on
form MC-001) to future action by the staff of the Administrative Office of the
Courts and the pertinent Judicial Council advisory committee. The Criminal Law

*261*

Advisory Committee subsequently developed the content for proposed form MC-002, *Juror Questionnaire for Criminal Cases.*

The proposed form MC-002 is an optional form designed to assist the court in making voir dire more efficient—counsel can avoid repetition during direct questioning and can use the form as a basis to build individual questionnaires tailored to particular cases. The forms also provide individual jurors the opportunity to flag for the court potentially sensitive and private matters.

*Rule 4.200*
Rule 4.200 of the California Rules of Court pertains to the pre–voir dire conference in criminal cases. In addition to authorizing the use of form MC-002, the proposed amendments to the rule add three matters to be determined at the conference. Rule 4.200(a) is amended to include: (1) the schedule for, and predicted length of, the trial; (2) the number of, and procedures for selecting, alternate jurors; and (3) the procedure for making Wheeler/Batson objections.

Rule 4.200(b) authorizes the use of form MC-002 during jury selection. Rule 4.200(b) would also be modified to clarify when the court may require that proposed questions be in writing. The current version of the rule authorizes the court to require that all questions be submitted in writing before the pre–voir dire conference. Rule 4.200 was adopted in June of 1990 when the entire voir dire was conducted by the court. Since rule 4.200 was adopted, a statutory amendment allows counsel to voir dire the jury directly. The rule, however, has not been amended and subdivision (b) still provides that the court may require counsel to submit all voir dire questions to the court in writing prior to jury selection.

Because counsel may now conduct voir dire under Code of Civil Procedure section 223, rule 4.200(b) would be amended to authorize the court to require attorneys to submit, prior to the pre–voir dire conference, only the questions the attorneys wish the court to ask during the court's initial examination. The requirement to submit questions in writing does not apply to questions counsel intend to ask jurors. Also excluded from the "written question" requirement are follow-up questions that result from responses by jurors, as those questions are not known until the court or counsel hears the jurors' answers.

*Rule 4.201*
The proposed amendments to rule 4.201 (1) refer to the judge's affirmative duty to conduct an initial examination of prospective jurors in criminal cases and (2) authorize the use of form MC-002.

262

*Standard of Judicial Administration § 8.5*
The Advisory Committee comment to rule 4.200 advises that the rule should be used in conjunction with section 8.5 of the Standards of Judicial Administration, which recommends a process for conducting the examination of jurors in criminal cases. Section 8.5, however, is not consistent with California Code of Civil Procedure section 223, which, as noted above, permits counsel to participate in jury voir dire in criminal cases. Code of Civil Procedure section 223 requires the court to conduct an initial examination and thereafter gives counsel for each party the right to question any or all of the prospective jurors. Because section 8.5(a) currently states judges may, with a finding of good cause, permit counsel to participate in supplemental jury voir dire, this language would be deleted.

A new subpart 8.5(a)(3) would advise judges that they should consider conducting sequestered voir dire under certain circumstances. This amendment is proposed as good practice to balance jurors' concerns about disclosing personal matters in open court and concerns about discussion of media reports in high-profile cases tainting the rest of the jury panel, against the public's right to open court proceedings. Sequestered voir dire includes counsel for both sides, allows the defendant to be present, and becomes part of the trial record. The court may determine afterward whether a legitimate privacy interest requires the transcript of the proceeding to be sealed under rule 243.1 of the California Rules of Court, as well as removing juror-identifying information consistent with rule 31.3 of the California Rules of Court and Code of Civil Procedure section 237.

Additional amendments to section 8.5 include: (1) a reference to proposed form MC-002; (2) questions designed to screen for juror health concerns and for hardships at the beginning of voir dire; (3) reordering and rewording existing questions to create consistency with the questions in proposed form MC-002; and (4) rephrasing certain questions in plain English.

Alternative Actions Considered
The committee considered and rejected making the form questionnaire mandatory because it would be difficult, if not impossible, to develop a general questionnaire to cover all types of criminal cases. Because the rules and standard had to be amended to comply with Code of Civil Procedure section 223, which requires the court to allow counsel to voir dire the jury in criminal cases, no alternatives to the proposed amendments to the rules and standard were considered.

Comments From Interested Parties
The form and proposed amendments to the rules and standard were circulated for public comment from April 27, 2005 to June 20, 2005. Seventeen comments were submitted. Four agreed with the proposals, nine agreed only if modified, and four did not agree with the proposals. The majority of the comments received were about proposed form MC-

263

002. The amendments to the rules and standards elicited few comments, which are described further below.

*Form MC-002*
All of the commentators who disagreed with the proposed form shared the view that the model questionnaire was too long, would add too much time to voir dire, was too labor intensive for court staff, and that the use of questionnaires was best reserved for only the most serious or unusual cases. Because proposed form MC-002 is an optional form being made available for voluntary, not compulsory, use the advisory committee determined these concerns could be alleviated by emphasizing the optional nature of the form more clearly below the title on page A and in section 2, Use Notes for Courts. In addition, in response to a comment by Judge Tim Cissna of the Superior Court of Humboldt County, the committee directed staff to post the form, if approved, electronically on the California Courts Web site in a format that allows individuals to download, add, delete, alter, and expand the form to add room if needed.

*time should not be a' issue.*

Other recommended modifications to the form were in some cases quite detailed. They ranged from particular questions about wording and grammar to recommendations that categories of questions be eliminated. Modifications made to the form in response to these comments include:
- Adding question 1.21 asking if the prospective juror, a person with whom he or she has a significant personal relationship, or a relative has ever worked in law enforcement;
- Rephrasing and bolding the privacy statement on the "Introductions and Instructions" page; and
- Ensuring that the perjury declaration on the "Verification" page complies with the requirements of Code of Civil Procedure section 2015.5.

For more detailed information concerning comments to the proposed form see the comment chart attached at page 6.

*Rules 4.200 and 4.201*
The only comment received about the proposed amendments to rules of court 4.200 and 4.201 was a general concern from Administrative Presiding Justice Roger Boren of the Court of Appeal, Second Appellate District. He stated that the "wording of proposed rule 4.200 may lead counsel to insist on procedures that are not warranted." In addition, he suggested a new change to the existing wording of 4.200(a) not contemplated by the committee. The text of rule 4.200(a) currently states: "Before jury selection begins in criminal cases, the court must conduct a conference with counsel to determine . . ." Justice Boren suggested striking "determine" and substituting "discuss." This would change the nature of the pre–voir dire conference from a determination of the procedures, theories, and schedules set forth and proposed in subparts (1)–(8) of subdivision (a) to a discussion of those topics.

264

Insofar as this proposed change is substantive in nature, affecting the entire rule and not just the amendments recommended by the committee, the committee respectfully declined to recommend this change. The committee felt that a change of this type that would have such a significant impact on the rule should be brought forward and discussed during a future rules cycle where comment can be elicited from the public.

*Standard of Judicial Administration § 8.5*

The committee had the following responses to comments about the proposed amendments to section 8.5(b) of the Standards of Judicial Administration, which describes a process for conducting voir dire in criminal cases:

- Question 8.5(b)(3): The committee added language to this question and in section 2 of form MC-002, Use Notes for Courts, to clarify when a questionnaire should be given to jurors.
- Question 8.5(b)(5): In response to concerns that too many prospective jurors would be eliminated if the entire jury panel seated in the courtroom was asked if they know anyone else on the panel, the committee recommended that the question only be posed to prospective jurors once they are seated in the jury box.
- Question 8.5(b)(12): The committee declined to reinstate language they recommend be deleted from the rule concerning whether a juror has a general belief or feeling that would affect his or her fairness; the committee found that the type of response such vague language elicits is too general and wide-ranging to be of use in uncovering bias during voir dire.
- Former question 8.5(b)(17): The committee did not reinstate this question they recommend be deleted from the rule because they determined renumbered section 8.5(b)(19) adequately and more directly addresses the issue of law enforcement witnesses and that former subsection 8.5(b)(17) is redundant.

For more detailed information concerning comments to the proposed amendments to section 8.5 see the comment chart attached at page 6.

Implementation Requirements and Costs

Because use of proposed form MC-002 is optional, the implementation costs of preparing, copying, and administering the questionnaire during voir dire in criminal cases is entirely dependent on the discretion of the parties and the court. It is not anticipated that costs would increase above current levels associated with the use of juror questionnaires in criminal case voir dire. The amendments to rules and standard would not result in increased costs.

Attachments

265

SP05-02
Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| 1. Mr. Ed Berberian District Attorney County of Marin San Rafael | A | N | Have a concern that wording of proposed rule 4.200 may lead counsel to insist on procedures that are not warranted. In subd. (a) the word "determine" should be changed to "discuss" (I realize this is not a contemplated change.) | Disagree. This proposal represents a substantive change to the existing rule, beyond the scope of what is proposed in the amendments. Because of the potential extent of the change, this proposal should be discussed in a future rules cycle. |
| 2. Hon. Roger Boren Administrative Presiding Justice Court of Appeal, Second Appellate District Los Angeles | AM | N | 1. Pg. 5: Our questionnaires are not part of the public record and accessible to anyone. <br> 2. Pg. 9: Q.s 1.11, 1.13, 1.14, 1.15, 1.19, 1.24, and 1.25 should not be included. <br> 3. Pg. 15: Q. 1.34—Jury instruction language is unusual and confusing; do not include <br> 4. Questionnaire is way too long. Copy costs would be significant, as well as the labor cost, the bench time waiting for these questionnaires, the delay for the court to start trial. <br> 5. Sec. 8.5(b)(12): By this rule, the court would commence voir dire with the large group by 8.5(b)(1) through (12) and then send out to fill out the questionnaire? | 1. Disagree; current law states that questionnaires are public record. <br> 2. Disagree; questionnaire is optional form, questions can be deleted if desired. <br> 3. Disagree; jury instruction adds clarity to crucial concept of law. <br> 4. Disagree; because questionnaire is an optional form, it can be tailored to fit the specifics of the trial or not used if unnecessary. <br> 5. Agree; move reference to using questionnaires to section 8.5(b)(3), after initial hardship screening. |
| 3. Ms. Linda Carter Courtroom Services Manager Superior Court of Humboldt County Eureka | N | N | | |

Positions: A = Agree; AM = Agree only if modified; N = Do not agree.

9.26

SP05-02

Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| | Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|---|
| 4. | Hon. Tim Cissna Presiding Judge Superior Court of Humboldt County Eureka | A | N | If adopted, I would like to see the questionnaire put in an easy to use/modify format for computers, so that we can easily delete, add, modify, etc. as appropriate. | Agree |
| 5. | Ms. Diane Colonelli Court Administrative Services Manager Superior Court of Riverside County Riverside | AM | N | On page C-9, Q. 1.37 should read "his/her" testimony rather than "their" | Agree; substitute "his or her" for "their" |
| 6. | Ms. Betty Finley Assistant Court Manager/Jury Services Superior Court of Humboldt County Eureka | N | N | 1. Sec. 2.C. Good idea – I don't know of any other Jury Office that does this. <br> 2. Pg. 5: If only juror ID #s are used as identification and not names, that would make a difference. I know some counties now use only ID #s. <br> 3. Pg. 15: For years we used a 1-page questionnaire on NCR paper. Just the 1 page took up an extra half hour or more to get jurors to court. This questionnaire could take over an hour for some to complete. The special questionnaire used for homicides is case specific and makes more sense than a generic questionnaire for every criminal case. | 1. Agree; juror questionnaires should be administered in the trial court setting. <br> 2. Agree; juror ID #s are preferable to juror names. <br> 3. Disagree; the questionnaire is an optional form, can be tailored to fit the specifics of the trial or not used if determined to be unnecessary. |

Positions: A = Agree; AM = Agree only if modified; N = Do not agree.

26/9

SP05-02
Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| 7. Hon. David Flinn Judge Superior Court of California, County of Contra Costa Martinez | AM | N | Q. 1.32 should *exclude* traffic ("stopped by police") – too many will reply "yes. Issues re. traffic stops should be limited to "exceptionally pleasant or unpleasant" | Disagree; experiences regarding routine traffic stops are relevant and subpart questions elicit information regarding the characteristics of the stop and what occurred with law enforcement. |
| 8. Hon. Mark Forcum Judge Superior Court of San Mateo County Redwood City | N | N  *removed–1* | This is an area the AOC doesn't need to involve itself with. After almost 18 years x countless trials big and small I can handle voir dire just fine – certainly don't need question-naires on cases other than most serious 187s. | Disagree; the questionnaire is an optional form, can be tailored to fit the specifics of the trial or not used if determined to be unnecessary. |
| 9. Hon. Charles Horan Judge Superior Court of Los Angeles County Los Angeles | N | N | The use of written questions during voir dire should not be encouraged in routine cases. I have tried several hundred jury trials with and without written questions. Written questions are best reserved for death penalty or very, very unusual situations. In routine cases, they save no time, given the need for copying, distribution, reading, etc. They add about one day *at least* to the selection process. In LA we pick a jury in one day in a routine felony. With the written Q.s *plus* in court voir dire, it would 2 to 3 days in every case. Bad idea, not needed. | Disagree; the questionnaire is an optional form, can be tailored to fit the specifics of the trial or not used if determined to be unnecessary. |
| 10. Ms. Kate Johnston Deputy State Public Defender Office of the State Public Defender | AM | N | There is no direct question asking prospective jurors if they have a family/friend in law enforcement. Instead, Q. 1.7 simply asks if they have family/friend who has taken any "courses or had training in law or a related | Agree; the following question should be inserted as new 1.21: "If you, your spouse, a person with whom you have a significant personal relationship, or a relative are currently working or have |

Positions: A = Agree; AM = Agree only if modified; N = Do not agree.

268

SP05-02
Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Sacramento | | | subject." People could easily think this q. is restricted to lawyers/paralegals and does not include cops. Related questions include Q. 1.23 which asks if they or anyone close is involved in the military police or who has served in the military. Q. 1.32 asks if they or anyone close has ever been stopped or arrested/charged with a crime. There are also other q.s regarding possible bias towards law enforcement witnesses (1.35—1.37) Why not ask the obvious re family/friend who works or has worked in law enforcement? | ever worked in law enforcement, please list the agency, position, and the person's relationship to you." |
| 11. Ms. Irene Lopez Court Program Manager Superior Court of California, County of Ventura Ventura | AM | N | Pg. 5, paragraph 6: Parties present when court speaks to prospective jurors privately should also include the judicial assistant or courtroom clerk. | Agree; rephrase sentence to read: "If this is so, write 'private' next to the question and the court may then give you an opportunity to share your information with only the judge, counsel, the defendant, the court reporter, and the judicial assistant or courtroom clerk present." |
| 12. Superior Court of Los Angeles County Los Angeles | AM | Y | There are no issues with the concept of the questionnaire or the need to amend the rules and Standards of Judicial Administration. Some modifications to the proposed form should be considered.<br>1. Instructions page, first full paragraph and third full paragraph: delete the word "something" before "about you". Clearly | 1. Agree; substitute "information about you and people you know" for "something about you". |

Positions: A = Agree; AM = Agree only if modified; N = Do not agree.

269

SP05-02
Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Superior Court of Los Angeles County (cont.) | | | the questionnaire asks a great deal of information about the juror and aspects about the juror's life. Use of the word "something" leaves the expectation that little information is sought when the facts are to the contrary as attested to by the questions in the form. More than a few jurors would take umbrage at the use if this word. | |
| | | | 2. Instructions page, sixth full paragraph, the first full sentence should be bolded and underlined. Many jurors simply miss the fact that the answers they are providing in the questionnaire are public record. In the same paragraph, in the sentence referring to the use of the "private" the word "may" should be underlined for the same reason. The court is not bound to hold voir dire in chambers. | 2. Agree; bold first sentence and bold the word "may" (see Lopez comment above). |
| | | | 3. Re the perjury statement at the end: the Juror ID number and case number should be included in the upper right hand corner. | 3. Agree; insert numbers in upper right corner. |
| | | | 4. Also, there is uncertainty as to the legal correctness of the attestation itself and should be checked against the appropriate CCP sections, e.g. 2015.5(a) or (b), etc. | 4. Agree in part; Code of Civil Procedure section 2015.5 states that for a form executed within the State of California, "[t]he certification or declaration may be in substantially the following form: |

27 A

SP05-02
Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Superior Court of Los Angeles County (cont.) | | | | (b) If executed at any place, within or without this state:<br><br>"I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct";<br><br>_____ (Date and Place) _____ (Signature).<br><br>Because CCP 2015.5(b) states that the perjury declaration "may" be in "substantially" the form presented in the statute, the perjury declaration on the Verification complies when "and Place" is added after "Date" |
| 13. Mr. Stephen Love<br>Executive Officer<br>Superior Court of California, County of San Diego<br>San Diego | A | N | | 1. Disagree; courts can provide pre-printed stickers with identifying information they would like to attach at the top of each page or eliminate this element from the questionnaire altogether.<br><br>2. Disagree; see response above. |
| 14. Hon. Dennis J. McLaughlin<br>Judge<br>Superior Court of California, County of Alameda<br>Fremont | AM | N | 1. I do not like the reference to jury badges to identify jurors, as we do not give them badges until they are sworn trial jurors; until then, they have only their juror number as printed on their summons.<br><br>2. I do not like the case number at the top, as | |

271

SP05-02

Juror Questionnaire for Criminal Cases

(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| | | *yes* | the jurors will not remember it, and have nothing with that number on it. | |
| | | | 3. There should be places to insert additional questions in the questionnaire (especially after Q. 1.34 concerning law applicable to the case). | 3. Agree; questionnaire will be distributed in format allowing expansion to provide more room and customization. |
| | | | 4. There should be a general question at the end: "Is there any reason that has not already been given that would prevent you from serving as a fair and impartial juror in this case?" | 4. Disagree; the committee deleted this type of question because the general nature of question does not elicit useful, specific information to uncover possible juror bias. |
| | | | 5. Q. 1.28 concerning prior jury service is vague, and leaves too little space for the jurors who have multiple prior service; the questions should state, "For each prior jury service, please state approximate years, etc." | 5. Agree in part; questionnaire will be distributed in format allowing length and spacing of the form to be tailored to fit the specifics of the trial. |
| | | | 6. I don't understand why the questions are numbered as subparts of question 1 (1.2, 1.24, etc.); there may not be a question 2. | 6. Disagree; numbering anticipates capital case supplemental (and possibly others) that will use number such as 2.1, 2.2, etc. to distinguish questions in the various questionnaires. |
| | | | 7. Rule 8.5(b)(3), requesting all jurors released for time hardships be sent back to await service for other trials presupposes that all the jurors can be screened at one sitting, and that there are other trials in | 7. Disagree, Standards of Judicial Administration are already advisory in nature. |

272

Positions: A = Agree; AM = Agree only if modified; N = Do not agree.

SP05-02

Juror Questionnaire for Criminal Cases

(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Hon. Dennis J. McLaughlin (cont.) | | | which to serve. As that is not always true, this should be phrased as an advisory only. 8. Why not add (b)(13) through (22) to the sample questionnaire, as they are questions to be asked in every case? | 8. Disagree; questions in the standard are substantively reflected in the form questionnaire. |
| 15. Hon. Ken Riley Supervising Criminal Judge Superior Court of Ventura County Ventura | A | N | | |
| 16. Hon. James Woodward Judge Superior Court of Trinity County Weaverville | AM | N | In Trinity County if we ask the entire panel if anyone knows another would probably result in many affirmative responses—better to address the Q to the prospective jurors seated in the box | Agree; rephrase parenthetical directions in section 8.5(b)(5) of the standard. |
| 17. Mr. Dean Zipser President Orange County Bar Association Irvine | AM | Y | 1. On page 5 of the "Introduction and Instructions," prospective jurors are told to write the word "private" as their answer to any question that they feel calls for "personal and sensitive information" about themselves. They are then advised that their answers will become part of the public record in the case but that they "may not have to share the information in open court." Since it would be highly unlikely that any judge ever would require that a juror provide an answer to such a question | 1. Disagree; the wording for this section of the "Introduction and Instructions" was carefully crafted and reviewed by the committee to make jurors aware that their responses will be part of a public record and that there is a possible option that their answers to sensitive questions may be answered out of the presence of other jurors but that such examination is not guaranteed. |

273

SP05-02

Juror Questionnaire for Criminal Cases

(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Mr. Dean Zipser (cont.) | | | in front of other jurors, it is recommended that the language be changed to, in some better way, reassure prospective jurors that their requests for privacy regarding personal and sensitive information will be honored in every way possible. | 2. Disagree; the questionnaire is an optional form and will be distributed in a format allowing the length and spacing to be tailored to fit the specifics of the trial. |
| | | | 2. Questions 1.30, 1.31, and 1.32 attempt to create a structure for allowing thorough answers to questions that could lead to strings of answers regarding multiple people connected to the juror. It is recommended that this possibility be recognized in the language used. Perhaps there could be reference to using additional pages for multiple people referred to. | |
| | | | 3. Also, in questions 1.30, 1.31, and 1.32, "the person who is the subject of this question" is the way that was chosen to create a framework for follow up questions regarding multiple possible people with a relationship to the prospective juror. This manner of reference is difficult to understand. Perhaps "as to each of the people you have provided in your answer to the last question, please answer the following questions," would be clearer, because it would be directly connected to the juror's initial answer providing the | 3. Disagree; proposed language is awkward and not clearer; the questionnaire is an optional form and will be distributed in a format allowing the length and spacing to be tailored to fit the specifics of the trial. |

27 4

SP05-02
Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Mr. Dean Zipser (cont.) | | | in front of other jurors, it is recommended that the language be changed to, in some better way, reassure prospective jurors that their requests for privacy regarding personal and sensitive information will be honored in every way possible. <br><br> 2. Questions 1.30, 1.31, and 1.32 attempt to create a structure for allowing thorough answers to questions that could lead to strings of answers regarding multiple people connected to the juror. It is recommended that this possibility be recognized in the language used. Perhaps there could be reference to using additional pages for multiple people referred to. <br><br> 3. Also, in questions 1.30, 1.31, and 1.32, "the person who is the subject of this question" is the way that was chosen to create a framework for follow up questions regarding multiple possible people with a relationship to the prospective juror. This manner of reference is difficult to understand. Perhaps "as to each of the people you have provided in your answer to the last question, please answer the following questions," would be clearer, because it would be directly connected to the juror's initial answer providing the | 2. Disagree; the questionnaire is an optional form and will be distributed in a format allowing the length and spacing to be tailored to fit the specifics of the trial. <br><br> 3. Disagree; proposed language is awkward and not clearer; the questionnaire is an optional form and will be distributed in a format allowing the length and spacing to be tailored to fit the specifics of the trial. |

275

SP05-02

Juror Questionnaire for Criminal Cases

(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Mr. Dean Zipser (cont.) | | | identity of people connected to the juror who have been victim or witness of a crime, or connected to a crime as a suspect. | |
| | | | 4. Reinstate part of sec. 8.5(b)(12) "Do any of you have any belief for feeling toward any of the parties, attorneys or witnesses that would make it impossible, or difficult, for you to act fairly and impartially, both as to the defendant and the People?" This question is so general that it allows jurors the opportunity to speak up without worrying that their response is inappropriate. It is felt that such questions allow for a better selection process, by eliciting fuller participation in the selection process by jurors who may have legitimate concerns about whether they should serve as jurors. | 4. Disagree; the committee reviewed this question several times during the development of the proposed amendments and found that it was so vague that the type of responses that it elicited would be too general and wide-ranging to be of use in uncovering bias during voir dire. |
| | | | 5. Reinstate former sec. 8.5(b)(17) "Would you have any difficulty or embarrassment in returning a verdict for or against the side which had a police or other peace officer as a witness?" Law enforcement witnesses require careful attention in the jury selection process, because they can easily be perceived as being particularly powerful and trustworthy. The stricken question merely recognizes that this possibility | 5. Disagree; amended and renumbered section 8.5(b)(19) ("Would you be able to listen to the testimony of a police or other peace officer and measure it by the same way you would use to test the credibility of any other witness?") addresses the issue of law enforcement witnesses and therefore |

37  6

SP05-02
Juror Questionnaire for Criminal Cases
(approve form MC-002; amend Cal. Rules of Court, rule 4.200 and 4.201 and Stds. Jud. Admin., § 8.5)

| Commentator | Position | Comment on behalf of group? | Comment | Committee Response |
|---|---|---|---|---|
| Mr. Dean Zipser (cont.) | | | needs to be brought up during jury selection in an open-ended way, and discussed if anyone responds. | former subsection 8.5(b)(17) is redundant. |

Positions: A = Agree; AM = Agree only if modified; N = Do not agree.

*277*

# ATTACHMENT "C"

2.7 8

## TABLE of CONTENTS

Proof of Service                                                          i.

Petition for Writ of Habeas Corpus                                       1.

Attorney Letter with Direct Appeal                                      21.
   Legal Issues of Merit


Attachments

   Exhibit "A" — Jury List ; 2004 U.S.                            23.
     Census Bureau Survey of San
     Mateo County & surrounding areas

   Exhibit "B" — Attorney Letter & Trial                          34.
     Transcript Record, pp. 817, 818, 837

   Exhibit "C" — Case no. SC58720(a),                             38.
     Motion for New Trial, § 1181(5); Case
     no. A112322 (Sup. Ct. SC.056779) A.O.B.,
     pp. 1-85

   Exhibit "D" — Audio Tape(s) 1 & 2 (Revised                     93.
     by www.officesides.biz on Dec. 10, 2006),
     (credible prosecutrix statement's, new
     evidence "proofs" that testimony at
     trial was product of "confabulation")

   Exhibit "E" — Text Messages (Transcribed                      139.
     by Brian Wright, www.sprintpcs.com)
     (credible prosecutrix statement's, new
     evidence, reasons why she would pre-
     varicate.)

279

TABLE of CONTENTS (con't)

Exhibit "F" Case No. 079377, EX          654.
   Parte Motions (credible prose-
   cutrix statements, NEW EVIDENCE
   of her prevarications)

Exhibit "G" Attorney Letter's (account    197.
   of Preliminary Hearing text, prose-
   cutrix's contradictory testimony,
   proof of prevarication)

Exhibit "H" Job Summary (statement        207.
   of work employment of Jose Villa)
   (credible NEW EVIDENCE, refutes
   prosecutrix's testimony)

Exhibit "I" Computer Generated            208.
   Reports (http://www.ptypes.com
   /histrionicpd.html) The Diagnostic
   and Statistical Manual of Mental
   Disorders (American Psychiatric
   Association, 1994, pp. 657-658,
   describe Histrionic Personality
   Disorder

Exhibit "J" Computer Generated            215.
   Report; Epilepsy and Seizures,
   The Anatomy of a Head Injury,
   What Jennifer Saw, Memory
   and Manipulation

280

TABLE of CONTENTS (con't)

The Merck Manual of Diagnosis and Therapy; Rescue house. Core, Postictal State; Penetrating Head Trauma; Medical Encyclopedia: Head Injury; What Jennifer Saw, Elizabeth Loftus, Memory and Manipulation; The Anatomy of a Head Injury

• Question •

Did defendant receive an Sixth Amendment trial as of right? where evidence of inconsistent and conflicting statements by key prosecution witness have been excluded, and, where coercion such as existed, occurred? even, exclusion of Expert Witness's testimony? Pitchess vs. Superior Court of Los Angeles (1974) 11 Cal. 3d 531, 113 Cal. Rptr. 897, 522 P.2d 305 (Allowing the accused the right to discover is based on the fundamental proposition that he is entitled to a fair trial and an intelligent defense in light of all relevant and reasonable accessible information). Art. 1, 28(d) Calif Constitution "Truth-in-Evidence"

281

Name _Michael Tyrone Johnson_

Address _P.O. Box 8103 U14371U_

_San Luis Obispo Ca_

_93403-8103_

CDC or ID Number _F06081_

MC-275

## _Superior Court of California_
## _County of San Mateo_
(Court)

| | |
|---|---|
| _Michael Tyrone Johnson_<br>Petitioner<br>vs.<br>_John Marshall - Warden_<br>Respondent | **PETITION FOR WRIT OF HABEAS CORPUS**<br><br>No. _____<br>_(To be supplied by the Clerk of the Court)_ |

### INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the<br>Judicial Council of California<br>MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;<br>Cal. Rules of Court, rule 60(a)<br>American LegalNet, Inc.<br>www.USCourtForms.com

_282_

**This petition concerns:**

- [ ] A conviction
- [ ] A sentence
- [ ] Jail or prison conditions
- [ ] Other *(specify):* _____

- [ ] Parole
- [ ] Credits
- [ ] Prison discipline

1. Your name: _____

2. Where are you incarcerated? _____

3. Why are you in custody? [ ] Criminal Conviction  [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   _____

   _____

   b. Penal or other code sections: _____

   c. Name and location of sentencing or committing court: _____

   _____

   d. Case number: _____

   e. Date convicted or committed: _____

   f. Date sentenced: _____

   g. Length of sentence: _____

   h. When do you expect to be released? _____

   i. Were you represented by counsel in the trial court? [ ] Yes. [ ] No. If yes, state the attorney's name and address:

   _____

   _____

4. What was the LAST plea you entered? *(check one)*

   [ ] Not guilty  [ ] Guilty  [ ] Nolo Contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [ ] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

---

MC-275 [Rev. July 1, 2005]        **PETITION FOR WRIT OF HABEAS CORPUS**        Page two of six

*283*

6. **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." (If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)

*denied Sixth Amendment trial as of right*

a. **Supporting facts:**

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. If necessary, attach additional pages. CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

Appellant's Opening Brief was filed 20 November, 2006; his direct appeal. This habeas corpus is being filed "to augment" direct appeal, on proper venue. A Petitioner is African American, served Honorably in the United States Military (in four Wars) but was denied African American representation on his Jury. The alleged victim was NOT African American. Petitioner's case was peculiarly sagacious. Evidence crucial to defense theory was disallowed/suppressed, would have exculpated defendant. Exactly, what was the excluded evidence, is the TRUTH: the alleged victim incurred injury as a result of her own medical condition, and

b. **Supporting cases, rules, or other authority (optional):**

(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

Sixth Amendment Trial(s) require Jury to be drawn from a fair cross section of Community. Witkin & Epstein, Calif. Crim. Law 3rd Ed #5 pp. 631 [§442] Requirement that Jury be Representative. See, Taylor

**7. Ground 2 or Ground** _1_  *(if applicable):*

*(continued)*

_____

_____

_____

**a. Supporting facts:**

prevaricated about what happened ; also, a result of her malady. There were other psychological factors, and influences, apparent in the Evidence 1) an abusive Father 2) hysteronic personality disorder 3) previous head injury (trauma 4.) alleged victim's terminal relationship with defendant ; all contributory to "why" she would prevaricate. Truely, alleged victim suffered from "battered woman's syndrome" (as a child, at the hands of her father,) but NOT defendant-petitioner. If petitioner was guilty, he would not have cared for his girlfriend, but fled the scene of the crime as all guilty actors do. Instead, defendant used his Military-medical training on how he handled her after the accidental-injury, sought prompt medical treatment. Petitioner is NOT Guilty. Relief sought is Reversal with Remand for Retrial, or Dismissal on All Counts.

**b. Supporting cases, rules, or other authority:**

vs Louisiana (1975) 419 U.S. 522, 95 S Ct 692, 698, 42 LEd 2d 690, 698, infra, §446 [requirement that jury be chosen from fair cross-section of community is fundamental to Sixth Amendment guarantee of jury trial]; People vs Harris (1984) 36 C.3d 36, 48, 201 C.R. 782, 679 P 2d 433

285

b. *Supporting cases, rules, or other authority : (con't.)*

[right that jury be selected from representative cross section is guaranteed by California Constitution, Article I, section §16]. There was "total exclusion" instant case Jury of African-American vicinage, yet San Mateo County citizenry is multicultural.* See, Exhibit "A" in Attachment; San Mateo County (and, surrounding Counties) General Demographic Characteristics: 2004, U.S. Census Bureau (and) Petitioner's Jury Panel. ¶ Sixth Amendment Trial(s) require must sua sponte Jury Instruction(s). The necessity for instructions on lesser included offenses is founded on the defendant's Constitutional right to have the jury determine every material issue presented by the evidence and on sound public policy considerations. People vs Glenn, 229 Cal.App. 1461, 280 Cal.Rptr. 609. Instant case evidence was of an lesser included offense, if found true by trier of fact. The "duty" of Trial Court Judge was to instruct on "substantial evidence of a defense, sufficient to deserve consideration by his Jury" People vs. Wickersham (1982) 32 Cal. 3d 307, 324; People vs. Cummings (1993) 4 Cal. 4th 1233, 1311. (The trial court has a sua sponte duty to instruct the jury on the general principles of law relevent to and governing the case.) Trial Court Judge should NOT have allowed defense counsel's tactical "all or nothing" waiver. "The trial of a lawsuit

286

b. Supporting cases, rules, or other authority: (con't.)

is not a poker game, but a search for truth"
Williams vs Florida, 399 US 78, 26 L Ed 2d 446,
90 SCt 1893 (1970). Any stratagem by defense
attorney Chase would NOT be altered by the
effect of a lesser included offense. e.g. §243(d)
Effective Assistance of Counsel, Sixth Amendment
Trial as of right, includes reduced culpability
as well as acquittal, even on conviction,
that defense counselor raised all significant
facts and law pertinent to an defendant's Case.
Point Reserved "whether or not waiver was effective
assistance of counsel, or trial court plain error"
cannot negate the fact that a lesser for necessari-
ly included offense is an "affirmative defense"
in Sixth Amendment trial as of right in California.
Petitioner requested an Jury Trial, NOT trial by
Judge or his Attorney, he was "entitled to an in-
struction 'as to any recognized defense' for which
there exists evidence sufficient for a reasonable
jury to find in his favor." Mathews vs United States,
485 U.S. 58, 63, 108 S. Ct. 883, 99 L Ed 2d 54 (1988). Pe-
titioner's Jury was "entrapped" into an "all or
nothing" verdict; A longer sentence violates an
defendant's substantial rights (U.S. v Anderson,
201 F3d 1145, 1152 (9th Cir. 2000)(A longer sentence un-
doubtedly affects substantial rights) Proven in re
People vs Hawkins (1993) 15 C.A. 4th 1373, 1375, 1376,
19 C.R. 2d 434 [since "serious bodily injury" in §243(d)

287

b. Supporting cases, rules, or authority: (con't)

and "great bodily injury" in § 12022.7 have sub-
stantially the same meaning, great bodily injury
is element of battery with serious bodily injury;
hence, enhancement under § 12022.7 is improper].
Petitioner was greatly prejudiced by Government's
and Defense Counsel's decisions, the NOT giving
must sua sponte Jury Instruction on the lesser
included offense. The Court wrote In re People
vs. Breverman (1998) 19 Cal. 4th. 142, 154 " the trial
court has a duty to instruct the Jury on it's
own motion on general principles of law closely
and openly related to the facts necessary for
'the Jury's understanding' of the case. Among those
requirements is 'lesser necessarily included
offenses' which 'informs the Jury'.." Petitioner
requested an JURY trial as of right." Trial
Court's obligation is to state the law correctly"
People vs. Runnion (1994) 30 CA 4th. 852, 858 [36 CR
2d 203]; see, Calif. Reports 18 Cal. 4th. Headnote
reference § 676 - "erroneous instruction also im-
plicates U.S. Constitution 6th Amend. principles
preserving the exclusive domain of the trier of
fact" _ "misdirection" logically includes every
kind of instructional error. Incorrect, ambiguous,
conflicting, or wrongly omitted instructions may
equally "misdirect" the Jury's deliberations.
Calif. Const. Art. VI, § 13, § 643 - denial of Jury
Verdict." A trial court's instruction removing

288

b. Supporting cases, rules, or other authority: (con't.)

an issue from the Jury's consideration is the eq-
uivalent of failing to submit the entire case
to the Jury— an error that clearly is "structural"
rather than "trial" error. (Court's reasoning in
People vs. Flood (1998) 4 Cal. 4th 1233, t 315 [citing
Rose, vs. Clark (1986) 478 U.S. 570, 577-578 (106 S.Ct.
3101, 3105-3106)]; Estelle vs. McGuire (1991) 502
U.S. 62, 75 [112 S Ct. 475, 116 L Ed 2d 385][Instruction
al error infused the trial with unfairness that
appellant was denied federal due process] U.S.C.A
Fourteenth Amendment.* See, Exhibit "B" in
Attachment; appellant was denied Sixth
Amendment trial as of right when defense
counsel waived lesser- necessarily included
offense and trial court judge allowed-it. ¶
Sixth Amendment Trials require All relevant
Evidence material as to guilt or punishment,
to the facts and law surrounding the Case at
Bar, be admitted. "The very word 'trial' cannot as
decisions on the evidence and arguments pro-
perly advanced in open court" Bridges vs. Califor-
nia, 314 U.S. 252, 271 (1941). A trial is a search for
truth, evidentiary inclusion, not exclusion.

"[T]he accused shall enjoy the right...
to have compulsory process for obtaining
witnesses in his favor." U.S.C.A. 6th Amend.
Motion for New Trial under Penal Code § 1181(5)
should NEVER been denied; Dr. Terry Fortre's

289

b. Supporting cases, rules, or other authority: (con't.

Expert Witness testimony (reference to alleged victim's obvious "seizure" symtoms) was admissible under Evidence Code 801, and, the testimony of Reva Johnson Hall "an credible eye-witness" with knowledge of alleged victim and defendant's relationship issues. The Supreme Court in Giles vs. Maryland (1967) 386 US 66, 96, 17 LEd 2d 737, 87 S.Ct. 793, ruled on "compulsory process" & the right to fully develope "all possible defenses" Pursuant to prohibition under Penal Code § 1181, trial court judge misstated facts/Law; aforementioned and regarding the admission of Ms. Marcos testimony: the Ten Year rule under Evidence Code 1109, subd. (e), relies on an "charged offense" the alleged prior bad act the trial court judge relied-on for his determination was NOT an charged offense. *See, Exhibit "C" in Attachment; petitioner's Appellate Attorney argues correctly, a New Trial pursuant to Penal Code § 1181(5 is warranted, [w]ith ALL testimony favorable to defense theory allowed, [w]ithout testimony of Ms. Marcos. (emphasis supplied; yellow highlight) * Sixth Amendment trial as of right requires Brady suppression Evidence disclosure. Instant case, an peculiarly credibility case was infused with non-disclosure decisions by trial court judge.

290

b. supporting cases, rules, or other authority: (con't.

Comes, now, petitioner with such EVIDENCE that "reasonable probability" an different outcome had defendant received Sixth Amendment trial as of right. People vs. Watson, 46 Cal 2d 818. In Exhibit this Petition is Transcript Record of

"D" "audio tape" recording of prosecutrix being influenced by Police during interview. In Exhibit this Petition is Transcript Record of

"E" "text message" phone conversations between alleged victim/defendant demonstrating prosecutrix's hysteronic personality disorder; an obvious result of her abuse suffered by the hand of her father (evidenced in the audio tape.)

"F" In Exhibit this Petition is Transcript Record of "sequence" of restraining orders demonstrating prosecutrix's confusion, even perjury, influence by father. In Exhibit this Petition is Attorney

"G" Letter of "Preliminary Transcript Record" (evidence of friend Mable's influence) subsequent perjury. "[P]robably no one... would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial in a criminal case." Pointer vs. Texas, 380 U.S. 400, 404 (1965). Trial court judge instant case did just that by his rulings: denied what was said by "alleged" victim out-of-court; defendant-petitioner had an Sixth Amendment right to challenge prosecutrix's memory or truth-

291

b. Supporting cases, rules, or other authority: (con:

fulness directly, face to face, for his Jury
to see." The right to compulsory process must
encompass, where appropriate, the right to
treat the witness as "hostile", to cross-examin
with leading questions, and to even impeach
testimony: the very notion of 'compulsory'
process suggests the possibility of an obvious
conflict of interest between the witness and
the accused. Evidentiary rules that prohibit
a defendant from impeaching his 'own' wit-
ness violate the obvious spirit of the Com-
pulsory Process Clause, and basic innocence-
protecting and truthseeking principles to
boot." White vs. Illinois, 502 U.S. 346, 355 (1992);
United States vs. Inadi, 475 U.S. 387, 397-99 & nn.7, 9
(1986); Chambers vs. Mississippi, 410 U.S. 284, 295-9
(1973). Clearly, instant case, one must only
read the aforementioned Exhibits [this Pe-
tition] weigh their content (along with all
the already conflicting evidence given
at Trial) proven is "confabulation"; Ms.
Lara herself proves-it-true when she testified
that before she regained her memory, friends,
neighbors, and family were telling her it
was a case of domestic violence, which kind
of made sense. It was straight-up "coercion"
when Police Officer MacHale told Ms. Lara that
defendant made statements indicating that

292

*b. supporting cases, rules, or other authorities: (con't.*

he was responsible for hurting her. Everyone telling prosecutrix what "they wanted her to remember." Combine that with her wanting to know and her hostility toward defendant over their failing relationship, with her "paranoia" about other females, and becomes, with the accidental injuries an ready-made-case against defendant. Prosecution was afforded it's theory, but trial court judge's denials prevented Defense Theory. "A state may not arbitrarily prevent defendant from presenting evidence that is material, trustworthy, and important to his defense" Gray vs. Klauser, 282 F3d 633 (9th Cir 2002). The Exhibits in Attachment clearly prove alleged victim's confusion (and overtime her submission to other's) "I had no idea what happened to me, I asked them what happened. My father told me that the respondent physically assaulted me." "The officer reported that I made statements to the nurse that the respondent threw something at me." (on another occasion, she says, "know that I remember what happened and knowing that he didn't put his hands on me at any time." (at Preliminary Hearing, she says) "And so those were questions I couldn't answer — And I dropped her off at her house — I went at my house. When I was home, I fell asleep,

293

b. Supporting cases, rules, or other authority: (con't

And when I woke up — I called my best friend on the cell phone, it was around 8 p.m. — She told me "let me take you to the hospital because you don't sound too good". And I said "no". She gave me some water because I was at her house. She gave me some water and she told me to go to the police station and tell them exactly what I remember." It's only obvious the testimony illicited was "manicured" and raises the question: why didn't defense attorney Chase and Appellate Attorney Newhoff point-out this "contradictory Evidence". Attorney Chase had, perfect opportunity to discredit prosecutrix and impeach her testimony; who was coaching her? There exists an audio tape (in Exhibit this Petition, Exhibit "D") which "proofs more coercion by Authorities and others"; And, why prosecutrix makes incongruous statements. She testified she was dragged by her ankles, but on another occassion she says, she was NOT dragged; she stated she had bruises all over her body, yet all the photographs showed NONE to her mid-section where she was supposedly kicked. She tells Dr. Jun she remembers what happened, then two months later testifies she didn't remember until February 8, 2005. Did she remember it was an accident

294

b, Supporting cases, rules, or other authority: (con't

to Dr. Jun ? Is that why what she remembered is NOT revealed ? Is it not the law that any crime confessed under an Doctor's care MUST be reported to the Authorities ? Ms, Lara testified on November 22, 2004, she went to defendant's work (J.C. Penny's, Security) that Jose Villa was there on duty, an witness to her being there. In Exhibit "H", this Petition, is PROOF Jose Villa was termi nated, September 2, 2004, could NOT have been on duty that day. She stated she contracted herpes simplex from defendant without any evidence of having them, or that defendant did, either. Ms. Lara, prosecutrix against defendant, her testi mony just was NOT credible, did NOT juxtapose. There was "two" TAPES, one audio not introduced into evidence and one video introduced and received, but with pertinent parts (40%) technically unreviewable, which, tape two should have been excluded "as being 'tainted' — an complete tape or none at all !" Trial court erred allowing "tainted" evidence into Evidence. "Truthfulness of testimony" Mesarosh vs. U.S, 352 U.S. 1, 1 LEd 2d 1, 77 S Ct 1 (1956)("The dignity of the United States Government will not permit the conviction of any person on tainted testimony.") The

29 5

b. Supporting cases, rules, or other authority: (con't.

excluded audio tape (Exhibit "D") proves prosecutrix's "willful intent" to provide false testimony (two-party law) — Ms. Lara:
"How am I gonna pay these fucking bills?"

More, importantly, Ms. Lara went all-over the place with her inconsistent statement both in and out of Court, from "I don't remember anything" to "Remember I'm the victim, I know exactly what happened that night!" Ms. Lara says on tape "I want my baby, where is my baby." Prosecution uses heresay statement of nurse "baby I will forgive you, I'll be a good girl" The legal Issue is an "credibility" One. "Statements made by a prosecution witness that are inconsistent or that conflict with other statements made by the witness undermine the credibility, and are favorable to the accused" Calif. Crim. Proc. §13:2 pp. 341, 366... the Court of Appeals held that 'the witness' words, whether recorded electronically or by someone writing them down, are a statement.' Whether left in that form, or rearranged, restated, or edited by someone else, the witness' words in the new written notes or unedited tape remain a statement." (Thompson vs. Superior Court (1997) 55 Cal. App. 4th. 480, 486, 61 Cal. Rptr. 2d 785.)

296

b. Supporting cases, rules, or other authority: (con't

Defense Attorney Chase was ineffective NOT
to have introduced such crucial exhonera-
ting evidence as the aforementioned "audio
tape" (Paradis vs Arave (9th. Cir. 2000) 240 F3d
1169, 1179) This evidence was for Jury to de-
cide NOT defense counselor. People vs. Sedeno
(1974) 10 Cal 3rd. 703. 720. "It is well estab-
lished that a defendant has constitutional
right to have the jury determine every materia
issue presented by the evidence." Barger vs.
United States, 204 F3d 1180, 1182 (8th Cir 2000)
(...the trier of fact is entitled to make the
ultimate decision of whether testimony is
to be believed.) See, U.S. vs. Williams, 774
F2d 258 (8th Cir 1985); U.S. vs. McCowan, 706
F2d 863, 865 (8th Cir 1983) (These cases esta-
blish the 7 factors to be used to determine
the admissibility of a tape recording.) All
the Evidence clearly demonstrates the alleged
victim's obvious "Medical" issues, that of
"histrionic personality disorder", and,
"epilepsy and seizure disorder." In Exhi-
bit, this Petition, Exhibits "I, J", are
"criteria" which prosecutrix's "behavior,
mannerism, and testimony" present credible
evidence of both, imperium. The legal
issue is "dual": defense counselor should
have presented "histrionic personality

297

b. supporting cases, rules, or other authority: (con

disorder" theory is why prosecutrix was
testifying at all and that is why her
testimony given was what it was, so in-
congruous. Trial court was legally bound
to allow Dr. Forte's credible seizure testi-
mony theory of defense.

Conclusion

The cumulative errors instant case,
readily fit the definition of "miscarriage
of justice" (Webster's Dictionary of Law,
p. 314 (plea binding issue) — "an error at trial
that probably led to a less favorable outcome
for the appealing party.") and, Federal habeas
corpus standard. Ceja vs. Stewart, 97 F 3d 1246
(9th. Cir. 1996); McCleskey vs. Zant, 499 U.S.
467, 494-95 (1991). Petitioner instant case
is innocent! He NEVER assaulted his girl-
friend, Paolina Lara (Gutierrez). The "alleged
prior bad act evidence" illegally allowed into
evidence" by trial court was severely "pre-
judicial error" (People vs. Watson, 46 Cal. 2d
818, 836-837) and violated Federal Law on
"propensity evidence"— [Propensity]evidence
is [deemed] objectionable, not because it
has no appreciable probative value, but be-
cause it has too much! People vs. Alcala
(1984) 36 Cal. 3d 604, 631. U.S. vs. Burkhart,

298

b. Supporting cases, rules, or other authority: (con'

(10th. Cir. 1972) 458 F2d 201, 204. Also, a jury's tend
ency to condemn in one case because the defend
ant escaped punishment elsewhere is one reason
propensity evidence was banned for centuries
People vs. Smallwood (1986) 42 Cal. 3d 415, 428. Par-
ticular errors call out for reversal in light of
their nature, ie. their power to influence the
Jury. U.S. vs. Harrison (9th. Cir. 1994) 34 F3d 886,
892. Such is with criminal propensity. Chris-
tina Marcos' testimony should be held prejudicial
and impermissible, illegally allowed. Estelle
vs. McGuire, 502 U.S. 62, 67-68, 71-72 (1991); Pettier
vs. Wright, 15 F.3d 860, 861-862 (9th Cir 1994). See,
also, U.S. vs. Moore, 115 F3d 1348 (7th Cir 1997) (Other
crimes evidence may not be used to demonstrate in-
dividual's propensity to commit crime.) "It is re-
versible error to admit into evidence, plaintiff's
conviction that is over 10-years old." Shows vs M/V
Red Eagle, 695 F2d 114 (5th Cir 1983). In stant case,
the over 10-year evidence allowed was ONLY al-
leged to have occurred, not even proven, an con-
viction. U.S. vs Honer, 225 F3d 549 (5th Cir 2000)
(New trial is necessary when there is significant
possibility that improperly admitted prejudicial
evidence had substantial impact on verdict,
viewed in light of entire record). "Any substantial
error tending to discredit the defense, or to
to corroborate the prosecution, must be con-

299

b. supporting cases, rules, or other authority : (con't.)

sidered prejudicial" People vs. Gonzales (1967) 66 Cal. 2d 482, 493-494 ; People vs. Briggs (1962) 58 Cal. 2d 385, 407. Take away the testimony of Christin Marcos, Jury is left only with pictures of a victim of an accident. Prosecutrix's testimony was Kafkaesque and chimerical, and ONLY could be in light of her head trauma suffered, a result of an unrestricted fall. In Exhibit this Petition is demonstrable. Evidence "how" Ms. Lara's testimony became what is was ; suborned a confabulation, not her fault. U.S. vs. Gonzalez-Gonzalez, 258 F3d 16 (1st Cir. 2001)(Undisclosed impeachment evidence, if powerful enough, could constitute grounds for new trial). Was judge bias ? Undeniably, defendant's Constitutional right under the 10 year rule was Violated Undeniably, defendant's Constitutional right to present Defense Theory was Denied. Petition for Writ of Habeas Corpus should Issue, with Remand for Retrial [w]ithout the testimony of Christina Marcos and [w]ith defendant's "theory of defense" allowed, or Case dismissed.

                    Respectfully submitted,

                    [signature]    25 Dec 06

300

8. Did you appeal from the conviction, sentence, or commitment?    ☒ Yes.    ☐ No.   If yes, give the following information:

  a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):
     *First Appellate District, Division Four*

  b.  Result *just filed    20 November, 2006*    Date of decision: _____

  d.  Case number or citation of opinion, if known: *A112322*

  e.  Issues raised:  (1) *see attached*

     (2) _____

     (3) _____

  f.  Were you represented by counsel on appeal?  ☒ Yes.  ☐ No. If yes, state the attorney's name and address, if known:
     *Richard Neuhoff  11 Franklin Sq., New Britain, Conn., 06051*

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☐ No.   If yes, give the following information: *n.a.*

  a.  Result *n.a.* _____    b.  Date of decision: *n.a.*

  c.  Case number or citation of opinion, if known: *n.a.*

  d.  Issues raised:  (1) *n.a.* _____

     (2) *n.a.* _____

     (3) *n.a.* _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
   *attorney said these issues must be brought-up in habeas corpus petition*

11. Administrative Review:

  a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
     *n.a.*

     _____

     _____

     _____

     _____

     _____

     _____

  b.  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.  *n.a.*
     *Attach documents that show you have exhausted your administrative remedies.*

MC-275 (Rev. July 1, 2005)        **PETITION FOR WRIT OF HABEAS CORPUS**        Page five of six

301

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court? ☒ Yes. If yes, continue with number 13. ☐ No. If no, skip to number 15.

13. a. (1) Name of court: _Superior Court of San Mateo (now)_

   (2) Nature of proceeding (for example, "habeas corpus petition"): _habeas corpus petition_

   (3) Issues raised: (a) _denial of Sixth Amendment trial._

   (b) _____

   (4) Result (Attach order or explain why unavailable): _to be declared_

   (5) Date of decision: _n.a._

   b. (1) Name of court: _n.a._

   (2) Nature of proceeding: _n.a._

   (3) Issues raised: (a). _n.a._

   (b) _n.a._

   (4) Result (Attach order or explain why unavailable): _n.a._

   (5) Date of decision: _n.a._

   c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
   _n.a._

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
   _n.a._

16. Are you presently represented by counsel? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:
   _on direct appeal ; Richard Neuhoff_

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:
   _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   _n.a._

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: _30 November, 2006_          (SIGNATURE OF PETITIONER)  _25 Dec 06_

MC-275 [Rev. July 1, 2005]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page six of six

302

# LAW OFFICE
OF
## STEVEN A. CHASE
*421 Grand Avenue, Suite A*
*South San Francisco, California 94080-3635*

Steven A. Chase
State Bar Number 50274

Telephone: 650 589-6990
Fax:     650 589-3980

17 November 2005

Cheryl Batiste
Probation Department
400 County Center, 5th Floor
Redwood City, CA 94063

Re: Michael Tyrone Johnson, SC58720

Dear Ms. Batiste:

As I told you on the phone today, I'm the attorney for Michael Tyrone Johnson. I worked closely with Michael since he was first arraigned in the case after being appointed by the Office of the Private Defender to handle the case.

I have been practicing law since January 1972 and in all my years, this was the most factually interesting case I have ever had. When I saw the photographs of the condition of Paulina Lara when she was in the hospital, I was at a loss to explain how such injuries could have been caused if my client's version of what happened was correct. At the conclusion of the trial, I was convinced that the conditions demonstrated in these photographs were the natural consequence of what happened to her as a result of the brain trauma sustained when she struck her head (the redness on her eyelids, the hemorrhage in the whites of her eyes, and the bruise behind her ear), and that the bruising on her wrists was caused by having to be restrained when she was admitted to the emergency room at Kaiser hospital. The bruise on her foot was caused when Michael accidentally stepped on her foot. I also came away from the trial with the belief that Paulina Lara has no memory of the events that took place after she fell and struck her head. I am sincerely questioning whether an innocent man was convicted of these charges.

The initial offer to settle the case from the prosecution would have required Michael to plead guilty to a strike and be sentenced to three years in prison. He turned this down without consideration. After the prosecutor learned new information while preparing for trial, she made an offer of "no state prison" and a plea to a 245(a)(1) PC count with no strike allegation attached to it. I told Michael that it was in his best interest to accept this plea because I believed that I would not prevail at trial, and that he would be sent to prison for seven years with two strikes against him. I pleaded with him to accept the offer. He said "I'm not going to go to jail for

*303 )*

Page 2

something I didn't do. I never harmed Paolina." I couldn't dissuade him from his decision.

I had two expert witnesses for the defense. One was Dr. James Missett, a psychiatrist, and the other was Terry Fotre, an emergency room doctor. I was also armed with information that I couldn't get before the jury without putting Michael on the stand, and I wouldn't put him on because of the fact that the judge allowed Cristen Marcos, his girlfriend when he was in the Army, to testify against him for a prior claimed act of domestic violence. What I knew from both Michael, and his mother (to whom he had told this just after being released from jail on the day of the claimed offense), that Paolina was having a seizure after she fell. Michael tried to pick her up and she was "dead weight." Then, as he was trying to put her in the car, she was stiffening up and her body was rigid. This was a sign of a seizure. Dr. Fotre was unable to testify about seizures and symptoms to demonstrate one because of what I believe was an erroneous ruling of the judge. It is because I know she was having a seizure, that I can say with authority that she has no memory of the event. Both Dr. Missett and the prosecution expert Dr. Maldonado testified that if a person is unconscious, they don't form memory of events occurring during the period of unconsciousness. Paulina Lara's version of what happened was caused by a phenomenon called "confabulation." This is a process By which a person can take known facts, and create a story of what happened which the person then actually believes. In this case, Paulina took what she believed were injuries shown on the photographs and made up a story. This is not a lie. She believes it to be true.

Losing this trial has been very hard for me as I truly believed that I had created reasonable doubt. I'm sure that it didn't help that none of the jurors was an African American. There were no African American jurors in either of the panels used to pick the jury. Prejudice is a subtle monster that hides within the best of intentions. I believe that this hidden, but real issue contributed to the jury's verdicts.

Michael is not going to show remorse for her actions. He will defend his honor and tell you just what he told me–that this was an accident and that he was not the cause of Paulina's injuries. His co-workers Patti Rico, and Joseph Gerrans both testified at his trial, and I'm expecting to have recommendation letters from each of them. In talking with them, it is obvious that they think the world of Michael.

I want to address the issue of Cristen Marcos and her testimony against Michael. No court martial was implemented as a result of this incident. Ms. Marcos was required to attend alcohol counseling and was to have no contact with Michael at his barracks or through the use of Army phones. She disobeyed this order and continued to see him. She invite him to her family's home in Montana for Christmas after she left the service, and lied to police officers who questioned her about this extension of her relationship after the claimed incident where she claims Michael assaulted her. Obviously the Army didn't think it was as serious as portrayed by Ms. Marcos. It is very important to note that there have been no other complaints against Michael between that

*304*

Page 3

event (January 1994) until the event with Paulina in April 2004. If Michael had any violent propensities toward women, one would expect to have seen more complaints against him.

I can't say what happened on 10 April 2004, as I wasn't there. What I can say is that the evidence of wrongdoing on the part of Michael Johnson was thin at best, and that he makes a very convincing argument for his innocence. He stands convicted of a very serious event. Paulina Lara could have died as a result of the skull fracture she sustained that night. If Michael actively caused that injury, he certainly deserves to be punished. However, because of the doubt surrounding the claimed facts (now found to be true by a jury), I am requesting that he receive a lenient sentence—one that would include probation—so that he can prove to the Court and to all others that he can be a productive member of society and never come before the Court again on criminal charges.

If you wish to discuss the evidence from the trial in more depth, please feel free to call me. Thank you for the attention that you give to Mr. Johnson.

Very truly yours,

STEVEN A. CHASE
encs.
cc: Michael Tyrone Johnson

*305*

# EXHIBIT  "A"

206

Non African American list

Non African American list

COUNTY OF SAN MATEO

DATE: 10/25/05

JURY MANAGEMENT SYSTEM

PAGE:     1

LIST OF JURORS

COURT: SMC
VENIRE: 00000510
DATE: 10/25/2005
LOCATION: RCAM
PANEL: SILVER
CASE-ID:
JUDGE:

| JUROR NAME | CITY | OCCUPATION | EMPLOYER | SPOUSE OCCUPATION |
|---|---|---|---|---|
| ALAGAO,GLORIA BESONA | SO SAN FRANCISCO | | | |
| ARAP,MIRSAD | REDWOOD CITY | | | |
| BALDISSERI,DAVID JAMES | SAN MATEO | | | |
| BAUTISTA,CINDY CAFUIR | SAN BRUNO | | | |
| BENSON,PAMELA L | MENLO PARK | | | |
| BERNARDO,EMILY FE PACHECO | PACIFICA | | | |
| BURKOWSKI,ROGER R | PACIFICA | | | |
| CARLOS,RODOLFO C | PACIFICA | | | |
| CHEW,SCOTT WILLIAM | REDWOOD CITY | | | |
| CAROZA, DANIEL A | SAN MATEO | | | |
| DIAZ,JORGE ARTURO | SAN MATEO | | | |
| DOIDGE,ERICA ANN | REDWOOD CITY | | | |
| EBADY,SOUDABEH | HILLSBOROUGH | | | |
| EDWARDS,ELIZABETH S | MENLO PARK | | | |
| ENNIE,ELIZABETH H | HALF MOON BAY | | | |
| FAZOLI,CANDIDA M | BRISBANE | | | |
| GARRISON,HEIDI BUMAGAT | DALY CITY | | | |
| GNESI,MARGARET ENA | MENLO PARK | | | |
| JENKINS,JOSHUA DAVID | BELMONT | | | |
| JOE,PETER JR | PACIFICA | | | |

307

COUNTY OF SAN MATEO

JURY MANAGEMENT SYSTEM

COURT: SMC
VENIRE: 00000510

PANEL: SILVER
CASE-ID:
JUDGE:

| JUROR NAME | CITY | OCCUPATION | EMPLOYER | SPOUSE OCCUPATION |
| --- | --- | --- | --- | --- |
| KENNEDY,KIM ILENE | HALF MOON BAY | | | |
| KINNE,BONNIE JEAN | REDWOOD CITY | | | |
| LA,DANIEL D | SO SAN FRANCISCO | | | |
| LEE,CARA K | DALY CITY | | | |
| LEE,MIRA KIM | SAN BRUNO | | | |
| LIE,ANDREW HWAN-WEI | PACIFICA | | | |
| LORIN,LIANE M | SAN MATEO | | | |
| LUBIN,DONALD LEWIS | WOODSIDE | | | |
| MACIAS,RAMIRO | EAST PALO ALTO | | | |
| MALIK,FADY | BURLINGAME | | | |
| MARGARONI,JOHN | SAN MATEO | | | |
| MCNALLY,BRANDON PATRICK | BURLINGAME | | | |
| MEYER,INGRID CLAIRE | SAN MATEO | | | |
| NEIPP,ELISA TERESA | REDWOOD CITY | | | |
| NICHOLAS,FRANK | SO SAN FRANCISCO | | | |
| OTERO,ERNST CHRISTIAN | BELMONT | | | |
| OUYE,ALAN HIROSHI | SAN MATEO | | | |
| REINSTRA,SUSAN PASQUINELL | MENLO PARK | | | |
| ROSILLO,ELOY | DALY CITY | | | |
| SANDROFF,CLAUDE JOSH | HALF MOON BAY | | | |

308

```
                          C O U N T Y   O F   S A N   M A T E O
DATE: 10/25/05                 JURY MANAGEMENT SYSTEM                              PAGE:    3
                                 LIST OF JURORS

                              COURT: SMC
                             VENIRE: 00000510
                               DATE: 10/25/2005
                           LOCATION: RCAM
                              PANEL: SILVER
                            CASE-ID:
                              JUDGE:


     JUROR NAME                   CITY              OCCUPATION          EMPLOYER           SPOUSE OCCUPATION
--------------------------   --------------------   --------------------   --------------------------------   --------------------

SCHACKNE,JESSICA MARIE       FOSTER CITY

SIMERSON,LAURIE SUSAN        LA HONDA

SONSTROM,LAUREN ELAINE       BURLINGAME

TABLADA,ISMAEL FRANCISCO     S SAN FRAN

TAN,KUIFONG ECHO             FOSTER CITY

THOMPSON,PHILIP STEPHEN      SAN MATEO

TING,GRACE                   DALY CITY

TSIPTSIS,ARLENE A            MILLBRAE

JRIBE,SUSAN JOSEPHINE        SAN MATEO

JALTER,JENNIFER              HALF MOON BAY

WILLES,STIRLING QUINN        BURLINGAME

YABUT,NORMA M                DALY CITY

YAM,SHIRLEY Y M              MILLBRAE

ZARAZUA,MOISES C             REDWOOD CITY

ZHENG,CHENG                  SAN CARLOS


   *******  END OF REPORT  *******
```



*309*

Case 3:08-cv-03429-MMC    Document 2-10    Filed 07/16/2008    Page 5 of 17



# U.S. Census Bureau
## American FactFinder

**San Mateo County, California**
**General Demographic Characteristics: 2004**

Data Set: **2004 American Community Survey**

NOTE. Data are limited to the household population and exclude the population living in institutions, college dormitories, and other group quarters. For information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.

| General Demographic Characteristics: 2004 | Estimate | Lower Bound | Upper Bound |
|---|---|---|---|
| **Total population** | **688,847** | ***** | ***** |
| **SEX AND AGE** | | | |
| Male | 341,064 | 337,975 | 344,153 |
| Female | 347,783 | 344,694 | 350,872 |
| Under 5 years | 52,095 | 50,080 | 54,110 |
| 5 to 9 years | 41,539 | 36,407 | 46,671 |
| 10 to 14 years | 46,818 | 42,256 | 51,380 |
| 15 to 19 years | 37,945 | 34,456 | 41,434 |
| 20 to 24 years | 35,724 | 32,300 | 39,148 |
| 25 to 34 years | 89,708 | 88,060 | 91,356 |
| 35 to 44 years | 115,572 | 113,084 | 118,060 |
| 45 to 54 years | 107,350 | 105,294 | 109,406 |
| 55 to 59 years | 42,147 | 37,825 | 46,469 |
| 60 to 64 years | 36,908 | 32,202 | 41,614 |
| 65 to 74 years | 42,428 | 40,420 | 44,436 |
| 75 to 84 years | 32,832 | 30,196 | 35,468 |
| 85 years and over | 7,781 | 5,687 | 9,875 |
| | | | |
| Median age (years) | 38.6 | 38.1 | 39.1 |
| | | | |
| 18 years and over | 524,335 | 522,816 | 525,854 |
| 21 years and over | 503,051 | 498,610 | 507,492 |
| 62 years and over | 103,363 | 99,569 | 107,157 |
| 65 years and over | 83,041 | 80,820 | 85,262 |
| | | | |
| 18 years and over | 524,335 | 522,816 | 525,854 |
| Male | 258,024 | 255,942 | 260,106 |
| Female | 266,311 | 264,013 | 268,609 |
| | | | |
| 65 years and over | 83,041 | 80,820 | 85,262 |
| Male | 34,400 | 32,755 | 36,045 |
| Female | 48,641 | 47,286 | 49,996 |
| | | | |
| **RACE** | | | |
| One race | 662,140 | 655,121 | 669,159 |
| Two or more races | 26,707 | 19,688 | 33,726 |
| | | | |
| **Total population** | **688,847** | ***** | ***** |
| One race | 662,140 | 655,121 | 669,159 |
| White | 404,853 | 392,787 | 416,919 |
| Black or African American | 17,390 | 14,982 | 19,798 |

*310*

| General Demographic Characteristics: 2004 | Estimate | Lower Bound | Upper Bound |
|---|---|---|---|
| American Indian and Alaska Native | 2,950 | 2,052 | 3,848 |
| Cherokee tribal grouping | N | N | N |
| Chippewa tribal grouping | N | N | N |
| Navajo tribal grouping | N | N | N |
| Sioux tribal grouping | N | N | N |
| Asian | 154,077 | 147,183 | 160,971 |
| Asian Indian | 13,377 | 8,470 | 18,284 |
| Chinese, except Taiwanese | 44,179 | 35,358 | 53,000 |
| Filipino | 74,120 | 63,754 | 84,486 |
| Japanese | 12,008 | 7,348 | 16,668 |
| Korean | 3,131 | 1,398 | 4,864 |
| Vietnamese | 1,706 | 0 | 3,873 |
| Other Asian | 5,556 | 1,777 | 9,335 |
| Native Hawaiian and Other Pacific Islander | 6,944 | 4,456 | 9,432 |
| Native Hawaiian | N | N | N |
| Guamanian or Chamorro | N | N | N |
| Samoan | N | N | N |
| Other Pacific Islander | N | N | N |
| Some other race | 75,926 | 61,942 | 89,910 |
| | | | |
| Two or more races | 26,707 | 19,688 | 33,726 |
| White and Black or African American | 3,857 | 1,655 | 6,059 |
| White and American Indian and Alaska Native | 2,200 | 420 | 3,980 |
| White and Asian | 11,639 | 5,919 | 17,359 |
| Black or African American and American Indian and Alaska Native | 907 | 0 | 1,996 |
| **Race alone or in combination with one or more other races:** | | | |
| Total population | **688,847** | ***** | ***** |
| White | 426,881 | 413,017 | 440,745 |
| ~~Black or African American~~ | 22,525 | 22,525 | 22,525 |
| American Indian and Alaska Native | 6,314 | 3,991 | 8,637 |
| Asian | 169,332 | 164,766 | 173,898 |
| Native Hawaiian and Other Pacific Islander | 10,255 | 9,347 | 11,163 |
| Some other race | 78,463 | 64,566 | 92,360 |
| | | | |
| **HISPANIC ORIGIN AND RACE** | | | |
| Total population | **688,847** | ***** | ***** |
| Hispanic or Latino (of any race) | 154,928 | ***** | ***** |
| Mexican | 96,817 | 84,622 | 109,012 |
| Puerto Rican | 2,791 | 546 | 5,036 |
| Cuban | 969 | 0 | 2,215 |
| Other Hispanic or Latino | 54,351 | 42,109 | 66,593 |
| Not Hispanic or Latino | 533,919 | ***** | ***** |
| White alone | 328,876 | 328,285 | 329,467 |
| Black or African American alone | 17,390 | 14,982 | 19,798 |
| American Indian or Alaska Native alone | 2,679 | 1,939 | 3,419 |
| Asian alone | 151,412 | 144,614 | 158,210 |
| Native Hawaiian and Other Pacific Islander alone | 6,656 | 4,208 | 9,104 |
| Some other race alone | 4,317 | 42 | 8,592 |
| Two or more races: | 22,589 | 16,353 | 28,825 |
| Two races including Some other race | 653 | 0 | 1,491 |
| Two races excluding Some other race, and Three or more races | 21,936 | 15,730 | 28,142 |
| | | | |
| **RELATIONSHIP** | | | |
| Household population | **688,847** | ***** | ***** |
| Householder | 271,560 | 264,746 | 278,374 |
| Spouse | 134,724 | 127,782 | 141,666 |
| Child | 198,175 | 189,835 | 206,515 |
| Other relatives | 52,418 | 42,946 | 61,890 |
| Nonrelatives | 31,970 | 25,240 | 38,700 |
| Unmarried partner | 11,250 | 8,219 | 14,281 |

*311*

| General Demographic Characteristics: 2004 | Estimate | Lower Bound | Upper Bound |
|---|---|---|---|
| **HOUSEHOLDS BY TYPE** | | | |
| Total households | **255,173** | **251,339** | **259,007** |
| Family households (families) | 167,682 | 160,474 | 174,890 |
| With own children under 18 years | 79,327 | 72,959 | 85,695 |
| Married-couple families | 125,801 | 118,073 | 133,529 |
| With own children under 18 years | 60,348 | 54,120 | 66,576 |
| Female householder, no husband present | 28,184 | 23,020 | 33,348 |
| With own children under 18 years | 13,897 | 9,883 | 17,911 |
| Nonfamily households | 87,491 | 80,164 | 94,818 |
| Householder living alone | 68,929 | 61,935 | 75,923 |
| 65 years and over | 22,503 | 18,823 | 26,183 |
| | | | |
| Households with one or more people under 18 years | 86,111 | 79,643 | 92,579 |
| Households with one or more people 65 years and over | 58,264 | 54,823 | 61,705 |
| | | | |
| Average household size | 2.70 | 2.66 | 2.74 |
| Average family size | 3.37 | 3.27 | 3.47 |

Source: U.S. Census Bureau, 2004 American Community Survey

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a confidence interval. The interval shown here is a 90 percent confidence interval. The stated range can be interpreted roughly as providing a 90 percent probability that the interval defined by the lower and upper bounds contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

Notes:
· The number of householders does not necessarily equal the number of households because of differences in the weighting schemes for the population and occupied housing units.
· For more information on understanding race and Hispanic origin data, please see the Census 2000 Brief entitled, Overview of Race and Hispanic Origin, issued March 2001. (pdf format)

Explanation of Symbols:
1. An '**' entry in the lower and upper bound columns indicates that too few sample observations were available to compute a standard error and thus the lower and upper bounds. A statistical test is not appropriate.
2. An '***' entry in the lower and upper bound columns indicates that no sample observations were available to compute a standard error and thus the lower and upper bounds. A statistical test is not appropriate.
3. An '-' entry in the estimate column indicates that no sample observations were available to compute an estimate.
4. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
5. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
6. An '***' entry in the lower and upper bound columns indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
7. An '*****' entry in the lower and upper bound columns indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.
8. An 'N' entry in the estimate, lower bound, and upper bound columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.

*2/2.*



### U.S. Census Bureau
### American FactFinder

B02001. RACE - Universe: TOTAL POPULATION
Data Set: 2004 American Community Survey

NOTE. Data are limited to the household population and exclude the population living in institutions, college dormitories, and other group qua
information on confidentiality protection, sampling error, nonsampling error, and definitions, see Survey Methodology.

« hide upper and lower bounds

|  | Santa Clara County, California | | |
| --- | --- | --- | --- |
|  | Estimate | Lower Bound | Upper Bound |
| Total: | 1,656,128 | ***** | ***** |
| White alone | 950,541 | 930,315 | 970,767 |
| Black or African American alone | 39,687 | 35,862 | 43,512 |
| American Indian and Alaska Native alone | 7,812 | 4,445 | 11,179 |
| Asian alone | 487,359 | 479,324 | 495,394 |
| Native Hawaiian and Other Pacific Islander alone | 6,556 | 5,660 | 7,452 |
| Some other race alone | 107,793 | 88,432 | 127,154 |
| Two or more races: | 56,380 | 42,468 | 70,292 |
| Two races including Some other race | 10,379 | 6,173 | 14,585 |
| Two races excluding Some other race, and three or more races | 46,001 | 34,074 | 57,928 |

Source: U.S. Census Bureau, 2004 American Community Survey

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a confidence interval. The interval shown here is a 90 percent confidence interval. The stated range can be interpreted roughly as providing a 90 percent probability that the interval defined by the lower and upper bounds contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

Explanation of Symbols:
1. An '**' entry in the lower and upper bound columns indicates that too few sample observations were available to compute a standard error and thus the lower and upper bounds. A statistical test is not appropriate.
2. An '***' entry in the lower and upper bound columns indicates that no sample observations were available to compute a standard error and thus the lower and upper bounds. A statistical test is not appropriate.
3. An '-' entry in the estimate column indicates that no sample observations were available to compute an estimate.
4. An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
5. An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
6. An '****' entry in the lower and upper bound columns indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
7. An '*****' entry in the lower and upper bound columns indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.

**Standard Error/Variance documentation for this dataset:**
2004 Accuracy of the Data

http://factfinder.census.gov/servlet/DTTable?_bm=y&-geo_id=05000US06085&-ds_name=... 7/4/2006


**U.S. Census Bureau**
**American FactFinder**

FACT SHEET

## San Francisco County, California

**2004 American Community Survey**
**Data Profile Highlights:**

Note: The 2004 American Community Survey universe is limited to the household population and excludes the population living in institutions, college dormitories, and other group quarters.

| General Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| Total population | 724,538 | | |
| Male | 365,951 | 50.5 | 48.9% |
| Female | 358,587 | 49.5 | 51.1% |
| Median age (years) | 39.2 | (X) | 36.2 |
| Under 5 years | 38,498 | 5.3 | 7.0% |
| 18 years and over | 615,895 | 85.0 | 74.5% |
| 65 years and over | 104,063 | 14.4 | 12.0% |
| One race | 702,905 | 97.0 | 98.1% |
| White | 381,211 | 52.6 | 75.6% |
| Black or African American | 47,003 | 6.5 | 12.2% |
| American Indian and Alaska Native | 2,467 | 0.3 | 0.8% |
| Asian | 240,675 | 33.2 | 4.2% |
| Native Hawaiian and Other Pacific Islander | 3,906 | 0.5 | 0.1% |
| Some other race | 27,643 | 3.8 | 5.2% |
| Two or more races | 21,633 | 3.0 | 1.9% |
| Hispanic or Latino (of any race) | 101,520 | 14.0 | 14.2% |
| Household population | 724,538 | 100.0 | 100.0% |
| Group quarters population | (X) | (X) | (X) |
| Average household size | 2.25 | (X) | 2.60 |
| Average family size | 3.16 | (X) | 3.18 |
| Total housing units | 353,930 | | |
| Occupied housing units | 321,931 | 91.0 | 89.6% |
| Owner-occupied housing units | 123,553 | 38.4 | 67.1% |
| Renter-occupied housing units | 198,378 | 61.6 | 32.9% |
| Vacant housing units | 31,999 | 9.0 | 10.4% |

| Social Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| Population 25 years and over | 576,593 | | |
| High school graduate or higher | (X) | 84.3 | 83.9% |
| Bachelor's degree or higher | (X) | 51.0 | 27.0% |
| Civilian veterans (civilian population 18 years and over) | 34,718 | 5.6 | 11.2% |
| Disability status (population 5 years and over) | 97,648 | 14.2 | 14.3% |
| Foreign born | 270,165 | 37.3 | 12.0% |
| Male, Now married, except separated (population 15 years and over) | 136,477 | 42.8 | 56.4% |
| Female, Now married, except separated (population 15 years and over) | 132,350 | 42.2 | 51.4% |
| Speak a language other than English at home (population 5 years and over) | 317,591 | 46.3 | 18.7% |

| Economic Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| In labor force (population 16 years and over) | 423,321 | 67.6 | 65.9% |
| Mean travel time to work in minutes (workers 16 years and over) | 28.7 | (X) | 24.7 |
| Median household income (in 2004 inflation-adjusted dollars) | 60,031 | (X) | 44,684 |
| Median family income (in 2004 inflation-adjusted dollars) | 68,667 | (X) | 53,692 |
| Per capita income (in 2004 inflation-adjusted dollars) | 39,929 | (X) | 24,020 |
| Families below poverty level | (X) | 7.7 | 10.1% |
| Individuals below poverty level | (X) | 10.2 | 13.1% |

*3/4*

Case 3:08-cv-03429-MMC    Document 2-10    Filed 07/16/2008    Page 10 of 47

| Housing Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| Owner-occupied homes | 123,553 | | |
| Median value (dollars) | 661,904 | (X) | 151,366 |
| Median of selected monthly owner costs | (X) | (X) | |
| With a mortgage (dollars) | 2,472 | (X) | 1,212 |
| Not mortgaged (dollars) | 369 | (X) | 345 |

(X) Not applicable.
Source: U.S. Census Bureau, 2004 American Community Survey

215



## U.S. Census Bureau
### American FactFinder

FACT SHEET

## Santa Clara County, California

**2004 American Community Survey**
**Data Profile Highlights:**

Note: The 2004 American Community Survey universe is limited to the household population and excludes the population living in institutions, college dormitories, and other group quarters.

| General Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| Total population | 1,656,128 | | |
| Male | 841,221 | 50.8 | 48.9% |
| Female | 814,907 | 49.2 | 51.1% |
| Median age (years) | 36.0 | (X) | 36.2 |
| Under 5 years | 129,831 | 7.8 | 7.0% |
| 18 years and over | 1,236,814 | 74.7 | 74.5% |
| 65 years and over | 167,175 | 10.1 | 12.0% |
| One race | 1,599,748 | 96.6 | 98.1% |
| White | 950,541 | 57.4 | 75.6% |
| Black or African American | 39,687 | 2.4 | 12.2% |
| American Indian and Alaska Native | 7,812 | 0.5 | 0.8% |
| Asian | 487,359 | 29.4 | 4.2% |
| Native Hawaiian and Other Pacific Islander | 6,556 | 0.4 | 0.1% |
| Some other race | 107,793 | 6.5 | 5.2% |
| Two or more races | 56,380 | 3.4 | 1.9% |
| Hispanic or Latino (of any race) | 409,408 | 24.7 | 14.2% |
| Household population | 1,656,128 | 100.0 | 100.0% |
| Group quarters population | (X) | (X) | (X) |
| Average household size | 2.93 | (X) | 2.60 |
| Average family size | 3.54 | (X) | 3.18 |
| Total housing units | 600,685 | | |
| Occupied housing units | 564,670 | 94.0 | 89.6% |
| Owner-occupied housing units | 343,633 | 60.9 | 67.1% |
| Renter-occupied housing units | 221,037 | 39.1 | 32.9% |
| Vacant housing units | 36,015 | 6.0 | 10.4% |

| Social Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| Population 25 years and over | 1,110,279 | | |
| High school graduate or higher | (X) | 86.8 | 83.9% |
| Bachelor's degree or higher | (X) | 45.0 | 27.0% |
| Civilian veterans (civilian population 18 years and over) | 86,460 | 7.0 | 11.2% |
| Disability status (population 5 years and over) | 133,977 | 8.8 | 14.3% |
| Foreign born | 620,545 | 37.5 | 12.0% |
| Male, Now married, except separated (population 15 years and over) | 385,187 | 58.6 | 56.4% |
| Female, Now married, except separated (population 15 years and over) | 357,860 | 55.8 | 51.4% |
| Speak a language other than English at home (population 5 years and over) | 750,795 | 49.2 | 18.7% |

| Economic Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| In labor force (population 16 years and over) | 873,997 | 68.4 | 65.9% |
| Mean travel time to work in minutes (workers 16 years and over) | 23.7 | (X) | 24.7 |
| Median household income (in 2004 inflation-adjusted dollars) | 74,509 | (X) | 44,684 |
| Median family income (in 2004 inflation-adjusted dollars) | 85,581 | (X) | 53,692 |
| Per capita income (in 2004 inflation-adjusted dollars) | 35,230 | (X) | 24,020 |
| Families below poverty level | (X) | 6.1 | 10.1% |
| Individuals below poverty level | (X) | 8.7 | 13.1% |

http://factfinder.census.gov/servlet/ACSSAFFFacts?_event=Search&_lang=en&_sse=on&g...    7/4/2006

*316*

| Housing Characteristics - show more >> | Estimate | Percent | U.S. |
|---|---|---|---|
| Owner-occupied homes | 343,633 | | |
| Median value (dollars) | 602,727 | (X) | 151,366 |
| Median of selected monthly owner costs | (X) | (X) | |
| With a mortgage (dollars) | 2,360 | (X) | 1,212 |
| Not mortgaged (dollars) | 433 | (X) | 345 |

(X) Not applicable.
Source: U.S. Census Bureau, 2004 American Community Survey

*317*

# EXHIBIT "B"

318

RICHARD C. NEUHOFF
ATTORNEY
CALIFORNIA STATE BAR NO. 54215
----------------
(860) 229-0433
FAX: (860) 348-1942

11 FRANKLIN SQUARE
NEW BRITAIN, CONNECTICUT 06051

## CONFIDENTIAL & PRIVILEGED ATTORNEY-CLIENT COMMUNICATION

October 17, 2006

Mr. Michael Johnson, #F06081
P.O. Box 8103
CMC West 1-4-37U
San Luis Obispo, CA 93403-8103

Dear Michael,

This is just a short note to let you know that I will not be raising the "lesser included offense" issue that you have mentioned to me. The reason the issue will not be raised is that you waived all lesser included offenses at your trial. I enclose copies of the relevant pages of the Reporter's Transcript. (5 RT 817-818.)

Take care.

Sincerely,

Richard C. Neuhoff

319

to raise to the Court are really more appropriately considered by a Court under the standards of 654 of the Penal Code as it relates to if there is conviction of this case subsequent issues of punishment not in terms of instructing the jury.

They are separate offenses, there are separate elements to these offenses, it's not a singular offense that's being tried under dual theories, so respectfully 17.03 will not be given to the jury. All right. As it relates to those issues then on instructions other than what has been stated here on the record we agreed and settled on these proposed instructions, counsel, is that correct?

MR. CHASE: Yes.

MS. FORD: We are, except I do think there needs to be a waiver with respect to any lesser instructions.

THE COURT: We will get to that. Now it was discussed yesterday as a matter of trial tactics, given the status of the evidence and the defense theories to the case that there was not going to be any request for any lesser included instructions, is that correct, Mr. Chase?

MR. CHASE: That is correct, Your Honor. Mr. Johnson is taking the position that he is innocent of any wrongdoing. I believe that the state of the evidence is such that the jury should render a verdict of not guilty, if they can't decide what happened and to give them kind of an out of a lesser included I believe would be a mistake. So

SONIA KOLOKOURIS RISTING, CSR 6678

*320*

tactically, I am not requesting any lesser included offenses.

      THE COURT:  Do you understand that, Mr. Johnson, and do you agree with that?

      THE DEFENDANT:  Yes, yes.

      THE COURT:  Anything further in that regard?

      MS. FORD:  No.  I guess that the lessers would be substantive crimes as well as the lesser related special allegation for great bodily injury in a domestic violence versus non domestic violence setting.  The evidence clearly establishes this was a domestic violence setting.  I just wanted to make it clear there were lessers as to substantive crimes as well as special allegations.

      THE COURT:  That is correct, you are correct, there are.  You are waiving on that based on tactical aspects here and the defense theory of the case?

      MR. CHASE:  Yes, Your Honor.

      THE COURT:  Then as it relates to the verdict forms, have those questionnaires been completed now, Ms. Ford?

      MS. FORD:  They have.

      MR. CHASE:  That's fine, they are fine, Your Honor.

      THE COURT:  Have those in.

      MS. FORD:  In addition to the verdict forms, I have provided counsel or shown counsel the charts I intend

1    inflicted.  However, if an injury is inflicted it may be

2    considered in connection with the other evidence in

3    determining whether an assault was committed.  A necessary

4    element of an assault is that the person committing the

5    assault had the present ability to apply physical force to a

6    person of another.

7              This means that at the time of the act which by

8    its nature would probably and directly result in the

9    application of physical force upon the person of another,

10   the perpetrator of the act must have the physical means to

11   accomplish that result.  If there is this ability, present

12   ability exists even if there is no injury.

13             The defendant is accused in Count II of having

14   violated Section 273.5 subdivision (a) of the Penal Code, a

15   crime.  Every person who willfully inflicts upon a person

16   who is a former co-habitant corporal injury resulting in a

17   traumatic condition is guilty of violation of Section 243.5

18   subdivision (a) of the Penal Code, a crime.

19             Corporal injury means bodily injury.  The word

20   willfully as used in this instruction means a purpose or

21   willingness to commit the act that results in corporal

22   injury.  The word, inflicts, as used in this instruction

23   means that the corporal injury results from a direct

24   application of force by the perpetrator upon the victim.

25             A traumatic condition is a condition of the body

26   such as a wound, external or internal injury, whether of a

SONIA KOLOKOURIS RISTING, CSR 6678

*322*

# EXHIBIT "C"

*323*

1  LAW OFFICE OF STEVEN A. CHASE
    STATE BAR NO. 50274
2  421 Grand Avenue, Suite A
    South San Francisco, California 94080-3635
3  Telephone:  650 589-6990
    Fax:       650 589-3980
4  Attorney for: Michael Tyrone Johnson

5

6

7

8       **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                  **COUNTY OF SAN MATEO**

10

11  THE PEOPLE OF THE STATE OF CALIFORNIA,)

12              **Plaintiff,**      )  **CASE NO. SC58720(a)**

13  vs.                     )  **NOTICE OF MOTION FOR NEW TRIAL
                                AND POINTS AND AUTHORITIES**

14  MICHAEL TYRONE JOHNSON,    )

15             **Defendant.**    )  **DATE: 12-06-05
                                   TIME: 8:45 a.m.
                                   DEPT: 24**

16  TO THE DISTRICT ATTORNEY OF SAN MATEO COUNTY AND DEPUTY DISTRICT

17  ATTORNEY CHRISTINE FORD:

18       PLEASE TAKE NOTICE that on 06 December 2005 at the hour of 8:45 a.m. in Department 24

19  of the above entitled court, defendant Michael Tyrone Johnson shall make a motion for a new trial, or in

20  the alternative to enter an acquittal of counts one and two of the information.

21       Said motion shall be based on the transcript of the testimony of Doctor Terry Fotre, the points

22  and authorities filed herewith, and such other and further evidence or discussion as the court may

23  require.

24  Dated: 05 November 2005

25

26

27                       STEVEN A. CHASE, Attorney for
                       Michael Tyrone Johnson

28  ////

NOTICE OF MOTION FOR NEW TRIAL, ETC.

324

1

I.

2   **A NEW TRIAL SHALL BE GRANTED WHERE THE COURT**
    **HAS ERRED IN THE DECISION OF ANY QUESTION OF**
3   **LAW ARISING DURING THE COURSE OF THE TRIAL.**
    **PENAL CODE §1181(5)**

4

5       Penal Code §1181(5) provides that a defendant may be granted a new trial when the Court has

6   made an error of law during the course of the trial.   The court has made such an error in this case, and

7   this error prevented the defendant from presenting crucial evidence which would have proven that the

8   complaining witness' claimed memory of the event was not valid, and was the result of either

9   confabulation (as defined by both the prosecution and defense expert witnesses, Dr. Jose Maldonado and

10  Dr. James Missett, respectively), or a lie.  It is likely that, with this testimony, the defendant would have

11  been acquitted of the charges against him.

12      When Dr. Terry Fotre testified during the trial, he explained that the bilateral redness on the

13  eyelids of Paolina Lara Gutierrez (alternately called Pauline Lara during the trial), as demonstrated in

14  People's exhibit 2 in evidence, was possibly the result of a seizure.  When defense counsel attempted to

15  elicit testimony from the doctor about whether the confused and combative state of Ms. Lara-Gutierrez

16  could have been the result of a seizure, the prosecution objected and the court sustained the objection,

17  stating "there is no evidence of a seizure."  By making this ruling, the court foreclosed Dr. Fotre from

18  accurately stating that these conditions were medically indications of a postictal state, which is the state

19  of a person following a seizure.  In other words, this was circumstantial evidence that the person had

20  suffered a seizure after she fractured her skull.  During the closing argument of counsel, after objection

21  of the prosecutor regarding defense counsel's comments about evidence of a seizure, the court

22  admonished that "there was no evidence of a seizure."  The Court's ruling was incorrect.  The evidence

23  of petechiae on the eyelids was circumstantial evidence of a seizure.  Dr. Fotre did testify that seizure

24  occurs in approximately twenty percent of cases involving serious head blows such as that suffered by

25  the complaining witness.  This writer is informed and believes and thereon alleges that Dr. Fotre would

26  have testified that the combative behavior and confusion displayed by Ms. Lara-Gutierrez when she was

27  brought to the emergency room was evidence of a postictal state precipitated by a seizure.  He would

28  then have testified that a person would be unconscious during a seizure and would have no memory of

NOTICE OF MOTION FOR NEW TRIAL, ETC.

*325*

1   the event. The Court's ruling prevented the defense from presenting this crucial evidence.

2       The instant case presented a most unusual factual situation. No prosecution of the defendant was

3   commenced immediately after the incident because the complaining witness had no memory of the

4   events leading to her injury, and the defendant didn't make any confession or admission of a criminal

5   act. Without her claimed "recovered" memory, it's unlikely the prosecution would have proceeded to

6   prosecute this case. Therefore, the issue of the this so called recovered memory was crucial to their case.

7   Defendant was most probably convicted on the strength of the testimony of Cristen Marcos, whose

8   testimony was admitted under Evidence Code §1109. Defendant also asserts that admission of this

9   evidence in light of the entire case, and for the reasons argued in his pretrial motion, was another error of

10   law requiring a new trial.

11       Defendant incorporates his motion *in limine* entitled "Motion *In Limine* re: Use of Prior Bad Acts

12   Under Evidence Code §§1109 and 1101. The primary thrust of that motion was the remoteness of this

13   prior act, and the fact that it was beyond the ten year washout period under §1109. The Court ruled, after

14   that motion, that the evidence could come in under both sections. At the conclusion of the trial, after

15   consideration of the evidence presented and the defense theory of the case, the Court ruled that the

16   evidence could only come in under §1109. In the earlier ruling, the Court stated that it believed that the

17   evidence was "highly probative," but didn't mention the prejudicial effect it would have on the

18   defendant's right to a fair trial.

19       The admission of §1109 evidence puts a defendant in a real bind regarding his or her decision to

20   testify in a case. When the issue in a case is whether or not a crime was committed, as opposed to the

21   identity of the perpetrator, prior bad acts against a different alleged victim have a chilling effect on a

22   jury's ability to be fair and impartial. If the defendant is identified as the assailant in each instance

23   (present case and past), if he or she takes the stand and denies both acts, the prosecution argues that he is

24   a most unlucky fellow to be falsely accused twice. If he or she takes the stand and admits the past act,

25   but denies the current one, he or she loses in the eyes of the jury because of the admission of

26   wrongdoing. As the Court knows, in this case, Mr. Johnson had important information to give to a jury,

27   which he sought to have delivered by his mother in the motion filed during the trial under §1240 and

28   §1236 of the Evidence Code. This evidence was that Ms. Lara-Gutierrez' legs were "like tree

NOTICE OF MOTION FOR NEW TRIAL, ETC.

*326*

1  limbs—rigid," when he tried to get her into his car. Stiffening of the legs would be further sign of a

2  seizure which would support defendant's assertion that Ms. Lara-Gutierrez was unconscious as a result

3  of the blow to the head, and wasn't lapsing in and out of consciousness at the scene are argued by the

4  prosecution and evidently embraced by the jury. Failing to allow this testimony and to allow Dr. Fotre to

5  rely on it in forming an opinion was another nail in the judicial coffin of the defendant.

## CONCLUSION

7      The jury in this case was given extraneous information (Cristen Marcos) to bolster a failure of

8  proof. This could have been avoided had the court allowed Dr. Fotre to fully testify about the symptoms

9  and effects of a seizure, and had the defendant's statement to his mother, made after his release on bail,

10  less than 24 hours after this incident been put before the jury. There is no question that Paolina Lara-

11  Gutierrez suffered a seizure. The medical evidence corroborated the hearsay statement of Mr. Johnson

12  to his mother, demonstrating its credibility. Paolina Lara-Gutierrez had no memory of this event. Her

13  current "memory" is the product of confabulation. A potentially innocent man has been convicted

14  because of a sin of his youth, and incorrect application of the laws of evidence. He should be allowed to

15  have a new trial where a jury will be allowed to fairly assess his guilt or innocence.

16  Dated: 5 November 2005

17

18      STEVEN A. CHASE, Attorney for
    Michael Tyrone Johnson

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION FOR NEW TRIAL, ETC.

*327*

1

2                          **DECLARATION OF SERVICE**

3        I, Steven A. Chase, state:

4        I am a citizen of the United States, over eighteen years of age, a resident of the County of San
5   Mateo, State of California, and not a party to the within action; that my business address is:

6        421 Grand Avenue, Suite A, South San Francisco, California 94080-3635

7        That on this date, 5 November 2005, I served the

8            NOTICE OF MOTION FOR NEW TRIAL AND POINTS AND AUTHORITIES

9   by placing a true copy thereof in an envelope addressed to:

10  Christine Ford,  Deputy District Attorney
    Office of the District Attorney
11  400 County Center, 3rd Floor
    Redwood City, CA 94063

12

13  and by then sealing and depositing said envelope, with postage thereon fully prepaid, in the United
14  States Mail at South San Francisco, California.  That there is delivery service by the United States Mail
    at the place so addressed on regular communication by the United States Mail between the place of
15  mailing and the place so addressed.

16  Dated: 11-05-05

17

18

19  _____
    STEVEN A. CHASE

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION FOR NEW TRIAL, ETC.

*328*

329

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION FOUR

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) | |
| Plaintiff and Respondent, | ) ) ) | <u>A112322</u> |
| v. | ) ) | San Mateo County Superior Court No. SC056779 |
| MICHAEL T. JOHNSON, | ) ) | |
| Defendant and Appellant. | ) ) ) | |

## APPELLANT'S OPENING BRIEF

(On appeal from a judgment of the Superior Court of California, in and for the County of San Mateo, the Honorable Stephen M. Hall, Judge.)

\* Richard C. Neuhoff, No. 54215
Barbara A. Zuras, No. 100522
Attorneys at Law
11 Franklin Square
New Britain, CT 06051
tel.: (860) 229-0433
fax: (860) 348-1942

Attorney for Appellant
Michael T. Johnson

\* By appointment of the Court of Appeal under the First District Appellate Project's independent case system

*330*

## STATEMENT OF THE CASE[1]

On February 15, 2005, a complaint was filed in San Mateo Superior Court alleging that appellant Michael T. Johnson committed the following two offenses against "Jane Doe" on or about April 10, 2004:

Count One  assault with a deadly weapon and/or by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), and

Count Two  infliction of corporal injury upon a former cohabitant, resulting in a traumatic condition (§273.5, subd. (a)).

(1 CT 1-3.)

Each count also alleged that in the commission of the offense, appellant personally inflicted great bodily injury under circumstances involving domestic violence. (§ 12022.7, subd. (e); see also § 13700 [defining "domestic violence" and "cohabitant"].)

Preliminary hearing was held on May 19, 2005, and appellant was held to answer as charged. (1 CT 4, 8-84.)

On May 31, 2005, an information was filed, charging the same two counts and enhancements as the complaint and adding a notice of serious felony to each count. (1 CT 5-7, see § 1192.7, subd. (c)(8).) On June 7, appellant was arraigned, pled not guilty, and denied the other allegations. (1 CT 88-89.)

On October 17, 2005, appellant's case was assigned for trial to the Honorable Stephen Hall. Over the next several days, Judge Hall heard and ruled on several motions filed by appellant and the prosecutor. Among other things, the trial court held hearings under Evidence Code section 402 on

---

[1]      Unless specified otherwise, all references in this brief to sections are to the Penal Code, and all references to the Constitution or to constitutional provisions are to the federal Constitution.

*331*

defense motions (1) to exclude the "recovered memory" testimony of the complaining witness (Paolina Lara Gutierrez) and (2) to exclude the admission of evidence of an alleged prior act of domestic violence involving a different woman (Christina Marcos) (see Evid. Code, §§ 1101, 1109). Both of these motions were denied, as were defense motions to admit evidence of text messages that the complaining witness sent to appellant and to preclude the complaining witness from testifying to purported prior acts between her and appellant. (1 CT 157-158, 162-163, 170-171, 1 RT 6-218.)

Jury selection began on October 25 and concluded on October 26, when the jury was given pre-instructions and both sides made opening statements. (1 CT 172-181; 2 RT 219-241.) In addition, the information was amended to insert the name of Paolina Lara Gutierrez in place of "Jane Doe." On October 27, the prosecution offered a plea deal: if appellant would plead guilty to Count One as a non-strike felony, the enhancement allegation and Count Two would be dismissed, and appellant would not be sentenced to state prison. Appellant requested that he be given overnight to consider the offer, but the trial court refused to do so, and the case did not settle. (1 RT 242-245.)

On October 27, the prosecution began its case in chief, and it rested on October 31. (1 CT 182-194; 2 RT 242 - 3 RT 642.) The defense called its first witness on October 31 and rested the following day, when the prosecution put on two rebuttal witnesses. (1 CT 193-194, 2 CT 226-231, 3 RT 642- 4 RT 802.)

On November 2, the trial court modified its previous decision concerning the prior-domestic-violence evidence from Cristen Marcos, ruling that the evidence was admissible only under Evidence Code section 1109 and not under Evidence Code section 1101. (5 RT 812-814.) In addition, appellant waived instructions on necessarily included offenses. (5 RT 817-818.) Thereafter, arguments were presented, instructions were delivered, and

the jury began deliberations. (2 CT 253-255; 5 RT 820-894.) The following day (November 3), the jury returned for further deliberations and, at about 1:40 p.m., returned its verdicts, convicting appellant as charged and finding the enhancement allegations to be true. (2 CT 365-367, 5 RT 903-911.)

On December 6, 2005, the trial court denied appellant's motion for new trial and sentenced him to prison for seven years. (2 CT 391-393; 12/6/05 RT 1-33.[2]) The trial court imposed the middle term of three years on Count Two (§ 273.5) and four years consecutive for the great bodily injury enhancement (§12022.7). Pursuant to section 654, punishment on Count One was stayed. Actual restitution to Ms. Lara was ordered in an amount to be determined, and other restitution and fines were also imposed.

On December 9, 2005, a timely notice of appeal was filed on appellant's behalf. (2 CT 411-415.)

## STATEMENT OF APPEALABILITY

This an appeal from a final judgment of conviction and denial of a motion for new trial pursuant to section 1237, subdivision (a).

## STATEMENT OF FACTS

In the early morning hours of April 10, 2004, appellant brought Paolina Lara Gutierrez into Kaiser Permanente Hospital in South San Francisco. Ms. Lara had suffered a skull fracture, and she had other injuries as well. Appellant was questioned about Lara's injuries and denied having assaulted her. He told police the head injury had occurred when she fell outside her home during an argument. He was arrested and then released.

---

[2]    The reporter's transcript for December 6, 2005 was not numbered consecutively with the previous volumes of transcript and therefore is designated as "RT 12/6/05" followed by the page number in that volume.

*332*

Appellant was not charged with any offense for ten months. Then, in February 2005, Ms. Lara claimed to have recovered a memory that appellant had beaten her on the night she went to the hospital, causing her injuries. Appellant was thereupon arrested and charged with assault.

At trial, the sole issue was whether Ms. Lara's injuries were due to an assault by appellant or to an accidental fall. Ms. Lara testified that she had had no memory of how her injuries occurred until February 2005, when dream-like memories came to her that appellant had beaten her. Medical experts, including Lara's treating physician, testified for both sides on the questions of (1) whether a recovery of memory was possible at all in Lara's situation and whether Lara's "recovered" memory was a true memory or whether it was a lie or a confabulation, and (2) whether Lara's injuries indicated she had been beaten or whether they could be attributed to other, non-criminal causes.

Now, the details.

1.    **Background**

Paolina Lara Gutierrez (the complaining witness) met appellant in 2002, while both were employed at J.C. Penney's Department store; appellant worked in loss prevention, and she was a sales associate. (2 RT 251-253.) Ms. Lara was 17 years old. (2 RT 323.) Lara and appellant began dating in late 2002, and by end of January of 2003, they had been dating for a couple of months. (2 RT 255.) The relationship became serious, and Lara believed at that time that she was in love appellant. (2 RT 254.) Paolina moved in with him and his mother for approximately six months in 2003. (2 RT 255-256.)

Toward the end of the six months, Ms. Lara discovered she had contracted herpes. (2 RT 259-261, 327.) Appellant denied giving her the disease. (2 RT 260.) Lara, however, concluded that appellant was having sex with other women, and within two weeks of being diagnosed, she moved out.

(2 RT 256, 260-261.) She moved to her father's house at 150 Ramona Avenue, South San Francisco. (2 RT 261.) She also spent time with her mother in Los Angeles trying to forget appellant, but she returned to her father's home in November 2003. (2 RT 262-263.) Throughout this separation, Lara continued to talk with appellant by phone and text messages. (2 RT 262-264, 325.)

By the end of 2003, after her father gave his approval to the relationship, Ms. Lara resumed seeing appellant. (2 RT 263.) She felt more committed to him because her father's approval was important to her. (2 RT 263.) Although she and appellant were not working together, they saw each other every day or every other day, and they were sexually intimate in what she regarded as an exclusive dating relationship. (2 RT 264.) However, her father would not let her live with appellant or stay overnight with him, and so Lara continued to live at her father's house, along with her stepmother and three sisters. (2 RT 265-266.) Lara's father imposed a strict curfew of 11:00 p.m. (*Ibid.*)

   2.   **April 9, 2004: The Early Evening**

On April 9, 2004, Ms. Lara knew appellant had other plans for that night. (RT 267.) He told her he was going out with "the guys," but Lara suspected that he was looking to meet other women. (2 RT 267.) Lara and a friend, Yessenia Poras, decided to go to TGI Friday's restaurant for dinner. (2 RT 266 -267, 291.) At the restaurant, Lara saw appellant with a couple of men and one female. (2 RT 268.) She did not recognize the men or the woman. (2 RT 268.) Based on her observations of the way appellant was acting with the woman, Paolina was "bothered" and "suspicious" and left the restaurant. (2 RT 268-269.) At trial, Lara testified she left without talking to appellant. (2 RT 269.) However, on February 11, 2005, shortly after she purportedly "recovered" her memory of the subsequent events of that night,

Lara told an officer that appellant had stopped her at the door as she was leaving. (3 RT 555.) At trial, Lara denied both that this encounter with appellant took place and that she had told the officer that it had. (2 RT 332.)

After Ms. Lara departed, appellant sent her a text message asking her why she left without saying hello. (2 RT 270.) Lara responded by text message that she had seen appellant with another woman and that he appeared to be happy with that woman. (2 RT 270.) Appellant replied (by text message) by asking Lara to return to the restaurant and to show him the other woman she was referring to, and adding that he was not with another woman, that he was just with the guys, and that he wanted to talk to her. (2 RT 270-272.) Lara was upset and did not want to talk to him. (RT 271-272.) She and Yessenia went to dinner at Chili's in San Bruno, during which time appellant kept text messaging her.[3] (2 RT 271.)

At about 11 p.m., Yessenia dropped Ms. Lara off at her father's home. (2 RT 272.) Lara went upstairs and went to bed. (2 RT 272.)

### 3.    April 10, 2004 at 2:00 - 9:30 a.m.:  Ms. Lara Arrives At The Hospital And Is Treated

At 2:00 a.m. on April 10 — about three hours after Yessenia Porras had dropped Ms. Lara off at her father's house — a man carried Lara into Kaiser Permanente Hospital in South San Francisco. (2 RT 375.) The man told Bessie Sandoval, the EMT on duty that night, that Ms. Lara had tripped backwards, and Sandoval recorded the medical diagnosis as "head laceration after a fall." (2 RT 382, 388-389.) Ms. Sandoval believed that the man

---

[3]    Ms. Lara's companion Yessenia Poras testified that Ms. Lara and appellant sent text messages to each other during dinner at Chili's. (3 RT 638-639.)

apparently did not stay long because he could not be located when the staff needed information that they could not get from Lara.[4] (2 RT 382, 391.)

Ms. Lara had blood dripping from her hair. (2 RT 376-377.) Ms. Sandoval (the EMT) wanted to put Lara on a gurney to stabilize her neck because there was concern about a neck fracture, but Lara was combative, and it took a bit of time for hospital staff to get her onto the gurney. (2 RT 377-378.) Lara resisted when staff tried to put a cervical collar on her; she moved around and tried to take it off; she resisted the cuff that measured her vitals; and Sandoval had a hard time starting an IV line. (2 RT 378-379.) Because of her combative state, Lara may have been restrained, probably by being strapped to the gurney. (2 RT 378.)

Ms. Lara had suffered a skull fracture and was in an "altered state," meaning that she was not very oriented to being cooperative or to knowing what was going on. (2 RT 380.) She was slipping in and out of consciousness. (2 RT 385.)

At about 9:30 a.m., Ms. Lara was examined by Dr. Cecil Jun, a neurosurgeon. (2 RT 395-399.) Lara was not alert and was confused, but she was responsive to Dr. Jun's efforts to examine her. (2 RT 402.) Jun determined that Lara had suffered a skull fracture on the right side of her head towards the back of the head, what is called a "linear fracture in the occipital area." (2 RT 399.) Such a fracture heals on its own but can take several months to do so. (2 RT 401.) No surgery is necessary, and the brain or head is not vulnerable during the healing period. (*Ibid.*)

Dr. Jun saw bruising of Ms. Lara's eye lids, and he saw blood tracking behind the right ear. (2 RT 403.) Jun opined that the bruising was not the

---

[4]     It bears noting, however, that appellant was in the hospital waiting room not long after police arrived at 6:30 a.m. (3 RT 529, 534; see discussion, *post.*)

*334*

result of the skull fracture and could be consistent with direct trauma to the eyes, but the blood tracking was consistent with the skull fracture and accompanying laceration. (2 RT 403, 408.) Although trauma patients are a minority of the patients Dr. Jun sees, he testified initially that he felt Lara's skull fracture was unusually severe for a mere slip and fall, but thereafter he stated that such a head fracture would be consistent with a person falling without breaking his or her fall and striking a concrete curb or roadway. (2 RT 404, 413-414.)

Ms. Lara also had injuries to her back shoulder, left shoulder to her right wrist and fingers, to her left elbow and fingers, and to her feet (bruising on the top of her right foot and near her left ankle), and Dr. Jun felt that these injuries were more extensive than one would expect from a slip and fall. (2 RT 413, 4 RT 717.) She also had a bruise to the right wrist, abrasions on her elbow and hand, a bruise behind the right ear, redness of the eyelids, a "raccoon sign" or discoloration of the lower eyelids, toward the nose, and bleeding into the eyeball. (4 RT 717, 719, 721, 727.)

### 4.    April 10, 2004: Officer MacHale Comes to the Hospital

At about 6:30 a.m. on April 10 (about 4 hours after Ms. Lara's arrival at Kaiser Hospital), South San Francisco Police Officer Bart MacHale was dispatched to the hospital, where he talked with Ms. Sandoval. (3 RT 529.) MacHale testified that Sandoval told him (1) that Lara had said that appellant had thrown something at her head causing her injury and (2) that Sandoval

also heard Lara tell appellant, "Baby I forgive you, I'll be a good girl."[5]  (3 RT 532-533.)

Officer MacHale was not able to see Ms. Lara, but he did talk to appellant, who in the waiting room. (2 RT 534.) Appellant had dried blood on his sleeve, his right hand, and his shoe. (*Ibid.*) MacHale brought appellant to the South San Francisco police department, where they talked for approximately one hour about Lara's injuries. (*Ibid.*) Appellant was very cooperative. (2 RT 556.) MacHale found blood on the front passenger seat of appellant's car. (2 RT 536.)

Officer Dexter Lawley looked for physical evidence around the South San Francisco home of Ms. Lara's father. (2 RT 590-591.) He found several droplets of blood on the asphalt about 80 feet from the house, a few feet from the curb line. (RT 593-595.) The blood was never tested to determine whose blood it was.[6]  (RT 600.)

5.   **April 18, 2004:  Officer MacHale Interviews Ms. Lara the First Time**

Ms. Lara remained in the hospital for a week. (2 RT 356, 3 RT 604, 611.) On April 18, Officer MacHale interviewed Ms. Lara at her father's home in South San Francisco, but she was unable to tell him what caused the injuries she suffered. (RT 540-542.) Lara told him that she and appellant had

---

[5]     At trial, Ms. Sandoval did not remember what Ms. Lara said that night, and no statements by Lara were recorded in the medical records. However, when Sandoval was shown Officer MacHale's report indicating that she had told MacHale that Lara had stated "Baby, I forgive you, I'll be a good girl," Sandoval testified that she would have given the police an accurate account of what she heard.  (2 RT 386.) Sandoval did not know whether or not Lara's statement was the result of her confused state. (RT 390.)

[6]     Apparently, Ms. Lara's dog was hit by a car that night, and there was blood inside the house; when the police went in the house they found the dog barking and bleeding. (3 RT 599.) No testing was conducted to discover whether the blood in the house belonged to Ms. Lara or the dog. (3 RT 600.)

335

had an argument that night but never a physical altercation and that appellant had talked to her at the door as she was leaving TGI Friday's restaurant. (3 RT 555.) Lara also told MacHale that there had never been any evidence of violence in her relationship with appellant. (3 RT 345.)

6. **Events at Home Leading to the April 22, 2004 Restraining Order**

While still at the hospital, Ms. Lara had complained to her stepmother, Yadira Lara, that she could not see well and that she had terrible headaches. (3 RT 612.) After a while Lara's vision improved, but she had difficulty standing and walking, and she had problems with her hearing. (3 RT 613.) Lara told her family she had no memory of what happened on the night of her injuries. (3 RT 614-615.)

At trial, Ms. Lara testified that she did not remember in April how she sustained the injuries that led to her admission to the hospital. (2 RT 300-301.) She testified that the only events she recalled were being out with Yessenia Porras, seeing appellant with another woman, and going back home. (2 RT 301.) Lara's parents expressed their opinion that it was appellant who "did this" to her. (*Ibid.*) According to Lara, she did not believe them because she did not think appellant was capable of hurting her that way.[7] (*Ibid.*) Nevertheless, Lara's father prompted her to get a restraining order against appellant, and an order was obtained on April 22, 12 days after her admission to the hospital. (2 RT 302-303.) Lara testified that she obtained the order because her father was concerned about her safety and she wanted to respect that. (2 RT 304.) Lara could not describe the assault on the application for

---

[7] Ms. Lara told the police that she did not think appellant would do something like this to her because he had never done violence to her in the past, "[n]ot to the point where he could kill" her. (2 RT 347.) Appellant had never bruised her, never slapped her, never broken any of her bones, nor bloodied her nose or lip. (*Ibid.*)

the restraining order, and instead she had the application filled out with her father's opinion that the police shared with her.  (2 RT 303-304.)

### 7.     April 24, 2004: Officer MacHale Interviews Ms. Lara Again

Officer MacHale interviewed Ms. Lara again on April 24, and she again stated she did not have a memory of the injury-causing event.  (2 RT 542.)

### 8.     April 27, 2004: Ms. Lara Is Examined by Dr. Jun

On April 27, Ms. Lara was examined by Dr. Jun.  She complained of hearing loss, which was caused by blood behind the right eardrum resulting from the fracture or trauma to that area.  (2 RT 408.)  Lara complained about difficulty with her blurry vision, but not blindness, and Jun had her read something for him.  (2 RT 408-409, 415.)  Lara also complained that she had lost the sense of smell.  (2 RT 409.)

At trial, Dr. Jun testified that, although he did not make a notation about it in her records, Ms. Lara told him during this visit that she had recovered her memory of the night of her injury.  (2 RT 410.)  Jun testified that he remembered Lara's statement because he thought it unusual that she would have regained her memory when she had amnesia immediately after the events that caused her injuries.  (2 RT 410-412.)  Jun testified that Lara likely lost consciousness from a severe concussion, and he would not have expected her to remember the events immediately preceding the loss of consciousness.  (2 RT 410-411.)  In such cases as Lara's, patients never get back their memory.  (*Ibid.*)  Dr. Jun testified that the neurosurgical community believes it is impossible for someone who has retrograde amnesia to recover her memory.  (2 RT 421.)  Jun testified that if Lara did tell him she recalled what happened, he probably told her that he did not think she would ever regain her memory.  (2 RT 423.)

Officer MacHale spoke to Dr. Jun later that same day.  According to MacHale, Dr. Jun told him that due to the severity of Ms. Lara's injuries, she

would never regain her memory. (3 RT 544-545, 551.) Jun did not tell MacHale that Lara had claimed to have recovered her memory. (3 RT 545.)

At trial, Ms. Lara denied telling Dr. Jun that she had regained her memory. (4 RT 784.) She testified she asked Jun what she could do to recall the injury-causing event. (4 RT 783-784.) Lara also denied telling a Dr. Andrew Oh on December 2, 204, that she recalled how the injury occurred. (4 RT 785.)

9. **May - November, 2004: Ms. Lara Resumes Her Relationship with Appellant and Withdraws the Restraining Order**

Despite her father's suspicion that appellant had assaulted her, Ms. Lara continued to have contact with him. (2 RT 304-305.) She testified that appellant called her the first night she was home from the hospital, and she continued talking with him every day, although she did not tell her parents. (2 RT 306-308.) Lara testified that she believed the first time she saw appellant following her hospitalization was at work and that she returned to work after three or four months. (2 RT 305, 308.) However, Lara also testified that she saw appellant on his birthday, May 28, at his home and that this was probably the second time she had seen him. (2 RT 308-309.) Lara testified was shaking on that night but did not know why. (2 RT 309.)

At some point, Ms. Lara confronted appellant about the cause of her injuries. (2 RT 307.) Appellant told her that they had been arguing about "the girl" and that she had slipped and fallen backwards and that her head had hit the concrete. (*Ibid.*) Appellant denied that he had assaulted her; Lara believed him. (*Ibid.*) Although she still cared for him, Lara testified that she did not love him as she had before her injuries. (2 RT 308.) She was always questioning him about her injuries and how she sustained them, and while the police continued to contact her, she did not want to be involved in a police investigation because she believed appellant. (2 RT 309.) Appellant told her

that he had a witness to the cause of her injuries, but he never named the witness. (2 RT 309-310.)

In November 2004, Ms. Lara withdrew the restraining order. (2 RT 310-311.) She did so at appellant's request. (2 RT 311.) Appellant wanted to become a police officer, and the restraining order would be an impediment to achieving that. (*Ibid.*) Since Lara believed appellant's version of how she sustained her injuries, she had no reason to have the restraining order. (*Ibid.*) In asking that the restraining order be withdrawn, Lara provided reasons in her own handwriting on the application based on what appellant was telling her about her injuries: that they were the result of an accident, that the bruises on her body were due to the restraints placed on her at the hospital, and that her father's suspicions and his dislike for appellant were the reasons for obtaining the order in the first place. (2 RT 312, 349.)

In the application to withdraw the restraining order, Ms. Lara stated that she now remembered what had happened, that appellant had not hurt her, and knowing this, she wanted the order lifted. (2 RT 349.) At trial, Lara claimed that she did not realize that she was submitting the application under a penalty of perjury; in fact, she claimed she did not understand what "under penalty of perjury" meant. (2 RT 312-313.) She denied that she was motivated by a desire to be romantically involved with appellant; she was not hoping they would be a couple again. (2 RT 313.) She testified she believed appellant because he was the last person she had been with on the night she sustained the injuries. (*Ibid.*) Lara did not tell her parents that she had withdrawn the restraining order. (2 RT 313-314.)

Joseph Gerrans was the loss prevention manager at the J.C. Penney's store where appellant was employed, and in November 2004, Gerrans saw Lara come to his office (where appellant worked). (4 RT 766-767.) Gerrans overheard Lara tell appellant that she wanted to lift the restraining order

*337*

because she remembered that the incident causing her injuries was an accident and had not been appellant's fault. (4 RT 767-769.) Gerrans recalled this occurred in November because the store was putting up Christmas displays. (4 RT 770.) Lara sounded remorseful. (4 RT 772.) Gerrans made a note about the overheard conversation, but he had failed to tell the defense investigator about it because when the investigator called, he was working and did not look at his notes. (4 RT 777-778.)

The restraining order was lifted on January 7, 2005. (4 RT 798.)

### 10.    <u>In the Meantime</u>

After coming home from the hospital, Ms. Lara told her dinner companion Yessenia Poras that she could not remember how she had suffered her injuries. (3 RT 633-634.) Ms. Poras testified that for months, Lara could not recall what had happened except that she remembered coming home. (*Ibid.*)

Ms. Lara testified that before she regained her memory, friends, neighbors, and family were telling her that it was a case of domestic violence, which "kind of" made sense. (RT 785-786.)

### 11.    <u>February 8 - 11, 2005:  Ms. Lara "Recovers" Her Memory and Goes to the Police</u>

Despite believing appellant's version about what had happened to her, Ms. Lara wanted to remember herself what had happened. (2 RT 314.) She asked her doctor for medicine to help her recall. (*Ibid.*)

According to Ms. Lara, she spent time with a friend named Mabel on February 8, 2005. (2 RT 315.) Mabel questioned Lara about how she obtained her injuries, and Lara told her she could not remember. (2 RT 315-

316.) Mabel continued to question Lara, and when Lara could not answer, she felt useless.[8]  (2 RT 316.)

Ms. Lara went home because she was tired and needed a nap.  (*Ibid.*) She slept for about 30 or 40 minutes and woke up and started to see little images of what happened on the night her injuries occurred. (2 RT 317.) The images came "like a dream," but she was awake. (*Ibid.*) What she saw was an assault by appellant. (*Ibid.*) Lara had believed appellant, and she felt like a fool, but remembering made her feel sadness, anger and confusion. (2 RT 318.)

Ms. Lara called her friend Yessenia Poras and told her what she now remembered and that she had decided to tell the police. (2 RT 318-319, 3 RT 634-635.) Lara went to the police station and attempted to speak to Officer MacHale, but he was off duty. (2 RT 319.) She returned to the station on February 11 and was interview by Detective Neary and Officer MacHale. (2 RT 319, 3 RT 546-547.) Lara described for them the images of the assault she recalled. (2 RT 321, 3 RT 547.) Among the things that Lara told the officers was that after the assault, appellant picked her up and put her in his car and that he dragged her by her ankles to the car. (3 RT 549-550.)

Around the time of the appearance of these images, Ms. Lara and appellant were talking regularly and dating and engaging in sexual relations, but they were arguing every day, and there was some emotional distance on her part. (2 RT 320.) According to Lara, they argued about what happened on the night of her injuries, about appellant lying over little things, and about other women. (*Ibid.*) Lara did not trust appellant but "didn't mind" because she was "not serious" about him. (3 RT 320-321.) Appellant took a trip to the Super Bowl in Florida and said he was going with his father and uncle. (2 RT 321.) Lara suspected that appellant was going with another woman, and "[i]t

---

[8]      Mabel did not testify at trial, nor was she identified by surname.

*338*

bothered me in a way." (*Ibid.*) Lara testified that when she made her new statement to the police, she was telling the truth and was not motivated by anger or suspicions. (2 RT 321-322.)[9]

12.    **February 11, 2005: Appellant Is Interviewed by the Police**

On the same day that Ms. Lara had arrived with her "recovered" memories, Detective Neary and Officer MacHale arrested appellant and then interviewed him and recorded the interview on videotape. (3 RT 547, 560; 1 CT 208.) A transcript of the interview was provided for the jury while the recording of the interview was played, but the transcript was not allowed in the jury room during deliberations (3 RT 565, CT 208-225.)

In the interview, appellant stated that he was at TGI Friday's on a guys' night out and that, before he went there, he had stopped by Ms. Lara's house. (CT 211.) Lara and her friend Yessenia were also going to the restaurant. (*Ibid.*) Appellant was with his friends at the bar when he saw that Lara and Yessenia had come in and sit at a table. (*Ibid.*) Appellant continued to converse and laugh with his friends when he noticed that Yessenia and Lara were leaving. (*Ibid.*) Appellant also noticed that Lara had sent him a text message saying, "Have fun with those girls." (*Ibid.*) After Detective Neary acknowledged that Lara had told him that she had sent that message, appellant

---

9        Ms. Lara admitted that throughout her relationship with appellant, she had a problem with appellant's infidelity. (2 RT 350.) It made her angry when he would come home late with no explanation, and even though she knew he worked nights in security, she had the feeling he was cheating on her. (2 RT 351.) Lara claimed that she was not upset when appellant was delayed in returning from the Super Bowl because she knew delays were normal, but she had a feeling he was with someone else. (2 RT 352.) She knew that he was "single," and she was not with him emotionally, but she was still sexually intimate with him. (2 RT 353.) Lara testified that she had broken up with appellant many times since the start of the relationship and that it had always been due to her belief that he was seeing other women and that he had gotten herpes from some other woman and given it to her. (2 RT 368-369.)

related that Lara kept sending him text messages indicating that she was upset. (CT 212.) Because he and Paolina had promised each other that they would never go to bed upset at one another, appellant went home to change his clothes. (*Ibid.*)

Appellant picked up a co-worker, Patricia Rico, who was going through a personal problem, and then drove to Ms. Lara's house to talk to her and calm her down. (CT 212.) Meanwhile, Lara had continued to send him text messages indicating that she was still very upset. (*Ibid.*) At Lara's house, appellant sent her a text message indicating that he wanted her to come outside so they can talk and that if she didn't, he would kick in the door. (CT 213.) Ms. Lara came outside, and appellant told her that he loved her but that she had to stop being upset about nothing. (*Ibid.*) Lara replied she did not want to talk with him, and the two started walking down the street until they reached a street lamp, where they sat down on the curb. (*Ibid.*)

They argued more, and then Ms. Lara grabbed appellant's sweat top and started jerking back and forth, saying, "You're just like my father." (*Ibid.*) Lara repeated that statement three or four times and then lost her grip on his sweatshirt and fell back. (CT 213-214.) Appellant dropped down and put his hand on her head and felt blood. (CT 214.) He jumped back, and his left foot slid forward, getting blood on the side of his tennis shoe. (*Ibid.*) Appellant then tried to pick Lara up, but her clothing was loose. (*Ibid.*) At this point, Patricia Rico, the co-worker, jumped out of appellant's car. (*Ibid.*) Appellant could barely carry Lara because of her baggy sweats, and he was trying not to hurt her. (CT 215.) He pulled and dragged her, he tried to pick her up, and he bruised her arm from trying to carry her. (*Ibid.*) She was like a dead weight, and that fact, along with the emotional state appellant was in, all

*339*

combined to make it difficult to move her even though she weighed little.[10] (CT 225.) After getting Ms. Lara into the car, he rushed her to the hospital and carried her inside, where she was lightly strapped to a table. (CT 225, 216.)

Appellant strenuously denied that he had anything to do with Ms. Lara's injuries. (CT 216.) Appellant stated that Lara's accusations against him were due to the fact that she was "pissed" and upset with him and that she was going through a lot of problems and blamed him. (CT 220.) Appellant stated that Lara had been kicked out of her house and that she did not like her job. (*Ibid.*)

### 13.    Ms. Lara's "Recovered" Memory, According to Her Trial Testimony

At trial, Ms. Lara testified to two bad acts by appellant toward her, one being the charged offense from April 10, 2004, and the other allegedly occurring in 2003 and admitted over defense objection under Evidence Code section 1109.

### a.    The 2003 Incident

As noted earlier, when she spoke with Officer MacHale on April 18, 2004, Ms. Lara stated that there had never been any evidence of violence in her relationship with appellant. (2 RT 345-346.) At trial, however, she claimed there had been an incident a year earlier. (2 RT 259.) Although her testimony initially suggested she had told MacHale about this incident, she subsequently conceded that she had not. (2 RT 345-346.)

According to Ms. Lara's trial testimony, the incident occurred early in 2003, while she and appellant were living together. They had an argument during which appellant, in Lara's words, "was going to take me out of his

---

[10]    The evidence was that Ms. Lara was 4'9" tall and weighed about 95 pounds. (2 RT 252.)

house." (2 RT 256.) Lara said appellant wanted her to leave his home, and to that end, he grabbed her clothes and held them high in the air so that she could not reach them. (2 RT 256.) She started jumping up to reach the clothes, and appellant grabbed her by the back of the neck and pushed her down toward the ground or pushed her away, not hard, but just enough to stop her from jumping. (2 RT 257, 326.) Lara was not injured but was frightened a little bit. (2 RT 258, 326.) Appellant threw her clothes out the front door and shut her out. (2 RT 258.) Then, he opened the door, told her she could get the rest of her clothes later at the clubhouse, and shut the door again. (*Ibid.*) When Lara started to cry, appellant came back out and apologized, she accepted his apology, and the two talked over their dispute; she continued to live with him. (2 RT 258-259.) Lara did not call the police about that incident, nor did she tell her parents about it.[11] (RT 259.)

b.    **The Charged Offense**

After coming home from Chili's Restaurant, Ms. Lara got ready for bed, putting on a blue sweatsuit. (2 RT 272-273.) She and appellant were exchanged text messages every 10 to 20 minutes. (2 RT 333-334.) Appellant was also calling her, but she would not answer or would hang up. (2 RT 334.)

Around 12 or 1 a.m., Ms. Lara received a text message from appellant saying that he wanted to talk to her. (2 RT 273.) She responded that she did not want to talk about it, that there was nothing else to talk about. (2 RT 274.)

---

[11]    Reva Johnson Hall, appellant's mother, testified as a defense witness that Ms. Lara moved into their home after Mrs. Hall's mother died in February 2003. (4 RT 730-731.) In April, Lara moved out after an incident between herself and appellant, but she returned two days later. (4 RT 731-732.) Lara left because she was not happy that appellant had purchased a new car on April 25. (4 RT 732.) Hall testified that she saw appellant carry Lara's clothes out to her car, and then Lara drove away. (*Ibid.*) Hall did not see appellant push Lara, but she did observe Lara push appellant. (4 RT 733-734.) Lara came back in two days and stayed under after her final examinations in May. (4 RT 731.)

*340*

She then received a message from appellant stating that he was outside her house, that he wanted her to come out, and that he did not care if she called the police or if he woke up her father, and saying something to the effect that he would knock the door out if she did not come out and talk to him. (2 RT 274.) Lara was not frightened by the message because it was not the first time he had sent her that type of message. (2 RT 274.)

Ms. Lara went outside because she did not want appellant to wake up her parents or sisters. (2 RT 274-275.) At trial, Lara testified she did not remember exactly what was said, but her conversation was about the woman she had seen him with. (2 RT 276.) She testified that she wanted to break up with appellant but that she could not recall whether she told him. (*Ibid.*)

At any rate, their argument "became heated." (2 RT 276.) According to her testimony, Ms. Lara attempted to turn around and walk back inside, but appellant grabbed her by her head and pulled her down. (2 RT 277.) She was unable to put her hands on the ground, and appellant pushed her, and his "leg was in front so I got tripped." (*Ibid.*) Appellant had one hand on the side of her head, and the other hand was holding her arm. (*Ibid.*) Appellant pushed her head down to the "ground hard." (2 RT 278.)

In her trial testimony, Ms. Lara described having an image of appellant kicking her stomach a couple of times. (2 RT 279.) She testified she tried to cover her head because appellant "was going to kick my face." (*Ibid.*) Appellant then stepped on her, near her face but "more on my hand," and then he stepped on the right side of her face. (2 RT 280.) The side of her head was already against the ground, and the force of appellant stepping on her "wasn't as hard" as he could step, though it was painful. (*Ibid.*) Lara testified that she recalled only being able to see shadows just little things that happened, and that she could not see the whole thing or hear what appellant was saying or whether she said anything to him. (2 RT 283.)

Ms. Lara then saw appellant go to his car and drive towards her. (2 RT 281.) Her body was in "a little ball," and she could not move and "wasn't really alert." (2 RT 281-282.) Appellant picked her up; initially her testimony was that he put her into his car, but then she testified he "threw" her in. (2 RT 282, 283-284.) Appellant used both of his hands in sort of a scooping motion, putting his hands underneath her. (2 RT 283-284.) She denied that he dragged *pts.* her to the car. (RT 284.) Lara testified that once inside the car, she felt appellant's hand on her head holding it in a way so she would not move forward or side ways. (2 RT 286.)

Ms. Lara testified that her next memory was of waking up in the hospital, with doctors and nurses holding her head, feet, and hands. (2 RT 287-288.) She said she was unable to see, but she heard them talking and could feel hands holding her. (2 RT 289.) She felt pain in her feet and her head. (RT 288.) She had no memory of telling the staff that appellant threw ✓ something at her or of saying, "Baby, I forgive you, I'll be a good girl." (2 RT 287.)

Ms. Lara estimated that appellant weighed 220 pounds. (2 RT 284.)

**14.    The Testimony of Co-Worker Patricia Rico**

Patricia Rico worked with appellant for four years and became close friends but never had a dating relationship. (3 RT 585, 586.) Rico testified that appellant called her early on the morning of April 10, 2004, telling her what had happened and indicating to Rico that she needed to make schedule changes because Ms. Lara was not going to be able to come to work. (4 RT 752.) Rico denied that she had witnessed how Lara had been hurt, and she testified that she had not been with appellant on the night of April 9 to 10. (*Ibid.*) Appellant never told Rico to tell the police that she had been at the scene of Lara's injuries; he had simply said that he was going to use her as a character witness. (3 RT 588.)

341

Ms. Rico further testified that in late April of 2004, she overheard a telephone conversation on the speaker phone between appellant and Ms. Lara, in which Lara said that she remembered everything that had happened and that it had been an accident.[12]  (4 RT 756.)

### 15.  Dr. Jose Maldonado:    The Prosecution's "Recovered Memory" Expert

Dr. Jose Maldonado, a neuropsychiatrist from the Stanford University Medical Center, testified as a prosecution expert concerning Ms. Lara's claim of recovered memory.  He had never examined Lara but had reviewed police reports, medical records, and photographs. (3 RT 429, 434.)  In response to the prosecutor's hypothetical question that summarized Ms. Lara's physical injuries and that assumed as true Lara's claim of recovered memory and her testimonial description of the assault, Dr. Maldonado testified that there are two possible explanations for such a recovered memory, a psychological explanation and a physiological or neuropsychological explanation. (3 RT 436.)  Maldonado opined that, assuming Ms. Lara did indeed recover a memory of the injury-causing incident ten months after it occurred, the physiological explanation would more likely account for the recovery. (3 RT 442.)  Maldonado disagreed with Dr. Jun's testimony that a patient who has no memory of a traumatic event within a short time of its occurrence would be unable to regain that memory thereafter. (3 RT 444.)

On cross-examination, Dr. Maldonado admitted that a person who claims to have recovered a memory could also be lying, or the person could be

---

[12]    During cross-examination, Ms. Rico admitted that she had not given this information to the defense investigator or to Detective Neary or the prosecutor.  (4 RT 756-765.)  She said that she spoke to Neary before she heard the conversation.  (4 RT 762.)  Rico also stated that the police officers and the prosecutor did not ask her about the conversation and that when she was interviewed by the defense investigator, the conversation did not come to mind.  (4 RT 759, 765.)

confabulating a memory, that is, plugging in information that was learned after the event and then filling in memory gaps with this information. (4 RT 446-448.) In response to a defense hypothetical question that summarized Ms. Lara's head injuries and that presented her prior statements in which she claimed to have recalled that the injuries had been accidentally sustained, Maldonado opined that Lara was either confabulating an explanation, possibly based on what family members had been telling her, or she was suffering from "battered woman syndrome," in which a woman tends to defend her assailant until it is safer to tell the truth. (4 RT 450-452.) Maldonado further indicated that, if jealously were added to the hypothetical as an possible explanation for the report to the police of an assault, both confabulation and lying would be possibilities, but in medicine, he tended to go with overwhelming physical evidence that Lara suffered significant brain injury and that physiological damage to the brain and subsequent recovery is more likely than not the explanation for her recovered memory. (4 RT 459-460.)

### 16.    Dr. James Missett:  The Defense's "Recovered Memory" Expert

Dr. James Missett, a board certified psychiatrist and deputy chief of Psychiatry Services at Stanford University Hospital, testified as a defense witness concerning Ms. Lara's claim of recovered memory. Dr. Missett, like Dr. Maldonado, had not examined Lara but had reviewed medical records and police reports, and he had also read her preliminary hearing testimony and some investigation reports. (3 RT 656.) He opined that a person suffering Lara's skull fracture would likely lose consciousness and would have no memory of events while unconscious. (3 RT 650-651.) The person might have memory of events prior to in injury, but he could not think of any patient who could recall the injury-causing event. (3 RT 655.)

Dr. Missett opined that, given the severity of Ms. Lara's injuries, her recovered memory could be the result of confabulation or lying or both. (3 RT

*342*

661-662.) He noted that Lara had made contradictory statements regarding whether she had a memory and whether the injury was an accident, and these contradictions created problems for determining which version was accurate and, if inaccurate, whether the inaccuracy was due to lying or to confabulation. (3 RT 662-663.)   Presented with a hypothetical question reflecting Lara's injuries and her various statements, Missett opined that it was impossible to know with certainty which explanation for her recovered memory was correct.  (3 RT 684-685.)

Under cross examination, Dr. Missett stated that if the loss of memory was caused not by the trauma but by being upset, that kind of memory eventually may be recoverable.  (3 RT 699-700.)  Missett opined that the recalled memory is consistent with the physical evidence, the more believable the person's reported memory. (3 RT 700-701.)  However, Missett clarified, where the person remembers some things and not others, he would expect that the story would be consistent.  (3 RT 705.)

### 17.    Dr. Terry Fotre:  Defense Medical Expert

Dr. Terry Fotre, a physician certified in emergency medicine and diplomate of the American Board of Forensic Examiners, testified as a defense witness, primarily concerning the causes of Ms. Lara's injuries but also concerning "recovered" memory.  (4 RT 712-715.)

Dr. Fotre testified that of all patients he had treated for head injuries, none had ever recovered their memory of the injury-causing event after arriving at the hospital with no such memory.  (4 RT 716.)

Dr. Fotre testified that a common sequel of a fractured skull is the possibility of a seizure, though it happens less than 50 percent of the time. (4 RT 718.)  Fotre explained that a seizure can cause spasm, shaking, odd posturing, grunting, straining and a massive discharge of the muscles in the body.  (4 RT 719.)

Dr. Fotre opined that Ms. Lara's injuries were consistent with an accident. (4 RT 726-727.) The redness of her eyelids and the bleeding into the eyeball could have been the result of a sub-conjunctival hematoma; they were indications of increased pressure in the brain that can be caused by a bad cough, pressure on the chest, blows to the chest, grunting, and straining, including straining against restraints while a cervical collar is being attached. (RT 719-720.) Fotre explained that if blows to the eyes were the cause of the redness, he would have expected to see swelling and edema from the blows, which were not evident in the photographs or medical records (4 RT 720, 723-724.)

Dr. Fotre explained that the bruise behind Ms. Lara's ear was the result of blood from the area of the laceration or the fracture in the skull working its way through the deep tissue and showing up in areas where the tissue is thin. (4 RT 720.) If the bruise had been caused by blows, there would have been bruising and discoloration of the pinna of the ear, as it was rammed against the skull (4 RT 720-721.)

Dr. Fotre further testified that the "racoon sign" or discoloration of Ms. Lara's lower eyelids was an indication of the skull fracture. (4 RT 721.) The blood not only travels to behind the ear but also goes to the face, showing up in the soft spongy tissue under the eye where the skin is thin. (*Ibid.*) Fotre could not find any indication of a blunt trauma to the eye area or the front of the head (4 RT 722.)

On cross-examination, Dr. Fotre testified that the abrasion found on Ms. Lara's elbow and hand were consistent with someone falling to the ground. (4 RT 727.) He also testified that the marks on Lara's arm were consistent with someone either grabbing it or hitting it but that the arm appeared to have a fingerprints pattern. (*Ibid.*)

*343*

Finally, Dr. Fotre testified that if someone was trying to pick up an unconscious person, whose muscles would be relaxed, the unconscious person would feel like "dead weight," heavier and more difficult to pick up, like a bag of wet cement. (4 RT 729.)

### 18. Cristen Marcos Testifies to an Alleged Incident of Domestic Violence in January 1994

Cristen Marcos testified that she met appellant in 1992 and dated appellant for two to two-and-one-half years while they were in the Army and stationed in Texas. (3 RT 471-473.) Appellant had his own room in the barracks. (3 RT 476.)

On January 30, 1994, while attending a Super Bowl party, Ms. Marcos and appellant had an argument regarding whether Marcos was flirting with another man. (3 RT 473-474.) They went into a bedroom and argued; appellant pushed Marcos, and she pushed him back, and he fell or tripped into a window and broke it. (3 RT 474-476.) The two decided to leave, and on the way back to the barracks, they decided to go to appellant's room to continue their conversation. (3 RT 475-476.) Marcos testified that she had been drinking at the party but was not intoxicated to the point where she did not know what she was doing. (3 RT 477.) She did not know how much alcohol appellant had had. (*Ibid.*)

Once they got to appellant's room, appellant no longer wanted to talk; he wanted to watch the Super Bowl. (3 RT 476-477.) Ms. Marcos positioned herself between appellant and the television, blocking his view, and insisted that they talk. (3 RT 478.) Appellant asked her to move out of the way. (*Ibid.*) Marcos told appellant she was leaving if they did not talk, and he did not want her to. (3 RT 479.) Marcos turned off the television, whereupon appellant grabbed both of her legs below her knees and pulled her legs from under her. (3 RT 480-481.) Marcos landed on the cement floor, first with her buttocks or back and then with the back of her head. (3 RT 481.) Appellant

then was above her with his hand on her neck pushing up on her Adam's apple, not allowing her to breathe, and asking her a question of some sort and also saying, "Say goodbye Chris." (3 RT 481-483.)

Ms. Marcos testified that the next thing she recalled was being on a bed or some soft surface, face down, with appellant's hands still on her neck. (3 RT 484-486.) Marcos did not know how long she remained in that position or whether she lost consciousness. (3 RT 486-487.) When she woke up, she was on the bed, and appellant was lying next to her. (3 RT 487.) Marcos felt sore. (*Ibid.*) She got out of bed and looked in the mirror but could barely see herself. (3 RT 487-488.) She saw that she had black and swollen eyes, and it was very hard to open them. (3 RT 488.) It looked as though blood vessels in her eyes had been broken, and her vision was blurred. (*Ibid.*) Marcos turned to appellant and said, "Look what you have done to me." (3 RT 489.) Appellant told her that he had not done anything and that she had been beaten in a bar in Juarez, Mexico. (*Ibid.*) Marcos told him that was not true, and appellant admitted what had happened and took responsibility. (3 RT 490.)

Ms. Marcos needed medical attention, but appellant thought he could take care of her injuries and persuaded her to let him help her for a day, but when the pain and blurred vision continued, he agreed to take her to the hospital. (3 RT 491-492.) They decided to tell the hospital staff a story about her injuries. (3 RT 492.) Appellant told Marcos he was sorry. (*Ibid.*) Marcos agreed to hide what had happened because she loved him and she wanted to maintain her relationship with him and because it was an isolated incident and he agreed to get help. (*Ibid.*)

Appellant drove Ms. Marcos to the hospital and dropped her off. (3 RT 493.) Marcos was in the emergency room for a long time, having many tests run; the doctors were worried about her jaw alignment and a right cheek bone. (3 RT 494.) Marcos repeatedly told the Juarez fight story. (*Ibid.*) The Army

*344*

sent a chaplain to talk to her, and the chaplain talked her into telling him the truth. (3 RT 495.) Marcos told the chaplain her story was false, but she gave several statements to the military police and eventually told them what "truly" happened. (3 RT 495-496.) As a result, the military restricted appellant and Marcos from seeing one another or using military phones to contact each other. (3 RT 497.)

Ms. Marcos wanted to rekindle the relationship and wanted to make sure that appellant got the anger management help he needed. (3 RT 493, 497.) Marcos was discharged from the Army later that year, and for six months, they continued the relationship. (3 RT 497, 499.) She visited the Army base, and he spent Christmas with her family in Wyoming. (3 RT 499-500.) By that time, Marcos no longer wanted to pursue the relationship, but she did not know how to tell appellant. (3 RT 500-501.)

In 1995, Ms. Marcos received a telephone call from appellant, who said he was in town and wanted her to come talk to him. (3 RT 501.) Marcos and appellant had in the past talked about him coming to live with her in Wyoming when he got discharged from the service, but this visit was unexpected. (3 RT 501-502, 510-511.) Also, unbeknownst to appellant, Marcos had a new boyfriend and was pregnant. (3 RT 502, 510-511.) Marcos was reluctant, but she went to meet appellant and brought her boyfriend along. (3 RT 502.) Appellant told her that he had realized that he loved her and wanted to start his life with her, and he said that her pregnancy was not a problem; Marcos told him she was no longer interested. (3 RT 502.) Appellant went on his way. (3 RT 503.)

In September 1995, a detective from the South San Francisco Police Department contacted Ms. Marcos about criminal charges he was investigating. (3 RT 559, 503.) Marcos lied to the detective by telling him

that after the 1994 assault she had terminated her relationship with appellant. (3 RT 507.)

Approximately one week later, Marcos received a call from appellant. (3 RT 519.) They discussed his assault; appellant said that he was sorry he had hurt her and that he needed her help. (3 RT 505-506.) Marcos told him that there was nothing she could do for him and that all she had to do was tell the truth about what had happened between them. (3 RT 506.) Appellant did not ask her to lie or specify how she might help him, nor did he threaten her. (3 RT 519.)

Ms. Marcos testified that there was no violence between appellant and her after the 1994 assault. (3 RT 520.) She then testified that a few times prior to the assault, appellant had grabbed her by the neck during an argument and pushed her against the wall but that she had never reported those incidents. (*Ibid.*)

*345*

**I.**

## THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING THE ADMISSION OF CRISTEN MARCOS' TESTIMONY CONCERNING AN ALLEGED INCIDENT OF DOMESTIC ABUSE IN JANUARY 1994

Over defense objection, and relying on Evidence Code section 1109 (hereinafter, "section 1109"), the trial court allowed the prosecution to introduce the testimony of appellant's former girlfriend, Cristen Marcos, in which Ms. Marcos claimed appellant had beaten her on January 30, 1994. The admission of this evidence was error because (1) the incident had taken place more than ten years before the offense charged in this case, and appellant had led a law abiding life during those ten-plus years, (2) the incident was dissimilar from the charged offense in important aspects, and (3) the incident was likely to cause the jury to become prejudiced against appellant since he had never been charged or punished for the Marcos incident.[13]

But even if some portions of Ms. Marcos' testimony were admissible under section 1109, the trial court erred in permitting Marcos to testify to events that took place before the January 30, 1994 incident and to a visit by appellant to Marcos' hometown in Wyoming in 1995.

These errors deprived appellant of his federal and state constitutional rights to due process and fair trial.

---

[13]    Subdivision (a) of section 1109 provides that "*[e]xcept as provided in subdivision (e)*, in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101, *if the evidence is not inadmissible pursuant to Section 352*." (Emphases added.)

Subdivision (e), in turn, provides that "[e]vidence of acts occurring more than 10 years before the charged offense is *inadmissible under this section unless the court determines that the admission of this evidence is in the interest of justice*." (Emphasis added.)

### A.    Facts Regarding the Admission of Ms. Marcos' Testimony

Prior to trial, the prosecutor filed a motion requesting the trial court to allow the prosecution to introduce, as propensity evidence, the testimony of Christen Marcos, a woman who had once dated appellant and alleged that she had been assaulted by him in January 30, 1994. (1 CT 145-156.) The prosecution specifically limited its request to that one incident. (1 CT 147-148, 155.) The trial court held a hearing on the motion, pursuant to Evidence Code section 402, at which Ms. Marcos testified. (1 RT 74-75, 114- 180.)

Initially, the court ruled that Ms. Marcos' testimony was admissible under both Evidence Code sections 1109 and 1101, subdivision (b), but subsequently, shortly before the jury was instructed, the court modified its ruling so as to admit the testimony only under to section 1109 and not section 1101. (1 RT 193-199, 5 RT 812-814.) The court offered two reasons in support of its decision to admit the testimony under section 1109. First, it stated that

> "[d]espite the issue raised as it relates to remoteness, I believe that in the interest of justice this jury should in fact hear this evidence much of which is due to the fact that, one, there is describance [sic] here which may also be admitted under 1109 which would fit within the ten year period, that is, the events that took place between Miss Lara and Mr. Johnson sometime on and between April and May of 2003 which would be admissible under 1109 . . . ."

*plain error*

(1 RT 196-197.)

Second, the trial court stated that it considered

> "the unique facts of this case, where there is an apparent claim of somehow accident or mistake as to the underlying facts that took place....the proffered evidence was that when it came to Miss Marcos that Mr. Johnson's initial account to her was, no, you went to Juarez, Mexico, you got into a fight and that's how you sustained your injuries. What's been proffered to the Court at this point is that the version of this fact is that the claim is that Mr. Johnson went to Miss Lara Gutierrez's residence, that Miss Lara Gutierrez grabbed on to his

346

sweatshirt and that somehow then she fell and sustained the injuries apparently by accident, misfortune or other event."

(1 RT 198-199.)[14]

**B.    Law Governing the Admission of Propensity Evidence Pursuant to Evidence Code Section 1109**

Under section 1109, evidence of other acts of domestic violence may be admitted to show that a defendant who is charged with an act of domestic violence has a propensity for such acts. (*People v. Rucker* (2005) 126 Cal.App.4th 1107,1114.) However, because the defendant's due process right to a fundamentally fair trial is at stake, the Evidence Code conditions the introduction of the other-domestic-violence evidence on a careful weighing of prejudice against probative value pursuant to Evidence Code section 352 (hereinafter, "section 352"). (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314-1315; see also *People v. Rucker, supra,* 126 Cal.App.4th at p. 1114.)

"Prejudice" in this context encompasses, among other things, evidence that "uniquely tends to evoke an emotional bias" against a defendant as an individual and that has little effect on the issues. (*Rucker, id.* at p. 1119.) Relevant factors considered in a section 352 analysis in a domestic violence case include whether the evidence of the other act of domestic violence is stronger or more inflammatory than the charged offense, whether the testimony of the uncharged act will cause confusion of the issues (the

---

[14]    Prior to instructing the jury, the trial court essentially reiterated its earlier analysis on the section 1109 ruling. The court stated that it "perform[ed] an appropriate analysis under 1109 as it relates to theories including all of the issues related to 352 of the Evidence Code, and also . . . perform[ed] an analysis as it relates to questions of remoteness, since it fell just outside the ten year window that's described in 1109 and those cases which have provided insight in trial courts on how to apply 1109 in making my rulings on that , so I am not going to revisit the 1109 analysis." (5 RT 812.)

*Letter of errata"*

possibility the jury might confuse the prior act with the charged act), how recent the prior act was (remoteness), and whether the defendant has already been criminally punished for the prior act. (*Id.* at pp.1118-1119; *Jennings, supra,* 81 Cal.App.4th at p.1314 ; *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139; see also *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

The significance of the jury's knowledge that a defendant was arrested, charged and punished for his other acts of domestic violence has been explained in several cases. In *Jennings, supra,* for example, Division Three of this Court has recognized that "the kind of prejudice usually associated with the introduction of prior bad act evidence" is "substantially" mitigated when the jury learns that punishment has been exacted for the prior transgressions. (81 Cal.App.4th at p. 1315.) Similarly, the California Supreme Court has noted that the prejudicial effect of prior act evidence is "heightened" if a defendant's uncharged act did not result in a criminal conviction, because a jury may punish a defendant for the uncharged offense, regardless of whether it considered the defendant guilty of the charged offense. (*People v. Ewoldt, supra,* 7 Cal.4th at p. 405.)

Further, section 1109 contains another limitation on the admission of evidence of other acts of domestic violence. Subdivision (e) of the statute provides that an act that precedes the ⟨charged offense⟩ by more than ten years *charged offense (italicize)* must be excluded unless the trial court determines that the admission of the prior act is "in the interest of justice." Appellant is unaware of any case precedent in which the "interest of justice" standard is defined in this context. However, the "interest of justice" standard should be defined by reference to the concerns that motivated the Legislature to enact section 1109. Two cases are particularly instructive in this regard.

In *People v. Johnson* (2000) 77 Cal.App.4th 410, 419, the Court examined the legislative history of the enactment of section 1109 and

*347*

concluded that Legislature felt that the "propensity inference" of section 1109 was necessary because "on-going violence and abuse is the norm in domestic violence cases" and criminal prosecution is one of the few factors which may interrupt "the escalating pattern of domestic violence."

In *People v. Brown* (2000) 77 Cal.App.4th 1324, Division Two of this Court found that in enacting section 1109, the Legislature sought to create special evidentiary rules for domestic violence cases because of the typically repetitive nature of domestic violence crimes, which made past acts of domestic violence probative of whether the defendant committed the charged act of domestic violence. (*Id.* at pp. at 1333-1334.) The Court also explained that allowing other acts of domestic violence to prove a defendant's propensity for domestic violence would address "the acute difficulties of proof associated with frequently uncooperative victims and third-party witnesses who are often children or neighbors who may fear retaliation from the abuser and do not wish to become involved." (*Id.* at p. 1333.)

Therefore, when a prior act of domestic violence occurs more than ten years before the charged offense, the question of whether admission of that prior act serves "the interest of justice" should include a close assessment of whether the case involves "on-going violence and abuse" or an "escalating pattern of domestic violence" and whether the charged offense presents "acute difficulties of proof" associated with uncooperative victims, fear of retaliation, or reluctant third party witnesses.

Furthermore, because the concerns regarding on-going abuse, escalating pattern of violence, difficulties of proof, etc., underlie the enactment of section 1109 as a whole, and because subdivision (e) of section 1109 involves a legislative presumption that an uncharged act of domestic violence is inadmissible if it is more than ten years old — i.e., such an act "*is inadmissible* . . . *unless*" admission is in the interest of justice — the only

logical inference is that the Legislature intended that, in order to satisfy the "interest of justice" provision of subdivision (e), the prosecution must meet a heightened burden of justification as compared to the section 352 analysis that is performed in all cases under subdivision (a). Anything less would eliminate the distinction the Legislature drew between other-act evidence that is less than ten years old and such evidence that is more than ten years old. (We will elaborate on this point shortly, in Subsection E.)

In the present case, the trial court spoke of performing "an analysis as it relates to questions of remoteness" when it considered "the interest of justice" provision of subdivision (e). (1 RT 196, 5 RT 812.) However, the "interest of justice" analysis must require more than an analysis about remoteness. For one thing, if the Legislature had intended the term "interest of justice" to merely incorporate a concern about "remoteness," it would have said so. It would not have enacted any bright line like the ten-year window. Second, the "remoteness" concern is already addressed in the section 352 weighing that is required in *every case* where the prosecution seeks to introduce evidence of other acts of domestic violence. (See § 1109, subd. (a).) The trial court's resort to simple "remoteness" when considering the "interest of justice" language in *subdivision (e)* essentially treats that subdivision as a repetition of the section 352 balancing required by *subdivision (a)*. In short, the trial court's "remoteness" reasoning effectively reads the ten-year provision of subdivision (e) out of the statute.

One final point should be made here, namely, that the standard of review for a trial court decision to admit evidence of a prior act of domestic violence under section 1109 is abuse of discretion. (*People v. Brown, supra,* 77 Cal.App.4th at p. 1337.) In the present case, the trial court abused and arbitrarily exercised its discretion because it failed to give required factors their due weight. The court both failed to appreciate the inflammatory

*348*

character of Ms. Marcos' testimony and failed to consider the objectives of the statute insofar as they shed light on the application of the ten-year limitation in subdivision (e).

**C.    The Trial Court Should Have Excluded Ms. Marcos' Testimony Because its Inflammatory Character Far Outweighed Its Probative Value — the Incident Was Remote, Appellant Was Never Punished for It, and Appellant Had Lived a Law Abiding Life in the Interim**

In deciding whether the probative value of Ms. Marcos' testimony was substantially outweighed by its prejudicial impact, the trial court did not adequately assess the impact of the undisputed fact that appellant had never been charged or punished for Marcos' injuries. Also, the trial court did not give due consideration to the fact that the evidence concerning the prior act was stronger than the evidence for the charged offenses involving Paolina Lara. Those two facts created a ripe environment for the jury to convict appellant of the charged offenses, despite doubts about his guilt thereof, in order to punish him for the Marcos incident.

That the trial evidence for the prior act was stronger than the evidence of the charged offense is clear. During appellant's trial, Ms. Marcos' testimony went substantially unchallenged. In sharp contrast, Ms. Lara's accusations against appellant were frequently inconsistent with her prior statements to the police, to doctors, in conversations overheard by others, and in documents she signed under penalty of perjury. (2 RT 345-347, 421-423, 310-313, 347-349; 4 RT 691-692, 756, 765-766,769.) Further, the medical testimony of her treating neurosurgeon, Dr. Jun, called into serious doubt that Lara had the capacity to regain her memory of the events causing the injuries, due to the nature of her head injury. (2 RT 411-414, 422-423 .) The testimony of other medical experts also called into question whether she had any true memory of how her injuries were sustained. (3 RT 646, 650-651,

660; 4 RT 715-716.) Moreover, there was significant evidence that she had been motivated to create a memory against appellant, particularly due to her jealousy resulting from appellant's purported philandering with other women, but also due to her father's dislike of appellant and his pressuring her into obtaining the restraining order against appellant.) (2 RT 349, 320-322, 303-304.)

It is also clear that appellant was never charged or punished for his role in Ms. Marcos' injuries.  Marcos testified that the Army merely placed visitation restrictions on her and appellant after learning that he had assaulted her.  (RT 496.)  Thus, the jury heard Marcos' description of her assault and injuries and then heard that appellant had never been held accountable.

Nor did the trial court adequately consider that the probative value of the Marcos assault was undercut by the facts that appellant had led a law-abiding life in the years since then and that there were significant dissimilarities between the Marcos assault and Ms. Lara's account of her assault.

In *People v. Branch* (2001) 91 Cal.App.4th 274, 284-285, the Court noted that a significant time gap between a prior act of domestic violence and the charged offense signifies that it is less likely that the defendant had the propensity to commit the charged offense, particularly where the defendant has in the interim led a law abiding life.  In the current case, not only did the Marcos incident occur more than ten years before the charged offense, but the undisputed evidence is that appellant led a law abiding and gainfully employed life in the interim.[15]  (See probation report at 2 CT 398 [substantiating

---

[15]    As explained in Section II, *post*, a purported 2003 incident between appellant and Ms. Lara did not amount to an act of domestic violence, and, even if it did, the nine-year gap between the Marcos incident and the 2003 incident with Lara discounts the existence of any propensity towards
(continued...)

*349*

appellant's lack of criminal record], 4 RT 765-766 [appellant employed a security officer for J.C. Penney's] )

The probative value of Ms. Marcos' testimony was also weakened by the admitted dissimilarities between the incident she described and the charged offense. It is established that such dissimilarities weaken the probative value of the prior act as propensity evidence. (*People v. Harris* (1997) 60 Cal.App.4th 727, 740-741.) In this case, the dissimilarities were significant.

- Ms. Marcos admitted that prior to sustaining the injuries she accused appellant of inflicting, she herself had assaulted appellant by pushing him into a window, causing it to break. (3 RT 474-476.) Ms. Lara did not describe any assaultive behavior on her part; she said that she was walking a way from appellant when the assault began. (2 RT 361.)

- Ms. Marcos admitted to having consumed a number of alcoholic beverages prior to her argument with appellant, so that alcohol may have played a role in what transpired thereafter. (3 RT 477.) Alcohol was not involved in the incident described by Ms. Lara.

- The dispute between Ms. Marcos and appellant involved appellant accusing her of flirting with other men at a party they both attended and then appellant refusing to talk about it. (3 RT 474-477.) By contrast, Ms. Lara testified that prior to her assault, she and appellant had been arguing about his supposed infidelity, that she refused to talk about it further, that appellant did want to talk, and that she tried to walk away. (2 RT 276.)

---

[15](...continued)
domestic violence on appellant's part. The record does not reflect an ongoing abuse or any escalating pattern of abuse of Lara.

- The ways in which the two women were purportedly assaulted were dissimilar. Ms. Lara testified that appellant first grabbed her arm and pushed her head down to the ground and that she was tripped by his leg (2 RT 277-278), while Ms. Marcos testified that after she turned off the television that appellant had been watching, he grabbed her legs below the knees and pulled them from under her (3 RT 480-481.) Lara testified to appellant kicking her stomach and stepping on her head (2 RT 278-280), whereas Marcos described appellant as putting his hands around her neck pushing up her Adam's apple (3 RT 481).

- Also, there is a significant dissimilarity in appellant's purported reaction to the women's injuries. Although appellants initially denied having caused Ms. Marcos' injuries, she described that he soon confessed to the assault and was apologetic. (3 RT 490-492.) By contrast, Ms. Lara's account was that appellant never admitted having caused her harm and consistently told her that her injuries were an accident. (2 RT 307, 313.)

These differences in the women's accounts weakened the probative value of the Marcos testimony in proving the charged offense.

In light of the accentuated prejudice flowing from the fact that the evidence of the Marcos incident was largely unchallenged but that appellant was never punished for it, and in light of the fact that the probative value of that incident was diminished by its remoteness and dissimilarity to the charged offense, the prejudice substantially outweighed probative value. The trial court clearly abused its discretion in admitting the Marcos evidence when it conducted the section 352 weighing required by section 1109 in every case. But, as will be seen below in Subsection E, there is more.

*350*

**D.    The Trial Court's Failure to Conduct a Proper Section 352
Evaluation Resulted in a Denial of Due Process**

By permitting the jury to hear evidence of a purported assault committed by appellant more than ten years before the charged offenses, the trial court caused a violation of appellant's constitutional rights to due process and to a fair trial. Due process demands that each element of a charge offense be proven beyond a reasonable doubt. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.) Propensity evidence may improperly sway a jury to overlook its obligation to find that each element of the charged offense is proven beyond a reasonable doubt. (*Michelson v. United States* (1948) 335 U.S. 469, 475-476.) Even when the trial court has properly screened the evidence under section 352, there is still "a danger that the presumption of innocence will melt under the heat of emotions aroused by the defendant's prior offenses." (*People v. James* (2000) 81 Cal.App.4th 1343, 1353.)

Here, where the trial court did not adequately assess the heightened prejudicial impact of the Marcos incident, the propensity evidence in all probability improperly swayed the jury to overlook their doubts as to the prosecution's case against appellant and convict him in order to assure that he would be punished for his purported assault on Ms. Marcos. The admission of the propensity evidence violated appellant's constitutional rights to due process and to a fair trial.[16]

---

[16]    Appellant acknowledges that the Courts of Appeal addressing a due process and fair trial challenge to section 1109 have rejected those claims. (*People v. Johnson, supra,* 77 Cal.App.4th at p. 420; *People v. Brown, supra,* 77 Cal.App.4th at pp. 1333-1334; *People v. Jennings, supra,* 81 Cal.App.4th at p. 1310; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027.) However, those cases have rejected the claims on the grounds that the admission of propensity evidence via section 1109 occurred after a proper exercise of the trial court's duty to weigh whether the prejudicial character substantially outweighed the probative value of the evidence. Here in the present case,
(continued...)

**E.    The Trial Court Should Have Excluded the Ms. Marcos Testimony in Light of the Ten-Year Limitation of Subdivision (e) of Section 1109**

As noted by the trial court, the 1994 Marcos incident was "outside the ten year window" established by subdivision (e) of section 1109. (5 RT 812.) The court viewed the "interest of justice" test as calling for an inquiry into whether the prior act was too "remote" to be admitted. (*Ibid.*)

The trial court did not properly interpret the term "interest of justice." As we have previously discussed, the Legislature could not have meant for the phrase "interest of justice" to refer to mere remoteness as it is normally understood, because that concern is separately accounted for in the section 352 weighing demanded in every case by *subdivision (a)* of section 1109. Rather, "interest of justice" as used in *subdivision (e)* must implicate the specific concerns that occupied the Legislature when it enacted section 1109, namely "ongoing abuse" or an "escalating pattern of domestic violence" and the "acute difficulties of proof." Indeed, subdivision (e) only makes sense if "interest of justice" requires the prosecution to make an heightened showing that these legislative concerns would be advanced by admission of the other-act evidence. Included in any such heightened showing should be the requirement that the prosecution establish either exceptionally acute difficulties of proof or a particularly egregious pattern of escalating violence or ongoing abuse. Only if conditions such as these are met would the "interest of justice" provision of subdivision (e) be satisfied.

In the instant case, there was no showing of "ongoing abuse" or "escalating pattern of domestic violence" between appellant and Ms. Lara (or anyone else). As will be discussed in Section II, *post*, the one incident alleged to have taken place in April or May of 2003 between Ms. Lara and appellant

---

[16](...continued)
however, the trial court did not properly exercise its weighing function.

*351*

*Letter of errata*
*pp. 33, 42, 50*

does not qualify as an act of domestic violation under section 1109. But even if it did, one minor incident a year prior to the charged offenses does not fairly establish "ongoing abuse" or an "escalating pattern of domestic violence," let alone a showing of particularly egregious abuse.

In addition, Ms. Lara was fully willing to and did testify about the appellant's purported assault, as were the medical witnesses and other third-party witnesses. (2 RT 373-389; 396-404.) There were no "acute difficulties of proof" for the prosecution in this case.

Since the Marcos incident fell outside the ten year limit, it should have been excluded under subdivision (e) of section 1109. At the very least, the fact that the incident occurred more than ten years prior to the charged offenses, when combined with the other prejudice factors discussed earlier in connection with the section 352 balancing required under subdivision (a) of section 1109, compel the conclusion that the trial court abused its discretion by allowing the evidence to be admitted.[17]

*italicize repeated offense*

F.    **Even If the January, 1994 Marcos Incident Was Admissible, Ms. Marcos' Testimony Regarding an Incident Occurring Prior to 1994 Was Erroneously Admitted**

The trial court permitted Ms. Marcos to testify regarding purported instances of abuse by appellant that occurred prior to the 1994 Super Bowl incident. (3 RT 520.) However, the prosecution had limited its section 1109 request to the 1994 Super Bowl incident. (1 CT 147-148, 155.) The trial

---

[17]    Respondent may attempt to argue, as did the prosecutor at trial, that the "acute difficulty of proof" in this case was that appellant's purported assault on Ms. Lara caused her memory problems and that appellant should not benefit by what he caused. (1 CT 151.) However, that argument would contradict and violate appellant's constitutional rights to due process and to the presumption of innocence; the trial court cannot base its ruling on the pretrial premise that appellant is guilty.

court engaged in no section 352 weighing whatsoever, and made no "interest of justice" determination, with respect to this evidence. The admission of those purported prior instances of domestic violence was an arbitrary abuse of discretion and a violation of appellant's constitutional rights to due process and a fair trial.

**G.    The Admission of Ms. Marcos' Testimony Regarding Appellant's 1995 Visit to Her Town in Wyoming Was Irrelevant and Highly Prejudicial**

Prior to trial, appellant moved to preclude Ms. Marcos from testifying about a 1995 visit appellant made to Marcos' hometown in Wyoming in which he attempted to reunite with her. (1 CT 105-106.) The trial court denied the motion. Marcos thereafter testified that in approximately August of 1995, following months of silence, appellant arrived with his belongings to reunite with her. (3 RT 501-503.) Marcos described the visit as "very strange." (3 RT 501-502.) According to Marcos, appellant told her that he had awoken one morning and asked himself what he would do for love and that he then obtained a discharge from the Army and drove to Wyoming to start his life with her. (3 RT 502.) When Marcos informed appellant that she was pregnant and living with a new boyfriend, appellant said that this "wasn't a problem" and that they could "work that out." (3 RT 502.)

The admission of this portion of Ms. Marcos' testimony was irrelevant to the 1994 incident that the trial court had allowed to be admitted and yet it was highly prejudicial because Marcos' description of the "unexpected" visit portrayed appellant as a kind of disturbed stalker who, although he had not heard from her in months, would pack up and pursue her when, as far as she was concerned, the relationship was over. That

portrayal of appellant was accentuated even more by her testimony that appellant was not dissuaded by her relationship with, and pregnancy cy,

*352*

another man.  This error compounded the error in admitting the Marcos propensity evidence.

### H.    The Erroneous Admission of the Evidence Requires Reversal of the Judgment

The prejudice from these errors was substantial and requires reversal under both federal and state standards.  (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818.)

Under the California Constitution, a verdict must be set aside if there is a reasonable probability a different verdict would have resulted had evidence not been erroneously admitted.  (*People v. Watson, supra,* 46 Cal.2d 818.)  Here, there is more than a reasonable probability of a different verdict had the Marcos testimony been excluded.  The prosecution in this case made that argument itself.  The prosecutor argued for the admission of the Marcos testimony on the ground that Ms. Marcos' injuries had left "Paolina's memory in an altered state — she can only recall pieces of the assault, but not all of it" and that the "prior evidence of domestic violence against Cristen Marcos is more necessary in this case than in others because of the lasting effects this crime has had on the memory of the current victim."  (1 CT 151.)  And, in closing argument, the prosecutor made that same argument to the jury, asking the jurors to use the Marcos testimony if they held any doubts about the prosecution's case.  (5 RT 855.)

In *People v. Harris, supra,* 60 Cal.App.4th 727, 741, the Court pointed to a statement in which the prosecutor sought to justify the admission of prior acts because the victims' testimony was by virtue of illness and inconsistency "susceptible to doubt."  In *Harris,* that type of concession on the part of the prosecution was proof that the "reasonable probability" standard for reversal was met.  (*Ibid.*)  Here, as in *Harris,* the prosecutor acknowledged that the jury

may have doubts about the case against appellant and urged the jury to use the Marcos evidence to fill the gaps. (5 RT 855.)

Even without the prosecutor's concession, the inconsistencies in Ms. Lara's statements about the assault, her injuries, and her memory, along with the medical testimony that called into question her capability to have any memory, leave little doubt that the prosecution's case against appellant without the Marcos testimony was one with ample doubt as to appellant's guilt. Ms. Lara told police after she sustained her injuries that there had never been violence in her relationship with appellant. (2 RT 345.) After she claimed to have recovered her memory, she told police that on the night of April 9, 2004, prior to leaving TGI Friday's, appellant had stopped her at the door before she left the restaurant and talked to her, and yet, at trial, she denied telling the police that and insisted this did not occur. (2 RT 332, 555.) She testified that during the assault, appellant kicked her in the stomach "a couple of times," but medical records did not indicate that there were injuries to or bruises on her stomach. (2 RT 279, 4 RT 715- 717.) She described appellant stepping on and trying to kick her face (RT 279 -280), but photos of her face and her medical records did not reflect the edema or swelling indicative of direct blows. (4 RT 713-714, 720-723.)

After allegedly recovering her memory, Ms. Lara told police that appellant dragged her by her ankles to his car and yet, at trial, she denied both that appellant did this and that she had told the police he had. (2 RT 370-371, 3 RT 550-551.) She claimed at the preliminary hearing that she had been blind for four to six weeks, but at trial she claimed she merely had "blurry" vision. (2 RT 342-343.)

Apart from inconsistencies in Ms. Lara's statements, there was also medical evidence that the discoloring of her face and behind the ear were attributable to the skull fracture rather than to kicks or blows to her face or

head. (4 RT 719-722.) The abrasions to her elbow and hand were consistent with someone falling to the ground, and the bruise to her arm was consistent with appellant attempting to pick her up after a fall. (4 RT 715, 726-728.)

Her treating physician and two doctors testifying for the defense all stated that given Ms. Lara's skull fracture, it was highly likely she was unconscious during any assault and that physically it was highly unlikely she had any memory to recover. (2 RT 395-396, 410-412, 421-423, 3 RT 643-645, 650-651, 654-655, 4 RT 715-716.) Lara's treating physician testified that her head injury could have been caused by a fall backwards if she had been unable to break her fall if her head hit a curb or concrete. (2 RT 395-396, 413-414.) Medical testimony also provided support for appellant's claim that he had difficulty picking Lara up from the ground. (4 RT 713-715, 729.)

⟨And although Ms. Lara insisted she recovered her memory on February 8, 2005, witnesses testified to having heard her claim to have recovered her memory at earlier times, and two of those witnesses heard her say her injuries were the result of an accident.⟩(2 RT 394-395, 410, 421-423, 4 RT 691-693, 750, 756, 765-768.) Moreover⟨Lara had signed papers under penalty of perjury stating her injuries were the result of an accident.⟩(2 RT 310-313, 347-348.) And, as for why she would accuse appellant of an assault⟨there was significant evidence that she had been motivated to create a memory due to her jealously resulting from her belief that appellant was seeing other women and due to pressure placed on her by her father, who did not like appellant and believed that he had caused her injuries.⟩(2 RT 303-304, 320-322, 349.)

There is at least a reasonable probability that exclusion of the Marcos testimony, which was not compromised by the kinds of problems that beset Ms. Lara's accusations, would have resulted in a different verdict. The admission of that evidence also provided the jury with an emotional reason to

convict appellant despite the objective uncertainties in the prosecution's case on the charged offenses.

A fortiori, it has not been "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California, supra*, 386 U.S. at p. 24.)

354

**II.**

## EVIDENCE OF A PURPORTED INCIDENT BETWEEN MS. LARA AND APPELLANT IN APRIL OR MAY OF 2003 WAS ERRONEOUSLY ADMITTED AS EVIDENCE OF A PRIOR INCIDENCE OF DOMESTIC VIOLENCE PURSUANT TO EVIDENCE CODE 1109

The trial court permitted Ms. Lara to testify to an alleged incident in April or May, 2003, between appellant and her. (1 RT 196.) The court concluded that the incident was admissible as an act of "domestic violence" under section 1109. However, there was no substantial evidence to support this conclusion. What appellant was accused of doing in that incident does not meet the definition of "domestic violence" in section 1109.

At trial, Ms. Lara described the incident in the following terms:

> "We were arguing, he was going to take me out of his house, he had my clothes in his hand. I was trying to grab them, he put them really high and I started jumping to get it and we were arguing about that , to get my clothes back. He grabbed me by the neck, back of my neck and put me down to the floor, not hard, but he put me down in order for me to get my clothes. . . . I put my hands down so I didn't really hit the ground, it wasn't hard, just enough for me to stop jumping to get my clothes."

(2 RT 256.)

In response to the prosecutor's question about whether she was injured by the appellant's act, Ms. Lara replied, "No." (2 RT 257.) When asked if she was frightened by appellant's act, she replied, "Yes, a little bit, I was." (2 RT 258.) She testified that appellant did what he did "for me to stop jumping to get my clothes" and "for me not to get my clothes." (2 RT 256-257.) Appellant did not hold her down. (2 RT 258.) On cross-examination, Ms. Lara clarified: appellant "put his hand on my neck and pushed me away." (2 RT 326.)

These descriptions of appellant's conduct fail to show conduct within the scope of section 1109.

48

after the defendant left, and that the defendant later told a co-worker she had wanted to kill the former boyfriend. (*Ibid.*)

Unlike the complainant in the *Rucker* case, Ms. Lara did not see appellant's act of pushing her down or away as a "violent act" intended to cause bodily injury or apprehension of imminent serious bodily injury. Not only did she so testify, but on April 18, 2004, approximately eight days after her injuries were sustained, she told Officer MacHale that there had never been any violence in her relationship with appellant. (2 RT 345.) There was no testimony from any witness that it had been appellant's intent to cause bodily injury or to cause Lara to think that he wanted to cause her imminent serious bodily injury.[18] Whether characterized as momentarily pushing her down or pushing her away, there was no substantial evidence to support the trial court's determination that appellant's conduct constituted domestic violence within the parameters of section 1109. Therefore, the admission of this evidence as propensity evidence was error.

As discussed earlier, the prosecution's case on the charged offenses was replete with doubt as to appellant's guilt. Without evidence of this 2003 event painted by the trial court as "abuse," the prosecutor would not have been able to point to an event prior to the charged offenses as indicating a propensity for violence in the relationship between Ms. Lara and appellant. The admission of this evidence was thus prejudicial under both the state and federal constitutional tests.

---

[18]     Appellant's mother, Reva Johnson Hall, who lived with appellant and Ms. Lara at the time, may have seen the incident to which Lara was testifying but did not see appellant put Lara down or push her, although she did see Lara push appellant. (5 RT 729-733.)

*355*

Subdivision (d) of section 1109 specifies that "domestic violence" is defined by section 13700 of the Penal Code. As relevant to this case, section 13700 defines "domestic violence" as "abuse committed against an adult or a minor who is a cohabitant." (§ 13700, subd. (b).) Subdivision (a) of section 13700 defines "abuse" as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself or another." (See also *People v. Rucker, supra,* 126 Cal.App.4th at p. 1114.)

In Ms. Lara's own description of the 2003 incident, appellant was not "intentionally or recklessly causing or attempting to cause bodily injury" or placing her in "reasonable apprehension of imminent serious bodily injury." She understood what appellant did as an attempt to get her to stop jumping up and down to get her clothes from him. (2 RT 256-257.) While she was "a little bit" frightened, she did not testify that she was frightened that appellant might cause her to sustain "imminent serious bodily injury." Nor was she in anyway injured or endangered by appellant, let alone seriously. (2 RT 257.)

In *People v. Rucker, supra,* the Court rejected a defendant's assertion that when she pointed a gun at her previous boyfriend, her conduct did not amount to "abuse" as defined by section 13700, subdivision (a). (126 Cal.App.4th at pp. 1117-1118.) The Court pointed out that the act of pointing a gun was a violent act, that it could have been punished as an assault with a firearm, a "violent felony," and that therefore it was clearly included within the language that defined domestic violence as "intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself or another." (*Id.* at p. 1118.) The Court further pointed out that while the defendant was pointing the gun, she was telling the former boyfriend she knew how to use it; that boyfriend was afraid and became more frightened

### III.

### APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEY FAILED TO MOVE TO EXCLUDE PURPORTED HEARSAY STATEMENTS MADE BY MS. LARA AT THE HOSPITAL

At trial, the prosecution elicited from testifying witnesses certain hearsay statements allegedly made by Ms. Lara. Defense counsel failed to object to any of these statements. Counsel's failure to object constituted the ineffective assistance of counsel under the Sixth and Fourteenth Amendments. (*Strickland v. Washington* (1984) 466 U.S. 668.) Appellant acknowledges that ineffective-assistance claims normally must be brought in a petition for writ of habeas corpus so that counsel can give reasons for the challenged action or inaction (*People v. Diaz* (1992) 3 Cal.4th 495, 557-558), but there is an exception to this general rule in situations where there can be no adequate explanation for the claimed deficiency (see *People v. Pope* (1979) 23 Cal.3d 412, 426). That is plainly the situation with respect to the improper hearsay evidence at issue here: there can be no adequate explanation for counsel's failure to object.

There are three sets of hearsay testimony at issue.

First, Officer MacHale read from his police report, which indicated that on the night of Ms. Lara's arrival at the hospital, Bessie Sandoval, the emergency room technician, had told MacHale about statements Lara had made. Specifically, MacHale's report indicated that Ms. Sandoval had told him that Lara had said, "Baby, I forgive you, I'll be a good girl." MacHale's report further indicated that Sandoval told him that Lara had said that appellant had thrown something at her, causing her injury. (3 RT 528-533.)[19]

---

[19]    Ms. Sandoval did not remember Ms. Lara's statements, nor did she remember talking to Officer MacHale about Lara. (2 RT 383, 386.) In (continued...)

*356*

Second, Ms. Lara's stepmother Yadira testified that the hospital staff told her (Yadira) that Lara had stated that appellant hit her. (3 RT 614.)

Third, Yadira further testified that shortly after Ms. Lara came home from the hospital and while she was on heavy medication (including morphine), Lara stated to Yadira that appellant had hit her. (3 RT 614.)

All of this testimony was plain hearsay. In fact, the testimony by Officer MacHale was at least triple hearsay: he testified to what his report stated that Ms. Sandoval had stated about what Ms. Lara had stated. And the "hospital staff" testimony by the stepmother Yadira was double hearsay: she testified to what "hospital staff" stated that Lara had stated. It is axiomatic that, in order to be admissible, multiple hearsay must satisfy a hearsay exception as to each level. Here, there was no applicable hearsay exception as to any of the levels of hearsay involved.

Moreover, even if all of the statements did fall within a hearsay exception, statements were inadmissible because they were inherently untrustworthy. (*People v. Howard* (1988) 44 Cal.3d 375, 405.) It is undisputed that Ms. Lara's mental state was highly compromised when she purportedly made her statements. Lara was falling in and out of consciousness, was combative, uncooperative, confused, "very altered to what's going on." (2 RT 379-380, 384-385.) According to Dr. Jose Maldonado, the prosecution's own medical expert, Lara was probably in a delusional state due to her injuries and medication. (3 RT 427, 440.) Dr. 33Maldonado testified that when people emerge from a traumatic head injury, they suffer from "delirium which is an acute confusion natural state, people are asking weird things, pulling out lines trying to crawl out of bed, not really

---

[19](...continued)
fact, Sandoval was unable to specifically remember Lara's statements even when she was asked leading questions containing the quotes from MacHale's report. (2 RT 386.)

understanding what is being addressed."[9] (3 RT 440.) Maldonado added that patients with such symptoms end up being severely sedated in order not to harm themselves. (*Ibid.*) And, as Yadira testified, Lara was on morphine even at home. (3 RT 614.)

Thus, the testimony about Ms. Lara's alleged inculpatory statements at the hospital were inadmissible for multiple reasons.

To establish constitutionally inadequate representation, a defendant must demonstrate (1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington, supra,* 466 U.S. at pp. 687-696; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1058.) Given the highly prejudicial nature of the statements at issue here, it is inconceivable that there could have been a valid tactical reason for failing to object to this evidence. The issue is thus appropriately raised on appeal.

Defense counsel have been deemed ineffective where counsel failed to take steps necessary to keep prejudicial evidence from the jury where its admissibility is questionable. (*People v. Ledesma* (1987) 43 Cal.3d 171, 224, 226-227; *People v. Zimmerman* (1980) 102 Cal.App.3d 647, 656-659.) Counsel will be deemed to have been remiss if it appears that requests to exclude or strike not taken by counsel would have met with success. (See *People v. Jennings* (1991) 53 Cal.3d 334, 356-357.) Given that the statements attributed to Ms. Lara were clearly hearsay and, in most instances, multiple-level hearsay, and given that her statements were also inherently

---

[9]       In her argument to the jury, the prosecutor herself pointed out that in the "emergence stage" after trauma, a person can be in a confused state for hours or days. (5 RT 892.)

357

untrustworthy, a motion to exclude those statements would have met with success. Thus, deficient performance is established.

That leaves the question of *Strickland* prejudice. Here, not only were Ms. Lara's supposedly inculpatory statements heard by the jury during the testimony of three separate witnesses, but the prosecutor used those statements to good effect in her argument to the jury. She reminded the jury of the statements in the emergency room and in a dramatic finale stated that "Baby I forgive you, I'll be a good girl" was Ms. Lara's way of telling appellant that she was forgiving him for what he had done to her. (5 RT 894.) Without those alleged statements, the jury would not have had any inculpatory statement from Lara about the causes of her injuries until she purportedly recovered her memory some ten months later. Those unchallengeable and untrustworthy statements made in the emergency room and in close proximity to the injury-causing event carried devastating weight. Had defense counsel made the effort to exclude the statements, it is reasonably probable that the result of the trial would have been more favorable to the defense. The judgment should be reversed.

**IV.**

## THE TRIAL COURT IMPROPERLY PREVENTED DR. FOTRE FROM EXPRESSING AN OPINION CONCERNING SEIZURE AS A POSSIBLE CAUSE OF MS. LARA'S INJURIES

The trial court refused to permit Dr. Terry Fotre, a qualified emergency room physician who was called as a defense witness, to express his opinion that a seizure was a possible cause of the redness on Ms. Lara's eyelids and for the difficulty appellant had in carrying Lara to his car. (4 RT 717-719, 722.) This refusal was error under state law, and the exclusion of the evidence also deprived appellant of his constitutional rights to due process of law, to present a defense, to compulsory process, and to a fair trial, under the Fifth, Sixth, and Fourteenth Amendments.

Dr. Fotre is a certified emergency room physician and a diplomate of the American Board of Forensic Medicine. (4 RT 714-715.) He reviewed Ms. Lara's medical records and photographs of her injuries. (4 RT 716-717.) He testified that Lara's "confused state" as described in the medical records was consistent with a significant injury to the head with or without loss of consciousness. (4 RT 718.) Dr. Fotre was then asked whether a seizure was a possible side effect of a fractured skull, given Lara's confused and combative state in the emergency room which led to her being restrained and strapped to the examining table. (*Ibid.*) Fotre testified that though a seizure occurs in fewer than 50 percent of the patients who suffer a skull fracture, it was a possible explanation for her behavior and injuries. (*Ibid.*) Fotre went on to describe some of the side effects of a seizure, which included spasms, shaking, odd posturing, grunting, straining, and massive discharge of the muscles in the body. (*Ibid.*)

Defense counsel then asked Dr. Fotre whether during a seizure it was possible to get redness in the eyes that was demonstrated in one of the prosecution's photos of Ms. Lara in the hospital. (4 RT 718.) The prosecutor

*358*

objected to any questions being asked about seizures; she argued that had not "heard any testimony to substantiate the reasons of a seizure by treating physicians." (4 RT 719.) The trial court sustained the objection on the ground that "there hasn't been any foundational questioning in this case that would establish that." (*Ibid.*)

Further into Dr. Fotre's testimony, defense counsel asked whether a person having a seizure would be more difficult to lift up and carry than a person not having a seizure. (4 RT 722.) Again, the trial court sustained the prosecution's objection, stating there was no foundation regarding seizures. (*Ibid.*)

Thereafter, the trial court not only precluded defense counsel from arguing to the jury that the redness on Ms. Lara's eyelids may have been the result of a seizure but the court told the jury that there was no evidence of seizure. (5 RT 860.)

An abuse of discretion standard is applied when reviewing a decision by a trial court to exclude expert testimony. (*People ex rel. Dept. of Transp. v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1073; *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1522-1523.) While the trial court enjoys discretion in ruling on foundational matters on which expert testimony is to be based, it is prejudicial error to exclude relevant and material expert evidence where a proper foundation for it has been laid, and the proffered testimony is within the proper scope of expert opinion.. (*Korsak, id.* at p.1523.)

An expert may testify to an opinion if the opinion is related to "a subject that is sufficiently beyond common experience" and is "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that

reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801, subds. (a) and (b).)

Based on his special knowledge, experience, training and education, and using what he had read in Ms. Lara's medical records and what he had seen in photographs of her injuries, Dr. Fotre believed a possible cause for the redness in her eyelids was a seizure. The fact that the medical records do not mention a seizure does not preclude a physician from expressing the opinion that the physical symptoms and behavior of the patient as reported in the records indicate the occurrence of a certain medical condition that is not specifically stated in those records.

Consider, for example, *Harrison v. De Young* (1935) 3 Cal.App. 662, 663-664. In *Harrison*, a trial court permitted a physician to express an opinion identifying a medical condition (physical microscopical changes in the brain) that was not specifically reported in the patient's medical records. On appeal, that ruling was challenged on the basis that there was no foundation for the expert's testimony because nothing in the record at trial mentioned the microscopical changes that the expert described. The *Harrison* court made short work of the challenge, holding that the doctor's opinion was admissible because it was based on the professional and scientific knowledge and that therefore the conclusions drawn were not speculative. (*Id.* at p. 664.)

Medical experts are frequently to testify, within their sphere of expertise, to their opinions as to what may have caused certain injuries or death. (See, e.g., *People v. Mayfield* (1997) 14 Cal.4th 668, 766-767.) A physician may express an opinion from a photograph using the facts he or she derives from the photograph. (*People v. Obie* (1974) 41 Cal.App. 3d 744, 757.) It is also accepted that when there is no direct evidence of a condition,

*359*

an expert may rely on circumstantial evidence. (*People v. Bui* (2001) 86 Cal. App. 4th 1187, 1196-1197.)

Dr. Fotre's testimony fell well within these parameters, for he proposed to explain a physiological connection between a reported injury and a possible (though unrecorded) cause of that injury based on evidence that he gleaned from the medical records and photos. The trial court's exclusion of that testimony, and its further action of precluding defense counsel from even arguing about the possibility of seizure, were plain error.[10]

The only remaining issue is prejudice, and there is prejudice aplenty. Appellant told police that he had had difficulty lifting and carrying Ms. Lara after she fell and hit her head because she was like "dead weight," that he was pulling and dragging her as he was trying to pick her up, and that these problems, plus his emotional state, all combined to make it difficult to move her. (1 CT 215, 225.) The prosecutor ridiculed appellant's explanation for his difficulty in carrying Lara, who weighed 95 pounds, and then scoffed:

> "Look at him. He confirms on tape he can curl 85 pounds. He confirms he is a big guy, strong guy, yet he wants us to believe that he had trouble carrying her. Why? Because he needs to explain her other injuries."

(5 RT 855.)

By preventing Dr. Fotre from expressing his opinion — based on both the medical records and the photos admitted into evidence — that Ms. Lara may have suffered a seizure as a result of her injury, the trial court deprived appellant of evidence needed to corroborate that there was indeed a credible

---

[10]     The trial court's ruling was somewhat perplexing because it had permitted the prosecution's psychiatrist to testify extensively about "possible" medical explanations (unmentioned in the medical records) as to why Ms. Lara may have lost and then regained her memory as she claimed, and it also permitted rebuttal testimony from a defense psychiatrist. (3 RT 427-428, 436-437, 440-444, 645-646, 659-662, 4 RT 684-685.)

reason for his difficulty in picking up Ms. Lara, despite her being so much smaller than he. The ruling also blocked Dr. Fotre from offering another medical explanation for the redness in the eyelids that was depicted in the prosecution's photos, photos offered by the prosecution as evidence that appellant beat her about the face.

Moreover, the trial court compounded the prejudicial effect of the error by its dismissive remark to the jury during closing argument, when it sustained the prosecution's objection to defense counsel's argument and stated that there was no evidence of a seizure. It is virtually certain that this caused the jury to reject the defense contention that some of Lara's injuries were due to the difficulty appellant had as he was trying to pick her up, and it also cast doubt on the portions of Dr. Fotre's testimony in which he opined that Ms. Lara's injuries were secondary to the skull fracture.

The court's rulings, and the prejudice that flowed from them, substantially weakened appellant's efforts to at least raise a reasonable doubt as to whether there were non-criminal explanations for Ms. Lara's injuries. The error was plainly prejudicial.

360

V.

**THE TRIAL COURT IMPROPERLY PREVENTED DR. MISSETT FROM RELYING ON AN ENTRY IN MS. LARA'S MEDICAL RECORDS THAT INDICATED SHE HAD A MEMORY OF THE INJURY-CAUSING EVENT TWO MONTHS BEFORE SHE CLAIMED TO HAVE "RECOVERED" IT**

During the testimony of defense expert Dr. James Missett, appellant's counsel attempted to ask a hypothetical question about a reference to a December 2, 2004 entry in Ms. Lara's medical records. (4 RT 676.) That entry indicated that a neurologist (Dr. Andrew Oh) had seen Lara on December 2 and had made a note that she "evidently was attacked by an ex-boyfriend." (*Ibid.*) As part of his hypothetical question, defense counsel stated that Lara "may have told a doctor during a neurological consultation that she was evidently attacked by her ex-boyfriend." (*Ibid.*) The prosecutor objected on the ground that the facts were not in evidence. Defense counsel stated that the assumed fact came from Dr. Missett's testimony the previous day. (*Ibid.*)

The jury was excused, and following further discussion, the court ruled that the hypothetical question was improper because there was no basis in the medical record to suggest that Ms. Lara had told Dr. Oh that her ex-boyfriend had attacked her. (4 RT 678.) Defense counsel explained that had used the December 2 entry in his hypothetical question because Dr. Missett had opined that the entry suggested that Lara may have recovered some memory prior to February 8, 2005. (4 RT 678; see 3 RT 658-659 [Missett's testimony].) The court declined to change its ruling.

Back in open court, the jury was told that the last fact in the hypothetical question (referring to Dr. Oh's note) was being stricken. (4 RT 681.) "That is," the court added, "any reference to a claim that on December 2, 2004, that Paolina Lara Gutierrez may have told a doctor that she had been

attacked by an ex-boyfriend [is stricken]. There is no evidence of that."
(*Ibid.*) The court thereupon proceeded to read CALJIC 2.82, which informed
the jury that in allowing a hypothetical question, the court does not rule and
does not necessarily find that all of the assumed facts have been proved. (RT
682.)

By precluding Dr. Missett from referring to the December 2 note, and
by telling the jury that there was no evidence that Ms. Lara had said anything
to Dr. Oh on that occasion, the trial court erred. As noted earlier, Evidence
Code section 801 permits an expert to rely on his special knowledge, skill,
experience, training and education to analyze matter placed before him to
review, as long as that matter "is of a type that reasonably may be relied upon
by an expert in forming [his] opinion upon the subject to which his testimony
relates." (Evid. Code, §801, subd. (b).) The medical record in question was
"of a type that reasonably may be relied upon by an expert."

Moreover, given his education, training and experience, it was proper
for Dr. Missett to analyze the medical record entry to determine where the
information it reflected could have come from. Based on his experience as a
physician working with medical records and based upon practices in the
medical community regarding the likely sources for information in medical
entries, it was within the scope of his expertise to opine that the December 2,
2004 entry suggested that Ms. Lara claimed to have a memory at that time.
And indeed, Missett was correct. In the prosecution's case in rebuttal, Ms.
Lara returned to the stand and admitted that she had told Dr. Oh that her
complaints that day were due to a domestic case. (4 RT 785.) It was thus
entirely within the realm of reason for Dr. Missett to have concluded that Dr.
Oh had written "evidently attacked by her ex-boyfriend" because Lara uttered
words to that effect (thus contradicting her trial testimony that she never had
a recall until February 5, 2005).

*361*

The trial court's ruling not only deprived appellant of important relevant evidence as to Ms. Lara's credibility, but its ruling during defense counsel's questioning of Dr. Missett undermined the credibility of both Dr. Missett and defense counsel. In light of the factors discussed earlier, the errors here were prejudicial under both the *Watson* and *Chapman* standards.

## VI.

### THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO ALLOW THE DEFENSE TO ADMIT EVIDENCE THAT APPELLANT HAD SAID THAT MS. LARA HAD "STIFF LEGS" AS HE WAS ATTEMPTING TO LIFT HER AND TAKE HER TO THE HOSPITAL

During trial, defense counsel made a written motion requesting that appellant's mother, Reva Johnson Hall, be allowed to testify to a statement made by appellant on April 10, 2004, upon release from police custody. (1 CT 199-201.) In the statement, appellant said that when he tried to pick Ms. Lara up off the ground in order to take her to the hospital, her legs were stiff like tree limbs and rigid. (3 RT 567.) Defense counsel explained that the information about Lara's stiff legs was relevant to establishing that Lara suffered a seizure because, as Drs. Missett and Fotre had informed him, stiff legs were a symptom of a seizure. (*Ibid.*) Counsel contended that appellant's statement, while hearsay, met all the requirements of the hearsay exception for a "spontaneous utterance" pursuant to Evidence Code section 1240. (3 RT 567, 569-570.)

The prosecutor opposed the motion. Appellant, she pointed out, had been booked at approximately 11:00 a.m. on April 10 and released at 1:54 p.m. that same day (slightly less than 2 hours later). (3 RT 568.) The prosecutor argued that since the statement was made approximately 12 hours after the incident that caused Ms. Lara's injuries, it could not be deemed to be spontaneous. (3 RT 569.) The prosecutor further argued that since appellant had been questioned by the police prior to his release, he had time to fabricate a story. (*Ibid.*) The prosecutor also noted that during his subsequent recorded statement to police on February 11, 2005, appellant never mentioned stiff legs being a problem. (3 RT 571.)

In reply, defense counsel argued that Mrs. Hall would describe how upset appellant was and that he was almost crying when he related that Ms.

*362*

Lara's legs were so stiff that it was hard to pick her up and put her in the car. (3 RT 570-571.) Defense counsel noted that there was no way that appellant could have known that there was medical significance to the stiff legs information. (3 RT 570, 571.)

The trial court denied the defense motion, citing the timing of the statement and the inability to cross-examine appellant about it. (3 RT 571-572.) The court concluded that appellant's statement about stiff legs was not spontaneous or made under stress and excitement of the events. (3 RT 572.) The court went on to state that the statement had foundational problems "as it relates to the relationship between the parties" and had never been memorialized or mentioned until the trial. (3 RT 572.)

Defense counsel then asked whether the "stiff legs" statement could be relied on by defense medical experts, and the court ruled it could not be. (*Ibid.*)

> "They [the experts] can't [rely on the statement] unless there's been some admissible evidence to which they can rely. They can't rely upon a hearsay statement made by your client. It's not otherwise admissible to the jury. They can certainly rely on the hearsay that is foundational in terms of it's in some other context, but not something that is now coming from your client on the eve of trial."

(3 RT 572-573.)

The court's rulings were contrary to the Evidence Code and established precedent both on spontaneous utterances and on experts' use of hearsay. (Evid. Code, §§ 1240, 802.) They also violated appellant's Fifth, Sixth, and Fourteenth Amendment rights to present a defense, to due process, and to compel witnesses on his behalf. (*Taylor v. Illinois* (1988) 484 U.S. 400, 401. These rights encompass the right to present both direct testimony and, under these circumstances, the right to place before the jury secondary forms of evidence such as hearsay. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294; *Rosario v. Kuhlman* (2nd Cir. 1988) 839 F.2d 918, 924.)

**A.    Appellant's Statement to His Mother Satisfied the Requirements of the Spontaneous Utterance Hearsay Exception**

Appellant's statement to his mother after his release from jail on the day in which Ms. Lara sustained her injuries met the requirements of the spontaneous utterance hearsay exception.   Evidence Code section 1240 (hereafter, "section 1240") provides:

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

"(a)    Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and

"(b)    Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

A trial court's determination of the facts necessary to find that a hearsay exception applies or does not apply will be upheld on appeal if there is substantial evidence to support it.  (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)  Here, the trial court gave three reasons for its decision to exclude appellant's statement: (1) the 12-hour interval between the occurrence of the injuries and the uttering of the statement, (2) the fact that Mrs. Hall is appellant's mother, and (3) the fact that the statement had not been previously memorialized or mentioned until "the eve of trial."  (3 RT 572-573.)  The trial court's reasoning is not supported by the law or by substantial evidence.

The 12-Hour Lapse of Time:   The crucial element in determining whether a statement was uttered spontaneously is the mental state of the speaker: was he still "laboring mightily under the emotional influence of the disturbing events he perceived."  (*People v. Brown* (2003) 31 Cal.4th 518, 540-541.)   The circumstances stimulating the utterance may prolong the emotionally charged state of mind of the declarant long after the actual event occurred.   Thus, the fact that appellant did not describe Ms. Lara's stiff legs

*363*

until 12 hours after the perception of her injuries and the effort to get her medical help is not dispositive of whether the statement was spontaneous.

Consider, for example, *People v Raley* (1992) 2 Cal. 4th 870. There, a statement made 18 hours after an event was held to be spontaneous under section 1240. (*Id.* at pp. 893-894.) In so holding, the Court noted that the circumstances leading to the utterance were relevant to determining whether a statement made 18 hours after the event was spontaneous. The Court found that the victim's "overwhelming emotion elicited by the thought that strangers had heard of the sexual nature of the attack" on her supported the conclusion that her statements were made under the continuing influence of her assault despite the 18 hours that had passed. (*Id.* at p. 894.)

Thus, the 12-hour lapse of time was not dispositive of the claim of spontaneous utterance in this case. Rather, the question is whether appellant's statement was uttered at a time when he was laboring under the influence of the disturbing events he had perceived. Clearly, he was. Appellant had witnessed the serious injuries sustained by Ms. Lara, and he had struggled to get her into his car to transport her to the hospital while her head wound profusely bled onto him. Following her delivery to the hospital, he was questioned by the police and jailed for her assault. For a man with no criminal record, the questioning and arrest could only have exacerbated and prolonged his emotional state. That he was in such a state is confirmed by the fact that he was "almost crying" as he described to his mother what he had seen and experienced, including how difficult it was to lift and move Ms. Lara. It was in that emotional state that appellant described Lara's legs as stiff. (1 CT 199-200.)

The Fact That Mrs. Hall Was Appellant's Mother: The fact that it was appellant's mother to whom he revealed his perceptions supports rather than detracts from the claim that he was still under the emotional influence of the

disturbing events he perceived, because she was someone to whom he did not need to be guarded.

And even more to the point, the trial court simply assumed Mrs. Hall would not be a credible witness, without having met her or heard her testify. It thus had no basis for its assumption. There is certainly nothing in the case law that allows a court to assume, without hearing the witness, that the testimony of a parent of a defendant is necessarily suspect.

Failure To Memorialize: Nor does the fact that appellant's statement was not memorialized or mentioned until the eve of trial take it out of the hearsay exception. The prosecution used the appellant's interview from February, 2005, ten months after the events. The fact that on this later occasion, appellant described his difficulty getting Ms. Lara into his car but failed to mention that her legs were stiff does not make his April 10th statement unreliable or his mother's recollection suspect. After all, the trial court heard from a number of witnesses who had forgotten to mention or memorialize at least one important fact prior to their trial testimony — including Ms. Lara, Dr. Jun, Officer MacHale, Patricia Rico, and Joseph Gerrans — but the court did not exclude their testimony as to the omitted facts.

*prejudicial her but not him —*

Further, defense counsel explained that it was two days earlier, on a Saturday, when he interviewed Mrs. Hall in preparation for trial, that he first learned of her recollection of appellant's description of Ms. Lara's stiff legs. (4 RT 570.) The jury could have weighed Mrs. Hall's testimony for credibility, just as it would weigh the claims made by the other forgetful witnesses.

The trial court abused its discretion by not permitting appellant's mother to testify to appellant's statement regarding Ms. Lara's stiff legs.

*364*

**B.    Even If Appellant's "Stiff Legs" Statement to his Mother Constituted Inadmissible Hearsay, the Defense Medical Experts Were Nevertheless Permitted to Rely on It when Rendering Their Opinions Regarding Whether Ms. Lara Suffered a Seizure**

As just argued, Mrs. Hall's recollection of appellant's statement regarding Ms. Lara's stiff legs should have been admitted into evidence as a spontaneous utterance. But even if this Court were to conclude otherwise, appellant's medical experts should have been permitted to rely on that evidence, just as they relied on other information obtained from the medical records and photographs, from Lara's statements, and from appellant's police interview. This is because, as appellant's medical experts indicated, Ms. Lara's stiff legs were a symptom indicating that she suffered a seizure right after her head injury, which would corroborate appellant's story that she was difficult to pick up and move. (4 RT 567.)

Hearsay information of a type reasonably relied upon by professionals in a field in forming an opinion on a subject may be used to support an expert opinion, even though not admissible in court. (*People v. Montiel* (1993) 5 Cal.4th 877, 918; *People v. Dept. of Transp. v. Clauser/Wells Partnership, supra*, 95 Cal.App.4th at p. 1085.) Such hearsay includes out-of-court statements of lay persons. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.) Statements regarding patients' symptoms have long been recognized as hearsay that medical experts may reasonably rely upon. (*People v. Shattuck* (1895) 109 Cal. 673, 678.)

Here, appellant's observation of Ms. Lara's stiff legs was a report of a symptom that the medical experts, Dr. Missett and Dr. Fotre, should have been allowed to rely on. Indeed, the trial court allowed both defense and prosecution experts to rely on and refer to many other hearsay statements regarding Lara's memory. Appellant's description of her stiff legs would have

been one of many facts that the experts considered in reaching their several conclusions.

If the trial court was concerned about the details of the hearsay statement reaching the jury, it could have controlled the form in which the experts were questioned to prevent the jury from learning detailed accounts of incompetent hearsay. (*People v. Price* (1991) 1 Cal.4th 324, 416.) And, of course, the court could have instructed the jury that such out-of-court statements are admitted only to show the basis of the opinion and not for the truth of the matter asserted. (See *People v. Coleman* (1985) 38 Cal.3d 69, 92.)

Further, if the trial court was concerned that permitting appellant's account of Ms. Lara's stiff legs would allow appellant to get self-serving and unreliable hearsay before the jury without appellant ever having to submit to cross-examination, the trial court could have required the defense to use the stiff legs observation in a hypothetical question, as was done in *People v. Pollock* (2004) 32 Cal.4th 1153, 1172.

However, the trial court made clear that it would not permit the stiff legs information to be used at all by the defense experts. (3 RT 572-573; see also 4 RT 722.) The court prevented the defense from using the information in any shape or form.

Appellant's statement to his mother regarding a symptom Ms. Lara displayed, whether hearsay or not, was information on which that the medical experts could reasonably have relied. As with the trial court's decision that Dr. Fotre could not express an opinion regarding the possibility of Lara having suffered a seizure, its ruling blocking the use of the stiff legs information, as well as any reference to the possibility of her having had a seizure severely hampered appellant's defense. Not only did the ruling wrongfully restrict the defense's ability to counter the prosecution's theory that Lara's injuries were the result of being battered, but it deprived appellant of support for his

*365*

assertion that he had had a difficult time lifting and moving Lara, an assertion that the prosecution scoffed at in closing argument. (5 RT 855.)

In the absence of the error, it is reasonably probable that the outcome of the trial would have been more favorable to the defendant. (See *People v. Boyette* (2002) 29 Cal.4th 381, 429.) It thus has not been "prove[d] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California, supra*, 386 U.S. at p. 24.)

## VII.

### APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL ATTORNEY FAILED TO CROSS EXAMINE MS. LARA ON THE SUBJECT OF WHETHER HER FATHER HAD ABUSED HER AND/OR FORCED HER TO LEAVE HIS HOME JUST PRIOR TO HER "RECOVERING" HER MEMORY

Appellant's counsel failed to make use of powerful evidence that would have severely undermined the credibility of Ms. Lara's claim of recovered memory. Specifically, counsel failed to elicit evidence that Lara "recovered" her memory shortly after her father had forced her out of his home because of her failure to "remember" that appellant had assaulted her.

The trial court specifically ruled that the defense could question Ms. Lara on the issue of her father's abusing or pressuring her to regain her memory; it also ruled that the impact of such abuse or pressure could be addressed by the defense experts. (1 RT 202-204.) The prosecutor conceded that Lara had described to her (the prosecutor) the abusive behavior on the part of Lara's father; the prosecutor further conceded that there were other witnesses who had heard Lara say that her father was abusive and had kicked her out of the house because she failed to remember what happened on the night her injuries occurred. (1 RT 99-102.)

Ms. Lara herself had testified at the preliminary hearing that right before she regained her memory, her father had kicked her out of her home. (1 CT 25-26). She plainly stated that the reason she was "evicted" by her father was "because I believed that Michael was not the one who hit me." (1 CT 26.) And at trial, Ms. Lara testified on direct examination that her father had "prompted" her to obtain a restraining order against appellant even though she did not want it. (2 RT 302-304.)

Yet, defense counsel failed to elicit either the fact that Lara's father had kicked her out of the house immediately before the "recovery" of her memory

366

or the fact that the cause of the eviction was his displeasure that Lara had failed to "recall" that appellant had assaulted her. Had this information been presented to the jury, it would have provided highly significant evidence that Lara had been pressured into having a memory and that only a memory accusing appellant of having caused her injuries would have satisfied her father and allowed her to return to his house.

On these facts, the failure to introduce the evidence constituted ineffective assistance of counsel under the Sixth Amendment and Article I, Section 15 of the California Constitution. (*Strickland v. Washington, supra,* 466 U.S. 668; *People v. Pope, supra,* 23 Cal.3d 412; *Bergman v. Duncan* (9th Cir. 1996) 86 F.3d 1161, 1162.) Failure on the part of counsel to make use of available corroborating testimony to competently present a defense has been deemed a violation of the right to effective assistance of counsel. (*Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, 894.) And, where trial counsel fails to procure or elicit testimony that is known to corroborate the defendant's account which would otherwise go uncorroborated, incompetency has been found. (*Mitchell v. Ayers* (N.D. Cal. 2004) 309 F.Supp.2d 1146, 1155-1156.)

Appellant again acknowledges that ineffective-assistance claims normally should be brought in a petition for writ of habeas corpus, but, as before, this issue fits within the rule that allows such claims to be brought on direct appeal when there can be no adequate explanation for the challenged deficiency. (*People v. Pope, supra,* 23 Cal.3d at p. 426.) That is plainly the situation with respect to the explanatory or motive evidence concerning the actions of Ms. Lara's father immediately before the "recovery" of her memory. That evidence would have provided strong indications that Ms. Lara's  "recovered" memory was either knowingly false or a confabulation. There can be no adequate reason why counsel did not elicit the evidence, especially since

the prosecutor conceded the evidence existed and the trial court ruled counsel could elicit it.

At trial, defense counsel argued that jealousy on the part of Ms. Lara was the motivation for her making up the accusations against appellant and that appellant's attendance at the Super Bowl, purportedly with another woman, was the watershed point for Lara's decision to make assault accusations against appellant. (2 RT 351-353, 5 RT 878-879.) Predictably, however, Lara denied that jealousy played any role in her accusations against appellant, and she also denied she was bothered significantly by appellant being with another woman. (2 RT 321-322.)

Yet, there was a far more powerful and undeniable explanation for Ms. Lara's accusations against appellant, one that would not in any way have undercut the theme of jealousy. For Lara had acknowledged, at least in terms of timing, a connection between when she regained her memory and her eviction from her home due to her failure to remember that appellant caused her injuries. There can be no adequate or tactical reason for counsel's failure to use that evidence. Moreover, the evidence of the pressure she was under to have a memory of being assaulted was quite compelling, so that it is at least reasonably probable that had the jury heard it, the result of the trial would have been more favorable to appellant.

The conviction should be reversed.

## VIII.
## APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WERE VIOLATED BY THE INSTRUCTIONS GIVEN THE JURY CONCERNING THE PERMISSIBLE USES OF THE OTHER-DOMESTIC-VIOLENCE EVIDENCE

The trial court instructed the jury on the purposes for which the other-domestic-violence evidence could be used. Specifically, the court gave the jury the 2005 version of CALJIC No. 2.50.02. That instruction permitted the jury to find that appellant possessed a propensity to commit the charged offenses if the jury found *by a preponderance of evidence* that appellant had committed any prior act of domestic violence. (2 CT 277-278, 5 RT 830-831.) The instruction also informed the jurors that "[i]f you find that the defendant had *this disposition* [i.e., to commit other offenses of domestic violence], *you may*, but are not required to, *infer that he* was likely to commit and *did commit the crime or crimes of which he is accused.* (2 CT 277-278, 5 RT 830-831(emphasis added.)

The instruction then declared that "if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses." (*Ibid.*) It further stated that "[i]f you determine *an inference* properly can be drawn from this evidence, *this inference* is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charge crime." (*Ibid.*, emphasis added.)[11]

---

[11]    The version of CALJIC No. 2.50.02 used at trial provided in pertinent part:

"If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to,
(continued...)

These instructions violated constitutional principles of due process and a fair trial embodied in the Fifth, Sixth, and Fourteenth Amendments, because they impermissibly lowered the prosecution's burden of proof and, in all probability, led the jury to incorrectly interpret what its obligations were. Under the facts of this case, a reversal is required.

### A.    The Instruction Is Cognizable on Appeal Despite the Fact that Trial Counsel Offered the Instruction

Preliminarily, appellant notes that his trial counsel requested the CALJIC No. 2.50.02 instruction that is being challenged here. (1 CT 195.) However, the challenge is cognizable on appeal, notwithstanding. For the doctrine of invited error to apply, "it must be clear . . . that counsel acted for tactical reasons." (*People v. Wickersham* (1982) 32 Cal.3d 307, 332; *People v. Dunkle* (2005) 36 Cal.4th 861, 895.) "Error is invited only if defense counsel affirmatively causes the error and makes 'clear that [he] acted for tactical reasons and not out of ignorance or mistake' or forgetfulness." (*People v. Tapia* (1994) 25 Cal.App.4th 984, 103.) Counsel's tactical purpose

---

[11](...continued)

infer that the defendant had a disposition to commit other offenses involving domestic violence. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused. [¶] However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charge offenses. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime. [¶] Unless you are otherwise instructed, you must not consider this evidence for any other purpose." (*Ibid.*)

*368*

must be clear from the record. (See *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1127.) In the present case, there is no hint that counsel proposed the instruction for tactical reasons rather than out of ignorance or mistake. The current claim is therefore cognizable in this appeal.

### B.    The Instruction Violates Due Process

Any analysis regarding the burden of proof for the use of propensity evidence must take into account the impact such evidence can have on a jury. As previously noted, a jury may be improperly swayed by propensity evidence to the point of overlooking its obligation to find each element of the charged offense beyond a reasonable doubt. (*Michelson v. United States, supra,* 335 U.S. at pp. 475-476.) Even with the section 352 screening of propensity evidence, there is still a danger that the presumption of innocence will melt under the heat of emotions aroused by the defendant's prior offenses. (*People v. James, supra,* 81 Cal.App.4th 1343, 1353.) As *James* states, "[t]he court's instructions should restrain the jury from misusing such evidence. (*Ibid.*)

Given the highly charged testimony of Cristen Marcos in this case, as well as the other alleged incident of domestic violence testified to by Paolina Lara, CALJIC 2.50.02 did not adequately restrain the use of propensity evidence so as to ensure that the jury knew of its obligation to find there was proof beyond reasonable doubt of each element of the charged offenses and that a conviction could not solely rest on proof of propensity arising out of prior crimes.

Appellant begins by pointing out that an earlier version of CALJIC No. CALJIC 2.50.02 was found to be unconstitutional by Division Three of this Court in *People v. James* (2000) 81 Cal.App. 4th 1343. *James* involved the 1997 version of CALJIC 2.50.02, the relevant portion of which was identical to language in the version that was given at appellant's trial. That is, the

instruction in *James*, like the instruction at appellant's trial, (1) permitted the jury to find that appellant possessed a propensity to commit the charged offenses if the jury found *by a preponderance of evidence* that appellant had committed any prior act of domestic violence and (2) informed the jurors that "[i]f you find that the defendant had *this disposition, you may*, but are not required to, *infer that he* was likely to commit and *did commit the crime or crimes of which he is accused*." (See 81 Cal.App.4th at pp. 1349-1350.

*James* held that italicized language did not properly rein in the jury's use of propensity evidence and improperly permitted a conviction to be based upon a defendant's propensities, in violation of due process. (81 Cal.App. 4th at pp. 1353-1354.) Since the identical language condemned in *James* also appears in the instruction given to appellant's jury (5 RT 830), it must be condemned here as well.

However, the instruction given to appellant's jury added two sentences that *attempted* to preclude the limit the jury's ability to return a conviction based upon propensity evidence. These two sentences provided:

> "However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime."

(5 RT 830-831.)

These two additional sentences do not cure the due process defect found in *James*. At the very least, there is at least a reasonable likelihood that the jury applied the instruction in an unconstitutional manner. There are at least two reasons why this is so.

One: Insofar as the first of the additional sentences states that a determination "that the defendant "committed a prior crime or crimes

*369*

involving domestic violence" is "not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offenses," this statement is plainly *not* a warning or advisement that "the inference of a disposition" arising from the prior act cannot by itself convict the defendant of the charged offense. All that this language sentence forbids is the jury using a finding (by preponderance of evidence) that the defendant committed prior domestic violence to directly prove guilt of the current offenses. But it does not forbid the jury from using its conclusion that the defendant "a disposition" as the sole basis for a conviction on the charged offenses.

The second additional sentence builds upon this foundation. For it provides that if the jury does draw the inference that the defendant has a disposition to commit crimes of domestic violence, this inference is "one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime." This language is wordy, but it does not prohibit the jury from using the inference of disposition as the sole basis for a conviction. To the contrary, it is reasonably likely that a jury would read this instruction as allowing a conviction based solely on the inference of disposition.

What these instructions failed to indicate was that if the jury determined by a preponderance of evidence that the defendant committed other offenses involving domestic violence and if it inferred from those prior offenses that the defendant has a disposition to commit other domestic-violence offenses, neither the prior offenses *nor the inference of disposition arising from such offenses* would be sufficient by themselves "to prove beyond a reasonable doubt that the defendant committed the charge offenses."

Two: There is a second reason why the two additional sentences in CALJIC No. 2.50.02 do not cure the constitutional deficiencies found in *James*. The new language warns that a determination by preponderance of

evidence that the defendant committed a prior act of domestic violence is not sufficient by itself to prove beyond a reasonable doubt that he committed the charge offenses, but it is reasonably likely that this language would be interpreted by the jury as permitting it to convict the defendant solely on the basis of the prior offense as long as the evidence of that prior offense exceeds a preponderance of evidence. In other words, if the jury found that the prosecution had proven beyond a reasonable doubt that the uncharged acts of domestic violence occurred, those acts could serve as the basis for convicting the defendant on the charged offenses.

Nothing in the other instructions given corrected these constitutional defects. CALJIC No. 2.50.1 only referred to proof "that a defendant committed the other crimes." Furthermore, CALJIC No. 2.01 added to the confusion, because it required — in direct conflict with the preponderance of evidence standard of CALJIC No. 2.50.02 — that "before any inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt." As *James* itself held,

> "The jury should not be placed in the position of resolving complicated standard of proof issues that perplex even judges. To assume a jury will accomplish this feat stretches to the breaking point the presumption that juries generally understand and faithfully follow the court's instruction."

(81 Cal.App.4th at p. 1358.)[12]

---

[12]    Appellant recognizes that in *People v. Reliford* (2003) 29 Cal. 4th 1007, 1013, the California Supreme Court rejected a due process challenge to the similar provisions of the revised CALJIC No. 2.50.01 instruction addressing the use of propensity evidence in sex offense cases. Appellant also notes that in *People v. Brown* (2000) 77 Cal.App.4th 1324, 1334-1335, and *People v. Hill* (2001) 86 Cal.App.4th 273, 276-279, two divisions of this Court have rejected due process challenges to instructions similar to the one used in the instant case. However, those decisions did not involve instructions
(continued...)

*370*

C.    **The Constitutional Error Requires Reversal of the Judgment**

Where a jury is given burden of proof instructions that violate the demands of due process, the standard of review is "whether it appears beyond a reasonable doubt that the error did not contribute to [the] jury's verdict." (*People v. Flood* (1998) 18 Cal.4th 470, 504; *People v. James, supra,* 81 Cal.App.4th at pp. 1360-1361.) The error did not contribute to the verdict if it is unimportant in relation to everything else the jury considered on the question of the defendant's guilt as revealed in the record. (*Yates v. Evatt* (1991) 500 U.S. 391, 403.) The reviewing court must make a judgment about the significance to reasonable jurors of the inference permitted by the instruction, measured against the other evidence they considered. (*Id.* at p. 404.) It is only when the effect of the inference is comparatively minimal that it can be said the error did not contribute to the verdict. (*Id.* at pp. 404-405.)

Here, it cannot be said that the evidence of appellant's guilt was so strong that the effect of the inference from propensity alone was insignificant. Ms. Lara's testimony was riddled with inconsistencies as to whether she had a true and accurate memory of the events leading to her injuries or whether the injuring producing event was an accident or assault. Medical testimony questioned whether she could have any memory at all. But unlike Lara's testimony, the testimony of Cristen Marcos regarding the prior act of domestic violence went virtually unchallenged. Exacerbating the instructional error was the fact that appellant had never been charged or punished for his role in Marcos' injuries, making this case one in which the jury had great emotional motivation to convict solely on Marcos' testimony, as CALJIC No. 2.50.02 permitted. The jury had a tremendous incentive to substitute appellant's

---

[12](...continued)
identical to the one used at appellant's trial, nor did the defendants there raise all of the arguments made by appellant here.

apparent guilt in the Marcos incident with the problematic proof of the charged offenses. (See *People v. James*, *supra*, 81 Cal.App.4th at p. 1365.) The conviction must be reversed.

## IX.

**IF THIS COURT WERE TO CONCLUDE THAT DEFENSE COUNSEL FAILED TO PRESERVE ANY OF THE AFOREMENTIONED CLAIMS, THEN A NEW TRIAL WOULD BE REQUIRED ON THE GROUND THAT APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL**

As to all of the claims raised above, either appellant's trial counsel objected sufficiently to preserve the claim, or (as with the instructional and ineffective-assistance claims) no objection was required. However, if this Court were to conclude otherwise, or if it were to conclude that one or more of the objections were somehow insufficient to allow the claims to be raised on appeal, then appellant was denied the effective assistance of counsel to which he was entitled under the Sixth and Fourteenth Amendments. (*Strickland v. Washington, supra,* 466 U.S. 668.)

As discussed earlier, although an ineffective assistance claim should normally be raised in a habeas petition when the record sheds no light on the reasons for counsel's inactions, an appellate claim is appropriate when there simply could be no satisfactory explanation for the inactions. (*People v. Pope, supra,* 23 Cal.3d at p. 426). That would be the situation here. There clearly was no tactical reason for any allegedly inadequate objections or failures to object. Nor is there any other satisfactory explanation for counsel's inactions. Under these circumstances, any failure to object adequately would amount to the ineffective assistance of counsel. (See *People v. Lewis* (1990) 50 Cal.3d 262, 282 [Supreme Court considers otherwise forfeited "claim on the merits to forestall an effectiveness of counsel contention"]; *People v. Stratton* (1998) 205 Cal.App.3d 87, 93 [Sixth Amendment violated by failing to preserve meritorious claim for review].)

Moreover, to the extent constitutional issues are raised in this appeal, they are not waived by inadequate objection. (See *People v. Yeoman* (2003) 31 Cal.4th 93; *People v. Coddington* (2000) 23 Cal.4th 529.)

# X.

## IF REVERSAL OF THE CONVICTION IS NOT REQUIRED BY ANY OF THE PRECEDING CLAIMS, REVERSAL WOULD NEVERTHELESS BE REQUIRED BECAUSE OF THE CUMULATIVE PREJUDICE OF THE ERRORS

Each of the errors described above requires a new trial for the reasons discussed. However, the Court may, if it prefers, decline to decide which issues would require reversal by themselves. That is because the cumulation of errors was surely prejudicial under federal constitutional law. The seriousness of the errors together, along with the difficulty of the case as shown by the length of the jury's deliberations, compels the conclusion that the errors contributed to the verdict. (See *Chapman v. California, supra,* 386 U.S. 18.)[13]

The same result would obtain even if the errors were all viewed purely as matters of state law and even if the inquiry were whether it is reasonably likely that a different outcome would have occurred in the absence of the errors. (See *People v. Watson, supra,* 46 Cal.2d 818; *People v. McGreen* (1980) 107 Cal.App.3d 504, 519-520; *People v. Buffum* (1953) 40 Cal.2d 709, 726; *People v. Ford* (1964) 60 Cal.2d 772, 798; *People v. Zerillo* (1950) 36 Cal.2d 222, 233; *People v. Cruz* (1978) 83 Cal.App.3d 308, 334; *People v. Guzman* (1975) 48 Cal.App.3d 380, 388; and see *United States v. McAlister* (9th Cir. 1979) 608 F.2d 785.)

Moreover, state law errors "that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may

---

[13]    When errors of federal constitutional magnitude combine with non-constitutional errors, all errors should be reviewed under a *Chapman* standard. (*People v. Williams* (1971) 22 Cal.App.3d 34, 58-59; see also *In re Rodriguez* (1981) 119 Cal.App.3d 457, 469-470.)

cumulatively produce a trial setting that is fundamentally unfair."[14]  In this case, the cumulation of errors did just that. (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642-643; *Greer v. Miller* (1987) 483 U.S. 756, 764.)

## CONCLUSION

For the foregoing reasons, the judgment against appellant should be reversed, and the case remanded for a new trial.

DATED:  November 18, 2006

Richard C. Neuhoff
Barbara A. Zuras
Attorneys for Appellant
Michael T. Johnson

---

[14]  *Cooper v. Sowders* (6th Cir. 1988) 837 F.2d 284, 286-88; *Lincoln v. Sunn* (9th Cir. 1987) 807 F.2d 805, 814 footnote 6; *Menzies v. Procunier* (5th Cir. 1984) 743 F.2d 281, 288-289; *Greer v. Miller* (1987) 483 U.S. 756, 764; *Rose v. Lundy* (1982) 455 U.S. 509, 531 footnote 8, concurring opinion; *Taylor v. Kentucky* (1978) 436 U.S. 478, 488; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 642-643.

*373*

## CERTIFICATE OF WORD COUNT

I, Richard C. Neuhoff, appellate counsel for appellant Michael T. Johnson in the above-entitled cases, hereby certify that the Appellant's Opening Brief was produced on a computer and that the brief contains 24,928 words, according to the word count of the computer program used to prepare the petition.

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this certificate was executed on November 18, 2006, at New Britain, CT.

_____
RICHARD C. NEUHOFF

# EXHIBIT "D"

374

*[handwritten: OFFicer Mecale = OFFicer mchale]*
*[handwritten: Decinya = Yessinia ~~[crossed out]~~]*
*[handwritten: Best Friend.]*

Tape 1
Page 1

*Transcriber's Notes: Unsure of spelling or a phrase, (?) was used; where any of the dialog was inaudible or unclear [inaudible] was used.*

## BACKGROUND CONVERSATION

*[handwritten: mc]*  Male:        Turn the TV off.  Hit mute.

*[handwritten: mom]*  Female:      I can't even hear nothing.

Male:        That's because you went back too far.

Female:      Oh, you didn't turn it on at first?

Male:        You went back too far.  You said the tape was ready to run.  You don't know what you're doing.  Here.  You're recording, lady.  Jesus Christ.

## PHONE CALL

Paolina:     …my whole family.  And they told me my grandfather(?) as soon as he found out that I died(?) for a couple hours, they sent him to the hospital because he had a [inaudible].  I can't really picture his face.  I mean…

Mike:        Listen, listen.

Paolina:     My memory _____ fucked up but [Inaudible]

Mike:        Listen, listen.

Paolina:     [Inaudible].

Mike:        Listen.

Paolina:     You can call from your job or…

Mike:        Listen.

Paolina:     I mean your girlfriend's cell phone.  I don't even know.

Mike:        Listen, listen, listen, listen.  Then why did you tell the police officers that I threw something at you?]

Paolina:     [I don't remember that.  That's the thing.  I remember talking to the cop as soon as

Revised by www.officeaides.biz on December 10, 2006

*[handwritten: 375]*

*Subjucates herself to Officer McCole*

I got home and he goes, "Do you remember anything, you know?" It's like, "No, I'm trying. But, every time I try I mean my head really hurts and I can't remember anything." He was like, "Oh, but you know he's 37 and he has a really(?) background like I mean you're really pretty and you're really young to be with a person with this type of background. I was in shock when he said that. I was like, "Okay." And then he left and then he came back and he's all, "Well, do you, you know, do you remember anything?" You know, i was iike. "Weii. my whoie memory's gone, most of it is gone and it's not coming back.")

| Mike: | And you want to go to court about this? |
|---|---|
| Paolina: | They do. |
| Mike: | Do you? |
| Paolina: | I told [inaudible] I don't even want to go through this, not even through the pain. Nothing. |
| Mike: | You don't want to go to the hearing? |
| Paolina: | No. I mean I said nothing. Why would i want to go through the pain? [Laughs] That's it. I mean really it's a lot of pain I don't want to go through it, pain or court nothing. Aii I'm worried about is how in the world am I supposed to pay aii that fucking money in the hospital? It is more than $25,000 I think, something like that. |

*All I'm worried about is how in the world am I supposed to pay all that fucking money —*

| Mike: | It's what? |
| Paolina: | I'm thinking about selling my car and probably have two jobs. I don't even know. |
| Mike: | Okay, I'll call you later, okay? |
| Paolina: | Okay. Bye. |
| Mike: | All right. |

PHONE CALL

| Mike: | No, I was doing something for my mom. |
| Paolina: | Huh? |
| Mike: | I had to do something for my mom. |

Paolina:    I mean you can tell me whatever you want. I...I'm not going to believe you. I mean, whatever. I mean the whole emails by your friend little(?) cocoa girlfriend [inaudible] who used to send you the email, the whole chat room, the two-way messages, text messages you used to send her or she would send you a text message. You'd tell me it was one of your guy friends and it would turn out to be Sheena(?).

*jealousy !*

Mike:    What are you talking about?

Paolina:    I mean it was obvious you were with somebody else and I was trying not to believe them and now [inaudible] that it's true. I mean Shawn... I mean not Shawna, Shug and them told me. I mean...

Mike:    Shug and them told you what?

Paolina:    I mean you are going out with somebody. I mean it's true, Mike.

Mike:    Who?

Paolina:    You don't have to...you don't have to lie about it. I mean it's obvious.

Mike:    Who am I...?

Paolina:    You're telling me that even when I was working and I'd [inaudible] and go, "Hi, baby."

Mike:    Paolina...

Paolina:    And somebody sends you a text message...

*( capture the conversation )*

Mike:    Paolina...

Paolina:    You'd tell me it was one of your guy friends...

Mike:    Paolina...

Paolina:    And it'd turn out to be Sheena(?).

Mike:    Paolina...

Paolina:    [Inaudible] Other girls used to send you text messages and you used to tell me it was one of your guy friends.

*377*

*paranoia*

Mike:        Paolina...

Paolina:     ...that they were waiting for you to go to a study session. You were going to go take somebody out. You were going to go see your other girl.

Mike:        Paolina...

Paolina:     What happened? Every Friday night...every Friday night go to [inaudible] Fridays, you'd go pick up the other girl to go touch her and to go kiss her and to go do something.

Mike:        What are you talking about?

Paolina:     When your mom went to Texas, what happened? You were home alone. You were fucking other people. I mean...

Mike:        What are you talking about?

Paolina:     It's obvious. I mean it's proven. I mean all I have to say is that next time, you know, every time you had sex, you know, [inaudible] girls you wear a condom so you don't have to, you know...

Mike:        Paolina...

Paolina:     ...give them the herpes because I mean regardless have to keep you for the rest of my life because the herpes thing doesn't go away.

Mike:        Paolina...

Paolina:     So regardless I have to keep a little bit of you on me and I can't do anything about that because that's going to stay with me for the rest of my life.

Mike:        Paolina, would you...would you stop?

Paolina:     And if I do turn out to have kids, they're going to have it, too.

Mike:        Paolina, are you -- would you stop?

Paolina:     I...I mean how do you want me to stop? You told me how many hours ago that you were going to call me back. I mean as far as I can remember when you used to take a shower it was like five minutes.

Mike:        My mom...

*Attention*

*378*

Paolina:     And that was the longest.

Mike:        My mom.

Paolina:     Don't you...don't. You don't have to fucking explain that to me. I mean it's obvious you're with somebody else.

Mike:        I'm telling you, my mom...

Paolina:     I was trying not... I was trying not to believe your friend and the girls from JC Penney.

Mike:        What are you talk... ?

Paolina:     And [inaudible] when he told me that you were with somebody else in the car, like she was all over you a while ago. I didn't want to say anything. I just kept it to myself when I was with you. Every time I used to look in your eyes I was trying not to believe that shit. And now I do.

Mike:        [Sighs] Whatever, Paolina. I don't know what you're talking about.

Paolina:     Uh-huh. You can say...you can whatever. But you know I'm right because that's all you have to say, whatever, because you know I'm right. I mean how can you prove it? You can't prove it.

Mike:        I can prove my mom...

Paolina:     I mean what you're proving, you're proving that you are with somebody else. I mean...

Mike:        I can put my...I can put my mom on the phone and she can tell you I'm putting up the curtains for her.

Paolina:     She doesn't like me.

Mike:        But she would...

Paolina:     You even know if she doesn't like me. You even told me that she cannot even stand me.

Mike:        But...but she will not...

Paolina:     I have nothing against her. I have a lot...

*379*

Mike:        …she will not lie…but she will not.  But Paolina…

Paolina:     of words to say thank you to her because…

Mike:        Paolina…

Paolina:     …she helped me out a lot.

Mike:        Paolina, but she will not lie to you.

Paolina:     I don't…I don't hate her.  I don't dislike her.  Instead, it's the opposite.  I used to
             feel that she was like my second mom.

Mike:        Oh, God.  Whatever.

Paolina:     I still do, but, hey, I mean that's your mom, not mine.

Mike:        Okay.

Paolina:     You probably have [inaudible] me because of what the police officer is telling me
             about your whole background.  It's kind of like, maybe it's kind of like you
             having to like, you know, you used to like an ex-wife or something or with kids.  I
             don't even want to found out because I mean I will feel kind of like, well, you
             know, I mean…

Mike:        Paolina…

Paolina:     I don't.  I'm aware I'm naïve.

Mike:        Paolina…

Paolina:     You know and for me to think that I really wanted to have your kids.

Mike:        Paolina…

Paolina:     That was…that was just me.

Mike:        Paolina…

Paolina:     It was not going to happen.

Mike:        Paolina…

Paolina:     But [inaudible] it's wrong and to me it felt right.  But it was totally wrong.

Revised by www.officeaides.biz on December 10, 2006

*380*

Mike:        Paolina… Paolina?

Paolina:     Um-hmm?

Mike:        Are you there?

Paolina:     Yeah.  It's I'm just saying, I mean there really is…

Mike:        Would you…?  Paolina?

Paolina:     …dreaming of one day having your kids.

Mike:        Paolina…Paolina, didn't you tell me…?

Paolina:     What?

Mike:        Didn't you tell me the other day the police were making you press charges?

Paolina:     ⎰ I mean everyone, your friends, my friends, fucking people at JC Penney, my ⎱
             family.

Mike:        Every…

Paolina:     Everyone at my job.

Mike:        Do you want to press charges?

Paolina:     I can't swear(?) it. ⎰ I don't even know what happened. ⎱ I mean you're with
             somebody else.

Mike:        Didn't the…

Paolina:     I can(?) be moving along.  I'm opening(?), I mean I'm like…

Mike:        Paolina…Paoline, listen.

Paolina:     I mean if you're happy with that person…

Mike:        Paolina, would you listen?

Paolina:     Go ahead.

Mike:        ⎰ Didn't you tell me the nurse said I beat you up? ⎱

Revised by www.officeaides.biz on December 10, 2006

381

_suggestible_

**Paolina:** Somebody told me. Yeah, a lot of people were telling me like it's obvious he beat you down. I mean...

**Mike:** Paoline...

**Paolina:** ...how can you have all these, you know, those scratches all over your body? I mean I know you weren't tied up but you look like you were tied up. [Inaudible]

**Mike:** Paolina. Yes or no...

**Paolina:** [Inaudible] tied up.

**Mike:** Paolina, yes or...

**Paolina:** A lot of people tell me you whipped me down my dad. Who else told me? A couple of nurses, some other guy. I don't...I can't [inaudible] time I was completely blind so I don't know who it was. I know it was a guy.

**Mike:** Did the police...?

**Paolina:** [Inaudible] like he beat you down.

**Mike:** Did the...?

_← from [unc]onsciousness._

**Paolina:** So what am I supposed to do? I mean as soon as I woke up I wanted to see you and hold you and that was the first thing I told the nurse, "Can you please call my boyfriend and call my [inaudible] to let them know I am at the hospital." And he's like, "Well, your boyfriend was the one who beat you down." It's like, "What? Don't lie about it."

**Mike:** Who said that?

**Paolina:** "I'm not lying." Some guy came in. He's like, "Yeah, Michael Johnson. Was that your boyfriend?" And I was like, "Yeah." And he said, "Well, yeah, he was the one who beat you down."

**Mike:** Who told you that?

**Paolina:** What am I supposed to do? Be all like, "Oh, is it? Oh, yeah."

**Mike:** Paolina...

**Paolina:** And then when they told me you were with somebody else, you made it obvious.

Revised by www.officeaides.biz on December 10, 2006

_382_

*Attention disorder*

I mean all you have to say is, "Paolina, I don't want you anymore. I'm interested in somebody else." That's all you had to do.

**Mike:** What are you talking about? Why are you bat… What are you talking about?

**Paolina:** That you didn't have to beat me down or you didn't have to hurt my feelings inside. You didn't have to be cheating on me; you didn't have to be behind my back sleeping with people, kissing people, being all over the other girl. All you had to say was, "Paolina, I don't want you anymore. I'm interested with somebody else." That's all you had to do.

**Mike:** I was not cheating on you. If I was cheating on you, how come none of these people have the names or can show me…?

**Paolina:** They told me Sheena(?). Even if it's not Sheena it could probably be Patty because I mean you're always with her by, you know yourself. And you used to slap her ass. I remember that you used to slap her and I mean she has your house phone number. I don't even have your house phone number. She has it but I don't. And that used to be your girlfriend. That's like kind of weird, don't you think? Yeah. You know, she used to call you _____ night because, uh, yeah, excuse me but I mean but yet she couldn't call her best friend or anybody close to her or other family members, cousins, her auntie, her uncle, anyone. She calls you. It kind of made it obvious. I mean, I mean, it's kind of gone, my whole memory's kind of out, you know, and I do kind of feel stupid because I don't remember a lot of things. But I remember all this.

**Mike:** Paolina…

**Paolina:** Why? Because you made a point.

**Mike:** Paolina, have I ever hit you before?

**Paolina:** What happened when you kicked me out of your house and you were having my clothes in your hand and I was trying to get off of you? Where were your hands at? At my neck kind of choking [inaudible].

**Mike:** Who was the police officer that said this?

**Paolina:** I…I can't remember his name. My whole memory's fucked up, I mean…

**Mike:** But did someone say that? Did one of the police officers say they wanted to take me down?

**Paolina:** A lot of people want to take you down, I mean, not only my friends… I mean other

*383*

*being influenced*

people that they're trying to do a whole case thing. They want to take you down. That's why I told you. It was on my messages and do this, do that but you told the officer that I'd send you a message and then I called you. So he was just like, "Well, when we have something to comment, we'll get into it." That's why I told you a couple minutes ago, don't -- well, hours because you didn't call me back...

Mike:  Oh, you know your friend Anthony came up to me yesterday at the bar?

Paolina:  Anthony who?

Mike:  Anthony the Columbian guy who used to work at JC Penney's.

Paolina:  No.

Mike:  Yeah, he wanted to fight me, too.

Paolina:  Huh?

Mike:  Yeah, your boy Anthony wanted to fight me.

Paolina:  Anthony who?

Mike:  He used to work at JC Penney. Said he came over to see you.

Paolina:  When?

Mike:  He says he came up to see you like last week or something like that.

Paolina:  Last week. That's the guy who wears glasses [inaudible] like glasses at the hos...I think of at the hos... I don't know.

Mike:  Okay.

Paolina:  But I don't remember him anyways [inaudible].

Mike:  Well, I've got to go. I'll talk to you later, okay?

Paolina:  See, you're not going to call me back. So all I have to say, take care of yourself and be happy with that person you're with and...

Mike:  I'm not. I'm not with anybody. Okay?

Paolina:  ...be good. I mean I totally forgot the whole image of you. All I can remember is just your voice. Your whole face and body is gone. All they told me that you

*384*

were black and that's it so [inaudible] black guy.  I don't remember your face.

Mike:        Okay, I'll talk to you later.

[Phone rings]

Paolina:     I mean what can I do?  Nothing / I'm all by myself / [Inaudible]

[Phone rings]

Paolina:     Oh, okay, I think I remember.

/PHONE CALL / *would preveriate, to save step. Mother from being deported.

Paolina:     My mother told me.  What am I supposed to do?

Mike:        What...what...wait...wait, but...  Wait, wait, wait.  The cops told you what?

Paolina:     They were looking into the whole situation.  They want to talk to my dad and then
             they'll talk to my mom.  They're going to look into the records, my mom and my
             dad's records.  But when they need(?) the social security number and their ID and
             everything.

Mike:        Wait, the...

Paolina:     My mom...

Mike:        Wait, wait, hold on.

Paolina:     ...doesn't have a social security number.

Mike:        Wait...wait, hold on.  Paolina.

Paolina:     So they're going to take her from the United States.

Mike:        Paolina.

Paolina:     What am I supposed to do?                    sense of helplessness

Mike:        The...

Paolina:     I've been thinking about fucking all these fucking different ways and the only way
             is for me to get married.

Revised by www.officeaides.biz on December 10, 2006

385

*was leniency given in exchange for testimony? you do what we want or else your mother be deported?

Mike:       Paolina.

Paolina:    I don't care about Santiago.

Mike:       Would you listen?

Paolina:    I mean he wants to talk to my dad.

Mike:       Would you...would you listen?

Paolina:    I never say yes. I yell. I mean I'll know you know.

Mike:       Paolina, would you listen?

Paolina:    I don't know what to do.

Mike:       Wait, wait, wait. They police are looking into your parent's background because
            of me?

Paolina:    Because you said something about the whole arguing and I said something like
            well, you need to talk to my dad and my mom or something like that. So they're
            talking to them. Well, they're talking to my dad. And then they want to talk to
            my mom. And the cops are looking into their records. Once they look into my
            mom's records they know she's here, an illegal, they're going to kick her out.
            What am I supposed to do?

Wow!  →

←  Ban!

Mike:       So you're blaming them deporting your mom on me because of this whole
            situation?

Paolina:    No, not on you, not on you. I mean she doesn't have the papers so that's not your
            fault because that's not your mom. You're not the one who brought her here. She
            was not the one who gave you birth. Cool, fine. But what am I supposed to do? I
            mean my parents already [inaudible] fucking drive(?) from all the crying I've been
            doing every single fucking day over at the hospital. You have to staple it back,
            take the staples out, sew it, cut it, sew it, cut it.

Mike:       Jose told me all about that.

emotional
co-dependency!

Paolina:    You can even ask Earl(?) when you get out. Right now I need to have someone
            with me. I can't have Michael with me because he doesn't want to. At least let
            me have you because you're next to him.

Mike:       Paolina.

Revised by www.officeaides.biz on December 10, 2006

386

Paolina:    You work with him.

Mike:       Paolina, Paolina, I could not…

Paolina:    You're the only person I could, you know, kind of like…

Mike:       Paolina, Paolina, would you listen?

Paolina:    …be with him because…

Mike:       Would you listen?

Paolina:    You work with him.

Mike:       Listen.

Paolina:    He was just like, "Okay." So he was there the whole time, even without a car. He was cleaning my tears with a fucking towel because I was crying so much and I was yelling.

Mike:       Paolina.

Paolina:    And he couldn't stand it.

Mike:       Paolina, would you listen? I cannot be anywhere near you because of the restraining order. I'm sorry I couldn't be there for you, sweetie.

Paolina:    Did you think my dad was there? Do you think the cops was there? Did you think my family was there? Shawna(?) was the one who picked me up from the hospital because they were working and they have to go school and I asked Jose, I was like, "Can you come so you could be with me?" He's like, "Yeah, sure."

Mike:       Can you call… Wait, wait.

Paolina:    So he went. [Inaudible]

Mike:       Call who? Call what?

Paolina:    If you really…If you really wanted to talk to me, you could use a pay phone. You could use somebody else's cell phone. You could use the work phone. Do you think they're going to check that one? No. So think about it. I mean I'm the one with the fucking brain damage and I'm the one stupid one, the one that can't go to school for a whole fucking year because my whole memory's fucked up and it's

*rule breaking, self effacing, attention seeking, co-dependent*

*387*

*not even telling y*
*just about her.*

not going to stay with me.  If I'm going to try to remember something for the test for the next day...

PHONE CALL

| | |
|---|---|
| Paolina: | Like I'm going to be going, I'm not going to go to school for a whole year.  I can't remember fucking nothing about math.  My sister was just making fun of me because she asked me a question and I was just like, "I don't know the answer." |
| Mike: | Paolina, it was not my fault.  It was an accident, Paolina. |
| Paolina: | And she was like, "Are you fucking serious?"  It was like, "You need a calculator or something?"  "I don't know." |
| Mike: | Paolina, it was not my fault, Paolina.  It was an accident. |
| Paolina: | So you're the smart one so you should figure it out.  I could use the pay phone.  I could use somebody's cell phone.  I could use the work phone. But you don't do it.  I got your point.  Clear.  And you even told me, "If I don't want to deal with somebody I'm just going to ignore them, da-da-da-dah."  That's what you do.  What happened the last time?  You hang up on me.  Cool, fine. |

PHONE CALL

| | |
|---|---|
| Mike: | You tell me what's supposed to be going on. |
| Paolina: | I -- hold on.  What, Susie(?)? |

[Side conversation]

| | |
|---|---|
| Paolina: | Hello? |
| Mike: | Yeah. |
| Paolina: | Yeah.  Well, I mean, I was about to tell you a lot of things but you're not interested in me so what's the point? |
| Mike: | Okay, if you don't want to tell me. |
| Paolina: | I mean I did but... |
| Mike: | What...? |

Paolina:     You're the one who's not calling back or anything, not answering back or...

Mike:     Okay what did you...?

Paolina:     ...texting me back until like five hours later.

Mike:     Okay, what did you tell me?

Paolina:     What did I tell you what?

Mike:     Are you going to tell me what's going on or what?

Paolina:     Well, yeah, I mean... [Sighs]

[Dog barking]

Mike:     So what's going on?

Paolina:     Oh, hi.  Hi.  How are you guys?  I'm fine.  Okay.  Are you going to be awake a couple minutes?

Mike:     Yeah.

Paolina:     Well, let me call you back like in ten minutes.

Mike:     Okay.

Paolina:     Bye.


PHONE CALL

Paolina:     Okay, hold on, let me close this door.  Okay, firstly, you don't have to call me, Michael, like really.  I mean I definitely get the point.  I mean, I believe you've changed.  Yeah, I've changed too.  My temperament [inaudible].  I even got into a fight at the movie theatre.  It's cool, fine.  I know, I won't text you like my whole life thing [inaudible].  But you don't have to call me if you don't want to.

Mike:     Okay.

Paolina:     You know like the whole attitude thing like, "Uh-huh, whatever, yeah."  Like yeah, whatever, come on.  You know?  If you don't want to _____, just say it.

Revised by www.officeaides.biz on December 10, 2006

*389*

Mike:       Okay.  Okay.

Paolina:    So what is it?

Mike:       So what's going on?

Paolina:    So what is it?

Mike:       What's going on?

Paolina:    So I mean so that's going to be your answer?

Mike:       What's your question?

Paolina:    If you still want to talk to me, just say it.

Mike:       Yeah, I do want to talk to you.

Paolina:    Then how come you don't call me like before?  I mean you're my boyfriend, all the time you used to call me from your job, or at night, or when you woke up or on your break.  And now no.  So I'm like, "Okay."

Mike:       Okay.

Paolina:    You were the one who moved.  I mean it was time to move on but I couldn't because I don't want to be with them.  I'm trying but because you moved on and [inaudible] Decinya(?) was you told her that I have to be with another guy.

Mike:       I did not tell her that.

Paolina:    Well, that's what she told me.  And I mean it hurt me because I was just like I still wanted to spend the rest of my life with him, but...

Mike:       Paolina, stop listening to Decinya(?), okay, I'm telling you.

Paolina:    I mean, [inaudible], I mean you guys have to work together.

Mike:       I don't work with Decinya(?).  I hardly even speak to Decinya(?).

Paolina:    Well, I don't know.  I'm just, well now I'm getting confused.  I know I'm stupid now.  [Inaudible] because I have a brain thing I can't go back to school, so...

Mike:       Yeah, yeah, yeah.

Paolina:   You know, I have everything that I need from my dad and my sister.  They put me down yeah, because it hurts me when my family is calling me names and you know, "You're mentally retarded now," just da-da-da-dah.  Cool, fine.

Mike:   They've been...they've been calling you names and putting you down ever since I've known you.

Paolina:   Yeah, probably but now that I need their help, like they're going to say it because I don't have nothing, I mean my friends are always here.  Cool.

Mike:   Okay, so what's going on Wednesday?

Paolina:   That's fine.  [Inaudible].

Mike:   So what's...?  Okay.

Paolina:   [Inaudible] telling me what to do.  And it'll be okay.  Which they are...

Mike:   Paolina...

Paolina:   [Inaudible] My dad hates that...

Mike:   Paolina...

Paolina:   ...sometimes he's not happy.          *Possible Oedipus complex?*

Mike:   Paolina...

Paolina:   He's just a little kid.  Like when he's mad you have to leave him alone for a couple hours or a couple days.  Later on, come back he'll be nice.

Mike:   Is that...is that why he beat you the other week?

Paolina:   Yeah, because of my temperamental [inaudible] He said something smart to me.  I came back with a reply.  It was, "You're going to [inaudible]," and he couldn't handle it.  Bam.

Mike:   He started hitting you.

Paolina:   Um, just once.  It was hard.  I thought that I was going to get a bruise.  But no bruise.  It went away.  I was crying, you know, just like [inaudible].

Mike:   Okay.

Revised by www.officeaides.biz on December 10, 2006

391

Paolina:    ⌈ I mean he snapped he [inaudible]. So.. ⌉

Mike:       Okay, so what's going on Wednesday?

Paolina:    I don't think it's going to happen. I'm going to talk to Officer Mercale(?). I'm
            going to tell him that I don't want to do it.

Mike:       What do they want to do?

Paolina:    So I'm going to go to the police station, call you and ask you all these questions.
            They're going to be recording it and they're looking for your tone of voice and the
            way you answer them. The way you're supposed to be answering them is we
            haven't talked ever since last month, like ever since I left your things at Loss
            Prevention and that was the last time we talked. Otherwise you'll be in trouble,
            I'll be in trouble and you'll go to jail and [inaudible] like call me or some shit like
            that like if they found out that we're talking, which I'm not saying nothing but if
            you say something like last time that I called you, you'll be in trouble and I'll be
            in trouble. But you'll be the one getting in trouble more.

*rule
over king*

Mike:       Who's idea was this?

Paolina:    That was his idea. That's why I'm like I don't want to do it.

Mike:       It was who's idea?

Paolina:    His idea.

Mike:       Who's he?

Paolina:    Officer Mercale(?).

Mike:       It's his idea?

Paolina:    To call you? Yeah.

Mike:       Okay.

Paolina:    Then they're looking if you -- cause if I ask you why you did this, you know, like
            why you hit me, if you said, "I didn't do it," like with an attitude, mad and kind of
            like, you know, "Get over it. I didn't do it," that will be like oh, he did it. They're
            looking like, you know, "No, sweetie. I would never do that." They're looking
            that like, "Okay, he didn't do it." But I don't want to do it. I don't want to do it.
            And I'm not going to do it. I mean [inaudible] is fine. If they want to take me to
            the police station, cool, fine [inaudible] but I won't do it. What for? I mean later

*392*

on you could get busted(?) out(?)  like last time when you told Officer Mercale(?) about the whole, "Well, she called me, like yesterday," or something, because you don't want to get in trouble.  And I told you don't say that.  We're talking, don't say that, you know, we're calling each other and sending like messages and you did.  Right?

Mike:       Yes, I did.

Paolina:    See.

Mike:       How often does he call you?

Paolina:    Huh?

Mike:       How often does Officer Mercale(?) call you?

Paolina:    Well, he came to the house, yesterday?  Yeah, yesterday.  [Inaudible]  I can't remember if it was yesterday or two days ago.  I don't know.  Memory's fucked up [inaudible].  He was just like here yesterday, I don't know.

Mike:       Dude, when was this?  Paolina, what are you doing…what are you doing driving to go pick your father up?

Paolina:    Huh?

Mike:       What were you doing driving to go pick up your father?

Paolina:    To pick my father what?

Mike:       You said you drove to pick up your father.

Paolina:    Huh?

Mike:       You said you drove to go pick up your father the other day.

Paolina:    Yeah, to the bus station and I got in trouble for my dad.

Mike:       What the hell are you doing driving?

Paolina:    Dude, I mean, I know the top light is red and red means stop, the bottom one is green and I know it's go.  So I mean my dad was just like, "Okay, I'll have you drive me because I don't want to walk home."  I was like, "Oh, well, you know," because Kim's(?) like, "Okay, [inaudible]."  I'm here.  So then I was just like, "Okay, [inaudible] but my whole brain's fucked up.  I should go pick him up now

*Paolina is not chemirical*

because it's been like an hour already. So I went up there. It wasn't bad. I mean I was excited. I was shaking. I was shaking. I was just like, "Damn, I'm driving again," because I haven't touched my car or any car ever since, what? Last month.

Mike:       Sweetie...

Paolina:    I don't know.

Mike:       Sweetie, you do not need to be driving, okay?

Paolina:    Dude you think I want to be home with all these people calling me names, putting me down? The only time I go out it's to the hospital. That's it. Yesterday...

Mike:       Wait...wait...wait...

Paolina:    I can't believe fucking somebody from work, I'm like, I mean I thought it was you. I thought that you were the one who told the people. You know how [inaudible] like in the middle of the night they bring like all these people who like sing to you.

Mike:       Bring singers?

Paolina:    [Inaudible] to the hospital because they knew I was going to be like there, so they found other [inaudible] singing to me. I'm like, "What the fuck?" [inaudible] that's why I called you. You were the first person I called [inaudible]. You were like, "No." It was just like, "Damn."

Mike:       No, it wasn't me.

Paolina:    [Inaudible]. I guess not because [inaudible] you called me [inaudible]. I was just like, "What?" He was like, "Yeah, I mean..." I know that was one of your dreams that [inaudible], you know. And I was like, "Not one of the guys. I wanted Michael to be my husband for good, not any fucker." And he was just like, "Well, you know I really care about you." I was like, "Well, I don't care about you, so let it go."

Mike:       He's stupid.

Paolina:    And you know he got upset. Cool, fine but I don't feel nothing towards that person. Okay, [inaudible] from the hospital [inaudible]. Cool, fine. And they sang like three, four songs and they were out. Then my dad was just like he turned [inaudible] and he looked up and I was just kind of like [inaudible] kind of [inaudible] ballroom or whatever and we started dancing. And damn, I felt really

*394*

dizzy because he was spinning me too fast. [Inaudible] dancing. I was like, "Yeah, but [inaudible]." All right. It was all right. [inaudible] stopping real fast. I mean I did them but at the end I [inaudible] was like just had to sit down. And when I got home, got home and called you. You don't pick up. I called work and Patty was like [inaudible]. All right. Called you again, no pick up, called you again. It's just like, okay. Sent you a message. I was still awake until like 3:30, 4:00 in the morning [inaudible] woke up at 10, I think [inaudible] night. I don't know, around there. And, you know, no response. Okay.

Mike:        Okay.

Paolina:     I mean what do you want me to say? I mean if one person told me that they love you, missed you, da-da-dah and they don't call you back or respond.

Mike:        I do love you and I do miss you.

Paolina:     [Inaudible]

Mike:        One you need to stop listening to Decinya(?).

Paolina:     I'm not listening to Decinya(?). I mean we talk. But most of the time we talk…

Mike:        It's just…

Paolina:     Because she wants to go out. Every Thursday, Friday night she wants to go out. It's like cool, fine. So this Friday she wants to take me out. I'm like, "Oh, I don't even know where we're going." Shawna(?), she broke up with her boyfriend because he wasn't paying attention to her. He wasn't spending the time that she wanted with her. She broke up with him. Cool, fine. So now we're three single girls I guess and we're just going to go out every Friday night or I don't know because I don't – I guess I'm not used to that anymore now. So we'll see and my mommy's coming this Friday and I'm going to go out with Decinya(?) and Shawna(?) for a little bit and go back to the hotel with my mom. The next day my sister's graduating and…

Mike:        How can you…?

Paolina:     …party, that's fine.

Mike:        Paolina…

Paolina:     So, I mean…

Mike:        Paolina…

Revised by www.officeaides.biz on December 10, 2006

*395*

Paolina:     ...Decinya(?), we talk every day.

Mike:        Paolina...

Paolina:     She comes to my house almost every day.

Mike:        Paolina, how can your mom be...

Paolina:     I mean...

Mike:        Paolina, how can your mom doesn't stay at your father's place?

Paolina:     Because she needs to work.

Mike:        Because what?

Paolina:     She needs to work.

Mike:        No, how come your mom doesn't sleep with you in your room?

Paolina:     Oh, my dad doesn't want that.  And my mom doesn't want to.

Mike:        Why not?

Paolina:     I asked my mom.  It was like, "Well, how come you're not staying here?"  "Well, first of all, your dad doesn't want me to.  Second of all, I don't want to because it just makes me feel uncomfortable. Because I know your daddy's upstairs with your step mom.  It's not -- I don't feel comfortable. I mean I'd rather pay for a hotel than stay here."  I mean, likely [inaudible] hotel with her.  Most likely, except Laura because she's graduating and Cynthia, she's dancing, she's performing her [inaudible] dance in [inaudible].

Mike:        Did your mom tell you about your mom and your father when they were together?

Paolina:     What do you mean?

Mike:        Well, how your mom or your father used to hit your mom and all that?

Paolina:     Hmm, I don't, I mean my mother [inaudible] kind of told me that, but not to that point.  I don't remember a lot of things.  I mean I'm telling you, I totally forgot I was Mexican.  My mom got mad at me for that.  I thought that my step mom was my real mom.  You know, I don't -- I'm fucked up brain [inaudible].  I have to get everything all back.

Revised by www.officeaides.biz on December 10, 2006

*396*

Mike:       I hear you.

Paolina:    I can't remember my grandparents.


PHONE CALL

Mike:       No, I thought someone was throwing rocks at my window.

Paolina:    Who was it?

Mike:       Nah, it's just one of the dogs out there.  It's like the leash is banging on the floor, on the concrete.  But go ahead.

Paolina:    Okay, I have [inaudible] you're with somebody else, some other girl, I don't know but [inaudible] said you were in Orange Park at night with some female.

Mike:       Orange Park?

Paolina:    Not like recently; a couple months ago.          *more jealousy*

Mike:       Orange Park?

Paolina:    Orange Park.

Mike:       The only time I would have been to Orange Park is when you took me down there for that parade.

Paolina:    Well that's what I was thinking about.  It's just like [inaudible] a day at the park. He's like, "No.  It was at night."  And then Officer Mercale(?) said, "[inaudible] oh, so now you have a record Paolina?"  And I was just like, "Um, no.  I mean you can check my record.  Is it clean or is it dirty?" [inaudible].

Mike:       Yeah.

Paolina:    [Inaudible] yeah, I mean, [inaudible] I told you, I mean, I almost got into a fight. [inaudible] beat her up because the lady told my sis, my little sister off and then that pissed me off, so I went off on her, slapped the shit out of her.  And she calmed down because she kind of got the hint.

Mike:       Oh, okay.  Well, I've never been...

Paolina:    [Inaudible].

Revised by www.officeaides.biz on December 10, 2006

*397*

Mike:       Well, I've never been in Orange Park at night.

Paolina:    Yeah, I mean, you tell me what you were doing over there.

Mike:       I wasn't there at Orange Park.

Paolina:    Okay, well, that's what he said.

Mike:       Do you remember the police officer's name?

Paolina:    Oh, no, [inaudible].  I mean he told me his name.  I didn't get it.  I don't remember it.  My memory's fucked up, so don't ask me, "Do you remember something?" because I don't.

Mike:       But he said it was Mike Johnson at Orange Park?

Paolina:    Um, he did say -- I mean he knows [inaudible] because of the whole paperwork and everything and he was just like, "[inaudible] I remember him," [inaudible] talk about him.  It was him and some girl they were in Orange Park at night.

Mike:       Oh, God.

Paolina:    "I can remember the night," and I was just like, "Oh, really?"  He's like, "Yeah."

Mike:       Please.

Paolina:    [Inaudible] you know.

Mike:       Sorry.

Paolina:    I don't know if it was Orange Park or [inaudible] you and me when through that little park, what it's called?...

Mike:       Berry-Berry(?).

Paolina:    Yeah.  I mean I don't know the name, but yeah, like it was probably [inaudible].  I don't know.  I don't remember things.  I don't remember...  I don't know.

Mike:       The only time I was at...The only time I was ever at a park with anyone at night was with you at Berry-Berry(?) Park when the Japanese officer ran your ID and ran my ID.

Paolina:    But he couldn't have even run the ID.  [Laughs]  And now I know why.  So I

*398*

mean everything is just, it's not clicking. Everything is like I said I feel like the blonde girl from MTV...

PHONE CALL

Mike:       Wait, wait, wait, say that again.

Paolina:    The restraining order that they want to give you for three years. You have to argue about that. It's not up to me [inaudible]. If you argue about it because they think I'm scared of you and when they said that I was just laughing, I was just like, "I'm not scared of nobody," because I'm not. [Laughs]

Mike:       And the thing is...and the thing is what is this...what is this history of violence? We don't have a history of violence.

Paolina:    Exactly. Exactly. I mean...

Mike:       So who's coming up with this crap?

Paolina:    My dad, you know my dad [inaudible] and Miriam, my dance teacher, the [inaudible] dance teacher, she was eating and she heard it because my dad was like, "Yeah, I remember when you came...came home. You were living with him and you had bruises on your arm." And I was just like, "He never gave me bruises, dad." And I was like, "Miriam, I used to dance with you and you know the little [inaudible] who used to work [inaudible] dancing. Did you notice any bruises [inaudible] like that?" She's like, "No. That's not true, sir." And my dad was like, "Well, I remember that." And I was like, "Well, I mean I know I'm kind of fucked up in the memory but that's not in my memory so I don't remember that." And Ann(?), "Do you remember seeing me with bruises?" She's like, "No, not at all. I mean, you were fine." And then that's when my dad came out like _____. He hasn't said anything like that ever again.

Mike:       Wait...wait.

Paolina:    I mean like some...

Mike:       Wait...wait...wait...wait...wait. I beat you?

Paolina:    You say something, I'll say something back.

Mike:       No, Paolina, no listen.

Paolina:    See, it's not nice.

*399*

Mike:        I did give you one bruise.  Remember when you twisted your ankle or your knee
             dancing and I had to carry you out of the car into the apartment, I think I like
             grabbed your left leg a little too hard because my fingers are bony and I left a
             small bruise on you because of that, carrying you in.

Paolina:     Yeah and I still have like on my right arm small, one, two, three, right finger.
             They said that you stuck your nail right there and I still have it and it looks like it
             [inaudible] little scars.

Mike:        Ah, you…

Paolina:     [Inaudible] look like somebody just pinched you real hard.  And I still have it.  I
             mean you can still see it.  I don't think that's going to go away at all.

Mike:        That's just it.  I don't have any fingernails.

Paolina:     Then on the [inaudible] and even before [inaudible] "Damn, girl, you [inaudible]
             ring the door.  And I was just like, "No shit."  So I guess on my arm [inaudible]
             whenever you picked me up like too hard or something.

Mike:        No, what it was was…

Paolina:     Like you could see…

Mike:        No, you wouldn't…

Paolina:     your handprint…

Mike:        No, you wouldn't…

Paolina:     …on my arm.

Mike:        You want to know where the bruises came from?

Paolina:     Huh?

Mike:        Do you want to know where the bruises came from?

Paolina:     What?

Mike:        When you were at Kaiser they had to strap you down and you were struggling
             loose.  And that guy who attended to you, Ray Flores, he said if you didn't stop
             struggling he was going to tighten them even tighter.

Revised by www.officeaides.biz on December 10, 2006

*400*

Paolina:    But they were not because of the tie things because I was tied up.  These were
            handprints.

Mike:       How can it be a handprint through…?

Paolina:    I don't know.  I don't -- do you think I remember [inaudible]?  I don't remember
            what happened.  Fucking/they were telling me that I was saying a fucking vampire
            came into my room and sucked on my blood [inaudible] because there was this
            vampire.

Mike:       What?

Paolina:    I don't remember.  [Inaudible] do it, somebody, some guy, fucking put me against
            the wall.

Mike:       Wait…wait…wait.

Paolina:    [Inaudible]

Mike:       Wait, wait, who put you against the wall?

Paolina:    Well, guess who.

Mike:       Who?

Paolina:    Well, guess who.

Mike:       Who…wait…what are you talking about?

Paolina:    Well, I mean who else would do it?

Mike:       Who'd do what?

Paolina:    Put me against the wall.

Mike:       Who slammed you against the wall?

Paolina:    Well, guess who?

Mike:       Someone slammed you against the wall because of what?

Paolina:    Because I didn't want to go to the police station and call you.

Revised by www.officeaides.biz on December 10, 2006

401

Mike:        So someone slammed you against the wall for that?

Paolina:     What was that?

Mike:        I've got another call. It's my mom from work.

Paolina:     All right, pick it up.

Mike:        No, someone pushed you against the wall because of what?

Paolina:     I didn't want to go to the police station and call you.

Mike:        So who pushed you against the wall?

Paolina:     Who do you think?

Mike:        One of the police officers?

Paolina:     No, the police officers don't know nothing about it.

*Father throws things at her.*

Mike:        Your father pushed you against the wall?

Paolina:     Yeah, I mean right now we're not. He's not talking to me and I mean [inaudible] talking or anything and every time he talks to me, he just, he always yells and throws things at me. So I mean I would go to my room and that's it. I mean I couldn't calm myself down. I was just going crazy and he was about to fucking call you. Like, dude, she was here for a couple hours and [inaudible] she calmed him down a little bit.

Mike:        Decinya(?)?

Paolina:     Yeah and she wants to take me out on Friday so, "Don't worry, I mean, you know, we're going to go get something to eat or watch a movie or something so you can calm down." You know, a little bit and I was shaking, I was crying. [Inaudible] really break down. I can't understand your dad. [Inaudible] like, "Well, I don't know. I don't know."

Mike:        Okay, sweetie. Okay, let me call you back, all right? I need to call my mom, okay, because she's getting ready to go this weekend, okay?

Paolina:     Cause what?

Mike:        Because my mom's going over to spend the weekend with Bria(?).

402

*Paolina has childhood issues about her father and mother, something serious occurred that they fled Mexico, bottom line!*

Paolina:    Okay, yeah and just call me back [inaudible].

Mike:       Okay.

Paolina:    Bye.

*This would effect her, now, and how she would seek to please others, enter-into shallow relationships. even prevaricates!*

**PHONE CALL**

Mike:       And what'd you say?

Paolina:    [Inaudible]

Mike:       What?

Paolina:    I don't know. I forgot. My short memory's not working at all. So I don't know.

Mike:       No, you said something about your father slapping you?

Paolina:    Oh yeah, because he _____ slapped me against the wall and a couple of my memories came back. But they were the bad ones and I told him and he slapped me one. Then I turned around and I was just like, "Well, the truth hurts, doesn't it?" And he slapped me again.

Mike:       What'd he slap you for?

Paolina:    [Inaudible] he went to work.

Mike:       What'd he slap you for?

Paolina:    Because I told him something on the memories that came back and there was a little girl and they were bad. Then he slapped me and then I told him then, "Well, the truth hurts, doesn't it?" And he slapped me again.

Mike:       He slapped you because memories when you were younger were bad?

Paolina:    You know, like I could I mean I could [inaudible]. I mean he was really [inaudible] and I was just like I told him. He was just kind of laughing like, "Yeah, right." And he slapped me, you know, like "Truth hurts, doesn't it," and he stopped laughing and he slapped me again.

Mike:       Damn.

Paolina:    I mean like then he just walked out of the house and went to work.

Revised by www.officeaides.biz on December 10, 2006

*403*

Mike:        That son of a bitch.

Paolina:     I mean the whole thing is done.  I have to pay for my medical bill and I have to save up so I can get my own apartment because my mom can't support me is one thing and I don't want to be here anymore because not even my sisters are helping. Just because I'm home all day they want me to do the cooking and whole house cleaning up and when I tried it because I was standing up for more than like 20 minutes, I... [inaudible] I don't, I mean I don't know why they do this.

Mike:        Paolina...Paolina...

Paolina:     It's like I wanted you to be next to me when I was at the hospital and...

Mike:        Paolina...

Paolina:     [Inaudible] hold him or...

Mike:        Would you listen?

Paolina:     ...try to touch him...

Mike:        Would you listen?

Paolina:     [Inaudible] and they said no.

Mike:        Would you listen?

*irrational thinking. total evidence of histrionic personality disorder*

PHONE CALL

Mike:        You're going to marry this guy because of what?

Paolina:     I told you.

Mike:        Why are you going to marry this guy?

Paolina:     I just told you.

Mike:        Do you want to marry him?

Paolina:     No, I don't.

Mike:        Why don't you?

Revised by www.officeaides.biz on December 10, 2006

404

Paolina:    But I mean…

Mike:    Why don't you want to marry him?

Paolina:    Because I care about him but I'm not in love with him.

Mike:    Who do you love?

Paolina:    You know.

Mike:    Who?

Paolina:    You.

Mike:    But you're going to marry him.

Paolina:    Yeah, because you don't want me so I'm not going to be sticking up your butt(?) saying, "Oh, come on, please, please." No.

Mike:    You're not -- you're going to marry him because I don't call you?

Paolina:    Not because you don't call me, no, because you don't care about me period. You don't like my dad. You're not thinking about talking to my dad or you're not telling him so what's the point?

Mike:    I told you after all this court stuff is over I want to talk to your dad.

Paolina:    And when do you think it's going to be over?

Mike:    What's that?

Paolina:    And when do you think it's going to be over?

Mike:    Hopefully after the hearing Wednesday.

Paolina:    That's one of them out of a lot of them.

Mike:    What of what? What are you talking about?

Paolina:    They said there would be a lot of them, a lot of court dates. That's not the only one.

Mike:    Hold up. There are going to be more court dates because of what?

Revised by www.officeaides.biz on December 10, 2006

*405*

Paolina:     I don't know.  I found out there's going to be more.

Mike:        Who wants more court dates?

Paolina:     Hmm, I don't know.  Officer Mercale(?) told me there's going to be more, that it
             was not the only one.

Mike:        Okay.  So I've been exonerated of all the charges but he wants more court dates.

Paolina:     [Inaudible] court date [inaudible] Wednesday it's nothing.  The only thing they
             want to do is just give you the biggest, you know, restraining order maximum
             they're [inaudible] to.  If you don't care anymore, cool, fine, you know, why
             should I care then?

Mike:        You don't care because you think I don't care?

Paolina:     Yeah, you're like, "I don't care about the whole restraining order."  Well, I ain't
             worried then.  That answers a lot of my questions.

Mike:        I do care about the restraining order but you want me to call you anyway.

Paolina:     Well, I mean when you care about somebody you want to hear them, just because
             you can't be close to them.  And now you answered that other question.  Thanks.

Mike:        Paolina, do you know if I -- you know I can go to jail for violating a restraining
             order?

Paolina:     What do you think I'm going to go and tell him?  No.  Otherwise I would have
             told him the truth from the beginning.

Mike:        Suppose they're watching me or suppose they're watching you?

Paolina:     They're not.  Otherwise they would have gone to your house a long time ago.

Mike:        Like you did last…

Paolina:     Right?

Mike:        Like you did last week?

Paolina:     Last week?

Mike:        Yeah, when you gave me my birthday present?

Revised by www.officeaides.biz on December 10, 2006

406

*more rule breaking*
*Paolina has no ago*
*boundaries ; plays*
*to the emotions*
*of the moment*

Tape 1
Page 33

**Paolina:** Huh?

**Mike:** Like when you came by my place to give me my birthday present?

**Paolina:** Uh-huh. They don't know that until you tell them. Go ahead, tell them, right?

**Mike:** It's not a question of telling. I'm trying to figure out what does Officer Mercale(?) want to do?

**Paolina:** Like to put you in jail because he can't believe it, you know. He -- who told me? I don't know if it was [inaudible] that talked to an officer or Officer Mercale(?) that this is the biggest beat down [inaudible] from a guy in [inaudible]. So they're making a big deal about it.

**Mike:** But I didn't touch you. I didn't hit you.

**Paolina:** Well, don't tell me that. Tell them.

**Mike:** I've tried to tell them. When the guy asked me to come give a voluntary statement, I gave him a voluntary statement. He says my story didn't match yours. He said that, you know, in the…in the restraining order it said that I threw something -- you told them that I threw something at you.

**Paolina:** Yeah, I know. You told me that, "Well, you said…" And then I said, "Sorry," to you.

**Mike:** So… *amazing!*

**Paolina:** I'm just like, "Well, I don't remember anything." I don't remember talking to an officer. I don't remember saying, "Sorry," to Michael or fucking thinking that I was at the house or that it was 2003 or seeing a vampire. I don't remember shit.

**Mike:** So you mean to tell me your boy Officer Mercale(?) has it out for me?

**Paolina:** I don't know. I'm just -- I'm telling you what's going on and if you want to take it that way, that's fine, not me.

**Mike:** Okay.

**Paolina:** [Inaudible] I remember last night I was talking to two movies [inaudible] but what happened two months ago I don't remember what happened at all.

**Mike:** Do you remember about any of the papers you signed?

Revised by www.officeaides.biz on December 10, 2006

*407*

| | |
|---|---|
| Paolina: | I remember going once Laura my sister and [inaudible] Decinya(?) and I think the first time was when they gave me some papers to sign. |
| Mike: | Did they read the papers to you? |
| Paolina: | Nuh-uh. |
| Mike: | They didn't read them to you, they just had you sign them? |
| Paolina: | Um-hmm. I have the restraining order, like there were copies because one's for my job, one's in my car and one's at home and one's carried with me all the time. |
| Mike: | The papers that they had you sign, they want civil damages, they want me to pay for your medical bills that I'm not responsible for. And you didn't... |
| Paolina: | No, the ones that I have say you have to be, you know, 100 feet away from me and, you know, all this kind of shit. |
| Mike: | Uh-huh. |
| Paolina: | Yeah, that's the one I have and that's the one I have signed and everything. |
| Mike: | Do you remember signing a paper that says you wanted me to pay for your lawyer's bill and your medical bills? |
| Paolina: | No. |
| Mike: | They had you signing papers and they didn't read them to you? |
| Paolina: | I don't think so. I don't remember to be honest...to be honest, I don't remember. |

END
(Duration 45:54)

Revised by www.officeaides.biz on December 10, 2006

*408*

# EXHIBIT  "D"  # 1

409

*Transcriber's Notes: Unsure of spelling or a phrase, (?) was used; where any of the dialog was inaudible or unclear [inaudible] was used.*

PHONE CALL

Mike:       Whoa...whoa...whoa...whoa.  What ?

Paolina:    Water is good for you.

Mike:       Yeah, water is good for you.  Drank too much today.

Paolina:    Well, that's good.

Mike:       Now, what were you saying?

Paolina:    Just I don't know why everyone's against you like.  They think that you really did it.  And Officer Mercale's(?) like -- everyone's, "Well, we're pretty sure you did it."

Mike:       I'm going to tell you this for about the millionth time, Paolina, Boobie, I did not touch you.  I love you.  I want to spend the rest of my life with you.  I want to have kids with you, whether you can have them naturally or we can adopt.

Paolina:    I could get them naturally.

Mike:       I don't...I don't know what Officer Mercale's(?) problem is.  I don't know what the community's problem is.  And I really don't care, as long as I love you and you love me.

Paolina:    I mean I can understand the point of view of my mom because, you know, she's been there done it and she doesn't want me to go through the same thing.   *Father beats Mother, too!*

Mike:       I could barely hear you.

Paolina:    I said I can understand where my mom is coming from when she's telling me not to get with somebody that hits me or anything because she's been there and done it.  So I mean I could totally understand her point.

Mike:       Oh, so you're starting to remember about your mom being beat by your father?

Paolina:    Not really.  Kind of but not really.

Mike:       Did she tell you?

*410*

Paolina: No, but I...I mean she was just like, "I know what it feels like to love a person and, you know, to put you in that situation." And I'm just like I could kind of feel where she's coming, like I don't know why.

Mike: And Officer Mercale(?) wanted you to call me so I would admit to doing this?

Paolina: Yeah. Like he thinks that by me calling you on the police station and recording everything I'll be asking you some questions like, tell you something like, "Oh, I remember what happened, why you did this, da-da-da-dah." And then you'd probably go, "Yeah, well I did it because da-da-dah, you know, you were acting all crazy and I had to smack you down." I don't know.

Mike: I want you to ask me questions. I want you to remember because you -- once you do remember you're going to be like, "Mike didn't do this."

Paolina: But I don't remember anything.

Mike: Huh?

Paolina: But I don't remember anything.

Mike: I...I understand that, Boobie.

Paolina: I mean a lot of things are gone. I mean I remember, you know, the whole cooking thing with your mom [laughs].

Mike: But the thing is...

Paolina: And when I, I think when I was sick I fell asleep(?) in your bed and I think she got scared. She goes, "Paolina, Paolina, Paolina, Paolina!"

Mike: No, but the thing...

Paolina: I think she was scared of [inaudible]. I think...

Mike: Nah, I mean but the thing is sweetie, why would Officer Mercale(?) say your story was totally different from my story but you didn't give him a story?

Paolina: Well, I don't remember giving him a story.

Mike: I mean that makes...

Paolina: I don't.

Transcribed by www.officeaides.biz on November 28, 2006

411

*different than testimony given by nurse)*
*(hearsay)*

Tape 2
Page 3

| | |
|---|---|
| **Mike:** | I mean that makes no sense. Why would...why would they say I threw something at you and they said you told them that I threw something at you. |
| **Paolina:** | I don't know. I probably did...probably did I don't remember anything, Michael. All, I mean, even -- Baldwin(?) told me that like I got extremely pissed that the first thing I said when I woke up was, "I want to see my baby, Michael. I want to see Michael. Call Michael." Like I was pissed. That was the first thing I said. |
| **Mike:** | That's because... |
| **Paolina:** | You know, I... |
| **Mike:** | That's because you know I didn't do it. |
| **Paolina:** | I remember calling for you. You know I remember calling out telling the nurses and just everybody around me, "Call Michael, call Michael. I want to see my baby. I want to see my boyfriend." And everyone was like, "He did it. He was the one who did it. Stop. Stop it. We're not going to call him. He did it." |
| **Mike:** | I know you wouldn't... |
| **Paolina:** | I remember that. |
| **Mike:** | I...I remember you wouldn't sit still and they were trying to hold you down and everything. [Sighs] |
| **Paolina:** | I don't remember any, like, nothing. I don't remember seeing you that night like afterwards. I don't remember talking to you over the phone or in person really. I don't remember all that. I don't. That's why I didn't remember your face, it's like how you look like at all. My brother(?) was like, "Yeah, he's a really big black, black man. Black, pitch black." And I was like, "Okay." |
| **Mike:** | [Laughs] I am not pitch black. I'm a nice chocolate color. |
| **Paolina:** | Yeah, you and me too(?). That's it. |
| **Mike:** | And I love you. |
| **Paolina:** | I love you too, but I mean when I called you yesterday I heard things that now I know what you guys talk about and, you know, I can't be with a person that's like that. |
| **Mike:** | Like what? |

Transcribed by www.officeaides.biz on November 28, 2006

412

*conversation back goes right about to being her*

| | |
|---|---|
| Paolina: | Talking about other like other girls, "Yeah, she's [inaudible] fine. Um-hmm, yeah, she's fine." If you think she's fine, then go get at her. |
| Mike: | Now see, there's the difference sweetie. I can look at the menu, I just didn't order anything. Jose was talking about a girl on camera. Big deal. |
| Paolina: | Yeah, but I know how you guys talk. |
| Mike: | Oh, like you and your girlfriends don't sit around and look at guys? |
| Paolina: | We talk shit about them. |
| Mike: | If you're going to… |
| Paolina: | [Inaudible] |
| Mike: | Oh, well, if you don't want to be with me because I'm with the fellas and I look at a girl and say, "Wow, she's nice, cool, fine," I mean that's your business. I'm not going to fool… |
| Paolina: | [Inaudible] has some issues that's what I'm telling you. |
| Mike: | Nah, we do it all the time. Well, I'm just saying. |
| Paolina: | Yeah, but then when you told me about you know Tony and Jose and Joe(?) were talking about this girl, looking at her like, "Well, she's so fine," [inaudible] to why you are talking about them like that. Sorry, hold on. Ouch. |
| Mike: | What's Hunter barking for? |
| Paolina: | Yeah, [inaudible] my room. Hello? |
| Mike: | What's Hunter barking for? |
| Paolina: | Huh? |
| Mike: | Why is Hunter barking? |
| Paolina: | Because Harold's here. |
| Mike: | Oh, okay. |
| Paolina: | But, whatchacall, do you want to go to the beach in a little bit? |

413

Mike:       No, I got to do some stuff for Mom when she gets here.

Paolina:    So we could talk more?  I mean or is this it?

Mike:       Oh, we're going to talk more.

Paolina:    I mean I want to talk today.

Mike:       Yeah, we'll talk today.

Paolina:    Not over the phone.

Mike:       What, face to face?

Paolina:    Yeah.

Mike:       Oh, you want to come over or what?

Paolina:    I don't want to go over there.

Mike:       You want me to go over there?

Paolina:    No.

Mike:       Okay, what do you want me...?

Paolina:    That's what I'm saying, do you want to go to the beach later on?

Mike:       You going to drive?

Paolina:    Yeah, I could drive.

Mike:       [Laughs] Watch out for the trees, huh?

Paolina:    Well, no choice.

Mike:       Wait, who's Harold?

Paolina:    The guy I used to work with.

Mike:       Oh, okay, that's cool.

Paolina:    Yeah, he's -- where do you work now?

*414*

Mike:        Because I was wondering why Hunter was...was...

Paolina:     Huh?

Mike:        I was wondering why Hunter was barking so loud in the background.

Paolina:     Yeah, I can't stand his barks anymore.

Mike:        Okay.  All right, I'll talk to you later then, lady.

Paolina:     So we're going to do it?  Yes or no?

Mike:        Yeah, I'll call you.

Paolina:     Are you sure you're going to call me?

Mike:        I'm sure I'm going to call you.

Paolina:     Okay.

Mike:        All right.

Paolina:     Bye.

/PHONE CALL/

Mike:        What are you scared of?

Paolina:     I don't know.

Mike:        Scared of tomorrow, for what?

Paolina:     Huh?

Mike:        You're scared about the court hearing tomorrow, why?

Paolina:     I don't know.  I just have this bad feeling about me I mean.  I think I don't know, Mike.

Mike:        A bad feeling about what?

Paolina:     Because my dad is going to go.  I mean I don't know [inaudible] with him going

415

because firstly I feel bad because he's not going to go to my sister's graduation and she was really sad and I was just like, "I mean, if you want to go you could go. It's fine." He's like, "No, I'm going with you." And I was just like, I mean we kind of talked about it and he's going to go after the end of it. I'm scared.

**Mike:**      What you had to be scared of?

**Paolina:**   I mean if they find out that we're talking, we'll get in trouble and I'll get in trouble with my dad. He'll beat me up even more [inaudible].

**Mike:**      So what do you want...what do you want me to do?

**Paolina:**   I don't know. What do you want to do?

**Mike:**      What is the court hearing for?

**Paolina:**   A restraining order.

**Mike:**      Are you sure?

**Paolina:**   And she told me that like everyone in the court, like right there on that court is going to be used for restraining orders and that's it.

**Mike:**      So this court hearing has nothing to do with me...?

**Paolina:**   Paying my medical bill? No. That's why my lawyer gave me all this stuff, this application for this place so I could get the money and they could pay for my medical bill.

**Mike:**      Okay.

**Paolina:**   Not you.

**Mike:**      You don't want me...you don't want me to come tomorrow?

**Paolina:**   No, I want you to go because if you don't go they're going to give you the thing, your restraining order and I don't want that. I mean unless you do, then, you know, then that's on you.

**Mike:**      No, all you got to do is speak up.

**Paolina:**   Well, that's what I'm speaking right now. That's why I'm telling you.

**Mike:**      No, speak up to the judge and tell him you don't want a three year restraining

416

*father needs a restraining order against him !!* (handwritten)

order.

**Paolina:** [ But if I say that, my dad is going to beat me up ] And my dad was the one who put the restraining order.

**Mike:** Ah, really?

**Paolina:** Yeah. But I want you to tell them because when I was at the hospital I didn't know you had the restraining order.

**Mike:** Okay.

**Paolina:** [Inaudible] and then a couple of like, like up to three, two weeks, that was when [inaudible] this person and that was when they told me about the whole restraining order and I was just like, "What?" And I was like, "Well, [inaudible]." "Well, he's not supposed to call you or go near you, your house or your car or your job." And I was just like, "Why? I'm not scared of him." He's like, "Well, they're scared that he might come back and hit you or do something." And I was just like, "What?" He's like, "Well, can you sign here." I was like, "Yeah." And that's it. I mean Decinya(?) went there too and they didn't want her to go inside a room. I was just like, "What?" When [inaudible] it was like, "Whoa, wow."

**Mike:** Your girl Decinya's(?) full of shit.

**Paolina:** Huh?

**Mike:** Your girl Decinya(?) is full of shit.

**Paolina:** Why? What makes you say that?

**Mike:** I mean here she is thinking I beat you up when I didn't. All the evidence points that I didn't do it. It was a simple accident. When you grabbed, you fell. I didn't push you and I didn't hit you. I mean think about it. [ You had blackness around your eyes but you had no bruises or swelling ] Isn't that kind of funny?

**Paolina:** I mean I had it on like, well, on my elbow did you see the scar? On my right(?) feet they're all, they're all scratched up. I mean my dad has the record of pictures and I'll show them to you. And I know you didn't do it. Baby, I know you didn't.

**Mike:** Oh, so I stepped on your feet. Stupid. Jesus Christ.

**Paolina:** So then how come on both of them?

**Mike:** I was dragging you because I couldn't keep your pants up because you had on

*417* (handwritten)

*no previous 2003*
*(see Tape L, p. 33)*

Tape 2
Page 9

baggy sweats and they were falling down. So I bent down to pick up your baggy
sweatpants to cover your butt and your feet were dragging a little bit.

Paolina:    I mean I even told my dad, "Look, I don't think he did it, Dad, otherwise he would
have done it a long time ago." And it's just been three years, four months and, no,
he never put his hands on me.

Mike:    I haven't even...

Paolina:    I was like, "If you want to hypnotize me then go ahead."

Mike:    Paolina...Paolina...

Paolina:    Huh?

Mike:    I haven't even known you for three years.

Paolina:    Huh?

Mike:    I haven't known you for three years.

Paolina:    We're together for three years, right?

Mike:    No.

Paolina:    Well, how long then?

Mike:    The third week of July this year I'll be working at JC Penney's for three years.

Paolina:    Um-hmm.

Mike:    We haven't been going out.

Paolina:    Well you...you asked me out in 2001 when I came back from Paris(?). That was
January 1st. I remember that.

Mike:    Of 2001?

Paolina:    I remember giving you a ride.

Mike:    It couldn't have been 2001.

Paolina:    Yeah. You have more than three years at JC Penney. I mean, I quit JC Penney
like two years ago and, you know, I was with you.

*418*

Mike:    I was working at Niketown.

Paolina:    No.

Mike:    Trust me. My third year at JC Penney's will be this July.

Paolina:    Nah(?). Because I quit JC Penney two years ago...two, yeah, two and a half years, something like that, yeah.

Mike:    But I'm telling you, I just checked my paperwork. This July will be my third year.

Paolina:    Hmm...

Mike:    Well, let me go to sleep and you figure if I'm going to go to this hearing or not tomorrow.

Paolina:    [Inaudible] you're going to get three years. I mean if you want a three years restraining order then that's on you.

Mike:    So you just want me to sit there and do what?

Paolina:    I mean, [inaudible] supposed to go and argue about the whole restraining order.

Mike:    Oh, I'm supposed to argue?

Paolina:    Yeah. Didn't you read(?) the paper that I showed you today?

Mike:    Yeah, it says, the paper says I don't really have to go, but I...

Paolina:    Well, you don't, but if you go you have to argue about it and tell them why you don't deserve the hearing(?) there, the whole restraining order.

Mike:    Okay, I'll be there.

Paolina:    I mean if you don't want to, Mike, then that's on you.

Mike:    I don't want to see your father. I can't stand that son of a bitch.

Paolina:    I know but I mean he's my dad.

Mike:    I'm going to sit there and I'm going to point out all the facts. I'm like how in the hell can this-and-this-and-this and this-and-this. Oh, it's just wrong.

Transcribed by www.officeaides.biz on November 28, 2006

419

Paolina:    Yeah, I mean, just tell them that you didn't do it and prove your point.  I mean just tell them what happened.

Mike:    Okay, I will.  All right, let me go get sleep.  I'll talk to you tomorrow, okay?

Paolina:    Okay.

Mike:    All right, lady.

Paolina:    But I'm scared.

Mike:    Why?

Paolina:    I don't know.  Just I have this bad feeling.  I don't know.  I mean not about you and my dad.  It's just I have that feeling my dad's going to do something to me.

Mike:    Ah, he won't.

Paolina:    I mean even about your mom and all(?), I mean, I hope she feels better if I calmed(?) him right down.

Mike:    Ah, she'll be fine.

Paolina:    But I mean right now my mom is sick and just it makes me realize, you know, how much I care about her and since you're the only son I'm really sure you really care about her, too.

Mike:    She'll be okay.

Paolina:    I really hope so.  I really, really hope so.  Just remember I'll be right inside(?) [inaudible] good or bad.  Okay?

Mike:    See you tomorrow, lady.

Paolina:    Bye.

END OF TAPE
(16:15 minutes)

Transcribed by www.officeaides.biz on November 28, 2006

*430*

# EXHIBIT "E"

421

# Individual Charges

www.sprintpcs.com

| Customer | Account Number | Invoice Period | Invoice Date | Page |
|---|---|---|---|---|
| REVA L HALL | 0071001664-9 | Apr. 3 - May 2 | May 3, 2004 | 10 of 17 |



**Individual Charges for**   **REVA L HALL (continued)**
650-270-7459
rhall602@sprintpcs.com

## Voice Call Detail

| | Date | Time | Phone Number | Call Destination | Rate/ Type | Minutes Used | Airtime Charges | LD/ Additional Charges | Total Charges |
|---|---|---|---|---|---|---|---|---|---|
| 120 | 4/10 | 2:52 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 121 | 4/10 | 2:55 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 122 | 4/10 | 2:56 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 123 | 4/10 | 2:57 A M | 650-346-7166 | San Mateo, CA | | 1.0 | Included | 0.00 | 0.00 |
| 124 | 4/10 | 2:58 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 125 | 4/10 | 2:59 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 126 | 4/10 | 2:59 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 127 | 4/10 | 3:00 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 128 | 4/10 | 3:20 A M | 650-278-2472 | Sanfrncsco, CA | | 1.0 | Included | 0.00 | 0.00 |
| 129 | 4/10 | 6:18 A M | 650-873-2769 | South Snfr, CA | | 2.0 | Included | 0.00 | 0.00 |
| 130 | 4/10 | 6:22 A M | 650-873-2769 | South Snfr, CA | | 2.0 | Included | 0.00 | 0.00 |
| 131 | 4/10 | 6:28 A M | 415-759-2626 | San Fran, CA | | 2.0 | Included | 0.00 | 0.00 |
| 132 | 4/10 | 6:38 A M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 133 | 4/10 | 9:08 A M | 650-270-1290 | South Snfr, CA | | 1.0 | Included | 0.00 | 0.00 |
| 134 | 4/10 | 9:23 A M | 650-346-7166 | San Mateo, CA | | 1.0 | Included | 0.00 | 0.00 |
| 135 | 4/10 | 9:24 A M | 650-270-7459 | South Snfr, CA | | 1.0 | Included | 0.00 | 0.00 |
| 136 | 4/10 | 2:49 P M | 650-270-7459 | San Fran, CA | | 1.0 | Included | 0.00 | 0.00 |
| 137 | 4/10 | 2:49 P M | 650-270-7459 | South Snfr, CA | | 1.0 | Included | 0.00 | 0.00 |
| 138 | 4/10 | 2:56 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 139 | 4/10 | 2:58 P M | 650-758-2945 | San Fran, CA | | 2.0 | Included | 0.00 | 0.00 |
| 140 | 4/10 | 3:08 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 141 | 4/10 | 3:10 P M | 650-270-1290 | South Snfr, CA | | 2.0 | Included | 0.00 | 0.00 |
| 142 | 4/10 | 3:12 P M | 650-872-0606 | South Snfr, CA | | 1.0 | Included | 0.00 | 0.00 |
| 143 | 4/10 | 3:28 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 144 | 4/10 | 3:29 P M | 650-346-7166 | San Mateo, CA | | 1.0 | Included | 0.00 | 0.00 |
| 145 | 4/10 | 3:29 P M | 650-346-7166 | San Mateo, CA | | 2.0 | Included | 0.00 | 0.00 |
| 146 | 4/10 | 3:36 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 147 | 4/10 | 3:44 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 148 | 4/10 | 4:06 P M | 650-346-7166 | San Mateo, CA | | 1.0 | Included | 0.00 | 0.00 |
| 149 | 4/10 | 4:20 P M | 650-346-7166 | San Mateo, CA | | 1.0 | Included | 0.00 | 0.00 |
| 150 | 4/10 | 4:56 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 151 | 4/10 | 5:13 P M | 800-772-4657 | 800 Svc | | 2.0 | Included | 0.00 | 0.00 |
| 152 | 4/10 | 5:18 P M | 919-824-2237 | Durham, NC | | 1.0 | Included | 0.00 | 0.00 |
| 153 | 4/10 | 5:52 P M | 650-834-0943 | South Snfr, CA | | 2.0 | Included | 0.00 | 0.00 |
| 154 | 4/10 | 5:56 P M | 415-759-2626 | San Fran, CA | | 2.0 | Included | 0.00 | 0.00 |
| 155 | 4/10 | 6:05 P M | 650-270-1290 | South Snfr, CA | | 2.0 | Included | 0.00 | 0.00 |
| 156 | 4/10 | 6:07 P M | Incoming | | Off | 1.0 | Included | 0.00 | 0.00 |
| 157 | 4/10 | 6:18 P M | 650-346-7166 | San Mateo, CA | | 3.0 | Included | 0.00 | 0.00 |
| 158 | 4/10 | 8:03 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 159 | 4/10 | 8:04 P M | Incoming | | | 25.0 | Included | 0.00 | 0.00 |
| 160 | 4/10 | 8:06 P M | Incoming | | | 1.0 | Included | 0.00 | 0.00 |
| 161 | 4/10 | 8:24 P M | Incoming | | Off | 2.0 | Included | 0.00 | 0.00 |
| 162 | 4/10 | 8:32 P M | 650-834-0943 | South Snfr, CA | | 1.0 | Included | 0.00 | 0.00 |

*Handwritten notes (right margin):*

Paolinas Old Cell # 278-2472

Paolinas Dads Home # 873-2769

*Handwritten notes (bottom):*

In First Statement that prosecution or Defense lawyer did not admit, Plaintiff claims I came to her place at 11pm, under California perjury law.

422

# EXHIBIT "E" # 1

423

Text Message transcription from Michael Johnson's
Cellular Telephone as noted on April 19, 2005.
Transcribed by Brian Wright
*(Text is transcribed exactly as it appears on the phone
screen despite spelling and grammatical errors)*

**Drama queen (2/6 3:04 am):**
We don't even talk anymore, we dont even say i love you no more, some people work
things out and some just dont know how to change, but yet you are to stoburn to realize
what you are doing, but hopefuly once you know hopefully by that time it wont be to late.

**Me (2/6 3:07 am):**
Youchange like the wind, you have issues with ya fam and other things

**Me (2/6 3:09 am):**
I have no problem talking to you, you like to pass judgement on everyone but yourself
and when someone does ya get butt hurt.  You can say I love you first, it won't hurt you
to do so

**Drama queen (2/6 3:08 am):**
My family has nothing to do with this, so do use that as an excuse

**Me (2/6 3:11 am):**
Please the way u blow up on the phone the other night, blaming me for all ya wrong
doings?  Please

**Drama queen (2/6 3:11 am):**
The only one that hurt me was you, not diego, bud, jade, santiago, so im not jugging you
im telling you

**Me (2/6 3:14 am):**
I don't care about them, and how did I hurt you?

**Drama queen (2/6 3:14 am):**
Then i guess being with you was all my wrongs, if it was my fault.

**Me (2/6 3:17 am):**
I'm not placing blame you are

**Drama queen (2/6 3:18 am):**
You just did, like i said you are to stubborn to realize.

**Me (2/6 3:22 am):**

*424*

Stubborn? Of course I am, especially when i'm right, and when i'm on an even why of thought

**Me (2/6  3:23 am):**
One minute ya kissin me then ya blaming me for the things going wrong in ya life

**Drama queen (2/6  3:23 am):**
Sorry boy you are totally wrong 4 that one you are to stubborn to realize you are wrong

**Me (2/6  3:25 sm):**
if you say so

**Drama queen (2/6  3:24 am):**
Cuz if i wont kiss you, you wont leave me alone until i kiss you thats why.

Drama queen (2/6  3:25 am):
Yea i say so.

**Me (2/6  3:27 am):**
What are you smokin?

**Me (2/6 3:29 am):**
Did you come by job on the 4th of febuary 2005 & kiss me? *(regain's memory Feb. 8)*

**Drama queen (2/6  3:27 am):**
If telling you the truth is smoking then im really smoking

**Drama queen (2/6  3:28 am):**
Did you ask me what was i doing?

**Me (2/6  3:31 am):**
My bad did you kiss me on the 3rd of feb 2005, when you came by my job?

**Drama queen (2/6  3:30 am):**
Did you ask me what was i doing and give me a bad look?

**Me (2/6 3:33 am):**
Answer my question?

**Drama queen (2/6  3:33 am):**
yes i did and i regret it.

**Me (2/6  3:35 am):**
Why?

**Drama queen (2/6  3:34 am):**
Ok answer my question

*425*

**Me (2/6 3:37 am):**
I was shocked at you being there with such a big smile and in such a great mood, not to mention i was caught up with work at the time

**Me (2/6 3:37 am):**
I'm not sure what I said at that moment

**Drama queen (2/6 3:40 am):**
Okay so you are always busy to the point that i cant visit with out you giving of a dirty look or a remark thats why i regret doing that.

**Drama queen (2/6 3:41 am):**
yes you were to busy looking at other people.

**Me (2/6 3:43 am):**
Dirty look? I work in a dark room, I came out into the sunlight, that's the look

**Me (2/6 3:44 am):**
That's my job to obseve people and people outside were loading up a car, I was just lookin

**Me (2/6 3:45 am):**
Big deal

**Drama queen (2/6 3:45 am):**
Dam thats a really Fucked look i never seen that look on you so thats not the way you look when you go out of the office

**Drama queen (2/6 3:46 am):**
Guess what thats my job too so i should know

**Drama queen (2/6 3:47 am):**
to me it is

**Me (2/6 3:3:49):**
My eyes were adjusting, I had the same look when you came by to get ya boxes but not bad because I put ya box together in a lit room before comin out to u

**Me (2/6 3:50 am):**
Your office has bright lights on all the time, u know my office is dark

**Drama queen (2/6 3:52 am):**
Im not stupid i know the way your eyes get when you step out to an area that is bright so give me that

426

**Me (2/6 3:54 am):**
Put ya spin on it if ya like

**Me (2/6 3:56 am):**
It's almost 6am, I need couple more hours sleep, long day ahead, we can talk about this when I get home, please

**Drama queen (2/6 3:55 am):**
its not my spin is what it is, you are just to stubborn to realize the truth

**Me (2/6 3:57 am):**
The truth or your truth?

**Drama queen (2/6 3:56 am):**
the truth

**Me (2/6 3:58 am):**
LoL, okay if u say so

**Drama queen (2/6 3:58 am)**
Yes i say so

**Me (2/6 4:00 am):**
Okay?

**Drama queen (2/6 3:59 am):**
Yup


*Transcription note:  --------end of messages until 2/7/05--------*


**Drama queen (2/7 9:50 pm):**
Dam and the fligt takes all day!! Say hi to her from me.


*Transcription note:  --------end of messages until 2/8/05--------*


**Me (2/8 10:45 am):**
Her who?

**Me (2/8 4:33 pm):**

*427*

5

Cute kid, Mabel's I take it

**Drama queen (2/8  4:42 pm):**
huh?

**Me (2/8  4:44 pm):**
Nevamind

**Drama queen (2/8  4:48 pm):**
you want to hit on her?

**Me (2/8  4:52 pm):**
Where do you get ur material?

**Drama queen (2/8  4:52 pm):**
You just said that you want to take it

**Me (2/8  4:56 am):**
LoL, that's not what it means

**Drama queen (2/8  4:55 pm):**
Ok if you say so have a good one

**Me (2/8 4:57 pm):**
u2

**Drama queen (2/8  5:35 pm):**
Did you get home from your trip?  Wow takes 2 days to get home from florida!

**Me (2/8  5:37 pm):**
Got in at 4am

**Me (2/8  5:38 pm):**
WoW

**Drama queen (2/8  5:38 pm):**
Monday at 4am WOW!! Then you really are single.

**Drama queen (2/8  5:45 pm):**
Wow so you are.

She is reacting to her jealousy; said she talked with her girlfriend about 8:00 pm.

**Me (2/8  7:51 pm):**
You want to go to court because we are not workin out?  Please, give me a break

**Me  (2/8  8:05 pm):**
What are you mad about?

428

6    '6

**Me (2/8  8:13 pm):**
LoL, something is really wrong with you

**Me (2/8  8:17 pm):**
Why ya actin like this?

**Me (2/8  8:19 pm):**
Well whatever you try to do i'm going to counter sue, if need be

**Me (2/8  8:21 pm):**
And what's this other girl thing ya talkin about?

**Drama queen (2/8  11:43 pm):**
Hopefully you wont kill the other two grils you are Fucking and unfortunantly they have herpes thanks to you and they are not even 20.

**Me (2/8 11:49 pm):**
Whatever

**Me (2/8  11:50 pm):**
Cya in court like ya say

**Me (2/9  12:02 am):**
What girls?

**Me (2/9  2:54 am):**
Drama

**Me (2/9  2:55 am):**
Sorry to see ya go to such lengths lady

**Drama queen (2/9  7:45 am):**
Dam kid grow up you are 37 years old and you are Fucking little grils, and about we going to that lenght i have to know that i remember what happene on april 10, i never imagine a human being can really do all the things you did to of that night and do you remember some one was at there window and thats

**Drama queen (2/9  7:46 am):**
why you came back and take me to the hospital?  Because i do.

**Me (2/9  10:00 am):**
LoL, you are funny

**Me (2/9 10:02 am):**

429

Stop blaming me for ya problems, just because things don't go ur way ya now all butt hurt, please

**Drama queen (2/9  10:19 am):**
Ok will see

**Me (2/9  10:21 am):**
yup yup

**Me (2/9  10:25 am):**
My witness/audio tapes/your story in your writing, should be an interesting case

**Me (2/9  10:26 am):**
Not to mention/all the text messages/

**Drama queen (2/9  10:25 am):**
Did i mention that i remember what happened

**Me (2/9  10:27 am):**
LoL, yea you did

**Me (2/9  10:28 am):**
All of a sudden when we break up, lol

**Me (2/9  10:28 am):**
Funny how that works

**Me (2/9  10:29 am):**
I'm having ya dad brought in for court as well as your mom, getting all this out in the courts

**Drama queen (2/9  10:49 am):**
This is about you and of not them so be ready because i cant belive what you did    *✓ strong admission of no memory*

**Me (2/9  10:53 am):**
angry ex-girlfriend wants to get back at ex-boyfriend

**Me (2/9  10:53 am):**
Good one

**Me (2/9  10:54 am):**
Like I told ya, audio tapes, your writing, and a witness

**Me (2/9  10:54 am):**
And yes they will be involved

430

**Me (2/9  11:00 am):**
Ya mad because ya job, dad kickin you out, illegal mom with problems, grandfather's health issues and more.  I feel for ya

**Me (2/9  11:01 am):**
Cya in court

**Drama queen (2/9  11:32 am):**
Sorry but its not like that good one, i knew that you were not in love with me so on big deal i learn a lots of thing from you

*letting out her feelings of rejection*

**Me (2/9  11:34 am):**
Okay?

**Drama queen (2/9  11:35 am):**
Remember in the victim i know exactly what happene that night, and about your friend being there thrust me he was not there, audio lol

*?*

**Drama queen (2/9  11:38 am):**
everione knows about your other grils so no bige i have other ones too you are not the only one with other grils.

**Me (2/9  11:40 am):**
LoL, you sure it's a he?  remember my windows on my car were tinted, even ur boy officer Mchale asked about my window tint

**Me (2/9  11:40 am):**
Other grils? Huh? What?

**Drama queen (2/9  11:40 am):**
There was nobody there so it couldnt be a he or a she.

**Me (2/9  11:43 am):**
LoL, if you say so

**Drama queen (2/9  11:41 am):**
dont play dum we all know so you dont have to act anymore

**Me (2/9  11:45 am):**
My mind is clear and my soul is at ease

**Drama queen (2/9  11:44 am):**
Yup yup i know so

**Drama queen (2/9  11:47 am):**
Lol i really dont think so, oh i have the nurses that they were the ones who call the police.

431

*f*    *9*

**Me (2/9  11:49 am):**
LoL, happy for you

**Me (2/9  11:56 am):**
I know they called the police, it's part of their protocal, you and I talked about that last year

**Drama queen (2/9  11:59 am):**
When i didn't remember what had happened but now i know look am with the kids now

**Me (2/9  12:02 pm):**
LoL

**Me (2/9  12:03 pm):**
Been telling you that for the longest, you belong with the kids

**Me (2/9  12:06 pm):**
And to think I was trying to you prego the past month

**Me (2/9  12:27 pm):**
So you'd know I was not going to leave you if I became a police officer

**Me (2/9  12:29 pm):**
Even if you didn't want me to become one because some police have bad marriages like ya friend jack

**Drama queen (2/9  1:01 pm):**
That has nothing to do with me not wanting you to be a cop, you trying to get me pregnant for what you were doing the same thing with the other grils

**Me (2/9  1:04 pm):**
That other girls?

**Me (2/9  1:05 pm):**
And you were bitter when I told you I was "thinking" of being a cop

**Me (2/9  1:05 pm):**
Your bitter about lots of things

**Me (2/9  1:06 pm):**
Like I said, do what ya gotta do

**Drama queen (2/9  1:05 pm):**
The grils that every one knows that you were doing so dont act like you dont know

**Me (2/9  1:07 pm):**

432

You got issues

**Me (2/9  1:08 pm):**
There are no girls

**Drama queen (2/9  1:06 pm):**
Thats what im doing

**Drama queen (2/9  1:07 pm):**
Lol whatever

**Me (2/9  1:16 pm):**
What ya doin is making things up, good luck

**Drama queen (2/9  1:16 pm):**
Mmm no sorry im not

**Me (2/9  1:19 pm):**
LoL

**Me (2/9  1:20 pm):**
Kind of funny how you say you remember all of a sudden when you and I break up lmao

**Drama queen (2/9  2:34 pm):**
ike we were not even a couple.

**Drama queen (2/9  2:34 pm):**
If that what you think more power to you but its funny who we broke up when you were messing with two grils, real funny cuz it looks like and it sound l

**Me (2/9  2:37 pm):**
*Zzzzzzzzzzzzzz*

**Drama queen (2/9  2:37 pm):**
You will wake up really soon and its not going to be nice.

**Me (2/9  2:42 pm):**
You can get off my nutz now

**Me (2/9  2:48 pm):**
Big rumor around the store is you and I getting married, funny huh

**Me (2/9  2:51 pm):**
Ash wednsday, get ya ashes

**Drama queen (2/9  2:53 pm):**

*433*

I being off long time ago

**Drama queen (2/9  2:54 pm):**
Lol lol

**Me (2/9  2:56 pm):**
Sleepin with me last week, hmmmmm

**Drama queen (2/9  3:07 pm):**
Lol Fucking other grils on the weekend mm.  Giving me an Std hitting me and almost killing me i think thats more than enoft.  Sorry ggod try

**Me (2/9  3:09 pm):**
You on medication?

--------*end of messages until 2107/05*--------

**Drama queen (2/10  2:23 pm):**
So in guessing that you want another restraning order

**Me (2/10  7:27 pm):**
LMAO, enjoy Miami

--------*end of messages until 2/11/05*--------

**Me (2/11  2:28 pm):**
And stop calling me from blocked numbers with your made up accusations of me kicking and hitting you

**Me (2/11  2:31 pm):**
Accusations that are totally false and mad up due to your bitterness

**Me (2/11  2:31 pm):**
Made up that is

**Me (2/11  2:34 pm):**
The reason I did not tell your boy officer Mchale there was no witness is because I did nothing wrong and I did not trust officer Mchale

*434*

**Me (2/11 2:35 pm):**
Just look what he pulled that day I gave my volunteered statement and what you called and told me about the guy

**Drama queen (2/11 2:37 pm):**
Well its kind of funny that we have a witness and i know what happened that night so sorry im not making anything up

**Me (2/11 2:41 pm):**
What you're remembering is what you are making up, you spend the night with me the night I leave for the super bowl.....

**Me (2/11 2:42 pm):**
Then I don't stay in touch like you want, so you make up all this stuff that i'm with girls over the weekend? Please

**Me (2/11 2:42 pm):**
And we all know how you show you lack of mental balance when things don't go your way

**Drama queen (2/11 2:41 pm):**
Ok so, the point is that i remember i know what happened that night

**Me (2/11 2:45 pm):**
LoL, like I said you can make up whatever you and whomever ya trying to fool, but I did nothing in the way of hitting or kicking you anytime ever

**Drama queen (2/11 2:45 pm):**
I dont care about the grils you are with i dont, you are the only one who thinks that if things dont go my way i get mad but no sorry i guess you dont know me

**Drama queen (2/11 2:47 pm):**
Well you did and i never imagine you'll do something like that but you did

**Me (2/11 2:52 pm):**
Please, all this due to you being fed up with the situations in your life

**Me (2/11 2:53 pm):**
Don't text me with ya made up stories, I don't have time for them

**Me (2/11 2:54 pm):**
Matter of fact I've been instructed not to talk to you

**Drama queen (2/11 2:55 pm):**

435

13    13

Lol that has nothing to do with me remembering what happened, i never asked you for any help regarding my family probably because i can handle my family

**Drama queen (2/11 2:55 pm):**
problems so im Koo with my family problems because i'm not alone

**Drama queen (2/11 2:56 pm):**
Ok then why are you Texing me?

**Me (2/11 3:00 pm):**
You have family problems, work problems, health problems, living situation proablems, or were you lying about that as well?

**Me (2/11 3:01 pm):**
I'm texting you because I still and will always love you, like I told you before, if ya not happy with me i'd love to see ya happy with someone else

**Me (2/11 3:02 pm):**
So, happy ya got someone to be with, no hurt on my side, happy for ya

**Drama queen (2/11 3:02 pm):**
No im not lying about that but im taking care of those problems just like the problem that you hit me im taking care of that too

**Drama queen (2/11 3:03 pm):**
Lol that bad love then just like you told me

**Me (2/11 3:05 pm):**
You are lyin because ya butt hurt and the thing you did yesterday was tacky

**Drama queen (2/11 3:04 pm):**
I know you are not in pain because you have other grils to "love"

**Me (2/11 3:07 pm):**
I am alone now you are not with me, i'm not going to make up anything about all these girls, there are no girls

**Drama queen (2/11 3:07 pm):**
Lol oh sorry should i say booty call "friends"

**Me (2/11 3:08 pm):**
You spent ever night with me sleeping over every nite, a couple of weeks ago, so don;t give me that other girl stuff, it's getting very old

**Me (2/11 3:09 pm):**
Have a nice one Paolina

436

**Drama queen (2/11  3:09 pm):**
Well its getting by you doing it not me so go travel with that gril again i dont care
**Me (2/11  3:11 pm):**
Huh?  What?

**Me (2/11  3:12 pm):**
You do care, that's why ya makin yourself look like a big joke

**Me (2/11  3:12 pm):**
Please stop textin me

**Drama queen (2/11  3:09 pm):**
U2

**Drama queen (2/11  3:13 pm):**
I dont care about you and your girlfriends all im doing is telling the cops what you did to me so its not a joke

**Drama queen (2/11  3:13 pm):**
Ok

**Drama queen (2/11  3:15 pm):**
You Should save the tex messages to see who is Texing who.


*--------end of messages until 2/16/05--------*


**Drama queen (2/16  8:32 am):**
So who bail you out boy?......Your Witness "Pati" LMAO


*--------end of all messages--------*


*--------end of transcription--------*

# EXHIBIT "F"

438

OFFICER

**APPLICATION FOR EMERGENCY PROTECTIVE ORDER (CLETS)**    1295.90

(Name): _MCHALE_ has provided the information in items 1-5.

LAW ENFORCEMENT CASE NUMBER
04-04-10-014

1. PERSON(S) TO BE PROTECTED (insert names of all persons to be protected by this order):
LARA DALINA (11-10-84) KAISER HOSPITAL 1200
EL CAMINO REAL SSF  KAISER HOSPITAL 1150 VETERANS BLVD RD

2. PERSON TO BE RESTRAINED (name): JOHNSON, MICHAEL TYRONE CITY

Sex: [X] M. [ ] F. Ht: 6'01 W: 215 Hair color: BLK Eye color: BRN Race: BLK Age: 57 Date of birth:

3. The events that cause the protected person to fear immediate and present danger of domestic violence, child abuse, child abduction, elder or dependent adult abuse, or stalking (including workplace violence or civil harassment) are (give facts and specify weapons): V (LARA) WAS TAKEN TO KAISER HOSPITAL BY
AFTER A PHYSICAL ALTERCATION, LARA SUSTAINED A SERIOUS
MAKING THREATENING STATEMENTS TO
JOHNSON THREATENING TO KILL

4. [X] The person to be protected lives with the person to be restrained and requests an order that the restrained person move out immediately from the address in item 9.

5. a. [ ] The person to be protected has minor children in common with the person to be restrained, and a temporary custody order is requested because of the facts alleged in item 3. A custody order [ ] does [ ] does not exist.
   b. [ ] The person to be protected is a minor child in immediate danger of being abducted by the person to be restrained because of the facts alleged in item 3.

6. [ ] A child welfare worker or probation officer has advised the undersigned that a juvenile court petition [ ] will be filed [ ] will NOT be filed.

7. [ ] Adult Protective Services has been notified.

8. Phoned to (name of judicial officer): STEVEN DYLINA on (date): 04-10-04 at (time): 0855
   [X] The judicial officer granted the Emergency Protective Order that follows.

By OFFICER MCHALE                         ► _[signature]_
(PRINT NAME OF LAW ENFORCEMENT OFFICER)      (SIGNATURE OF LAW ENFORCEMENT OFFICER)

Agency: SSPD    Telephone No.: (650) 877-8900  Badge No. M4613

**EMERGENCY PROTECTIVE ORDER**

9. To restrained person (name): JOHNSON MICHAEL TYRONE
   a. [X] You must not contact, molest, harass, attack, strike, threaten, sexually assault, batter, telephone, send any messages to, follow, stalk, destroy any personal property, or disturb the peace of each person named in item 1.
   b. [X] You must [X] stay away at least 100 yards from each person named in item 1.
   [ ] stay away at least ___ yards from [ ] move out immediately from
   (address): 

10. [ ] (Name): _____ is given temporary care and control of the following:
    minor children of the parties (names and ages):

11. Reasonable grounds for the issuance of this order exist and an emergency protective order is necessary to prevent the occurrence or recurrence of domestic violence, child abuse, child abduction, elder or dependent adult abuse, or stalking (including workplace violence or civil harassment).

12. THIS EMERGENCY PROTECTIVE ORDER WILL EXPIRE AT 5:00 P.M. ON: APRIL 19, 2004
    To protected person: If you need protection for a longer period of time, you must request permanent protective orders at (court name and address):

    INSERT DATE OF FIFTH COURT DAY OR FIFTH
    CALENDAR DAY, WHICHEVER IS EARLIER.
    DO NOT COUNT DAY THE ORDER IS GRANTED.

**PROOF OF SERVICE**

13. Person served (name): MICHAEL TYRONE JOHNSON

14. I personally delivered copies to the person served as follows: Date: 04-10-04  Time: 0915
    Address: 800 ARROYO DR. SOUTH SAN FRANCISCO CA 94080

15. At the time of service I was at least 18 years of age and not a party to this cause.

16. My name, address, and telephone number are (this does not have to be server's home telephone number or address):
    BART MCHALE  33 ARROYO DR SO SAN FRANCISCO CA  877-8900

[X] California sheriff or marshal
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Date: ____  BART MCHALE  ► _[signature]_
(TYPE OR PRINT NAME)      (SIGNATURE OF SERVER)

439

April 10 2004 10 days of accident, I was arrested due to her statement

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN MATEO

F I L E D
SAN MATEO COUNTY

APR 2 2 2004

Clerk of the Superior Court

By _____
DEPUTY CLERK

Case No. _____ 079377

Petitioner: _Paolina Lara_____

And

Respondent: _Michael Johnson_____

DECLARATION RE: NOTICE OF
EX PARTE APPLICATION
FOR ORDERS

I, ___Paolina Lara_____, declare:

1. That I am ☐ counsel for petitioner/respondent
   ☒ petitioner in propria persona
   ☐ respondent in propria persona
   ☐ other:_____

in the within action.

2. That, pursuant to Local Rules of Court, I have given notice of the present ex-parte
   application for orders to:

   ☐ counsel for petitioner/respondent,
   _____(name)
   ☐ petitioner in propria persona
   ☐ respondent in propria persona
   ☐ other:_____

in the following manner:

   ☐ by telephone call at _____(AM) (PM) on _____, 20___
   ☐ by personally advising at _____(AM) (PM) on _____, 20___
   ☐ by letter (personally delivered) (mailed) at _____(AM) (PM)
      on _____, 20_____
   ☐ other: (describe)_____
   _____

to appear in Department No. _____ at _____(AM) (PM) on _____, 20___

3. I have received the following response to said notice:

440

## DV-100   Request for Order

Clerk stamps below when form is filed.

FILED
SAN MATEO COUNTY
APR 2 2 2004
Clerk of the Superior Court
By
DEPUTY CLERK

**1** Your name (person asking for protection):
PAOLINA LARA

Your address (skip this if you have a lawyer): (If you want your address to be private, give a mailing address instead):
150 RAMONA AVE.
City: SOUTH SAN FRANCISCO   State: CA.   Zip: 94080
Your phone # (optional): ( 650 ) 873-2769
Your lawyer (if you have one): (Name, address, phone #, and State Bar #):

Court name and street address:

Superior Court of California, County of
SAN MATEO
SAN MATEO COUNTY SUPERIOR COURT
401 MARSHALL STREET
400 COUNTY CENTER
REDWOOD CITY, CA   94063

Case Number: 079377

**2** Name of person you want protection from (restrained person):
MICHAEL JOHNSON
Describe that person: Sex: [X] M [ ] F   Ht: 6'1"   Wt: 215
Race: BLACK   Hair Color: BLACK
Eye Color: BROWN   Age: 37   Date of Birth: 5/28/66

**3** Besides you, who needs protection? (Family or household members)

| Full Name | Age | Lives with you? | How are they related to you? |
|---|---|---|---|
| | | [ ] Yes [ ] No | |
| | | [ ] Yes [ ] No | |
| | | [ ] Yes [ ] No | |

[ ] Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 3—Protected People" by your statement. NOTE: In any item that asks for Form MC-020, you can use an 8 1/2 x 11 inch sheet of paper instead.

**4** What is your relationship to the person in **2**? (Check all that apply)
a. [ ] We are now married.
b. [ ] We used to be married.
c. [ ] We live together.
d. [X] We used to live together.
e. [ ] We are relatives, in-laws, or related by adoption (specify relationship): _____
f. [X] We are dating or used to date.
g. [ ] We are engaged to be married or were engaged to be married.
h. [ ] We are the parents together of a child or children under 18.
   Child's Name: _____ Date of Birth: _____
   Child's Name: _____ Date of Birth: _____
   Child's Name: _____ Date of Birth: _____
   [ ] Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 4h" by your statement.
i. [ ] We have signed a Voluntary Declaration of Paternity for our child or children. Attach a copy if you have one.

### This is not a Court Order.

Judicial Council of California

442

Your name: PAOLINA LARA _____

| Case Number: | 0 7 9 3 7 7 |
|---|---|

**5** **Other Court Cases**

a. Have you and the person in ❷ been involved in another court case?   [X] No   [ ] Yes

If yes, where? County: _____   State: _____

What are the case numbers? *(If you know)* _____

What kind of case? *(Check all that apply)*

[ ] Divorce/Dissolution   [ ] Parentage/Paternity   [ ] Legal Separation   [ ] Domestic Violence   [ ] Criminal

[ ] Juvenile   [ ] Child Support   [ ] Nullity   [ ] Civil Harassment

[ ] Other *(specify):* _____

b. Are there any domestic violence restraining/protective orders now (criminal, juvenile, family)?

[X] No   [ ] Yes   *If yes, attach a copy if you have one.*

## What orders do you want? Check the boxes that apply to your case.

**6** [X] **Personal Conduct Orders**

I ask the court to order the person in ❷ not to do the following things to me or any of the people listed in ❸:

a. [X] Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, or block movements

b. [X] Contact (either directly or indirectly), or telephone, or send messages or mail or e-mail

**7** [X] **Stay-Away Order**

I ask the court to order the person in ❷ to stay at least _100_ yards away from: *(Check all that apply)*

a. [X] Me                                          e. [ ] The children's school or child care

b. [ ] The people listed in ❸          f. [X] My vehicle

c. [X] My home                              g. [ ] Other *(specify):* _____

d. [X] My job or workplace             _____

If the person listed in ❷ is ordered to stay away from all the places listed above, will he or she still be able

to get to his or her home, school, job, or place of worship? [X] Yes   [ ] No   *(If no, explain):* _____

_____

**8** [ ] **Move-Out Order**

I ask the court to order the person in ❷ to move out from and not return to *(address):*

_____

I have the right to live at the above address because *(explain):* _____

_____

**9** [ ] **Child Custody, Visitation, and Child Support**

I ask the court to order child custody, visitation, and/or child support. *You must fill out and attach Form DV-105.*

**This is not a Court Order.**

443

Your name: PAOLINA LARA _____

| Case Number: | |
|---|---|
| | **079377** |

## What orders do you want? Check the boxes that apply to your case ☞

**10** [X] **Record Unlawful Communications**
I ask for the right to record communications made to me by the person in ❷ that violate the judge's orders.

**11** [ ] **Property Control**
I ask the court to give *only* me temporary use, possession, and control of the property listed here:
_____

**12** [ ] **Debt Payment**
I ask the court to order the person in ❷ to make these payments while the order is in effect:
[ ] *Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 12—Debt Payment" by your statement.*

Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____

**13** [ ] **Property Restraint**
I am married to the person in ❷. I ask the judge to order that he or she not borrow against, sell, hide, or get rid of or destroy any possessions or property, except in the usual course of business or for necessities of life. I also ask the judge to order the restrained person to notify me of any new or big expenses and to explain them to the court.

**14** [X] **Attorney Fees and Costs**
I ask that the person in ❷ pay some or all of my attorney fees and costs.
*You must complete and file Form FL-150, Income and Expense Declaration.*

**15** [X] **Payments for Costs and Services**
I ask that the person in ❷ pay the following:
*You can ask for lost earnings or your costs for services caused directly by the person in ❷ (damaged property, medical care, counseling, temporary housing, etc.). You must bring proof of these expenses to your hearing.*
Pay to: KAISER HOSPITAL (REDWOOD CITY) For: MEDICAL EXPENSES  Amount: $ TBD _____
Pay to: _____ For: _____ Amount: $ _____
Pay to: _____ For: _____ Amount: $ _____

**16** [X] **Batterer Intervention Program**
I ask the court to order the person listed in ❷ to go to a 52-week batterer intervention program and show proof of completion to the court.

**17** [ ] **No Fee to Serve (Notify) Restrained Person**
*If you want the sheriff or marshal to serve (notify) the restrained person about the orders for free, ask the court clerk if you need to file more forms. You may need Form CH-101/DV-290 and Form 982(a)(17).*

**This is not a Court Order.**

Request for Ord...
DV-100, Page 3 of 4

H4H )

/

Your name: PAOLINA LARA

Case Number: **079377**

## What orders do you want? Check the boxes that apply to your case ☞

**18** [X] **More Time for Notice**
I need extra time to notify the person in ② about these papers. Because of the facts explained on this form, I want the papers served up to 5 ___ days before the date of the hearing. *For help, read DV-210.*
If necessary, add additional facts: _____

_____

**19** [ ] **Other Orders**
What other orders are you asking for? _____

[ ] *Check here if you need more space. Attach MC-020 and write "DV-100, Item 19—Other Orders" by your statement.*

**20** **Turn In Guns or Other Firearms**
I ask the judge to order the person in ② to sell or turn in any guns or firearms that he or she has or controls. If the judge approves the orders at a noticed hearing, the restrained person will be required to sell to a gun dealer or turn in to police any guns or firearms that he or she has or controls. *Describe any use or threatened use of firearms in ㉑.*

**21** **Describe the most recent abuse.**
  a.  Date of most recent abuse: 4/10/04
  b.  Who was there? SEE ATTACHMENT
  c.  What did the person in ② do or say that made you afraid? SEE ATTACHMENT

_____

_____

_____

_____

  d.  Describe any use or threatened use of guns or other weapons: SEE ATTACHMENT

  e.  Describe any injuries: SEE ATTACHMENT

_____

  f.  Did the police come? [ ] No [X] Yes
     If yes, did they give you an Emergency Protective Order? [X] Yes [ ] No [ ] I don't know
     *Attach a copy if you have one.*

     [X] *Check here if you need more space. Use Form MC-020 and write "DV-100, Item 21—Recent Abuse" by your statement.*

     [X] *Check here if the person in ② has abused you (or your children) other times. Use Form DV-101 or Form MC-020 to describe any previous abuse.*

**22** I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.
Date: APRIL 20, 2004

PAOLINA LARA
*Type or print your name*

▶ *Sign your name* _Polo Lara_

**This is not a Court Order.**

445

SHORT TITLE: LARA V. JOHNSON

CASE NUMBER: 079377

1  The Respondent and I were in an on and off dating relationship for almost three and a half

2  years.  We lived together for a period of six months.  We have no minor children.  I am

3  nineteen years old and the Respondent is thirty seven years old.  I did not know his true age

4  until recently because when I met him he lied to me and told me that he was twenty-three

5  years old.

6

7  The most recent incident of violence occurred on April 10, 2004.  I came home from work.  I

8  went to bed early.  I live in the same house as my father and step-mother.  I do not remember

9  anything that happened next.  My next memory is waking up in the hospital.  I was surrounded

10  by my family.  I had no idea what happened to me.  I was in excruciating pain.  I asked them

11  what happened.  My father told me that the Respondent physically assaulted me.  He told me

12  that my step-mom received a phone call from the Respondent at 6:00 a.m. on the morning of

13  April 11, 2004.  He said that the Respondent told her that I was hurt and that he took me to

14  the emergency room.  The doctor told me that I had severe injuries.  I had a fractured skull

15  and my scalp had to be stapled.  The insides of my eyes were dark red, and my right eye was

16  black and blue.  My face was swollen and bruised.  I have trouble hearing and seeing.  It is

17  difficult for me to walk without assistance because it is hard for me to maintain my balance.

18  My elbow was badly cut and bruised.  My head is still bleeding and sore.

19

20  I spoke to a police officer about what happened to me.  It is difficult for me to talk about

21  the incident because due to my severe head injuries I am having a hard time remembering the

22  details.  The police took photographs of me while I was at the hospital.  The officer

23  reported that I made statements to the nurse that the Respondent threw something at me.  An

24  officer came to my home a few days ago.  The officer told me the Respondent's true age.  He

25  also told me that the Respondent made statements indicating that he was responsible for

26  *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers)*:

27  This page may be used with any Judicial Council form or any other paper filed with this court.    Page 1

*446*

SHORT TITLE: LARA V. JOHNSON

CASE NUMBER: 079377

1  hurting me.  I told the police officer about the history of violence in our relationship.

2  The officer issued an Emergency Protective Order protecting me from the Respondent.  (Please

3  see attached EPO Case #: 04-04-10-014).  The order expired on April 19, 2004.  The Respondent

4  was arrested and is out on bail.  The victim advocate at the District Attorney's Office

5  informed me that his arraignment is set for May 18, 2004.

6

7  A recent threat of violence occurred approximately four months ago.  The Respondent and I had

8  an argument.  He called me and told me that he wanted to talk to me.  I told him that I did

9  not want to talk to him.  He called me again.  I did not pick up the phone.  He left a

10 message threatening that he was on his way to my house and if I didn't open the door he would

11 break the door down.  He told me that he didn't care if I called the police or made a big

12 deal about it.  The Respondent showed up about ten minutes later at around 11 p.m.  He called

13 again and told me that he was in front of the house.  He demanded that I open the door.  I

14 opened the door because I didn't want him to wake up anyone else in the house.

15

16 Another incident of violence occurred in May 2003 while the Respondent and I were living

17 together.  The Respondent and I had an argument.  I was trying to pack up my belongings and

18 leave.  The Respondent got made at me and pushed me.

19

20 My Emergency Protective Order expired on April 19, 2004 and I am afraid that the Respondent

21 will try to hurt me again.  I am respectfully requesting that this Court grant my request for

22 a three year domestic violence restraining order.

23

24

25

26 *(Required for verified pleading)* The items on this page stated on information and belief *(specify item numbers, not line numbers)*:

27
| This page may be used with any Judicial Council form or any other paper filed with this court. | Page 2 |

HH7

**DV-170**   Other Orders

Case Number:
079377

☑ This form is attached to form DV-130 (Restraining Order After Hearing), Item 15.

**①** Protected person's name: _Paolina Lara_

**②** Restrained person's name: _Michael Tyrone Johnson_

**③** ☐ Property Control
Only the person in ❶ can use, possess, and control the following property:_____
_____

**④** ☐ Debt Payment
The person in ❷ must make these payments until this order ends:
☐ *Check here if you need more space. Attach Form MC-020 or a sheet of paper and write "DV-170, Item 4 — Debt Payment" at the top.*
Pay to: _____ For: _____ Amount: $_____ Due date: _____
Pay to: _____ For: _____ Amount: $_____ Due date: _____
Pay to: _____ For: _____ Amount: $_____ Due date: _____

**⑤** ☐ Property Restraint
The people in ❶ and ❷ must not transfer, borrow against, sell, hide, or get rid of any property, except in the usual course of business or for the necessities of life. In addition, each person must notify the other of any new or big expenses and explain them to the court.

**⑥** ☐ Attorney Fees and Costs
The person in ❷ must pay the following lawyer fees and costs:
Pay to: _____ For: _____ Amount: $_____ Due date: _____
Pay to: _____ For: _____ Amount: $_____ Due date: _____

**⑦** ☐ Payments for Costs and Services
The person in ❷ must pay the following:
Pay to: _____ For: _____ Amount: $_____ Due date: _____
Pay to: _____ For: _____ Amount: $_____ Due date: _____
Pay to: _____ For: _____ Amount: $_____ Due date: _____

**⑧** Other Orders
_Respondent shall return any and all personal belongings of the Petitioner to her immediately. These belongings include, but are not limited to, her cell phone, watch, and earrings. Additionally, this court reserves jurisdiction over the issue of reimbursement of medical expenses by the Respondent to the Petitioner._

**This is a Court Order.**

Judicial Council of California, www.courtinfo.ca.gov
Rev. July 1, 2003, Mandatory Form
Family Code, §§ 6324, 6340–6344

**Other Orders**
(Domestic Violence Prevention)   _448_

DV-170, Page 1 of 1

| DV-125 | Reissue Temporary Restraining Order |
|---|---|

**1** Name of person asking for protection (protected person):

PAOLINA LARA

Protected person's address *(skip this if you have a lawyer): (If you want your address to be private, give a mailing address instead):*

City: _____ State: _____ Zip: _____

Phone # *(optional):* ( _____ )

Protected person's lawyer *(if any): (Name, address, phone #, and State Bar #):*

DIMPLE MALHOTRA (SBN: 212729),

P.O. BOX 5090

SAN MATEO, CA. 94402

(650) 652-0800

**2** Restrained person's name:

MICHAEL TYRONE JOHNSON

Description of that person:  Sex: [X] M [ ] F  Ht.: 6'1"
Wt.: 215   Race: BLACK   Hair Color: BLK
Eye Color: BRN   Age: 37   Date of Birth: 5/28/66

*Clerk stamps below when form is filed.*

**FILED**
**SAN MATEO COUNTY**

MAY 12 2004

Clerk of the Superior Court

By _____
DEPUTY CLERK

*Court name and street address:*

Superior Court of California, County of
SAN MATEO
SAN MATEO COUNTY SUPERIOR COURT
401 MARSHALL STREET
400 COUNTY CENTER
REDWOOD CITY, CA   94063

Case Number:
079377

**3** I ask the judge to reissue the Temporary Restraining Order, Form DV-110.
   a. The last hearing date was *(date):* 5/12/04
   b. The order has been reissued 0 times.

**4** I ask the judge to reissue the order because:
   a. [X] I could not get the order served before the hearing date.
   b. [ ] The date of the hearing was changed because we were sent to mediators or other family court services.
   c. [ ] Other *(specify):* _____

**5** I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.
Date: 5/12/04

PAOLINA LARA
*Type or print your name*

*Sign your name*

## This is a Court Order.

*Clerk will fill out section below.*

The order listed in **3** is reissued and reset for hearing in this court on the date and time below. Unless a judge extends the time, the order will end on the date and time below.

Name & address of court if different from above:

Date: 6/9/04   Time: 9:00 A.M.

Dept.: 25   Rm.:

All other orders in the Temporary Restraining Order stay in effect unless this order changes them.

Date: MAY 12, 2004

Judge (or Judicial Officer)
HON. JOSEPH C. SCOTT

Judicial Council of California
Rev. July 1, 2003, Mandatory Form
Code of Civil Procedure, § 527(b). Approved by DOJ

**Reissue Temporary Restraining Order**
(Domestic Violence Prevention)

Legal
Solutions
Plus

DV-125, Page 1 of 1

449



STATE OF CALIFORNIA
COUNTY OF SAN MATEO

I, Peggy Thompson, the Clerk of the Superior Court of the entitled County, do hereby certify that the foregoing is a full, true and correct copy of the original on file in my office, and have carefully compared same with the original.

Witness my hand and seal of said Superior Court

This __12__ day of __May__ __04__

Clerk of the Superior Court of California, County of San Mateo

By _____ Deputy Clerk

450

**DV-130**    **Restraining Order After Hearing**

Clerk stamps below when form is filed.

**FILED**
SAN MATEO COUNTY

JUN 9 - 2004

Clerk of the Superior Court

By _____

DEPUTY CLERK

**①** Protected person's name:

PAOLINA LARA

Protected person's address *(skip this if you have a lawyer)*: *(If you want your address to be private, give a mailing address instead):*

_____

City: _____ State: _____ Zip: _____

Your phone # *(optional)*: (____) _____

Your lawyer *(if you have one)*: *(Name, address, phone #, and State Bar #):*

DIMPLE MALHOTRA (SBN: 212729)

P.O. BOX 5090

SAN MATEO, CA. 94402

(650) 652-0800

Court name and street address:

Superior Court of California, County of
SAN MATEO
401 MARSHALL STREET
400 COUNTY CENTER
REDWOOD CITY, CA   94063

**②** Restrained person's name:

MICHAEL TYRONE JOHNSON

Description of that person: Sex: [X] M [ ] F   Ht.: 6'1"

Wt.: 215   Race: BLACK   Hair Color: BLACK

Eye Color: BROWN   Age: 37   Date of Birth: 5/28/66

Case Number:

079377

**③** List the full names of all other family or household members protected by this order: _____

_____

**④** **Court Order**

**To the person named in ②: This is a court order.**

*Court will fill out section below.*

There was a hearing on *(date):* 6/9/04   at *(time):* 9:00   [X] a.m. [ ] p.m. Dept.: 25   Rm.: 7C

Judge HON. JOSEPH C. SCOTT _____ made the orders at the hearing.

The orders end at *(time):* [X] midnight or _____ [ ] a.m. [ ] p.m. on *(date):* 6/8/07    End Date

■ *If no date is written, the restraining orders end 3 years after the date of the hearing.*

■ *If no time is written, they end at midnight on the end date.*

■ *Note: Custody, visitation, or support orders have different end dates and usually end when the children turn 18.*

All orders are on pages 2 and 3 and attachment pages *(if any).*

**This is a Court Order.**

Judicial Council of California
Rev. January 1, 2004, Mandatory Form
Family Code, § 6200 et seq. Approved by DOJ

**Restraining Order After Hearing (CLETS)**
**(Domestic Violence Prevention)**

Legal
Solutions
Plus

DV-130, Page 1 of 5

451

Protected person's name: PAOLINA LARA

Case Number: 079377

**13** ☐ **Batterer Intervention Program**

The person in ❷ must go to and pay for a 52-week batterer intervention program, and show proof of completion to the court. This program must be approved by the probation department.

**14** **No Fee to Notify Restrained Person**

If the sheriff or marshal serves this order, he or she will do it for free.

**15** ☒ **Other Orders** relating to property control, debt payment, attorney fees, restitution, and/or other orders are in attached Form DV-170 or *(specify other form):* _____

**16** ☒ **Service**

a. ☐ The people in ❶ and ❷ were at the hearing. No other proof of service is needed.

b. ☒ The person in ❶ was at the hearing. The person in ❷ was not. But Proof of Service of DV-110 was presented to the court.

   (1) ☐ The judge's orders in this form are the same as DV-110 except for the end date. This order can be served by mail.

   (2) ☒ The judge's orders in this form are different from DV-110. Someone — not the people in ❶ or ❸ — must personally "serve" a copy of this order to the person in ❷.

c. ☐ The people in ❶ and ❷ have agreed in writing to this order. No other proof of service is needed.

**17** ☐ The people in ❶ and ❷ must return to this court/department on *(date):* ___/___/___
at *(time):* _____ ☐ a.m. ☐ p.m. to review *(specify issues):* _____

**18** **Attached Pages Are Orders**

■ Number of pages attached to this 5-page form: _1_

■ All of the attached pages are part of this order.

■ Attachments include *(check all that apply):*

   ☐ DV-140   ☐ DV-145   ☐ DV-150   ☐ DV-160   ☒ DV-170   ☐ Other *(specify):* _____

Date: JUNE 9, 2004

*Judge (or Judicial Officer)*
HON. JOSEPH C. SCOTT

---

### Certificate of Compliance With VAWA

This protective order meets all Full Faith and Credit requirements of the Violence Against Women Act, 18 U.S.C. 2265 (1994) (VAWA). This court has jurisdiction over the parties and the subject matter; the restrained person has been afforded reasonable notice and an opportunity to be heard as provided by the laws of this jurisdiction. **This order is valid and entitled to enforcement in all jurisdictions throughout the 50 United States, the District of Columbia, all tribal lands, and all U.S. territories, commonwealths, and possessions and shall be enforced as if it were an order of that jurisdiction.**

---

### This is a Court Order.

Protected person's name: PAOLINA LARA

Case Number:
079377

## Instructions for Law Enforcement

**19** **Start Date and End Date of Orders**

The orders *start* the earlier of the following dates:
- The hearing date on page 1 *or*
- The date next to the judge's signature on page 3.

The orders *end* on the end date on page 1. If no end date is listed, they end 3 years from the start date.

**20** **Arrest Required If Order Is Violated**

If an officer has probable cause to believe that the restrained person had notice of the order and has disobeyed the order, the officer must arrest the restrained person. (Pen. Code, §§ 836(c)(1), 13701(b).) A violation of the order may be a violation of Penal Code section 166 or 273.6.

**21** **Notice/Proof of Service**
- Law enforcement must first determine if the restrained person had notice of the orders. If notice cannot be verified, the restrained person must be advised of the terms of the orders. If the restrained person then fails to obey the orders, the officer must enforce them. (Fam. Code, § 6383.)

  Consider the restrained person "served" (noticed) if:
  - The officer sees a copy of the Proof of Service, or confirms that the Proof of Service is on file *or*
  - The restrained person was at the restraining order hearing, or was informed of the order by an officer (Fam. Code, § 6383, Pen. Code, § 836(c)(2).)

**22** **If the Protected Person Contacts the Restrained Person**

Even if the protected person invites or consents to contact from the restrained person, the orders remain in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact by the restrained person. The orders can be changed only by another court order (Pen. Code, § 13710(b).)

**23** **Child Custody and Visitation**
- The custody and visitation orders are on Form DV-140, Items ❸ and ❹. They are sometimes also written on additional pages, or referenced in DV-140 or other orders that are not part of the restraining order.
- Forms DV-100 and DV-105 are not orders. Do not enforce them.

**24** **Enforcing the Restraining Order in California**

Any law enforcement officer in California who receives, sees, or verifies the orders on a paper copy, the California Law Enforcement Telecommunications System (CLETS), or in an NCIC Protection Order File, must enforce the orders.

**25** **Conflicting Orders**

If a criminal restraining order (CR-160) conflicts with a civil restraining order (DV-110 or DV-130), enforce the criminal order. Even if the criminal order is older, the officer must still enforce it over the civil order. (Pen. Code, § 136.2(h).) Any nonconflicting terms of the civil restraining order remain in full force.

## This is a Court Order.

### Restraining Order After Hearing (CLETS)
(Domestic Violence Prevention)



*453*

Protected person's name:  PAOLINA LARA

| Case Number: |
| --- |
| 079377 |

## Warnings and Notices to the Restrained Person in ❷

**26** **If you do not obey this order, you can be arrested and charged with a crime.**
- If it is a felony to take or hide a child against this order. You can go to prison and/or pay a fine.
- If you travel to another state or to tribal lands, or make the protected person do so, with the intention of disobeying this order, you can be charged with a federal crime.
- If you do not obey this order, you can go to prison and/or pay a fine.

**27** **You Cannot Have Guns or Firearms**



You cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get a gun while the order is in effect. If you do, you can go to jail and pay a $1,000 fine. You must sell to a licensed gun dealer or turn in to police any guns or firearms that you have or control. The judge will ask you for proof that you did so. If you do not obey this order, you can be charged with a crime. Federal law says you cannot have guns or ammunition while the order is in effect.

*Clerk's Certificate*
*[seal]*



I certify that this Restraining Order After Hearing is a true and correct copy of the original on file in the court.

Date:  **JUN 9 - 2004**

Clerk, by  **PEGGY THOMPSON**  _____, Deputy

## This is a Court Order.

Rev. January 1, 2004

### Restraining Order After Hearing (CLETS)
(Domestic Violence Prevention)

454

Name: Paolina Lara

Address: 150 Ramona Ave

So. San Francisco CA 94080

Telephone: (650) 267-1616

**ENDORSED FILED**
**SAN MATEO COUNTY**

NOV 2 4 2004

Clerk of the Superior Court
By _CEDRIC A. CARTER_
DEPUTY CLERK

BEFORE THE SUPERIOR AND MUNICIPAL COURTS OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN MATEO

In Re: _____

Plaintiff/Petitioner: Paolina Lara

Defendant/Respondent: Michael Johnson.

No. **079377**

DECLARATION FOR ASSIGNMENT

TO NORTHERN BRANCH

I, _____Paolina Lara_____, hereby declare:
That I am the ___Petitioner___ in the above entitled matter, and that said matter
may be properly assigned to the Northern Branch of the above-entitled Court at South San Francisco,
California, as provided in the Rules of the said Court, for the following reason:

__Paolina Lara__ is a resident of the city of __South San Francisco__, within the
geographical boundaries of the Northern Branch.

I, declare under penalty of perjury that the foregoing is true and correct.
Executed on ___NOV 29, 2004___, at ___S.S.F.___, California

_____
(signature)

___Paolina Lara___
(print name)

455

| PETITIONER/PLAINTIFF: Paolina Lara | CASE NUMBER: |
|---|---|
| RESPONDENT/DEFENDANT: Michael Tyrone Johnson | 079377 |

7. ☐ **PROPERTY CONTROL**     ☐ **To be ordered pending the hearing**
   a. ☐ Petitioner ☐ Respondent   are given the exclusive temporary use, possession, and control of the following property we own or are buying *(specify)*:

   b. ☐ Petitioner ☐ Respondent   are ordered to make the following payments on liens and encumbrances coming due while the order is in effect:
   Debt                         Amount of payment                              Pay to

8. ☐ I request that time for service of the Order to Show Cause and accompanying papers be shortened so that they may be served no less than *(specify number)*:                    days before the time set for the hearing. I need to have the order shortening time because of the facts specified in the attached declaration.

9. ☑ **OTHER RELIEF** *(specify)*:

   Terminate restraining Order

10. ☑ **FACTS IN SUPPORT** of relief requested and change of circumstances for any modification are *(specify)*:
    ☑ contained in the attached declaration.

    On April 10, 2009 around 2:00 am, I had an accident in front of my house, I lost my memory and all that I could remember was going out with my girlfriends and getting home at 11:30pm next thing I notice I was in the hospital. At that time I didn't remember what happened and I was asking my father what had happened. At that time my father didn't like my boyfriend Michael, he wanted

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: Nov 17, 2009

X  Paolina Lara
   (TYPE OR PRINT NAME)

► X  *[signature]*
     (SIGNATURE OF APPLICANT)

**APPLICATION FOR ORDER AND SUPPORTING DECLARATION**          Page 2 of 2

4561

SHORT TITLE:

CASE NUMBER:

679377.

1  me to break up with him, so he told me in the hospital
2  that Michael Johnson hit me and almost killed me. I.
3  didn't believe him so he made me file a restraining
4  Order against him. Know that I remember what happened
5  and knowing that he didn't put his hands on me at any
6  time I would like to take the restraining order out, I
7  am not scare of him or I don't feel threat by him
8  in any way.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26  *(Required for verified pleading)* The items on this page stated on information and belief are  *(specify item numbers, not line numbers)*:
27  This page may be used with any Judicial Council form or any other paper filed with the court

Page____

Form Approved by the

ADDITIONAL PAGE  | 457

CPC ---- ---

_Order Terminating Restraining Order_

**DV-130** ~~Restraining Order After Hearing~~

*Clerk stamps below when form is filed.*

**1** Protected person's name:

Paolina Lara

Protected person's address *(skip this if you have a lawyer)*: *(If you want your address to be private, give a mailing address instead)*:

150 Ramona Avenue

City: S. San Francisco  State: CA  Zip: 94080

Your phone # *(optional)*: (____) _____

Your lawyer *(if you have one)*: *(Name, address, phone #, and State Bar #)*:

_____

_____

_____

**FILED**
SAN MATEO COUNTY

JAN 0 7 2005

Clerk of the Superior Court

By _____
DEPUTY CLERK

*Court name and street address:*

Superior Court of California, County of
Superior & Municipal Courts
County of San Mateo
1050 Mission Road
So San Francisco, CA 94080

**2** Restrained person's name:

Michael Johnson

Description of that person: Sex: ☒ M  ☐ F  Ht.: 6'2

Wt.: 215  Race: African Am.  Hair Color: black

Eye Color: brown  Age: ~~31~~ ~~5/04~~

Case Number:

079377

**3** List the full names of all other family or household members protected by this order: _____

_____

**4** **Court Order**

**To the person named in ❷: This is a court order.**

*Court will fill out section below.*

There was a hearing on *(date)*: 1/07/05  at *(time)*: 9:00 ☒ a.m. ☐ p.m.  Dept.: 19  Rm.: "P"

Judge HON. KATHLEEN MCKENNA _____ made the orders at the hearing.

Court terminated restraining order on 1/7/2005

The orders end at *(time)*: ☐ midnight or 9:00 ☒ a.m. ☐ p.m. on *(date)*: 1/7/05 . ← **End Date**

■ *If no date is written, the restraining orders end 3 years after the date of the hearing.*

■ *If no time is written, they end at midnight on the end date.*

■ *Note: Custody, visitation, or support orders have different end dates and usually end when the children turn 18.*

All orders are on pages 2 and 3 and attachment pages *(if any)*.

**This is a Court Order.**

458

Protected person's name: ___Paolina Lara_____

Case Number: 079377

**13**  ☐ **Batterer Intervention Program**
The person in ❷ must go to and pay for a 52-week batterer intervention program, and show proof of completion to the court. This program must be approved by the probation department.

**14**  **No Fee to Notify Restrained Person**
If the sheriff or marshal serves this order, he or she will do it for free.

*orders terminated*

**15**  ☐ **Other Orders** relating to property control, debt payment, attorney fees, restitution, and/or other orders are in attached Form DV-170 or *(specify other form)*: _____

**16**  ☒ **Service**
   a. ☒ The people in ❶ and ❷ were at the hearing. No other proof of service is needed.
   b. ☐ The person in ❶ was at the hearing. The person in ❷ was not. But Proof of Service of DV-110 was presented to the court.
      (1) ☐ The judge's orders in this form are the same as DV-110 except for the end date. This order can be served by mail.
      (2) ☐ The judge's orders in this form are different from DV-110. Someone — not the people in ❶ or ❸ — must personally "serve" a copy of this order to the person in ❷.
   c. ☐ The people in ❶ and ❷ have agreed in writing to this order. No other proof of service is needed.

**17**  ☐ The people in ❶ and ❷ must return to this court/department on *(date)*: ____ / ____ / ____
   at *(time)*: _____ ☐ a.m. ☐ p.m. to review *(specify issues)*: _____

**18**  **Attached Pages Are Orders**
   ■ Number of pages attached to this 5-page form: __0__
   ■ All of the attached pages are part of this order.
   ■ Attachments include *(check all that apply)*:
     ☐ DV-140  ☐ DV-145  ☐ DV-150  ☐ DV-160  ☐ DV-170  ☐ Other *(specify)*: _____

Date: ___1/7/05___  ▶ _____
                                     Judge (or Judicial Officer)

---

**Certificate of Compliance With VAWA**

This protective order meets all Full Faith and Credit requirements of the Violence Against Women Act, 18 U.S.C. 2265 (1994) (VAWA). This court has jurisdiction over the parties and the subject matter; the restrained person has been afforded reasonable notice and an opportunity to be heard as provided by the laws of this jurisdiction. This order is valid and entitled to enforcement in all jurisdictions throughout the 50 United States, the District of Columbia, all tribal lands, and all U.S. territories, commonwealths, and possessions and shall be enforced as if it were an order of that jurisdiction.

459

FL-300

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Paolina Lara<br>150 Romona Ave<br>South San Francisco CA 94080<br><br>TELEPHONE NO. (Optional):          FAX NO. (Optional):<br>EMAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | **ENDORSED FILED**<br>SAN MATEO COUNTY<br><br>NOV 2 4 2004<br><br>Clerk of the Superior Court<br>By CEDRIC A. CARTER<br>DEPUTY CLERK |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Mateo
~~Superior & Municipal Courts~~
STREET ADDRESS:
MAILING ADDRESS: 1050 MISSION ROAD
CITY AND ZIP CODE: So. San Francisco, CA 94080
BRANCH NAME: www.sanmateocourt.org

PETITIONER: Paolina Lara

RESPONDENT: Michael Johnson

| ORDER TO SHOW CAUSE FOR | ☐ MODIFICATION | CASE NUMBER: |
|---|---|---|
| ☐ Child Custody   ☐ Visitation   ☐ Injunctive Order | | 079377 |
| ☐ Child Support   ☐ Spousal Support   ☑ Other (specify): | |
| ☐ Attorney Fees and Costs   Terminate Restraining Order | |

1. TO (name): **Michael Johnson**
2. YOU ARE ORDERED TO APPEAR IN THIS COURT AS FOLLOWS TO GIVE ANY LEGAL REASON WHY THE RELIEF SOUGHT IN THE ATTACHED APPLICATION SHOULD NOT BE GRANTED. If child custody or visitation is an issue in this proceeding, Family Code section 3170 requires mediation before or concurrently with the hearing listed below.

a. Date: JAN 0 7 2005   Time: 9AM   ☐ Dept: DV 19   ☐ Room: SSF

b. The address of the court is   ☑ same as noted above   ☐ other (specify):

c. ☐ The parties are ordered to attend custody mediation services as follows:
~~Parties are referred to Family Court~~
~~Services to schedule a Mediation~~
~~Hearing prior to the hearing date.~~
~~(650) 363-4561~~

3. THE COURT FURTHER ORDERS that a completed Application for Order and Supporting Declaration (form FL-310), a blank Responsive Declaration (form FL-320), and the following documents be served with this order:
   a. (1) ☐ Completed Income and Expense Declaration (form FL-150) and a blank Income and Expense Declaration
   (2) ☐ Completed Financial Statement (Simplified) (form FL-155) and a blank Financial Statement (Simplified)
   (3) ☐ Completed Property Declaration (form FL-160) and a blank Property Declaration
   (4) ☐ Points and authorities
   (5) ☐ Other (specify):

   b. ☐ Time for   ☐ service   ☐ hearing   is shortened. Service must be on or before (date):
   Any responsive declaration must be served on or before (date):
   c. ☐ You are ordered to comply with the temporary orders attached.
   d. ☐ Other (specify):

Date: NOV 2 4 2004                                   KATHLEEN McKENNA
_____
                                                    JUDICIAL OFFICER

**NOTICE:** If you have children from this relationship, the court is required to order payment of child support based on the incomes of both parents. The amount of child support can be large. It normally continues until the child is 18. You should supply the court with information about your finances. Otherwise, the child support order will be based on the information supplied by the other parent.
You do not have to pay any fee to file declarations in response to this order to show cause (including a completed Income and Expense Declaration (form FL-150) or Financial Statement (Simplified) (form FL-155) that will show your finances). In the absence of an order shortening time, the original of the responsive declaration must be filed with the court and a copy served on the other party at least ten calender days before the hearing date.

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California          **ORDER TO SHOW CAUSE**          Family Code, §§ 215, 270 et seq., 3600 et seq., 3500 et seq., 4300

460

FL-320

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:                    FAX NO.:

ATTORNEY FOR *(Name):*

SUPERIOR COURT OF CALIFORNIA
STREET ADDRESS: **COUNTY OF SAN MATEO**
MAILING ADDRESS: **1050 Old Mission Rd.**
CITY AND ZIP CODE: **So. San Francisco, CA 94080**
BRANCH NAME:                    www.sanmateocourt.org

PETITIONER/PLAINTIFF:

RESPONDENT/DEFENDANT:

| **RESPONSIVE DECLARATION TO ORDER TO SHOW CAUSE OR NOTICE OF MOTION** | CASE NUMBER: |
|---|---|
| HEARING DATE: **JAN 0 7 2005**    TIME: *9AM*    DEPARTMENT OR ROOM: *DU 19* | *079377* |

1. ☐ **CHILD CUSTODY**
   a. ☐ I consent to the order requested.
   b. ☐ I do not consent to the order requested but I consent to the following order:

2. ☐ **CHILD VISITATION**
   a. ☐ I consent to the order requested.
   b. ☐ I do not consent to the order requested but I consent to the following order:

3. ☐ **CHILD SUPPORT**
   a. ☐ I consent to the order requested.
   b. ☐ I consent to guideline support.
   c. ☐ I do not consent to the order requested, but I consent to the following order:
      (1) ☐ Guideline
      (2) ☐ Other *(specify):*

4. ☐ **SPOUSAL SUPPORT**
   a. ☐ I consent to the order requested.
   b. ☐ I do not consent to the order requested.
   c. ☐ I consent to the following order:

5. ☐ **ATTORNEY FEES AND COSTS**
   a. ☐ I consent to the order requested.
   b. ☐ I do not consent to the order requested.
   c. ☐ I consent to the following order:

*461*

**APPLICATION FOR EMERGENCY PROTECTIVE ORDER (CLETS)**    1295.90

*(Name):* OFFICER M. HALE _____ has provided the information in items 1-5.

| | LAW ENFORCEMENT CASE NUMBER: |
|---|---|
| 1. PERSON(S) TO BE PROTECTED *(insert names of all persons to be protected by this order):* LARA, PAOLINA (11.10.84) | 04-04-10-014 |

2. PERSON TO BE RESTRAINED *(name):* JOHNSON, MICHAEL TYRONE (03-28-66)

Sex: ☒ M ☐ F  Ht: 6'01"  Wt: 215  Hair color: BLK  Eye color: BRN  Race: BLK  Age: 38  Date of birth: 3-28-66

3. The events that cause the protected person to fear immediate and present danger of domestic violence, child abuse, child abduction, elder or dependent adult abuse, or stalking (including workplace violence or civil harassment) are *(give facts and dates; specify weapons):* ON 04-10-04 V-1 (LARA) WAS VIOLENTLY ASSAULTED BY S-1 (JOHNSON) CAUSING HER TO LOSE CONSCIOUSNESS AND SUBSEQUENTLY THE MEMORY OF THE ASSAULT. LARA OBTAINED AN EPO AND A TRO ON 05-12-04. LARA THEN BELIEVING JOHNSONS PERIOD OF THE INCIDENT CANCELLED THE ORDER. LARA

4. ☐ The person to be protected lives with the person to be restrained and requests an order that the restrained person move out immediately from the address in item 9. Because her removal on 02-07-05 AND RESIDING

5. a. ☐ The person to be protected has minor children in common with the person to be restrained, and a temporary custody order is requested because of the facts alleged in item 3. A custody order ☐ does ☐ does not exist.
   b. ☐ The person to be protected is a minor child in immediate danger of being abducted by the person to be restrained because of the facts alleged in item 3.

6. ☐ A child welfare worker or probation officer has advised the undersigned that a juvenile court petition ☐ will be filed. ☐ will NOT be filed.

7. ☐ Adult Protective Services has been notified.

8. Phone call to *(name of judicial officer):* DWINA _____ on *(date):* 02-11-05 at *(time):* 1:45
   ☒ The judicial officer granted the Emergency Protective Order that follows.

By: OFFICER M. HALE _____ ▶ _____
   (PRINT NAME OF LAW ENFORCEMENT OFFICER)        (SIGNATURE OF LAW ENFORCEMENT OFFICER)

Agency: SSFPD _____  Telephone No.: 650 877 8900  Badge No.: M4812

---

**EMERGENCY PROTECTIVE ORDER**

9. To restrained person *(name):* JOHNSON MICHAEL TYRONE
   a. ☒ You must not contact, molest, harass, attack, strike, threaten, sexually assault, batter, telephone, send any messages to, follow, stalk, destroy any personal property, or disturb the peace of person named in item 1.
   b. ☒ You must ☒ stay away at least 100 yards from each person named in item 1.
      ☐ stay away at least _____ yards from ☐ move out immediately from
      *(address):* _____

10. ☐ *(Name):* _____ is given temporary care and control of the following minor children of the parties *(names and ages):* _____

11. Reasonable grounds for the issuance of this order exist and an emergency protective order is necessary to prevent the occurrence or recurrence of domestic violence, child abuse, child abduction, elder or dependent adult abuse, or stalking (including workplace violence or civil harassment).

12. THIS EMERGENCY PROTECTIVE ORDER WILL EXPIRE AT 5:00 P.M. ON: 02-21-05 ✱
   *To protected person:* If you need protection for a longer period of time, you must request permanent protective orders at *(court name and address):*
   INSERT DATE OF FIFTH COURT DAY OR SEVENTH CALENDAR DAY, WHICHEVER IS EARLIER; DO NOT COUNT DAY THE ORDER IS GRANTED

---

**PROOF OF SERVICE**

13. Person served *(name):* MICHAEL T. JOHNSON

14. I personally delivered copies to the person served as follows: Date: 02-11-05  Time: 1750
    Address: 33 ARROYO DR 56F CA 94080

15. At the time of service I was at least 18 years of age and not a party to this cause.

16. My name, address, and telephone number are *(this does not have to be server's home telephone number or address):*
    C. DEVAN D2633  33 ARROYO DR 56F CA 94080
    ☒ California sheriff or marshal

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 02-11-05 ▶ _____ D2633

462

F.I.L.E.D.
SAN MATEO COUNTY

7. This order expires on *(specify date)*
   If no date is listed, this order expires three years from the date of issuance.

Date:

CONFIDENTIAL

463

Your name: _____

| Case Number: |
|---|
| 0 7 9 3 7 7 |

**What orders do you want? Check the boxes that apply to your case** ☑

**18** ☑ **More Time for Notice**
I need extra time to notify the person in ❷ about these papers. Because of the facts explained on this form, I want the papers served up to ___5___ days before the date of the hearing. *For help, read DV-210.*
*If necessary, add additional facts:* _____
_____

**19** ☐ **Other Orders**
What other orders are you asking for? _____
_____

　　☐ *Check here if you need more space. Attach MC-020 and write "DV-100, Item 19—Other Orders" by your statement.*

**20** **Turn in Guns or Other Firearms**
I ask the judge to order the person in ❷ to sell or turn in any guns or firearms that he or she has or controls. If the judge approves the orders at a noticed hearing, the restrained person will be required to sell to a gun dealer or turn in to police any guns or firearms that he or she has or controls. *Describe any use or threatened use of firearms in* ㉑.

**21** **Describe the most recent abuse.**
a. Date of most recent abuse: ___4/10/09___
b. Who was there? ___Johnson   Only___
c. What did the person in ❷ do or say that made you afraid? ___Michael   assaulted   me   and   for   that   I   was   hospitalise___
___for   1   week.   I   have   long   term   disavilitia   South   San___
___Francisco   Police   report #   04-04-10-014___
_____
_____

d. Describe any use or threatened use of guns or other weapons: ___N/A___

e. Describe any injuries: ___multiple   contusion,   abrasilons   lost   of___
___hear   on   my   right   ear,   lost   of   teeth   and   smell___

f. Did the police come? ☐ No ☑ Yes
If yes, did they give you an Emergency Protective Order? ☑ Yes ☐ No ☐ I don't know
*Attach a copy if you have one.*
　　☐ *Check here if you need more space. Use Form MC-020 and write "DV-100, Item 21—Recent Abuse" by your statement.*
　　☐ *Check here if the person in ❷ has abused you (or your children) other times. Use Form DV-101 or Form MC-020 to describe any previous abuse.*

**22** I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.

Date: ___2-18-05___

___Paolina Lara___　　　　　▶ ___[signature]___
*Type or print your name*　　　　　*Sign your name*

**This is not a Court Order.**

4.4

Name: _Paolina lara_____

Address: _150 Ramona Ave. / ___

_So. San Francisco CA. 94080_

Telephone: _(650) 267-1616_____

FILED
SAN ___ COUNTY

FEB 2 3 2005

Clerk ___ Superior Court
By ___
DEPUTY CLERK

BEFORE THE SUPERIOR AND MUNICIPAL COURTS OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN MATEO

In Re: _____

Plaintiff/Petitioner: _Paolina lara_____

Defendant/Respondent: _Michael Johnson._

No. _079377_

DECLARATION FOR ASSIGNMENT

TO NORTHERN BRANCH

I, _Paolina lara._____, hereby declare:
That I am the __Plaintiff / Petitioner___ in the above entitled matter, and that said matter
may be properly assigned to the Northern Branch of the above-entitled Court at South San Francisco,
California, as provided in the Rules of the said Court, for the following reason:

_Paolina lara_____ is a resident of the city of __South San Francisco__ within the
geographical boundaries of the Northern Branch.

I, declare under penalty of perjury that the foregoing is true and correct.
Executed on ___2-18-05_____, at ___San Mateo County___, California

_____
(signature)

___ _Paolina lara_____
(print name)

465

SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SAN MATEO

F I L E D
SAN MATEO COUNTY

FEB 2 8 2005

Clerk of the Superior Court
By
DEPUTY CLERK

Case No. 079577

Petitioner: _Paolina Lara_

And

Respondent: _Michael Tyrone Johnson_

DECLARATION RE: NOTICE O
EX PARTE APPLICATION
FOR ORDERS

I, _Paolina Lara_, declare:

1. That I am
   ☐ counsel for petitioner/respondent
   ☑ petitioner in propria persona
   ☐ respondent in propria persona
   ☐ other:_____

in the within action.

2. That, pursuant to Local Rules of Court, I have given notice of the present ex-parte application for orders to:
   ☐ counsel for petitioner/respondent,
   _____(name)
   ☑ petitioner in propria persona
   ☐ respondent in propria persona
   ☐ other:_____

in the following manner:

   ☐ by telephone call at _____(AM) (PM) on _____, 20___
   ☐ by personally advising at _____(AM) (PM) on _____, 20___
   ☐ by letter (personally delivered) (mailed) at _____(AM) (PM)
   on _____, 20_____
   ☐ other: (describe)_____
   _____

to appear in Department No. _____at _____(AM) (PM) on _____, 20

3. I have received the follow...

_4ldo_ ~

4.  I have not given notice of the present ex-parte application for orders for the following reason(s):  (indicate)

☐ (a) Notice of this ex parte application would frustrate the purpose of the orders sought herein.  (Explain below.)

☑ (b) The applicant would suffer immediate and irreparable harm before the adverse party could be heard in opposition.  (Explain below.)

☐ (c) No significant direct burden or inconvenience to the adverse party will be likely to result from the orders sought herein.  (Explain below.)

☐ (d) I made the following reasonable and good faith efforts to notify the adverse party and further efforts to give notice would probably be futile and unduly burdensome.  (Describe in detail.)

_Current TRO will exp. 2-21-05_
_I need more permanent order_

☐ (e) Other  (Describe in detail.) _____

Explanation: _____

5.  There are the following (temporary) (permanent) orders currently in effect: _____

6.  There is presently a court hearing date set in this matter on _____,20___, for_____

7.  The parties (have) (have not) been to Family Court Services for mediation.  If so, mediation was held on _____, 20___, and the mediator was _____ (name).

The recommendation of the mediator was _____

I declare under penalty of perjury that the foregoing is true and correct and that this declaration is executed at _S.S.F_, California, at _____ (AM) (PM), on _2-18_, 20_05_.

_467_

**DV-100**  **Request for Order**

Clerk stamps below when form is filed.

F I L E D
SAN MATEO COUNTY

FEB 2 8 2005

Clerk of the Superior Court
By
DEPUTY CLERK

① Your name (person asking for protection):

Paulina Lara

Your address (skip this if you have a lawyer): (If you want your address to be private, give a mailing address instead):

150 Ramona Ave.

City: So. S. F.    State: CA    Zip: 94080

Your phone # (optional): (____)

Your lawyer (If you have one): (Name, address, phone #, and State Bar #):

Court name and street address:

Superior Court of California, County of San Mateo
1050 Old Mission Road
South San Francisco, Ca. 94080
Northern Branch
www.sanmateocourt.org

② Name of person you want protection from (restrained person):

Michael Tyrone Johnson

Describe that person: Sex: ☑M ☐F    Ht.: 6'1    Wt.: 215

Race: black    Hair Color: brown

Eye Color: brown    Age: 36    Date of Birth: 5-28-66

Case Number:

079377

③ Besides you, who needs protection? (Family or household members)

| Full Name | Age | Lives with you? | How are they related to you? |
|---|---|---|---|
| | | ☐ Yes ☐ No | |
| | | ☐ Yes ☐ No | |
| | | ☐ Yes ☐ No | |
| | | ☐ Yes ☐ No | |

☐ Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 3—Protected People" by your statement. NOTE: In any item that asks for Form MC-020, you can use an 8 1/2 x 11 inch sheet of paper instead.

④ What is your relationship to the person in ② ? (Check all that apply)

a. ☐ We are now married.

b. ☐ We used to be married.

c. ☐ We live together.

d. ☑ We used to live together.

e. ☐ We are relatives, in-laws, or related by adoption (specify relationship): _____

f. ☑ We are dating or used to date.

g. ☐ We are engaged to be married or were engaged to be married.

h. ☐ We are the parents together of a child or children under 18:

Child's Name: _____    Date of Birth: _____

Child's Name: _____    Date of Birth: _____

Child's Name: _____    Date of Birth: _____

☐ Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 4h" by your statement.

i. ☐ We have signed a Voluntary Declaration of Paternity for our child or children. Attach a copy if you have one.

**This is a not a Court Order.**

468

DV-100, Page 1 of 4

Your name: _____

| Case Number: |
|---|
| 079577 |

**⑤ Other Court Cases**

a. Have you and the person in ❷ been involved in another court case? ☑ No ☐ Yes

If yes, where? County: _____ State: _____

What are the case numbers? *(If you know)* _____

What kind of case? *(Check all that apply)*

☐ Divorce/Dissolution ☐ Parentage/Paternity ☐ Legal Separation ☐ Domestic Violence ☐ Criminal
☐ Juvenile ☐ Child Support ☐ Nullity ☐ Civil Harassment
☐ Other *(specify):* _____

b. Are there any domestic violence restraining/protective orders now (criminal, juvenile, family)?
☐ No ☐ Yes  *If yes, attach a copy if you have one.*

## What orders do you want? Check the boxes that apply to your case ☑

**⑥ ☑ Personal Conduct Orders**

I ask the court to order the person in ❷ not to do the following things to me or any of the people listed in ❸:

a. ☑ Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, or block movements

b. ☑ Contact (either directly or indirectly), or telephone, or send messages or mail or e-mail

**⑦ ☑ Stay-Away Order**

I ask the court to order the person in ❷ to stay at least __100__ yards away from: *(Check all that apply)*

a. ☑ Me
b. ☐ The people listed in ❸
c. ☑ My home
d. ☑ My job or workplace
e. ☐ The children's school or child care
f. ☑ My vehicle
g. ☐ Other *(specify):* _____

If the person listed in ❷ is ordered to stay away from all the places listed above, will he or she still be able to get to his or her home, school, job, or place of worship? ☐ Yes ☐ No  *(If no, explain):* __N/A__

**⑧ ☐ Move-Out Order**

I ask the court to order the person in ❷ to move out from and not return to *(address):*
__N/A__

I have the right to live at the above address because *(explain):* _____

**⑨ ☐ Child Custody, Visitation, and Child Support**

I ask the court to order child custody, visitation, and/or child support. *You must fill out and attach Form DV-105.*

**This is not a Court Order.**

469

Case Number:
07 93 77

Your name: _____

## What orders do you want? Check the boxes that apply to your case ☑

**10** ☑ **Record Unlawful Communications**
I ask for the right to record communications made to me by the person in ❷ that violate the judge's orders.

**11** ☐ **Property Control**
I ask the court to give *only* me temporary use, possession, and control of the property listed here: *N /A*
_____

**12** ☐ **Debt Payment**
I ask the court to order the person in ❷ to make these payments while the order is in effect:
☐ *Check here if you need more space. Attach Form MC-020 and write "DV-100, Item 12—Debt Payment" by your statement.*

*N/A*
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____
Pay to: _____ For: _____ Amount: $ _____ Due date: _____

**13** ☐ **Property Restraint**
I am married to the person in ❷. I ask the judge to order that he or she not borrow against, sell, hide, or get rid of or destroy any possessions or property, except in the usual course of business or for necessities of life. I also ask the judge to order the restrained person to notify me of any new or big expenses and to explain them to the court.

*W/A*

**14** ☐ **Attorney Fees and Costs**
I ask that the person in ❷ pay some or all of my attorney fees and costs.
*You must complete and file Form FL-150, Income and Expense Declaration.*

*N/A*

**15** ☐ **Payments for Costs and Services**
I ask that the person in ❷ pay the following:
*You can ask for lost earnings or your costs for services caused directly by the person in ❷ (damaged property, medical care, counseling, temporary housing, etc.). You must bring proof of these expenses to your hearing.*

*N/A*
Pay to: _____ For: _____ Amount: $ _____
Pay to: _____ For: _____ Amount: $ _____
Pay to: _____ For: _____ Amount: $ _____

**16** ☐ **Batterer Intervention Program**
I ask the court to order the person listed in ❷ to go to a 52-week batterer intervention program and show proof of completion to the court.

*N/A*

**17** **No Fee to Serve (Notify) Restrained Person**
*If you want the sheriff or marshal to serve (notify) the restrained person about the orders for free, ask the court clerk if you need to file more forms. You may need Form CH-101/DV-290 and Form 982(a)(17).*

**This is not a Court Order.**

*470*

Protected person's name:_____

## Instructions for Law Enforcement

**23**  **Start Date and End Date of Orders**
The start date is the date next to the judge's signature on page 3. The orders end on the hearing date on page 1 or the hearing date on Form DV-125, if attached.

**24**  **Arrest Required If Order Is Violated**
If an officer has probable cause to believe that the restrained person had notice of the order and has disobeyed the order, the officer must arrest the restrained person. (Pen. Code, §§ 836 (c) (1), 13701 (b).) A violation of the order may be a violation of Penal Code section 166 or 273.6.

**25**  **Notice/Proof of Service**
- Law enforcement must first determine if the restrained person had notice of the orders. If notice cannot be verified, the restrained person must be advised of the terms of the orders. If the restrained person then fails to obey the orders, the officer must enforce them. (Fam. Code, § 6383.)

   Consider the restrained person "served" (noticed) if:
- The officer sees a copy of the Proof of Service, or confirms that the Proof of Service is on file *or*
- The restrained person was at the restraining order hearing, or was informed of the order by an officer (Fam. Code, § 6383, Pen. Code, § 836 (c) (2).)

**26**  **If the Protected Person Contacts the Restrained Person**
Even if the protected person invites or consents to contact with the restrained person, the orders remain in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact with the restrained person. The orders can be changed only by another court order. (Pen. Code, § 13710(b).)

**27**  **Child Custody and Visitation**
- Custody and visitation orders are on Form DV-140, Items ❸ and ❹. They are sometimes also written on additional pages or referenced in DV-140 or other orders that are not part of the restraining order.
- Forms DV-100 and DV-105 are not orders. Do not enforce them.

**28**  **Enforcing the Restraining Order in California**
Any law enforcement officer in California who receives, sees, or verifies the orders on a paper copy, or on the California Law Enforcement Telecommunications System (CLETS), or in an NCIC Protection Order File must enforce the orders.

**29**  **Conflicting Orders**
If a criminal restraining order (CR-160) conflicts with a civil restraining order (DV-110 or DV-130), enforce the criminal order. Even if the criminal order is older, the officer must still enforce it over the civil order. (Pen. Code, § 136.2 (h).) Any nonconflicting terms of the civil restraining order remain in full force.



*Clerk's Certificate*

I certify that this Temporary Restraining Order is a true and correct copy of the original on file in the court.     Date: _____

Clerk, by _____  FEB 2 3 2008 , Deputy

**This is a Court Order.**

471

**DV-110, Page 5 of 5**

MC-025

SHORT TITLE:

CASE NUMBER: 079377

ATTACHMENT (Number): DV-100, Item 3

(This Attachment may be used with any Judicial Council form.)

Page _____ of _____

(Add pages as required)

## "Protected People"

**(5) Name:**

Age:_____ Lives with you? ☐ Yes ☐ No
How are they related to you?_____

**(6) Name:**

Age:_____ Lives with you? ☐ Yes ☐ No
How are they related to you?_____

**(7) Name:**

Age:_____ Lives with you? ☐ Yes ☐ No
How are they related to you?_____

**(8) Name:**

Age:_____ Lives with you? ☐ Yes ☐ No
How are they related to you?_____

**(9) Name:**

Age:_____ Lives with you? ☐ Yes ☐ No
How are they related to you?_____

**(10) Name:**

Age:_____ Lives with you? ☐ Yes ☐ No
How are they related to you?_____

(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)

472

**DV-110**  **Temporary Restraining Order and Notice of Hearing**

Clerk stamps below when form is filed.

F I L E D
SAN MATEO COUNTY
FEB 2 3 200~
Clerk of the Superior Court
By _____
DEPUTY CLERK

**1**  Protected person's name:

Paolina Lara

Protected person's address *(skip this if you have a lawyer): (If you want your address to be private, give a mailing address instead):*

150 Ramona Ave.

City: SO. S. F.    State: CA    Zip: 94080

Phone # (optional): _____

Protected person's lawyer *(if any):(Name, address, phone # and State Bar #):*

**Court name and street address:**
Superior Court of California, County of San Mateo
1050 Old Mission Road
South San Francisco, Ca. 94080
Northern Branch
www.sanmateocourt.org

**2**  Restrained person's name:

Michael Tyrone Johnson.

Description of that person: Sex: ☑ M ☐ F  Ht.: 6'2

Wt.: 215  Race: black  Hair Color: brown

Eye Color: brown  Age: 38  Date of Birth: 5-28-66

**Case Number:**
079377

**3**  List the full names of all family or household members protected by this order: _____

**4**  **Court Hearing Date** *(Fecha de la Audiencia)*
Court will fill in box below.

| Hearing Date | Date: MAR 1 8 2005 | Time: 9:00a.m. | The court hearing will be at: |
|---|---|---|---|
| | Dept.: DV19 | Rm.: "P" | |

To the person in **2**: At the hearing, the judge can make restraining orders that last for up to 3 years. The judge can also make other orders about children, child support, money, and property. At the hearing, you can tell the judge if you do not want the orders against you. Even if you do not attend the hearing, you *must* obey the orders.

*Para la persona nombrada en* **2**: *En esta audiencia el juez puede hacer que la orden de restricción sea válida hasta un máximo de 3 años. El juez puede también hacer otras órdenes acerca de niños, manutención, dinero y propiedad. Si Usted se opone a estas órdenes, vaya a la audiencia y dígaselo al juez. Aunque no vaya a la audiencia, tiene que obedecer estas órdenes.*

**5**  **Temporary Orders (Ordenes Temporales)**

Any orders made in this form end on the date and time of the court hearing in **4**, unless a judge extends them. Read this form carefully. All checked boxes ☑ and item 10 are court orders.

*Todas las órdenes hechas en este formulario terminarán en la fecha y hora de la audiencia en* **4**, *al menos que un juez las extienda. Lea este formulario con cuidado. Todas las casillas marcadas* ☑ *y artículo 10 son órdenes de la corte.*

**This is a Court Order.**

473

DV-110, Page 1 of 5

Case Number: 074377

Protected person's name: _____

**6** ☑ **Personal Conduct Orders**

The person in **2** must *not* do the following things to the protected people listed in **1** and **3**:

a. ☑ Harass, attack, strike, threaten, assault (sexually or otherwise), hit, follow, stalk, molest, destroy personal property, disturb the peace, keep under surveillance, or block movements

b. ☑ Contact (either directly or indirectly), or telephone, or send messages or mail or e-mail

☐ Except for brief and peaceful contact as required for court-ordered visitation of children unless a criminal protective order says otherwise

Peaceful written contact through a lawyer or a process server or another person to serve legal papers is allowed and does not violate this order.

**7** ☑ **Stay-Away Order**

The person in **2** must stay at least _100_ yards away from:

a. ☑ The person listed in **1**          d. ☐ The children's school or child care

b. ☐ The people listed in **3**          e. ☐ Other *(specify):* _____

c. ☑ Home   ☑ Job   ☑ Vehicle of person in **1**          _____

**8** ☐ **Move-Out Order**

The person in **2** must take only personal clothing and belongings needed until the hearing and move out immediately from *(address):* _____

WITH THE ASSISTANCE OF A CIVIL STAND-BY OFFICER AT A MUTUALLY AGREED TIME.

**9** ☑ **Child Custody and Visitation Order**

a. ☑ You and the other parent must make an appointment for court mediation *(address and phone #):*

Parties shall be prepared to attend Mediation on the day of the court hearing.

b. ☑ Follow the orders listed in Form DV-140, which is attached.

**10** **No Guns or Other Firearms**

The person in **2** cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get a gun or firearm.

**11** ☑ **Turn In or Sell Guns or Firearms**

The person in **2**:

■ Must sell to a licensed gun dealer or turn in to police any guns or firearms that he or she has or controls. This must be done within 48 hours of receiving this order. But if the person in **2** was at a hearing on this order, it must be done within 24 hours of the hearing.

■ Must bring a receipt to the court within 72 hours of receiving this order, to prove that guns have been turned in or sold.

**12** ☐ **Property Control**

Until the hearing, *only* the person in **1** can use, control, and possess the following property and things:

_____

**This is a Court Order.**

474

Protected person's name: _____

Case Number:
07 9377

**13**  ☐ **Property Restraint**

If the people in ❶ and ❷ are married to each other, they must not transfer, borrow against, sell, hide, or get rid of or destroy any property, except in the usual course of business or for necessities of life. In addition, each person must notify the other of any new or big expenses and explain them to the court.

**14**  ☑ **Record Unlawful Communications**

The person in ❶ can record communications made by the person in ❷ that violate the judge's orders.

**15**  **No Fee to Notify Restrained Person**

If the sheriff or marshal serves this order, he or she will do it for free.

**16**  ☐ **Other Orders** *(specify):* _____

_____

_____

**17**  If the judge makes a restraining order at the hearing, which has the same orders as in this form, the person in ❷ will get a copy of that order by mail at his or her last known address. *(Write restrained person's address here):*

_____

If this address is not correct, or to know if the orders were made permanent, contact the court.

**18**  ☑ **Time for Service**

| **A**  To: Person Asking for Order | **B**  To: Person Served With Order |
|---|---|
| Someone 18 or over – **not you or the other protected people** – must personally "serve" a copy of this order to the restrained person at least ___5___ days before the hearing. | If you want to respond in writing, someone 18 or over – **not you** – must "serve" Form DV-120 on the person in ❶, then file it with the court at least ___2___ days before the hearing. |

*For help with Service or Answering, read Form DV-210 or DV-540.*

Date: 2.22.05

Judge (or Judicial Officer)  ROSEMARY PFEIFFER

---

**Certificate of Compliance With VAWA**

This temporary protective order meets all Full Faith and Credit requirements of the Violence Against Women Act, 18 U.S.C. 2265 (1994) (VAWA) upon notice of the restrained person. This court has jurisdiction over the parties and the subject matter; the restrained person has been or will be afforded notice and a timely opportunity to be heard as provided by the laws of this jurisdiction. **This order is valid and entitled to enforcement in all jurisdictions throughout the 50 United States, the District of Columbia, all tribal lands, and all U.S. territories, commonwealths, and possessions and shall be enforced as if it were an order of that jurisdiction.**

---

**This is a Court Order.**

475

Protected person's name: _____

## Warnings and Notices to the Restrained Person in ②

**19** **If you do not obey this order, you can be arrested and charged with a crime.**

- It is a felony to take or hide a child in violation of this order. You can go to prison and/or pay a fine.
- If you travel to another state or to tribal lands, or make the protected person do so, with the intention of disobeying this order, you can be charged with a federal crime.
- If you do not obey this order, you can go to prison and/or pay a fine.

**20** **You Cannot Have Guns or Firearms**



**You cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get a gun while the order is in effect. If you do, you can go to jail and pay a $1,000 fine. If item ⑪ on this form is checked, you must sell to a gun dealer or turn in to police any guns or firearms that you have or control. The judge will ask you for proof that you did so. If you do not obey this order, you can be charged with a crime. Federal law says you cannot have guns or ammunition if you are subject to a restraining order made after a noticed hearing.**

**21** **After You Have Been Served With a Restraining Order**

- Obey all the orders.
- If you want to respond, fill out Form DV-120. Take it to the court clerk with the forms listed in Item ㉒.
- File DV-120 and have all papers served on the protected person by the date listed in Item ⑬ of this form.
- At the hearing, tell the judge if you agree to or disagree with the orders requested.
- Even if you do not attend the hearing, the judge can make the restraining orders last for 3 years.

**22** **Child Custody, Visitation, and Support**

- Child Custody and Visitation: If you do not go to the hearing, the judge can make custody and visitation orders for your children without hearing your side.
- Child Support: The judge can order child support based on the income of both parents. The judge can also have that support taken directly from your paycheck. Child support can be a lot of money, and usually you have to pay until the child is 18. File and serve a Financial Statement (FL-155) or an Income and Expense Declaration (FL-150) so the judge will have information about your finances. Otherwise, the court may make support orders without hearing your side.

## This is a Court Order.

476

**DV-125**  Reissue Temporary Restraining Order

Clerk stamps below when form is filed.

**FILED**
SAN MATEO COUNTY

MAR 1 8 2005

Clerk of the Superior Court
By _____
DEPUTY CLERK

① Name of person asking for protection (protected person):
Paolina Lara

Protected person's address (skip this if you have a lawyer): (If you want your address to be private, give a mailing address instead):
150 Ramona
City: SSF   State: CA   Zip: 94080
Phone # (optional): (____)
Protected person's lawyer (if any): (Name, address, phone #, and State Bar #):
_____
_____

Court name and street address:
Superior Court of California, County of
San Mateo-Northern Branch
1050 Old Mission Road
South San Francisco, Ca. 94080

Case Number:
079377

② Restrained person's name:
Michael Tyrone Johnson
Description of that person; Sex: ☒M ☐F  Ht: 6'1"
Wt: 215  Race: BLK   Hair Color: brown
Eye Color: BRN  Age: 38  Date of Birth: 5/28/66

③ I ask the judge to reissue the Temporary Restraining Order, Form DV-110.
  a. The last hearing date was (date): 3/18/05
  b. The order has been reissued __0__ times.

④ I ask the judge to reissue the order because:
  a. ☐ I could not get the order served before the hearing date.
  b. ☐ The date of the hearing was changed because we were sent to mediators or other family court services.
  c. ☒ Other (specify): Respondent has criminal charges pending

⑤ I declare under penalty of perjury under the laws of the State of California that the information above is true and correct.
Date: 3/18/05
Paolina Lara                           ➤ _____
Type or print your name                  Sign your name          ✱

**This is a Court Order.**

Clerk will fill out section below.

The order listed in ③ is reissued and reset for hearing in this court on the date and time below. Unless a judge extends the time, the order will end on the date and time below. no further proof of service is
Both parties were present at the hearing. necessary.
                                        Name & address of court if different from above:
**Hearing Date**  Date: 4/29/05   Time: 9:00 A.M.
Dept.: 19         Rm.: "P" SSF

All other orders in the Temporary Restraining Order stay in effect unless this order changes them.
Date: 3/18/05                          ➤ Kathlen McKenn
                                         Judge (or Judicial Officer)

**DV-101**    Description of Abuse

Case number: 079377

☑ This form is attached to DV-100, Item 21.

**①** Your name: _Padina Lava._

**②** Name of person you want protection from (restrained person): _Michael Tyrane Johnson._

**③** Describe the 2nd most recent abuse.

a. Date of 2nd most recent abuse: _3 years ago_

b. Who was there? _Johnson only_

c. What did the person in ② do or say to you that made you afraid? _we had an argument and he push me and caused me to fall backwards._

d. Describe any use or threatened use of guns or other weapons. _/ W/A_

e. Describe any injuries. _N/A_

f. Did the police come? ☑ No  ☐ Yes

   If yes, did they give you an Emergency Protective Order? ☐ Yes  ☑ No  ☐ I don't know
   *Attach a copy if you have one.*

_478_

Your name: _____

Case Number: 079377

**4** Describe other recent abuse.

a. Date of other recent abuse: _____

b. Who was there? _____

c. What did the person in **2** do or say to you that made you afraid? _____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

d. Describe any use or threatened use of guns or other weapons. _____
_____
_____

e. Describe any injuries. _____
_____
_____

f. Did the police come? ☐ No   ☐ Yes

   If yes, did they give you an Emergency Protective Order? ☐ Yes  ☐ No  ☐ I don't know
   *Attach a copy if you have one.*

**5** ☐ Describe other abuse against you or your children.
_____
_____
_____
_____

☐ *If you need more space, check the box and attach Form MC-020. Or attach a sheet of paper and write*
*"DV-101 — Description of Abuse" at the top.*

New January 1, 2003                    **Description of Abuse**   *479*              DV-101, Page 2 of 2

**DV-130**   **Restraining Order After Hearing**

Protected person's name:

_P A O L I N A     L A R A_

Protected person's address *(skip this if you have a lawyer)*: *(If you want your address to be private, give a mailing address instead)*:

_150   RAMONA  AVE_

City: _SSF_   State: _CA_   Zip: _94080_

Your phone # *(optional)*: _____

Your lawyer *(if you have one)*  :  *(Name, address, phone #, and State Bar #)*:

_____

_____

_____

Restrained person's name:

_MICHAEL  TYRONE  JOHNSON_

Description of that person: Sex: ☒ M   ☐ F   Ht.: _6'1"_
Wt.: _215_   Race: _BLK_   Hair Color: _Brown_
Eye Color: _Brown_ Age: _38_ Date of Birth: _5-28-66_

List the full names of all other family or household members protected by this order:

_____

---

Clerk stamps below when form is filed.

**FILED**
SAN MATEO COUNTY
MAY 2 7 2005
Clerk of the Superior Court
By _____
DEPUTY CLERK

*Court name and street address:*

Superior Court of California, County of
SAN MATEO
1050 Old Mission Rd.
S. San Francisco, CA 94080

www.sanmateocourt.org

*Case Number:*

_079377_

---

## Court Order

**To the person named in ❷ : This is a court order.**

*Court will fill out section below.*

There was a hearing on *(date)*: _5-27-05_ at *(time)*: _9:00_ ☒ a.m. ☐ p.m. Dept.: _19_   Rm.: _P_
Judge _Hon. SUSAN GREENBERG_ made the orders at the hearing.
The orders end at *(time)*: ☒ midnight or _____ ☐ a.m. ☐ p.m. on *(date)*: _5-26-08_ .
- *If no date is written, the restraining orders end 3 years after the date of the hearing.*
- *If no time is written, they end at midnight on the end date.*
- *Note: Custody, visitation, or support orders have different end dates and usually end when the children turn 18.*

All orders are on pages 2 and 3 and attachment pages *(if any)*.

---

**This is a Court Order.**

Judicial Council of California, www.courtinfo.ca.gov
Rev. January 1, 2004, Mandatory Form
Family Code, § 6200 et seq. Approved by DOJ
Martin Dean's Essential Forms™
**Restraining Order After Hearing (CLETS)**
(Domestic Violence Prevention)
DV-130, Page 1 of 5

1480   SSF FORMS

Protected person's name: _PAOLINA   LARA_

| Case Number: |
|---|
| O79377 |

☐ **Batterer Intervention Program**

The person in ⚬ must go to and pay for a 52-week batterer intervention program, and show proof of completion to the court. This program must be approved by the probation department.

**No Fee to Notify Restrained Person**

If the sheriff or marshal serves this order, he or she will do it for free.

☐ **Other Orders** relating to property control, debt payment, attorney fees, restitution, and/or other orders are in attached Form DV-170 or *(specify other form):*_____

☑ **Service**

a. ☐ The people in ⚬ and ⚬ were at the hearing. No other proof of service is needed.

b. ☑ The person in ⚬ was at the hearing. The person in ⚬ was not. But Proof of Service of DV-110 was presented to the court.

    (1) ☑ The judge's orders in this form are the same as DV-110 except for the end date. This order can be served by mail.

    (2) ☐ The judge's orders in this form are different from DV-110. Someone-not the people in ⚬ or ⚬ -must personally "serve" a copy of this order to the person in ⚬ .

c. ☐ The people in ⚬ and ⚬ have agreed in writing to this order. No other proof of service is needed.

☐ The people in ⚬ and ⚬ must return to this court/department on *(date):*_____

at *(time):* _____ ☐ a.m. ☐ p.m. to review *(specify issues):*_____

**Attached Pages Are Orders**

■ Number of pages attached to this 5-page form: ___*O*___

■ All of the attached pages are part of this order.

■ Attachments include *(check all that apply):*

    ☐ DV-140   ☐ DV-145   ☐ DV-150   ☐ DV-160   ☐ DV-170   ☐ Other *(specify)* : _____

Date: ___5-27-05___    ▶ *Judge (or Judicial Officer)*    **SUSAN GREENBERG**

**Certificate of Compliance With VAWA**

This protective order meets all Full Faith and Credit requirements of the Violence Against Women Act, 18 U.S.C. 2265 (1994) (VAWA). This court has jurisdiction over the parties and the subject matter; the restrained person has been afforded reasonable notice and an opportunity to be heard as provided by the laws of this jurisdiction. **This order is valid and entitled to enforcement in all jurisdictions throughout the 50 United States, the District of Columbia, all tribal lands, and all U.S. territories, commonwealths, and possessions and shall be enforced as if it were an order of that jurisdiction.**

**This is a Court Order.**

Rev. January 1, 2004
*Martin Dean's Essential Forms* ™    **Restraining Order After Hearing (CLETS)**
(Domestic Violence Prevention)    DV-130, Page 3 of 5 →

*482*    SSF FORMS

Protected person's name: _PAOLINA  LARA_

| Case Number: |
| --- |
| 079377 |

## Warnings and Notices to the Restrained Person in ②

 **If you do not obey this order, you can be arrested and charged with a crime.**

- It is a felony to take or hide a child against this order. You can go to prison and/or pay a fine.
- If you travel to another state or to tribal lands, or make the protected person do so, with the intention of disobeying this order, you can be charged with a federal crime.
- If you do not obey this order, you can go to prison and/or pay a fine.

 **You Cannot Have Guns or Firearms**

 You cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get a gun while the order is in effect. If you do, you can go to jail and pay a $1,000 fine. You must sell to a licensed gun dealer or turn in to police any guns or firearms that you have or control. The judge will ask you for proof that you did so. If you do not obey this order, you can be charged with a crime. Federal law says you cannot have guns or ammunition while the order is in effect.

---

**Clerk's Certificate**

I certify that this Restraining Order After Hearing is a true and correct copy of the original on file in the court.

Date: **MAY 27 2008**

Clerk, by _____, Deputy

---

## This is a Court Order.

Rev. January 1, 2004
*Martin Dean's Essential Forms* ™

**Restraining Order After Hearing (CLETS)**
(Domestic Violence Prevention)

DV-130, Page 5 of 5

483    SSF FORMS

CR–160

**SUPERIOR COURT OF CALIFORNIA • COUNTY OF SAN MATEO**

☒ **SUPERIOR SOUTHERN**
400 COUNTY CENTER, 4TH FL.
REDWOOD CITY, CA 94063
(650) 363-4302

☐ **SUPERIOR NORTHERN**
1050 MISSION ROAD
SO. SAN FRANCISCO, CA 94080
(650) 877-5773

FOR COURT USE ONLY
(ENDORSED)

**FILED**
SAN MATEO COUNTY

JUN 0 7 2005

Clerk of the Superior Court
By _LESLIE WISE_
DEPUTY CLERK

**PEOPLE OF THE STATE OF CALIFORNIA**
vs.

DEFENDANT: *Michael Tyrone Johnson*

CASE NUMBER:
*SC058720*

**PROTECTIVE ORDER IN CRIMINAL PROCEEDING (CLETS)**
(Penal Code, §§ 136.2 and 1203.097(a)(2))

☒ ORDER PENDING TRIAL
☐ ORDER POST-TRIAL
PROBATION CONDITION

☐ MODIFICATION
☐ DOMESTIC VIOLENCE CASE
(Pen. Code, § 13700)

**THIS ORDER TAKES PRECEDENCE OVER ANY CONFLICTING COURT ORDER**

PERSON TO BE RESTRAINED (Complete name): *Michael Tyrone Johnson*
Sex: ☒ M ☐ F  Ht: *6'1"*  Wt: *210*  Hair Color: *Blk*  Eye Color: *Br*  Race: *B*  Age: *37*  Date of Birth: *5/28/66*
☐ The defendant is a peace officer with _____ Department.

1. This proceeding was heard
   on (date): *6-7-05* at (time): *8:30* in Dept.: *24* Room: *2A*
   by judicial officer (name): *Judge Hall*
2. ☒ Defendant was personally present at the court hearing, and no additional proof of service of the restraining order is required.

**GOOD CAUSE APPEARING, THE COURT ORDERS**

3. The above-named defendant
   a.) must not annoy, harass, strike, threaten, sexually assault, batter, stalk, destroy personal property of, or otherwise disturb the peace of the protected persons named below.
   b.) must surrender to local law enforcement or sell to a licensed gun dealer any firearm owned or subject to his or her immediate possession or control within
      (1) ☒ 24 hours after issuance of this order (if restrained person is present at hearing)
      (2) ☐ 48 hours after service of this order (if restrained person is not present at hearing)
      (3) ☐ other (specify):
         The restrained person shall file a receipt with the court showing compliance with this order within 72 hours of receiving this order.
   c.) must not attempt to or actually prevent or dissuade any victim or witness from attending a hearing or testifying or making a report to any law enforcement agency or person.
   d. ☒ must have no personal, telephonic, or written contact with the protected persons named below.
   e. ☒ must have no contact with the protected persons named below through a third party, except an attorney of record.
   f. ☒ must not come within _*100*_ yards of the protected persons named below.
   g. ☐ may have peaceful contact with the protected persons named below only for the safe exchange of children for court-ordered visitation as stated in the attached Family, Juvenile, or Probate court order in case no. _____, issued on (date): _____ , as an exemption to the "no contact" or "stay-away" provision in paragraph (d), (e), or (f) of this order.
   h. ☐ may have peaceful contact with the protected persons named below only for the safe exchange of children for visitation as stated in a Family, Juvenile, or Probate court order issued after the date this order is signed, as an exemption to the "no contact" or "stay away" provisions in paragraph (d), (e), or (f) of this order.

4. ☒ The protected person may record any prohibited communications made to him or her by the restrained person.

5. COMPLETE NAMES OF PROTECTED PERSONS: *Paolina Lara Gutierrez*

6. Other orders including stay-away orders from specific locations:

7. This order expires on (specify date): *6/6/06*
   If no date is listed, this order expires three years from the date of issuance.

Date: *6/7/05*

_____
JUDICIAL OFFICER    Department/Division:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California

**PROTECTIVE ORDER IN CRIMINAL PROCEEDING (CLETS)**
Penal Code, §§ 136.2, 166, 1203.097(a)(2)
Form Approved by
Department of Justice

*484*

# EXHIBIT "G"

4P5

*Preliminary Transcript Record Letter*

# LAW OFFICE
OF
## STEVEN A. CHASE
### 421 Grand Avenue, Suite A
### South San Francisco, California 94080-3635

Steven A. Chase
State Bar Number 50274

Telephone: 650 589-6990
Fax:        650 589-3980

28 September 2005

James Missett, MD
1187 University Drive
Menlo Park, CA 94025

Re: Recovered Memory Testimony

Dear Dr. Missett:

Through the Private Defender Program, I have been assigned to represent Michael Johnson who is charged with assaulting his girlfriend. The young woman suffered a basal skull fracture and was taken to the hospital by Mr. Johnson. She denied any knowledge of the incident. Mr. Johnson reported to the hospital that she had fallen and struck her head on the ground. This occurred on 10 April 2004. She claims that she was "blind" for 1 ½ months (this is not mentioned in her medical records), and that she couldn't hear for a month (also not mentioned). She still has no sense of smell and her eyesight is blurrier than it had been.

She continued to have no memory of the incident until 8 February 2005. At the preliminary hearing, she described the return of her memory as follows:
Q. "What happened just prior to you getting memories back about the assault that you have been describing?
A. My dad evicted me out of the house because aI believed that Michael was not the one who hit me; that it was probably an accident, like the wasy Michael was telling me over the phone. He told me that I went back' he told me that I was grabbing his shirt and I slipped back and hit my head. So I believed him."
Q... I would like you to tell me about, on the day you began to remember the incident, on that particular day, what happened just prior to you getting some of your memories back?
A. That day?
Q. Yes.
A. I went to my girlfriend's house, Mable, with her baby. And she had a pair of black pants for work...I got them. And Mable was asking me questions, a lot of questions, like "how was your day?" or, "Do you remember now something of what happened that night? You should be able to remember something, at least seeing him or talking to him. Do you remember what you were wearing, what he was wearing, during the time?"

486

And so those were questions I couldn't answer. And every time somebody asked me those type of questions, I would try to remember them and I would get migraines in my head because I can't figure it out. And she kept on asking me those type of questions, what happened and I couldn't remember.

And I dropped her off at her house and I stayed with her baby for a couple of minutes and I went at my house. When I was home, I fell asleep, I took a 45 minute, and hour nap. And when I woke up, that is when I could remember seeing little pieces of him hitting me and kicking me.

After that, I called my best friend on the cell phone, it was around 8 p.m., I believe. So I called her up and I told her that I remember parts of what happened that night. I was shaking. I was crying.

She told me, "let me take you to the hospital because you don't sound too good." And I said "no." She gave me some water because I was at her house (*please note the paragraph above where she said she "called' this person*) She gave me some water and she told me to go to the police station and tell them exactly what I can remember."

Prior to "recovering" her memory, she had the restraining order lifted that was placed after the incident. She wrote, under penalty of perjury (she testified that she didn't know what that meant:) that she remembered that this had been an accident and that Mr. Johnson hadn't assaulted her.

I am seeking your expert opinion regarding the believability of this recovered memory. According to one doctor I have talked to (an emergency room doc), he believes that the amnesia following trauma to the brain is caused by the injury to the brain preventing the "laying down of memory" in the brain, so that there is nothing to recover. I have done some research on the web and find the simple information I received there confusing at best. Charlie Robinson at the Private Defender's office suggested that I contact you.

Please have your secretary call my office to let me know if you are interested in reviewing this case for me. I have a trial date of 17 October, so time is of the essence. If you decide to accept this assignment, and are unavailable for that trial period, (10-17 to 10-24 or 25), please let me know, and I will get a continuance of the trial.

Thank you for considering this interesting case.

Very truly yours,

STEVEN A. CHASE
cc: Michael Johnson

487

# LAW OFFICE
#### OF
# STEVEN A. CHASE
### *421 Grand Avenue, Suite A*
### *South San Francisco, California 94080-3635*

Steven A. Chase
State Bar Number 50274

Telephone: 650 589-6990
Fax:    650 589-3980

27 August 2005

Terry V. Fotre, D.O., FACEP
180 Ware Road
Woodside, CA 94062

Re: People v. Michael Johnson

Dear Dr. Fotre:

I represent Michael Johnson through the Private Defender's Program. Mr. Johnson is charged with Penal Code §§245(a)(1) and 273.5(a), both with great bodily injury allegations. His exposure for punishment is 9 years in prison, with a minimum term of 5 years if he is convicted of all of the charges. He is 39 years old with no criminal record. The "offer" of settlement of the case is to plead guilty to §245(a)(1); admit that it is a strike, and serve three years in prison. He would have to serve 85% of that sentence. He has maintained his innocence.

This is an unusual case, and I believe I questioned you about retrograde amnesia when I first got the case. The facts are that Mr. Johnson drove Ms. Lara (the complaining witness) to Kaiser Hospital in the early morning hours of 10 April 2004. She had a laceration on the back of her head which bled quite a bit, and bruises on her hands, arms and feet. I've enclosed pictures of her injuries.

Mr. Johnson told the police that Ms. Lara and he were talking outside her house when she "started acting crazy." He claims she was jealous of his relationship with other women. He told the police "she grabbed his sweatshirt with both hands, put an unknown foot on his leg and fell backwards, hitting her head on the ground." He's 6'1" tall and weighs 210 lbs. She is 4'9 ½" and weighs about 93 lbs. Mr. Johnson didn't have any injuries to his hands, arms, chest, or back. He did have some blood on his sweatshirt sleeve, hat, and shoe. Mr. Johnson called Ms. Lara's father around 6:00 a.m. and told him she had an accident and was in the hospital.

On 18 April 2004, Ms. Lara told the police that she had no memory of the incident. She told them that she remembered everything that had occurred earlier in the evening, up to about 11:00 p.m. when she went to bed. The next thing she remembered was waking up in the hospital several days later. There was no mention of blindness during this interview with the police. In


488

an interview with the police on 4-24-04, she does state that she was still "having problems seeing and hearing clearly, due to her head injury." She told the police that the doctor at Kaiser told her that she would never regain her memory or her sense of taste and smell.

The admitting notes from Kaiser say "19 year old female brought in by boyfriend with history of falling and striking the back of her head. May have had something thrown at her." I can't make out the rest. In the medical screening examination form, ETOH/substance abuse is checked, but I don't know why. On the Glascow Coma Scale, she was rated at "eye 3, verbal 4, and motor 6." She claims that she was blind for 4 to 6 weeks, but I don't find any mention of that in the treatment notes I have until she's seen on 10-26-04 after she claims she was in a motor vehicle accident which appears to have been on Saturday ("Sat"), which would have been 10-23-04. She claims that her current visual acuity is diminished and she has no sense of smell. I've enclosed copies of the medical records that I received from the prosecution.

On 9 February 2005, Ms. Lara called the police and told them that she had recovered her memory. It came back to her in bits and pieces on one day. Her story is that Mr. Johnson grabbed her left arm and twisted her body while tripping her with his left leg. He threw her down to the ground and the back of her head struck the ground. She put her hands up to protect her head when he kicked her twice in the stomach and then "stepped on my head real hard." She said that Mr. Johnson dragged her to his car by her ankles and drove her to the hospital. As they were driving to the hospital he continued grabbing and squeezing her arms. She said that she suffered from "blurred vision" for several weeks (no mention of blindness).

Mr. Johnson said that after she fell, he cradled her head in his left hand, and grabbed her left triceps to pull her up. He stepped on one of her feet doing this. She was dead weight and kept slipping. Her legs were stiffening. I believe he said that she might have struck part of her body on the door jamb when he was putting her in the car.

My questions pertain to retrograde amnesia and the recovery of memory (the prosecution has provided me with a witness, Jose R. Maldonado, M.D., FAPM, FACFE, who works at the Stanford School of Medicine, Department of Psychiatry & Behavioral Sciences, who has a 29 page CV who says that traumatic amnesia can end with the recovery of the memory. I'd like your opinion on that. Also, are the injuries consistent with Ms. Lara's "recovered" memory, and are they also consistent with Mr. Johnson's account. He gave me his account prior to seeing the pictures in the case. Is there anything significant in the medical records?

The Private Defender's Office will pay for your time to review this matter. I've enclosed copies of the photographs that were taken of the complaining witness when she was in the hospital after this incident.

489

Page 3

I look forward to your comments after reviewing the enclosed.

Very truly yours,

STEVEN A. CHASE
encs.
cc: Michael Johnson

490

# LAW OFFICE
OF

## STEVEN A. CHASE
*421 Grand Avenue, Suite A*
*South San Francisco, California 94080-3635*

Steven A. Chase                                             Telephone: 650 589-6990
State Bar Number 50274                                      Fax:      650 589-3980

17 November 2005

Cheryl Batiste
Probation Department
400 County Center, 5th Floor
Redwood City, CA 94063

Re: Michael Tyrone Johnson, SC58720

Dear Ms. Batiste:

As I told you on the phone today, I'm the attorney for Michael Tyrone Johnson. I worked closely with Michael since he was first arraigned in the case after being appointed by the Office of the Private Defender to handle the case.

I have been practicing law since January 1972 and in all my years, this was the most factually interesting case I have ever had. When I saw the photographs of the condition of Paulina Lara when she was in the hospital, I was at a loss to explain how such injuries could have been caused if my client's version of what happened was correct. At the conclusion of the trial, I was convinced that the conditions demonstrated in these photographs were the natural consequence of what happened to her as a result of the brain trauma sustained when she struck her head (the redness on her eyelids, the hemorrhage in the whites of her eyes, and the bruise behind her ear), and that the bruising on her wrists was caused by having to be restrained when she was admitted to the emergency room at Kaiser hospital. The bruise on her foot was caused when Michael accidentally stepped on her foot. I also came away from the trial with the belief that Paulina Lara has no memory of the events that took place after she fell and struck her head. I am sincerely questioning whether an innocent man was convicted of these charges.

The initial offer to settle the case from the prosecution would have required Michael to plead guilty to a strike and be sentenced to three years in prison. He turned this down without consideration. After the prosecutor learned new information while preparing for trial, she made an offer of "no state prison" and a plea to a 245(a)(1) PC count with no strike allegation attached to it. I told Michael that it was in his best interest to accept this plea because I believed that I would not prevail at trial, and that he would be sent to prison for seven years with two strikes against him. I pleaded with him to accept the offer. He said "I'm not going to go to jail for

*491*

something I didn't do. I never harmed Paolina." I couldn't dissuade him from his decision.

I had two expert witnesses for the defense. One was Dr. James Missett, a psychiatrist, and the other was Terry Fotre, an emergency room doctor. I was also armed with information that I couldn't get before the jury without putting Michael on the stand, and I wouldn't put him on because of the fact that the judge allowed Cristen Marcos, his girlfriend when he was in the Army, to testify against him for a prior claimed act of domestic violence. What I knew from both Michael, and his mother (to whom he had told this just after being released from jail on the day of the claimed offense), that Paolina was having a seizure after she fell. Michael tried to pick her up and she was "dead weight." Then, as he was trying to put her in the car, she was stiffening up and her body was rigid. This was a sign of a seizure. Dr. Fotre was unable to testify about seizures and symptoms to demonstrate one because of what I believe was an erroneous ruling of the judge. It is because I know she was having a seizure, that I can say with authority that she has no memory of the event. Both Dr. Missett and the prosecution expert Dr. Maldonado testified that if a person is unconscious, they don't form memory of events occurring during the period of unconsciousness. Paulina Lara's version of what happened was caused by a phenomenon called "confabulation." This is a process By which a person can take known facts, and create a story of what happened which the person then actually believes. In this case, Paulina took what she believed were injuries shown on the photographs and made up a story. This is not a lie. She believes it to be true.

Losing this trial has been very hard for me as I truly believed that I had created reasonable doubt. I'm sure that it didn't help that none of the jurors was an African American. There were no African American jurors in either of the panels used to pick the jury. Prejudice is a subtle monster that hides within the best of intentions. I believe that this hidden, but real issue contributed to the jury's verdicts.

Michael is not going to show remorse for her actions. He will defend his honor and tell you just what he told me—that this was an accident and that he was not the cause of Paulina's injuries. His co-workers Patti Rico, and Joseph Gerrans both testified at his trial, and I'm expecting to have recommendation letters from each of them In talking with them, it is obvious that they think the world of Michael.

I want to address the issue of Cristen Marcos and her testimony against Michael. No court martial was implemented as a result of this incident. Ms. Marcos was required to attend alcohol counseling and was to have no contact with Michael at his barracks or through the use of Army phones. She disobeyed this order and continued to see him. She invite him to her family's home in Montana for Christmas after she left the service, and lied to police officers who questioned her about this extension of her relationship after the claimed incident where she claims Michael assaulted her. Obviously the Army didn't think it was as serious as portrayed by Ms. Marcos. It is very important to note that there have been no other complaints against Michael between that

492

Page 3

event (January 1994) until the event with Paulina in April 2004. If Michael had any violent propensities toward women, one would expect to have seen more complaints against him.

I can't say what happened on 10 April 2004, as I wasn't there. What I can say is that the evidence of wrongdoing on the part of Michael Johnson was thin at best, and that he makes a very convincing argument for his innocence. He stands convicted of a very serious event. Paulina Lara could have died as a result of the skull fracture she sustained that night. If Michael actively caused that injury, he certainly deserves to be punished. However, because of the doubt surrounding the claimed facts (now found to be true by a jury), I am requesting that he receive a lenient sentence—one that would include probation—so that he can prove to the Court and to all others that he can be a productive member of society and never come before the Court again on criminal charges.

If you wish to discuss the evidence from the trial in more depth, please feel free to call me. Thank you for the attention that you give to Mr. Johnson.

Very truly yours,

STEVEN A. CHASE
encs.
cc: Michael Tyrone Johnson

*493*

# LAW OFFICE
## OF
# STEVEN A. CHASE
### *421 Grand Avenue, Suite A*
### *South San Francisco, California 94080-3635*

Steven A. Chase
State Bar Number 50274

Telephone: 650 589-6990
Fax:        650 589-3980

16 December 2005

Michael Tyrone Johnson, F06081 - 4W98
San Quentin State Prison
San Quentin, CA 94974

Re: Your Appeal

Dear Michael:

First of all, thank you for writing to me and for the nice things you said in your letter. The case number of your appeal is A112322, and you will be represented by an attorney at the Fist District Appellate Project, 730 Harrison Street, Suite 201, San Francisco, CA 94107.

I wrote to Jonathan Soglin, an attorney who works at FDAP, telling him about your case and the possible issues that I see on appeal. I'm hoping that he will handle your case himself as he is an excellent appellate lawyer. The process takes time. First the court clerk and court reporter have to prepare transcripts of the proceedings and file them with the Appellate Court. Then your attorney has, I believe 30 or 45 days in which to file the opening brief. The Attorney General's office handles the appeals for the State, and they file a responsive brief. Your attorney then has the opportunity to file a rebuttal brief. If the attorney thinks that it is an appropriate case, he or she can ask for oral argument. Most cases do not proceed to oral argument.

There can be no new evidence provided in the appeal. The record from the trial is the only evidence allowed. I know that you believed that evidence you had available, such as phone records, would have resulted in a different result. Unfortunately, those records, in my opinion, would have been determined to be irrelevant by the judge had we sought to introduce them. It really didn't matter if Paulina called you first or you she. Unless you testified, there was little inference we could raise from those records. For instance, you could have called her from a pay phone or from JC Penny's phone, and then, when she called back, it would only look like she was calling first. As you know, we litigated the issue of the text messages, and he wouldn't allow us to use those. *The judge said "I we ask que*

I truly hope that your case is overturned, and that you are allowed to have a new trial. I am still reeling from the verdict in your case. I always told you I didn't think I could win the case, but by

*The Judge Said, " We could ask questions about the text messages, but we would have the Jury leave the court room First to*

*494*   *Discuss them in closed court, then I'll make my decision."*

Page 2

the time all of our evidence had come in, I was convinced that we did win.  Obviously, the jury thought otherwise.

Write whenever you have questions, or just want a sympathetic ear.

Very truly yours,

STEVEN A. CHASE

495

# EXHIBIT "H"

496

## Job Summary

Villa,Jose                                                                        **EmplID: 00006177173**

| | Job Information | | | | | Customize \| Find \| View All | First ◁ 1-8 of 21 ▷ Last |
|---|---|---|---|---|---|---|---|

General | Work Location | [FEE] |

| | **Eff Date** | **Action** | **Reason** | **Job Code** | **Job Description** | **Date to Jobcode** |
|---|---|---|---|---|---|---|
| 1 | 09/02/2004 | Termination | Resignation-Other Emplmt | 040095 | Loss Prevention Officer | 06/03/2001 |
| 2 | 08/08/2004 | Data Change | Status Change | 040095 | Loss Prevention Officer | 06/03/2001 |
| 3 | 08/01/2004 | Pay Rate Change | Merit | 040095 | Loss Prevention Officer | 06/03/2001 |
| 4 | 06/27/2004 | Data Change | Status Change | 040095 | Loss Prevention Officer | 06/03/2001 |
| 5 | 06/06/2004 | Data Change | Status Change | 040095 | Loss Prevention Officer | 06/03/2001 |
| 6 | 05/23/2004 | Pay Rate Change | Merit | 040095 | Loss Prevention Officer | 06/03/2001 |
| 7 | 05/25/2003 | Pay Rate Change | Merit | 040095 | Loss Prevention Officer | 06/03/2001 |
| 8 | 05/26/2002 | Pay Rate Change | Step Progression | 040095 | Loss Prevention Officer | 06/03/2001 |

Reporting Structure Summary

Compensation Summary        PA Summary

Benefit Payrate Summary        Premium Payrate Summary

Back

497

# EXHIBIT "I"

# PTypes - Personality Types

PTypes                 Personality Disorders                    Sadistic

*all these*

# Histrionic Personality Disorder

*page*

### Histrionic Idealized Image

## Perspectives q.v.

- Disease
- Dimensional
- Behavior
- Life Story  NEW

## The Disease Perspective

The *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition*
(American Psychiatric Association, 1994, pp. 657-658) describes **Histrionic
Personality Disorder** as a pervasive pattern of excessive emotionality and
attention seeking, beginning by early adulthood and present in a variety of
contexts, as indicated by five (or more) of the following:

- is uncomfortable in situations in which he or she is not the center of
  attention;

- interaction with others is often characterized by inappropriate sexually
  seductive or provocative behavior;

- displays rapidly shifting and shallow expression of emotions;

- consistently uses physical appearance to draw attention to self;

- has a style of speech that is excessively impressionistic and lacking in

*498*

detail;

- shows self-dramatization, theatricality, and exaggerated expression of emotion;

- is suggestible, i.e., easily influenced by others or circumstances;

- considers relationships to be more intimate than they actually are.

# The Dimensional Perspective

## Dimensions

Here is a hypothetical profile, in terms of the underlined five-factor model of personality, for Histrionic Personality Disorder (speculatively constructed from McCrae, 1994, pg. 306):

High Neuroticism
> Chronic negative affects, including anxiety, fearfulness, tension, irritability, anger, dejection, hopelessness, guilt, shame; difficulty in inhibiting impulses: for example, to eat, drink, or spend money; irrational beliefs: for example, unrealistic expectations, perfectionistic demands on self, unwarranted pessimism; unfounded somatic concerns; helplessness and dependence on others for emotional support and decision making.

Low Extraversion
> Social isolation, interpersonal detachment, and lack of support networks; flattened affect; lack of joy and zest for life; reluctance to assert self or assume leadership roles, even when qualified; social inhibition and shyness.

High Openness
> Preoccupation with fantasy and daydreaming; lack of practicality; eccentric thinking (e.g., belief in ghosts, reincarnation, UFOs); diffuse identity and changing goals: for example, joining religious cult; susceptibility to nightmares and states of altered consciousness; social rebelliousness and nonconformity that can interfere with social or vocational advancement.

High Agreeableness
> Gullibility: indiscriminate trust of others; excessive candor and generosity, to detriment of self-interest; inability to stand up to others and fight back; easily taken advantage of.

*[handwritten: Mike its strange Judge Hall say he could tell your Personality & didn't talk to you. But listened to Poalina & did not see]*

# Histrionic Personality Disorder

## What is Histrionic Personality Disorder?

**Quick Summary:** *[handwritten overlay]*

People with histrionic personality disorder are constant attention seekers. They need to be the center of attention all the time, often interrupting others in order to dominate the conversation. They use grandiose language to discribe everyday events and seek constant praise. They may dress provacatively or exaggerate illnesses in order to gain attention. Histrionics also tend to exaggerate friendships and relationships, believing that everyone loves them. They are often manipulative.

## Symptoms of Histrionic Personality Disorder: *[handwritten: this behavior in her]*

- Needs to be the center of attention
- Dresses or acts provocatively
- Rapidly-shifting and shallow emotions
- Exaggerates friendships
- Overly-dramatic, occassionally theatrical speech
- easily influenced; highly suggestible

## Additional Information:

None at this time.

## Books on Histrionic Personality Disorder

**Hysterical Personality Style and Histrionic Personality Disorder**
*"Includes issues of promiscuity, what other books would call "low self esteem," substance abuse, gender confusion, repeated destructive relationships, sadism, compulsive sexual behavior, asexual behavior, feminine role-playing in women, fake hyper-masculine behavior in men, and the way that all these defenses are mobilized to sabotage relationships and counselling."*

## Where to Get More Help and Information

- pTypes - Histrionic Personality Disorder
- Dual Diagnosis and the Histrionic Personality Disorder

Find A Date for the weekend - Someone compatible with your personality.

*[handwritten: 500]*

Low Conscientiousness
Underachievement: not fulfilling intellectual or artistic potential; poor academic performance relative to ability; disregard of rules and responsibilities can lead to trouble with the law; unable to discipline self (e.g., stick to diet, exercise plan) even when required for medical reasons; personal and occupational aimlessness.

## Specific Affects

Exaggerated, shallow emotions; enthusiasm, anger, boredom (Millon, pg. 158).

Hysteria; sadness, jealousy, disappointment, fear, boredom (Stone [Briquet], pg. 318).

## Character Weaknesses and Vices*

- praise-hungry
- seductive
- over-dramatic
- shallow
- self-centered
- impressionistic
- attention-seeking

Know Your Major Weaknesses

* Derived from Michael Stone's (pg. 22) list of the "personality traits" of DSM-III-R Histrionic Personality Disorder.

# The Behavior Perspective

## Motivations

*501*

Desire to coerce, manipulate, and deceive others into giving help and to establish and maintain dependency.

"The inordinate and demanding dependency displayed by many of these patients plays so important a role in hysterical psychopathology as to constitute a kind of organizing principle for many of the other features, which can be seen as distorted efforts to gratify dependency or as defensive reactions to its presence" (Chodoff, pg. 2727).

## Behaviors

Overly dramatic, reactive, and intensely expressed behavior; strident and superficial emotionality, emotional storms, constant attention-seeking, sexually seductive behavior, histrionics, submissiveness, eagerness to please, ruthless willfulness (Chodoff, pp. 2727-2728).

Affectation, overreaction, stimulus-seeking, intolerance of inactivity, impulsiveness, theatricality, flirtatiousness, demandingness, attention-seeking, exhibitionism (Millon, pp. 138, 140).

Emotional manipulation, seductiveness; demands for constant attention; cravings for novelty, stimulation, and excitement; suicide gestures and threats (American Psychiatric Association, pg. 656).

Bombast.

## Associated Disorders

Somatization Disorder, Conversion Disorder, Major Depressive Disorder (American Psychiatric Association, pg. 656).

Depression, Hysteroid Dysphoria (Chodoff, pp. 2735-2736).

- Google Search: histrionic behavior therapy
- Google Search: comorbidity histrionic personality

# The Life Story Perspective


502

## Childhood

Inconsistent parenting style: alternation between insensitive non-involvement and rewards for exhibitionist behavior.

Universal Personality Disorder    Basic Passions  Sadistic

## A Christian Approach to Character Disorder

**Histrionic personality disorder** is a type of "solution" to the problem of anxiety; that is, it is a strategy to alleviate anxiety. The objects of desire and pleasure listed below (derived mostly from Beck, Freeman, and associates, 1990, pp. 50-51) are limited goods pridefully turned to for security when basic trust is lost. They are analogous to Karen Horney's "neurotic needs."

Karen Horney: Intrapsychic Strategies of Defense

The Self-Effacing Solution

"Even when we deeply value ourselves, the anxiety built into finitude will tempt us to find our source of security in some strategy rather than a trust in God" (Cooper, pg. 163).

### Habitual inordinate Passions

| **Desires/ Pleasures** | **Fears/ Distresses ( anxiety)** |
|---|---|
| • attention | • being ignored |
| • expressiveness | • being unattractive |
| • emotionalism | • being unlovable |
| • romanticism | • being uninteresting |
| • impressing others | • being abandoned |
| • captivating others | • being helpless |
| • glamor | • frustration |
| • amusement | • not getting their own way |
| • affection | • not getting compliance from |
| • alliances |   others |
| • an audience | • being treated unfairly |
| • appreciation | |
| • being entertaining | |
| • admiration | |
| • feelings | |

- dramatics
- demonstrativeness

## Cognitive Effects

**Basic Belief:** I need to impress. **Strategy:** Dramatics (Beck, Freeman & associates, pg. 26).

The "idealized self is made up of beliefs about how we should feel, think, or act" (Tamney, pg. 32).

In *Cognitive Therapy of Personality Disorders*, Aaron T. Beck, Arthur Freeman, and associates (1990) list typical beliefs associated with each specific personality disorder. The typical beliefs are analogous to Karen Horney's "shoulds" and "neurotic claims." Here are the typical beliefs that they have listed (pg. 362) for Histrionic Personality Disorder:

- I am an interesting, exciting person.
- In order to be happy I need other people to pay attention to me.
- Unless I entertain or impress people, I am nothing.
- If I don't keep others engaged with me, they won't like me.
- The way to get what I want is to dazzle or amuse people.
- If people don't respond very positively to me, they are rotten.
- It is awful for people to ignore me.
- I should be the center of attention.
- I don't have to bother to think things through—I can go by my "gut" feeling.
- If I entertain people, they will not notice my weaknesses.
- I cannot tolerate boredom.
- If I feel like doing something, I should go ahead and do it.
- People will pay attention only if I act in extreme ways.
- Feelings and intuition are much more important that rational thinking and planning (362).

Beck's Cognitive Therapy for Personality Disorders

- Google Search: histrionic cognitive.therapy
- Google Search: histrionic cognitive.behavioral.therapy
- Google Search: histrionic psychoanalytic therapy
- Google Search: histrionic psychodynamic therapy
- Google Search: histrionic interpersonal therapy
- Google Search: histrionic humanistic therapy

http://www.ptypes.com/histrionicpd.html                                    1/2006


504

# EXHIBIT "J"

505

# Epilepsy and Seizures

## Epilepsy and Seizures

### What is a seizure?

The brain is the center that controls and regulates all voluntary and involuntary responses in the body. It consists of nerve cells that normally communicate with each other through electrical activity.

A seizure occurs when part(s) of the brain receives a burst of abnormal electrical signals that temporarily interrupts normal electrical brain function.

### What are the different types of seizures?

There are several different types of seizures, including the following:

- partial seizures
  Partial seizures take place when abnormal electrical brain function occurs in one or more areas of one side of the brain. In about one-third of people with partial seizures, the person may experience an aura before the seizure occurs. An aura is a strange feeling, either consisting of visual changes, hearing abnormalities, or changes in the sense of smell. Two types of partial seizures include the following:
  - simple partial seizures
    The seizures typically last less than one minute. The person may show different symptoms depending upon which area of the brain is involved. If the abnormal electrical brain function is in the occipital lobe (the back part of the brain that is involved with vision), sight may be altered, but muscles are more commonly affected. The person's muscles are typically more commonly affected. The seizure activity is limited to an isolated muscle group, such as the fingers, or to larger muscles in the arms and legs. Consciousness is not lost in this type of seizure. The person may also experience sweating, nausea, or become pale.
  - complex partial seizures
    This type of seizure commonly occurs in the temporal lobe of the brain, the area of the brain that controls emotion and memory function. This seizure usually lasts between one to two minutes. Consciousness is usually lost during these seizures and a variety of behaviors can occur. These behaviors may range from gagging, lip smacking, running, screaming, crying, and/or laughing. When the person regains consciousness, the person may complain of being tired or sleepy after the seizure. This is called the postictal period.
- generalized seizures
  Generalized seizures involve both sides of the brain. There is loss of consciousness and a postictal state after the seizure occurs. Types of

*sight*
*hearing* *vision*
*blurred*

*memory function*
*loss of consciousness*

*506*

generalized seizures include the following:

- o absence seizures (formerly known as petit mal seizures)
  These seizures are characterized by an altered state of consciousness and staring episodes. Typically, the person's posture is maintained during the seizure. The mouth or face may move or the eyes may blink. The seizure usually lasts no longer than 30 seconds. When the seizure is over, the person may not recall what just occurred and may go on with his/her activities, acting as though nothing happened. These seizures may occur several times a day. This type of seizure is sometimes mistaken for a learning problem or behavioral problem. Absence seizures are uncommon before the age of 5 and occur more often in girls.
- o atonic
  With atonic seizures, there is a sudden loss of muscle tone and the person may fall from a standing position or suddenly drop his/her head. During the seizure, the person is limp and unresponsive.
- o generalized tonic-clonic seizures (GTC or formerly known as grand mal seizures)
  This seizure is characterized by five distinct phases that occur. The body, arms, and legs will flex (contract), extend (straighten out), and tremor (shake), followed by a clonic period (contraction and relaxation of the muscles) and the postictal period. During the postictal period, the person may be sleepy, have problems with vision or speech, and may have a bad headache, fatigue, or body aches.
- o myoclonic seizures
  This type of seizure refers to quick movements or sudden jerking of a group of muscles. These seizures tend to occur in clusters, meaning that they may occur several times a day, or for several days in a row.
- o infantile spasms
  This rare type of seizure disorder occurs in infants before six months of age. There is a high occurrence rate of this seizure when the child is awakening, or when he/she is trying to go to sleep. The infant usually has brief periods of movement of the neck, trunk, or legs that lasts for a few seconds. Infants may have hundreds of these seizures a day. This can be a serious problem, and can have long-term complications.
- o febrile seizures
  This type of seizure is associated with fever. These seizures are more commonly seen in children between six months and six years of age, and there may be a family history of this type of seizure. Febrile seizures that last less than 15 minutes are called "simple," and typically do not have long-term neurological effects. Seizures lasting more than 15 minutes are called "complex" and there may be long-term neurological changes in the child.

## What causes a seizure?

A person may experience one or many seizures. While the exact cause of the seizure may not be known, the more common seizures are caused by the following:

- in newborns and infants:
  - o birth trauma
  - o congenital (present at birth) problems
  - o fever
  - o metabolic or chemical imbalances in the body
- in children, adolescents, and adults:
  - o alcohol or drugs
  - o head trauma
  - o infection
  - o unknown reasons

Other possible causes of seizures may include the following:

507

- brain tumor
- neurological problems
- drug withdrawal
- medications

## What are the symptoms of a seizure?

The person may have varying degrees of symptoms depending upon the type of seizure. The following are general symptoms of a seizure or warning signs of seizures. Symptoms or warning signs may include:

- staring
- jerking movements of the arms and legs
- stiffening of the body
- loss of consciousness
- breathing problems or breathing stops
- loss of bowel or bladder control
- falling suddenly for no apparent reason
- not responding to noise or words for brief periods
- appearing confused or in a haze
- sleepiness and irritability upon waking in the morning
- nodding the head
- periods of rapid eye blinking and staring

During the seizure, the person's lips may become bluish and breathing may not be normal. The movements are often followed by a period of sleep or disorientation.

The symptoms of a seizure may resemble other problems or medical conditions. Always consult your physician for a diagnosis.

## How are seizures diagnosed?

The full extent of the seizure may not be completely understood immediately after onset of symptoms, but may be revealed with a comprehensive medical evaluation and diagnostic testing. The diagnosis of a seizure is made with a physical examination and diagnostic tests. During the examination, the physician obtains a complete medical history of the person and family and asks when the seizures occurred. Seizures may be due to neurological problems and require further medical follow up.

Diagnostic tests may include:    *were any of these done ?*

- blood tests
- electroencephalogram (EEG) - a procedure that records the brain's continuous, electrical activity by means of electrodes attached to the scalp.
- magnetic resonance imaging (MRI) - a diagnostic procedure that uses a combination of large magnets, radiofrequencies, and a computer to produce detailed images of organs and structures within the body.
- computed tomography scan (Also called a CT or CAT scan.) - a diagnostic imaging procedure that uses a combination of x-rays and computer technology to produce cross-sectional images (often called slices), both horizontally and vertically, of the body. A CT scan shows detailed images of any part of the body, including the bones, muscles, fat, and organs. CT scans are more detailed than general x-rays.
- lumbar puncture (spinal tap) - a special needle is placed into the lower back, into the spinal canal. This is the area around the spinal cord. The pressure in the spinal canal and brain can then be measured. A small amount of cerebral spinal fluid (CSF) can be removed and sent for testing to determine if there is an infection or other problems. CSF is the fluid that bathes the brain and spinal cord.

508

**Treatment of a seizure:**

Specific treatment for a seizure will be determined by your physician based on:

- your age, overall health, and medical history
- type of the seizure
- frequency of the seizures
- your tolerance for specific medications, procedures, or therapies
- expectations for the course of the condition
- your opinion or preference

The goal of seizure management is to control, stop, or decrease the frequency of the seizures without interfering with the normal activities of daily living (ADLs). The major goals of seizure management include the following:

- proper identification of the type of seizure
- using medication specific to the type of seizure
- using the least amount of medication to achieve adequate control
- maintaining appropriate medication levels

Treatment may include:

- medications
  There are many types of medications used to treat seizures and epilepsy.
  Medications are selected based on the type of seizure, age of the patient,
  side effects, the cost of the medication, and the adherence with the use of the
  medication.

  Medications used at home are usually taken by mouth (as capsules, tablets,
  sprinkles, or syrup), but some can be given rectally (into the person's rectum).
  If the person is in the hospital with seizures, medication by injection or
  intravenous (IV) may be used.

  It is important to take your medication on time and as prescribed by your
  physician. Different people use up the medication in their body differently, so
  adjustments (schedule and dosage) may need to be made for the most
  effective seizure control.

  All medications can have side effects, although some people may not
  experience side effects. Discuss your medication's side effects with your
  physician.

  While you are taking medications, different tests may be done to monitor the
  effectiveness of the medication. These tests may include the following:

  - blood work
    Frequent blood draws testing is usually required to check the level of
    the medication in the body. Based on this level, the physician may
    increase or decrease the dose of the medication to achieve the desired
    level. This level is called the "therapeutic level" and is where the
    medication works most efficiently. Blood work may also be done to
    monitor the effects of medications on body organs.
  - urine tests
    These tests are performed to see how the person's body is responding
    to the medication.
  - electroencephalogram (EEG)
    An EEG is a procedure that records the brain's continuous, electrical
    activity by means of electrodes attached to the scalp. This test is done
    to monitor how the medication is helping the electrical problems in the
    brain.
- vagus nerve stimulation (VNS)
  Some people, whose seizures are not being well-controlled with seizure

*509*

medications, may benefit from a procedure called vagus nerve stimulation (VNS). VNS is currently only used for persons over the age of 12 who have partial seizures that are not controlled by other methods.

VNS attempts to control seizures by sending small pulses of energy to the brain from the vagus nerve, which is a large nerve in the neck. This is done by surgically placing a small battery into the chest wall. Small wires are then attached to the battery and placed under the skin and around the vagus nerve. The battery is then programmed to send energy impulses every few minutes to the brain. When the person feels a seizure coming on, he/she may activate the impulses by holding a small magnet over the battery. In many cases, this will help to stop the seizure.

There are some side effects that may occur with the use of VNS. These may include, but are not limited to, the following:
- o hoarseness
- o pain or discomfort in the throat
- o change in voice
- surgery
Another treatment option for seizures is surgery. Surgery may be considered in a person who:
- o has seizures that are unable to be controlled with medications.
- o has seizures that always start in one area of the brain.
- o has a seizure in a part of the brain that can be removed without disrupting important behaviors such as speech, memory, or vision.

Surgery for epilepsy and seizures is a very complicated surgery performed by a specialized surgical team. The operation may remove the part of the brain where the seizures are occurring, or, sometimes, the surgery helps to stop the spread of the bad electrical currents through the brain.

A person may be awake during the surgery. The brain itself does not feel pain. With the person awake and able to follow commands, the surgeons are better able to make sure that important areas of the brain are not damaged.

Surgery is not an option for everyone with seizures. Discuss this treatment option with your physician for more information.

## More information regarding the person with seizures or epilepsy:

- Make sure you or your child (if age appropriate) understand the type of seizure that is occurring and the type of medication(s) that are needed.
- Know the dose, time, and side effects of all medications.
- Consult your physician before taking other medications. Medications for seizures can interact with many other medications, causing the medications to work improperly and/or causing side effects.
- Young women of childbearing age who are on seizure medications need to be informed that seizure medications are harmful to a fetus, and the medication may also decrease the effectiveness of oral contraceptives.
- Check with your state to understand any laws about people with epilepsy or seizures operating a motor vehicle.
- If a person has good control over the seizures, only minimal restrictions need to be placed on activities, in most cases.
- Specific follow-up will be determined by your physician.
- Medications for seizures may not be needed for the person's entire life. Some persons may be taken off their medications if they have been seizure-free for one to two years. This will be determined by your physician.

Click here to view the
of Nervous System Disorders

*510*

# EXHIBIT  "J" # 1

511

# THE ANATOMY OF A HEAD INJURY

Injuries involving some type of blow to the head are among the most common in our society. Some 700,000 people in North America suffer traumatic head injuries each year, and between 70,000 and 90,000 are left permanently disabled. Head injuries can range from relatively minor damage to the scalp and face such as lacerations, abrasions and bruising to more serious consequences involving damage to the brain. While traumatic brain injury occurs much less frequently, it is important to know how it is identified and what to do for the person.

Loss of consciousness, even for a very brief period, is one of the clearest indications that the brain may have been affected by a blow to the head. A confusional state involving uncertainty about time, date, and location and/or a period of memory loss for the events surrounding the head injury are also indicators of trauma to the brain. Any of these symptoms following a blow to the head should be taken seriously.

With the most severe symptoms, loss of consciousness for more than a few minutes, the person should receive immediate medical attention. With less severe symptoms the person should be watched for a period of several hours after the head trauma. The person's state of consciousness, orientation to time and place and immediate memory function (e.g., remembering a series of four numbers) should be evaluated periodically during this time. Any evidence of deterioration may be a sign of the delayed effects of brain injury due to swelling or internal bleeding and require that the person receive medical attention as soon as possible. Some appreciation for how and why these symptoms arise will provide insight into why even a seemingly mild blow to the head may have very serious and potentially life-threatening consequences.

The effects of a blow to the head on brain function arise from the structural characteristics of the skull and the brain and the direction and size of the forces acting on the head. The brain, a rather soft tissue with the consistency somewhere between egg white and jello, is covered by three membrane layers. The outer-most layer, called the dura mater, is connected to the inside of the skull at various suture points which serve to suspend the brain within the skull. The brain sits atop the brain stem, an extension of the spinal cord which passes out the base of the skull through a hole called the foramen magnum. Brain injuries arise from three characteristics of this brain-skull anatomy: the rigidity and internal contours of the skull, the incompressibility of brain tissue and the susceptibility of the brain to shearing forces.

The first two characteristics give rise to contusions or hematomas (i.e., bleeding) on the surface of the brain, one of the most common injuries. There are usually two contusion sites in a brain injury. One occurs at the site of the blow to the brain and is called the coup injury. The other arises where the brain bounces off the skull when it has been moved away from the site of the original blow. The contusion here is termed the contre coup injury. Some bleeding may also arise at the suture points when the dura mater is torn away from the inside of the skull.

The third characteristic, susceptibility to shearing forces, plays a role primarily in injuries which involve rapid and forceful movements of the head, such as in motor vehicle accidents. In these situations rotational forces such as might occur in whiplash-type injuries are particularly important. These forces, associated with the rapid acceleration and deceleration of the head, are smallest at the point of rotation of the brain near the lower end of the brain stem and successively increase at increasing distances from this point. The resulting shearing forces cause different levels in the brain to move relative to one another. This movement produces stretching and tearing of axons (diffuse axonal injury) and the insulating myelin sheath, injuries which are the major cause of loss of consciousness in a head trauma. Small blood vessels are also damaged causing bleeding (petechial hemorrhages) deep within the brain.

Collectively these injuries can result in swelling of the brain. If the pressure within the skull is not relieved

512

through surgery, cooling or medication, the brain will gradually be pushed down through the opening at the base of·the skull, the foramen magnum. Nuclei in the brain stem controlling breathing and cardiac function will eventually be compressed resulting in death.

Returning now to the symptoms of head injury a great deal of work has been directed toward using these symptoms to classify the severity of head injury. Loss of consciousness or coma and post traumatic amnesia (difficulty remembering new information after waking up from the coma), are the two most common symptoms used. A mild head injury is one in which the period of unconsciousness is less than twenty minutes and post traumatic amnesia lasts for less than one hour, while a head injury in which the person is unconscious for at least one day and experiences post traumatic amnesia for more than twenty four hours is considered severe.

The severity of head injury can also be indexed on the basis of neurological and neuroradiological tests. Increased reflexes and muscle tone (e.g., spasticity), abnormal movements (e.g., tremors), difficulty in swallowing and slurring of speech are all indicators on a neurological examination of a moderate to severe head injury. Findings from neuroradiological tests using computer assisted brain scans have proven useful in visualizing the damage caused to the brain. Computerized Axial Tomography (CAT) and Magnetic Resonance Imaging (MRI) provide scans of the structural integrity of the brain and may reveal physical changes such as hematomas and diffuse axonal injuries. Positron Emission Tomography examines brain function as opposed to structure and provides a view of more subtle effects of·trauma to the brain which might not be seen by the CAT or MRI scans.

Attempts have also been made to predict the outcome for persons who has suffered a head injury and to assess the stages in recovery following their emergence from coma. The Glasgow Coma Scale is one of the most widely used scales for describing the severity of head injury and predicting the person's likelihood of recovery. This scale rates the severity of person's injury based on his/her ability to open his/her eyes, move and speak. The more severe the injury the lower is the performance as reflected in the score on the scale. A very low score suggests a very severe injury and little likelihood of total recovery.

The Glasgow Coma Scale is very useful for predicting early outcome from a head injury, for example, whether the person will survive. It is not as useful for estimating how someone will eventually function in daily living nor what degree of independent living they might achieve. Other scales such as the Ranchos Los Amigos Scale of Cognitive Functioning have proven more valuable for predicting these later outcomes. This scale, divided into eight stages which progress from coma to appropriate behaviour and cognitive functioning, is useful in following the recovery of the head injury survivor and in determining when he/she is ready to begin a structured rehabilitation program. However, many changes in cognitive, memory and motor functions predictive of whether the person can return to gainful employment or to school are not identified with this scale. More detailed assessments by neuropsychologists, speech pathologists, and physical and occupational therapists are needed to identify these deficits.

The effects of head injury most often observed in these assessments can be classified generally into three categories: physical, cognitive and behavioural. The physical effects of head injuries include such symptoms as seizures, loss of motor speed and coordination and the presence of abnormal movement such as tremors and spasticity. Cognitive changes involve disorders of attention, concentration and memory, problems with understanding or producing speech, difficulties with initiating and planning daily activities, and poor reasoning and judgement. The behavioural effects include agitation and irritability, verbal and physical aggressiveness, impulsivity, depression and suicidal thoughts, and an egocentric or self-centred orientation in interpersonal relationships. *does she have a history (perhaps brought-on by her father's physical abuse ?)*

While the physical and behavioural effects of head injury present significant challenges for rehabilitation, the cognitive deficits are often the most difficult for the caregivers, family members and prospective

employers to deal with. The relative "invisibility" of these deficits in comparison to the more obvious physical and behavioural effects is one of the key reasons for this fact. The relative impact of cognitive deficits is the greatest in the case of mild to moderate head injuries where there may be negligible physical symptoms. In such cases the head injury survivor looks "normal" and people around him/her are often unable to understand why he/she cannot, for example, act appropriately or remember instructions.

Identification of these effects of head injury is a very important first step in helping the person and his/her family. Too often, though, this assessment and early treatment stage is where the process stops. Until recently less than ten percent of head injury survivors received the more long term rehabilitation programs needed to enable them to attain the maximal possible recovery. This situation has been due largely to the lack of long term care programs and the difficulty on the part of the head injury survivor and his/her family to find the funds to pay for these services. In the past several years, however, this situation has improved substantially. The Ministry of Health in Ontario has developed a coordinated network of trauma care centres and several ministries have amalgamated to provide long term care services. Many private companies have also been formed offering a variety of rehabilitation services some of which (community re-entry programs) are aimed at returning the head injury victim to the community. This proliferation of services for head injury victims has been accompanied by new no fault insurance laws which increase the funds available for rehabilitation services for those who have suffered a head injury as a result of a motor vehicle accident.

The Ontario Head Injury Association has worked diligently over the past decade to increase the visibility of head injury victims and their needs. Local chapters such as the Brain Injury Association of Waterloo-Wellington offer a number of educational, recreational and support group programs and have developed a directory outlining the assessment and rehabilitation services available in this region(1).

These developments hold promise for improving the lifestyle and potential for recovery of those who have suffered a brain injury. They have also served to increase the awareness of the general public to effects of head injury which has lead to the development of programs to prevent head injuries in the first place. Prevention addressed through seat belt and helmet laws is clearly the best way to treat head injuries.

Eric A. Roy, Ph.D., C.Psych.
Professor and Director,
Centre for Habilitation Education and Research

(1)Anyone interested in learning more about the programs offered by the Brain Injury Association of Waterloo-Welington should contact Patti Lehmann,
at (519)579-5300 (9:00 a.m. to 12:00 p.m.).

The authorities (and family) being so eager to blame (place guilt), along with her cognitive ability to reason properly, may have resulted in over looking a "diagnosis of her underlying problem." Defense counsel should have proposed this, at least! Investigated her medical past; were there previous Hospital /or Mental Inquires /Evaluations. This was an affirmative Defense.

5/4

# EXHIBIT  "J" # 2

5/5



FRONTLINE

# WHATJENNIFER**SAW**

- PHOTOS
  THE LINE UP
- COTTON'S
  WRONGFUL
  CONVICTION
- INTERVIEWS
- FAQs
- RE-EVALUATING
  PROCEDURE
- H O M E

## ELIZABETH**LOFTUS**

Forensic psychologist who specializes on memory research.
She has testified in criminal cases on the fallibility of eyewitness
testimony and is the author of several books on eyewitness
identification and memory.

Q: What happens to a person's memory in a traumatic experience?

LOFTUS: One of the things that we know about memory is that when you experience something extremely upsetting or traumatic, you don't just record the event like a video tape machine would work, the process is much more complex and what's happening is you're taking in bits and pieces of the experience, you're storing some information about the experience, but it's not some indelible image that you're going to be able to dig out and replay later on.

Q: Why are juries persuaded by eyewitness testimony?

LOFTUS: Well, one of the things that we know about juries and how they react to evidence that they're hearing is that they do place a lot of weight in eyewitness testimony. They especially place weight in eyewitness testimony  when it's very confidently expressed. When the victim, for example, can give a whole lot of details. Jurors are impressed with that confident detailed testimony and they're very persuaded by it.

Now why jurors are so influenced by eyewitness testimony--that's a more difficult question to answer and one of the reasons may be that we don't catch most of the mistakes that we make in our memories. If I tell somebody that I had a chicken last night instead of

 5/6

hamburgers, I'm going to get away with that mistake because my listener isn't going to catch it. I think we're not really as aware of the malleability of memory. How readily distorted our memories can be and that's one reason we place so much weight on someone else's memory--when it's a confident memory.

Q: What happens to memory when you're more excited and in an upsetting situation?

LOFTUS: One of the things that we know about memory for very upsetting experiences, traumatic experiences, is that the memory does not work like a videotape recorder. You don't just record the event and play it back later the way a videotape player would work. The process is much more complicated, and actually what's happening is you're storing bits and pieces of the experience. Later, when you try to tell somebody what happened, you are in some sense reconstructing that experience, you're piecing it together and essentially telling a story about your experience.

Q: What if a person is trying to pay particular attention to remembering what another person looked like?

LOFTUS: Well, one thing that does help memory is you pay attention at the time something is happening. If you do make efforts to study the information and to retain that information, that helps your memory. So there are some things that people can do at the time that they are having an experience or witnessing an experience or being a victim of an experience if they think about doing those things, it will help the memory.

Q: And in a rape case?

LOFTUS: Well, one of the things about a rape case, in particular, is, of course, you have people who are very close together. That's almost by definition. And short distances, that's good for memory. But to the extent that you have other factors in the situation that create problems for memory, you can get mistakes. So you do have to ask: Is it a cross-racial identification? Is it a situation where there was tremendous stress and fright? Is it a situation where the victim was given information or feedback or told stories about another victim? If there were things going on that create problems for accurate memory, it's going to affect the memory even if it was a rape, even if the people were very close together to begin with.

*517*

Q: Cross-racial identification ... what are the problems in that kind of situation?

LOFTUS: We do have more difficulty identifying the faces of strangers of a different race that the faces of strangers of our own race. Whites identifying blacks, blacks identifying whites, whites and Asians, all these different cross-racial combinations demonstrate this greater difficulty. It may be that what is happening in a cross-racial situation is that you're actually scanning the face differently when it's a member of a different race. I could give you one example. If you're looking at the face of an Asian person and you're Caucasian, maybe you notice those eyes because they're a little bit unusual. Later you go to a lineup and those unusual eyes are present in all the cases because you've got a lineup that's full of Asians and that doesn't help you very much in making that discrimination--which particular face did I see. So we might be looking at the faces differently when they're faces of a different race.

Q: What kind of dynamic can occur between a victim and the police investigator?

LOFTUS: One of the things that happens when you have a victim of a serious crime and a police investigator is they both have the same goal. They want to see the crime solved and they're going to work together to do that. And that is perfectly natural, but if you have somebody who is very, very motivated to see that crime solved, she may be especially sensitive to feedback that she might be getting from investigators who are assisting her in that process. And so, if they've a suspect in mind, if they've an idea who the perpetrator is and they communicate that idea to the victim, even unwittingly, she may be more sensitive to picking up that communication.

And if they explicitly give her feedback, "Well that's the guy we thought it was," then this can be a serious problem. This kind of feedback can artificially increase the confidence level of the victim, make the victim more certain if the police believe it, they must have a good reason, "I think that's the guy, in fact, I'm even more confident than I was before." And now, you have a victim who's going to be even more persuasive when she goes into the court room to testify than, perhaps, is warranted.

Q: What about selecting someone in photos and physical line ups?



LOFTUS: Well, first of all, when a victim goes to a lineup or to a photo spread, looks at a set of photos, one of the things that would be natural is for that victim to think the police must have a suspect or they wouldn't have brought me here. And while it's a very good idea for the police to try to make that victim feel that it's OK not to choose someone and, in fact, it's a very good idea for them to be instructing those victims that the person may or may not be here, still some victims have in their minds the idea that, "I wouldn't be here unless they had some idea of who this was."

Q: What is the significance when a victim fails to make an identification?

LOFTUS: Sometimes you have a situation where there will be a witness or another victim to a crime who goes to a lineup and doesn't identify anybody. If the defendant is in that lineup and the victim says, "No I don't recognize anybody," that is valuable information. Often times that information is just thrown away, the jurors don't even get to hear about it, but that information is telling you something. Yes, it's possible that this victim really was a victimized by one of those people in the lineup and has forgotten it, but it's also possible that his nonidentification is telling you he's not there. It's somebody else and that information should be preserved and presented along with the rest of the information to the jury, the triers of fact, so that they have that valuable information in making their decision.

▶ NEXT

the photos | cotton's wrongful conviction | interviews | faqs | re-evaluating procedures | song of an innocent man | links | tapes & transcripts | reactions | explore frontline | wgbh

PBS

web site copyright 1995-2006 wgbh educational foundation

http://www.pbs.org/wgbh/pages/frontline/shows/dna/interviews/loftus.html          8/16/2006

*519*

# EXHIBIT "J" # 3

520

Case 3:08-cv-03429-MMC     Document 2-15     Filed 07/16/2008     Page 25 of 58



**WIN A 12-DAY CRUISE!**
Enter to win a 12-day British Isles cruise from the
Hollywood Bowl and Princess Cruises! **Click for Details.**

HOLLYWOOD BOWL
PART OF YOUR LIFE

# LA

Search [search...]
ADVANCED SE

**NEWS   BLOGS   FILM/TV   MUSIC   LA VIDA   STAGE   ART/BOOKS   EAT/DRINK   CLASS**

*backpage*.com

## FEATURES

# MEMORY AND MANIPULATION
*The trials of Elizabeth Loftus, defender of the wrongly accused*
**BY SASHA ABRAMSKY**
Thursday, August 19, 2004 - 12:00 am



Photos by Slobodan Dimitrov

On the wall of Professor Elizabeth Loftus' third-floor UC Irvine office is a paper bull's-eye target, pockmarked with bullet holes. If it looks somewhat incongruous in the mostly sedate academic surroundings — bookshelves lined with psychology texts, a large desk with a black Dell computer and stylish flat screen, a mock *Vanity Fair* cover with Loftus' face staring out from atop Demi Moore's body (a humorous gift from students), and photocopies of Andy Warhol's Mick Jagger portraits — there's good reason. Loftus — who, when she pulls her blue straw hat over her mussed shoulder-length brown hair and stands up in black-velvet pants and cotton blouse, looks startlingly like Diane Keaton in *Annie Hall* — took up target practice in 1994 after receiving death threats following the publication of her book *The Myth of Repressed Memory*. "We're going to kill the bitch," was one choice missive. The holes in the paper, Loftus says, laughing nervously as she recalls the events, were made on the firing range.

Target practice aside, Loftus' work veers into an *X-Files*-type reality where nothing is as it seems, where even the inner sanctum of an individual's most personal memories is subject to manipulations and falsification. We think of that sanctum as a citadel invulnerable to outside pressures. Loftus tells us that, to the contrary, it is a marshland crisscrossed with paths, instantly imprinted by the footprints of all those who traverse it.

Beth Loftus grew up in a house on Santa Monica Boulevard. And while she has spent much of her adult life away from the place of her birth, she has always been drawn back to the city where things are not always what they seem, where humans — the storytelling species — have perfected the art of illusion. The allure is appropriate given that Loftus specializes in studying the malleability of, the fallibility of, human memory and given that she has spent a lifetime exploring the strange nether regions of the mind where fact and fantasy, reality and distortion, blend into new versions of "the truth."

*521*

Recently, three decades into her influential career as a research psychologist and memory expert in legal cases, Loftus, in her early 50s and recently divorced, returned to Southern California after several years at the University of Washington in Seattle. Now ensconced at UCI's department of psychology and social behavior, as well as its criminology department, she lives in a modest faculty house. A framed panoramic oil painting of the early-20th-century wooden house overlooking Lake Washington in which she lived until 2002 hangs on her hallway wall, copied from a photograph by a man she believes to be wrongfully imprisoned and whose cause she has championed.

Somewhat ironically, her return was a side effect of research work investigating the veracity behind the allegations at the heart of a high-profile Jane Doe child-abuse case. She eventually co-authored an article about the case with University of Michigan psychologist Mel Guyer — from which stemmed a lawsuit against the authors, the university, the journal in which the article appeared and the organization that publishes the journal — but first Jane Doe filed an ethics complaint against Loftus with the University of Washington. Though the university eventually cleared Loftus of breaking research protocols — after seizing all of her files on the case and preventing her from publishing her work for almost two years — its support was so lukewarm, and its unwillingness to stand by its controversial psychologist during the current lawsuit so clear, that Loftus was only too happy to accept an offer from Irvine.

For the past many months, Loftus, who herself has served as an expert witness in over 250 cases since 1975, has been preparing to go to court. It is a battle for personal survival as much as for her professional reputation — never mind that she was recently elected to the prestigious National Academy of Sciences as well as listed by the *Review of General Psychology* as one of the 20th century's Top 100 psychologists. "I'm so proud of what I've done," Loftus states defiantly. "I'll fight to the bitter end." Over the last year, the lawsuit has been wending its way toward the trial stage. If she loses, not only will academic freedom have arguably suffered a grievous blow, but on a personal level, Loftus herself could face bankruptcy.

In early 2003, Loftus gave a lecture in Hollywood, at the Center for Inquiry West, a venue run by the Committee for the Scientific Investigation of Claims for the Paranormal (CSICOP) that specializes in casting skeptical eyes over discussions about paranormal, and otherwise scientifically dubious, or unprovable, happenings: UFO sightings, alien abductions, crop circles, that sort of thing. "Preconceived ideas and the accuracy of memory are factors that always seem to come into play, at least with these anecdotal beliefs we investigate," explains Jim Underdown, the center's executive director, hinting at the strange interplay of cultural beliefs and sensory input that goes into molding complex memories. "The fact that memories are so plastic and changeable, if a memory can be introduced, then that becomes a serious issue and a serious aspect of an investigation. Even if somebody is telling the truth, it may be they're telling the truth about a false memory — about something that didn't happen."

Loftus told her audience about a case she had recently investigated, a famous Jane Doe case, in which a messy divorce and child-custody battle had ended with the biological mother being accused, by her 6-year-old daughter, of having sexually abused her earlier in her life. Following the accusations, custody was awarded to the girl's father and his new wife. Over the years, the young girl lost all memory of the "abuse"; then, nearly 11 years later, the doctor who had interviewed her after the initial abuse claims re-interviewed her. At that point, the 17-year-old suddenly recalled detailed abuse episodes. Touted by repressed-memory specialists as one of the most celebrated cases in the literature, Jane Doe's story — which had been written about, with her consent, by the specialist who conducted the interviews — had long struck Loftus as resting on extremely shaky foundations. Was it possible, she wondered, that the 6-year-old child had been coached by her father and his wife to issue the initial allegations; that she had quickly "forgotten" the abuse because it hadn't in fact occurred; and that, years later, she had "recalled" false events at the prompting of the specialists who interviewed her?

Loftus and a colleague from the University of Michigan began interviewing all the key players in the events — including the biological mother and the stepmother, who Loftus came to believe had helped the child to recall the abuse episodes. Eventually they concluded that the abuse had never occurred, and that the memories, which, over the years and decades, had come to

522



27  28  29  30  :

3  .4  .5  6  :

10  11  12  13  .

17  18  19  20  :

Event or Venu

ROCKIE HORO

COMICS

represent a defining event in Jane Doe's life, were, while powerful, in fact entirely false.

In the summer of 2002, Loftus and her colleague published an article on their findings in *Skeptical Inquirer* magazine, a journal run by CSICOP. It was provocatively titled *Who Abused Jane Doe? The Hazards of the Single Case History*. Now, in early 2003, she was speaking before an audience at the Center, reiterating some of these oil-thrown-on-fire conclusions.

Not long afterward, in May of that year, Loftus and her colleague (as well as her editor and friend) psychologist Carol Tavris, the Center and the magazine were named as co-defendants in a civil lawsuit — *Taus v. Loftus* — filed by Jane Doe at the Solano County Superior Court in Northern California. Doe, by then a lieutenant in the U.S. Navy, was suing them for violations of her privacy — even though, until the lawsuit was filed, her identity (Nicole Taus) had been kept entirely out of the public domain. "Dr. Loftus and/or her co-author apparently spent quite a bit of time talking to people, including my client's biological mother," Taus' attorney, Julian Hubbard, of the Redwood City law firm of McCloskey, Hubbard, Ebert and Moore, explains. "Talking about her, and soliciting information about her private life — obtaining her medical records and obtaining information about her when she was growing up that has nothing to do with what she [Loftus] was writing about." Hubbard claims that Loftus went beyond the bounds of academic research, by "befriending" Jane Doe's mother to the point where she would provide a willing audience for poetry the mother had written, by coaching her to believe she had not abused her daughter decades earlier, and by attempting to forge a reconciliation between mother and child.

Not surprisingly, Loftus' side sees things somewhat differently. They argue that Doe's privacy was always protected until she, herself, nullified it by going to court and seeking financial damages against the defendants. The lawsuit, says Loftus' attorney, Tom Burke, "revealed who she [Jane Doe] was, where she went to high school, where she grew up. What's really frustrating here is not only did she apparently consent to the original publication of her case history when she was young, but later on in life, when she was interviewed 10 years later by Dr. [David] Corwin [the psychologist who popularized her story], she consented again." Then, after Loftus' article was published, Corwin received Jane Doe's consent one more time to use her case history in arguing against Loftus' ideas on the dangers of believing in recovered memories.

In other words, Loftus' team believes that Jane Doe, who did not respond to requests (issued through her attorney) to comment for this article, is fine with her story being used as long as those using it uncritically accepted the reality of her memories.

Yet increasingly memory experts such as Loftus have been proving that not only is memory unreliable, it can also be so utterly manipulated as to render it next-to-useless as pivotal evidence in criminal cases. If Nicole Taus wins her lawsuit, says attorney Burke, frustrated in an attempt several months back to have the case summarily dismissed, "it would set a very dangerous precedent. If you have someone who's simply trying to contribute to an understanding of the data, if those views are silenced, you can't do what needs to be done."

It's no secret that, in recent years, numerous men and women have been released from prison after new DNA evidence cleared them of crimes for which they were convicted entirely on the basis of eyewitness testimony. In New York, Barry Scheck's Innocence Project has created a cottage industry out of using new technologies to expose such miscarriages of justice. But, despite high-profile cases such as the release from Illinois' death row of several prisoners after journalism students at Northwestern University investigated their stories and proved their innocence, we like to think of these cases as unfortunate aberrations blemishing a system that, in the main, works to protect the innocent. Loftus challenges this reassuring assumption.

In an era where social panics — around sexual abuse, drug use and, more recently, terrorism in particular — have led all too many Americans to abandon the assumptions of innocence that theoretically underlie our criminal-justice system, Beth Loftus is a voice of caution. Like Henry Fonda in *Twelve Angry Men*, she is a holdout against our willingness to equate an accusation with guilt and our tendency to damn people on hearsay rather than genuine, verifiable evidence. Fighting the memory wars, for Loftus, has gone beyond the confines of the academy; it has

*523*

become a battle for the credibility of America's justice system.

In essence, Loftus says that our memories can lie, and that, when coaxed in one direction by people we trust (family members, therapists, police officers asking us to identify perps from a series of mug shots), all too often we can "remember" events that did not happen and see people at the scene of a crime who, in fact, were not actually there. While these false memories can be about almost anything, in the past couple of decades they have had an impact on the criminal-justice scene, most notably around the theme of "recovered" memories of instances of sexual abuse alleged to have occurred years or decades previously. Lacking any physical evidence, these cases hinge solely on the word of the alleged victim, their legal viability reliant entirely on the willingness of prosecutors, judge and jury to accept the allegations at face value. Yet, so traumatizing are these "memories," these images of shattered and violated childhoods that swim up to the surface years later, often while the "victim" is undergoing counseling with an unlicensed therapist, that few are willing to challenge their validity, and to further devastate already desperately depressed individuals — and, as a result, too often men and women have been prosecuted solely on the basis of such "memories" or, if not prosecuted, have had their reputations and family relationships destroyed.

What drives Loftus is not, as her detractors believe, a perverted desire to keep sexual predators free to wreak havoc on young innocents, but rather a passionate belief that, during social hysterias, the presumption of innocence becomes subsumed under a tidal wave of lock-'em-all-up-and-throw-away-the-key rhetoric. And that, during such hysterias, finger-pointing by those who really have been victimized is enough to convict the innocent and guilty alike, while, at the same time, finger-pointing by those who have never been victimized is also enough to doom the accused. Suffused with a sense of history, Loftus is haunted by the ghosts of the Salem witch trials from over three centuries ago. Combine sloppy police work, the pressure to identify, and convict, high-profile criminals at any cost, and intense pressure put on suspects during interrogations to own up to — to remember — committing certain acts, and, Loftus argues, all the ingredients are present for grievous miscarriages of justice.

"I was getting pretty upset about this," she says. "I'd see people convicted I believed were innocent, and it would keep me awake at night. There is a problem with faulty memory — it's the major cause of wrongful convictions in this country. We're living in a world where there's a temptation to believe every accusation of abuse, no matter how dubious it may be, and sexual abuse seems to have a privileged status, which makes it all the more special. Obviously there's real child sex abuse, and there are adults who were abused as children — as I was," Loftus says softly and way too matter-of-factly. For a woman who has been accused for years of defending pedophiles and other dangerous predators, it's a pretty large bombshell to just drop into the conversation. But, after hesitating a while, she begins to explain. It turns out that Loftus herself recalls being sexually molested by a family acquaintance when she was a young girl. "I was maybe 6. I always remembered it. The first person I told was my former husband, when I was in my 20s. It was definitely sort of embarrassing. I remember him [the acquaintance] scratching my arm and telling me certain things — like where babies came from. The one worst thing I remember is when he pulled his pants down and laid me on top of him — and I squirmed my way off of him."

The difference between the abuse she remembers suffering and the "repressed memories" of so many other alleged victims, Loftus argues, is that she never "repressed" her experience; it never lay dormant and utterly outside of her consciousness from the moment it allegedly occurred until, years later, it was coaxed out into the open again by a therapist trying to find the source of a patient's adult discomforts. Instead, throughout her childhood, the memories kept resurfacing, sometimes in bizarre ways. When she turned 13, for example, and her period didn't arrive, somehow she decided that maybe her abuser's actions all those years ago had put her into a state of permanent pregnancy.

"I'm pretty aware of the fact there are some creepy people out there — from my own experience," Loftus explains. "But all the people who get harmed by the uncritical acceptance of every accusation — there's a whole bunch of people who get hurt, including the real victims, who get trivialized. You can't be raped for 10 years and not remember it. Yet, according to the repression aficionados, anything's possible."

*524*

Just ask Pamela Freyd, of the Philadelphia-based False Memory Syndrome Foundation. FMSF, on whose scientific and professional advisory board Loftus sits, was founded in 1992 to provide advice to those accused in repressed-memory cases. "We've been contacted by 22,000 families," says Freyd, a retired teacher whose own family was rent apart by an abuse allegation from her 33-year-old daughter in 1991. "There was a growing problem for some families who had adult children who had suddenly and inexplicably accused them of abuse — abuse they had had no awareness of till, as adults, they entered therapy. These were families with good relationships. Therapists used hypnosis, sodium amenthol, guided imagery, dream interpretation, relaxation exercises. These are very dangerous techniques to use if undertaken in the expectation you can excavate historically accurate memories."

Wisconsin attorney Bill Smoler, who represents several accused families in repressed-memory cases, recalls one instance in which a young woman entered therapy and "began a journey into believing she was raped by her father, grandfather, uncle, brother, two cousins and three members of the clergy — and had repressed all of these memories." Ultimately, it emerged that the woman had severe multiple-personality disorder, and, after she died, Smoler sued her therapist on behalf of her parents for malpractice, and also for damages, because of the hurt done to the family. In 2000, a jury awarded the deceased woman's estate and her family over $5 million.

Back in Southern California, a 79-year-old onetime marriage, family and child counselor, who asked that her name not be used, explained how, in the late 1980s, her then-41-year-old daughter entered therapy and began recalling images that started with a memory of her mother inserting scissors into her vagina and gradually built up to a point at which she decided her parents were Satanists who had killed and eaten babies in her presence. Nobody was ever charged in the case, but the family in question was, naturally, completely devastated.

Others were not so lucky. In her books on repressed-memory cases, Loftus details the experiences of many individuals who were charged with sexually abusing their children, solely on the basis of recovered-memory testimony. Many of these men and women spent months in jail awaiting trial; others ultimately were sentenced to years in prison — all without a shred of physical evidence ever being presented.

Over the years, Loftus' work has generated many followers. But others have responded with the kind of venom rarely seen within the confines of academia. Her friend Carol Tavris — who herself tasted a little of the fury after she published a famous *New York Times Book Review* article in 1993 titled "Beware the Incest-Survivor Machine" — jokes that they have both been caricatured as "evil pedophile psychologists from hell." Their critics range from rival memory experts, such as Jane Doe's champion, David Corwin, to an array of therapists, victims of child abuse, and those who, for whatever reason, feel betrayed by those around them and hold Loftus and Tavris personally responsible for their ills. A quick Google search reveals hostile Internet correspondence, angry radio-show transcripts and high-octane commentary issuing against Loftus from around the world. And then, of course, there are the aforementioned death threats.

"Once I started being skeptical of those repressed-memory accusers and the therapists who helped them get this way," Loftus says, her voice tinged with an emotion somewhere between resignation and bewilderment, "the hate mail began flowing in."

Yet, in fact, Loftus' work goes well beyond the veracity of sex-abuse claims. While she made a name for herself as a memory expert defending those she believed to be wrongly accused, her work increasingly highlights the rough edges of memory in a host of different situations. Take a high-profile case in which the guilt or innocence of a defendant revolves almost entirely around eyewitness testimony or memories recalled by defendants during police interrogation, and the chances are pretty good that Beth Loftus' name will show up somewhere in the proceedings. These cases include the celebrated McMartin and Dale Akiki kiddie-abuse cases from the 1980s, in which allegations of day-care providers systematically abusing their young charges led to a national panic about youngsters being ritualistically abused by those hired to care for them, and the Holly Ramona case, which spawned a generation of repressed-memory allegations. (Ramona was a student at UC Irvine who went into therapy and "recovered" very vivid, but

*525*

ultimately false, memories of being repeatedly raped by her father while she was a young girl. Eventually, in 1994, in a case written up by Moira Johnston in her book *Spectral Evidence*, the father successfully sued the therapist for malpractice for implanting the false memories in his daughter's mind.) Loftus has even testified in the Ted Bundy trial, as well as in the Hillside Strangler, O.J. Simpson and Rodney King cases in L.A. — she argued that the video of the police beating King didn't capture the entirety of the event, yet likely shaped the firsthand memories of those called to give testimony in the trial. More recently, Loftus has served as a behind-the-scenes consultant in some of the church-abuse sagas around the country, trying to work out which allegations have merit and which are coattails claims.

Look carefully, and Loftus also appears as a consultant for the defense in the federal trial of Texas Tech professor Thomas Butler, a bioterrorism and bubonic-plague expert. He was accused of illegally importing vials of plague from Africa, contacting the FBI after several dozen vials went missing, and then, after three days of interrogation, admitting that, while he had no memory of the events, he might have accidentally destroyed the vials himself. Loftus argued that even an absent-minded and aging professor would remember if he had destroyed such an integral part of his own work. In the end, the jurors agreed, and acquitted the 62-year-old Butler on the most serious charges.



In a simple conference room in one of UCI's 1960s-era tower blocs, Loftus and her students, who are for some reason overwhelmingly female, devise experiments to show just how

**The Professor:**
**Fighting the memory war**

manipulable memories can be. While they don't seek to replicate alien-abduction experiences or to insert images of sexual abuse into the minds of those never abused — even if they were unethical enough to want to attempt such experiments, they would never in a million years receive permission from the university to do so — they do seek to create an array of other memories of events that never occurred.

In an extra-credit homework assignment, for example, Loftus' students went home and said to younger siblings things as simple as "Hey, do you remember the time you got lost in the mall when you were 5 years old?" and then recorded the ways in which the "memory" would take on a life of its own in the succeeding days, becoming more vivid, more detailed, with each conversation. At a more advanced level, using research subjects in a lab, students successfully created memories of mildly traumatic childhood experiences — such as being temporarily separated from one's parents — that never actually occurred. One student even managed to generate a series of false memories in her research subjects about being licked on the ear by a Pluto character while visiting Disneyland decades earlier. In another experiment, to make sure they were dealing with false recollections rather than real ones, research assistants created memories about meeting Bugs Bunny at Disneyland, who, in reality, couldn't possibly have been in the theme park. The purpose of these mind games is to show that even the most vivid memory is not necessarily an accurate representation of past reality.

Not long ago, the actor Alan Alda visited Loftus' lab while researching a television documentary on memory. Before he visited the lab, Loftus' team had Alda fill in a questionnaire about his eating history since childhood. Over the course of the morning he was in the lab, Loftus and her students then implanted a false memory in Alda's head, subtly convincing him that a computer analysis of his questionnaire had determined that he had gotten sick from eating bad hard-boiled eggs when he was a young boy. Later, when they took the actor out for a picnic — a photograph of the event is tacked up on Loftus' office cork board — they monitored his food choices and, sure enough, he avoided the hard-boiled eggs they offered him.

Loftus' Irvine colleague Michael Rugg, an expert in the physiology of memory, believes that physiologically the same brain regions are activated when someone answers "yes" to something

*526*

that is true as when someone answers "yes" to something that he believes to be true but that is actually false. In other words, physiologically, the truth is less important than an individual's perception of the truth. Ultimately, perhaps, it is this blending of interior and exterior realities that creates uniquely human forms of memory — that renders our minds forever different from those of the binary strings at the center of computer hard drives, that makes our vision of the world, our interaction with the world over time, so different from that of machines designed to manifest artificial intelligence.

Among the more bizarre examples of the tricks memory can play is the rash of vivid alien-abduction stories that has intrigued scientists and ufologists for several decades. While some experts accept at face value stories of men and women being removed from their beds in the middle of the night, taken aboard spaceships, being experimented upon and even made to have sexual intercourse with alien beings, most memory specialists have a somewhat different explanation. Harvard experimental-psychopathology professor Richard McNally, for example, has run two studies on alien abductees. He found that most reported a form of sleep paralysis known in the profession as hypnopompic episodes — essentially a state, experienced by up to 30 percent of the population at some point in their lives, when the body is physically asleep, part of the mind is still dreaming, but another part of the mind is conscious of being awake — and that most, while certainly not psychotic, did have a strong tendency toward beliefs outside of the mainstream. "They're not lying," McNally says of their experiences. "They're really sincere. They are, however, characterized by a range of New Age beliefs, by magical ideation — they tend to believe in past lives, crystals, reincarnation, alternative medicines. Second, they're high on absorption — they can become entranced by a sunset, absorbed in a novel, they had imaginary playmates as children."

Like many of the people in the sexual-abuse cases, most of the alien abductees McNally interviewed did not actually remember, at the time of awakening from their hypnopompic episode, that they had been abducted. What they did feel was intense discomfort; many then sought the help of therapists or counselors — under whose tutelage they began to "remember" that they had been abducted and experimented upon while in this strange state. In a different cultural context, the same individuals would likely have recalled being visited by witches, ghosts or Satan. "Under the suggestive questioning of clinicians," McNally states, "these individuals' minds are generating very powerful explanatory frameworks — under the guise of memory — for their sleep paralysis. They're very resistant to reinterpretation." Soon, such "memories" become an integral part of the individual's self-identity — "I am an alien-abductee survivor" — and, physiologically, the alien abductees, when asked to relive their experiences, respond in much the same way (sweaty palms, racing heartbeat, facial muscle tensions) as do traumatized war veterans.

Those who cling to "recovered" memories of long-ago childhood sexual abuse — many of whom, says Loftus, also have a tendency to vibrant visual imagination, are somewhat suggestible in the presence of more extroverted personalities (such as therapists) and tend to have problems concentrating — are likewise invested in the reality of their claims. In both instances, says McNally, psychological problems lead to therapy, which leads to hypnotic regression, which leads to "false memories that explain the original problem." Maybe that's why Jane Doe reacted so furiously when Loftus and a colleague challenged the veracity of her story. It wasn't just that strangers were snooping around her past; those same strangers were actually, in effect, telling the world that the adult Jane Doe might not have as valid an excuse for perceived adult neuroses and problems as she believed she had.

Maybe that's also why many therapists have also reacted so furiously to Loftus' work. One female therapist sat down next to her on an airplane a few years back and, when in the course of casual conversation she found out whom she was sitting next to, got so angry that she hit Loftus over the head with a rolled-up newspaper, saying over and over again, "You're that woman."

Loftus, says Tavris, "makes people question, even if they don't know they're questioning, the explanation they've lived with for so long. She's telling doctors they're killing women because they're not washing their hands. The venom in the clinical world to Beth is in direct relation to how defensive she makes them feel. Beth is questioning some of the basic principles on which people are earning their livelihoods. People don't like that."

527

Now, Loftus is getting ready to defend herself in court. Like many of the cases in which she has testified over the decades, *Taus v. Loftus* has the potential to once again remake the ground rules in the memory wars. Win or lose, however, Loftus has already succeeded in highlighting the legal system's overreliance on uncorroborated eyewitness testimony. "I think I've really helped people to understand the malleable nature of memory," Loftus says. "When I help save one innocent person, I feel really good about it."

Recently, Loftus tells me, she got a call from "Jane Doe's mother. She said, 'I'm calling because I had a stroke. I'm getting out of the hospital, and I just wanted to say to you that I'll never forget what you did for me.'"

---

## PREVIOUSLY IN FEATURES

### THE SIMULATED REPUBLIC
Wednesday, August 16, 2006 - 11:00 am

### AFTER THE FALL
Wednesday, August 9, 2006 - 12:00 pm

### DYING TO GET OFF SKID ROW
Wednesday, August 2, 2006 - 11:30 am

### MORE»

PRIVACY POLICY  |  STAFF  |  PRINT ADVERTISING  |  WEB ADVERTISING  |  AWARDS  |  FEEDBACK  |  JOBS AT LA WEEK

© Copyright 2006 LA Weekly, LP

*528*

# EXHIBIT  "J" # 4

529

Patients & Caregivers | Healthcare Professionals | Worldwide

Search

HOME | ABOUT MERCK | PRODUCTS | NEWSROOM | INVESTOR INFORMATION | CAREERS | RESEARCH | LICENSING | THE MERCK MANUALS

This Publication Is Searchable        **SEARCH**

# [General]

(See also Neonatal Seizure Disorders in Ch. 260.)

There are two kinds of seizure disorders: an **isolated, nonrecurrent attack,** such as may occur during a febrile illness or after head trauma, and **epilepsy**—a recurrent, paroxysmal disorder of cerebral function characterized by sudden, brief attacks of altered consciousness, motor activity, sensory phenomena, or inappropriate behavior caused by excessive discharge of cerebral neurons.

## The Merck Manual of Diagnosis and Therapy

### Section 14. Neurologic Disorders
### Chapter 172. Seizure Disorders
*Topics*

[General]

navigation help

If given a sufficient stimulus (eg, convulsant drugs, hypoxia, hypoglycemia), even the normal brain can discharge excessively, producing a seizure. In epileptics, seizures are rarely precipitated by exogenous factors, such as sound, light, and touch.

## Etiology and Incidence

Seizures result from a focal or generalized disturbance of cortical function, which may be due to various cerebral or systemic disorders (See Table 172-1). Seizures may also occur as a withdrawal symptom after long-term use of alcohol, hypnotics, or tranquilizers. Hysterical patients occasionally simulate seizures. In many disorders, single seizures occur. However, seizures may recur at intervals for years or indefinitely, in which case epilepsy is diagnosed.

Epilepsy is classified etiologically as symptomatic or idiopathic. Symptomatic indicates that a probable cause exists and a specific course of therapy to eliminate that cause may be tried. Idiopathic indicates that no obvious cause can be found. Unexplained genetic factors probably underlie most idiopathic cases.

The risk of developing epilepsy is 1% from birth to age 20 yr and 3% at age 75 yr. Most persons have only one type of seizure; about 30% have two or more types. About 90% have generalized tonic-clonic seizures (alone in 60%; with other seizures in 30%). Absence seizures occur in about 25% (alone in 4%; with others in 21%). Complex partial seizures occur in 18% (alone in 6%; with others in 12%).

Idiopathic epilepsy generally begins between ages 2 and 14. Seizures before age 2 are usually caused by developmental defects, birth injuries, or a metabolic disease. Those beginning after age 25 may be secondary to cerebral trauma, tumors, or cerebrovascular disease, but 50% are of unknown etiology.

## Symptoms and Signs

Manifestations depend on the type of seizure, which may be classified as partial or generalized. In partial seizures, the excess neuronal discharge is contained within one region of the cerebral cortex. In generalized seizures, the discharge bilaterally and diffusely involves the entire cortex. Sometimes a focal lesion of one part of a hemisphere activates the entire cerebrum bilaterally so rapidly that it produces a generalized tonic-clonic seizure before a focal sign appears.

**Auras** are sensory or psychic manifestations that immediately precede complex partial or generalized tonic-clonic seizures and represent seizure onset. A **postictal state** may follow a seizure (most commonly a generalized seizure) and is characterized by deep sleep, headache, confusion, and muscle soreness.

**Simple partial seizures** consist of motor, sensory, or psychomotor phenomena without loss of consciousness. The specific phenomenon reflects the affected area of the brain (see Table 172-2). In **Jacksonian seizures,** focal motor symptoms begin in one hand and then "march" up the extremity. Other focal attacks can first affect the face area, then spread down the body to involve an arm and sometimes a leg. Some partial motor seizures begin with raising the arm and turning the head toward the moving part. Some proceed to generalized convulsions.

In **complex partial seizures,** the patient loses contact with the surroundings for 1 to 2 min. At first, the patient may stare, perform automatic purposeless movements, utter unintelligible sounds without understanding what is said, and resist aid. Mental confusion continues another 1 or 2 min after motor components of the attack

*530*

subside. These seizures may develop at any age, and structural pathology (eg, mesial temporal sclerosis, low-grade astrocytomas) should be ruled out. Complex partial seizures most commonly originate in the temporal lobe but may originate in any lobe of the brain.

Complex partial seizures are not characterized by unprovoked aggressive behavior. However, if restrained during a complex partial seizure, a patient may lash out at the person restraining him, as may a patient in a postictal confused state after a generalized seizure. Between seizures, patients with temporal lobe epilepsy have a higher incidence of psychiatric disorders than does the general population; 33% may have psychologic difficulties, and 10% may have symptoms of schizophreniform or depressive psychoses.

**Generalized seizures** cause loss of consciousness and motor function from the onset. Such attacks often have a genetic or metabolic cause. They may be primarily generalized (bilateral cerebral cortical involvement at onset) or secondarily generalized (local cortical onset with subsequent bilateral spread). Types of generalized seizures include infantile spasms and absence, tonic-clonic, atonic, and myoclonic seizures.

**Infantile spasms** are primarily generalized seizures characterized by sudden flexion of the arms, forward flexion of the trunk, and extension of the legs. Seizures last a few seconds and are repeated many times a day. They occur only in the first 3 yr of life and then are replaced by other types of seizures. Developmental abnormalities are usually apparent.

**Absence seizures** (formerly called petit mal) consist of brief, primarily generalized epileptic attacks manifested by a 10- to 30-sec loss of consciousness and eyelid flutterings at a rate of 3/sec, with or without loss of axial muscle tone. Affected patients do not fall or convulse; they abruptly stop activity and resume it just as abruptly after the seizure, with no postictal symptoms or even knowledge that an attack has occurred. Absence seizures are genetic and occur predominantly in children. Without treatment, such seizures are likely to occur many times a day. Seizures often occur when the patient is sitting quietly and can be precipitated by hyperventilation. They rarely occur during exercise.

**Generalized tonic-clonic seizures** typically begin with an outcry; they continue with loss of consciousness and falling, followed by tonic, then clonic contractions of the muscles of the extremities, trunk, and head. Urinary and fecal incontinence may occur. Seizures usually last 1 to 2 min. Secondarily generalized tonic-clonic seizures begin with a simple partial or complex partial seizure.

**Atonic seizures** are brief, primarily generalized seizures in children. They are characterized by complete loss of muscle tone and consciousness. The child falls or pitches to the ground, so that seizures pose the risk of serious trauma, particularly head injury.

**Myoclonic seizures** are brief, lightning-like jerks of a limb, several limbs, or the trunk. They may be repetitive, leading to a tonic-clonic seizure. There is no loss of consciousness.

**Febrile seizures** are associated with fever without evidence of intracranial infection. They affect about 4% of children between the ages of 3 mo and 5 yr. Benign febrile seizures are brief, solitary, and generalized tonic-clonic in form; complicated febrile seizures are either focal, last > 15 min, or recur >= 2 times in < 24 h. Overall, the occurrence of febrile seizures is associated with a 2% incidence of subsequent epilepsy; the incidence of epilepsy and the risk of recurrent febrile seizures are much greater among children with complicated febrile seizures, preexisting neurologic abnormalities, onset before age 1 yr, or a family history of epilepsy.

In **status epilepticus**, seizures follow one another with no intervening periods of normal neurologic function. Generalized convulsive status epilepticus may be fatal. It may result from too-rapid withdrawal of anticonvulsants. Confusion may be the only manifestation of complex partial or absence status epilepticus, and an EEG may be needed to diagnose seizure activity.

**Epilepsia partialis continua** is a rare form of focal (usually hand or face) motor seizures that recur at intervals of a few seconds or minutes for days to years at a time. In adults, it is usually due to a structural lesion, such as a stroke. In children, it is usually due to a focal cerebral cortical inflammatory process (Rasmussen's encephalitis), possibly caused by a chronic viral infection or autoimmune processes.

## Diagnosis

Idiopathic epilepsy must be distinguished from symptomatic epilepsy. Focal seizures or focal postictal symptoms imply a focal structural lesion in the brain; generalized seizures are more likely to have a metabolic cause. In newborns, the type of seizure does not help distinguish between structural and metabolic causes.

An eyewitness account of a typical seizure, the frequency of seizures, and the longest and shortest intervals between them should be recorded. A history of prior head trauma, infection, or toxic episodes must be sought and evaluated. A family history of seizures or neurologic disorders is significant.

Fever and stiff neck accompanying new-onset seizures suggest meningitis, subarachnoid hemorrhage, or encephalitis. Lumbar puncture is indicated. Focal cerebral symptoms and signs accompanying seizures suggest brain tumor, cerebrovascular disease, or residual traumatic abnormalities. In an adult, even generalized seizures should stimulate a search for an unsuspected focal lesion.

Appropriate studies include EEG and serum glucose, sodium, magnesium, and calcium. When the EEG or serum is focally abnormal or when seizures begin in adulthood, MRI is indicated. A lumbar puncture should be performed if infection is suspected.

The EEG between seizures (interictal) in primarily generalized tonic-clonic seizures is characterized by symmetric bursts of sharp and slow, 4- to 7-Hz activity. Focal epileptiform discharges occur in secondarily generalized seizures. In absence seizures, spikes and slow waves appear at a rate of 3/sec. Interictal temporal lobe foci (spikes or slow waves) occur with complex partial seizures of temporal lobe origin. Because an EEG taken during a seizure-free interval is normal in 30% of patients, one normal EEG does not exclude epilepsy. A second EEG performed during sleep in sleep-deprived patients shows epileptiform abnormalities in half of patients whose first EEG was normal. Rarely, repeated EEGs are normal, and epilepsy may have to be diagnosed on clinical grounds.

## Prognosis

Drug therapy completely eliminates seizures in 1/3 of patients and greatly reduces the frequency of seizures in another 1/3. About 2/3 of patients with well-controlled seizures can eventually discontinue drugs without relapse.

Most patients with epilepsy become neurologically normal between seizures, although overuse of anticonvulsants can dull alertness. Progressive mental deterioration is usually related to the neurologic disease that caused the seizures. Left temporal lobe epilepsy is associated with verbal memory abnormalities; right temporal lobe epilepsy sometimes causes visual spatial memory abnormalities. The outlook is best when no brain lesion is demonstrable.

## Treatment

**General principles:** Treatment aims primarily to control seizures. A causative disorder may need to be treated as well.

A normal life should be encouraged. Exercise is recommended; even such sports as swimming and horseback riding can be permitted with proper safeguards. Most state licensing agencies permit automobile driving after seizures have stopped for 1 yr. Social activities should be encouraged. Alcohol intake should be minimized. Cocaine and several other illicit drugs can trigger seizures.

Family members must be taught a commonsense attitude toward the patient. Overprotection should be replaced with sympathetic support that lessens feelings of inferiority and self-consciousness and other emotional handicaps; prevention of invalidism should be emphasized. Institutional care is rarely advisable and should be reserved for severely retarded patients and for patients with seizures so frequent and violent despite drug therapy that they cannot be cared for elsewhere.

During a seizure, injury should be prevented. Protecting the tongue should not be attempted because teeth may be damaged. Inserting a finger to straighten the tongue is dangerous and unnecessary. Clothing around the neck should be loosened, and a pillow placed under the head. The patient should be rolled onto his side to prevent aspiration. A responsible fellow worker may be trained to give emergency aid if the patient agrees.

Causative or precipitating factors should be eliminated. Progressive structural lesions of the brain (eg, tumors, abscesses) should be sought and promptly treated. After definitive treatment of structural lesions, continued medical treatment (eg, anticonvulsants) is usually necessary. Other physical disorders (eg, systemic infections, endocrine abnormalities) should be corrected.

Head injuries with skull fractures, intracranial hemorrhages, focal neurologic deficits, or amnesia cause posttraumatic epilepsy in 25 to 75% of cases. Prophylactic treatment with anticonvulsant drugs after the head injury reduces the probability of early posttraumatic seizures during the first few weeks after the injury but does not prevent the development of permanent posttraumatic epilepsy months or years later.

**Drug therapy:** No single drug controls all types of seizures, and different drugs are required for different patients. Patients rarely require several drugs. The drug of choice for the particular type of epilepsy is started at relatively low dose and increased over about 1 wk to the standard therapeutic dose. After about 1 wk at this dose, blood levels are measured to determine whether the effective therapeutic level has been reached. If seizures continue, the daily dose is increased by small increments. If toxic blood levels or toxic symptoms develop before seizures are controlled, a second anticonvulsant is added, again guarding against toxicity. Interaction between drugs can interfere with their rate of metabolic degradation. The initial, failed anticonvulsant is then withdrawn gradually. Once seizures are controlled, the drug should be continued *without interruption* until at least 1 yr is seizure-free. At that time, discontinuing the drug should be considered, because about 2/3 of such patients remain seizure-free without drugs. Static encephalopathy and structural brain lesions increase the risk of relapse off medication. Patients whose attacks were initially difficult to control, those who failed a drug-free trial, and those with important social reasons for avoiding seizures should be treated indefinitely.

The most effective anticonvulsants for long-term use and their doses for children and adults are given in Table 172-3. Once the drug response is known, blood levels are less useful to follow than the clinical course. Some patients have toxic symptoms at low levels; others tolerate high levels without symptoms.

**For generalized tonic-clonic seizures,** phenytoin, carbamazepine, or valproate is the drug of choice. For adults, phenytoin can be given in divided doses or at bedtime. If seizures continue, the dose can be increased cautiously to 500 mg/day with blood level monitoring. At a higher dose, dividing the daily dose may reduce toxic symptoms.

**For partial seizures,** treatment begins with carbamazepine, phenytoin, or valproate. If seizures persist despite high doses of these drugs, gabapentin, lamotrigine, or topiramate may be added.

**For absence seizures,** ethosuximide orally is preferred. Valproate and clonazepam orally are effective, but tolerance to clonazepam often develops. Acetazolamide is reserved for refractory cases.

**Atonic seizures, myoclonic seizures, and infantile spasms** are difficult to treat. Valproate is preferred, followed, if unsuccessful, by clonazepam. Ethosuximide is sometimes effective, as is acetazolamide (in dosages as for absence seizures). Phenytoin has limited effectiveness. For infantile spasms, corticosteroids for 8 to 10 wk are often effective. The optimal corticosteroid regimen is controversial. ACTH 20 to 60 U/day IM may be used. A ketogenic diet may help but is difficult to maintain. Carbamazepine may make patients with primary generalized epilepsy and multiple seizure types worse.

**Status epilepticus** can be terminated by giving diazepam 10 to 20 mg (for adults) IV or up to 2 doses (if necessary) of lorazepam 4 mg IV. For children, IV diazepam up to 0.3 mg/kg or lorazepam up to 0.1 mg/kg is given. For adults, phenytoin 1.5 g IV may be given to prevent recurrence. Fosphenytoin, a water-soluble product, is an alternative that in equivalent doses reduces the incidence of hypotension and phlebitis. Anesthetic IV doses of phenobarbital, lorazepam, or pentobarbital may be necessary in refractory cases; in such instances, intubation and $O_2$ therapy are required to prevent hypoxemia.

In acute generalized tonic-clonic seizures due to febrile illnesses, ingestion of alcohol or other toxins, or acute metabolic disturbance, the causative condition must be treated as well as the seizures. Status epilepticus should be treated at once. If only one seizure has occurred, phenytoin should be given in full dosage (see Table 172-3) for 7 to 10 days; afterward, a decision concerning long-term therapy must be made. After a first seizure, 1/3 of patients have recurrent attacks, followed by chronic epilepsy. Anticonvulsants are of little value in preventing alcohol withdrawal seizures.

**Benign febrile convulsions** do not require treatment because of the favorable prognosis compared with the potential toxic effects of anticonvulsants in a young child. For patients with **complicated febrile seizures** or other risk factors for recurrence (listed above), recurrence rates for febrile seizures can be reduced by continuous prophylactic treatment with phenobarbital 5 to 10 mg/kg/day. However, no evidence suggests that such treatment of complicated febrile seizures prevents the development of recurrent nonfebrile seizures (epilepsy). Furthermore, phenobarbital given chronically to children measurably reduces their learning capacity.

***Adverse effects:*** Possible toxic effects of anticonvulsants are listed in Table 172-3. All anticonvulsants may cause an allergic scarlatiniform or morbilliform rash.

Patients receiving carbamazepine should have a CBC once a month for the first year of therapy. *If the WBC or RBC count decreases significantly, the drug should be discontinued immediately.* Patients receiving valproate should have liver function tests every 3 mo for 1 yr; if serum transaminases or ammonia levels increase significantly (to > 2 times the upper limit of normal), the drug should be discontinued. An increase in ammonia up to 1.5 times the upper limit of normal can be tolerated safely.

When an overdose reaction occurs, the amount of drug is reduced until the reaction subsides. When more serious acute poisoning occurs, the patient is given ipecac syrup or, if obtunded, is lavaged. After emesis or lavage, activated charcoal is administered, followed by a saline cathartic (eg, magnesium citrate). The suspect drug should be discontinued, and a new anticonvulsant started simultaneously.

**Fetal antiepileptic drug syndrome** (cleft lip, cleft palate, cardiac defects, microcephaly, growth retardation, developmental delay, abnormal facies, digital hypoplasia) occurs in 4% of the children of epileptic women who take anticonvulsants during pregnancy. Among commonly used drugs, carbamazepine appears to be the least teratogenic, but only slightly so; valproate may be the most teratogenic. Yet, because uncontrolled generalized seizures during pregnancy lead to fetal injury and death, continued treatment with anticonvulsants is generally advisable (see Ch. 249).

**Surgical therapy:** About 10 to 20% of patients have seizures that are refractory to medical treatment. Most patients whose seizures originate from a local area of abnormal brain function improve markedly when the epileptic focus is resected. Some are completely cured. Because extensive monitoring and skilled medical-surgical teamwork are required, these patients are best managed in specialized centers.

**Vagus nerve stimulation:** Intermittent electrical stimulation of the left vagus nerve with an implanted pacemaker-like device reduces the number of partial seizures by one third. After the device is programmed,

patients can activate it with a magnet when they sense a seizure is imminent. Vagus nerve stimulation is used as an adjunct to an anticonvulsant. Adverse effects include a deepening of the voice during stimulation, cough, and hoarseness. Complications are minimal. Duration of effectiveness is not well established.

*534*

# EXHIBIT  "J" # 5

# RESCUEHOUSE.COM
FIREFIGHTING, EMS AND POLICE WEB PORTAL

Home > EMS Terminology > postictal state

## POSTICTAL STATE

Period following a seizure that lasts between 5 and 30 minutes, characterized by labored respirations and some degree of altered mental status.

Posted by Chief, on April 30, 2004 04:52 AM

**FIREFIGHTER T-SHIRT AND DECALS STORE**
HOT PRODUCTS ON SALE NOW !
A RESCUEHOUSE.COM STORE

**FIREFIGHTERS**

Firefighter Poems >

Firefighter Jokes >

Firefighter History >

Firefighter Stories >

Firefighter Articles >

Firefighter Recipes >

Firefighter Tattoos >

Firefighter Pictures >

Firefighter Quizzes >

Firefighter Events >

Firefighter Guides >

Equipment Guide >

Firefighter Forum >

Firefighter Jobs >

Live Dispatch >

Firefighter Quotes >

Firefighter Pranks >

Links Directory >

Firefighter T-shirts >

**EMS**

EMS Poems >

EMS Jokes >

EMS Articles >

EMS Stories >

EMS History >

**ADVERTISEMENT**

**FIREFIGHTER T-SHIRTS DECALS**
ON SALE !
CLICK HERE

Ads by Goooooogle

**Adult Epilepsy Treatment**
Effective add on medication for partial onset seizures. Learn more.
www.lyrica.com

**LED Dash/Deck Lights**
Quality & value in emergency LED lights - built the way you want!
www.vehicleledtech.com

**Be a Fire Fighter**
Find Schools near you for a Career as a Fire Fighter. Learn More
www.Degree-Finder.com

**Emergency Medical Service**
News, Education, Features, Training Products, Discussion & More for EMS
www.emsresponder.com

Advertise on this site

535



Search 🔍 | ▌ | Home | Specialties | Resource Centers | Learning Centers | CME | Contributor Recruitment

[_____] 🔵

June 17, 2006

🔵 Articles ◖ Images ◖ CME   ▶Advanced Search        ▶Consumer Health      **Link to this site**

You are in: eMedicine Specialties > Medicine, Ob/Gyn, Psychiatry, and Surgery > Neurosurgery

# Penetrating Head Trauma

Rate this Article

Email to a Colleague

**Last Updated: November 8, 2004**

Get CME/CE for article

**Synonyms and related keywords:** open intracranial injuries, penetrating injuries, Glasgow Coma Scale, GCS, GCS score, traumatic brain injuries, TBIs, brain trauma, intercranial trauma, intracranial pressure, ICP, gunshot wounds, GSWs

| **Quick Find** |
| --- |
| Author Information |
| Introduction |
| Indications |
| Relevant Anatomy And Contraindications |
| Workup |
| Treatment |
| Complications |
| Outcome And Prognosis |
| Future And Controversies |
| Pictures |
| Bibliography |
| Click for related images. |

---

**AUTHOR INFORMATION**                    Section 1 of 11      Next⟩

Author Information Introduction Indications Relevant Anatomy And Contraindications Workup Treatment Complications Outcome And Prognosis Future And Controversies Pictures Bibliography

---

Author: **Federico C Vinas, MD**, Consulting Neurosurgeon, Department of Neurological Surgery, Halifax Medical Center

Coauthor(s): **Julie Pilitsis, MD**, Staff Physician, Department of Surgery, Division of Neurosurgery, Wayne State University

Federico C Vinas, MD, is a member of the following medical societies: American Association of Neurological Surgeons

Editor(s): **Michael G Nosko, MD, PhD**, Chief, Division of Neurosurgery, Director of Neurovascular Surgery, Medical Director of Neuroscience Unit, Associate Professor, Department of Surgery, University of Medicine and Dentistry at New Jersey; **Francisco Talavera, PharmD, PhD**, Senior Pharmacy Editor, eMedicine; **Ryszard M Pluta, MD, PhD**, Associate Professor, Neurosurgical Department Medical Research Center, Polish Academy of Sciences at Warsaw, Poland; Senior Researcher, Surgical Neurology Branch, National Institute of Neurological Disorders and Stroke, NIH; **Paolo Zamboni, MD**, Professor of Surgery; Chief, Day Surgery Unit; Director, Vascular Diseases Center, University of Ferrara, Italy; and **Lyal G Leibrock, MD †**, Former Professor and Chief, Department of Surgery, University of Nebraska College of Medicine

Disclosure

---

**INTRODUCTION**                    Section 2 of 11    ⟨Back  Top  Next⟩

Author Information Introduction Indications Relevant Anatomy And Contraindications Workup Treatment Complications Outcome And Prognosis Future And Controversies Pictures Bibliography

---

Traumatic brain injury (TBI) is the fourth leading cause of death in the United States and is the leading cause of death in persons aged 1-44 years. Approximately 2 million traumatic brain injuries occur each year, and an approximate $25 billion per year is spent in social and medical management of people with such injuries.

Analysis of the trauma literature has shown that 50% of all trauma deaths are secondary to TBI, and gunshot wounds to the head caused 35% of these (see Image 1). The current increase in firearm-

| **Continuing Education** |
| --- |
| CME available for this topic. Click here to take this CME. |

| **Patient Education** |
| --- |
| Brain and Nervous System Center |
| Brain Infection Overview |
| Brain Infection Causes |
| Brain Infection Symptoms |
| Brain Infection Treatment |



*536*

related violence and subsequent increase in penetrating head injury remains of concern to neurosurgeons in particular and to the community as a whole.

The definition of a penetrating head trauma is a wound in which a projectile breaches the cranium but does not exit it. Despite the prevalence of these injuries, the morbidity and mortality of penetrating head injury remains high. Improvements in the understanding of the mechanisms of injury and aggressive medical and surgical management of patients with these injuries may lead to improved outcomes.

This chapter focuses on the pathophysiology of both primary and secondary mechanisms of injury, describes the treatment of patients from presentation to discharge, and concludes with a discussion of possible complications and patient outcome. For excellent patient education resources, visit eMedicine's Brain and Nervous System Center. Also, see eMedicine's patient education article Brain Infection.

**History of the Procedure:** The earliest reported series about head injuries and their management appears in the Edwin Smith papyrus around 1700 BC, reporting 4 depressed skull fractures treated by the Egyptians by leaving the wound unbandaged, providing free drainage of the intracranial cavity, and anointing the scalp wound with grease. Hippocrates (460-357 BC) performed trephination for contusions, fissure fractures, and skull indentations. Galen's experience in 130-210 AD treating wounded gladiators led to recognition of a correlation between the side of injury and the side of motor loss.

During the Dark Ages, little progress was made in the surgical management of head wounds and medicine continued to hold a pessimistic view of head wounds with torn dura mater. In the 17th century, Richard Wiseman provided a better understanding of surgical management of penetrating brain injuries; he recommended the evacuation of subdural hematomas and the extraction of bone fragments. In his experience, deep wounds had a much worse prognosis than superficial ones.

Major advances in the management of penetrating craniocerebral injuries in the mid-19th century were related to the work of Louis Pasteur (1867), Robert Koch in bacteriology (1876), and Joseph Lister in asepsis (1867). Such advances dramatically reduced the incidence of local and systemic infections, as well as mortality.

**Problem:** In the past 20 years, a dramatic increase in the incidence of penetrating injuries to the brain has occurred. Gunshot wounds to the head have become the leading or second leading cause of head injury in many cities in the United States. These injuries are devastating to the patient, family, and society.

Siccardi et al (1991) prospectively studied a series of 314 patients with craniocerebral missile wounds and found that 73% of the victims died at the scene, 12% died within 3 hours of injury, and 7% died later, yielding a total mortality of 92% in his series. In another study, gunshot wounds were responsible for at least 14% of the head injury-related deaths from 1979-1986.

Age-adjusted death rates for injury by firearms have increased nearly every year since 1985. A study using multiple logistic regressions found that injury from firearms greatly increases the probability of death and that the victim of a gunshot wound to the head is approximately 35 times more likely to die than is a patient with a comparable nonpenetrating brain injury.

**Frequency:** A National Institutes of Health survey estimates that in the United States, 1.9 million persons annually experience a skull fracture or intracranial injury, and, of these cases, one-half have a suboptimal outcome. In 1992, firearms accounted for the largest proportion of deaths from traumatic brain injury in the United States, and gunshot wounds were the most common cause of mortality in African Americans.

**Etiology:** Penetrating head injuries can be the result of numerous intentional or unintentional events, including missile wounds, stab wounds, and motor vehicle or occupational accidents (nails, screwdrivers).

Stab wounds to the cranium typically are caused by a weapon with a small impact area and wielded at low velocity. The most common wound is a knife injury, although bizarre craniocerebral-perforating injuries have been reported that were caused by nails, metal poles, ice picks, keys, pencils, chopsticks, and power drills.

**Pathophysiology:** The pathological consequences of penetrating head wounds depend on the circumstances of the injury, including the properties of the weapon or missile, the energy of the impact, and the location and characteristics of the intracranial trajectory. Following the primary injury or impact, secondary injuries may develop. Secondary injury mechanisms are defined as pathological



Six experts present

Advancing the
Management of
Cardiovascular and
Metabolic Risk Factors:
The Role of the
Endocannabinoid
System

Earn AMA PRA
Category 1
Credits—FREE!

LEARN MORE  ▸

emedicine

emedicine

*537*

processes that occur after the time of the injury and adversely affect the ability of the brain to recover from the primary insult. A biochemical cascade begins when a mechanical force disrupts the normal cell integrity, producing the release of numerous enzymes, phospholipids, excitatory neurotransmitters (glutamate), Ca, and free oxygen radicals that propagate further cell damage.

## Missile wounds

Missiles range from low-velocity bullets used in handguns or shotguns to high-velocity metal-jacket bullets fired from military weapons (see Image 6). Low-velocity civilian missile wounds occur from air rifle projectiles, nail guns used in construction devices, stun guns used for animal slaughter, and shrapnel produced during explosions. Bullets can cause damage to brain parenchyma through 3 mechanisms: (1) laceration and crushing, (2) cavitation, and (3) shock waves. The injury may range from a depressed fracture of the skull resulting in a focal hemorrhage to devastating diffuse damage to the brain.

As stated previously, a wound in which the projectile breaches the cranium but does not exit is described technically as penetrating, and an injury in which the projectile passes entirely though the head, leaving both entrance and exit wounds, is described as perforating. This distinction has some prognostic implications. In a series of missile-related head injuries during the Iran-Iraq war, a poor postsurgical outcome occurred in 50% of patients treated for perforating wounds, as compared to only 20% of those with penetrating wounds.

In missile wounds, the amount of damage to the brain depends on numerous factors including (1) the kinetic energy imparted, (2) the trajectory of the missile and bone fragments through the brain, (3) intracranial pressure (ICP) changes at the moment of impact, and (4) secondary mechanisms of injury. The kinetic energy is calculated employing the formula $1/2mv^2$, where m is the bullet mass and v is the impact velocity.

At the time of impact, injury is related to (1) the direct crush injury produced by the missile, (2) the cavitation produced by the centrifugal effects of the missile on the parenchyma, and (3) the shock waves that cause a stretch injury. As a projectile passes through the head, tissue is destroyed and is either ejected out of the entrance or exit wounds or compressed into the walls of the missile tract. This creates both a permanent cavity that is 3-4 times larger than the missile diameter and a pulsating temporary cavity that expands outward. The temporary cavity can be as much as 30 times larger than the missile diameter and causes injury to structures a considerable distance from the actual missile tract.

## Stab wounds

This group of wounds represents a smaller fraction of penetrating head injuries. The causes may be from knives, nails, spikes, forks, scissors, and other assorted objects (see Image 2 and Image 3). Penetrations most commonly occur in the thin bones of the skull, especially in the orbital surfaces and the squamous portion of the temporal bone. The mechanisms of neuronal and vascular injury caused by cranial stab wounds may differ from those caused by other types of head trauma. Unlike missile injuries, no concentric zone of coagulative necrosis caused by dissipated energy is present. Unlike motor vehicle accidents, no diffuse shearing injury to the brain occurs.

Unless an associated hematoma or infarct is present, cerebral damage caused by stabbing is largely restricted to the wound tract. A narrow elongated defect, or so-called slot fracture, sometimes is produced by a stab wound and is diagnostic when identified. However, in some cases in which skull penetration is proven, no radiological abnormality can be identified. In a series of stab wounds, de Villiers (1975) reported a mortality of 17%, mostly related to vascular injury and massive intracerebral hematomas.

Stab wounds to the temporal fossa are more likely to result in major neurological deficits because of the thinness of the temporal squama and the shorter distance to the deep brain stem and vascular structures. Patients in whom the penetrating object is left in place have a significantly lower mortality than those in whom the objects are inserted and then removed (26% versus 11% respectively).

## Skull perforations and fractures

The local variations in thickness and strength of the skull and the angle of the impact determine the severity of the fracture and injury to the brain (see Image 4 and Image 5). Impacts striking the skull at nearly perpendicular angles may cause bone fragments to travel along the same trajectory as the penetrating object, to shatter the skull in an irregular pattern, or to produce linear fractures that radiate away from the entry defect. Grazing or tangential impacts produce complex single defects with both internal and external beveling of the skull, with varied degrees of brain damage.

*538*

**Clinical:** The clinical condition of the patient depends mainly on the mechanism (velocity, kinetic energy), anatomical location of the lesions, and associated injuries.

### Traumatic intracranial hematomas

These can occur alone or in combination and constitute a common and treatable source of morbidity and mortality resulting from brain shift, brain swelling, cerebral ischemia, and elevated ICP. Patients present with the signs and symptoms of an expanding intracranial mass, and the clinical course varies according to the location and rate of accumulation of the hematoma. The classic clinical picture of epidural hematomas is described as involving a lucid interval following the injury; the patient is stunned by the blow, recovers consciousness, and lapses into unconsciousness as the clot expands.

### Epidural hematomas

Most traumatic epidural hematomas become rapidly symptomatic with progression to coma. Acute subdural hematoma occurs in association with high rates of acceleration and deceleration of the head that takes place at the time of trauma. This remains one of the most lethal of all head injuries because the impact causing acute subdural hematoma commonly results in associated severe parenchymal brain injuries.

### Intracerebral hematomas

These result from direct rupture of small vessels within the parenchyma at the moment of impact. Patients typically present with a focal neurological deficit related to the location of the hematoma or with signs of mass effect and increased ICP. The occurrence of delayed traumatic intracerebral hematomas is well documented in the literature.

### Delayed intracerebral hematomas

The time interval for the development of delayed intracerebral hematomas ranges from hours to days. Although these lesions may develop in areas of previously demonstrated contusion, they frequently occur in the presence of completely normal results on the initial computed tomography (CT) scan. Patients with this diagnosis typically meet the following criteria: (1) a definite history of trauma, (2) an asymptomatic interval, and (3) an apoplectic event with sudden clinical deterioration.

### Contusions

These consist of areas of perivascular hemorrhage about small blood vessels and necrotic brain. Typically, they assume a wedgelike shape, extending through the cortex to the white matter. When the pia-arachnoid layer is torn, the injury is termed a cerebral laceration. Clinically, cerebral contusions serve as niduses for delayed hemorrhage and brain swelling, which can cause clinical deterioration and secondary brain injury.

### Traumatic subarachnoid hemorrhage

This type of hemorrhage usually is a result of various forces that produce stress sufficient to damage superficial vascular structures running in the subarachnoid space. Traumatic subarachnoid hemorrhage may predispose to cerebral vasospasm and diminished cerebral blood flow, thereby increasing morbidity and mortality as a result of secondary ischemic damage.

### Diffuse axonal injury or shearing injury

This has become recognized as one of the most important forms of primary injury to the brain. In the most extreme form, patients present with immediate prolonged unconsciousness from the moment of injury and subsequently remain vegetative or severely impaired.

| **INDICATIONS** | Section 3 of 11 | [Back Top Next] |
|---|---|---|

Author Information  Introduction  Indications  Relevant Anatomy And Contraindications  Workup  Treatment  Complications
Outcome And Prognosis  Future And Controversies  Pictures  Bibliography

A critical factor in early treatment decisions and in long-term outcome after penetrating head injuries is the patient's initial level of consciousness. Although many methods of defining level of consciousness exist, the most widely used measure is the Glasgow Coma Scale (GCS) introduced by Teasdale and Jennett in 1974.

Glasgow Coma Scale

| Points | Eye Opening | Best Verbal | Best Motor |
|---|---|---|---|

*539*

| 6 | ... | ... | Follows commands |
|---|-----|-----|------------------|
| 5 | ... | Appropriate | Localizes pain |
| 4 | Spontaneous | Inappropriate | Withdraws to pain |
| 3 | In response to voice | Moaning | Flexion (decorticate) |
| 2 | In response to pain | Incomprehensible | Extension (decerebrate) |
| 1 | None | None | None |

The level of consciousness can be lowered independent of head injury for numerous reasons, including shock, hypoxia, hypothermia, alcohol intoxication, postictal state, and administration of sedatives or narcotics. Therefore, a more reliable assessment of severity and, thus a more meaningful predictor of outcome, is provided by the postresuscitation GCS score (hereafter referred to as GCS), which generally refers to the best level obtained within the first 6-8 hours of injury following nonsurgical resuscitation. This allows patients to be categorized into 3 levels, as follows:

- Minor or mild injury includes those patients with an initial level of 13-15.

- Moderate injury includes patients with a score of 9-12.

- Severe injury refers to a postresuscitation level of 3-8 or a subsequent deterioration to 8 or less.

Patients with severe head injury typically fulfill the criteria for coma, have the highest incidence of intracranial mass lesions, and require intensive medical and, often, surgical intervention.

## RELEVANT ANATOMY AND CONTRAINDICATIONS

Section 4 of 11    [Back  Top  Next]

Author Information Introduction Indications Relevant Anatomy And Contraindications Workup Treatment Complications Outcome And Prognosis Future And Controversies Pictures Bibliography

**Relevant Anatomy:** Penetrating objects to the cranium must traverse through the scalp, through the skull bones, and through the dura mater before reaching the brain.

The scalp consist of 5 different anatomical layers that include the skin (S); the subcutaneous tissue (C); the galea aponeurotica (A), which is continuous with the musculoaponeurotic system of the frontalis, occipitalis, and superficial temporal fascia; underlying loose areolar tissue (L); and the skull periosteum (P).

The subcutaneous layer possesses a rich vascular supply that contains an abundant communication of vessels that can result in a significant blood loss when the scalp is lacerated. The relatively poor fixation of the galea to the underlying periosteum of the skull provides little resistance to shear injuries that can result in large scalp flaps or so-called scalping injuries. This layer also provides little resistance to hematomas or abscess formation, and extensive fluid collections related to the scalp tend to accumulate in the subgaleal plane.

The bones of the calvarium have 3 distinct layers in the adult—the hard internal and external tables and the cancellous middle layer, or diploë. Although the average thickness is approximately 5 mm, the thickest area is usually the occipital bone and the thinnest is the temporal bone. The calvarium is covered by periosteum on both the outer and inner surfaces. On the inner surface, it fuses with the dura to become the outer layer of the dura.

Aesthetically, the frontal bone is the most important because only a small portion of the frontal bone is covered by hair. In addition, it forms the roof and portions of the medial and lateral walls of the orbit. Displaced frontal fractures therefore may cause significant deformities, exophthalmus, or enophthalmos. The frontal bone also contains the frontal sinuses, which are paired cavities located between the inner and outer lamellae of the frontal bone. The lesser thickness of the anterior wall of the frontal sinus makes this area more susceptible to fracture than the adjacent tempora-orbital areas.

The dura mater or pachymeninx is the thickest and most superficial meninx. It consists of 2 layers—a superficial layer that fuses with the periosteum and a deeper layer. In the same region between both layers, large venous compartments or sinuses are present. A laceration through these structures can produce significant blood loss or be responsible for producing epidural or subdural hematomas.

*540*

**WORKUP**                                                   Section 5 of 11 〔**Back Top Next**〕

Author Information Introduction Indications Relevant Anatomy And Contraindications Workup Treatment Complications Outcome And Prognosis Future And Controversies Pictures Bibliography

**Lab Studies:**

- The assessment of patients with penetrating brain injuries should include routine laboratory tests, electrolytes, and coagulation profile.

- Many patients have lost a significant amount of blood before reaching the emergency department or might present with disseminated intravascular coagulation (DIC); consequently, determining the hemoglobin concentration and platelet count is important.

- Type and cross match should always be obtained with the initial orders.

- Obtaining a toxicology screen, including alcohol levels, also is appropriate.

**Imaging Studies:**

- Radiological evaluation

  o The radiological methods of evaluation depend on the patient's condition.

  o In general, a lateral cervical spine and chest x-rays are obtained in the resuscitation room.

  o A CT scan of the head should be obtained as soon as the patient's cardiopulmonary condition has been stabilized to determine the extent of intracranial damage and the presence of intracranial metallic fragments. The study always should include bone windows to evaluate for fractures, especially when the skull base or orbits are compromised.

  o Some centers can perform computed tomographic angiography (CTA) for the evaluation of intracranial and extracranial vessels.

- Cerebral angiography: If a vascular injury is suspected and the patient is stable, cerebral angiography often is used to diagnose injuries such as carotid and/or vertebral artery dissections, traumatic pseudoaneurysms, or arteriovenous fistulas.

- Magnetic resonance imaging

  o In patients with penetrating injuries and intracranial metallic fragments, an MRI scan is contraindicated. If the presence of bullets or intracranial metallic fragments has been ruled out, an MRI scan of the brain provides valuable information on posterior fossa structures and the extent of sharing injuries.

  o A fluid-attenuated inversion recovery (FLAIR) sequence allows the evaluation of contusions or hemorrhages.

  o Diffusion or perfusion scan sequences are useful to evaluate areas of stroke or cerebral ischemia.

  o Magnetic resonance angiography (MRA) and magnetic resonance venogram (MRV) are useful if vascular or sinus injuries are suspected.

**TREATMENT**                                                   Section 6 of 11 〔**Back Top Next**〕

Author Information Introduction Indications Relevant Anatomy And Contraindications Workup Treatment Complications Outcome And Prognosis Future And Controversies Pictures Bibliography

**Medical therapy:** Patients with severe penetrating injuries should receive resuscitation according to the Advanced Trauma Life Support guidelines. Specific indications for endotracheal intubation include inability to maintain adequate ventilation, impending airway loss from neck or pharyngeal injury, poor airway protection associated with depressed level of consciousness, and/or the potential for neurological deterioration.

Virtually all individuals with an admission GCS of 8 or less meet these criteria. A systolic blood pressure of at least 90 mm Hg should be maintained. In a large series of patients with severe traumatic brain injury, a single episode in which systolic blood pressure fell below 90 mm Hg was associated with an 85% increase in morbidity. Isotonic saline (0.9% NaCl) is the most common preparation for volume resuscitation. In general, the acute loss of as much as 20% of total blood volume can be replaced with crystalloid solution, while loss of 30% or more requires replacement with blood.

The cervical spine is stabilized, and a careful examination for injuries to the neck, chest, abdomen, pelvis, and extremities is

*541*

sterile conditions.

- The patient's head is positioned at a higher level than the chest.

- The head draping should cover all of the available surface of the scalp to allow extension of the surgical incision beyond the actual confines of the wound or to allow possible scalp rotation procedures.

- The skin incision is planned so that the blood supply to the scalp is not compromised.

- Fresh frozen plasma and platelets should be administered (1) when an elevated prothrombin time (PT) or elevated activated partial thromboplastin time (aPTT) suggests a coagulopathy in a patient who requires evacuation of an intracranial hematoma or (2) if an intraoperative coagulopathy is suspected.

**Intraoperative details:**

- Often a craniotomy or craniectomy with removal of accessible bone fragments and foreign bodies is performed.

- Gentle debridement of devitalized brain is performed using a combination of suction and irrigation.

- In gun shot wounds, the bullet is not removed unless it is easily accessible because the risk of brain injury from the retrieval of the bullet exceeds the benefit of its removal.

- In cases of stab wounds, the knife or penetrating object should not be removed until the dura is opened in the operating room and the procedure can be performed under direct vision.

- In all cases, the surgeon should be prepared to manage potential vascular injuries that may be encountered. The importance of a watertight dural closure cannot be overemphasized in order to prevent centripetal infection and CSF fistula.

- If a dural defect is present, pericranium or temporalis fascia may be needed for the dural repair. The use of artificial synthetic or biological dural substitutes should be avoided.

- Patients with penetrating head injury often require cranioplasty secondary to craniectomy and/or damage by the missile. Cranioplasty should be delayed for approximately 1 year, when the patient is medically stable and risk of infectious complications is low.

**Postoperative details:** The same principles discussed under <u>Medical therapy</u> apply to the postoperative care of patients with penetrating head trauma. An ICP monitor or a ventricular drain usually is placed intraoperatively in patients with a GCS of 8 or less. This is placed to monitor and maintain an adequate cerebral perfusion pressure. If the patient is neurologically stable, a CT scan is obtained 24-72 hours postoperatively.

**Follow-up care:** Patients' cases are followed up clinically with standard neurological checks, and their vital signs are assessed every hour. Routine laboratory tests are performed as needed.

The follow-up radiological studies to be obtained depend on the patient's neurological evolution but typically consist of serial CT examinations.

---

## COMPLICATIONS                                                    Section 7 of 11  〔Back  Top  Next〕

Author Information  Introduction  Indications  Relevant Anatomy And Contraindications  Workup  Treatment  Complications  Outcome And Prognosis  Future And Controversies  Pictures  Bibliography

---

Patients who survive penetrating craniocerebral injuries are at risk of experiencing multiple complications, including persistent neurological deficits, infections, epilepsy, CSF leak, cranial nerve deficits, pseudoaneurysms, arteriovenous fistulas, and hydrocephalus.

**Intracranial infections**

These infections can complicate as many as 11% of penetrating craniocerebral injuries. Therefore, prevention and proper management of infectious complications can lead to improved outcome in these patients. Patients can develop meningitis, epidural abscess, subdural empyema, or brain abscess.

- Posttraumatic meningitis usually is associated with skull fractures or CSF leak.

- Cranial epidural abscess is an uncommon infection that most often occurs secondary to osteomyelitis or because of foreign bodies. The purulent collection remains well localized due to the tight adherence of the dura to the overlying calvarium; however, cranial epidural abscess can cause meningitis and subdural empyema associated with significant morbidity and mortality.

*543*

- The most frequent source of subdural empyema is penetration through adjacent facial infections, such as paranasal sinusitis or mastoiditis.

- Brain abscess can occur after a long period of silent infection. Hida et al (1978) reported a case of delayed brain abscess following a penetrating gunshot injury, found 38 years after the insult. The treatment of epidural abscess, subdural empyema, and brain abscess consists of prompt surgical intervention followed by prolonged antibiotic therapy.

## Epilepsy

The incidence of posttraumatic epilepsy varies widely, depending on the type and severity of the injury. In closed head injury, the incidence of posttraumatic epilepsy varies from 2.9-17% for moderate and severe head injury. In contrast, the incidence of epilepsy for military craniocerebral missile wounds is twice as high; most series report a 5- to 10-year incidence of seizures of 32-51%.

## Cerebrospinal fluid leak

Head trauma is the most common cause of CSF leak. Meningitis occurs in approximately 20% of acute (within 1 wk) posttraumatic leaks and 57% of delayed posttraumatic leaks. The use of prophylactic antibiotics administration for CSF leak has been demonstrated to lead to serious infections, including drug-resistant meningitis.

Patients with posttraumatic CSF leak initially are treated conservatively with bed rest in a position that results in decrease or cessation of the fistulous drainage. If the drainage has not ceased within 24-48 hours, a lumbar drain is inserted and drained at a rate of 10 cc of CSF per hour for 5-7 days. A lumbar drain should not be inserted in patients with significant pneumocephalus. During CSF drainage, progressive diminution of the level of consciousness should alert the clinician to the possibility of pneumocephalus. If the CSF leak does not stop with the lumbar drainage, a surgical intervention to repair the fistulous tract may be indicated.

Vascular injuries may result from direct injury of the vessels by the penetrating object, blast effect at the time of trauma, or by skull fractures or bone fragments producing vascular occlusion. Direct vascular injuries sustained at the time of head injury initially may be clinically silent and may remain so for weeks, months, or years. In addition, delayed posttraumatic pseudoaneurysms can appear weeks to months after the injury.

## Cranial nerve deficits

Patients who experience an injury to the temporal area and/or have a fracture of the temporal bone are especially at risk for carotid artery injury as well as injury to the facial nerve. Hence, in patients who experience penetrating brain injuries, maintaining a high index of suspicion and obtaining follow-up radiological studies, usually via cerebral angiography, is important.

## Pseudoaneurysm

Pseudoaneurysms may result in a perturbation of the normal blood flow and can act as foci of thrombus formation, or they can rupture, causing a subarachnoid or intracerebral hematoma. They usually require surgical or endovascular treatment. The role of anticoagulation in the treatment of pseudoaneurysms remains controversial, but it may be beneficial in minimizing thrombus propagation and embolization.

## Arteriovenous fistula

Arterial dissections occur when a laceration through the intima and sometimes the media permits entry of blood and separation of these inner and outer vascular layers, compromising the vessel lumen. They usually present with transient ischemic attacks or symptoms of stroke. Nonsurgical management of arterial dissections with chronic anticoagulation usually is effective.

Probably the best-recognized posttraumatic arteriovenous fistula is the posttraumatic carotid-cavernous sinus fistula. In general, these fistulae are associated with the blast injury rather than the intracranial penetration, they usually are high-flow fistulas, and they are clinically characterized by a clinical syndrome consisting of pulsating exophthalmos, chemosis, and bruit. Carotid-cavernous fistulae can be diagnosed by a cerebral angiography and are best treated by endovascular occlusion.

| **OUTCOME AND PROGNOSIS** | Section 8 of 11 [Back  Top  Next] |
| --- | --- |

Author Information Introduction Indications Relevant Anatomy And Contraindications Workup Treatment Complications Outcome And Prognosis Future And Controversies Pictures Bibliography

Many studies have attempted to associate various prognostic factors with outcome. The most important prognostic factor currently recognized is the GCS after cardiopulmonary resuscitation. Traditionally, the higher the GCS after resuscitation, the better the patient outcome. However, concern has developed that, because patients who present in coma are thought to have a dismal prognosis, less aggressive management often is employed, contributing to the poorer outcome.

Studies over the last decade have examined the outcome of patients with a postresuscitation GCS of 3-5 who underwent aggressive medical and surgical management. Grahm et al (1990) found that no patient in a study of 100 patients with

*544*

postresuscitation GCS of 3-5 had a satisfactory outcome (good/moderately disabled). They also found that no patients with a GCS of 6-8 and bihemispheric or multilobar dominant hemisphere injuries had a satisfactory outcome.

In a review of 190 patients, Levy et al (1994) found that only 2 patients with a GCS of 3-5 achieved a moderately disabled outcome. Further analysis showed that these patients had reactive pupils at admission and did not have bihemispheric/multilobar dominant hemispheric injuries. They concluded that surgical intervention is not beneficial in most patients with a GCS of 3-5 but may be beneficial for the rare patient with reactive pupils but without ominous findings on CT scan. Despite these studies, some controversy remains regarding surgery performed on patients with a GCS of less than 9 and especially regarding patients with a GCS of less than 5.

Other poor prognostic factors include age, suicide attempt, and through-and-through injuries. Patients who present with high ICP and/or hypotension also tend to have worse outcomes. CT scan findings associated with poor outcome include (1) bihemispheric injury, (2) intraventricular and/or subarachnoid hemorrhage, (3) mass effect and midline shift, (4) evidence of herniation, and/or (5) hematomas greater than 15 mL on CT scan. Morbidity and mortality rates associated with penetrating brain injury remain unacceptably high. For patients presenting with a GCS of 3-5, mortality rates remain near 90%, and a satisfactory outcome as defined by the GCS only rarely occurs. Patients presenting with a GCS of 6-8 have a more variable outcome that may be related to differences in management and/or the smaller numbers of patients presenting in this category. Patients with a GCS greater than 9 have much lower mortality rates. Approximately one half of these patients make good recoveries, and 90% have satisfactory outcomes.

---

## FUTURE AND CONTROVERSIES                    Section 9 of 11  [Back  Top  Next]

Author Information  Introduction  Indications  Relevant Anatomy And Contraindications  Workup  Treatment  Complications  Outcome And Prognosis  Future And Controversies  Pictures  Bibliography

---

Many penetrating head injuries are incompatible with life, and people with these injuries often die almost immediately. Moderately injured patients more frequently are resuscitated and receive treatment. Upon presentation, beginning aggressive medical and surgical treatment is important in patients who may benefit from these interventions. Aggressive treatment of secondary mechanisms of injury must be initiated, and the patient must be monitored closely for possible complications.

Kaufman et al (1991) found that considerable variability exists among neurosurgeons currently as to what constitutes appropriate treatment of penetrating head injury. In particular, wide variations exist in the amount of surgical debridement performed, the use of ICP monitoring, and the use of various medical therapies. Duration of antiepileptics and antibiotics remains controversial, as does the use of hyperventilation, hypothermia, and steroids. Use of jugular bulb catheters and transcranial Doppler is institution-dependent.

Considerable research continues in the area of neurotrauma. Once secondary mechanisms of injury are better understood and treatment modalities are studied in prospective randomized clinical trials, less variation in management of penetrating head injury is likely to occur. The medical community as a whole will become more successful in the treatment of these patients.

Aggressive intensive care management in combination with surgical intervention, when appropriate, already have reduced the mortality and morbidity associated with these injuries significantly. Primary prevention of these injuries remains important. With the increasing numbers of firearms and firearm-related violence in our society, discussing the issues of violence with patients and offering appropriate intervention becomes the duty of all physicians.

---

## PICTURES                                     Section 10 of 11  [Back  Top  Next]

Author Information  Introduction  Indications  Relevant Anatomy And Contraindications  Workup  Treatment  Complications  Outcome And Prognosis  Future And Controversies  Pictures  Bibliography

---

**Caption:** Picture 1. A young male arrived in the emergency department after experiencing a gunshot wound to the brain. The entrance was on the left occipital region. A CT scan shows the skull fracture and a large underlying cerebral contusion. The patient was taken to the operating room for debridement of the wound and skull fracture, with repair of the dura mater. He was discharged in good neurological condition, with a significant visual field defect.


View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** CT

**Caption:** Picture 2. Lateral skull x-ray film of a young female who presented to the

*545*

emergency department with a stab wound to the head produced by a large knife (see Image 3).



View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** X-RAY

**Caption:** Picture 3. A CT scan of a young female who presented to the emergency department with a stab wound to the head produced by a large knife shows the extent of intracranial damage, affecting midline structures (see Image 2).



View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** CT

**Caption:** Picture 4. Lateral skull x-ray film of a patient who presented with a severe intracranial injury produced by a golf club (see Image 5).



View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** X-RAY

**Caption:** Picture 5. The patient presented to the emergency department with a golf club in his head. The club was removed in the operating room (see Image 4).



View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** Photo

546

**Caption:** Picture 6. A 65-year-old man experienced a gunshot wound to the right frontoparietal region. A CT scan shows that the bullet crossed the midline, lacerating the superior longitudinal sinus and producing a large midline subdural hematoma. The patient presented with a Glasgow Coma Scale (GCS) score of 4 and died.



View Full Size Image

eMedicine Zoom View (Interactive!)

**Picture Type:** CT

---

**BIBLIOGRAPHY**                                    Section 11 of 11  [Back  Top

Author Information  Introduction  Indications  Relevant Anatomy And Contraindications  Workup  Treatment  Complications  Outcome And Prognosis  Future And Controversies  Pictures  Bibliography

---

- Aarabi B: Causes of infections in penetrating head wounds in the Iran-Iraq War. Neurosurgery 1989 Dec; 25(6): 923-6[Medline].
- Aarabi B: Traumatic aneurysms of brain due to high velocity missile head wounds. Neurosurgery 1988 Jun; 22(6 Pt 1): 1056-63[Medline].
- Aarabi B: History of the management of craniocerebral wounds. In: Aarabi B, Kaufman HH, Dagi TF, George ED, Levy ML, eds. Missile Wounds of the Head and Neck. Vol 1 . Park Ridge, Ill: American Association of Neurological Surgeons; 1999: 281-292.
- American College of Surgeons: Advanced Trauma Life Support Guidelines. Advanced Trauma Life Support Course. American College of Surgeons 1999.
- Annegers JF, Hauser WA, Coan SP: A population-based study of seizures after traumatic brain injuries. N Engl J Med 1998 Jan 1; 338(1): 20-4[Medline].
- Arabi B: Surgical outcome in 435 patients who sustained missile head wounds during the Iran-Iraq War. Neurosurgery 1990 Nov; 27(5): 692-5; discussion 695[Medline].
- Baker CC, Oppenheimer L, Stephens B: Epidemiology of trauma deaths. Am J Surg 1980 Jul; 140(1): 144-50[Medline].
- Benzel EC, Day WT, Kesterson L: Civilian craniocerebral gunshot wounds. Neurosurgery 1991 Jul; 29(1): 67-71; discussion 71-2[Medline].
- Breased JH: The Edwin Smith Surgical Papyrus. In: The Edwin Smith Surgical Papyrus. Vol 1. Chicago, Ill: University of Chicago Press; 1930: 165-166.
- Centers for Disease Control: Traumatic brain injury--Colorado, Missouri, Oklahoma, and Utah, 1990- 1993. MMWR Morb Mortal Wkly Rep 1997 Jan 10; 46(1): 8-11[Medline].
- Chesnut RM, Marshall LF, Marshall SB: Medical management of intracranial pressure. In: Cooper PR, ed. Head Injury, 3rd ed. Baltimore, Md: Williams & Wilkins; 1993: 225-246.
- Dagi TF, Meyer FB, Poletti CA: The incidence and prevention of meningitis after basilar skull fracture. Am J Emerg Med 1983 Nov; 1(3): 295-8[Medline].
- De Villiers JC: Stab wounds of the brain and skull. In: Vinken PJ, Bruyn GW, eds. Handbook of clinical neurology. Vol 23. New York, NY: Elsevier Science Publishing; 1975: 407-503.
- Feldman J, Narayan RK, Robertson CS: Secondary insults associated with severe closed head injury. Contemporary Neurosurgery 1992; 14: 1-8.
- Giannotta SL, Gruen P: Vascular complications of head trauma. In: Barrow DL, ed. Complications and sequelae of head injury. Park Ridge, Ill: American Association of Neurological Surgeons; 1992: 31-49.
- Goldstein M: Traumatic brain injury: a silent epidemic. Ann Neurol 1990 Mar; 27(3): 327[Medline].
- Grahm TW, Williams FC Jr, Harrington T: Civilian gunshot wounds to the head: a prospective study. Neurosurgery 1990 Nov; 27(5): 696-700; discussion 700[Medline].
- Harris ME, Barrow D: Traumatic carotid-cavernous fistulas. In: Barrow DL, ed. Complications and sequelae of head injury. Park Ridge, Ill: American Association of Neurological Surgeons; 1992: 13-30.
- Hida K, Tsuda E, Sato H: Brain abscess discovered 38 years after head injury (author's transl). No Shinkei Geka 1978 Aug; 6(8): 811-3[Medline].
- Kaufman HH, Timberlake G, Voelker J: Medical complications of head injury. Med Clin North Am 1993 Jan; 77(1): 43-60[Medline].
- Kaufman HH, Schwab K, Salazar AM: A national survey of neurosurgical care for penetrating head injury. Surg Neurol

- Knightly JJ, Pulliam MW: Military head injuries. In: Narayan R, Wilberger J, Povlishock J, eds. Neurotrauma. New York, NY: McGraw Hill; 1996.
- Levy ML, Masri LS, Lavine S: Outcome prediction after penetrating craniocerebral injury in a civilian population: aggressive surgical management in patients with admission Glasgow Coma Scale scores of 3, 4, or 5. Neurosurgery 1994 Jul; 35(1): 77-84; discussion 84-5 [Medline].
- Muizelaar JP, Marmarou A, Ward JD: Adverse effects of prolonged hyperventilation in patients with severe head injury: a randomized clinical trial. J Neurosurg 1991 Nov; 75(5): 731-9 [Medline].
- Phillips ED: Greek Medicine. London, UK: Thames & Hudsen; 1973.
- Price DJ, Sleigh JD: Control of infection due to Klebsiella aerogenes in a neurosurgical unit by withdrawal of all antibiotics. Lancet 1970 Dec 12; 2(7685): 1213-5 [Medline].
- Rezai AR, Lee M, Kite C: Traumatic posterior cerebral artery aneurysm secondary to an intracranial nail: case report. Surg Neurol 1994 Oct; 42(4): 312-5 [Medline].
- Rosenberg WS, Harsh GR: Penetraing wounds of the head. In: Wilkins RH, Rengachary SS, eds. Neurosurgery. Vol 2. New York, NY: McGraw Hill; 1996: 2813-2820.
- Rosenwasser RH, Andrews DW, Jimenez DF: Penetrating craniocerebral trauma. Surg Clin North Am 1991 Apr; 71(2): 305-16 [Medline].
- Salazar AM, Aarabi B, Levi L: Postraumatic epilepsy following craniocerebral missile wounds in recent armed conflicts. In: Aarabi B, Kaufman HH, Dagi TF, George ED, Levy ML, eds. Missile Wounds of the Head and Neck. Vol 2. Park Ridge, Ill: American Association of Neurological Surgeons; 1999: 281-292.
- Siccardi D, Cavaliere R, Pau A: Penetrating craniocerebral missile injuries in civilians: a retrospective analysis of 314 cases. Surg Neurol 1991 Jun; 35(6): 455-60 [Medline].
- Sosin DM, Sacks JJ, Smith SM: Head injury-associated deaths in the United States from 1979 to 1986. JAMA 1989 Oct 27; 262(16): 2251-5 [Medline].
- Sosin DM, Sniezek JE, Waxweiler RJ: Trends in death associated with traumatic brain injury, 1979 through 1992. Success and failure. JAMA 1995 Jun 14; 273(22): 1778-80 [Medline].
- Stack BC Jr, Farrior JB: Missile injuries to the temporal bone. South Med J 1995 Jan; 88(1): 72-8 [Medline].
- Stiernberg CM, Jahrsdoerfer RA, Gillenwater A: Gunshot wounds to the head and neck. Arch Otolaryngol Head Neck Surg 1992 Jun; 118(6): 592-7 [Medline].
- Temkin NR, Dikmen SS, Wilensky AJ: A randomized, double-blind study of phenytoin for the prevention of post-traumatic seizures. N Engl J Med 1990 Aug 23; 323(8): 497-502 [Medline].
- Torner JC, Choi S, Barnes TY: Epidemiology of head injuries. In: Marion DW, ed. Traumatic Brain Injury. New York, NY: Thieme; 1999: 9-25.
- Trask TW, Narayan RK: Civilian Penetrating Head Injury. In: Narayan R, Wilberger J, Povlishock, J, eds. Neurotrauma. New York, NY: McGraw Hill; 1996: 868-889.
- Verweij BH, Muizelaar JP, Vinas FC: Mitochondrial dysfunction after experimental and human brain injury and its possible reversal with a selective N-type calcium channel antagonist (SNX-111). Neurol Res 1997 Jun; 19(3): 334-9 [Medline].
- Vetter H, Kolloch R, Appenheimer M: [Effect of a chronic alpha adrenergic receptor blockade on basal secretion of renin in essential hypertension]. Schweiz Med Wochenschr 1978 Dec 9; 108(49): 1978-81 [Medline].
- Vinas FC: Clinical Uses of Laser Doppler in the Intensive care Unit. Critical Reviews in Neurosurgery 1999; 9: 28-33.
- Vinas FC, Verweij B, Muizelaar P: Invasive monitoring of cerebral oxygenation. Critical Reviews in Neurosurgery 1998; 8: 31-40.
- Wald SL: Advances in the early management of patients with head injury. Surg Clin North Am 1995 Apr; 75(2): 225-42 [Medline].
- Waxweiler RJ, Thurman D, Sniezek J: Monitoring the impact of traumatic brain injury: a review and update. J Neurotrauma 1995 Aug; 12(4): 509-16 [Medline].
- Weigelt JA: Resuscitation and initial management. Crit Care Clin 1993 Oct; 9(4): 657-71 [Medline].
- West CG: A short history of the management of penetrating missile injuries of the head. Surg Neurol 1981 Aug; 16(2): 145-9 [Medline].

| NOTE: |
| --- |
| Medicine is a constantly changing science and not all therapies are clearly established. New research changes drug and treatment therapies daily. The authors, editors, and publisher of this journal have used their best efforts to provide information that is up-to-date and accurate and is generally accepted within medical standards at the time of publication. However, as medical science is constantly changing and human error is always possible, the authors, editors, and publisher or any other party involved with the publication of this article do not warrant the information in this article is accurate or complete, nor are they responsible for omissions or errors in the article or for the results of using this information. The reader should confirm the information in this article from other sources prior to use. In particular, all drug doses, indications, and contraindications should be confirmed in the package insert. FULL DISCLAIMER |

Penetrating Head Trauma excerpt

**HON CODE** We subscribe to the HONcode principles of the Health On the Net Foundation

© 1996-2006 by WebMD. All Rights Reserved.

*548*

# EXHIBIT  "J" # 6

×49

**MedlinePlus®**
Trusted Health Information for You

A service of the U.S. NATIONAL LIBRARY OF MEDICINE
and the NATIONAL INSTITUTES OF HEALTH

Print this page    Close this window

# Medical Encyclopedia: Head injury

URL of this page: http://www.nlm.nih.gov/medlineplus/ency/article/000028.htm

**Alternative names**

Concussion - first aid; Brain injury; Head trauma

**Definition**

A head injury is any trauma that leads to injury of the scalp, skull, or brain. These injuries can range from a minor bump on the skull to a devastating brain injury.

Head injury can be classified as either closed or penetrating. In a closed head injury, the head sustains a blunt force by striking against an object. A concussion is a type of closed head injury that involves the brain.

In a penetrating head injury, an object breaks through the skull and enters the brain. (This object is usually moving at a high speed like a windshield or another part of a motor vehicle.)

**Considerations**

Every year, millions of people sustain a head injury. Most of these injuries are minor because the skull provides the brain with considerable protection. The symptoms of minor head injuries usually go away on their own. More than half a million head injuries a year, however, are severe enough to require hospitalization.

Learning to recognize a serious head injury, and implementing basic first aid, can make the difference in saving someone's life.

In patients who have suffered a severe head injury, there is often one or more other organ systems injured. For example, a head injury is sometimes accompanied by a spinal injury.

**Causes**

Accidents are the leading cause of death or disability in men under age 35, and over 70% of accidents involve head injuries and/or spinal cord injuries.

Common causes of head injury include traffic accidents, falls, physical assault, and accidents at home, work, outdoors, or while playing sports.

Some head injuries result in prolonged or non-reversible brain damage. This can occur as a result of bleeding inside the brain or forces that damage the brain directly. These more serious head injuries may cause:

- Changes in personality, emotions, or mental abilities
- Speech and language problems
- Loss of sensation, hearing, vision, taste, or smell
- Seizures

550

- Paralysis
- Coma

**Symptoms**

The signs of a head injury can occur immediately or develop slowly over several hours. Even if the skull is not fractured, the brain can bang against the inside of the skull and be bruised. (This is called a concussion.) The head may look fine, but complications could result from bleeding inside the skull.

When encountering a person who just had a head injury, try to find out what happened. If he or she cannot tell you, look for clues and ask witnesses. In any serious head trauma, always assume the spinal cord is also injured.

The following symptoms suggest a more serious head injury that requires emergency medical treatment:

- Loss of consciousness, confusion, or drowsiness
- Low breathing rate or drop in blood pressure
- Convulsions
- Fracture in the skull or face, facial bruising, swelling at the site of the injury, or scalp wound
- Fluid drainage from nose, mouth, or ears (may be clear or bloody)
- Severe headache
- Initial improvement followed by worsening symptoms
- Irritability (especially in children), personality changes, or unusual behavior
- Restlessness, clumsiness, lack of coordination
- Slurred speech or blurred vision
- Inability to move one or more limbs
- Stiff neck or vomiting
- Pupil changes
- Inability to hear, see, taste, or smell

**First Aid**

Get medical help immediately if the person:

- Becomes unusually drowsy
- Develops a severe headache or stiff neck
- Vomits more than once
- Loses consciousness (even if brief)
- Behaves abnormally

For a moderate to severe head injury, take the following steps:

1. Call 911.
2. Check the person's airway, breathing, and circulation. If necessary, begin rescue breathing and CPR.
3. If the person's breathing and heart rate are normal but the person is unconscious, treat as if there is a spinal injury. Stabilize the head and neck by placing your hands on both sides of the person's head, keeping the head in line with the spine and preventing movement. Wait for medical help.
4. Stop any bleeding by firmly pressing a clean cloth on the wound. If the injury is serious, be careful not to move the person's head. If blood soaks through the cloth, DO NOT remove it. Place another cloth over the first one.
5. If you suspect a skull fracture, DO NOT apply direct pressure to the bleeding site, and DO NOT remove any debris from the wound. Cover the wound with sterile gauze dressing.
6. If the person is vomiting, roll the head, neck, and body as one unit to prevent choking. This still protects the spine, which you must always assume is injured in the case of a head injury. (Children often vomit ONCE after a head injury. This may not be a problem, but call a doctor for further guidance.)

http://www.nlm.nih.gov/medlineplus/print/ency/article/000028.htm                    11/5/2006



7.  Apply ice packs to swollen areas.

For a mild head injury, no specific treatment may be needed. However, closely watch the person for any concerning symptoms over the next 24 hours. The symptoms of a serious head injury can be delayed. While the person is sleeping, wake him or her every 2 to 3 hours and ask simple questions to check alertness, such as "What is your name?"

If a child begins to play or run immediately after getting a bump on the head, serious injury is unlikely. However, as with anyone with a head injury, closely watch the child for 24 hours after the incident.

Over-the-counter pain medicine (like acetaminophen or ibuprofen) may be used for a mild headache. DO NOT take aspirin, because it can increase the risk of bleeding.

**Do Not**

- DO NOT wash a head wound that is deep or bleeding a lot.
- DO NOT remove any object sticking out of a wound.
- DO NOT move the person unless absolutely necessary.
- DO NOT shake the person if he or she seems dazed.
- DO NOT remove a helmet if you suspect a serious head injury.
- DO NOT pick up a fallen child with any sign of head injury.
- DO NOT drink alcohol within 48 hours of a serious head injury.

**Call immediately for emergency medical assistance if**

**Call 911 if:**

- There is severe head or facial bleeding.
- The person is confused, drowsy, lethargic, or unconscious.
- The person stops breathing.
- You suspect a serious head or neck injury or the person develops any symptoms of a serious head injury.

**Prevention**

- Always use safety equipment during activities that could result in head injury. These include seat belts, bicycle or motorcycle helmets, and hard hats.
- Obey traffic signals when riding a bicycle. Be predictable so that other drivers will be able to determine your course.
- Be visible. DO NOT ride a bicycle at night.
- Use age-appropriate car seats or boosters for babies and young children.
- Make sure that children have a safe area in which to play.
- Supervise children of any age.
- DO NOT drink and drive, and DO NOT allow yourself to be driven by someone who you know or suspect has been drinking alcohol.

**References**

Marx JA, Hockberger RS, Walls RM, eds. *Rosen's Emergency Medicine: Concepts and Clinical Practice*. 5th Ed. St. Louis, MO: Mosby; 2002.

DeLee JC, Drez, Jr., D, Miller MD, eds. *DeLee and Drez's Orthopaedic Sports Medicine*. 2nd Ed. Philadelphia, PA: Saunders; 2003.

Goetz CG, Pappert EJ. *Textbook of Clinical Neurology*. 2nd Ed. Philadelphia, PA: Saunders; 2003:1130-1134.

**Update Date: 4/8/2005**

Updated by: William D. Whetstone M.D., Division of Emergency Medicine, University of California San Francisco, San Francisco, CA. Review provided by VeriMed Healthcare Network.

*ADAM

*ADAM
quality

A.D.A.M., Inc. is accredited by URAC, also known as the American Accreditation HealthCare Commission (www.urac.org). URAC's accreditation program is the first of its kind, requiring compliance with 53 standards of quality and accountability, verified by independent audit. A.D.A.M. is among the first to achieve this important distinction for online health information and services. Learn more about A.D.A.M.'s editorial process. A.D.A.M. is also a founding member of Hi-Ethics (www.hiethics.com) and subscribes to the principles of the Health on the Net Foundation (www.hon.ch).

The information provided should not be used during any medical emergency or for the diagnosis or treatment of any medical condition. A licensed physician should be consulted for diagnosis and treatment of any and all medical conditions. Call 911 for all medical emergencies. Adam makes no representation or warranty regarding the accuracy, reliability, completeness, currentness, or timeliness of the content, text or graphics. Links to other sites are provided for information only -- they do not constitute endorsements of those other sites. Copyright 2005, A.D.A.M., Inc. Any duplication or distribution of the information contained herein is strictly prohibited.

**United States Postal Service®**

## DELIVERY CONFIRMATION™







0306 0320 0002 2128 2621

U.S. POSTAGE
PAID
SOUTH SAN FRANC.CA
94080
JUL 12 '08
AMOUNT
$10.45
0002 1442-03

94102

FRAGILE

C 08-3429 MMC

FRAGILE

#8

*l Use*



RECEIVED

RECEIVED

JUL 14 2008

WIEKING
DISTRICT COURT
DIST. OF CALIFORNIA

Ju      '9

RICH      KING
CLERK, U.   DT COURT
NORTHERN DISTRICT OF CALIFORNIA

**Expéditeur:**

REVA HALL
368 IMPERIAL WAY #105
DALY CITY, CA 94015

**To:   Destinataire:**

United State Courthouse - 16th floor

450 Golden Gate Avenue

San Francisco, CA 94102-3483

**Country of Destination:   Pays de destination:**

USA



**Cradle to Cradle Certification**
is awarded to products that
pursue an innovative vision of
ecologically-intelligent design
that eliminates the concept
of waste.
This USPS® packaging has been
certified for its material content,
recyclability, and manufacturing
characteristics.

*Please recycle.*