1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL TYRONE JOHNSON             )     No. C 08-3429 MMC (PR)
                                   )
          Petitioner,              )     **ORDER DENYING PETITION FOR**
                                   )     **WRIT OF HABEAS CORPUS;**
    v.                             )     **DENYING CERTIFICATE OF**
                                   )     **APPEALABILITY**
JOHN MARSHALL, Warden,             )
                                   )
          Respondent.              )
_____    )

    Before the Court is the above-titled petition for a writ of habeas corpus, filed by

petitioner Michael Tyrone Johnson pursuant to 28 U.S.C. § 2254, challenging the validity of

a judgment obtained against him in state court.  Respondent has filed an answer to the

petition.  Petitioner has not filed a traverse.

## I.  PROCEDURAL HISTORY

    In 2005, in the Superior Court of San Mateo County, petitioner was convicted of

assault by means of force likely to produce great bodily injury and corporal injury to a former

cohabitant, resulting in a traumatic condition.  (Ex. 1 at 366; People v. Johnson, No.

A112322 (Cal. Ct. App. May 30, 2007) (hereinafter, "Ex. 8 ") at 1.)[1]  The jury also found

true allegations that petitioner committed serious felonies and personally inflicted great

_____

[1]All references to exhibits herein are to exhibits submitted by respondent in support of
the answer.

bodily injury under circumstances involving domestic violence.  (Ex. 8 at 1.)  The trial court sentenced petitioner to a term of seven years in prison.  (Id.)

In a reasoned opinion, the California Court of Appeal affirmed the trial court's decision (Ex. 8), and the California Supreme Court summarily denied the petition for review (Ex. 12).  In addition to his direct appeal, petitioner filed a state habeas petition in the San Mateo County Superior Court, which was denied on the ground petitioner had not exhausted his state remedies on direct appeal.  (Ex. 3.)  Petitioner also filed state habeas petitions in the California Court of Appeal and California Supreme Court, both of which were summarily denied.  (Exs. 10, 13.)

Thereafter, on July 16, 2008, petitioner filed the instant petition for a writ of habeas corpus.

## II.  STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

I.  Prosecution Evidence

A.  Events Prior to the Assault

The victim, P.G., met [petitioner] in 2002, while both were employed at J.C. Penney's department store; [petitioner] worked in loss prevention, and P.G. was a sales associate.  P.G. was 17 years old, 4 feet 9 inches tall, and weighed 95 pounds.  [Petitioner], who was considerably older than P.G., was 6 feet 1 inches tall, and weighed 220 pounds.  P.G. and [petitioner] began dating in late 2002 or early 2003.  The relationship became serious after two months, at which time P.G. believed that she was in love with [petitioner].  P.G. began living with [petitioner] and his mother in early 2003.  She lived with [petitioner] and his mother for approximately six months.

Sometime in early 2003, [petitioner] became violent with P.G. during an argument.  P.G. testified that [petitioner] "was going to take me out of his house."  [Petitioner] held P.G.'s clothes high in the air so that she could not reach them.  When P.G. jumped up to reach her clothes, [petitioner] grabbed her by the back of the neck and pushed her face down onto the floor.  P.G. was not injured, but she was "a little bit" frightened.  [Petitioner] then threw P.G.'s clothes out of the door.  As P.G. was picking up her clothes, [petitioner] shut the door.  P.G. began crying, and was about to leave when [petitioner] came back outside and apologized.  P.G. accepted his apology, and she decided to keep living with [petitioner].  P.G. did not report this act of violence to the police.  She also did not tell her family about this incident because she knew that they would be upset about it.

2

P.G. eventually moved out of [petitioner's] home in the summer of 2003, after discovering that she had contracted herpes, a sexually transmitted disease (STD).  P.G. believed that [petitioner] had given her the STD because he was the only person she had been intimate with during that time period.  When P.G. confronted [petitioner], he denied giving her the STD; P.G. believed that [petitioner] was being unfaithful.

After moving out of [petitioner's] home, P.G. went to live with her mother in Los Angeles.  P.G. lived in Los Angeles for a couple of months, during which time she kept in contact with [petitioner] by text messages.  In November 2003, P.G. moved back to her family's house in South San Francisco, where she lived with her father, stepmother, and sisters.  P.G. and [petitioner] t reconciled near the end of 2003.  P.G. and [petitioner] no longer worked together, but they saw each other almost every day and had resumed their sexual relationship.  P.G. believed that she had an exclusive dating relationship with [petitioner]. Although P.G.'s father gave his approval to the relationship, he refused to let P.G. spend the night at [petitioner's] home; P.G.'s father also imposed an 11:00 p.m. curfew on her.

        B.  The Assault

On April 9, 2004, [petitioner] told P.G. that he was going out with his friends for a "guys' night out."  P.G. suspected that [petitioner] was going out to meet other women.  P.G. and a female friend, Y.P., went to TGI Friday's restaurant in San Bruno.  At the restaurant, P.G. saw [petitioner] with a couple of men and one woman.  P.G. did not recognize the men or the woman.  P.G. said that she was "bothered" by the way [petitioner] had been holding the woman because it "looked like they ha[d] been dating."  P.G. testified that she and Y.P. left the restaurant without speaking to [petitioner].

As P.G. left the restaurant, [petitioner] sent her a text message, asking her why she left without saying hello.  P.G. sent [petitioner] a return text message, stating that she had seen him with another girl and that he looked happy with that girl.  [Petitioner] sent a reply text message, asking P.G. to return to the restaurant and to show him the girl that she said he was with.  P.G. did not go back into the restaurant.  She and Y.P. then went to dinner at Chili's restaurant in San Bruno.  While P.G. and Y.P. ate dinner, [petitioner] repeatedly sent P.G. text messages, claiming that he was not with a girl and asking her to return to TGI Friday's.  P.G. did not return to TGI Friday's, but instead went home around 11:00 p.m.

Sometime after midnight, [petitioner] began calling P.G. on her cellular telephone; she would not speak with him.  When [petitioner] sent P.G. a text message saying that he wanted to talk to her, she replied that she had nothing to say to him.  P.G. then received a message from [petitioner] stating that he was outside her house, that he wanted her to come out, and that he did not care if she called the police, or if her family woke up, and saying something to the effect that he would knock the door down if she did not come out and talk to him.  P.G. testified that she was not frightened by the message because [petitioner] had made similar threats in the past.

P.G. went outside because she did not want [petitioner] to awaken her family. P.G. could not remember the exact words of her conversation with [petitioner],

but she remembered having a "heated" argument with [petitioner] about the woman she had seen him with at the restaurant.  When P.G. turned her back to go inside, [petitioner] grabbed her left arm, put his other hand around her head, and pushed her over his leg, causing her to trip.  She was unable to put her hands on the ground.  [Petitioner] pushed P.G.'s head down to the ground, causing the back of her [] head to hit the hard ground.  Once her head hit the ground, P.G. had an image of [petitioner] kicking her a couple of times in the stomach as she tried to cover her face.  P.G. recalled that [petitioner] stepped on her hand as he was trying to step on her head.  She also remembered [petitioner] stepping on the right side of her face and head.  P.G. was frightened during the assault; she could not recall what [petitioner] was saying or whether she said anything to him.

As P.G. lay immobilized on the ground in a fetal position, [petitioner] picked her up and threw her in his car.  P.G. did not remember whether [petitioner] dragged her by the ankles during the assault.  However, she did recall that [petitioner] did not appear to have any difficulty in carrying her to the car.  P.G. remembered [petitioner] holding her head as he drove her to the hospital.

C.  P.G.'s Hospitalization

P.G.'s next memory was of waking up at the hospital, with doctors and nurses holding her head, feet, and hands.  She was in "a lot of pain," especially in her feet and head.  P.G. could hear the hospital staff around her but could not see them.  She remembered her head being shaved and the wound in her head being closed with staples.  P.G. had no memory of telling the hospital staff that [petitioner] had thrown something at her, or of saying, "baby, I forgive you, I'll be a good girl."

Bessie Sandoval, an emergency medical technician at Kaiser Hospital in South San Francisco, first saw P.G. when [petitioner] brought her to the emergency room sometime after 2:00 a.m. on April 10, 2004.  P.G.'s face and head were covered in blood.  P.G.'s hair was drenched in dripping blood.  P.G. seemed confused and was combative when hospital staff moved her onto a gurney and applied a surgical collar.

Sandoval called the police due to the suspiciousness of the nature and extent of P.G.'s injuries.  [Petitioner] told Sandoval that P.G. had tripped forward, which Sandoval thought was inconsistent with the injury to the back of P.G.'s head.  Sandoval also thought there was a "certain awkwardness" because [petitioner] did not stay very long at the hospital.  Sandoval had been concerned regarding the extent of P.G.'s bruises.  Finally, Sandoval's concerns were prompted by hearing P.G. say something to the effect of, "I forgive you."

South San Francisco Police Officer Bart MacHale reported to the emergency room at 6:30 a.m. on April 10, 2004.  He spoke to Sandoval and wrote down her statements in his police report, using direct quotes where appropriate.  Specifically, Officer MacHale, reading from his report, testified, "Sandoval told me [P.G.] was 'slipping in and out of consciousness' unquote.  Sandoval said that [P.G.] had a serious injury to the back of the head along with scrapes, scratches, and bruises to several parts of her body.  Sandoval said that [P.G.] told her [petitioner] threw something at her head causing her injury.  Sandoval also heard [P.G.] tell [petitioner], 'baby I forgive you, I'll be a good girl' end quote."  Although Sandoval remembered speaking with Officer MacHale, she

4

did not specifically remember giving this statement to Officer MacHale, but Sandoval added that if she were so quoted, she was "a pretty honorable person." Sandoval further testified that she had given accurate statements to Officer MacHale about what she had seen and heard regarding P.G. After reading Officer MacHale's report, Sandoval stated that she remembered that something P.G. said had given her cause for concern.

[Petitioner] called P.G.'s stepmother, Y.L., around 6:00 on the morning of April 10, 2004, and told her that P.G. had been in an accident and that she was at Kaiser Hospital in South San Francisco. At that time, [petitioner] did not mention anything about P.G.'s injuries. When Y.L. called [petitioner] back to ask about P.G.'s condition, [petitioner] said P.G. was "okay." Y.L. left immediately and arrived at the hospital about five minutes later. Y.L. did not see [petitioner] at the emergency room. Y.L. was unable to see P.G. because she was being transferred to another hospital in Redwood City; Y.L. eventually saw P.G. a few hours later. Y.L. said that when she first saw P.G., P.G was in "very bad shape," and that she had "bruises all over" and "black eyes."

D.  [Petitioner's] Initial Police Interview

Officer MacHale first saw [petitioner] in the waiting room of Kaiser Hospital in South San Francisco on the morning of April 10, 2004. Officer MacHale noticed that [petitioner] had dried blood on his sleeve, right hand, and shoe. Later that morning, Officer MacHale spoke with [petitioner] at the South San Francisco Police Department regarding the circumstances of P.G.'s injuries. During an hour-long conversation, [petitioner] never mentioned he had an eyewitness or the name Patricia Rico.

E.  P.G.'s Recuperation and Initial Memory Loss

P.G. remained at the hospital for a week, during which time she was immobilized and unable to care for herself; P.G.'s family came to the hospital to feed and bathe her. Initially, P.G. experienced significant vision loss, with everything appearing black, and then gradually she was able to see shadows and then color. She regained her full eyesight after about a month. P.G. did not recall mentioning her vision problems to her doctors while she was in the hospital; she was more concerned with the pain she was experiencing. P.G. also experienced hearing loss in her right ear that lasted for approximately a month. P.G. also lost her sense of taste and smell, the loss of which persisted at the time of trial.

In April 2004, P.G. had no memory of the events that caused her injuries. She only recalled being at T.G.I. Friday's and going home. When her parents expressed suspicions that [petitioner] was responsible for her injuries, P.G. did not believe them. While she was recovering, [petitioner] called P.G. and told her that she had been injured when she slipped backwards and hit her head on the concrete. [Petitioner] "always" maintained that he had a witness to the incident that caused P.G.'s injuries. However, [petitioner] never named the witness, even after P.G. asked [petitioner] to identify the person. P.G. did not recall a third person being present in [petitioner's] Mustang as they drove to the hospital; she further stated that there would not have been enough room in the car for another person.

On April 18, 2004, Officer MacHale interviewed P.G. at her home.  P.G. was unable to say how she was injured.  She reported having blurred vision and difficulty hearing in her right ear.

On April 22, 2004, P.G., at the insistence of her father, obtained a restraining order against [petitioner].  P.G. did not want to get the restraining order, but her father was worried for her safety and she wanted to respect his wishes.

On April 24, 2004, Officer MacHale again interviewed P.G. at her home.  She still complained of vision and hearing problems, and she still had no memory of how she was injured.  The police continued to contact P.G.  However, she did not want to cooperate with the investigation because she believed [petitioner's] explanation for her injuries.

In the weeks following her release from the hospital, P.G.'s stepmother, Y.L., tried to talk to P.G. about her injuries.  Y.L. testified that on one occasion, P.G. said that "he hit me, but she didn't say much."  Y.L. also stated that when she inquired about P.G .'s injuries at the hospital, the staff said that P.G. said that "he hit her."

Despite her father's suspicion that [petitioner] had assaulted her, P.G. continued to have contact with [petitioner].  P.G. and [petitioner] continued to talk every day on the telephone.  She saw [petitioner] once at work, and then another time at the end of May for his birthday.  In November 2004, P.G., at [petitioner's] request, withdrew the restraining order.  [Petitioner] told P.G. that he wanted to become a police officer and that the restraining order would interfere with this goal.  At the time she withdrew the restraining order, P.G. still had no memory of the cause of her injuries, but she believed [petitioner's] explanation.  P.G. wanted to remember what happened.  She even asked one of her doctors if medication or hypnosis would help her to recovery her memory.

By February 2005, P.G. and [petitioner] had reunited, but they argued almost every day about "what happened that night, about him lying, over little things, [and] girls pretty much."  When [petitioner] traveled to the Super Bowl, P.G. became upset because she suspected that he went on the trip with another woman.

### F.  P.G.'s Recovered Memory

On February 8, 2005, P.G. spent time with her friend, M.V.  During their visit, M.V. asked P.G. many detailed questions about her injuries that P.G. was unable to answer.  Feeling useless and suffering from a headache, P.G. went home and took a nap.  After sleeping for about 45 minutes, P.G. woke up and started to see "little images" of what happened on the night of her injuries.  What she saw was an assault by [petitioner].  P.G. felt like a "fool" for believing [petitioner]; she also experienced feelings of sadness, anger, and confusion.  Upon recovering her memory, P.G. called Y.P.  P.G. then went over to Y.P.'s house and described how she awoke from her nap and had images of [petitioner] assaulting her.

6

### G. Subsequent Police Investigation and Videotaped Interview

On February 8, 2005, P.G. went to the police station to talk to Officer MacHale, but he was off duty that day. She returned to the police station on February 11, 2005, and was interviewed by Officer MacHale and Detective Tom Neary. During the interview, P.G. described [petitioner] dragging her to the car by her ankles and putting her in the car. P.G. testified that what she told the officers about her attack was based on her recovered memory; she was not motivated by her suspicion that [petitioner] had been cheating on her.

On February 11, 2005, Detective Neary conducted a videotaped interview of [petitioner] at the police department. Regarding the night in question, [petitioner] said that he had been at TGI Friday's for a guys' night out, when he saw P.G. and Y.P come into the restaurant and sit down at a table. [Petitioner] was at the bar with his friends when he noticed that P.G. and Y.P. were leaving. As P.G. left, she sent [petitioner] a text message saying, "'have fun with those girls.'" [Petitioner] looked at the message and said, "What girls, I am surrounded by five guys."

[Petitioner] said that he went home and changed his clothes. He then picked up a coworker, Patricia Rico, and drove over to P.G.'s house. While outside of P.G's house, [petitioner] sent a text message to P.G. telling her that he wanted her to come outside so that they could talk, and that if she did not come out he would kick the door in. P.G. came outside, and [petitioner] told her that he loved her, but that she had to stop being upset about nothing. P.G. and [petitioner] walked down the street and then sat down on the curb. When P.G. accused [petitioner] of being with "those girls," she grabbed his sweatshirt and started jerking back and forth. As P.G. was pulling on [petitioner's] sweatshirt, she lost her grip and fell backward. [Petitioner] put his hand under P.G.'s head and felt blood.

[Petitioner] stated that, at this point, his "witness hops out of the car." [Petitioner] was barely able to carry P.G. because of her baggy clothes. [Petitioner] explained that he had to drag P.G. to his car, and that in this process her toes were dragging on the ground. When Detective Neary commented that P.G. had bruises on her head that were consistent with being kicked, [petitioner] denied causing the bruises and explained that the injuries were caused when P.G.'s head initially hit the ground. [Petitioner] put P.G. in his car and drove her to the hospital. [Petitioner] gave the police Patricia Rico's name and telephone number.

### H. Patricia Rico's Testimony

Patricia Rico testified that she was not with [petitioner] in the late evening/early morning hours of April 9-10, 2004. Rico had never been to P.G.'s residence, and had heard about P.G.'s injuries from [petitioner]. [Petitioner] did not tell Rico that he was going to name her as an eye witness; he simply said he would use her as a character witness.

## I. Expert Testimony

### 1. Neurosurgeon

Cecil Jun, M.D., a neurosurgeon at Kaiser Hospital in Redwood City, first saw P.G. on the morning of April 10, 2004. She was in bed and had blood-stained bandages around her head. At the time of the initial examination, P.G. was not alert, and seemed somewhat tired, sleepy, and lethargic. Upon removing the bandages, Dr. Jun saw a laceration on P.G.'s scalp. A CT scan revealed that P.G. had suffered a skull fracture on the right side of her head, specifically referred to as a "linear fracture in the occipital area." This type of fracture does not require surgery, but it can take several months to heal.

Dr. Jun opined that P.G. had sustained an "unusually severe injury" that seemed inconsistent with a mere slip and fall at home. Additionally, numerous other bruises on P.G.'s back, left shoulder, right wrist and fingers, left elbow and fingers, and feet were more extensive than one would expect from a mere fall. Dr. Jun further testified that the bruising on P.G.'s eyelids was not the result of the skull fracture, but was consistent with direct trauma to the eye.

On cross-examination, Dr. Jun admitted that the unusual severity of P.G.'s skull fracture could be consistent with a person falling without breaking the fall and striking concrete. However, he was unable to express an opinion as to the cause of P.G.'s numerous other bruises.

Dr. Jun next saw P.G. on April 15, 2004, when he removed her staples and cleaned the wound. Dr. Jun saw P.G. again on April 27, 2004, at which time he observed that her laceration had not been healing as expected. At this visit, P.G. complained of decreased hearing in her right ear. Dr. Jun stated that P.G.'s hearing loss could have been the result of blood draining behind her right eardrum. P.G. indicated that she was experiencing vision problems and had lost her sense of smell.

On cross-examination, Dr. Jun stated that he seemed to recall P.G. telling him at the April 27, 2004 visit that she had regained her memory. However, his file did not include a notation that P.G. had regained her memory. Dr. Jun testified that he would not have expected P.G. to remember the events immediately preceding the injury, or to be able to recover these memories if she had been totally unconscious. According to Dr. Jun, head trauma patients never regain such memories. On redirect, Dr. Jun testified that the neurological community believes it is impossible for someone who has retrograde amnesia to recover his or her memory. He further testified that if P.G. had told him that she had remembered the incident, he probably would have told her that he did not think she would ever regain her memory.

### 2. Psychiatrist

Jose Maldonado, M.D., an associate professor of psychiatry at Stanford University, testified as an expert in neuropsychiatry. Dr. Maldonado specializes in changes in brain function following surgery or physical trauma. As a neuropsychiatrist, he examines "how brain function leads to mental changes, like behavior changes or mental changes like memory disturbances, post traumatic stress syndrome . . . ."

8

Dr. Maldonado did not examine P.G., but he reviewed her medical records, as well as the police reports and photographs. He offered two explanations for P.G.'s delayed recollection of how she was injured. The first theory was purely psychological. According to this theory, a person who undergoes significant traumatic events may repress those memories for a certain period of time. These memories can be recovered later when the patient feels safe and something jogs the memory. Any number of things could trigger the memory, including watching another event that is reminiscent of the repressed event, talking with a friend, or walking by the place where the incident occurred.

Dr. Maldonado also discussed a second, more physiological explanation for P.G.'s recovered memory. In this scenario, a patient suffers a traumatic injury with accompanying stages of recovery. In the first or emergent stage, the patient emerges from the trauma itself. This stage is associated with acute confusion and delirium, as well as variable posttraumatic amnesia. The second or recovery stage can last anywhere between six and twelve months. In this stage, memories can come back all at once or in pieces.

Based on the medical evidence he reviewed and the hypothetical facts regarding the injury, Dr. Maldonado opined that P.G. had suffered "significant brain injury," which weighed in favor of a physiological explanation for her memory loss. He described her skull fracture as being large enough to allow air to flow into the brain. He further stated that there was absolutely no doubt that P.G.'s brain was bruised. Looking beyond the interpersonal drama surrounding the injury, Dr. Maldonado stated that P.G. had "significant memory, significant cognitive and brain function deficit[s]," which he opined were more likely than not the cause of P.G.'s amnesia and subsequent recovered memory. He disagreed with the suggestion that a patient who initially had no memory of a traumatic event could never regain that memory.

On cross-examination, Dr. Maldonado conceded that if a person "truly lost consciousness" and then claimed to recall what happened during the time he or she was unconscious, that person could be lying or confabulating the incident. He further explained that confabulation has two aspects. There is confabulation for the purpose of lying, and there is confabulation based on a faulty memory of an event. In the latter, the person is not consciously lying, but is trying to fill in the gaps in his or her memory.

On redirect, Dr. Maldonado explained that he would question the veracity of [sic] person's recovered memory claim only in the event of a complete loss of consciousness.

### J. Prior Incident of Domestic Violence

[Petitioner] met C.M. in 1992, while they were in the Army stationed in Texas. [Petitioner] and C.M. dated for approximately two years. During an argument at a Super Bowl party in 1994, [petitioner] accused C.M. of flirting with another man and pushed her. She pushed [petitioner] back and he fell into a window and broke it. Both C.M. and [petitioner] had been drinking alcohol at the party. C.M. did not recall how much alcohol [petitioner] had consumed, but remembered that she had not been intoxicated to the point where she did not know what she was doing. [Petitioner] and C.M. left the party and went back to [petitioner's] barracks to continue their conversation.

9

When the pair arrived at [petitioner's] room, [petitioner] no longer wanted to talk about the argument, he wanted to watch the rest of the Super Bowl.  C.M. stood in front of the television and insisted that they talk about what had happened at the party.  [Petitioner] asked C.M. to move out of the way; she refused to move.  C.M. told [petitioner] that she was going to leave if they did not talk.  [Petitioner] did not want C.M. to leave, but he did not want to talk about the argument.  When C.M. turned off the television, [petitioner] grabbed both of her legs below her knees and pulled her legs out from under her.  C.M. fell and hit the back of her head on the cement floor.  C.M. testified that [petitioner] was standing above her, "with his hand on [her] neck pushing on [her] Adam's apple."  She recalled that she was unable to breathe as [petitioner] was forcefully pressing on her neck, and that he was saying, "say good-bye, Chris, say good-bye."

C.M. testified that the next thing she remembered was being on the bed or some soft surface, face down, with [petitioner's] hands still on her neck.  C.M. did not know how long she remained in that position or whether she lost consciousness.  She recalled waking up on the bed, with [petitioner] lying next to her.  C.M. experienced soreness in her "whole body."  When she got out of bed and looked at herself in the mirror, she could barely see herself.  She had two black eyes that were very swollen; it was very difficult for C.M. to open her eyes.  The whites of C.M.'s eyes were red from broken blood vessels, and she had blurred vision.  After looking at herself in the mirror, C.M. turned around and said to [petitioner], "look what you have done to me."  [Petitioner] denied injuring C.M., and told her that she had gotten beaten up in a fight in Juarez, Mexico.  When C.M. told him that she remembered what had happened and that she knew his version of the incident was untrue, [petitioner] admitted that he was responsible for her injuries.

Although C.M. wanted to seek medical attention, [petitioner] persuaded her to stay at his room and allow him to take care of her injuries.  C.M. stayed at [petitioner's] room for approximately one day.  When her pain and blurred vision persisted, [petitioner] agreed to take C.M. to the hospital.  Before going to the hospital, [petitioner] and C.M. agreed that they would say that she had been injured in a fight in Juarez, Mexico.  C.M. agreed to go along with the story because she believed that [petitioner] was sorry, and that this was an isolated incident for which [petitioner] would seek counseling.  C.M. was also in love with [petitioner] and wanted to maintain her relationship with him.

Initially, C.M. told military personnel the false story about being injured in Juarez, Mexico.  She later told a chaplain and the military police the truth about her injuries.  As a result, C.M. was restricted from going to [petitioner's] barracks and she could not use military telephones to contact him.

C.M. testified that there was no violence between them after the January 1994 incident.  However, a few times before the incident, [petitioner] had grabbed her neck and pushed her against a wall during arguments.  C.M. never reported these incidents to law enforcement.

C.M. completed her term of enlistment approximately six months after the January 1994 incident.  Following her discharge from the Army, C.M. and [petitioner] remained in contact for approximately six months.  During this time, the two exchanged letters, and they visited each other at or near the Army base; [petitioner] also visited C.M. at her family's home in Wyoming.

In 1995, [petitioner] paid a surprise visit to C.M. in Wyoming. At that time, C.M. had a new boyfriend and was pregnant. [Petitioner] told C.M. that he wanted to reconcile and be a couple again; C.M. declined.

Following the 1995 visit, C.M. had no further contact with [petitioner] until September 2005. At that time, she received a call from Detective Neary regarding the January 1994 incident. [Petitioner] called her about one week later. During the conversation, [petitioner] indicated that he was aware that she had spoken with Detective Neary. [Petitioner] told C.M. that he was sorry about the 1994 incident and said that he had a different recollection of what had happened. [Petitioner] told C.M. that he was in trouble and needed her help. During this conversation, [petitioner] did not ask C.M to lie and did not specify how she could help him; he also did not threaten her. C.M. explained that there was nothing she could do for [petitioner], and that her only involvement with the instant case was to tell the truth about what had happened between them.

II. Defense Evidence

    A. Expert Testimony

        1. Psychiatrist

James Missett, M.D., a board certified psychiatrist and deputy chief of psychiatric services at Stanford University, testified as an expert in psychiatry. Dr. Missett reviewed P.G.'s medical records, as well as the police reports and her testimony at the preliminary hearing. Dr. Missett explained that there are three components to memory: (1) perception, meaning the experience of seeing, hearing, or thinking something; (2) the ability to encode or retain the experience; and (3) the ability to recall the retained experience. He further explained that memory has temporal components of immediacy and remoteness.

Dr. Missett opined that a person suffering P.G.'s skull fracture would likely lose consciousness and would have no memory of the event while unconscious. He did not know of any patient who had sustained a serious brain injury who was able to remember the injury-causing event itself. However, an emotionally traumatic event, where there is no physical damage to the brain, may "cut both ways," in terms of a person's ability to recall the event. Specifically, one person may be able to recall the event with exquisite detail, while another may have no memory at all, or traumatic amnesia, because the event is too painful to think about. A person suffering from traumatic amnesia is usually able to recover his or her memory of the traumatic event.

Based on the severity of P.G.'s injuries, Dr. Missett opined that her recovered memory could be result of confabulation, lying, or both. He noted that P.G. had made inconsistent statements regarding whether the injury was an accident and whether she had a memory of the event. These inconsistencies created a problem for determining the veracity of P.G.'s recovered memory claim.

Dr. Missett could not explain with any degree of certainty whether P.G.'s claim of recovered memory was presented consciously and accurately, or whether it was consciously false, or if she were malingering, or in some way mistaken. Based on the hypothetical questions, Dr. Missett could not determine whether P.G. lost consciousness, and if so, when or whether she was confabulating.

11

However, he did opine that if P.G. were at all conscious during the event, she could have experienced it, encoded it, and later retrieved the memory.

### 2. Emergency Medicine Physician

Terry Fotre, M.D., testified as an expert in the field of emergency medicine. Dr. Fotre estimated that about 20 percent of the patients he had treated for skull fractures had no memory of how they were injured. Of this group of patients, none had ever recovered a memory of the injury-causing event after arriving at the hospital with no such memory.

Dr. Fotre testified that a common sequel to a skull fracture is the possibility of a seizure, though it happens in less than 50 percent of the time. He explained that a seizure can cause spasm, shaking, odd posturing, grunting, straining, and a massive discharge of the muscles in the body.

Dr. Fotre opined that the redness in P.G.'s eyes was consistent with increased pressure in the brain, and could have also been caused by her straining against the cervical collar after she was brought to the hospital, or from a significant physical blow. He further explained that if blows to the eyes were the cause of redness in P.G.'s eyes, he would have expected to see swelling, which was not present in the medical records or photographs. Additionally, the "raccoon sign" or discoloration of P.G.'s lower eyelids was an indication of a skull fracture.

According to Dr. Fotre, the bruise behind P.G.'s ear was the result of blood pooling in that area, which had been caused by the skull fracture. He explained that if the bruise had been caused by a direct blow, there would have been bruising and swelling to the outer portion of the ear as well, which was not depicted in the photographs. Dr. Fotre did not find any indication of blunt trauma to P.G.'s eyes or the front of her head.

On cross-examination, Dr. Fotre testified that the abrasions on P.G.'s elbow and hand were consistent with someone falling backwards on the ground. However, the marks on P.G.'s arm, which were in a fingerprint pattern, were consistent with someone grabbing or hitting the arm.

On further direct examination, Dr. Fotre testified that lifting an unconscious person was like lifting "dead weight" or a bag of wet cement.

### B. Testimony from [Petitioner's] Family and Coworkers

#### 1. Reva Hall

[Petitioner's] mother, Reva Johnson Hall, testified that P.G. moved into her home in February of 2003. P.G. lived at Hall's home until the end of April 2003, when P.G. moved out for two days and then returned. P.G. stayed at Hall's home until after P.G.'s final exams that May. Hall said that P.G.'s departure in April 2003 was sudden. Hall saw [petitioner] carry P.G.'s clothes to her car. According to Hall, [petitioner] and P.G. had not been arguing, but Hall thought P.G had been unhappy that [petitioner] had purchased a Mustang. Hall never saw [petitioner] push P.G., but had seen P.G. push [petitioner] a couple times in the past.

12

### 2. Patricia Rico

Patricia Rico, recalled as a defense witness, testified that she heard P.G. tell [petitioner] on a speakerphone at work that "it was an accident and that she remembered everything that happened." On cross-examination, Rico admitted that even though she knew that this was important information, she never disclosed this information to the defense investigator, Detective Neary, or the prosecutor, when she was interviewed by them.

### 3. Joseph Gerrans

Joseph Gerrans, a loss prevention manager at J.C. Penny's, recalled P.G. arriving at the store in November 2004. He heard P.G. say that she had had a restraining order lifted and that she remembered that it was not [petitioner's] fault. Gerrans did not know what P.G. was talking about when she referred to "it" not being [petitioner's] fault. On cross-examination, Gerrans admitted that he did not mention what he had overheard to the defense investigator, even though he considered it to be important information. After his interview with the defense investigator, Gerrans typed a statement dated June 2, 2005, in which he sets forth what he heard in November 2004; Gerrans had the statement notarized.

### III.  Prosecution Rebuttal

P.G. testified that when she visited Dr. Jun on April 27, 2004, she did not tell him that she had regained her memory of the attack. Rather, she asked him whether she would ever get her memory back, and if she could take some medicine, or be hypnotized, to regain it.

On December 2, 2004, P.G. saw Dr. Andrew Oh because she was experiencing dizziness. At that time, P.G. did not tell Dr. Oh that she remembered the assault that had occurred. She mentioned that her visit was regarding a "domestic case" because that is what she had been told by her family, friends, and neighbors, and that "kind of made sense[ ]" to her.

P.G. did not recall any conversation with [petitioner] at his place of work in April 2004, or talking to him on a speakerphone. [Petitioner] was the one who had brought up the subject of withdrawing the restraining order because he wanted to be a police officer. During their conversations, [petitioner] told P.G. that her injuries were an accident and that he would never do something like that to her because he loved her. P.G. talked to [petitioner] up until the time she had obtained the restraining order because he continued to call her. P.G. denied telling [petitioner] that her injuries were an accident and not his fault because at that time she did not know what had happened to her.

(Ex. 8 at 1-18 (footnotes omitted).)

13

# III.  DISCUSSION

A.    <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict."  <u>Penry v. Johnson</u>, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  <u>Williams</u>, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

On state habeas review, the state courts did not reach the merits of the claims petitioner raises in the instant petition. (Exs. 3, 10, 13.) The Court of Appeal, in its opinion on direct review (Ex. 8), addressed several of the claims petitioner raises in the instant petition. The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). As to the claims for which there is no reasoned opinion available, the United States Supreme Court has recently clarified that a federal habeas court, in applying the review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest state court, and that the absence of reasoning does not prevent application of the standard of review set forth in § 2254(d). See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

B.    Petitioner's Claims

Petitioner claims that: (1) he was denied his Sixth Amendment right to an impartial jury; (2) he is actually innocent of the crimes for which he was convicted; and (3) cumulative error denied him a fair trial. The Court addresses each claim in turn, including any sub-claims contained therein.

1.    Impartial Jury

Petitioner contends he was denied his Sixth Amendment right to an impartial jury in that he is African-American, and "there were no African-American[] jurors in either of the

15

1    panels used to pick the jury." (Pet. at 6-7.)  In support thereof, petitioner submits United

2    States Census data showing that in 2004, the year before petitioner's jury trial, San Mateo

3    County, the county in which petitioner was convicted, had 25,023 persons of African-

4    American descent out of a total population of 688,847.  (Pet. Attachment C at 310-11.)

5         A criminal defendant has a constitutional right, stemming from the Sixth Amendment,

6    to a fair and impartial jury pool composed of "a fair cross section of the community."  See

7    Holland v. Illinois, 493 U.S. 474, 477 (1990).  The "fair-cross-section" requirement applies

8    only to the larger jury pool or venire and is not applicable to petit juries.  See Lockhart v.

9    McCree, 476 U.S. 162, 173-74 (1986).  Although the Sixth Amendment guarantees a petit

10   jury selected from a pool representing a cross section of the community, it does not require

11   that "petit juries actually chosen must mirror the community and reflect the various

12   distinctive groups in the population."  Taylor v. Louisiana, 419 U.S. 522, 538 (1975).

13        In Duren v. Missouri, 439 U.S. 357, 364 (1979), the Supreme Court held that to

14   establish a violation of the fair-cross-section requirement, a defendant must show that (1) the

15   group alleged to be excluded is a "distinctive" group in the community, see, e.g., United

16   States v. Cannady, 54 F.3d 544, 547 (9th Cir. 1995) (holding African-Americans, Hispanics,

17   and Asians are distinct groups); (2) the group was not fairly represented in the venire from

18   which the petit jury was chosen, see, e.g., United States v. Nelson, 137 F.3d 1094, 1101 (9th

19   Cir. 1998) (holding representation constitutionally sufficient where absolute disparity

20   between proportion of Hispanics in the community and proportion of Hispanics in jury pool

21   was 3.9%); see also Cannady, 54 F.3d at 548 (holding representation constitutionally

22   sufficient where absolute disparity below 7.7%); and (3) the underrepresentation resulted

23   from a systematic exclusion of the group in the jury selection process, see, e.g., United States

24   v. Miller, 771 F.2d 1219, 1228 (9th Cir. 1985) (holding, where only 30% of grand jury

25   members and 42% of venire were women, systematic exclusion not shown absent showing

26   underrepresentation of women occurred in other venires).

27        Here, petitioner has satisfied the first requirement of the Duren test, because African-

28

1    Americans are a distinct group.  See Cannady, 54 F.3d at 547.  As set forth below, however,

2    petitioner fails to establish the second and third requirements.

3        For purposes of the second requirement, the Ninth Circuit has adopted an "absolute

4    disparity" test.  United States v. Esquivel, 88 F.3d 722, 726 (9th Cir. 1996).  "Absolute

5    disparity" is determined by subtracting the percentage of the group in the jury pool from that

6    group's percentage of the relevant total population.  Id.  While California courts use several

7    different tests to determine the degree of underrepresentation of minorities on jury venires, in

8    federal habeas corpus proceedings challenging state convictions, the Ninth Circuit's absolute

9    disparity test is applied, i.e., the disparity between the percentage of the subject group in the

10   population and the percentage of that group "represented on the master jury wheel."  See

11   Thomas v. Borg, 159 F.3d 1147, 1150 (9th Cir. 1998).  In this instance, using the census data

12   provided by petitioner, the only disparity shown by petitioner is between the county's

13   African-American population of 3.63 percent and the percentage of African-Americans in

14   petitioner's jury panel, zero percent.  Even assuming, arguendo, such disparity would be

15   considered relevant under applicable case authority, petitioner's showing fails.  In light of

16   Ninth Circuit authority permitting an absolute disparity of  7.7%, the exclusion of a group

17   constituting 7.7% or less of the total population is, without more, insufficient to establish a

18   violation of the fair-cross-section requirement.  See Rich v. Calderon, 187 F.3d 1064, 1068

19   (9th Cir. 1999).

20       Moreover, petitioner fails to satisfy Duren's third requirement, because he provides no

21   evidence that the asserted underrepresentation was the result of a "systematic exclusion" of

22   African-Americans from the jury selection process.  Petitioner concedes he "has no way of

23   producing statistical data of systematic exclusion other than the fact [that] California's Jury

24   Questionnaire Form . . . does not ask for ethnicity."  (Pet. Original Part 1 at 65 (emphasis

25   omitted).)  Petitioner makes no showing as to how the absence of such question on the jury

26   questionnaire bears on San Mateo County's system for assembling jury venires, let alone that

27   such system produces an underrepresentation of African-Americans in those venires.  In

28

short, petitioner has only the underrepresentation of African-Americans in his particular jury panel to support his claim.  This is not enough to show "systematic exclusion."  See Randolph v. California, 380 F.3d 1133, 1141-42 (9th Cir. 2004) (holding underrepresentation of identifiable group not sufficient by itself to show systematic exclusion).

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2.   Actual Innocence

Petitioner next claims he was "convicted of a crime he did not do."  (Pet. at 6.)  To the extent petitioner asserts a freestanding claim of actual innocence, the claim is not cognizable on federal habeas.  See Herrera v. Collins, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.")  Read broadly, however, petitioner's actual innocence claim asserts three sub-claims that allege independent constitutional violations. The Court next addresses those sub-claims.

### a.   Insufficient Evidence

To the extent, petitioner's "actual innocence" claim is construed as a claim that his convictions are unsupported by sufficient evidence, such claim fails.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Consequently, where a state prisoner alleges the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324.  For purposes of determining such claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319 (emphasis in original).  Where the record

18

supports conflicting inferences, a federal habeas court must presume the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.  Id. at 326. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  Id. at 324.

Here, there was sufficient evidence upon which the jury could have based a finding of guilt on each of the two charges: (1) assault by means of force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)), and (2) corporal injury to a former cohabitant resulting in a traumatic condition (Cal. Penal Code § 273.5(a)).  (See Ex. 8 at 1-15.)  Specifically, P.G. described in detail at trial how petitioner had assaulted her, causing extensive and severe injuries requiring hospitalization.  (RT at 276-84, 286-99.)  Petitioner's testimony as to the extent of her injuries and her recollection of the cause thereof was corroborated by other witnesses, including the investigating officer and the emergency medical technician who first attended to P.G. at the hospital (id. at 373-87, 534-36), as well as an expert witness, Dr. Maldoanado (id. at 444).  Further, petitioner's purported eyewitness did not corroborate his account of the events and, indeed, directly contradicted petitioner's statement to the police that she was with him that evening.  (Compare Trial Ex. 8A (CT at 212, 214) to RT at 584-88.)

Accordingly, to the extent this claim is based on insufficient evidence, petitioner is not entitled to habeas relief.

> **b.** Admissibility of Petitioner's Statement to His Mother

Petitioner asserts the trial court erred in excluding certain testimony by his mother. (Pet. at 9.)  The Court understands petitioner to be making the same argument he made on direct appeal, that "the trial court erroneously excluded evidence that he had told his mother that P.G. had 'stiff legs' when he was attempting to lift her and take her to the hospital."  (Ex. 8 at 37.)  The state court summarized the issue and ruled as follows:

> Defense counsel first brought this statement to the prosecution's attention by sending a facsimile of a motion to permit hearsay evidence on Saturday, October 29, 2005, just two days before [defense expert] Dr. Fotre testified at trial.  The proposed testimony consisted of [petitioner's] mother stating that,

1
2
3
4
5
6
7
8
9

after his release from police custody on April 10, 2004, [petitioner] told her that when he lifted P.G. into his car, her legs were "stiff like tree limbs." At trial, the prosecution argued that this evidence appeared to be a way around [petitioner] testifying and noted that more than 12 hours had elapsed since the incident causing P.G.'s injuries had occurred. In denying the motion, the trial court ruled as follows: "This [statement] would not meet the criteria under the definition of spontaneous statements under 1240 of the [California] Evidence Code. It is not a statement made to attempt to narrate, to try to explain the act, condition or event perceived by the declarant, being [petitioner], spontaneously under the stress and excitement of the events. [¶] Given the passage of time between the time of the events and the time that that statement is purportedly made, let alone the other foundational questions as it relates to the relationship between the parties and the fact that there's been nothing presented to me this was ever memorialized until discussing this with [defense counsel] on Friday, it will not meet the foundational requirements and as such will not be permitted to be presented to the jury." . . .

10

[Petitioner] contends that his statement to his mother about P.G.'s "stiff legs" should have been admitted as a spontaneous declaration. . . .

11
12
13
14
15
16
17

Here, the fact that [petitioner's] "stiff legs" statement was made 12 hours after the incident, does not automatically deprive the utterance of spontaneity. . . . However, the circumstances surrounding the [petitioner's] statement to his mother, including its mid-trial disclosure, rather than providing a basis for its trustworthiness, suggest [petitioner] had the opportunity to reflect between the time of the incident and the time he purportedly made the statement. In other words, there is ample support for the conclusion that [petitioner's] statement was part of [a] deliberative process to provide an excuse, and not a mere product of the startling occurrence. . . . There is substantial evidence to support the trial court's conclusion that section 1240 did not apply to [petitioner's] "stiff legs" comment, and we conclude the exclusion of the statement was not an abuse of discretion.

18

(Ex. 8 at 37-39 (citations omitted).)

19
20
21
22
23
24
25
26
27
28

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (internal quotation and citation omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding due process does not guarantee defendant right to present all relevant evidence). Such latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. See Holmes, 547 U.S. at 324. Due process may be violated when excluded hearsay testimony bears "persuasive assurances of trustworthiness" and is "critical" to the defense. See Chambers v. Mississippi, 410 U.S. 284, 302 (1973); see also Chia v. Cambra, 360 F.3d 997, 1003 (9th Cir. 2004).

20

In deciding whether the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." Chia, 360 F.3d at 1004 (9th Cir. 2004) (citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)).  The court also must give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based.  See Chia, 360 F.3d at 1006; Miller, 757 F.2d at 995.  Here, under the applicable Miller factors, the exclusion of petitioner's statement did not violate his due process rights.

Petitioner apparently sought to introduce the statement as evidence that P.G. had suffered a seizure that caused her fall and subsequent injuries.  (See Pet. at 8- 9 (asserting "stiff legs" as "symptom of seizure" possibly resulting from "medical condition").)  With respect to the first factor, probative value, petitioner's observation that P.G. had "stiff legs" is minimally, if at all, probative of whether P.G. suffered an unprovoked seizure, as opposed to either a physical assault or a seizure because of a physical assault.  There was no evidence, or even offer of evidence, whether from a medical expert or otherwise, that "stiff legs" are a possible symptom of seizure.  Nor does petitioner offer any explanation as to why P.G. would have suffered an unprovoked seizure in the first instance.

Reliability, the second Miller factor, weighs against admissibility for two reasons.  First, there is nothing in the record indicating petitioner, in making the subject statement, was acting under the stress or excitement of the moment or under any other circumstance suggesting he was unlikely to be untruthful.  See, e.g., Fed. R. Evid. 803(2) (providing exception for spontaneous statements).  Rather, petitioner, knowing he was a potential suspect, had both the time and motive to fabricate an alternative explanation for P.G.'s injuries.  The reliability of the statement is further weakened by the relationship between the declarant and the proposed witness to the declaration, petitioner's mother, an individual who

1   might well be inclined to testify falsely to protect her son.

2         The third <u>Miller</u> factor, whether the statement is capable of evaluation by the trier of

3   fact, weighs against admissibility for the reason that the statement, without context or other

4   information from the declarant, leaves too many questions unanswered, not only as to what

5   petitioner meant by "stiff legs," but also as to P.G.'s other symptoms at that time and the

6   circumstances surrounding petitioner's purported observations.

7         The fourth <u>Miller</u> factor arguably weighs in favor of admissibility because petitioner's

8   out-of-court statement was the sole evidence on the issue of seizure.  This factor, however, is

9   heavily outweighed by the other four factors.

10        Not surprisingly, with respect to the fifth factor, the excluded testimony was not a

11  major part of petitioner's defense.  Rather, petitioner emphasized other defenses, including

12  the theory that P.G. had accidentally fallen backwards after losing her grip on petitioner

13  and/or was confabulating or lying.  (<u>See</u>, <u>e.g.</u>, RT at 344-45, 349, 365-67, 410-14, 661-63,

14  716, 719-22, 766-68, 860-65, 882-83.)

15        Finally, as discussed above, the state's case consisted of strong evidence pointing to

16  petitioner's guilt.  Petitioner thus fails to demonstrate he was prejudiced by the exclusion of

17  his out-of-court statement.  <u>See</u> <u>Hernandez</u>, 282 F.3d at 1144.

18        Accordingly, to the extent this claim is based on the exclusion of petitioner's out-of-

19  court statement, petitioner is not entitled to habeas relief.

20                    c.      Admissibility of Text Messages

21        Petitioner asserts the trial court erred in excluding text messages exchanged between

22  petitioner and P.G. prior to the time P.G. claimed to recover her memory.  (Pet. at 9.)

23  Specifically, petitioner argues, the text messages "prove beyond any reasonable doubt [that

24  the] victim's testimony [was] a product of confabulation."  (<u>Id.</u>)  Prior to trial, petitioner

25  moved in limine to admit the text messages for the limited purpose of using the messages "to

26  question [P.G.]" to show she was "very jealous of [petitioner]" and "angry at him" (RT at 83-

27  86), but only to impeach P.G. if she were to testify to the contrary, i.e., that P.G. and

28

1   petitioner "were wonderful" and "everything was going great" (RT at 88-89).  A review of

2   the record, however, shows the trial court did not exclude the text messages but merely

3   required defense counsel to meet the foundational requirements for introducing electronic

4   evidence.  (RT at 89-92.)

5       "[A] defendant's right to present relevant evidence is not unlimited, but rather is

6   subject to reasonable restrictions, such as evidentiary and procedural rules."  Moses v. Payne,

7   555 F.3d 742, 757 (9th Cir. 2009) (internal quotation and citation omitted).  There was

8   nothing unreasonable about the limitation the trial court imposed on the introduction of the

9   text messages.  Moreover, nothing in P.G.'s testimony suggested "everything was going

10  great."

11      Accordingly, to the extent this claim is based on the exclusion of text messages,

12  petitioner is not entitled to habeas relief.

13      3.   Cumulative Error

14      Petitioner alleges his claims, when added together, show the trial as a whole was a

15  violation of due process.  In other words, petitioner relies on cumulative error.  (Pet. at 6.)

16  When there is no single constitutional error, "there is nothing to accumulate to a level of

17  constitutional error."  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).  Here,

18  petitioner reiterates the alleged errors discussed above, which the Court has found meritless,

19  but further asserts that: (1) defense counsel was ineffective, (2) the trial court erred in

20  allowing propensity evidence, and (3) the trial court imposed an unconstitutional sentencing

21  enhancement.  As discussed below, such additional claims likewise fail.

22      a.   Ineffective Assistance of Counsel

23      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

24  Sixth Amendment right to counsel, which guarantees not only assistance, but "effective"

25  assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to

26  prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first

27  must establish such counsel's performance was deficient, i.e., that it fell below an "objective

28

23

standard of reasonableness" under prevailing professional norms. Id. at 687-88.  Second, the

petitioner must establish prejudice resulting from his counsel's deficient performance, i.e.,

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." Id. at 694.  "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." Id.

A federal habeas court considering an ineffective assistance claim need not address

the prejudice prong of the Strickland test "if the petitioner cannot even establish

incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir.

1998).  Conversely, the court "need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the defendant as a result of the alleged

deficiencies." Strickland, 466 U.S. at 697.

Petitioner claims his trial counsel provided ineffective assistance by: (1) failing to

object to hearsay statements made by P.G.; (2) failing to present evidence showing P.G. had

lied or confabulated; (3) failing to make a Batson/Wheeler motion; (4) failing to call certain

defense witnesses; and (5) failing to object to a tape recording.  The Court addresses each

such claim in turn.

i. Failure to Object to Hearsay

Petitioner claims his defense counsel was ineffective for failing to object to hearsay

statements made by P.G. "at the hospital."  (Pet. at 15.)  The Court assumes petitioner is

making the same argument he made on direct appeal, that "his counsel failed to object to

Officer MacHale's testimony, in which [Officer MacHale] read from his police report that

repeated Sandoval's statements about what [Sandoval] had heard P.G. say at the hospital."

(Ex. 8 at 42.)  The appellate court summarized the issue as follows.

> Reading from his police report, Officer MacHale testified that Sandoval had
> told him that she heard P.G. say, "'baby, I forgive you, I'll be a good girl.'"
> Officer MacHale's report also indicated that Sandoval told him that P.G. had
> said that [petitioner] had thrown something at her head, which had caused her
> injury.  [Petitioner] contends defense counsel could have no tactical reason for
> failing to object to this multilevel, inculpatory hearsay.

(Ex. 8 at 42.)

24

1   The appellate court proceeded to reject the argument on two grounds.  First, the court

2   found defense counsel may have had tactical reasons for not objecting, because he used the

3   statement during direct examination of defense expert Dr. Missett for the purpose of

4   discrediting P.G.'s claim of recovered memory.  (Ex. 8 at 42-43.)  Second, the court found

5   applicable hearsay exceptions existed for, respectively, P.G.'s statement, see Cal. Evid. Code

6   section 1240 (spontaneous declaration), Sandoval's statement, see id. section 1237 (past

7   recollection recorded), and Officer McHale's statement, see id. section 1280 (official record).

8   (Ex. 8 at 43-45.)[2]  Trial counsel cannot be deemed ineffective for failing to raise a meritless

9   objection.  See Juan H. V. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005).

10   Lastly, petitioner fails to show that had P.G.'s statement been excluded, the result of

11   the proceeding would have been different.  See Strickland, 466 U.S. at 694; Wilson v. Henry,

12   185 F.3d 986, 990 (9th Cir. 1999).

13   ii.  Failure to Present Evidence to Discredit P.G.

14   Petitioner claims defense counsel was ineffective for failing to present evidence that

15   P.G. lied about petitioner's assaulting her.  (Pet. at 16-20, 22.)  Specifically, petitioner

16   argues, defense counsel failed to cross-examine P.G. on "her father's abuse of her," and

17   "forcing her to leave home," and also "how many times he had badgered her, insist[ing] that

18   her boyfriend did this to her."  (Pet. at 16.)[3]

19   On direct appeal, the state court rejected this claim as follows:

20   [Petitioner's] next claim of ineffective assistance of counsel relates to his
    counsel's failure to cross-examine P.G. about whether her father had abused

21   her and/or forced her to leave his home just prior to "'recovering'" her
    memory.  [Petitioner] contends that had his counsel elicited this information

22   from P.G., "it would have provided highly significant evidence that [P.G.] had

23   _____

24   [2] The Court further notes there was no violation of the Confrontation Clause under
    Crawford v. Washington, 541 U.S. 36 (2004), as both P.G. and Sandoval, as well as Officer

25   McHale, were witnesses at the trial and available to be cross-examined as to their respective
    statements.  See id. at 59.

26   [3] Petitioner further argues his defense counsel failed to introduce evidence of P.G.'s

27   "personality disorder," which led her to be "easily persuaded by the people around her."
    (Pet. at 22.)  Petitioner submits no evidence of any such "personality disorder" and fails to

28   state what evidence defense counsel should or could have introduced.

25

1    been pressured into having a memory" that [petitioner] had assaulted her,
     which would have supported his theory that P.G.'s recovered memory was
2    either knowingly false or a confabulation.

3

4    The circumstances surrounding P.G.'s recovered memory, including the
     possibility that her recovered memory had been the product of lying or
5    confabulation, or some combination thereof, were explored at length by trial
     counsel.  We cannot find ineffective assistance of counsel based on this claim.
6
     (Ex. 8 at 46.)
7
         Petitioner fails to satisfy either prong of the <u>Strickland</u> test.  First, petitioner cannot
8
     establish ineffectiveness.  In support of this claim, petitioner relies on an unauthenticated
9
     recording of a telephone conversation between himself and P.G.  Although the recording
10
     contains references to a use of physical force by P.G.'s father, it contains no factual support
11
     for any of the other behavior attributed to him by petitioner.  Moreover, petitioner's counsel
12
     could have made a tactical decision to avoid introducing evidence of any abuse of P.G. by
13
     her father, out of a concern that testimony by P.G. about a less than idyllic family life, and, in
14
     particular, any physical abuse, would only serve to make her a more sympathetic witness.
15
     <u>See</u> <u>Brown v. Utrecht</u>, 530 F.3d 1031, 1036 (9th Cir. 2008) ("We give great deference to
16
     counsel's decisions at trial, such as refraining from cross-examining a particular witness.")
17
     (internal quotation and citation omitted).
18
         Second, petitioner cannot show prejudice, because defense counsel, through both P.G.
19
     and other witnesses, extensively explored the issue of P.G.'s credibility.  (<u>See</u>, <u>e.g.</u>, RT at
20
     344-45, 349, 365-67, 410-14, 661-63, 716, 719-22, 766-68.)
21
                              iii.  <u>Batson</u>/<u>Wheeler</u> Motion
22
         Petitioner claims defense counsel should have made a "<u>Batson</u>/<u>Wheeler</u>[4] motion"
23
     during jury selection.  (Pet. at 21.)
24
         The Equal Protection Clause forbids peremptory challenges of "potential jurors solely
25
     on account of their race."  <u>Batson v. Kentucky</u>, 476 U.S. at 89.  A party may raise an equal
26

27        [4] <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986); <u>People v. Wheeler</u>, 22 Cal. 3d 258, 280
28   (1978).

                                         26

protection claim on behalf of a juror excluded because of the juror's race, regardless of whether the party and the excluded juror share the same race.  <u>Powers v. Ohio</u>, 499 U.S. 400, 415 (1991).

A violation of equal protection under <u>Batson</u> is established in a three-step process: (1) the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose"; (2) if the prima facie case is established, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question; and (3) if the prosecutor carries the burden of showing a race-neutral explanation, the trial court must determine whether the opponent of the strike has proved purposeful discrimination.  <u>Johnson v. California</u>, 545 U.S. 162, 169 (2005).

Here, petitioner's claim fails at the outset because he identifies no peremptory challenges made by the prosecution on the basis of race.  Petitioner thus fails to show ineffectiveness on the part of defense counsel and further fails to demonstrate prejudice.  To the extent petitioner by such claim is relying on his earlier-discussed argument that he was denied an impartial jury, the claim likewise fails; as set forth above, the venire did not unconstitutionally exclude African-Americans, and petitioner's counsel was not ineffective in failing to make a meritless objection on such basis.  <u>See Juan H.</u>, 408 F.3d at 1273.

### iv.  Failure to Call Defense Witnesses

Petitioner claims defense counsel was ineffective for failing to call various individuals as defense witnesses.  (Pet. at 15, 22-23.)  Petitioner claims Ron Haysbert "would have placed [P.G.] at [petitioner's] work at the time she testified she was home sleeping on February 8th, 2005" (Pet. at 23), and that Jose Villa would have testified petitioner "was not working at J.C. Penny in November 2004 because [he] stopped working there in September 2004" (<u>id.</u>).[5]  Petitioner also claims defense counsel failed to interview "potential witness

---

[5] Petitioner does not further identify either such individual or elaborate with respect to how they possessed the knowledge he attributes to them.

[Jasmine Kasner], the neighbor who[] witnessed what happened" and "[Dr. Craig Hoffman], the first respondent [d]octor [who] could have been concrete to [P.G.'s] 'postictal' state, her 'unconsciousness.'"  (Pet. at 15, 23.)

To succeed on a claim that counsel was ineffective in failing to call a favorable witness, a federal habeas petitioner must identify the witness, provide the testimony the witness would have given, show the witness was likely to have been available to testify and would have given the proffered favorable testimony, and demonstrate a reasonable probability that, had such testimony been introduced, the jury would have reached a verdict more favorable to the petitioner.  See Alcala v. Woodford, 334 F.3d at 862, 872-73 (9th Cir. 2003).  A petitioner's mere speculation that the witness would have given helpful information if interviewed by counsel and called to the stand is not enough to establish ineffective assistance.  See Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001).

In Dows v. Wood, 211 F.3d 480 (9th Cir. 2000), the Ninth Circuit denied a petitioner's claim that his counsel had been ineffective in failing to investigate and call a witness, where the petitioner only provided his own "self-serving affidavit" and no other evidence, such as "an affidavit from [the] alleged witness," that the witness would have given helpful testimony.  Id. at 486-87; cf. Alcala, 334 F.3d at 872 & n. 3 (distinguishing, inter alia, Dows; finding ineffective assistance of counsel where petitioner submitted interviews reflecting testimony missing witnesses would have provided).  As with the petitioner in Dows, petitioner here submits no more than his own statements in his petition; he provides no affidavit from any of his purported "defense witnesses," or any other evidence showing the testimony they would have given.  Nor does petitioner provide any evidence demonstrating any such witness was available to testify at trial.  Consequently, this claim fails.

                                 v.  Audio Recording

Petitioner claims defense counsel should have objected to a tape recording played by

the prosecution at trial.  (Pet. at 24.)  The recording contained the February 11, 2005

interview between petitioner and Officer Neary.  (Trial Ex. 8A (CT at 207-25); RT at 560,

565.)  Officer Neary testified at trial that there were "technical difficulties" with the

recording, in that "some of the audio [was] difficult to hear."  (RT at 562.)  Petitioner argues

the recording was "tainted" because it was "not a complete production."  (Pet. at 24.)

Petitioner again fails to satisfy either prong of the <u>Strickland</u> test.  First, petitioner

cannot establish ineffectiveness as he does not suggest, let alone show, anything of

importance was missing from the recording or that the recording as played was misleading in

any manner.  Second, petitioner has not shown he was prejudiced by the introduction of such

evidence, not only for the reason that he points to nothing of significance missing from the

recording, but also because Officer Neary was a witness at trial and available to testify as to

the content of petitioner's interview, including any damaging statements petitioner made

therein.

### b.     Exclusion of Seizure Evidence

Petitioner claims the trial court erred in excluding Dr. Fotre's opinion testimony as to

whether "stiff legs" and "red eyes" were "both symptoms . . . of a seizure."  (Pet. at 40.)  This

claim likewise fails.

First, as discussed above, petitioner made no offer as to Dr. Fotre's opinion, if any, on

stiff legs, nor did he ask Dr. Fotre any question on that subject or offer any other witness's

opinion thereon.  Equally if not more importantly, there no foundation in the record to

support a finding by the jury that P.G. had stiff legs; the only evidence offered in that regard

was petitioner's out-of-court statement to his mother, which, as discussed, was properly

excluded by the trial court.

Second, although there was photographic evidence that P.G. had redness in her eyes

(RT at 719), there is nothing in the record to suggest what Dr. Fotre's opinion would have

been as to the significance thereof with respect to a seizure unprovoked by a significant blow

to the head.  Indeed, given the many potential causes of such a symptom, it is highly unlikely

1   red eyes alone would be a sufficient basis for an opinion that P.G. had suffered any seizure,

2   let alone one unprovoked by her fall, and, as the trial court noted, there was nothing else in

3   the record, whether from any witness to the fall or otherwise, to suggest a seizure had

4   occurred.  (RT 722.)

5          Moreover, petitioner has not shown he was prejudiced by the trial court's ruling.

6   Petitioner makes no showing as to the testimony Dr. Fotre would have given.  Further, to the

7   extent petitioner sought through such testimony to explain P.G.'s physical condition,

8   including the redness in her eyes, as something other than the result of an assault, petitioner

9   was allowed to present such evidence in detail through Fotre.  (See Ex. 8 at 16-17) (setting

10   forth Dr. Fotre's testimony as to alternative causes for, inter alia, P.G.'s red eyes, bruising

11   behind ear, and under-eye discoloration).)  In sum, even if the trial court's ruling were in

12   error, petitioner fails to show the result of the proceeding would have been different had the

13   trial court ruled otherwise.

14                c.    Propensity Evidence

15          Petitioner claims the trial court improperly admitted evidence of prior domestic abuse.

16   (Pet. at 26-38.)   As noted above, the trial court, under Evidence Code section 1109 admitted

17   evidence of petitioner's uncharged domestic abuse against C.M. in 1994 and P.G. in 2003.

18   Petitioner can prevail on this claim only if the state court's decision to allow the propensity

19   evidence under section 1109 was "contrary to, or involved an unreasonable application of,

20   clearly established Federal law, as determined by the Supreme Court of the United States."

21   28 U.S.C. § 2254(d).

22          The Supreme Court has left open the question whether a state law allowing admission

23   of propensity evidence violates due process.  See Estelle v. McGuire, 502 U.S. 62, 75 n.5

24   (1991) ("[W]e express no opinion on whether a state law would violate the Due Process

25   Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a

26   charged crime.").  Based on the Supreme Court's reservation of this issue as an "open

27   question," the Ninth Circuit has held a due process right barring the admission of propensity

28

1   evidence has not been "clearly established" within the meaning of section 2254(d).  Alberni

2   v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006); accord Mejia v. Garcia, 534 F.3d 1036,

3   1046 (9th Cir. 2008) (reaffirming Alberni).

     d.  Sentencing Error

5      Petitioner claims the trial court improperly enhanced his sentence because, petitioner

6   argues, the elements of the statutory enhancement for inflicting "great bodily injury," see

7   Cal. Penal Code section 12022.7(e), are included in the elements of the underlying offense of

8   assault on a former cohabitant "resulting in a traumatic condition," see Cal. Penal Code

9   section 273.5(a).  (Pet. at 24-25.)

10      Petitioner was convicted under Penal Code section 273.5, which provides:

11     (a)  Any person who willfully inflicts upon a person who is his or her spouse, former spouse, cohabitant, former cohabitant, or the mother or father of his or

12       her child, corporal injury resulting in a traumatic condition, is guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the

13       state prison for two, three, or four years, or in a county jail for not more than one year, or by a fine of up to six thousand dollars ($6,000) or by both that fine

14       and imprisonment.

15           *  *  *

16     (c)  As used in this section, "traumatic condition" means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious

17       nature, caused by a physical force.

18   Petitioner received the middle term of three years under this statute.  (CT at 394.)

19      California Penal Code section 12022.7 increases the penalty for those criminals who

20   inflict great bodily injury during a domestic violence incident.  It provides, in relevant part:

21     (e)  Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony

22       shall be punished by an additional and consecutive term of imprisonment in the state prison for three, four, or five years.  As used in this subdivision,

23       "domestic violence" has the meaning provided in subdivision (b) of Section 13700.[6]

24

25   //

26       [6] Under section 13700(b), "domestic violence" includes "abuse committed against an

27   adult or minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement

28   relationship."  Cal. Penal Code § 13700(b).

(f)     As used in this section, "great bodily injury" means a significant or substantial physical injury.

Petitioner received a consecutive term of four years under this statute.  (CT at 394.)

As the language of the statute makes clear, "great bodily injury" is not required for a conviction under section 273.5(a); rather, that section refers to "corporal injury resulting in a traumatic condition," which, in turn, is defined by section 273.5(c) to include injury of either a "minor" or a "serious" nature.  By contrast, for the sentence enhancement under section 12022.7 to apply, there must be "great bodily injury," which is defined as "a significant or substantial physical injury."  Cal. Penal Code § 12022.7(f).  In short, because great bodily injury is not an element of the crime of inflicting corporal injury on a cohabitant, there was no sentencing error.

In sum, whether viewed individually, or collectively, petitioner fails to show his claims entitle him to habeas relief.

C.     Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Cases, Rule 11(a).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal).  See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing and, accordingly, a certificate of

1  appealability will be denied.

2  **CONCLUSION**

3       For the reasons stated above, the petition for a writ of habeas corpus is hereby

4  DENIED, and a certificate of appealability is hereby DENIED.

5       The Clerk shall enter judgment in favor of respondent and close the file.

6

7       IT IS SO ORDERED.

8  DATED: September 30, 2011

9                              MAXINE M. CHESNEY

10                             United States District Judge